**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

MARK TASSINARI, RICHARD ESPINOSA,       )
RANDY OWENS, and JONATHAN ANDERSON )
individually and on behalf of all                        )
others similarly situated,                                    )
                                                                          )       Civil Action No.: 1:21-cv-10806
            Plaintiffs,                                            )
                                                                          )       **JURY TRIAL DEMAND**
v.                                                                      )
                                                                          )
THE SALVATION ARMY NATIONAL       )
CORPORATION; THE SALVATION ARMY, )
A NEW YORK CORPORATION                   )
                                                                          )
                                                                          )
            Defendants.                                         )
                                                                          )

---

## FIRST AMENDED CLASS ACTION COMPLAINT

1.       Plaintiffs bring this class action complaint, seeking damages and injunctive relief

on behalf of themselves and others similarly situated against Defendants The Salvation Army

National Corporation and The Salvation Army, a New York Corporation (together, "The

Salvation Army"), pursuant to the Americans with Disabilities Act, 42 U.S.C. §§ 12181 *et seq.*

and 12203 ("ADA"), Section 504 the Rehabilitation Act, 29 U.S.C. § 794 ("Rehabilitation Act"),

and the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* ("FHA"), for excluding from Salvation Army

Adult Rehabilitation Centers and Programs individuals with opioid use disorder (OUD)[1]

participating in medication-assisted treatment (MAT)[2]  and/or denying and/or impeding

---

[1] "Opioid use disorder" or "OUD" is a term that includes disorders related to opioid use, the most severe form of which is often referred to as "addiction." The acronym OUD is often pronounced phonetically, "ood" or "ude" (rhymes with "food" and "rude").
[2] The acronym MAT, for medication-assisted treatment, is often pronounced M-A-T (phonetically, "em-ay-tee") with each letter of the acronym said individually.

1

individuals with OUD access to MAT while enrolled in Salvation Army Adult Rehabilitation

Centers and Programs, and for interfering with protected civil rights, and state as follows upon

information and belief.

## JURISDICTION

2.      This action is brought pursuant to the ADA, the Rehabilitation Act, and the FHA.

3.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331,

because this action arises under federal law.

4.      Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the

events and omissions giving rise to this action occurred within this judicial district and because

the Defendants are subject to personal jurisdiction in this District.

## PARTIES

**Plaintiff Mark Tassinari**

5.      Plaintiff Mark Tassinari is an adult resident of Massachusetts who has OUD, a

chronic brain disease and disability that affects and substantially limits several major life

activities including, but not limited to, sleeping, working, thinking, remembering, eating, and

caring for himself.

6.      Mr. Tassinari also has anxiety, depression, and Post Traumatic Stress Disorder,

disabilities that substantially limit several major life activities.

7.      Mr. Tassinari currently participates in MAT; he takes doctor-prescribed

buprenorphine. He uses MAT only in accordance with his doctor's prescribing instructions as

part of his treatment for OUD.

8.      Mr. Tassinari's treatment for OUD is ongoing and he has experienced numerous

relapses since his expulsion from The Salvation Army ARC program and housing in 2018. He

does not have a permanent address and is in need of rehabilitative treatment and housing. Other than his participation in MAT, Mr. Tassinari meets the requirements to enroll in a Salvation Army ARC and would like the opportunity to do so without ending his participation in MAT.

**Plaintiff Richard Espinosa**

9.     Plaintiff Richard Espinosa is an adult resident of Rhode Island who has OUD, a chronic brain disease and disability that affects and substantially limits several major life activities including, but not limited to, sleeping, working, thinking, remembering, eating, and caring for himself.

10.     Mr. Espinosa currently participates in MAT; he takes doctor-prescribed methadone. He currently uses MAT only in accordance with his doctor's prescribing instructions as part of his treatment for OUD.

11.     Mr. Espinosa's treatment for OUD is ongoing. Other than his participation in MAT, Mr. Espinosa meets the requirements to enroll in a Salvation Army ARC and would like the opportunity to do so without ending his participation in MAT.

**Plaintiff Randy Owens**

12.     Plaintiff Randy Owens is an adult resident of Louisiana who has OUD, a chronic brain disease and disability that affects and substantially limits several major life activities including, but not limited to, sleeping, working, thinking, remembering, eating, and caring for himself.

13.     Mr. Owens also has anxiety, depression, and diabetes with diabetic neuropathy, disabilities that substantially limit several major life activities.

14.      Mr. Owens currently participates in MAT; he takes doctor-prescribed buprenorphine. He currently uses MAT only in accordance with his doctor's prescribing instructions as part of his treatment for OUD.

15.      Mr. Owens's treatment for OUD is ongoing. He does not have a permanent address and is in need of rehabilitative treatment and housing. Other than his participation in MAT, Mr. Owens meets the requirements to enroll in a Salvation Army ARC and would like the opportunity to do so without ending his participation in MAT.

**Plaintiff Jonathan Anderson**

16.      Plaintiff Jonathan Anderson is an adult resident of Missouri who has OUD, a chronic brain disease and disability that affects and substantially limits several major life activities including, but not limited to, sleeping, working, thinking, remembering, eating, and caring for himself.

17.      Mr. Anderson also has anxiety, depression, bipolar disorder, and ADHD, disabilities that substantially limit several major life activities.

18.      Mr. Anderson currently participates in MAT; he takes doctor-prescribed buprenorphine. He uses MAT only in accordance with his doctor's prescribing instructions as part of his treatment for OUD.

19.      Mr. Anderson's treatment for OUD is ongoing. Other than his participation in MAT, Mr. Anderson meets the requirements to enroll in a Salvation Army ARC and would like the opportunity to do so without ending his participation in MAT.

**Defendant The Salvation Army National Corporation**

20.     Defendant The Salvation Army National Corporation is a 501(c)(3) organization incorporated in New Jersey with its headquarters at 615 Slaters Lane, Alexandria, Virginia 22314.

21.     The Salvation Army National Corporation owns, leases, leases to, or operates approximately 143 Adult Rehabilitation Centers and Programs (ARCs)[3] throughout the United States, including the Boston Adult Rehabilitation Center, located at 209 Broadway, Saugus, Massachusetts 01906 ("Boston ARC"), the Providence Adult Rehabilitation Center, located at 201 Pitman Street, Providence, Rhode Island 02906 ("Providence ARC"), the New Orleans Adult Rehabilitation Center, located at 200 Jefferson Highway, New Orleans, LA 70121 ("New Orleans ARC"), and the St. Louis Adult Rehabilitation Center, located at 3949 Forest Park Avenue, St. Louis, MO 63108 ("St. Louis ARC").

22.     The ARCs owned, leased, leased to, or operated by The Salvation Army National Corporation, including the Boston, Providence, New Orleans, and St. Louis Adult Rehabilitation Centers, are places of public accommodation.

23.     The ARCs include and provide housing.

24.     Upon information and belief, The Salvation Army National Corporation receives federal financial assistance.[4]

---

[3] *See* The Salvation Army, https://salvationarmyannualreport.org/financials/ (last visited March 12, 2021).

[4] The Salvation Army, https://salvationarmyannualreport.org/financials/ (last visited May 14, 2021); Sabrina Kiser, *How the Salvation Army Engages the Federal Government with Sabrina Kiser*, Caring Magazine (Sept. 30, 2019), https://caringmagazine.org/19-how-the-salvation-army-engages-the-federal-government-with-sabrina-kiser/;  U.S. Government, https://www.usaspending.gov/ (last visited May 14, 2021).

25.     Upon information and belief, The Salvation Army National Corporation receives federal financial assistance extended to The Salvation Army National Corporation as a whole.

**Defendant The Salvation Army, A New York Corporation ("The Salvation Army Eastern Territory")**

26.     Defendant The Salvation Army, a New York Corporation ("The Salvation Army Eastern Territory") is a 501(c)(3) organization located at 440 West Nyack Road, West Nyack, New York 10994.

27.     The Salvation Army Eastern Territory operates in 12 U.S. states:  Connecticut, Delaware, Northeast Kentucky, Maine, Massachusetts, New Hampshire, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, and Vermont. The Salvation Army Eastern Territory also operates in Puerto Rico and the Virgin Islands.

28.     The Salvation Army Eastern Territory owns, leases, leases to, or operates several Adult Rehabilitation Centers and Programs (ARCs) throughout the eastern United States, including the Boston ARC, and the Providence ARC.

29.     The ARCs owned, leased, leased to, or operated by The Salvation Army Eastern Territory, including the Boston ARC and Providence ARC, are places of public accommodation.

30.     The ARCs include and provide housing.

31.     Upon information and belief, The Salvation Army Eastern Territory receives federal financial assistance.

32.     Upon information and belief, The Salvation Army Eastern Territory receives federal financial assistance extended to The Salvation Army Eastern Territory as a whole.

33.     Upon information and belief, The Salvation Army Eastern Territory receives federal financial assistance extended to The Salvation Army National Corporation as a whole.

## FACTS

### Opioid Use Disorder is a Serious Disability Recognized by the ADA, Rehabilitation Act, and Fair Housing Act

34.     OUD is a chronic brain disease associated with numerous potentially deadly complications. Individuals with OUD experience cravings, increasing tolerance to opioids, withdrawal symptoms, and a loss of control. OUD substantially limits major life activities including, but not limited to, sleeping, working, caring for oneself, thinking, and communicating.

35.     Like other chronic diseases, OUD often involves cycles of relapse and remission. Without treatment or other recovery, individuals with OUD are frequently unable to control their use of opioids. OUD is a progressive illness and can result in permanent harm or premature death.

36.     In 2017, the U.S. Department of Health and Human Services declared the opioid epidemic a public health emergency.[5] In 2019, the Centers for Disease Control and Prevention recorded 49,860 opioid-involved overdose deaths in the United States.[6] OUD remains a serious public health crisis affecting millions throughout the country.

37.     "Drug addiction" – another term for substance use disorders including OUD – is a disability as defined by the Americans with Disabilities Act, Rehabilitation Act, and Fair Housing Act.[7] *See* 42 U.S.C. § 12102; 28 C.F.R. § 36.104 ("The phrase physical or mental impairment includes, but is not limited to . . . drug addiction, and alcoholism."); 45 C.F.R. Pt. 84, App. A; 24 C.F.R. § 100.201 ("The term physical or mental impairment includes, but is not

---

[5] U.S. Dep't of Health and Human Services, *What is the U.S. Opioid Epidemic?* (Apr. 28, 2021), https://www.hhs.gov/opioids/about-the-epidemic/index.html.
[6] National Institute on Drug Abuse, *Overdose Death Rates* (Jan. 29, 2021), https://www.drugabuse.gov/drug-topics/trends-statistics/overdose-death-rates.
[7] The FHA uses the outdated term "handicap" which is synonymous with "disability." This Complaint will use the term "disability" throughout.

limited to…drug addiction (*other than* addiction caused by *current, illegal* use of a controlled substance)" (emphasis added)). Individuals participating in drug rehabilitation programs or seeking drug rehabilitation are protected from discrimination on the basis of their substance use disorder. 42 U.S.C. § 12210(a), (b); 29 U.S.C. § 705(10)(B).

**Medication-Assisted Treatment for Opioid Use Disorder is the Standard of Care**

38.    Medication-assisted treatment (MAT) is the medically-recognized standard of care for treating OUD.[8]

39.    Although some patients can treat their opioid use disorder using other methods, most patients need MAT to achieve long-term recovery.

40.    MAT for OUD involves a doctor's prescription for medications such as methadone, buprenorphine (*e.g.,* Suboxone, Subutex), or naltrexone (Vivitrol) alongside other therapeutic interventions, to better enable people with OUD to overcome their cravings and symptoms of withdrawal.

41.    Methadone, buprenorphine, and naltrexone have been approved by the United States Food and Drug Administration for treatment of opioid dependence.

42.    MAT medications are not strictly interchangeable or one-size-fits-all and are prescribed according to a patient's needs. Although all three MAT medications are approved for treatment of OUD, the specific MAT medication or medications that a doctor prescribes a patient with OUD or that are appropriate for a patient may depend on that patient's individual circumstances, including the side-effects of each medication, age, length of treatment, history of

---

[8] Barbara DiPietro et al., Addressing the Opioid Crisis: Medication Assisted Treatment at Health Care for the Homeless Programs (2019), https://files.kff.org/attachment/Issue-Brief-Addressing-the-Opioid-Crisis-Medication-Assisted-Treatment-at-Health-Care-for-the-Homeless-Programs.

OUD, success in treatment, dosage, and other factors. MAT medications block opioid receptors in the brain, suppressing opioid cravings, and prevent many painful symptoms of withdrawal such as insomnia or disrupted sleep, hot and cold sweats, muscle aches and pains, cramping, nausea, vomiting, diarrhea, and mood swings.

43.     The two most commonly used MAT medications are methadone and buprenorphine.

44.     Both medications facilitate extinction learning because patients learn that they will not get the same "high" from taking opioids.

45.     MAT decreases the risk that someone in OUD recovery will suffer serious medical conditions related to withdrawal, improves retention in treatment (for example, staying enrolled in a residential rehabilitation program), increases abstinence from illicit drugs, and decreases incidence of relapse, overdosing, and death.[9]

46.     MAT is far more effective than detoxification alone, which produces very poor outcomes.[10]

47.     Once OUD patients begin MAT, continued MAT treatment offers the best chance of success.

48.     Forced withdrawal is not medically appropriate for patients being treated with MAT.

---

[9] Shane Darke et al., *Yes, People Can Die From Opiate Withdrawal*, ADDICTION 1 (2016).
[10] National Institute on Drug Abuse, *Medications to Treat Opioid Use Disorder Research Report* (2018), https://www.drugabuse.gov/publications/research-reports/medications-to-treat-opioid-addiction/how-do-medications-to-treat-opioid-addiction-work.

49.     Death is significantly more likely to occur for people with OUD who do not receive MAT treatment in comparison with those who do receive this treatment.[11]

***Plaintiff Mark Tassinari***

50.     Mr. Tassinari, who is 35 and a resident of Massachusetts, began his struggle with OUD almost twenty years ago. He was not able to stop on his own, even though he felt the intense and persistent physical toll the drugs were taking on his body.

51.     Mr. Tassinari's ongoing recovery includes periods of relapse and remission. He has experienced sobriety for long stretches, including when he was 25 and maintained his sobriety with MAT (specifically, buprenorphine) for four-and-a-half years. During that period of hard-won sobriety, he had a driver's license and car, housing, employment, and a meaningful relationship—he considers this period of remission the most successful time of his life.

52.     He has also experienced many lows related to relapse. For example, Mr. Tassinari's struggle with OUD brought him into contact with the criminal justice system and has contributed to many periods of homelessness.

53.     Before he tried MAT, Mr. Tassinari attempted sobriety dozens of times over a five-year period, without success lasting longer than a couple months.

54.     The only treatment for OUD that has worked for Mr. Tassinari is MAT.

55.     After a licensed physician prescribed Mr. Tassinari MAT for the first time, when he was 25 and already a decade into his struggle with OUD, Mr. Tassinari felt like he could sit comfortably in his own skin for the first time in his life.

---

[11] National Institute on Drug Abuse, *Medications to Treat Opioid Use Disorder Research Report* (2018), https://www.drugabuse.gov/publications/research-reports/medications-to-treat-opioid-addiction/how-do-medications-to-treat-opioid-addiction-work.

56.     Ever since that time, MAT, including buprenorphine and methadone, has been a significant part of Mr. Tassinari's ongoing recovery and treatment for OUD.

57.     In or around late 2017, after four-and-a-half years of sobriety and stability, Mr. Tassinari experienced a period of relapse that culminated in his arrest and prosecution for three non-violent OUD-related offenses, including possession of pills.

58.     Although Mr. Tassinari was initially sentenced to probation, he experienced a second relapse during probation that led to a three-month hospitalization for complications arising from OUD and his other mental health issues. During his relapse and hospitalization, Mr. Tassinari was not able to reach his probation officer, which put him in violation of his probation. When he was released from the hospital, Mr. Tassinari turned himself in for the probation violation. A judge sentenced him to a year at Essex County jail.

59.     In or around early 2018, after spending more than a month in Essex County jail, Mr. Tassinari's prison case worker gave him a choice: complete the rest of his one-year sentence in prison, or the State would agree to release him on probation if he agreed to attend The Salvation Army's ARC program for treatment for OUD. Mr. Tassinari was not given any other choices: either jail or The Salvation Army ARC.

60.     Mr. Tassinari, in substance withdrawal and without access to his prescribed psychiatric medications or MAT, was suffering extreme physical and emotional distress in jail. He agreed to the transfer and was placed on probation pending completion of The Salvation Army's 180-day residential drug rehabilitation program at the Boston ARC.

61.     When Mr. Tassinari arrived at the Boston ARC, he participated fully in the rehabilitation program. He knew that The Salvation Army was the only thing between him and jail, so he kept his head down, followed instructions, worked hard, and tried not to complain

(although The Salvation Army was aware of his withdrawal symptoms, including by Mr. Tassinari directly communicating his symptoms), even as he suffered painful withdrawal symptoms and was prohibited from seeking medical help from a doctor.

62.     Mr. Tassinari's repeated requests to The Salvation Army to allow him to seek medical treatment went unanswered. The Salvation Army would not let him leave the ARC to see his doctor and would not provide him with the medical help he needed at the ARC.

63.     Approximately a month into joining The Salvation Army's ARC program, Mr. Tassinari's need to see a doctor to refill his prescriptions became critical. By then, he had been off his psychiatric medications and MAT for approximately three months and was suffering physical pain, anxiety, frayed emotions, loss of appetite, and difficulty sleeping. Every day that Mr. Tassinari could not see a doctor and receive treatment for his OUD was a struggle.

64.     Finally, Mr. Tassinari's probation officer, who was in contact with The Salvation Army, convinced The Salvation Army to allow Mr. Tassinari to see his doctor at Boston Health Care for the Homeless, where he had been a patient for several years.

65.     Mr. Tassinari met with his usual doctor, who immediately expressed concern for Mr. Tassinari's health if he did not resume his MAT regimen. In addition to refilling Mr. Tassinari's other prescriptions, his doctor prescribed buprenorphine (the same widely-used MAT medication Mr. Tassinari took during his four-and-half-year period of sobriety), to assist in recovery from OUD. Mr. Tassinari's prescription included instructions that he should self-administer the medication; a medical professional would not need to administer his doses.

66.     Following his doctor's orders, Mr. Tassinari took his first dose of the medication before returning to The Salvation Army ARC.

67.     Mr. Tassinari did not use any criminalized or non-prescribed drug while he was away from The Salvation Army ARC traveling to and from his doctor's office. He remained committed to his recovery, health, sobriety, and probation conditions, including staying enrolled at The Salvation Army ARC for the full 180-day period of his assignment.

68.     However, when he returned to The Salvation Army ARC, he was required to submit to urinalysis. Mr. Tassinari explained to The Salvation Army that he had taken doctor-prescribed buprenorphine for OUD. His urinalysis confirmed that he had buprenorphine in his system and that he had not taken any criminalized or non-prescribed drug.

69.     The Salvation Army immediately, on or about April 14, 2018, terminated Mr. Tassinari from participation in the ARC program, including his ARC housing, because of its blanket, discriminatory, nationwide policy and practice of prohibiting participants with OUD from receiving MAT even when prescribed directly by their licensed physicians.

70.     In that instant, The Salvation Army forced Mr. Tassinari onto the streets, where he lived outside the margins and faced months of uncertainty, relapse, danger, helplessness, and the looming threat of jail.

71.     During the days remaining of the 180-day ARC program required by the court as a condition of his probation, The Salvation Army did not attempt to accommodate Mr. Tassinari's OUD or revise its policy to ensure that he could continue to participate in the ARC while taking his doctor-prescribed MAT. The Salvation Army did not engage with him, listen to his request to remain enrolled in the ARC with MAT, or even follow up with him after terminating him from the ARC program and removing him from ARC housing.

72.     After Mr. Tassinari's expulsion from The Salvation Army's ARC program, Mr. Tassinari faced extraordinarily difficult and debilitating circumstances, directly resulting from

The Salvation Army's discrimination against him. He became homeless, suffered a harmful relapse, lost many of his personal belongings and personal paper records, did not have reliable access to a phone or computer, lost contact with his probation officer, and required lengthy hospitalization before he could even get back in front of the court for a hearing on his probation conditions.

73.   Because of The Salvation Army's discrimination against Mr. Tassinari through The Salvation Army's expulsion of him from the ARC, it took nearly a year for Mr. Tassinari to get back in front of a judge for a hearing on his probation conditions.

74.   During that hearing, the court learned from Mr. Tassinari that The Salvation Army had terminated him from its ARC program including ARC housing due to him taking doctor prescribed MAT to treat his OUD and The Salvation Army's policy prohibiting participants from using MAT.

75.   Because he was no longer enrolled in The Salvation Army's ARC program, the court found Mr. Tassinari in violation of his probation.

76.   The court ordered Mr. Tassinari to complete the remainder of his probation at The North Cottage Program, a residential treatment facility in Norton, Massachusetts that provides program participants with OUD access to MAT.

77.   With MAT, Mr. Tassinari was able to complete his probation and was released from North Cottage in or around October 2019.

78.   Mr. Tassinari is continuing his fight for sobriety and recovery from OUD with doctor-prescribed MAT. He continues to experience periods of homelessness.

79.   On May 13, 2021, as part of his planning for his housing and rehabilitation needs after he completed an in-patient OUD treatment program at Arbour Hospital in Massachusetts,

Mr. Tassinari contacted the Boston ARC to ask if they would accept him for OUD rehabilitation. Mr. Tassinari disclosed that he was currently taking MAT, and that he had a prescription to continue taking MAT. Although the ARC acknowledged that it had a bed available, The Salvation Army told Mr. Tassinari that he could not have a bed because of his participation in MAT. The Salvation Army further said that if Mr. Tassinari wanted to have the bed and participate in the ARC, he would have to stop taking his MAT.

80.     Based on The Salvation Army advising him of its clear and unambiguous national policy prohibiting the use of doctor-prescribed MAT by participants in its ARC programs, Mr. Tassinari concluded that it would be futile to seek admission to the ARC while taking buprenorphine.

81.     Mr. Tassinari made other housing and rehabilitation arrangements with a facility that would allow him to continue using buprenorphine when he was discharged from Arbour Hospital.

### *Plaintiff Richard Espinosa*

82.     Richard Espinosa, who is 36 and a resident of Rhode Island, has a history of OUD going back nearly 20 years.

83.     After years of painful struggle with his OUD, Mr. Espinosa made the decision to seek medical treatment to secure his recovery.

84.     A doctor prescribed him MAT (methadone).

85.     Mr. Espinosa did not take criminalized drugs for approximately a year and a half while he was participating in MAT and credits MAT with allowing him to restore his stability, maintain relationships with his children, and work on his long-term OUD recovery.

86.     In 2018, Mr. Espinosa experienced a relapse. He was worried that he could not continue his recovery on his own and decided to enroll himself in a rehabilitation program.

87.     Mr. Espinosa had completed The Salvation Army's program once before, around 2010-2011. He contacted the Providence ARC and asked to be readmitted.

88.     Mr. Espinosa shared with The Salvation Army that he had substance use disorders including OUD and that he had remained sober for periods lasting up to around three years using MAT.

89.      The Salvation Army told him that he would need to "detox" before joining the ARC program.

90.     The Salvation Army admitted Mr. Espinosa to the Providence ARC approximately 30 days later, on or about November 1, 2018, after he completed an in-patient detoxification program at another facility.

91.     When Mr. Espinosa arrived at the ARC, he was still experiencing withdrawal symptoms including excessive sweating, painful irregular bowel movements, and headaches.

92.     Mr. Espinosa was aware from his first time at an ARC (in 2010-2011) that The Salvation Army imposed a blackout period for all medical treatment for participants in the first month and had a policy prohibiting the use of MAT specifically. So, even though he desperately needed it, he knew it would be futile to ask the Salvation Army to allow him to receive methadone or other doctor-prescribed MAT.

93.     Even though it was evident that Mr. Espinoza was experiencing painful withdrawal symptoms, The Salvation Army imposed their blackout period on him, refused to permit him to seek medical attention or access MAT, failed to arrange for any medical

assessment regarding his treatment and needs, and required Mr. Espinosa to participate in "work therapy."

94.     Throughout his time at the ARC, The Salvation Army repeatedly told Mr. Espinosa that if he left the program, he would die.

95.     The Salvation Army hung up photographs in the ARC of past participants who had left the program and subsequently died and warned participants that if they did not do things The Salvation Army's way, their pictures would also hang in the ARC.

96.     Although Mr. Espinosa's withdrawal symptoms lasted throughout his stay at the ARC, he was determined to continue fighting for his recovery. He stayed at the ARC for approximately five months.

97.     After leaving the ARC, his doctor prescribed MAT for OUD and diagnosed Mr. Espinosa's painful irregular bowel movements as a symptom of prolonged opioid use and prescribed a treatment regimen that, paired with MAT, greatly reduced Mr. Espinosa's discomfort.

98.     Mr. Espinosa has remained in remission since and continues to take MAT as treatment for OUD.

***Plaintiff Randy Owens***

99.     Randy Owens, who is 54 and a resident of Louisiana, currently has OUD and has a history of OUD lasting many years.

100.     In or around May 2021, Mr. Owens went to the Red River Treatment Center ("Red River"), a medically supervised in-patient detoxification program funded by the state of Louisiana. He spent about one month there – the full length of the program. During that time, Red River treated Mr. Owens with MAT (specifically, buprenorphine).

101.    At the end of the Red River program, in or around June 2021, Red River recommended that Mr. Owens continue his MAT. A doctor at Red River prescribed Mr. Owens a limited supply of buprenorphine to take after leaving the facility and assisted Mr. Owens in scheduling an appointment with a doctor to refill his buprenorphine prescription when he ran out, and to refill his prescription for gabapentin, the medication Mr. Owens had previously used successfully for diabetic neuropathy.

102.    Mr. Owens asked Red River to place him in a longer-term program so that he could continue his recovery.

103.    Red River referred Mr. Owens to the New Orleans ARC. He did not know that The Salvation Army would prohibit him from continuing to take his doctor-prescribed MAT treatment or from seeing his doctor for his other disability (diabetes with diabetic neuropathy).

104.    When Mr. Owens arrived at the ARC in or around June 2021, he had a four-day supply of buprenorphine with him (prescribed by a doctor at Red River) and an appointment with another doctor in a few days to get a refill of buprenorphine and a prescription for gabapentin.

105.    During The Salvation Army's intake process, Mr. Owens disclosed that he had doctor-prescribed buprenorphine with him. The Salvation Army confiscated his buprenorphine for disposal and informed him that the Salvation Army would not allow him to take buprenorphine or go to his doctor's appointment while participating in the ARC program.

106.    Soon after he missed his first dose of buprenorphine at the ARC, Mr. Owens started feeling withdrawal symptoms. His sickness during the first few days was so extreme–including trouble breathing and physical pain – that ARC staff sent him to the Emergency Room for treatment.

107.    When he returned to Salvation Army after a day in the Emergency Room, the pain continued. Mr. Owens repeatedly told The Salvation Army staff that he was in extreme pain and needed his doctor-prescribed buprenorphine as part of his treatment for OUD. The Salvation Army did not allow him access to the buprenorphine, nor did they allow him to see a doctor for treatment for neuropathy related to his diabetes.

108.    Even though he was in severe pain from his untreated OUD and diabetic neuropathy, The Salvation Army required Mr. Owens to work full time in a standing position, exacerbating his pain, in The Salvation Army's retail operation (thrift stores and warehouses) as part of the ARC's "work therapy" program.

109.    After two weeks of enduring this untreated withdrawal and pain, Mr. Owens was desperate for relief and remained committed to his recovery. Through word of mouth, he discovered that two other participants in the ARC had, without The Salvation Army's knowledge, kept their prescribed buprenorphine.

110.    The other participants with doctor-prescribed buprenorphine offered to share it with Mr. Owens.

111.    Desperate to stay off heroin and prohibited from accessing his own doctor-prescribed buprenorphine, Mr. Owens took the buprenorphine he was offered. Almost immediately his symptoms of withdrawal began to recede, and he felt hopeful again that he could continue in the program and achieve his goal of long-term recovery.

112.    After approximately two weeks of his treatment with buprenorphine and a significant reduction in withdrawal symptoms, The Salvation Army asked Mr. Owens to submit to urinalysis. Mr. Owens informed The Salvation Army then that he had been taking buprenorphine as part of his treatment for OUD.

113.    The Salvation Army immediately kicked Mr. Owens out of the program for taking buprenorphine.

### *Plaintiff Jonathan Anderson*

114.    Jonathan Anderson is 34 and a resident of Missouri.

115.    When Mr. Anderson was 15, he developed OUD.

116.    Mr. Anderson experienced several periods of incarceration and homelessness – all related to his substance use disorders, including OUD – in his 20s.

117.    In 2018, Mr. Anderson first sought help from a doctor for his OUD. His doctor prescribed buprenorphine. While he was taking buprenorphine, Mr. Anderson did not use heroin and was able to maintain jobs and relationships.

118.    In August 2019, Mr. Anderson experienced a relapse. He checked himself into the St. Louis ARC. When he checked himself in, he did not know that he would not be permitted to receive MAT at the ARC.  When he asked for MAT, The Salvation Army denied his request and told him that if he wanted MAT, he would have to leave the ARC program. Mr. Anderson completed the ARC program approximately six months after checking in.

119.    Mr. Anderson began taking doctor-prescribed MAT again in early 2020, shortly after completing the ARC program.

120.    In late 2020, Mr. Anderson experienced another period of relapse, resulting in another order of incarceration related to his continued struggle with OUD.

121.    He was sentenced to eight years in prison, but the state of Missouri permitted Mr. Anderson to take buprenorphine while incarcerated and serving his sentence.

122.    After three months serving his sentence, the court offered Mr. Anderson the opportunity to be released more than 7 years early if he served six months of probation in a drug rehabilitation program.

123.    The court selected and ordered that Mr. Anderson be placed at the St. Louis ARC for his probation. Mr. Anderson was not given any input into the decision or offered any other rehabilitation option.

124.    Before he was allowed to attend, The Salvation Army required Mr. Anderson to complete a five-day "detoxification" program to get the buprenorphine prescribed to him by the treating physician in the prison out of his system.

125.    When he arrived at the ARC, in January 2021, Mr. Anderson again asked about receiving buprenorphine, as prescribed by his physician. The Salvation Army informed Mr. Anderson that its policy had not changed, and he could not resume taking doctor-prescribed buprenorphine at the ARC.

126.    Mr. Anderson experienced painful withdrawal symptoms and cravings during his first month at the ARC. During this "blackout" period, The Salvation Army prohibited Mr. Anderson from seeing any doctors or leaving the ARC.

127.    After the "blackout" period, in February 2021, The Salvation Army permitted Mr. Anderson to visit his doctor, who was both familiar with his medical history and experienced in treating OUD. His doctor prescribed him buprenorphine and directed him to start treatment immediately.

128.    Mr. Anderson was fearful that he could be held in violation of probation and sent back to jail to complete his eight-year sentence if he followed his doctor's prescribed treatment. He explained to his doctor that if he took buprenorphine, he could get kicked out of the ARC,

which would be a violation of his probation. He thus declined the prescription and medical advice of his treating physician.

129.    Three months (halfway) through the ARC program, Mr. Anderson's cravings and withdrawal symptoms intensified and he feared that he would start using criminalized drugs if he did not get medical help. Mr. Anderson returned to his doctor who again strongly recommended that Mr. Anderson begin his prescribed treatment plan with buprenorphine.

130.    Mr. Anderson was committed to his recovery and desperate to maintain his sobriety after he completed the ARC program. After careful consideration, he agreed to follow his doctor's orders and accepted the prescription for buprenorphine.

131.    Mr. Anderson promptly informed his probation officer that he was taking buprenorphine, as prescribed by his doctor, even though it was a violation of The Salvation Army's policy. His probation officer agreed with him that it was appropriate to follow his doctor's orders and did not discipline him for violating The Salvation Army's policy prohibiting MAT.

132.    The Salvation Army did not discover Mr. Anderson's commencement of MAT treatment. The ARC did not require him to submit to urinalysis during the last three months of the program, and Mr. Anderson was able to successfully complete The Salvation Army's program without disruption.

133.    Mr. Anderson graduated from the ARC in July 2021; he is still taking buprenorphine and maintaining his sobriety.

**The Salvation Army**

134.    The Salvation Army describes itself as an international movement related to evangelical Christianity.[12] Defendants are principally engaged in the business of providing education, health care, housing, and social services, within the meaning of and for the purpose of applying federal anti-discrimination laws.

135.    "The administration of The Salvation Army is top-down and autocratic, in true military style[.]"[13] It has a unified mission and centralized control; The Salvation Army's international motto is "One Army, One Mission, One Message."[14]

136.    In the United States, The Salvation Army operates through a hierarchy of related 501(c)(3) organizations that operate as a single enterprise.

137.    The Salvation Army includes a national headquarters (Defendant "The Salvation Army National Corporation"), headed by a "National Commander," and four "territorial headquarters" run by "Territorial Commanders," representing each of four regions of the United States ("Territories"): Eastern (Defendant The Salvation Army, a New York Corporation), Southern (The Salvation Army, a Georgia Corporation), Western (The Salvation Army, a California Corporation), and Central (The Salvation Army, an Illinois Corporation).[15]

---

[12]The Salvation Army, https://www.salvationarmyusa.org/usn/about/ (last accessed July 23, 2021).

[13] The Salvation Army, https://ctri.salvationarmy.org/SNE/Organizational (last accessed May 14, 2021).

[14] The Salvation Army, https://www.salvationarmy.org/ihq/vision (last accessed May 14, 2021).

[15] The Salvation Army, https://ctri.salvationarmy.org/SNE/Organizational (last accessed May 14, 2021).

138.    The National Commander, who serves as head of Defendant The Salvation Army National Corporation, coordinates and directs Salvation Army functions and policies nationwide by also serving as the Chairperson of the Board for each of the Territories.[16]

139.    Additionally, national uniform Salvation Army policies, which apply across all Territories of The Salvation Army, are agreed upon by the Commissioners' Conference, which is presided over by the National Commander and includes leadership from each of the Territories, including the Territorial Commanders.[17]

140.    Each of the Territories acts in coordination with each other and The Salvation Army National Corporation to administer Adult Rehabilitation Centers and Programs in the United States, including to set and enforce uniform policies and procedures related to ARC program participants' access to MAT, including denial of ARC services to individuals participating in MAT.

141.    The Salvation Army's ARCs operate pursuant to a single, common, nationwide discriminatory policy and practice regarding MAT treatment, which has been in place at all times relevant to this case and continues to be in place.

142.    The Salvation Army National Corporation contributes funding to each of the Territories, including Defendant The Salvation Army, a New York Corporation, to administer ARC services.

143.    The Salvation Army's medication policy, which includes a nationwide prohibition on MAT at ARCs, does not arise out of The Salvation Army's religious beliefs.

---

[16] The Salvation Army, https://ctri.salvationarmy.org/SNE/Organizational (last accessed May 14, 2021).
[17] The Salvation Army, https://ctri.salvationarmy.org/SNE/Organizational (last accessed August 9, 2021).

144.     The Salvation Army allows MAT, including buprenorphine, in some of its programs, while preventing individuals enrolled in its ARCs from accessing MAT.[18]

145.     Although The Salvation Army prohibits MAT in its ARCs, it recognizes that MAT is "the gold standard of care when treating opiod [sic] addiction disorders."[19]

146.     The operation of The Salvation Army's ARCs is deeply entangled with the courts, jails, prisons, federal government, and state and local agencies.

147.     The Salvation Army, including The Salvation Army National Corporation and The Salvation Army, a New York Corporation holds itself out to courts, jails, prisons, probation departments, and other state and local agencies as a provider of rehabilitation services for individuals with substance use disorders.

148.     The Salvation Army, including The Salvation Army National Corporation and The Salvation Army, a New York Corporation, voluntarily entangles itself with the state – by soliciting the courts, jails, prisons, probation departments, and other state and local agencies to send individuals with substance use disorders to ARCs for rehabilitative treatment.

149.     The Salvation Army, including The Salvation Army National Corporation and The Salvation Army, a New York Corporation, voluntarily entangles itself with the state by

---

[18] The Salvation Army Harbor Light program uses MAT including buprenorphine (https://centralusa.salvationarmy.org/emi/harbor-light/) (last accessed August 20, 2021); The Salvation Army's contract with the Department of Corrections in Alaska requires "evidence-based substance abuse treatment" (https://doc.alaska.gov/doc/DOC%20and%20Salvation%20Army%20team%20up%20to%20provide%20substance%20abuse%20treatment.pdf); The Salvation Army's "Licensed Treatment Centers" use MAT including buprenorphine and acknowledge, "MAT is considered by experts to be the gold standard of care when treating opio[i]d addiction disorders." (https://centralusa.salvationarmy.org/usc/licensed-treatment-centers/) (last accessed August 20, 2021).

[19] https://centralusa.salvationarmy.org/usc/licensed-treatment-centers/ (last accessed August 20, 2021).

obtaining funds from the Supplemental Nutrition Assistance Program as part of its administration of ARCs nationwide.

150.     ARC programs and services are places of public accommodation.

151.     ARC programs and services include and provide housing.

### The Salvation Army's Adult Rehabilitation Centers and Programs

152.     The Salvation Army operates approximately 143 residential Adult Rehabilitation Centers and Programs (ARCs) in the United States,[20] purportedly to assist individuals with recovery from substance use disorders including OUD.[21]

153.     ARCs provide participants with housing and basic living necessities for approximately six months, during which time participants are expected to live on site, be sober, attend church, and work full-time for The Salvation Army's retail operations (thrift stores) without wages.

154.     The Salvation Army relies on a steady stream of marginalized program participants who do not have anywhere else to go.

155.     The Salvation Army is the largest provider of purportedly "no-cost" adult rehabilitation for OUD in the United States.

156.     In many communities, The Salvation Army's ARCs are the only rehabilitation option available to people with OUD and limited means.

157.     Moreover, The Salvation Army's ARCs receive many program participants directly from court placements, probation, or prison, enrolling individuals, like Plaintiffs

---

[20] *See* The Salvation Army, https://salvationarmyannualreport.org/financials/ (last visited March 12, 2021).
[21] *See* The Salvation Army, https://www.salvationarmyusa.org/usn/combat-addiction/ (last visited March 12, 2021).

Tassinari and Anderson, who attend rehabilitation at The Salvation Army as an alternative, provided by the State, to jail.

158.     For program participants diverted from prisons, jails, and/or probation programs as ordered, overseen, or approved by the state or federal court or government officials, The Salvation Army's ARCs regularly communicate with these government officials, including probation officers, regarding the participants' compliance with the ARC's programs. The Salvation Army informs these officials if participants completing probation or parole terms at an ARC are expelled from the program, knowing that this report may lead to negative consequences, including arrest or jail, for the expelled participant by the overseeing government official.

159.     The Salvation Army purports to enroll program participants without charge.

160.     In reality, The Salvation Army requires program participants to work full-time (and sometimes overtime) at The Salvation Army without wages.

161.     The Salvation Army requires participants to apply for government benefits (like the federal Supplemental Nutrition Assistance Program (SNAP)) and assign those benefits to The Salvation Army.

162.     Although there is substantial consensus among physicians that MAT is the standard of care for OUD, The Salvation Army has a national policy and practice of prohibiting MAT, even for those who are already taking prescribed MAT medications at the time they seek (or are ordered by a court to participate in) rehabilitation at The Salvation Army's ARCs.

163.     Defendants' discriminatory policies and practices present individuals participating in MAT with an impossible decision: stop taking doctor-prescribed medications before enrolling in The Salvation Army's rehabilitation program, risking cravings, painful withdrawal, and other

serious physical symptoms – including greatly increasing the risk of death from OUD – or forego The Salvation Army's rehabilitation programs and services – including housing – altogether.

164.    For individuals who need MAT but do not yet have a prescription or whose prescription needs to be refilled, enrolling in The Salvation Army's rehabilitation program means forgoing their best chance of long-term recovery.

165.    For many, including Plaintiffs Tassinari and Anderson, whose participation in The Salvation Army's rehabilitation program was a probation condition, forgoing such participation risks a jail sentence.

166.    For others, forgoing rehabilitation or stopping MAT may exacerbate OUD symptoms, lead to relapse, and substantially reduce the chance of successful long-term recovery.

**The Salvation Army Excludes and Discriminates Against Plaintiffs and Members of the Proposed Class Because of Their Participation in or Need for Doctor-Prescribed MAT**

167.    At all times relevant to this case, The Salvation Army has had in place a policy that discriminates against Plaintiffs and other individuals with OUD who use doctor-prescribed MAT in ARC program and services including housing. This policy remains in place.

168.    The Salvation Army's policy of prohibiting participants and residents from obtaining MAT treatment applies in its ARC program and services including housing nationwide.

169.    As a result, The Salvation Army denies thousands of individuals like Plaintiffs access to MAT while enrolled in ARC program and services including housing nationwide.

170.    The Salvation Army denied Plaintiff Tassinari access to doctor-prescribed MAT in 2018 in its ARC program and services including housing.

171.    The Salvation Army denied Plaintiff Espinosa access to doctor-prescribed MAT in 2018 and 2019 in its ARC program and services including housing.

172.    The Salvation Army denied Plaintiff Anderson access to doctor-prescribed MAT in 2019 and 2021 in its ARC program and services including housing.

173.    The Salvation Army denied Plaintiff Owens access to doctor-prescribed MAT in 2021 in its ARC program and services including housing.

174.    The Salvation Army refuses to admit to its ARC program and services including housing individuals who are participating in MAT.

175.    The Salvation Army refused to admit Plaintiff Anderson to its ARC program and services including housing in January 2021 because of his participation in doctor-prescribed MAT.

176.    The Salvation Army required Plaintiff Anderson to "detoxify" from taking doctor-prescribed MAT prior to admission to its ARC program.

177.    The Salvation Army refused to admit Plaintiff Tassinari to its ARC program and services including housing on May 13, 2021, because of his participation in doctor-prescribed MAT.

178.    The Salvation Army has a national policy and practice of expelling any individual who participates in MAT from its ARC program and services including housing without regard to the medical necessity of MAT for those individuals and without attempting to make reasonable modifications necessary due to their disabilities.

179.    The Salvation Army expelled Plaintiff Tassinari from its ARC program and services including housing on or around April 14, 2018, because of his participation in doctor-prescribed MAT. The Salvation Army did not attempt to make reasonable modifications necessary due to his disability.

180.     The Salvation Army expelled Plaintiff Owens from its ARC program and services including housing on or around July 2021 because of his participation in MAT. The Salvation Army did not attempt to make reasonable modifications necessary due to his disability.

181.     The Salvation Army's blanket policy discriminating against individuals participating in MAT means that many individuals with OUD cannot access rehabilitation services at all, and those who do enroll in The Salvation Army's ARC program and services including housing cannot access medically necessary MAT.

182.     Due to The Salvation Army's discriminatory policy, The Salvation Army discriminated against and excluded Plaintiffs from its ARC program and services including housing. This discrimination and exclusion is repeated, continuous, and ongoing.

183.     Due to The Salvation Army's discriminatory policy, Plaintiffs have been and continue to be prevented from participating in and/or returning to its ARC program and services including housing.

184.     Plaintiffs need or needed to participate in MAT for treatment of their OUD at all times relevant to this case.

185.     The Salvation Army has a policy of permitting individuals expelled from its ARC program and services including housing, or who voluntarily left, to resume participation in its ARC program and services including housing if the specific ARC has capacity and the individual meets The Salvation Army's conditions, including the unlawful discriminatory condition of not taking doctor-prescribed MAT.

**Class Allegations**

186.     Plaintiffs Tassinari, Espinosa, Owens, and Anderson bring this class action pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of the

following Class:  all individuals with OUD who are or were excluded from participating in The

Salvation Army's ARCs in the United States because of their use of doctor-prescribed MAT

drugs and/or are or were denied access to, and/or are or were impeded from receiving, doctor-

prescribed MAT drugs while participating in The Salvation Army ARCs in the United States. As

used herein, the term MAT drugs includes methadone (including methadone with

hydrochloride), buprenorphine (including buprenorphine with naloxone), and naltrexone.

187.     Numerosity—Fed. R. Civ. P. 23(a)(1).  The members of the Class are so

numerous that joinder of all members is impracticable. The exact number or identification of the

members of the Class is presently unknown. Upon information and belief, the Class includes

thousands of individuals across the country. Upon information and belief, the identity of the

members of the Class is ascertainable and can be determined based on available records

maintained by Defendants. An estimated 150,000 individuals with substance use disorders go

through Defendants' ARCs each year.[22] Joinder of all members of the proposed Class would be

impracticable because, without limitation, the Class consists of numerous marginalized

individuals who are geographically diverse, these individuals are very difficult to identify, and

they are unlikely to be able to bring individual suits. Thus, the numerosity requirement is easily

satisfied here.

188.      Predominance of Common Questions—Fed. R. Civ. P. 23(a)(2), 23(b)(3).  There

are multiple questions of law and fact common to the Class that will predominate over questions

---

[22]Kenneth Anderson, *"Work Therapy" – How the Salvation Army's Chain of Rehabs Exploits Unpaid Labor*, The Influence (Nov. 21, 2016), https://www.prisonlegalnews.org/news/2016/nov/21/work-therapyhow-salvation-armys-chain-rehabs-exploits-unpaid-labor/#:~:text=There%20are%20119%20ARC%20rehabs,rehabs%20at%20any%20given%20time.

affecting only the individual members. The core questions in this case are legal: whether Defendants violated the ADA, Rehabilitation Act, and FHA by (1) refusing to provide services to individuals participating in MAT, and/or (2) refusing to permit individuals enrolled in its ARCs to participate in MAT, and/or (3) impeding individuals enrolled in its ARCs from participating in MAT. Such an inquiry includes several common questions of law, including whether The Salvation Army's operation of ARC programs and services including housing is covered by the ADA, Section 504 Rehabilitation Act, and FHA; whether the ADA, Rehabilitation Act, and FHA prohibit The Salvation Army from excluding individuals from ARCs for participating in doctor-prescribed MAT; whether the ADA,  Rehabilitation Act, and FHA prohibit The Salvation Army from denying ARC participants from accessing MAT; and whether the ADA, Rehabilitation Act, and FHA require The Salvation Army to put in place nondiscriminatory policies and practices and/or to provide reasonable accommodations where necessary to allow full and equal participation by people with disabilities. These common questions predominate over individual inquiries. Class damages will be determinable as an aggregate or calculable by a formula.

189.    Typicality—Fed. R. Civ. P. 23(a)(3).  Plaintiffs' claims are typical of the claims of the Class because they and all proposed members of the Class were and continue to be subject to, and affected by, The Salvation Army's discriminatory policies and practices alleged herein.

190.    Adequacy—Fed. R. Civ. P. 23(a)(4); 23(g)(1).  Plaintiffs are adequate representatives of the Class because they are each a member of the Class and their interests do not conflict with the interests of the members of the Class they seek to represent. Plaintiffs are represented by experienced and competent Class Counsel. Class Counsel have litigated scores of class actions, including cases brought under federal civil rights statutes including the ADA, Rehabilitation Act, and FHA. Plaintiffs' counsel intend to prosecute this action vigorously for

the benefit of the entirety of the Class. Plaintiffs and Class Counsel can fairly and adequately protect the interests of all Members of the Class.

191.    <u>Action on Grounds Generally Applicable to the Class – Fed. R. Civ. P. 23(b)(2).</u> Based on their nationwide policies and practices, Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or declaratory relief with respect to the Class as a whole.

192.    <u>Superiority—Fed. R. Civ. P. 23(b)(3)</u>.  The class action is superior to other available methods for fairly and efficiently adjudicating this controversy because individual litigation of the claims of members of each Class would be impracticable and individual litigation would be unduly burdensome to the courts. Without the class action vehicle, the Classes would have no reasonable remedy and would continue to suffer losses. Further, individual litigation has the potential to result in inconsistent or contradictory judgments. There is no foreseeable difficulty in managing this action as a class action and it provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

**<u>Count I – Violation of the Americans With Disabilities Act</u>**

193.    Plaintiffs incorporate by reference the foregoing paragraphs as if fully alleged herein.

194.    Plaintiffs bring this claim on their own behalf and on behalf of the proposed Class.

195.    At all times relevant to this action, Plaintiffs were and are each qualified individuals with a disability within the meaning of the ADA.

196.    Plaintiffs have OUD, a chronic brain disease that substantially limits one or more of their major life activities.

197.    "Drug addiction" – another term for substance use disorders including OUD – is a "disability" recognized by the Americans with Disabilities Act.  *See* 42 U.S.C. § 12102; 28 C.F.R. § 36.104 ("The phrase physical or mental impairment includes, but is not limited to . . . drug addiction, and alcoholism.").

198.    Individuals participating in drug rehabilitation programs or seeking drug rehabilitation are protected from discrimination on the basis of their substance use disorder. 42 U.S.C. § 12210(b).

199.    Plaintiffs have, are regarded as having, and have a record of having, such disability.

200.    Plaintiffs are otherwise qualified to enroll in Defendants' Adult Rehabilitation Centers and Programs because they meet the program criteria.[23]

201.    Plaintiffs have been directed by their physicians to participate in doctor-prescribed MAT, including buprenorphine, methadone, and/or other prescribed MAT medications, as part of their treatment for OUD, and are currently participating in MAT.

202.    Defendants are each a "private entity," as defined in the ADA, 42 U.S.C. § 12181(6).

203.    Defendants own, operate, lease, or lease to ARCs throughout the United States, including the Boston ARC, the Providence ARC, the New Orleans ARC, and the St. Louis ARC, and purport to provide residential rehabilitation services including housing, food, and "work therapy" for individuals with substance use disorders including OUD.

---

[23] https://www.salvationarmyusa.org/usn/combat-addiction/ (last visited May 14, 2021).

204.    Defendants' ARCs are "public accommodations" within the meaning of the ADA, because they are (among other things) "homeless shelters" or "other social service center establishment[s]." 42 U.S.C. § 12181(7)(K).

205.    Defendants are subject to the ADA and its corresponding regulations in providing services and benefits to Plaintiffs and the members of the proposed Class.

206.    At all times relevant to the facts in this Complaint, Defendants were and continue to be obligated under the ADA not to discriminate against Plaintiffs and members of the proposed Class on the basis of disability including OUD and participation in doctor-prescribed MAT, in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations in their ARCs.

207.    Defendants repeatedly violated and continue to violate the ADA by denying services at ARCs to Plaintiffs and other individuals participating in MAT.

208.    Defendants repeatedly violated and continue to violate the ADA by failing to accommodate Plaintiffs and other individuals who need MAT at ARCs.

209.    Defendants repeatedly violated and continue to violate the ADA by failing to modify their policies, practices, or procedures to afford Plaintiffs and other individuals who use or need MAT access to its ARCs.

210.    Defendants repeatedly violated and continue to violate the ADA by denying Plaintiffs and other individuals in ARCs access to MAT.

211.    Defendants repeatedly violated and continue to violate the ADA by imposing and applying eligibility criteria that screen out or tend to screen out Plaintiffs and other individuals who participate in MAT or need MAT from fully and equally enjoying ARCs.

212.    Defendants repeatedly violated and continue to violate the ADA by interfering with and/or retaliating against Plaintiffs and other individuals who participate in MAT or need MAT and participate in or seek to participate in Defendants' ARC program and services.

213.    Unless and until Defendants cease their discrimination, interference, and retaliation, and make reasonable modifications in policies, practices, and procedures and implement the same to permit Plaintiffs and other individuals who participate in or need MAT to enroll and remain enrolled in ARCs, Plaintiffs and the members of the proposed Class will continue to be denied full and equal access to and enjoyment of the services, goods, facilities, privileges, advantages, and accommodations that Defendants provide at  their ARCs.

214.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the members of the proposed Class have suffered and continue to suffer irreparable harm including threat of imminent physical injury, pain and suffering, emotional distress, humiliation, hardship and anxiety, serious illness, and death.

### Count II – Rehabilitation Act 29 U.S.C. § 794

215.    Plaintiffs incorporate by reference the foregoing paragraphs as if fully stated herein.

216.    Plaintiffs bring this claim on their own behalf and on behalf of each proposed Class.

217.    At all times relevant to this action, Plaintiffs were and are each a qualified individual with a disability within the meaning of Section 504 of the Rehabilitation Act.

218.    Plaintiffs have OUD, a chronic brain disease that substantially limits one or more of his major life activities.

219.    "Drug addiction" – another term for substance use disorders including OUD – is a disability recognized by the Rehabilitation Act. See 45 C.F.R. Pt. 84, App. A.

220.    Individuals participating in drug rehabilitation programs or seeking drug rehabilitation are protected from discrimination on the basis of their substance use disorder. 42 U.S.C. § 12210(b); 29 U.S.C. § 705(10)(B).

221.    Plaintiffs have, are regarded as having, and have a record of having such disability.

222.    Plaintiffs are otherwise qualified to enroll in Defendants' ARCs because they meet the program criteria.

223.    Plaintiffs have been directed by their physicians to participate in doctor-prescribed MAT, including buprenorphine, methadone, and/or other prescribed MAT medications, as part of their treatment for OUD, and currently participate in MAT.

224.    Defendants' ARCs are each programs or activities receiving federal financial assistance.

225.    Defendants receive federal financial assistance.

226.    Defendants are principally engaged in the business of providing education, health care, housing, or social services, within the meaning of and for the purpose of applying federal anti-discrimination laws.

227.    Defendants own, operate, lease, lease to, and/or manage ARCs throughout the United States, including the Boston ARC, the Providence ARC, the New Orleans ARC, and the St. Louis ARC, and purport to provide residential rehabilitation services including housing, food, and "work therapy" for individuals with substance use disorders including OUD.

228.     Defendants receive federal financial assistance directly from the federal government, and from individuals participating in ARCs who are required to apply for and remit federal financial assistance such as Supplemental Nutrition Assistance Program funds to Defendants as a condition of enrolling in ARCs.

229.     Defendants are subject to the Rehabilitation Act and its corresponding regulations in providing services and benefits to Plaintiffs and the members of the proposed Class.

230.     Defendants are and were obligated under the Rehabilitation Act not to exclude Plaintiffs and members of the proposed Class from participation in, deny them the benefits of, or subject them to discrimination under any of Defendants' programs or activities on the basis of disability including OUD and participation in doctor-prescribed MAT.

231.     Defendants repeatedly violated and continue to violate the Rehabilitation Act by denying services at ARCs to Plaintiffs and other individuals participating in MAT.

232.      Defendants repeatedly violated and continue to violate the Rehabilitation Act by failing to accommodate Plaintiffs and other individuals who need MAT at ARCs.

233.     Defendants repeatedly violated and continue to violate the Rehabilitation Act by failing to make reasonable accommodations in its policies, practices, or procedures to afford Plaintiffs and other individuals who use or need MAT access to its ARCs.

234.     Defendants repeatedly violated and continue to violate the Rehabilitation Act by denying Plaintiff and other individuals in ARCs access to MAT.

235.     Defendants repeatedly violated and continue to violate the Rehabilitation Act by imposing and applying eligibility criteria that screen out or tend to screen out Plaintiffs and other individuals who participate in MAT or need MAT from fully and equally enjoying ARCs.

236.     Defendants repeatedly violated and continue to violate the Rehabilitation Act by retaliating against Plaintiffs and other individuals who participate in MAT or need MAT and participate in or seek to participate in Defendants' ARC program and services.

237.     Unless and until Defendants cease their discrimination and retaliation, and make reasonable modifications in policies, practices, and procedures and implement the same to permit Plaintiffs and other individuals who participate in or need MAT to enroll and remain enrolled in ARCs, Plaintiffs and the members of the proposed Classes will continue to be denied full and equal access to and enjoyment of the services, goods, facilities, privileges, advantages, and accommodations that Defendants provide at their ARCs.

238.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the proposed Class have suffered and/or continue to suffer irreparable harm including physical injury, pain and suffering, emotional distress, humiliation, hardship and anxiety, serious illness, and death.

## Count III – Fair Housing Act

239.     Plaintiffs incorporate by reference the foregoing paragraphs as if fully stated herein.

240.     Plaintiffs bring this claim on their own behalf and on behalf of the proposed Class.

241.     At all times relevant to this action, Plaintiffs were and are each an individual with a handicap[24] within the meaning of the Fair Housing Act.

---

[24] The Fair Housing Act uses the term "handicap," *see* 42 U.S.C. § 3602(h), while the ADA uses the modern and preferred term "disability," *see* 42 U.S.C. § 12102(1).

242.    Plaintiffs have OUD, a chronic brain disease that substantially limits one or more of their major life activities.

243.    Drug addiction – another term for substance use disorders including OUD – is a disability recognized by the Fair Housing Act, 24 C.F.R. § 100.201 ("The term physical or mental impairment includes, but is not limited to…drug addiction (other than addiction caused by current, illegal use of a controlled substance)" (emphasis added).

244.    Plaintiffs have, are regarded as having, and have a record of having such handicap.

245.    Plaintiffs are otherwise qualified to enroll in Defendants' ARCs because they meet the program criteria.

246.    Plaintiffs have been directed by their physicians to participate in doctor-prescribed MAT, including buprenorphine, methadone, and/or other prescribed MAT medications, as part of their treatment for OUD, and currently participate in MAT.

247.    Defendants own, operate, lease, and/or manage ARCs throughout the United States, including the Boston ARC, the Providence ARC, the New Orleans ARC, and the St. Louis ARC, and purport to provide residential rehabilitation services including housing for individuals with substance use disorders including OUD.

248.    Defendants are subject to the FHA and its implementing regulations in their provision of housing as part of their ARC program and services.

249.    Defendants repeatedly violated and continue to violate the FHA by making unavailable or denying a dwelling to Plaintiffs and other individuals with OUD due to their use of MAT.

250.     Defendants repeatedly violated and continue to violate the FHA by discriminating against Plaintiffs and other individuals with OUD due to their use of MAT in the provision of services or facilities in connection with a dwelling.

251.     Defendants repeatedly violated and continue to violate the FHA by refusing to grant reasonable accommodations in rules, policies, practices or services to Plaintiffs and other individuals with OUD who use MAT and/or by having a blanket prohibition on the use of MAT.

252.     Defendants repeatedly violated and continue to violate the FHA by coercing, intimidating, threatening, and/or interfering with Plaintiffs and other individuals who participate in MAT or need MAT and participate in or seek to participate in Defendants' ARC program and services.

253.     Unless and until Defendants cease their discrimination, coercion, intimidation, threats and/or interference, make reasonable accommodations in rules, policies, practices, or services and implement the same to permit Plaintiffs and other individuals who participate in or need MAT to enroll and remain enrolled in ARCs, Plaintiff and the members of the proposed Class will continue to be discriminated against in violation of the Fair Housing Act and denied the equal opportunity to use and enjoy ARC dwellings.

254.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the proposed Class have suffered and/or continue to suffer irreparable harm including physical injury, pain and suffering, emotional distress, humiliation, hardship and anxiety, serious illness, and death.

**Prayer for Relief**

**WHEREFORE**, Plaintiffs, on behalf of themselves and the proposed Class, demand a jury trial for all issues so appropriate and request that this Court order the following relief:

A.      Certify this action as a class action pursuant to Rule 23(b)(2) and/or 23(b)(3) of the Federal Rules of Civil Procedure, certify the Class defined above; appoint Plaintiffs Mark Tassinari, Richard Espinosa, Randy Owens, and Jonathan Anderson as representatives for the Class in regard to the claims against Defendant The Salvation Army National Corporation; appoint Plaintiffs Mark Tassinari and Richard Espinoza as class representatives in regard to the claims against Defendant The Salvation Army, a New York Corporation,  and appoint undersigned counsel as counsel for the Class;

B.      Issue a declaratory judgment that Defendants' conduct described above violates the rights of the Plaintiffs and the proposed Class under the ADA, the Rehabilitation Act, the Fair Housing Act, 42 U.S.C. § 3601 *et seq*., and the implementing regulations for each.

C.      Issue an injunction requiring Defendants to come into full compliance with the requirements of the ADA, Rehabilitation Act, and FHA including but not limited to:

1.   Changing its policies to permit participants in ARC programs nationwide to participate in MAT, if prescribed by a physician, and to meet with and/or contact a physician concerning such prescription at any time during such participation;

2.   Immediately issuing a written statement announcing the policy change referenced above and publicizing it in a fashion designed to reach individuals (a) who may have been affected by past discrimination, indicating that they are welcome to reapply to participate in the ARC; and (b) who may currently be in need of the ARC's services but are being deterred by Defendants' discriminatory policies; and

3.   Conducting an immediate review of all current participants in their ARC programs for possible OUD history or experience and provide participants with immediate access to OUD physicians to consider whether MAT should be commenced as it is the current standard of care for OUD.

42

D.      A judgment compensating the Plaintiffs and the proposed Class for the damages that they suffered as a result of Defendant The Salvation Army National Corporation's unlawful conduct in an amount to be determined at trial;

E.      A judgment compensating Plaintiffs Tassinari and Espinosa and members of the proposed Class for the damages they suffered as a result of Defendant The Salvation Army, a New York Corporation's unlawful conduct in an amount to be determined at trial;

F.      Punitive damages against the Defendants and in favor of the individual Plaintiffs and members of the Class as appropriate under the Fair Housing Act, to be determined according to proof;

G.      Pre- and post-judgment interest as permitted by law;

H.      An order and judgment granting Plaintiffs' reasonable attorneys' fees and costs; and

I.      Such other and further relief as this Court deems just and proper.

Dated: August 23, 2021                          Respectfully submitted,


                                                /s/Benjamin Elga
                                                Benjamin Elga (Bar No. 697933)
                                                Lucy B. Bansal* (D.C. Bar No. MD06639)
                                                Janet Herold (Bar No. 632479)

                                                **Justice Catalyst Law**
                                                123 William Street, 16th Floor
                                                New York, NY 10038
                                                Main: 518-732-6703
                                                belga@justicecatalyst.org
                                                lbansal@justicecatalyst.org
                                                jherold@justicecatalyst.org

                                                *Pro Hac Vice*

Martha M. Lafferty* (TN Bar# 019817)
**Civil Rights Education and Enforcement Center**
525 Royal Parkway, #293063
Nashville, TN 37229
Main: 615-913-5099
mlafferty@creeclaw.org

*Pro Hac Vice*

Amy F. Robertson* (CO Bar# 25890)
**Civil Rights Education and Enforcement Center**
1245 E. Colfax Ave., Suite 400
Denver, CO 80218
(303) 757-7901
arobertson@creeclaw.org

*Pro Hac Vice*

### CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system on August 23, 2021, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.


/s/ Kyle E. Neumann
Paralegal
Civil Rights Education and Enforcement Center