IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **MARK TASSINARI, RICHARD ESPINOSA, RANDY OWENS, AND JONATHAN ANDERSON,** individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>**V.**<br><br>**THE SALVATION ARMY NATIONAL CORPORATION; THE SALVATION ARMY, A NEW YORK CORPORATION,**<br><br>Defendants. | ) | **CASE NO. 1:21-CV-10806** |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED CLASS ACTION COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(1) AND 12(B)(2)**

Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(2), Defendants The Salvation Army National Corporation (the "National Corporation") and The Salvation Army, a New York corporation (the "New York Corporation") hereby respectfully move this Court to dismiss in its entirety Plaintiffs' First Amended Class Action Complaint ("FAC"). [1]

## INTRODUCTION

The FAC should be dismissed in its entirety for a number of independent reasons, as set forth in this motion as well as in Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) and to Strike Class Allegations ("Motion to Dismiss and Strike") filed concurrently herewith. First, the First Amendment bars Plaintiffs' claims. The Salvation Army is a church and

[1] The FAC abandons claims asserted against three other defendants for which there was neither personal nor subject matter jurisdiction, in response to Defendants' prior motions to dismiss the original complaint.

religious organization. It has long-standing, deeply held religious beliefs that govern the day-to-day lives of its members as well as the operation of its many religious and charitable programs. Plaintiffs request that the Court apply secular principles to the religious beliefs of The Salvation Army and to the religious administration and policies of The Salvation Army's Adult Rehabilitation Centers ("ARCs"). Any attempt by the Court to adjudicate these disputes would violate the Free Exercise and Establishment clauses of the First Amendment.

Second, the National Corporation is not a proper party to this lawsuit. The Court lacks personal jurisdiction over the National Corporation as to any of the Plaintiffs' claims, and the named Plaintiffs also lack standing to assert their claims against the National Corporation.

Finally, this Court lacks personal jurisdiction over the claims of Plaintiffs Espinosa, Owens, and Anderson (together, the "non-Massachusetts plaintiffs"), and those non-Massachusetts plaintiffs likewise lack standing for the claims asserted against the New York Corporation.

## FACTS

### A. The Salvation Army

The Salvation Army is an international religious denomination and charitable organization, a branch of the Christian Church, which was founded in Great Britain in 1865. *See* Declaration of Colonel Kenneth O. Johnson, Jr. ("Johnson Decl.") at ¶ 2; Declaration of Lt. Colonel Dennis Gensler ("Gensler Decl.") at ¶ 1. As a matter of its worldwide ecclesiastical structure, The Salvation Army has divided its operations in the United States into four geographic Territories. Separate Salvation Army religious and non-profit corporate entities have been established, in turn, to conduct the activities of The Salvation Army in each of the four Territories, each of which operates independently and exclusively within its own geographic area. Johnson Decl. at ¶¶ 3-4.

The activities of The Salvation Army within the Eastern Territory of the United States are

directed and controlled by the New York Corporation, which is incorporated in the State of New York and has its headquarters in West Nyack, New York. Gensler Decl. at ¶ 6, 10. The Eastern Territory comprises 13 states and territories, including Massachusetts and Rhode Island. *Id.* at ¶ 4. The New York Corporation does not operate outside of these areas and does not control the operations of any other Territory or the National Corporation. *Id.* at ¶ 7. The ARCs within the Eastern Territory, including the Saugus, Massachusetts ARC ("Saugus ARC") and Providence, Rhode IslandARC ("Providence ARC"), are solely operated, and owned or leased directly, by the New York Corporation. *Id.* at ¶ 6.

The National Corporation is incorporated in New Jersey and is authorized to do business at, and operates out of, its headquarters in Alexandria, Virginia, from which it directs, controls, and coordinates its operations. Johnson Decl. at ¶ 6. The National Corporation acts only as an administrative coordinating office to support the activities of The Salvation Army in the United States – it does not operate any religious or charitable programs and has no control over the New York Corporation or the corporate entities that operate the other geographic Territories. *Id.* at ¶ 4. It does not operate any ARCs, control the operations of any ARCs, or own or lease any property out of which ARCs are operated. *Id.* Without limiting the foregoing, the National Corporation does not operate, and is not registered to do business, within Massachusetts, Rhode Island, Louisiana, or Missouri. *Id.* at ¶ 4, 7.

**B. Adult Rehabilitation Centers**

The New York Corporation owns and operates 30 ARCs within its geographic area, including the Saugus ARC and Providence ARC. Gensler Decl. at ¶ 10.[2] The ARCs are

[2] Defendants address only the facts of the operations of the ARCs within the Eastern Territory, as neither Defendant has any involvement with the operations of the New Orleans ARC or the St. Louis ARC with which Plaintiffs Randy Owens and Jonathan Anderson allege to have had the interactions that form the basis for their claims.

fundamentally religious institutions and are not medical facilities or psychiatric clinics. *Id.* at ¶ 11. The ARCs are an essential part of The Salvation Army's faith and are among the principal programs whereby Salvation Army Officers, who are ordained ministers of the Gospel, practice and preach their theology, just like worship services. *Id.* at ¶ 12. The Salvation Army's mission and inspiration is a divine command to save souls, and particularly men and women rejected by society and untouched by ordinary religious efforts. This includes ministering to the underprivileged, individuals who have been estranged from their families, the homeless or otherwise disaffiliated, individuals with criminal histories, the chronically unemployed, individuals who have been unable to cope with the normal demands of society, as well as individuals who have had problems with alcohol or drugs, by exposing them to the Gospel. *Id.* at ¶ 14. Salvation Army Officers manage the New York Corporation's ARCs and set policies and procedures, including Territory-wide policies regarding the use of various medications by beneficiaries of the ARCs that are based on scripture and The Salvation Army's religious beliefs. *Id.* at ¶ 15.

The ARCs do not limit admission to, or otherwise target, persons who suffer from problems related to drugs or alcohol. Rather, the ARC programs are designed to provide for the spiritual and social rehabilitation of disaffiliated persons generally. *Id.* at ¶ 17. The Salvation Army's Adult Rehabilitation Centers Command "Handbook of Standards, Principles, and Policies," which governs the operation of all 30 ARCs within the Eastern Territory, provides that the primary function of the ARC is:

> the spiritual regeneration and rehabilitation of men and women who have undergone a process of disaffiliation from those significant ties which enable individuals to take advantage of the opportunities and cope with the tribulations of everyday life . . . The [Adult Rehabilitation] Center[s] afford them the opportunity to gain insights into their problems, while acquiring self-respect, and to develop moral and spiritual principles of conduct and habits of industry that will enable them to gain purpose and meaning in their lives.

*Id.* at ¶ 19.

The ARC programs are open to individuals who are willing to comply with the various Christian-based requirements of the program and who are otherwise eligible for admission. *Id.* at ¶ 20. These requirements include attending religious services twice per week, undergoing spiritual counseling, and committing not to engage in the use of alcohol or drugs, including narcotic or addictive prescription medications. *Id.* Failure to participate in the religious activities at the ARCs results in termination from the program. *Id.* at ¶ 21.

Because ARC beneficiaries must commit to complying with the religious requirements of the program and because the program is not designed to provide medical or psychiatric care, no ARC applicant is admitted while intoxicated or under the influence of drugs. *Id*. at ¶ 20. The policy prohibiting use of intoxicants or mind-altering substances, including illicit drugs, alcohol, and narcotic or addictive prescription medications (including certain medication-assisted treatment ("MAT") medications, including methadone and buprenorphine), is based in part on The Salvation Army's long-standing religious beliefs against use of such substances. *Id.* at ¶¶ 23-26. The Salvation Army's religious beliefs include that its members should be "sober-minded," and treat their bodies as a temple. *See, e.g., https://salvationarmy.org/ihq/ipsalcoholinsociety* (citing scripture, including 1 Corinthians 6:19-20, as part of the religious basis for its beliefs about drugs and alcohol)*; see also* Gensler Decl. at ¶ 24.

The ARCs are one of any number of programs that may be available to eligible individuals; those who are unwilling to commit to the requirements of the ARC programs may seek assistance through a wide variety of charitable, government, or for-profit institutions operated by others or may be referred to other programs. *Id.* at ¶ 27. While some ARC beneficiaries may participate in alcohol or drug-specific activities conducted by outside organizations, such as Alcoholics Anonymous, the ARC program itself is spiritual in nature and does not provide substance use

disorder treatment services. *Id.* at ¶ 28.

## LEGAL STANDARD

### ***A. Rule 12(b)(1) and the First Amendment***

A motion to dismiss for lack of subject matter jurisdiction based on the application of the First Amendment is governed by Federal Rule of Civil Procedure 12(b)(1). *See, e.g., Moon v. Moon*, 431 F. Supp. 3d 394, 404 n.10 (S.D.N.Y. 2019) (citing *Watson v. Jones*, 80 U.S. 679, 733 (1871)); *Hartwig v. Albertus Magnus Coll.*, 93 F. Supp. 2d 200, 218–19 (D. Conn. 2000). Plaintiffs have the burden of demonstrating the existence of federal jurisdiction. *Katz v. Pershing, LLC,* 672 F.3d 64, 70 (1st Cir. 2012). A challenge to the court's subject matter jurisdiction must be addressed before addressing the merits of a case. *See Acosta-Ramirez v. Banco Popular de P.R.*, 712 F.3d 14, 18 (1st Cir. 2013). Where a challenge to the Court's subject matter jurisdiction involves factual questions that are not intertwined with the elements of the plaintiff's cause of action, the Court "is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case" and find the facts necessary to resolve the motion. *See, e.g., Torres-Negron v. J&N Records, LLC*, 504 F.3d 151, 163 (1st Cir. 2007) (citing *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990)).

### ***B. Rule 12(b)(1) and Standing***

A motion to dismiss for lack of standing is also governed by Rule12(b)(1) as a challenge to the Court's subject matter jurisdiction. *See Katz v. Pershing, LLC*, 672 F.3d 64, 70 (1st Cir. 2012). Article III of the United States Constitution limits judicial power to actual cases and controversies. *See* U.S. Const. art. III, § 2, cl. 1. An actual case or controversy only exists if the plaintiff has demonstrated "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends." *Baker v. Carr*, 369 U.S. 186, 204 (1962); *see also TransUnion LLC v. Ramirez*, 594 U.S. ___, 141

S. Ct. 2190, 2203 (2021) ("a plaintiff must show that he has suffered an injury in fact that is concrete, particularized, and actual or imminent"). To make this showing, the plaintiff must establish "injury, causation, and redressability." *Katz*, 672 F.3d at 71 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). The causation and redressability elements require that the plaintiff show that the injury is "fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *California v. Texas*, —— U.S. ——, 141 S. Ct. 2104, 2113 (2021) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006)).

***C. Lack of Personal Jurisdiction and Rule 12(b)(2)***

Under Rule 12(b)(2), a court must dismiss a claim when it lacks personal jurisdiction over the defendant for that claim. Plaintiffs bear the burden of "proffering evidence which, if credited, is sufficient to support findings of all facts essential to personal jurisdiction." *A Corp. v. All Am. Plumbing, Inc.*, 812 F.3d 54, 58 (1st Cir. 2016). Under the commonly used *prima facie* standard, a court must "restrict its inquiry to whether the plaintiff has proffered evidence which, if credited, suffices to support a finding of personal jurisdiction." *Barrett v. Lombardi*, 239 F.3d 23, 26 (1st Cir. 2001). The court need not "credit conclusory allegations or draw farfetched inferences," *Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201, 203 (1st Cir. 1994), but must credit only specific facts supported by competent evidence. In addition, the court should consider all uncontradicted facts advanced by the defendant. *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Assoc.*, 142 F.3d 26, 34 (1st Cir. 1998).

There are two forms of personal jurisdiction: general and specific. *Ford Motor Co. v. Mont. Eighth Judicial Dist. Ct.*, 592 U.S. ___, 141 S. Ct. 1017, 1024 (2021); *Pritzker v. Yari*, 42 F.3d 53, 59 (1st Cir. 1994). General personal jurisdiction exists only if the entity can be regarded as fairly "at home" in the forum, such as the location where the entity is incorporated or has its principal place of

business. *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014). Alternatively, federal courts may assert specific personal jurisdiction over a defendant if permitted by both the forum state's long-arm statute and the Due Process Clause of the Fourteenth Amendment. *Bluetarp Fin., Inc. v. Matrix Const. Co., Inc.*, 709 F.3d 72, 79 (1st Cir. 2013). Under M.G.L. Ch. 223A §3, Massachusetts' long-arm statute permits personal jurisdiction over "a person, who acts directly or by an agent, as to a cause of action . . . arising from the person's . . . transacting any business in [Massachusetts]." "[T]he defendant must have transacted business in Massachusetts, and the plaintiff's claim must have arisen from the transaction of business by the defendant." *Tatro v. Manor Care, Inc.*, 416 Mass. 763, 769-71 (1994). For purposes of the Fourteenth Amendment, specific personal jurisdiction requires a showing that the defendant purposefully availed itself of the privilege of conducting business in the forum state, the claims arise out of the defendant's contacts with the forum, and exercise of jurisdiction is reasonable. *See Ford Motor Co.*, 141 S. Ct. 1017, 1024-25.

## ARGUMENT

### A. The FAC Should Be Dismissed Under Rule 12(b)(1) on First Amendment Grounds

The First Amendment to the United States Constitution guarantees religious freedom through the "Free Exercise" and "Establishment" clauses. These clauses have been repeatedly interpreted to prevent government interference, including interference by the courts, with the administration of religious organizations. Courts should refuse to adjudicate such religious issues, and maintain the separation of church and state, in order to uphold church autonomy and avoid excessive ecclesiastical entanglement.

Abstaining from alcohol and intoxicants is an essential tenet of the religion of The Salvation Army, and has been part of the religious underpinnings of the organization since its founding in the 19th century. Gensler Decl. at ¶ 23. The Salvation Army's religious beliefs and church

administration are inextricably intertwined with the operation of the ARC programs, and the means and methods to accomplish the ARC goals of rehabilitation, including its policies regarding substance use, are part of The Salvation Army's religious mission. *Id. at* ¶ 10-23; *see also Salvation Army v. Dep't of Comm. Affairs of N.J.,* 919 F.2d 183, 189 (3d Cir. 1990) (holding that the Salvation Army's Adult Rehabilitation Centers are "an essential part of the [The Salvation Army's] faith, playing a role analogous to that of a church in a more traditional Christian faith: 'The Centers . . . are the tools whereby Salvation Army officers practice and preach their basic theology. . . .'").

Deciding claims related to the administration of these programs and policies regarding who may participate in the religious ARC programs would entangle the Court in essential ecclesiastical issues that would create serious Constitutional issues. Therefore, this Court lacks subject matter jurisdiction over Plaintiffs' claims.

**1. The First Amendment Broadly Limits Review of Ecclesiastical Policies**

The First Amendment provides that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof." U.S. Const. amend. I. The Religion Clauses extend to both legislative and judicial action. *See Kreshik v. Saint Nicholas Cathedral*, 363 U.S. 190, 191 (1960); *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 8 (2004) (citing *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940)) *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126–28 (2014).

The Free Exercise Clause protects a religious institution's right to decide matters of faith, doctrine, and church governance. *Emp. Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 877 (1990); *Petruska v. Gannon Univ.*, 462 F.3d 294, 306 (3d Cir. 2006) (citing *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116 (1952)). The Supreme Court in *Watson v. Jones* articulated the principle that civil courts are to defer to religious authorities on "questions of [church] discipline, or of faith, or ecclesiastical rule, custom, or law." 80 U.S. 679, 727 (1871). The Supreme

Court applied that principle from *Watson* to federal constitutional rights in *Kedroff,* and has since followed and expanded this doctrine. *See, e.g., Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969) (civil courts may not resolve questions that would require them "to engage in the forbidden process of interpreting and weighing church doctrine" and citing the "hazards ... of implicating secular interests in matters of purely ecclesiastical concern"); *Serbian E. Orthodox Diocese for U.S. of Am. & Can. v. Milivojevich*, 426 U.S. 696, 713 (1976) (asserting "the general rule that religious controversies are not the proper subject of civil court inquiry"). More recently, the Court clarified that the First Amendment broadly protects the autonomy of religious institutions "with respect to internal management decisions that are essential to the institution's central mission." *See Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. ____, 140 S. Ct. 2049, 2060 (2020).

The Supreme Court in *Milivojevich* recognized that those questions "at the core of ecclesiastical concern," 426 U.S. at 717, even if they incidentally affect secular matters, cannot be adjudicated by civil courts. When the "character" of a "dispute" involves the "strictly and purely ecclesiastical," civil courts have "no jurisdiction." *Watson* at 733. Civil courts may only adjudicate secular issues that arise in the context of church disputes "when inquiry 'into religious law and polity' is not required." *Kavanagh v. Zwilling*, 997 F. Supp. 2d 241 at 249–50 (S.D.N.Y. 2014) (quoting *Ram v. Lal*, 906 F. Supp. 2d 59, 69–70 (E.D.N.Y. 2012)).

**2. Resolution of Plaintiffs' Claims Would Impermissibly Require this Court to Interfere in Questions of Religious Doctrine and Faith**

The evidence summarized above demonstrates both that The Salvation Army is a church, and that the ARC programs are an essential part of its faith and mission. *See McClure v. The Salvation Army,* 460 F.2d 553, 554 (5th Cir. 1972), *cert denied* 409 U.S. 896; *The Salvation Army v. Dept. of Comm. Affairs of N.J.*, 919 F.2d 183 (3d Cir. 1990); *N.L.R.B. v. The Salvation Army of*

*Mass. Dorchester Day Care Center,* 763 F.2d 1 (1st Cir. 1985). For instance, in *The Salvation Army v. Dept. of Comm. Affairs of N.J.*, the Third Circuit found that operating the ARC programs is a "sacrament," "central to the religious mission of The Salvation Army," and plays "a role analogous to that of a church [building] in a more traditional Christian faith."

The ARC programs are led by ministers of the Gospel, and are operated consistent with The Salvation Army's faith. As such, beneficiaries are required to participate in all religious aspects of the program, including worship services. Gensler Decl. at ¶¶ 13, 20. Many policies put in place at the ARCs are based on The Salvation Army's religious teachings and beliefs. *Id.* at ¶ 15. The medication policy, in particular, is based on the sincerely held religious beliefs of The Salvation Army against use of alcohol or intoxicating substances, and is implemented as part of the New York Corporation's religious mission. *Id.* at ¶¶ 22-26. The policy is directly derived from scripture and The Salvation Army's interpretation of that scripture. *Id.* at ¶¶ 24-25.

Plaintiffs' claims are solely based on the application of the religious-based medication policy. *See, e.g.,* FAC at ¶¶ 167-185, 207-213, 231-237, 249-253. As a result, any adjudication of Plaintiffs' claims would necessarily require entangling the Court in religious doctrine. Decisions regarding these aspects of The Salvation Army's faith and its management of its religious-based institutions like the ARCs would violate the principle that religious organizations must be free "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff*, 344 U.S. at 116. "[L]itigating in court about what does or does not have religious meaning touches the very core of the constitutional guarantee against religious establishment." *New York v. Cathedral Acad.*, 434 U.S. 125, 133 (1977). Issues of church dogma with which congregants are expected to comply, or disciplinary concerns regarding failure to follow religious teachings, are intrinsically religious questions exempted from court review by the First

Amendment. *See Paul v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 819 F.2d 875, 883 (9th Cir. 1987) (affirming that religious policies for congregants, and consequences thereof, were protected from tort claims because of the First Amendment); *see also Dausch v. Rykse*, 52 F.3d 1425 (7th Cir. 1994) (affirming dismissal of claims related to counseling provided by church because of application of the Free Exercise clause, where there were insufficient allegations that the counseling "was not part of the church's religious beliefs and practices").

Deciding matters related to religious doctrine and, potentially, permitting legal recovery against the Church would necessarily and improperly impact the religious beliefs of The Salvation Army. *See, e.g. Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985) (resolving certain types of claims could influence policy decisions "in contravention of a church's own perception of its needs and purposes"). Plaintiffs' claims directly confront The Salvation Army's faith, beliefs, and "internal management decisions that are essential to the institution's central mission." *Our Lady of Guadalupe*, 140 S. Ct. at 2060. Resolving the allegations would require this secular Court to sit in judgment of The Salvation Army, entangle the Court in religious policy and governance, and potentially pressure the religious organization of The Salvation Army into compromising its sincere religious beliefs to avoid secular, civil liability.

The very process of inquiry into these practices would impinge on Constitutional rights and risk the Court being "embroil[ed] . . . in line-drawing and second-guessing regarding [religious] matters about which it has neither competence nor legitimacy." *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1265 (10th Cir. 2008). The "sorting task" of discovery "itself invades the religious body's integrity." *Whole Woman's Health v. Smith*, 896 F.3d 362, 368, 372 (5th Cir. 2018) *cert. denied* 139 S. Ct. 1170 (2019); *see also EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 467 (D.C. Cir. 1996) ("extensive pre-trial inquiries" constituted "impermissible entanglement"). The

Supreme Court has cautioned that "courts should refrain from trolling through a person's or institution's religious beliefs." *Mitchell v. Helms*, 530 U.S. 793, 828 (2000) (plurality opinion); *Hosanna-Tabor Evangelical Lutheran Church and Sch. v. E.E.O.C.*, 565 U.S. 171, 205-206 (2012) (Alito, J. concurring) ("the mere adjudication of [religious] questions would pose grave problems for religious autonomy").

This Court cannot resolve this case without getting embroiled in questions of religious doctrine and belief. *See Moon v. Moon*, 833 F. App'x 876, 881 (2d Cir. 2020) (affirming district court's dismissal of complaint for lack of jurisdiction where "there are no neutral principals by which [the court] can adjudicate these claims without deciding the religious question . . . ."). Accordingly, the Court lacks jurisdiction over this case.

***<u>B. This Court Lacks Personal Jurisdiction over Defendants</u>***

Plaintiffs' claims must also be dismissed because this Court lacks personal jurisdiction over the National Corporation for all claims in the FAC, and lacks personal jurisdiction over the New York Corporation for purposes of Plaintiffs Espinosa, Owens, and Anderson.

<u>1. The National Corporation is an improper defendant, as this Court lacks both general and specific personal jurisdiction over it</u>

The National Corporation is not at home in the Commonwealth of Massachusetts and has no ties to Massachusetts that relate in any way to Plaintiffs' claims, and thus the Court lacks jurisdiction over any claims against the National Corporation.

First, there is no general personal jurisdiction over the National Corporation. The Supreme Court in *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014), held that general jurisdiction over a corporation only comports with due process if the corporation can be regarded as fairly "at home" in the forum. A corporation's place of incorporation and its principal place of business are the bases for corporation to be "at home." *Id*. *See also BNSF Ry. v. Tyrrell* 137 S. Ct. 1549,

1559 (2017) (personal jurisdiction lacking because the defendant, which was neither incorporated nor had its principal place of business in Montana, was not "at home" in the state, notwithstanding defendant's operations in Montana); *see also Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773, 1778 (2017) (no general jurisdiction over defendant despite five research facilities, more than 400 employees, government outreach office, and more than $900 million in sales in forum state).

Plaintiffs have not even alleged one single contact between the National Corporation and Massachusetts, other than trying to combine the defendant entities and impute the New York Corporation's contacts to the National Corporation, with conclusory allegations that lack sufficient support to be plausible. *Ticketmaster-New York, Inc*, 26 F.3d at 203. Instead, the undisputable facts here show that the National Corporation is incorporated and has its headquarters in states other than Massachusetts. *See* Johnson Decl. at ¶ 6. Its Virginia headquarters is the "actual center of direction, control, and coordination" of its operations. *AOP Orphan Pharmaceuticals AG v. Pharmaessentia Corp.*, No. 20-12066-MLW, 2021 WL 2516103 at *8 (D. Mass. June 18, 2021) (Wolf, J.) (quoting *Hertz Corp. v. Friend*, 130 S. Ct. 1811, 1186 (2010)). And the National Corporation does not own or operate any property or have any business operations in Massachusetts. *BNSF v. Tyrrell* and *Bristol Myers Squibb* mandate dismissal of the FAC with respect to the National Corporation for lack of personal jurisdiction.

The Plaintiffs also cannot establish specific jurisdiction over the National Corporation, because they have failed to plead any facts that would invoke that the Massachusetts long-arm statute would convey jurisdiction over the National Corporation. The National Corporation has not "transact[ed] any business in Massachusetts" out of which Plaintiffs' claims are alleged to arise, nor have they contracted to supply things or services in Massachusetts or caused a tortious

injury in Massachusetts. *See* M.G.L. ch. 223A § 3. The long-arm statute requires that the alleged injuries would not have occurred "but for" the National Corporation's transaction of business in Massachusetts. *See Tatro*, 416 Mass. at 770-771. The FAC fails that test. First, the claims at issue arise out of alleged policies and conduct at ARCs; the National Corporation undisputedly does not operate, own, or control any ARCs, and instead ARCs are owned and operated by other entities. Johnson Decl. at ¶ 4; Gensler Decl. at ¶¶ 7-9. Second, three of the named Plaintiffs allege that their claims arose in states other than Massachusetts, and thus these claims cannot support a serious claim of specific personal jurisdiction here. Finally, the National Corporation does not transact business in Massachusetts and had no involvement with Plaintiff Tassinari (the only plaintiff with claims allegedly arising in Massachusetts) or the operation of the Saugus ARC. Johnson Decl. at ¶¶ 7-8.

The Due Process Clause of the Fourteenth Amendment requires that a nonresident defendant must "have certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). In order for a court to exercise specific jurisdiction, "the suit" must "aris[e] out of or relat[e] to the defendant's contacts with the forum." *Bristol-Myers Squibb*, 137 S. Ct. at 1780. In other words, there must be "an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (internal quotation marks and brackets omitted). For purposes of specific jurisdiction, the First Circuit has "broken the minimum contacts analysis into three categories: relatedness, purposeful availment, and reasonableness[.]" *Adelson v. Hananel*, 510 F.3d 43, 49 (1st Cir. 2007). That is, a plaintiff must show that:

> (1) its claim directly arises out of or relates to the defendant's forum activities; (2) the defendant's forum contacts represent a purposeful availment of the privilege of conducting activities in that forum, thus invoking the benefits and protections of the forum's laws and rendering the defendant's involuntary presence in the forum's courts foreseeable; and (3) the exercise of jurisdiction is reasonable.

*LP Sols. LLC v. Duchossois*, 907 F.3d 95, 102 (1st Cir. 2018). "Failure to make any one of these showings dooms any effort to establish specific personal jurisdiction." *Scottsdale Capital Advisors Corp. v. The Deal, LLC*, 887 F.3d 17, 20 (1st Cir. 2018). For the reasons outlined above, namely that the FAC identifies no contacts between the National Corporation and Massachusetts, the National Corporation has not purposefully availed itself of the "privilege of conducting business in Massachusetts," and the National Corporation does not own, operate, or control any ARCs (within Massachusetts or otherwise) out of which the claims arise, Plaintiffs have utterly failed to make the necessary due process showings. It would be manifestly unreasonable and unfair to hail the National Corporation into this forum under these circumstances.

<u>2. This Court lacks personal jurisdiction over the New York Corporation with respect to all claims arising outside of the Commonwealth of Massachusetts</u>

This Court lacks personal jurisdiction over the New York Corporation with respect to the claims of Plaintiffs Espinosa, Owens, and Anderson, requiring dismissal of their claims.[3] The Court must have personal jurisdiction over each claim in the lawsuit, and where such jurisdiction is lacking, the claim must be dismissed even if there is personal jurisdiction over the defendant for purposes of other claims. *See Bristol-Myers Squibb v. Sup. Ct. of Cal.,* 137 S. Ct. 1773, 1783 (2017) (finding no personal jurisdiction over claims of all non-California plaintiffs because there was no connection between California and those plaintiffs' claims, even though personal

[3] Likewise, any claims of any putative class members that arise outside of Massachusetts should be dismissed, as demonstrated in the Motion to Dismiss and Strike.

jurisdiction existed for claims brought by California plaintiffs); *see Canaday v. Anthem Cos.*, 9 F.4th 392, 400 (6th Cir. 2001) (noting that personal jurisdiction is analyzed at "the level of each claim" rather than at the "level of the suit," and affirming dismissal of out-of-state plaintiffs' claims).

There is no general personal jurisdiction over the New York Corporation here; it is incorporated in New York and has its headquarters in New York. Accordingly, there must be a showing of specific personal jurisdiction over the New York Corporation for each claim in the FAC, a showing that cannot be met by any Plaintiff whose claims arose outside of Massachusetts. Plaintiffs Espinosa, Owens, and Anderson each allege that they were harmed as a result of their interactions with ARCs outside of the Commonwealth of Massachusetts – namely, in Rhode Island, Louisiana, and Missouri, respectively. Under the test for specific personal jurisdiction, none of the non-Massachusetts plaintiffs can establish either that their claims arise out of any the New York Corporation's operations in Massachusetts or that due process is satisfied by pursuing these claims against the New York Corporation here.

The New York Corporation does not operate in any capacity, including owning, operating, or controlling ARCs, outside of the states that make up the Eastern Territory of The Salvation Army in the United States. The New York Corporation does not operate in Missouri or Louisiana. *See* Gensler Decl. at ¶¶ 7-9. Accordingly, this Court lacks personal jurisdiction over the New York Corporation with respect to Plaintiffs Owens and Anderson's claims.

Second, the harmful conduct alleged by the non-Massachusetts plaintiffs took place at ARC facilities located outside of Massachusetts, and because they have not alleged any actions by the New York Corporation within Massachusetts except the operation of the Saugus ARC (out of which Plaintiff Tassinari's claims arise), there are no alleged ties between Massachusetts

and any of the non-Massachusetts plaintiffs' claims. Thus, due process concerns cannot be satisfied because there is no "relatedness" between the claims and the forum, and it would not be reasonable to proceed with their claims in this forum based on the application of the First Circuit's "Gestalt factors." *Pritzker v. Yari*, 42 F.3d 53, 63-64 (1st Cir. 1994). In particular, this forum has no interest in adjudicating claims by non-resident plaintiffs against a non-resident defendant, where the claims have no connection with the forum. *See, e.g., Comer v. Comer*, 295 F. Supp. 2d 201, 213 (finding Massachusetts had little to no interest in adjudicating a dispute where events did not occur in the forum, no parties or witnesses lived in the forum except the plaintiff, and relevant documents were located out of state). As a result, the non-Massachusetts plaintiffs' claims should be dismissed entirely for lack of personal jurisdiction over the Defendants.

**C. Plaintiffs Lack Standing to Bring Their Claims**

Plaintiffs' claims against the National Corporation also fail for lack of Article III standing. Plaintiffs allege purported damages as a result of interactions with specific ARC locations that are solely owned and operated by other corporate entities who are no longer defendants in this case. Gensler Decl. at ¶¶ 7-10. The Saugus and Providence ARC locations are owned and operated solely by the New York Corporation, which has and implements its own medication policy. *Id.* at ¶¶ 10, 26. The National Corporation does not operate any ARCs, control the operation of any ARCs, or own or lease the property from which any ARC is operated. Johnson Decl. at ¶¶ 4, 9. The National Corporation has never had any interaction with Plaintiffs, and they do not allege otherwise. Plaintiffs fail to allege any harm caused to them by the National Corporation – instead, the FAC relies, baselessly, on a purported "nationwide" policy somehow applied by five separate entities, four of which do not operate in the

Commonwealth of Massachusetts. Based on these facts, Plaintiffs have no standing to bring claims against The National Corporation.

Plaintiffs Owens and Anderson also lack standing to bring claims against the New York Corporation, as their claims relate to interactions with the New Orleans ARC and the St. Louis ARC, which are operated by entities that are no longer parties in this case. The New York Corporation does not operate in Louisiana or Missouri, and has had no interactions with Plaintiffs Owens or Anderson. Courts have repeatedly held that claims against multiple defendants, including purported class action claims, must be dismissed where the named plaintiff does not have standing with respect to some of those defendants. *See, e.g., Robinson v. Nat'l Collegiate Student Loan Trust 2006-2*, No. 20-cv-10203-ADB, 2021 WL 1293707 (D. Mass. Apr. 7, 2021) (Burroughs, J.) (dismissing claims against all but one defendant because the named plaintiff had not been harmed by the other defendants).

Plaintiffs have also failed to allege standing to bring their claims against either Defendant, because they have, by their own admissions, not suffered any injury in fact. Plaintiff Tassinari alleges that in 2021[4] he inquired about the Saugus ARC program but did not apply and was not denied admission. FAC at ¶ 80. Plaintiff Espinosa does not allege that he was denied admission to the ARC, that he was discharged from the program because of his disability, or even that he sought to use MAT at the ARC; in fact, he admits he did not ask to use "doctor-prescribed MAT" and stayed at the ARC for five months. FAC at ¶ 96. As a result, he suffered no concrete injury in fact related to the claims in the FAC. Likewise, Plaintiff Anderson alleges that he successfully completed the ARC program, while taking MAT, and therefore suffered no concrete injury in fact related to the claims in the FAC. FAC at ¶ 118, 132. *See TransUnion*

[4] As set forth in detail in the Motion to Dismiss and Strike, Tassinari's claims related to his participation at the Saugus ARC in 2018 must be dismissed because they are time barred.

*LLC v. Ramirez,* 594 U.S. ___, 141 S.Ct. 2190, 2204 (2021) (noting that a plaintiff must have a concrete injury, "not abstract" to have standing).

In sum, this Court lacks subject matter jurisdiction over Plaintiffs' claims against both remaining Defendants.

## CONCLUSION

For each of the reasons set forth above and in the concurrently filed Motion to Dismiss and Strike, Defendants respectfully request that Plaintiffs' claims be dismissed for lack of subject matter jurisdiction, lack of standing, and lack of personal jurisdiction.

By:
/s/ Kevin M. Hensley
Kevin M. Hensley (BBO#554824)
BARTON GILMAN LLP
75 Federal Street, 9th floor
Boston, Massachusetts 02110
617-654-8200
khensley@bglaw.com

Thomas P. Gies (*pro hac vice)*
Christine B. Hawes (*pro hac vice)*
CROWELL & MORING LLP
1001 Pennsylvania Avenue NW
Washington, DC 20004
202-624-2500
tgies@crowell.com
chawes@crowell.com

Attorneys for Defendants The Salvation Army National Corporation and The Salvation Army, a New York corporation

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 21, 2021.

/s/ Christine B. Hawes