UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

———————————————————————
)
MARK TASSINARI, RICHARD   )
ESPINOSA, RANDY OWENS, AND   )
JONATHAN ANDERSON,     )
individually and on behalf of all others )
similarly situated,       )
           )
  Plaintiffs,     )
           )
           )
v.          )  Civil No. 21-10806-LTS
           )
THE SALVATION ARMY NATIONAL )
CORPORATION; THE SALVATION   )
ARMY, A NEW YORK CORPORATION, )
           )
  Defendants.    )
———————————————————————)

<u>ORDER ON MOTIONS TO DISMISS (DOC. NOS. 37, 39)</u>

June 22, 2022

SOROKIN, J.

   This lawsuit challenges a policy prohibiting the use of medication-assisted treatment

("MAT") for opioid-use disorder ("OUD") in Salvation Army Adult Rehabilitation Centers

("ARCs"). The Plaintiffs, all of whom suffer from OUD and took part in ARC programming,

bring suit against The Salvation Army National Corporation and The Salvation Army, a New

York Corporation contending that the MAT policy discriminates against them based on disability

in violation of the Americans with Disabilities Act ("ADA"), the Fair Housing Act ("FHA"), and

the Rehabilitation Act.[1]

---

[1] At the Motion to Dismiss phase, the Court accepts as true all well-pleaded facts alleged in the
complaint and draws all reasonable inferences in the Plaintiffs' favor, <u>Watterson v. Page</u>, 987
F.2d 1, 3 (1st Cir. 1993), applying the familiar standard and assessing whether the Plaintiffs have

The Salvation Army ("TSA") is an "international movement related to evangelical Christianity." Doc. No. 30 ¶ 134.[2] It is comprised of five related 501(c)(3) organizations that represent the national headquarters and TSA's regional territories: National (The Salvation Army National Corporation), Eastern (The Salvation Army, a New York Corporation), Southern (The Salvation Army, a Georgia Corporation), Western (The Salvation Army, a California Corporation), and Central (The Salvation Army, an Illinois Corporation). Id. ¶¶ 136-37. The New York Corporation, one of the two Defendants in this case, operates in twelve U.S. states: Connecticut, Delaware, Northeast Kentucky, Maine, Massachusetts, New Hampshire, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, and Vermont. Id. ¶ 27. Plaintiff Espinosa enrolled in Eastern Territory ARC programming in Providence, Rhode Island, id. ¶ 90, and Plaintiff Tassinari enrolled in ARC programming in Boston, Massachusetts, id. ¶ 60.[3] Plaintiffs Owens and Anderson participated in ARC programming in Louisiana and Missouri, respectively. Id. ¶¶ 103, 118.

Each of the Plaintiffs allege that the MAT policy interfered with their ability to use doctor-prescribed MAT during their participation in ARC programming, causing them harm and suffering. The Defendants filed the present Motions to Dismiss for lack of jurisdiction and failure to state a claim. Doc. Nos. 37, 39. The Motions raise six arguments in support of

---

stated "a claim to relief that is plausible on its face," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Fed. R. Civ. P. 12(b).

[2] Citations to "Doc. No. __ at __" reference items appearing on the court's electronic docketing system, and pincites are to the page numbers in the ECF header.

[3] Plaintiff Tassinari, who was serving a one-year prison sentence at the time, enrolled in ARC programming after his prison case worker gave him a choice: he could complete his sentence in jail or the State could release him on probation to attend ARC programming. Doc. No. 30 ¶¶ 58-60. Tassinari understandably chose ARC programming and was transferred there in early 2018. Id.

dismissal, which the Court addresses in turn.  After careful consideration, the Court ALLOWS

IN PART AND DENIES IN PART the Defendants' Motions.

I.       MOTION TO DISMISS FOR LACK OF JURISDICTION (DOC. NO. 37)

         A.      First Amendment

The Defendants argue that this Court lacks subject matter jurisdiction over the Plaintiffs'

claims because the Free Exercise and Establishment Clauses bar courts from adjudicating

religious issues.  See Doc. No. 38 at 8-13.  According to the Defendants, the MAT policy stems

from TSA's religious belief against the use of alcohol and other intoxicants and, as a result, "the

Court cannot resolve this case without getting embroiled in questions of religious doctrine and

belief."  Id. at 8-9, 13.

"Federal courts are obliged to resolve questions pertaining to subject-matter jurisdiction

before addressing the merits of a case."  Acosta-Ramirez v. Banco Popular de Puerto Rico, 712

F.3d 14, 18 (1st Cir. 2013).  A court may dismiss a case pursuant to Rule 12(b)(1) when it "lacks

the statutory or constitutional power to adjudicate it."  Kavanagh v. Zwilling, 997 F. Supp. 2d

241, 247 (S.D.N.Y.), aff'd, 578 F. App'x 24 (2d Cir. 2014) (quoting Makarova v. United States,

201 F.3d 110, 113 (2d Cir. 2000)).

The Defendants' argument is grounded in a line of Supreme Court cases holding that

courts must refrain from adjudicating cases that require a "searching . . . inquiry into church

polity" or the resolution of religious disputes.  Serbian E. Orthodox Diocese for U. S. of Am. &

Canada v. Milivojevich, 426 U.S. 696, 723 (1976); see also Presbyterian Church in U.S. v. Mary

Elizabeth Blue Hull Mem'l Presbyterian Church, 393 U.S. 440 (1969); Kedroff v. St Nicholas

Cathedral of the Russian Orthodox Church in North America, 344 U.S. 94 (1952); Watson v.

Jones, 80 U.S. 679 (1871).  These cases stand for the proposition that "civil courts may not

3

entertain claims that in effect require religious determinations that are ecclesiastical, regardless of the nature of the underlying dispute." Ram v. Lal, 906 F. Supp. 2d 59, 70 (E.D.N.Y. 2012).

Though the First Amendment imposes restraints on a court's ability to adjudicate religious disputes, it "does not prevent courts from deciding secular civil disputes involving religious institutions when and for the reason that they require reference to religious matters." Martinelli v. Bridgeport Roman Cath. Diocesan Corp., 196 F.3d 409, 431 (2d Cir. 1999) (citing Jones v. Wolf, 443 U.S. 595, 603 (1979)). It falls to the Defendants to "point to a disputed religious issue which the jury or the district judge in [the] case [would be] asked to resolve." Id. This the Defendants have not done.

The Defendants rely on several cases in which courts have abstained from adjudicating religious disputes on First Amendment grounds. These cases are inapposite because they required courts to weigh in on religious views, apply church doctrine, or settle property disputes between competing religious groups. See, e.g., Moon v. Moon, 833 F. App'x 876, 879 (2d Cir. 2020), cert. denied, 141 S. Ct. 2757 (2021) ("[W]e hold that, based on the allegations in the complaint, there are no neutral principles by which we can adjudicate these claims without deciding the religious question of who the rightful successor to the late Rev. Sun Moon is."); Kavanagh, 997 F. Supp. 2d at 254 ("In this case, Defendants have pointed to a disputed religious issue that the Court or the jury would be asked to resolve in connection with the libel per se claim—namely, the truth or falsity of the Catholic Church's characterization of its own law and doctrine. The First Amendment bars this Court from addressing that issue."); Presbyterian Church in U.S., 393 U.S. at 450 ("[T]he departure-from-doctrine element of the Georgia implied trust theory requires the civil court to determine matters at the very core of a religion—the interpretation of particular church doctrines and the importance of those doctrines to the religion.

Plainly, the First Amendment forbids civil courts from playing such a role."); <u>Kedroff</u>, 344 U.S. at 120-21 (holding that a statute granting control of a property owned by the Russian Orthodox Church to a group seeking to sever ties with the Russian Mother Church violated the Free Exercise Clause); <u>Watson</u>, 80 U.S. at 735 (holding that courts may not decide purely ecclesiastical questions in a case involving a property dispute between a Presbyterian organization and local churches of the organization).  Here, the Plaintiffs ask the Court to apply neutral federal laws to the MAT policy.  In doing so, the Court need not wade into an ecclesiastical dispute, evaluate religious doctrine, or determine the validity of TSA's religious beliefs.  <u>See</u> <u>Hartwig v. Albertus Magnus Coll.</u>, 93 F. Supp. 2d 200, 217 (D. Conn. 2000) (finding that the First Amendment did not bar the court from hearing a case that required it to determine whether a Catholic College's religious reason for firing the plaintiff was pretextual because the "the resolution of these counts will not require the Court to inquire into competing interpretations of church law or policy").

The Defendants have not contended that the Religion Clauses of the First Amendment exempt this policy from the application of the federal laws at issue in this lawsuit.  <u>See</u> <u>Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.</u>, 565 U.S. 171 (2012) (holding that the Religion Clauses of the First Amendment create a "ministerial exception" to employment discrimination statutes for hiring decisions related to a church's ministers).  At this stage, the only question before the Court is whether it has jurisdiction to adjudicate the Plaintiffs' claims.  Resolution of the application question is not now ripe.  The Court therefore has jurisdiction to adjudicate, or at least further adjudicate, the Plaintiffs' claims.

B.     Personal Jurisdiction

Next, the Defendants argue that the Plaintiffs have failed to establish personal jurisdiction.  See Doc. No. 38 at 13-18.  More specifically, the Defendants contend that the Court lacks personal jurisdiction over the National Corporation with respect to all of the Plaintiffs' claims and lacks personal jurisdiction over the New York Corporation with respect to the claims brought by Plaintiffs Espinosa, Owens, and Anderson.  The Plaintiffs' opposition brief clarifies that Tassinari and Espinosa bring claims against the National Corporation and the New York Corporation, while Owens and Anderson bring claims only against the National Corporation. See Doc. No. 44 at 15.  Therefore, only two personal jurisdiction issues remain: 1) whether any of the Plaintiffs have established personal jurisdiction over the National Corporation, and 2) whether Plaintiff Espinosa has established personal jurisdiction over the New York Corporation.

1.     *The Standard*

As an initial matter, the parties dispute whether the Fourteenth Amendment or Fifth Amendment standard governs the existence of personal jurisdiction in this case.  According to the Plaintiffs, the Fifth Amendment standard applies and empowers the Court to exercise personal jurisdiction over defendants that have "minimum contacts" with the United States as a whole.  Doc. No. 44 at 14-17.  The Defendants argue that the more stringent Fourteenth Amendment standard is applicable here, thus requiring the Plaintiffs to establish that the Defendants have minimum contacts with the state of Massachusetts specifically.  Doc. No. 47 at 6 n.2.  As explained in more detail below, the Plaintiffs are technically but not practically correct; while the Fifth Amendment standard governs federal question cases like this one, the Plaintiffs must also satisfy the Massachusetts long-arm statute, which incorporates the Fourteenth Amendment standard.  In addition, and as discussed infra, the recent First Circuit

6

decision <u>Waters v. Day & Zimmermann NPS, Inc.</u> dictates the personal jurisdiction analysis of Espinosa, Owens, and Anderson's claims as they were added as Plaintiffs in an amended complaint filed after the Defendants waived service of process.  23 F.4th 84 (1st Cir. 2022).

"When the district court's <u>subject-matter jurisdiction</u> rests wholly or in part on the existence of a federal question, the constitutional limits of the court's personal jurisdiction are drawn in the first instance with reference to the due process clause of the [F]ifth [A]mendment," and not the Fourteenth Amendment.  <u>Lorelei Corp. v. County of Guadalupe</u>, 940 F.2d 717, 719 (1st Cir. 1991) (emphasis in original).  Under the Fifth Amendment, "a federal court [can] exercise personal jurisdiction over a defendant in a federal question case if that defendant has sufficient contacts with the United States as a whole."  <u>Id.</u> (quoting <u>Whistler Corp. v. Solar Electronics</u>, Inc., 684 F.Supp. 1126, 1128 (D. Mass. 1988)).  Plainly, both the National and New York Corporations have sufficient contacts with the United States to meet this expansive standard.

The Plaintiffs must also satisfy the statutory requirements for territorial limits of effective service found in Federal Rule of Civil Procedure 4(k)(1)(A), which states that "[s]erving a summons or filing a waiver of service establishes personal jurisdiction over a defendant . . . who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located."  Rule 4(k)(1)(A) thus imposes "the same long-arm statute plus minimum contacts with the forum state analysis that applies to cases in state courts or diversity cases in federal courts."  <u>Nahigian v. Leonard</u>, 233 F. Supp. 2d 151, 158 (D. Mass. 2002); <u>see also</u> <u>Waters</u>, 23 F.4th at 94 ("To be sure, Rule 4(k)(1)(A) does make the due process standard of the Fourteenth Amendment applicable to federal-question claims in federal court when a plaintiff relies on a state long-arm statute for service of the summons.").

After this case was fully briefed, the First Circuit issued the <u>Waters</u> opinion, which bears on the personal jurisdiction analysis.[4]  <u>Waters</u> held that Rule 4(k)(1) applies only to initial service and is not "concerned . . . [with] jurisdictional limitations after service."  23 F.4th at 98-99.  In other words, "serving a summons in accordance with state or federal law is necessary to establish jurisdiction over a defendant <u>in the first instance</u>," but only "the Fifth Amendment's constitutional limitations limit the authority of the court <u>after</u> service has been effectuated at least in federal-law actions."  <u>Id.</u> at 96 (emphasis added).  <u>Waters</u>' holding is relevant to this case because Owens, Anderson, and Espinosa were added as Plaintiffs in an amended complaint filed <u>after</u> the Defendants waived service.  <u>See</u> Doc. Nos. 11-15 (waiving service); Doc. No. 30 (amending the complaint to add Plaintiffs Owens, Anderson, and Espinosa).  Thus, Rule 4(k)(1)(A) and the accompanying long-arm statute and Fourteenth Amendment requirements apply only to Tassinari, the Plaintiff responsible for obtaining waiver of service in accordance with the Rule.  <u>See</u> <u>Waters</u>, 23 F.4th at 98-99 (explaining that "in both the case of added parties and added claims, the court's jurisdiction" is subject to the Fifth Amendment).  If Tassinari can establish personal jurisdiction over both Defendants, the additional Plaintiffs need only satisfy the requirements of the Fifth Amendment standard.  As explained in more detail below, however, <u>Waters</u>' holding only has implications for Espinosa's claims against the New York Corporation because Tassinari cannot establish personal jurisdiction over the National Corporation.

2.  *Personal Jurisdiction Analysis*

The burden lies with the Plaintiffs to establish the existence of jurisdiction where, as here, the Defendants challenge personal jurisdiction via a Rule 12(b)(2) Motion.  <u>Cossart v. United</u>

---

[4] Though the Plaintiffs filed a notice of supplemental authority with the Court, Doc. No. 54, neither party submitted additional briefing on the implications of <u>Waters</u> in this case.

Excel Corp., 804 F.3d 13, 18 (1st Cir. 2015).  When the court considers a 12(b)(2) motion without holding an evidentiary hearing,[5] the "prima facie standard" applies to its analysis. Clinton-Brown v. Hardick, No. 1:20-CV-11694-IT, 2021 WL 1427635, at *2 (D. Mass. Apr. 15, 2021) (citing Sawtelle v. Farrell, 70 F.3d 1381, 1386 n.1 (1st Cir. 1995)).  Under the prima facie standard, "plaintiffs may not rely on unsupported allegations in their pleadings but are obliged to adduce evidence of specific facts."  Platten v. HG Bermuda Exempted Ltd., 437 F.3d 118, 134 (1st Cir. 2006) (citations omitted).  The court must "in turn, take those 'specific facts affirmatively alleged by the plaintiff[s] as true . . . and construe them in the light most congenial to the plaintiff[s'] jurisdictional claim."  Id. (alteration in original) (quoting Mass. Sch. of L. at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 34 (1st Cir. 1998)).  The Court may also "add to the mix facts put forward by the defendants, to the extent that they are uncontradicted."  Mass. Sch. of L., 142 F.3d at 34.

Turning first to the Massachusetts long-arm statute, the Plaintiffs rely on subsection (a), which allows courts to exercise personal jurisdiction over an entity "transacting any business in this commonwealth[.]"  Mass. Gen. Laws ch. 223A, § 3(a).  "For jurisdiction to exist under § 3(a), the facts must satisfy two requirements—the defendant must have transacted business in Massachusetts, and the plaintiff's claim must have arisen from the transaction of business by the defendant."  Tatro v. Manor Care, Inc., 625 N.E.2d 549, 551 (Mass. 1994).  Courts construe the "transacted business" element liberally, focusing on "whether the defendant[s] attempted to participate in the commonwealth's economic life."  Cossart, 804 F.3d at 18 (alteration in original) (quoting United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp., 960 F.2d 1080,

---

[5] The Court notes that the Plaintiffs did not request an evidentiary hearing on the personal jurisdiction issue in their papers.

1087 (1st Cir.1992)).  As for the second "arising from" element, "courts look to see whether the transacted business was a "but for" cause of the harm alleged in the claim."  Id.

Under the familiar Fourteenth Amendment standard, there are two types of personal jurisdiction: general and specific.  Id. at 20.  Because the Plaintiffs do not rely on general jurisdiction, see Doc. No. 44 at 21 n.13, the Court focuses its attention on the analysis of specific jurisdiction over the National Corporation.  "In determining whether the exercise of specific jurisdiction over an out-of-state defendant conforms to the constitutional limits established by the Due Process Clause, we evaluate '(1) whether the claim directly arises out of, or relates to, the defendant's forum state activities; (2) whether the defendant's in-state contacts represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable; and (3) whether the exercise of jurisdiction is reasonable.'"  Cossart, 804 F.3d at 20 (quoting C.W. Downer & Co. v. Bioriginal Food & Sci. Corp., 771 F.3d 59, 65 (1st Cir. 2014)).

For the reasons stated in the above discussion of Waters, the Court first analyzes whether Plaintiff Tassinari can establish personal jurisdiction over the Defendants.  The Defendants concede that the Court has personal jurisdiction over Tassinari's claims against the New York Corporation but argue that there is no personal jurisdiction over the National Corporation, which operates independently from each of the regional territories.  Doc. No. 38 at 13-16.

The Plaintiffs cannot meaningfully dispute that the National Corporation neither operates out of nor does significant independent business in Massachusetts.  Instead, the Plaintiffs contend "the National Corporation and [New York Corporation] operate as a single unified enterprise, meaning that the specific jurisdiction this Court has over the [New York Corporation]

applies equally to the National Corporation."  Doc. No. 44 at 18-19.  In support of this argument,

the Plaintiffs point to the following <u>unsupported</u> allegations in their complaint:

- TSA Territories "operate as a single enterprise."  Doc. No. 30 ¶ 136.

- The National Corporation "owns, leases, leases to, or operates" roughly 143 ARCs, including some located in Massachusetts.[6]  <u>Id.</u> ¶ 21.

- The territories act in coordination with one another to administer the ARCs and establish policies.  <u>Id.</u> ¶ 140.

- TSA has embraced a nationwide policy prohibiting the use of MAT in ARCs.  <u>Id.</u> ¶ 141.

- The National Corporation contributes funding, engages in advertising, and solicits donations in support of ARCs nationwide, including in Massachusetts.[7]  <u>Id.</u> ¶ 142 n.12; Doc. No. 44 at 20 (citing The Salvation Army, https://www.salvationarmyusa.org/usn/).

The Court disregards these allegations for the purposes of its personal jurisdiction analysis

because the Plaintiffs have not "adduce[d] evidence of specific facts" to support them.  <u>Platten</u>,

437 F.3d at 134.

---

[6] In support of this assertion, the Plaintiffs' complaint cites to the "2020 Financial Summary" page of TSA's Annual Report website.  According to the page, "this summary represents a combination of data from the Audited Financial Statements of the six (6) separate Salvation Army corporations in the United States."  <u>2020 Financial Summary</u>, The Salvation Army 2021 Annual Report, https://salvationarmyannualreport.org/financials/.  The page summarizes 2020 revenue, expenses, and "statistical highlights."  <u>Id.</u>  It <u>does not</u> state or otherwise suggest that the National Corporation owns, operates, or leases the ARCs.

[7] The Plaintiffs refer to the TSA website that allows users to donate locally based on their zip code to support this allegation but offer no additional evidence that tends to show that the National Corporation indeed funds or advertises the Massachusetts ARCs. The donation link alone does not support such assertions.

The following list of allegations are supported by citations to a TSA website[8] and thus the Court treats these statements of a party opponent as evidence of specific facts for the purposes of the personal jurisdiction analysis.[9]

- "The administration of The Salvation Army is top-down and autocratic, in true military style[.]"  Doc. No. 30 ¶ 135 (quoting Organizational Structure, supra note 8).

- The National Commander serves as the leader of the National Corporation as well as the Chairperson of the Board for each of the territories (including the New York Corporation).  Id. ¶ 138 (citing Organizational Structure, supra note 8).

- The National Commander coordinates TSA's national functions.  Id. ¶ 138 (citing Organizational Structure, supra note 8).

- The Commissioners' Conference, which is comprised of the National Commander, territorial Commanders, and other TSA leadership is responsible for nationwide policies.  Id. ¶ 139 (citing Organizational Structure, supra note 8).

The Defendants submit sworn declarations stating, in relevant part:

- The National Corporation neither operates out of nor is registered to do business in Massachusetts.  Doc. No. 38-2 ¶ 7.

- Each of the territories are separate non-profit corporate entities that "operate independently and exclusively within their own geographic areas."  Doc. No. 38-1 ¶¶ 3, 5.

- The National Corporation "acts only as an administrative coordinating office to support the activities of the Salvation Army in the United States" and does not "control the operations of" the territories.  Doc. No. 38-2 ¶ 4.

---

[8] The Court notes that the link to which the Plaintiffs cite for many of these allegations (https://ctri.salvationarmy.org/SNE/Organizational) is broken and not, to the best of the Court's knowledge, available on the current version of TSA's website.  The Court has used an internet archive website called the "Wayback Machine" (https://archive.org/web/) to retrieve an archived version of the webpage dated January 22, 2021, which is the only date available.  See Organizational Structure, The Salvation Army, https://web.archive.org/web/20150106062239/https://ctri.salvationarmy.org/SNE/Organizational [hereinafter Organizational Structure].  The Court assumes that this version of the website is the one to which the Plaintiffs originally cited.  In the course of the Court's consideration of the Motions, the current website has, occasionally, come back online and, when viewed by the Court, was identical to the archived version available on the Wayback Machine.

[9] The Court has, at times, reframed the language of the Plaintiffs' factual allegations to align with the website to which they cite in support of such allegations.

- The New York Corporation directly owns or leases the properties where the ARCs in the Eastern Territory operate.  Doc. No. 38-1 ¶ 10.

- The National Commander serves as one of ten members on the New York Corporation's board of Trustees and holds no extraordinary voting power.  Doc. No. 47-1 ¶ 3; Doc. No. 47-2 ¶ 3.

- The Commissioners' Conference has no formal or informal relationship with the National Corporation, but rather operates as an independent forum "where Salvation Army church leaders meet and can voluntarily agree to adopt certain common policies."  Doc. No. 47-2 ¶ 4.

As explained supra, the jurisdictional inquiry requires courts to take "specific facts affirmatively alleged by the plaintiff[s] as true . . . and construe them in the light most congenial to the plaintiff[s'] jurisdictional claim" while "add[ing] to the mix facts put forward by the defendants, to the extent that they are uncontradicted."  Mass. Sch. of L., 142 F.3d at 34.  The Court accepts both the Plaintiffs' and Defendants' evidence because it finds no conflict between them.  Put another way, the evidence introduced by the Defendants simply supplements the Plaintiffs' supported allegations and may therefore be considered.[10]

The in-state activities of a subsidiary do not automatically establish personal jurisdiction over the parent entity.  Negron-Torres v. Verizon Commc'ns, Inc., 478 F.3d 19, 27 (1st Cir. 2007); cf. Kleinerman v. Morse, 533 N.E.2d 221, 224 (Mass. 1989) ("Significant exercise of control by an out-of-State parent corporation over a subsidiary and significant intermingling of

---

[10] The statement that TSA is "top-down and autocratic" from TSA's website arguably conflicts with portions of the sworn declarations attesting that the National Corporation and regional territories operate independently.  Any apparent conflict is resolved when the "autocratic" quote is considered in the context of other information from the same TSA webpage, including the following: 1) "[f]or administrative purposes, the nation is divided into four territories," 2) "[e]ach territory is under leadership of a territorial commander," 3) "the functions of The Salvation Army are coordinated," not controlled, "by the National Commander," and 4) the Commissioners' Conference includes leadership from each of the Territories in addition to the National Commander.  Organizational Structure, supra note 8.

officers and directors between parent and subsidiary have served to establish jurisdiction in the State where the subsidiary is conducting its business operations.").  To the contrary, "[t]he mere fact that a subsidiary company does business within a state does not confer jurisdiction over its nonresident parent, even if the parent is sole owner of the subsidiary.  There is a presumption of corporate separateness that must be overcome by clear evidence."  Platten, 437 F.3d at 139 (alteration in orginal) (quoting Escude Cruz v. Ortho Pharm. Corp. 619 F.2d 902, 905 (1st Cir.1980)).  For this presumption to be overcome these must exist a "plus factor" amounting to "something beyond the subsidiary's mere presence within the bosom of the corporate family."  Genzyme Corp. v. Shire Hum. Genetic Therapies, Inc., 906 F.Supp. 2d 9, 19 (D. Mass. 2012) (quoting Donatelli v. Nat'l Hockey League, 893 F.2d 459, 465-66 (1st Cir.1990)).  Such a plus factor may be found where 1) the subsidiary acts as the parent's agent, 2) the parent exercises control over the subsidiary that goes beyond "common ownership and directorship," or 3) the subsidiary is an "empty shell."  Id.

The Plaintiffs' evidence is insufficient to establish the existence of a plus factor strong enough to overcome the presumption of corporate separateness.  Though the National Commander "coordinates" TSA functions, coordination is different than control.  Similarly, the National Commander serves as the Chairperson of each of the territorial boards, but, as the Defendants point out, is only one of ten members and holds no extraordinary voting power.  The Plaintiffs imply that nationwide policies are unilaterally imposed by the Commissioners' Conference, but the TSA website to which they cite suggests a collaborative process and nowhere states that the territories are required to adopt Commissioners' Conference policies.  See Organizational Structure, supra note 8 (explaining that "[n]ationwide uniformity of policy is the responsibility of the Commissioners' Conference, whose membership includes the National

Commander and National President, the Territorial Commanders" and other TSA leadership).
Furthermore, the record depicts the Commissioners' Conference as a body separate from both the
National Corporation and the regional territories.  In sum, the evidence of overlapping leadership
and common policies does not satisfy the jurisdictional standard without more evidence of
overwhelming control.  See  Escude Cruz v. Ortho Pharm. Corp., 619 F.2d 902, 905 (1st Cir.
1980) (explaining that "allegations of interlocking directorates and stock ownership will not
alone suffice" to establish personal jurisdiction over a nonresident parent); Genzyme Corp., 906
F. Supp. 2d at 19 (holding "[the parent corporation's] inclusion of [the subsidiary] in its
Securities and Exchange Commission filings and publicity materials amounts to nothing more
than evidence of 'common ownership and directorship,'" which is insufficient to satisfy the
jurisdictional standard); Glowacki-Bishop v. W. & S. Fin. Grp. Inc., No. CV 21-11000-NMG,
2021 WL 6098729, at *3 (D. Mass. Dec. 22, 2021) ("That the Policy at issue was maintained by
[the parent corporation] and directed for adoption by [the subsidiary] also fails to satisfy this
[jurisdictional] burden.").[11]

Accordingly, the Plaintiffs cannot establish personal jurisdiction over the National
Corporation under the Massachusetts long-arm statute or the Fourteenth Amendment standard.
The National Corporation is therefore dismissed as a party to this lawsuit.[12]  Because Plaintiffs

---

[11] At the Court's hearing on the Motions to Dismiss, the Plaintiffs argued that there is personal
jurisdiction over the National Corporation because its nation-wide, uniform policies gave rise to
injuries that occurred in Massachusetts.  Yet, this argument is simply a reframed version of the
unified enterprise argument that the Court now rejects.

[12] After the Defendants' Motions were fully briefed, the Plaintiffs filed a request for judicial
notice of several documents that they contend contradict the Defendants' claims that the National
Corporation has no control over the regional territories or ARCs.  Doc. No. 66.  The documents,
which include court filings and United States Patent and Trademark Office Registration files,
contain statements from TSA claiming, inter alia, that the regional territories are "under unitary
control of the Salvation Army USA through the National Commander USA and the
Commissioners['] Conference USA."  Doc. No. 67-4 at 3.  As the Defendants point out and the

Owens and Anderson bring claims only against the National Corporation, these parties, and their respective claims, are dismissed as well.[13]

The only issue that remains is whether the Court has personal jurisdiction over the New York Corporation with respect to Espinosa's claims. The Defendants contend that Espinosa's claims do not "relate to" the New York Corporation's contacts with the state of Massachusetts because he attended a Rhode Island ARC. Under Waters, however, Espinosa need only satisfy the Fifth Amendment standard because he was added to the lawsuit after Tassinari obtained waiver of service pursuant to Rule 4(k)(1)(A). Given the New York Corporation's contacts with the United States as a whole, Espinosa easily fulfills the Fifth Amendment requirements. To summarize, the Court can exercise personal jurisdiction over the New York Corporation with respect to Espinosa and Tassinari's claims only.

C.    Standing

The Court briefly addresses the Defendants' argument that the Plaintiffs did not suffer an injury in fact and therefore cannot establish standing. Injury is an element of the Article III

_____

Plaintiffs seemingly concede, the documents may be "recognized not for the truth of the matters asserted within them," but instead for their existence or legal effect. Barnstable Cnty. v. 3M Co., No. CV 17-40002, 2017 WL 6452245, at *4 (D. Mass. Dec. 18, 2017) (emphasis added); see also Pls' Req. for Judicial Notice, Doc. No. 66 at 6 ("The Court may properly take notice of Exhibits A and B for the fact that the statements contained therein were made without considering the accuracy of those statements"); id. at 7 ("The USPTO documents are relevant not for the truth of the arguments made therein, but for their legal effect"). Assuming arguendo that the documents are in fact subject to judicial notice (an assumption the Defendants dispute), the fact that such documents exist (as distinct from the truth of the statements) is not material. Nothing before the Court establishes the "legal effect" of the statements at all let alone in a manner which might alter the Court's ultimate conclusion that there is no personal jurisdiction over the Defendants due to the insufficient evidence that the National Corporation exerts overwhelming control over the territories.

[13] The Plaintiffs requested discovery related to the personal jurisdiction issue at the Motion hearing. At no point have the Plaintiffs identified what discovery they seek or how it bears on these issues specifically. Under these circumstances, the request is denied.

standing inquiry and requires a plaintiff to show that "that he suffered an injury in fact that is concrete, particularized, and actual or imminent." TransUnion LLC v. Ramirez, 141 S. Ct. 2190, 2203 (2021). Tassinari has alleged concrete injuries arising from his initial participation in the ARC program in 2018, Doc. No. 30 ¶¶ 50-75, and his later inquiry about the ARC program in 2021, id. ¶ 79.

As for Espinosa, the Defendants contend that he did not suffer injury in fact because he neither requested to use MAT during his stay at the ARC nor was he denied admission or discharged from the ARC due to his disability. Doc. No. 38 at 19. Espinosa responds that he refrained from asking to use MAT because he was aware of the policy prohibiting its use and knew that any such request would be futile. Doc. No. 30 ¶¶ 91-92. As a result, Espinosa was forced to endure the pain of withdrawal during his stay. Id. Physical harm "readily qualif[ies] as [a] concrete injur[y]." TransUnion LLC, 141 S. Ct. at 2204. Here, Espinosa has plausibly alleged that he suffered painful withdrawal symptoms due to the New York Corporation's MAT policy with which he complied. Even absent discharge or denial of admission, this allegation of physical harm is sufficient to establish standing.

II.   MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM (DOC. NO. 39)

A.   Statute of Limitations

In their Motion to Dismiss, the Defendants first argue that Plaintiffs Tassinari and Espinosa's claims are time-barred. The parties agree that the applicable statute of limitations is three years for both the ADA the Rehabilitation Act, and two years for the FHA. See Cunningham v. Potter, No. CV 09-10815-RWZ, 2009 WL 10694441, at *1 (D. Mass. June 18, 2009); 42 U.S.C. § 3613(a)(1)(A). As a result, claims arising from actions prior to May of 2018

must be dismissed under all three statutes, and claims arising from actions prior to May of 2019 must be dismissed under the FHA.

According to the complaint, Plaintiff Tassinari first enrolled in TSA's 180-day residential drug rehabilitation program at the Boston ARC in early 2018.  Doc. No. 30 ¶¶ 59-60.  He was expelled on or about April 14, 2018 from the ARC program after taking doctor-prescribed MAT. Id. ¶ 69.  Tassinari, who has experienced periods of homelessness and continues his struggle with OUD, called the Boston ARC on May 13, 2021 to inquire about enrollment.  Id. ¶ 79.  After Tassinari disclosed that he was taking MAT, he was informed that he could not take the open bed at the ARC unless he stopped using MAT.  Id.

Plaintiff Espinosa first enrolled in ARC programming in or around 2010-2011, which is when he learned of TSA's MAT policy.  Id. ¶¶ 87, 92.  After relapsing, he enrolled in the Providence ARC on November 1, 2018, where he stayed for approximately five months.  Id. ¶¶ 86-90, 96.

The Defendants contend that the claims arising from Tassinari and Espinosa's initial stays in 2018 and 2010-2011 respectively are time-barred under all three statutes, and that the alleged actions arising from Espinosa's 2018-2019 stay must also be dismissed as time-barred under the FHA.  The Plaintiffs counter that the continuing violations doctrine permits recovery for otherwise time-barred acts where, as here, they stem from an ongoing, discriminatory policy (i.e., the MAT policy).  Doc. No. 44 at 22-24.

"Under the 'continuing violation' doctrine, a plaintiff may obtain recovery for discriminatory acts that otherwise would be time-barred so long as a related act fell within the limitations period."  Tobin v. Liberty Mut. Ins. Co., 553 F.3d 121, 130 (1st Cir. 2009).  Courts in the First Circuit have recognized two types of continuing violations: serial and systemic.  Sabree

v. United Bhd. of Carpenters and Joiners, 921 F.2d 396, 400 (1st Cir.1990).  "As to serial

violations, the Supreme Court has reiterated that 'discrete discriminatory acts are not actionable

if time barred, even when they are related to acts alleged in timely filed charges.'" Thornton v.

United Parcel Serv., Inc., 587 F.3d 27, 33 (1st Cir. 2009) (quoting Nat'l R.R. Passenger Corp. v.

Morgan, 536 U.S. 101, 113 (2002)).  A systemic violation, which the Plaintiffs claim to allege

here, occurs when the defendant maintains a discriminatory policy that has harmed the plaintiff

and continues into the limitations period.  Id.; see also Mack v. Great Atl. & Pac. Tea Co., 871

F.2d 179, 184 (1st Cir. 1989) ("[W]e have recognized that if a Title VII violation occurs in the

wake of some continuing policy, itself illegal, then the law does not bar a suit aimed at the

employer's dogged insistence upon that policy within the prescriptive period.").

Though the Defendants attempt to construe Tassinari's expulsion from the ARC as a

"discrete act" that cannot form the basis for a systemic continuing violation, the Plaintiffs'

complaint clearly and plausibly alleges a systemic violation caused by the well-defined MAT

policy.  Cf. Mack, 871 F.2d at 184 (holding that a "vague, undefined policy of discrimination" is

insufficient to satisfy the continuing violations doctrine).  In addition to alleging a discriminatory

policy, the Plaintiffs must show that "the discriminatory policy was in effect, and injured [them],

during the limitations period."  Id.  Turning first to the ADA and Rehabilitation Act claims, both

Espinosa and Tassinari have established that TSA's ongoing MAT policy injured them during

the limitations period—for Tassinari, this injury occurred during his 2021 call, and for Espinosa

it occurred during his 2018-2019 enrollment in the ARC program.  As for the FHA claims, only

Tassinari has alleged an injury that occurred within the limitations period.  Espinosa has not

alleged that he suffered harm after March of 2019 when he left the ARC program.  Espinosa's

FHA claim is therefore time-barred.  To summarize, the remaining claims in this case include

Tassinari's ADA, FHA, and Rehabilitation Act claims and Espinosa's ADA and Rehabilitation Act claims.

    B.    <u>Statutory Exemptions</u>

    Next, the Defendants urge the Court to dismiss the Plaintiffs' ADA and FHA claims due to the statutory exemptions applicable to religious organizations.  Both the ADA and FHA contain exemptions for religious organizations in certain circumstances.  Title III of the ADA excludes from its coverage "religious organizations or entities controlled by religious organizations, including places of worship."  42 U.S.C. § 12187.  The narrower FHA exemption states:

> Nothing in this subchapter shall prohibit a religious organization, association, or society, or any nonprofit institution or organization operated, supervised or controlled by or in conjunction with a religious organization, association, or society, from limiting the sale, rental or occupancy of dwellings which it owns or operates for other than a commercial purpose to persons of the same religion, or from giving preference to such persons, unless membership in such religion is restricted on account of race, color, or national origin.

42 U.S.C. § 3607(a).  The Plaintiffs contend that the exemptions are inapplicable here due, in part, to TSA's involvement in both religious and secular activities.  <u>See</u> Doc. No. 30 ¶ 134.

    Of course, these statutory exemptions apply only if TSA or the ARCs qualify as "religious organizations," or are controlled by a religious organization.  Determining an organization's religious status "is often a straightforward exercise as many organizations have been deemed clearly religious, such as churches or synagogues."  <u>Defiore v. City Rescue Mission of New Castle</u>, 995 F. Supp. 2d 413, 416 (W.D. Pa. 2013).  This is such a case.  The Plaintiffs' complaint acknowledges that TSA is "an international movement related to evangelical Christianity."  Doc. No. 30 ¶ 134.  In addition, the complaint repeatedly cites to

TSA's website,[14] which, <u>inter alia</u>, describes TSA as "an evangelical part of the universal

Christian Church" with a mission "to preach the gospel of Jesus Christ and to meet human needs

in His name without discrimination." <u>What Do We Do?</u> The Salvation Army,

https://www.salvationarmyusa.org/usn/about/.  Indeed, numerous cases have deemed TSA a

church in similar contexts.  <u>See</u> <u>Garcia v. Salvation Army</u>, 918 F.3d 997, 1003 (9th Cir. 2019)

("The record establishes that, as a church, the Salvation Army is "clearly" religious.");

<u>Schleicher v. Salvation Army</u>, 518 F.3d 472, 478 (7th Cir. 2008) ("The Salvation Army, which

has existed in the United States since 1880, is acknowledged to be a completely legitimate

church[.]"); <u>McClure v. Salvation Army</u>, 460 F.2d 553, 554 (5th Cir. 1972) ("The Salvation

Army is a church[.]").  The complaint itself and the documents incorporated therein establish that

TSA is a religious organization within the meaning of the ADA and the FHA.  Accordingly, TSA

is a religious organization for the purposes of the FHA and ADA statutory exemptions.[15]

Though the Court's determination regarding TSA's religious status ends the matter with

respect to the Plaintiffs' count under the ADA,[16] which broadly exempts religious organizations

---

[14] Because the complaint cites to portions of TSA's website, the Court finds that these webpages
are incorporated by reference therein.  <u>Watterson v. Page</u>, 987 F.2d 1, 3 (1st Cir. 1993).

[15] The Plaintiffs argue that the application of the ADA's statutory exemption might give rise to
an Establishment Clause claim if further discovery reveals "excessive entanglement" between
TSA, courts, and other government agencies.  Doc. No. 44 at 14 n.6.  Because the current
complaint contains no such claim, the Court finds the Plaintiffs' argument unpersuasive.
Furthermore, Plaintiffs have not explained why such a claim would lie against TSA as opposed
to the relevant governmental entity.

[16] The Plaintiffs maintain that the ADA count survives because they allege violations of both
Title III and Title V and, unlike Title III, Title V does not include a religious exemption.  Doc.
No. 44 at 11-12.  The Plaintiffs rely on Title V's anti-interference and retaliation provisions, <u>see</u>
42 U.S.C. § 12203, arguing that the Defendants interfered with their access to health care.  <u>Id.</u>
"[T]o establish a violation of § 12203(b), a plaintiff must show that when the interference,
coercion, or intimidation took place they were exercising or enjoying a right protected by the
ADA."  <u>Barnes v. Benham Grp., Inc.</u>, 22 F. Supp. 2d 1013, 1024 (D. Minn. 1998); <u>see also</u>
<u>Melerski v. Virginia Dep't of Behav. Health & Developmental Servs.</u>, No. 4:15-CV-00039, 2016
WL 154144, at *3 (W.D. Va. Jan. 11, 2016) ("A Title V retaliation action must rest upon a

from its coverage, the FHA's exemption is narrower.  The FHA permits religious organizations to "limit[] the sale, rental or occupancy of dwellings which it owns or operates for other than a commercial purpose to persons of the same religion or [to] give[] preference to such persons." 42 U.S.C. § 3607(a).  According to the Defendants, the policy barring individuals from taking MAT while participating in ARC programming simply gives preference to individuals who share TSA's religious beliefs.  The Plaintiffs counter that the FHA exemption is inapplicable here because TSA disqualifies individuals solely due to their use of MAT and not their adherence to TSA's religious beliefs.

The FHA's religious exemption does not result in dismissal under Rule 12(b)(6).  At the hearing on the Motions, the Defendants outlined two primary arguments in support of the exemption's application: 1) that ARC programming is motivated by TSA's religious beliefs, and 2) that ARC participants must adhere to TSA's religious beliefs as a condition of enrollment.  As to the first argument, the plain terms of the statute dictate that the exemption is applicable to organizations that give preference to "persons of the <u>same religion</u>."  42 U.S.C. § 3607(a). Because the text of the statutory exemption makes no mention of the organization's motive or religious purpose for offering such services, the first argument fails.  The Defendants conceded at the hearing on this Motion that the latter argument raises fact questions, such as whether ARC participants are truly required to attend religious services and the like.  <u>See</u> Doc. No. 30 ¶ 153 (alleging that ARC participants are "are expected to . . . attend church" while omitting any

---

previous Title's subject.") (citing <u>Collazo-Rosado v. Univ. of P.R.</u>, 775 F. Supp. 2d 376, 384 (D.P.R. 2011)).  Because the Court has dismissed the Plaintiffs' Title III claim, there is no predicate violation upon which the Plaintiffs may base their Title V claim.  <u>See</u> <u>Hann v. Royal Palms Mobile Home Park</u>, No. CV 20-805 CBM(SHKX), 2021 WL 3772125, at *3 (C.D. Cal. May 21, 2021) ("Because Plaintiff failed to allege an underlying Title I-III ADA Claim, Plaintiff's ADA Title V claim fails.").  Accordingly, the Title V claim fails.

allegations that such attendance is required).  Therefore, the Court finds that the applicability of the FHA exemption is better addressed after discovery upon a full record.  Accordingly, the Defendants' Motion to Dismiss based on the FHA statutory exemption is DENIED WITHOUT PREJUDICE.

Because the Defendants make no argument with respect to the Plaintiffs' Rehabilitation Act count, the Court does not address it here.

C.    Class Allegations

Finally, the Defendants move to strike or amend the Plaintiffs' class allegations, contending that: 1) the class definition is overbroad because it includes plaintiffs who participated in any ARC in the United States; 2) the court lacks personal jurisdiction over Defendants for claims by class members that arose outside of Massachusetts; 3) the class definition is not time-bound and therefore includes plaintiffs whose claims fall outside of the statute of limitations; 4) the class is not ascertainable; and 5) Plaintiffs cannot establish the requirements of Federal Rule of Civil Procedure 23(b)(2) or (3).  See Doc. No. 44 at 10.

The Defendants rely on two Federal Rules of Civil Procedure that permit courts to strike class allegations at the pleading stage.  Rule 12(f) empowers courts to "to delete the complaint's class allegations."  Manning v. Boston Medical Center Corp., 725 F.3d 34, 59 (1st Cir. 2013).  Rule 23(d)(1)(D) provides that a court may "require that the pleadings be amended to eliminate allegations about representation of absent persons and that the allegation proceed accordingly."  Monteferrante v. Williams-Sonoma, Inc., 241 F. Supp. 3d 264, 268 (D. Mass. 2017).

The First Circuit has, however, cautioned district courts against allowing this "drastic" and "disfavored" remedy, which "requires a reviewing court to preemptively terminate the class aspects of . . . litigation, solely on the basis of what is alleged in the complaint, and before

plaintiffs are permitted to complete the discovery to which they would otherwise be entitled on questions relevant to class certification."  Manning, 725 F.3d at 59 (quoting Mazzola v. Roomster Corp., 849 F.Supp.2d 395, 410 (S.D.N.Y. 2012)).  Courts should therefore refrain from allowing a motion to strike unless "it is obvious from the pleadings that the proceeding cannot possibly move forward on a classwide basis."  Id.

In light of its earlier determinations regarding personal jurisdiction and the statute of limitations, the Court ALLOWS the Defendants' Motion only insofar as it seeks to limit the class to plaintiffs bringing claims against the New York Corporation.  The Court finds that the Defendants' other arguments are premature at this phase given the undeveloped state of the record and the First Circuit's cautionary guidance regarding striking class allegations.  The Defendants' Motion to Strike the class allegations is therefore DENIED WITHOUT PREJUDICE.[17]

III.    CONCLUSION

For the reasons explained above, the Motions to Dismiss, Doc. Nos. 37, 39, are ALLOWED IN PART AND DENIED IN PART.  To summarize, the remaining claims are those of Tassinari and Espinosa under the Rehabilitation Act and that of Tassinari under the FHA.

---

[17] The Court notes that the First Circuit's recent decision in Waters likely closes the door on the Defendants' contention that class plaintiffs with claims arising from conduct that occurred outside Massachusetts cannot establish personal jurisdiction.  See Waters, 23 F.4th 84 at 99 (stating that in a Rule 23 class action "the named plaintiff . . . is the only party responsible for serving the summons, and thus the only party subject to Rule 4").

These claims lie only against The Salvation Army, a New York Corporation. The Clerk shall schedule a Rule 16 conference.


                              SO ORDERED.


                               /s/ Leo T. Sorokin
                              Leo T. Sorokin
                              United States District Judge