# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| **MARK TASSINARI, RICHARD ESPINOSA, AND JOSEPH ALMEIDA,** individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br> v. <br><br> **THE SALVATION ARMY, A NEW YORK CORPORATION** <br><br> Defendant**.** | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | **Civil Action No.:    1:21-CV-10806** |

## DEFENDANTS' OPPOSITION TO PLAINTFFS' MOTION TO COMPEL

# TABLE OF CONTENTS

**Page**

I.  BACKGROUND ................................................................................................................. 1

    A.  Plaintiffs' Claims Against Defendant's ARC Programs ......................................... 1

    B.  Plaintiffs' Overreaching Discovery Demands and Defendant's Attempts to Compromise.... 3

II.  ARGUMENT ................................................................................................................... 8

    A.  The ARC's Applicant and Beneficiary Files Contain Confidential PII and Production Should Be Limited to A Redacted, Reasonable Sample. ....................................... 8

    B.  Defendant Has Produced Sufficient Financial and Non-ARC Programming Information and Plaintiffs' Requests Regarding Government Benefit Assignments Are Irrelevant. .............. 12

    C.  Plaintiffs' Overbroad Request for Defendant's Communications Violates Its First Amendment Rights. ......................................................................................... 15

III.  CONCLUSION ............................................................................................................. 20

CERTIFICATE OF SERVICE.......................................................................................... 22

# <u>TABLE OF AUTHORITIES</u>

**Pages**

**Cases**

*Alicea v. New Brunswick Theological Seminary*,
608 A.2d 218 (N.J. 1992) ................................................................................................. 18

*Bell v. Presbyterian Church*,
126 F.3d 328 (4th Cir. 1997) ........................................................................................... 16

*In re Bextra & Celebrex Mktg. Sales Pracs. & Prod. Liab. Litig.*,
249 F.R.D. 8 (D. Mass. 2008) .......................................................................................... 15

*Bollard v. Soc'y of Jesus*,
196 F.3d 940 (9th Cir. 1999) ........................................................................................... 16

*Boy Scouts of Am. v. Dale*,
530 U.S. 640 (2000) ................................................................................................... 18, 19

*Bradford v. WR Starkey Mortg., LLP*,
No. CIV A 206-CV-86-WCO, 2007 WL 2302514 (N.D. Ga. Aug. 2, 2007)......................... 10

*Braidwood Mgmt. Inc. v. Becerra*,
No. 4:20-cv-00283-O, 2022 WL 4091215 (N.D. Tex. Sept. 7, 2022)................................. 17

*Briggs v. Adel*,
No. CV-18-02684-PHX-EJM, 2020 WL 4003123 (D. Ariz. July 15, 2020)................... 11, 12

*Butler v. St. Stanislaus Kostka Cath. Acad.*,
No. 19-CV-3574(EK)(ST), 2022 WL 2305567 (E.D.N.Y. June 27, 2022)........................... 19

*NLRB v. Catholic Bishop of Chicago*,
440 U.S. 490 (1979) ........................................................................................................ 15

*E.E.O.C. v. Catholic University of America*,
83 F.3d 455 (D.C. Cir. 1996)............................................................................... 16, 17, 18

*Collette v. Archdiocese of Chicago*,
200 F. Supp. 3d 730 (N.D. Ill. 2016) ............................................................................... 16

*Cusumano v. Microsoft Corp.*,
162 F.3d 708 (1st Cir.1998)............................................................................................... 9

*E.E.O.C. v. Electro-Term, Inc.*,
167 F.R.D. 344 (D. Mass. 1996) ...................................................................................... 20

*Employment Division v. Smith*,
494 U.S. 872 (1990) ........................................................................................................ 17

*United States v. Freedom Church*,
613 F.2d 316 (1st Cir. 1979)............................................................................................. 20

ii

*Fulton v. City of Philadelphia, Penn.*,
  141 S. Ct. 1868 (2021) (Barrett, J., concurring) ...................................................... 17

*Gary S. v. Manchester Sch. Dist.*,
  241 F. Supp. 2d 111 (D.N.H. 2003), *aff'd*, 374 F.3d 15 (1st Cir. 2004).................................. 17

*Hankins v. Lyght*,
  438 F.3d 163, 441 F.3d 96 (2d Cir. 2006) .......................................................... 17

*Moussazadeh v. Texas Dep't of Crim. Just.*,
  703 F.3d 781 (5th Cir. 2012) ..................................................................... 20

*N.O. v. Callahan*,
  110 F.R.D. 637 (D. Mass. 1986) .................................................................. 10

*Nat'l Collegiate Athletic Ass'n v. Smith*,
  525 U.S. 459 (1999) ......................................................................... 13, 17

*Natal v. Christian & Missionary All.*,
  878 F.2d 1575 (1st Cir. 1989) ................................................................. 15, 17

*Sabra as next friend of Baby M v. Pompeo*,
  453 F. Supp. 3d 291 (D.D.C. 2020) .............................................................. 20

*Our Lady of Guadelupe Sch. v. Morrissey-Berru*,
  140 S. Ct. 2049 (2020) ......................................................................... 16

*Our Lady's Inn v. City of St. Louis*,
  349 F. Supp. 3d 805 (E.D. Mo. 2018) ............................................................ 19

*United States Dep't of Transp. v. Paralyzed Veterans of Am.*,
  477 U.S. 597 (1986) ......................................................................... 13, 14

*Pardue v. Ctr. City Consortium Sch. of Archdiocese of Washington, Inc.*,
  875 A.2d 669 (D.C. 2005) ...................................................................... 16

*Presbyterian Church v. Hull Church*,
  393 U.S. 440 (1969) ........................................................................... 17

*Rayburn v. Gen. Conf. of Seventh-Day Adventists*,
  772 F.2d 1164 (4th Cir. 1985) ................................................................. 15, 18

*Silva v. Clarke*,
  No. CIV. A. 10-11381-RGS, 2010 WL 5441906 (D. Mass. Dec. 22, 2010)............................ 19

*Spencer v. Nigrelli*,
  No. 22-CV-6486 (JLS), 2022 WL 17985966 (W.D.N.Y. Dec. 29, 2022)............................... 18

*T.W. v. New York State Bd. of L. Examiners*,
  No. 16-CV-3029 (RJD), 2018 WL 4185803 (E.D.N.Y. Mar. 12, 2018)............................... 13, 14

*In re The Bible Speaks*,
  69 B.R. 643 (Bankr. D. Mass. 1987) ........................................................... 15, 20

*Thomas v. Review Bd. of Indiana Employment Sec. Div.*,
    450 U.S. 707 (1981) ................................................................................................ 20

*Vasquez v. Smith's Food & Drug Centers, Inc.*,
    No. CV-14-2339-TUC-DCB, 2017 WL 1233840 (D. Ariz. Apr. 4, 2017) ............................ 14

*Watson v. Jones*,
    80 U.S. 679 (1871) ................................................................................................ 17

**Statutes**

29 U.S.C. § 794(b)(3)(A)-(B) ........................................................................................ 12

42 U.S.C. 290dd-2(f) ...................................................................................................... 9

Americans with Disabilities Act  (ADA) ...................................................................... 1, 2

Fair Housing Act ........................................................................................................ 2, 3

Religious Freedom Restoration Act, 42 U.S.C.A. § 2000bb-1 (RFRA) ...................... 16, 17

Public Health Services Act, 42 U.S.C. 290dd-2 ............................................................. 9

Rehabilitation Act ...................................................................................................... 2, 3

Section 504, Rehabilitation Act of 1973, 29 U.S.C. § 794 ........................... 3, 9, 12, 13, 14

Victor E. Schwartz & Christopher E. Appel, The Church Autonomy Doctrine: Where Tort
    Law Should Step Aside, 80 U. Cin. L. Rev. 431, 484 (2011)  ................................. 18

**Other Authorities**

42 C.F.R. Part 2 ................................................................................................... *passim*

42 C.F.R. § 2.11 ........................................................................................................... 9

42 C.F.R. § 2.12(a)(1)(ii) ............................................................................................... 9

Fed. R. Civ. P. 26(b)(1) .................................................................................................. 8

LR 37.1 ........................................................................................................................ 4

Rule 26 ......................................................................................................... 9, 15, 20

Rule 26(b) ................................................................................................................... 15

Substance Abuse and Mental Health Services Administration, U.S. DEP'T OF HEALTH &
    HUMAN SERVS ..................................................................................................... 2

<u>**DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL**</u>

In their Motion to Compel, Plaintiffs Mark Tassinari, Richard Espinosa, and Joseph Almeida ("Plaintiffs"), seek exorbitant and disproportionate discovery while dismissing the undue burden, privacy invasion, and Constitutional infringement their requests entail. Plaintiffs seek discovery of highly sensitive files of tens of thousands of other current and former beneficiaries of Adult Rehabilitation Centers ("ARCs") operated by Defendant The Salvation Army, a New York Corporation ("Defendant" or "Eastern Territory"), individuals with no apparent nexus to Plaintiffs' claims. Plaintiffs also seek overreaching discovery into Defendant's finances, government benefit policies, programming, and communications regarding a medication policy based on its religious belief in abstinence. Defendant respectfully requests that the Court deny their motion.

## I.       BACKGROUND

### A.       **Plaintiffs' Claims Against Defendant's ARC Programs**

Defendant is the corporate instrumentality of The Salvation Army in its geographically-delineated Eastern Territory in the United States. The Salvation Army, an international religious and charitable organization, is an evangelical arm of the universal Christian church. *See* Declaration of Thomas P. Gies ("Gies Decl."), Ex.[1] E, ARC Mission and Purpose. The Court has already determined that Defendant is a religious organization for purposes of Plaintiffs' claims. *See* Order on Motions to Dismiss, June 22, 2022 (ECF 72) ("June 22, 2022 Order") at 21 ("Defendant is a religious organization within the meaning of the ADA and the FHA."). Abstinence from alcohol and addictive drugs is a core tenet of Defendant's religious beliefs that guides all of its activities, including its ARC programs. *See* Ex. F, The Soldier's Covenant; Ex. G, ARC Eastern Territory Center Guidelines.[2] The ARC programs involve daily devotions, Christian growth Bible studies, and other religious activities, all of which

---

[1] Unless otherwise indicated, all citations to "Ex. #" herein refer to exhibits to the Declaration of Thomas P. Gies.
[2] *Id.* at TSA0000659 ("Our intention is to provide a safe center that adheres to the standards of holy living. Therefore, we share common convictions regarding the use of intoxicants.")

provide the capstone of a spiritually-based holistic approach to lifestyle change and rehabilitation. *Id.* Defendant's ARCs are neither licensed medical clinics nor equipped to provide medical care.

With these concerns in mind, Defendant's ARCs maintain a medication policy that, among other things, "prohibits the general use of medications that are known to be abusive and addictive to [their] typical population. When conditions necessitate their use, the beneficiary then needs to be referred to a clinical program where medication management and monitoring is provided." Ex. H, Defendant ARC Command Eastern Territory Reference Guide for Medications and Mental Health Conditions, at TSA0000435. Among the medications that the ARCs prohibit because of their addictive qualities are methadone and buprenorphine—two of the three medications currently approved by the FDA as part of Medication-Assisted Therapy ("MAT")[3] to treat opioid use disorder ("OUD"). Defendant has determined that, in part because these drugs tend to be abused (Ex. K, Dep. of Joseph Almeida ("Almeida Dep.") at 39:9-16), their use is inconsistent with the ARC's commitment to an abstinence-based approach to rehabilitation. *See, e.g.* Ex. I, U.S. Department of Justice, Drug Enforcement Administration, Drugs of Abuse at TSA0000563; *see also id.* at TSA0000541. Defendant does not prohibit use of the third drug often prescribed to treat OUD—naltrexone—because, unlike methadone and buprenorphine, it does not have addictive properties. *See, e.g.,* Ex. J, The Talbott Medications Guide at TSA0000626, 628.

Nonetheless, Plaintiffs filed this putative class action challenging Defendant's religious-based medication policy prohibiting use of addictive drugs at its ARC programs as discriminatory against individuals with OUD under the Rehabilitation Act and the Fair Housing Act.[4] Defendant

---

[3] Plaintiffs mischaracterize the medication policy as a "no MAT" policy. MAT is not simply medication, it is the use of medications in combination with counseling and behavioral therapies. *See* "MAT Medications, Counseling, and Related Conditions," Substance Abuse and Mental Health Services Administration, U.S. DEP'T OF HEALTH & HUMAN SERVS. Defendant's ARCs are spiritually-based abstention focused programs and are not licensed or equipped to provide the counseling and behavioral therapies generally contemplated by MAT.

[4] The Court dismissed Plaintiffs' claims under the Americans with Disabilities Act ("ADA") because the ADA broadly exempts religious organizations—like Defendant—from its coverage. June 22, 2022 Order at 21.

contends that Plaintiffs' claims are barred in their entirety on First Amendment grounds—specifically, that the Religious Clauses and the First Amendment right of religious-based expressive association exempt Defendant's medication policy from application of the remaining federal statutes at issue. *See* Answer to Second Amended Complaint (ECF 84), Affirmative Defense No. 5. Defendant also contends that it is not covered by the Rehabilitation Act because its ARC programs do not receive federal financial assistance and it is principally engaged in the provision of religious—not social—services. *See* Section 504, Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"). Defendant also denies that it has violated either The Fair Housing Act or the Rehabilitation Act, but those arguments on the merits are beyond the scope of this opposition.

### B. Plaintiffs' Overreaching Discovery Demands and Defendant's Attempts to Compromise.

The issues in this case are quite narrow and few material facts are in dispute. Defendant does not dispute that its medication policy prohibits the use by ARC beneficiaries of methadone and buprenorphine, along with a long list of other addictive drugs, as well as other medications to address medical conditions that ARCs are not equipped to handle, including medications to treat Schizophrenia. *See* Ex. H at TSA0000435, 445, 466. Plaintiffs served Defendant with numerous discovery requests drafted broadly enough to encompass virtually every piece of paper having to do with Defendant's 29 separate ARC programs. The Parties have met and conferred in good faith and Defendant has produced the bulk of responsive documents it agreed to produce,[5] including documents central to Plaintiffs' claims. *See* Gies Decl. at ¶ 4.

However, the Parties are at an impasse as to the following three categories of documents

---

[5] Defendant is continuing to produce responsive documents under the rolling production protocol agreed to by the parties. This week, Defendant produced redacted applicant and intake logs from 26 ARCs, discharge logs and statistical summaries, and litigation summaries. Gies Decl. at ¶ 5. Other discovery continues, with both 30(b)(6) and fact depositions scheduled in the coming weeks, as well as scheduling Plaintiff Tassinari for his deposition.

demanded by Plaintiffs: (1) ARC applicant and beneficiary files and the extensive amount of personal identifying information ("PII") within them, (2) additional internal and non-party Salvation Army entity financial, government benefit assignment, and non-ARC programming information, and (3) communications about the medication policy.  On January 3, 2023, Defendant requested that the parties conduct the LR 37.1 discovery conference to further discuss Plaintiffs' proposed stipulation to modify the Scheduling Order (the "Scheduling Order Stipulation").  *See* Declaration of Matthew Murray ISO Plaintiffs' Motion to Compel, Ex. ("Murray Ex.") 35.  The Scheduling Order Stipulation would have asked the Court to modify the existing Case Scheduling Order to provide for accelerated consideration of the First Amendment issue presented by Plaintiffs' claims and discovery requests.  *See* Murray Ex. 29.  Plaintiffs declined that offer on January 6, and filed the Motion the same day.  *See* Ex. L; Pls.' Motion to Compel (ECF 89); Memorandum of Law ISO Pls.' Motion to Compel (ECF 90) ("Motion" or "Mot.").[6]

> i. *ARC Applicant and Beneficiary Files and Personally Identifying Information.*

Even though Plaintiffs' putative class is only comprised of individuals with OUD who were allegedly denied access to ARCs pursuant to the medication policy, Plaintiffs are seeking the entirety of Defendant's ARC beneficiary and applicant files, with complete disclosure of PII, for a five-year period, a request that contemplates more than a million pages of documents from over 33,000 files.  *See* Second Amended Complaint (ECF 83) at ¶ 209; Murray Ex. 1, Plaintiffs' Interrog. ("ROG") No. 4; Murray Ex. 2, Pls.' Req. for Production of Docs. ("RFP") Nos. 2, 14, 15.

The only documents that Defendant has containing information regarding specific applicants (*i.e.,* those who applied or inquired about the ARCs but for whatever reason did not ultimately participate in the program) are hard copy applicant files and some call logs, most of

---

[6] Because the discovery issues raised in the Motion present important First Amendment issues, Defendant filed a Motion to Schedule a Status Conference and Request for Partial Stay of Discovery ("Motion for Status Conference and Partial Stay") on January 16, 2023 (ECF 98-99).

which have now been produced with PII redacted, for as much of the period at issue as are available. Information regarding individuals who are accepted as <u>beneficiaries</u> in an ARC program are contained in hard copy beneficiary files stored at each of the 29 ARCs; beneficiary files are not maintained in electronic form. *See* Declaration of Beth Muhs ("Muhs Decl.") at ¶ 33. Some information about ARC beneficiaries also is stored in the BITS Pro database, a proprietary database developed for use by Defendant. Declaration of Jesse Melnick ("Melnick Decl.") at ¶¶ 2-3.

Production of ARC beneficiary files presents several obstacles. *First,* Defendant promises its beneficiaries complete confidentiality, a promise that is critical to its ability to serve this vulnerable population. Muhs Decl. at ¶ 33. *Second,* Defendant's ARCs are covered by 42 C.F.R. Part 2 ("Part 2"), which protects the confidentiality of information by strictly limiting disclosure of information that, *inter alia*, would identify individuals with substance abuse disorders. Part 2 thus addresses understandable concerns about breach of confidentiality and the possibility of criminal prosecution that would deter individuals from seeking help. Given the sensitivity of the information contained in the beneficiary files, maintaining this confidentiality obligation would require redaction of PII in each file produced.

The third hurdle is the sheer volume of material that has no obvious nexus to Plaintiffs' claims. Simply because someone was a beneficiary at an ARC program obviously does not mean they have been prescribed methadone or buprenorphine to treat OUD. The ARC programs serve individuals who are disassociated for a variety of life reasons, only some of which involve drug abuse or addiction. Muhs Decl. at ¶ 32; *see also* Murray Ex. 21, ARC Discharge Summary 1/1/2018 and 12/7/2022 (reflecting only 3% beneficiaries primarily abusing opiates). Defendant's best estimate is that it has served approximately 33,000 beneficiaries since May 1, 2018. Muhs Decl. at ¶ 32. Each hardcopy beneficiary file contains between approximately 50 to several hundred pages, all of which would need to be reviewed for redaction of PII. Muhs Decl. at ¶ 33.

Separately, the BITS Pro system does not allow users to search for specific terms, such as methadone and buprenorphine, nor can users search for and extract information about all beneficiaries discharged for using a particular type of narcotic. Muhs Decl. at ¶ 29.

Defendant raised these functionality challenges with Plaintiffs on a meet and confer call on October 5, 2022 in an attempt to reach a compromise. Gies Decl. at ¶ 2. Defendant proposed providing a reasonable sampling of beneficiary files from a subset of the ARCs, with PII redacted, and corresponding screenshots of entries in the BITS Pro database for the sample—also with PII redacted. *Id.* To better identify the approximate number of individuals likely to have been impacted by Defendant's medication policy, Defendant produced an ARC Discharge Summary that provides the breakdown of the bases for discharge for beneficiaries discharged from the ARC program between 9/30/2021 and 10/1/22. *See* Muhs Decl., Ex. D, ARC Discharge Summary 2021. If a beneficiary was discharged for needing or using methadone or buprenorphine, the discharge category would be either "Higher level of care" or "Drug Use". Muhs Decl. at ¶¶ 30-31.

On November 10, Defendant proposed that, prior to resolving the applicability of the First Amendment according to Plaintiffs' proposed Scheduling Order Stipulation, the initial sampling would include all beneficiary files and corresponding BITS screenshots of the 392 beneficiaries in those two discharge categories over the course of one year in the relevant period, with PII redacted. Gies Decl. at ¶ 3. On December 12, Plaintiffs responded to Defendant's proposal by suggesting a "sampling" of roughly 4,300 beneficiary files and corresponding BITS database screenshots – comprised of all beneficiaries from three ARCs, all beneficiaries recorded as having a Primary Abused Substance of "Opiates", and all beneficiaries discharged over four years for "Higher level of care," "Drug Use," or "Possession of Drugs/Alcohol" and "Medical." Murray Ex. 27.

Defendant explained that 4,300 beneficiary files is not a true "sample," as it includes *more* than a reasonable estimate of the total number of putative class members – not a reasonable sample

of that number. *Id.* Defendant also specifically explained why PII review and redaction of 4,300 files is unduly burdensome and cost-prohibitive, as those tasks alone would cost approximately $2 million, plus the additional costs of collection, scanning, and quality control review. *Id.*[7] Meanwhile, Defendant's proposal (as part of agreeing to the Scheduling Order Stipulation) amounted to a standard 10% sample of the beneficiaries who could reasonably be putative class members (i.e. approximately 3,400 beneficiaries either primarily using opiates or discharged for "Drug Use," "Higher Level of Care" or "Possession of Drugs/Alcohol" over the putative class period). *See* Murray Ex. 21, ARC Discharge Summary 2018-2022.

Plaintiffs rejected Defendant's sampling proposal on December 20, dismissing its concern that production of beneficiary files alone could amount to over a million dollars as "standard in any civil litigation" and—instead of responding with a more reasonable number or offering to cost-share, Plaintiffs gave Defendant an ultimatum: either Defendant agree wholesale to a 31-paragraph stipulation that effectively concedes class certification or "we will move to compel the full universe of beneficiary files and BITS data"—in other words, up to 33,000 beneficiary files including information protected under Part 2. *See* Murray Ex. 29. Plaintiffs' counsel concluded by stating that "alternatively," Defendant could effectively concede the case, by changing its medication policy. *Id.* Unwilling to violate its religious beliefs, Defendant declined.

          *ii. Internal and Non-Party Salvation Army Financial and Programming Information.*

Plaintiffs have also broadly requested effectively every financial document related not just to Defendant but all other Salvation Army entities, none of whom are party to this lawsuit.[8] *See* Mot. at 9-10; Murray Ex. 1, ROG No. 12; Murray Ex. 2, RFP Nos. 4, 5, 6. Plaintiffs further request

---

[7] Each beneficiary file is voluminous: Plaintiffs Espinosa and Tassinari's beneficiary files, which have been produced, are 318 and 69 pages respectively, and this range is typical for the files. Muhs Decl. ¶ 33.

[8] The Court dismissed all claims against The Salvation Army National Corporation, a New Jersey corporation, for lack of personal jurisdiction. June 22, 2022 Order. Much of Plaintiffs' discovery requests thus request information about non-parties that the Court has determined is irrelevant.

irrelevant documents related to the assignment of government benefits by ARC beneficiaries to Defendant and overbroad, invasive requests for documents "sufficient to show all your activities and programming in addition to the operation of ARCs." *See* Mot. at 10; Murray Ex. 2, RFP Nos. 4, 7. Plaintiffs concede that Defendant has produced some documents responsive to their financial requests, and otherwise claim to need the remaining invasive discovery to assess legal issues Defendant's productions already address or that are irrelevant. *See* Mot. at 16.

      *iii.  Communications re Defendant's Medication Policy*

Further, Plaintiffs seek all Defendant communications regarding its medication policy. *See* Mot. at 10; Ex. F, RFP No. 7. As discussed below, this request violates Defendant's First Amendment rights and, at a minimum, should be deferred until after resolution of the First Amendment defenses, as suggested in Defendant's Motion for Status Conference and Partial Stay.

## II.    ARGUMENT

### A.    The ARC's Applicant and Beneficiary Files Contain Confidential PII and Production Should Be Limited to A Redacted, Reasonable Sample.

The scope of discovery is governed by Fed. R. Civ. P. 26(b)(1), which requires that it be proportionate to the needs of the case considering the burden and expense weighed against likely benefit. Plaintiffs' Motion seeking applicant and beneficiary files overreaches in two ways. *First*, the names and other PII of non-party ARC beneficiaries are confidential, legally protected from disclosure by 42 C.F.R. Part 2, and not relevant or probative of any relevant fact in this case. *Second*, the files of all approximately 33,000 ARC beneficiaries are not relevant to Plaintiffs' claims.

      *iv.  Highly Sensitive Beneficiary PII Is Protected Under 42 C.F.R. Part 2 And Should Not Be Produced.*

Any relevant information in the applicant and beneficiary files should be produced redacted to avoid violating beneficiary confidentiality. Maintaining that confidentiality is both required by law and one of Defendant's bedrock principles, essential to developing the trust required to move

beneficiaries to seek help from the ARCs without fear of exposure.

42 CFR Part 2, promulgated under the Public Health Services Act, 42 U.S.C. 290dd-2, restricts the disclosure of, *inter alia*, the identity of individuals who seek treatment for substance abuse disorders, in order to facilitate assistance without fear of prosecution. Any person who violates Part 2 is subject to criminal penalties. 42 U.S.C. 290dd-2(f). Specifically, Part 2 restricts disclosure of "drug abuse information obtained by a federally assisted drug abuse program." 42 C.F.R. § 2.12(a)(1)(ii). A "program" is an entity that "holds itself out as providing, and provides, substance use disorder diagnosis, treatment, or referral for treatment." *Id*. at § 2.11.[9] Further, a program is considered to be "federally assisted" if it "is assisted by the Internal Revenue Service of the Department of the Treasury through the allowance of income tax deductions for contributions to the program or through the granting of tax-exempt status to the program." *Id*. at § 2.12(b).[10]

Defendant's ARCs provide referral for substance abuse treatment within the meaning of this definition, even though they are not licensed substance abuse treatment centers. And, because Defendant is a 501(c)(e)(3) tax-exempt organization and therefore is "federally assisted," Defendant is covered by Part 2. As such, Defendant cannot—by law—simply give Plaintiffs access to all unredacted beneficiary information without risking criminal sanctions.

Legal obligations aside, Defendant promises anonymity to the individuals it serves and that promise is central to its ability to build trust with vulnerable individuals who seek Defendant's help. Muhs Decl. ¶ 33; *see Cusumano v. Microsoft Corp.*, 162 F.3d 708, 714, 717 (1st Cir.1998) (requiring courts to consider confidentiality when applying Rule 26). Simply because Plaintiffs have styled their claims as a class action does not entitle them to the identities and highly personal and medical

---

[9] Plaintiffs erroneously assert that to be covered by Part 2, "the provision of drug and alcohol abuse treatment must be [Defendant's] 'primary function.'" Mot. at 13. The case Plaintiffs cite quotes the third definition of covered programs, which only applies to "general medical facility[ies]"; Defendant is covered under the first definition, applicable to "[a]n individual or entity (other than a general medical facility)," which has no "primary function" requirement. *Id*. at § 2.11.
[10] Defendants are not trying to "have it both ways" (Mot. at 13) regarding federal funding - Part 2 and Section 504 simply have different definitions of federal assistance.

9

information of every person to have passed through Defendant's doors over the last four years.

Plaintiffs claim that unredacted applicant and beneficiary information is relevant to "the identification of class members, the application and scope of the challenged policy, the merits of Defendant's asserted First Amendment defense, and potential damages." Mot. at 11. They are incorrect. Plaintiffs can obtain everything relevant to these issues from the beneficiary files without knowing an individual beneficiary's social security number or name, which can be protected by redacting PII with an anonymized identifying number that they can use to identify potential class members. Identities of putative class members are routinely redacted in cases involving the disclosure of medical and other sensitive personal information, such as here. *See e.g. N.O. v. Callahan*, 110 F.R.D. 637, 647 (D. Mass. 1986) (limiting production of the medical files of putative class members to a redacted sampling of only one fifth of a group of 210 individuals). As one district court reasoned regarding pre-certification requests for private loan information:

> In light of the fact that this case has not yet been certified as a class action, the court finds this request overly broad and unduly burdensome. Both the scope and nature of the request concern the court. To comply, defendant would have to review an extremely large number of files in search of the responsive documents, and those responsive documents contain highly confidential personal and financial information of borrowers who are not parties to this case.

*Bradford v. WR Starkey Mortg., LLP*, No. CIV A 206-CV-86-WCO, 2007 WL 2302514, at *2 (N.D. Ga. Aug. 2, 2007).

> ### v. 33,000 Beneficiary Files Are Not Relevant to Plaintiffs' Claims and Would Cost Millions of Dollars to Produce.

Plaintiffs' pursuit of files containing PII at this stage of the case[11] is even more overbroad and unduly burdensome because they seek 33,000 files – a request not remotely tailored to the needs of their case. The PII of *all* applicants and beneficiaries is not relevant to Plaintiffs' claims.

---

[11] Defendant acted in good faith in discussing this subject, acknowledging Plaintiffs' interest in getting some information that might be relevant to the question of possible class certification at this stage of the case, as part of the larger negotiation over the Scheduling Order Stipulation.

Just because an individual applied to or was a beneficiary of an ARC program does not mean they (1) have OUD; (2) were prescribed methadone or buprenorphine; or (3) were either not admitted or discharged from an ARC program as a result of the medication policy. Those seeking rehabilitation are addressing numerous other unfortunate life situations, including individuals who are homeless or recovering from alcohol abuse. Muhs Decl. ¶ 32. Tellingly, neither of the two Plaintiffs who have been deposed to date could name a single other person who has been impacted by Defendant's medication policy, and Plaintiffs have refused to answer Defendant's discovery request asking for names of other individuals who claim to be members of the putative class on a spurious claim of privilege. *See* Ex. N, Dep. of Richard Espinosa at 180:24–181:22; Ex. K, Almeida Dep. at 172:16– 173:17, Ex. O, Pls.' Resp. and Objections to Def.'s Interrog. No. 13. Plaintiffs nonetheless seek carte blanche access to the identities and beneficiary files of tens of thousands of non-parties, which include deeply private information such as medical conditions, past trauma, drug addictions, religious beliefs, and reasons for seeking help from Defendant. Muhs Decl. ¶ 33.

Defendant offered Plaintiffs a reasonable compromise—a sample of approximately 400 files, with PII redacted, representing a standard 10% sample of all individuals discharged from Defendant's ARCs in the last four years for reasons that could potentially implicate the medication policy, consistent with the limitations and searchability of the BITS Pro database. Alternatively, Defendant offered to negotiate search terms and run them across the BITS Pro system from the back-end. Ex. M, Dec. 30, 2022 Gies Email to Plaintiffs' Counsel. Plaintiffs declined, and instead demanded a copy of the entire BITS Pro system, including all PII. That demand is unreasonable, both because it is overbroad and for the confidentiality reasons discussed above. The BITS Pro system is large, complex, and many of the tables include PII, which would require hundreds of hours to export, review and redact. Melnick Decl. at ¶¶ 5-9.

Sampling is "useful at the pre-class certification phase of discovery." *Briggs v. Adel*, No.

CV-18-02684-PHX-EJM, 2020 WL 4003123, at *18 (D. Ariz. July 15, 2020). In *Briggs*, the Court found that because the program files subject to the plaintiff's motion to compel were protected by Part 2, redaction of PII was necessary before production. *Id*. at *17. However, because redaction of the complete set of requested program files would require "thousands of hours of work" and therefore impose a "substantial burden" on the defendant, the court ordered the parties to "negotiate a sampling procedure so as to provide Plaintiffs with sufficient access to information to support their case for class certification while reducing [Defendant]'s burden of disclosure." *Id*. at *17-18.

Defendant remains willing to provide a redacted sampling of 400 beneficiaries files (or other reasonable number) defined on mutually agreeable terms. But the unlimited access to tens of thousands of beneficiary files with identifying information Plaintiffs are now pursuing runs afoul of Part 2, is overly burdensome, disproportionate to the needs of the case (particularly pre-certification), and deeply intrusive of the privacy rights of non-parties to the lawsuit.

### B. Defendant Has Produced Sufficient Financial and Non-ARC Programming Information and Plaintiffs' Requests Regarding Government Benefit Assignments Are Irrelevant.

#### vi. Financial Information

Plaintiffs significantly overstate what they need to prove the narrow question of ARC federal government funding in this case. Plaintiffs claim to require financial information beyond what Defendant has already produced in this case to test Defendant's First Amendment defense and the government funding prongs of the Section 504 coverage test. Their claim lacks merit.

Under Section 504, an entity is covered if 1) the program (here, the ARCs) receives federal funding (they do not) *or, alternatively*, if 2) the entity as a whole (here, Defendant) both a) receives federal funding (Defendant does) *and* b) is principally engaged in the business of providing education, health care, housing, social services, or parks and recreation (Defendant is not). 29 U.S.C. § 794(b)(3)(A)-(B). Defendant concedes the government funding aspect of "prong 2" of the

Section 504 coverage test, but disputes the "principally engaged" aspect. Plaintiffs thus do not need additional federal funding information to address the "principally engaged" issue, which examines the nature of the programs offered by an entity. Rather, Plaintiffs seek to justify their overbroad financial requests by arguing that they intend to show the ARCs are receiving government funds, thereby establishing Section 504 coverage under "prong 1" and thus disallowing a First Amendment Defense. Mot. at 15.

Defendant has already produced documents sufficient to address this issue at this stage of the litigation. Defendant produced The Salvation Army Net Remittance Report and the Declaration of Defendant's Secretary for Business Administration, filed herewith, both which confirm the ARCs do not receive government funding. Murray Ex. 15, Net Remittance Report; Declaration of Lieutenant Colonel Hubert S. Steele III ("H. Steele Decl.") at ¶ 5.[12]

Nor are the ARCs indirect recipients of government funds. To qualify as an indirect recipient of funds under Section 504, federal funds must be "specifically earmarked" for the ARC's use. *T.W. v. New York State Bd. of L. Examiners*, No. 16-CV-3029 (RJD), 2018 WL 4185803, at *2 (E.D.N.Y. Mar. 12, 2018) (citing *Nat'l Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459 (1999); *United States Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597 (1986)). While Defendant does receive government funding, none of that funding is earmarked for the ARCs, nor could it be used by the ARCs consistent with either the terms of the funding agreements or the Constitutional limits on the use of government dollars to fund a fundamentally religious activity by a church (here the operation of the ARCs by Defendant). H. Steele Decl. at ¶ 6. To the extent the ARCs are subsidized by Defendant, those subsidies are only sourced from donations, not government funds. *Id.* Given the religious nature of the ARC program, this boundary is essential. Further, redaction and production of all Defendant's government contracts would be unduly

---

[12] Regarding Plaintiffs' complaint that the Report covers one year, Defendant is in the process of producing Net Remittance Reports for all other putative class period years, as part of its rolling production.

burdensome, requiring the manual review of thousands of voluminous documents. *Id*. at ¶ 7.

### vii.   Assignment of Government Benefits

Beyond financial information, Plaintiffs seek irrelevant discovery into ARC policies regarding government benefits received by ARC beneficiaries that are "sent to, assigned to, or used by" the ARCs. Mot. at 15-16. Assignment of government benefits by third parties does not render an entity a recipient of federal financial assistance under Section 504, and Plaintiffs cite no authority to suggest otherwise. To the contrary, "only those entities that actually receive federal financial assistance are covered by § 504; entities that indirectly 'benefit' from federal aid, or that are 'inextricably intertwined' with actual recipients, are not on that basis covered." *Vasquez v. Smith's Food & Drug Centers, Inc.*, No. CV-14-2339-TUC-DCB, 2017 WL 1233840, at *5 (D. Ariz. Apr. 4, 2017) (accepting SNAP at defendant grocer's locations did not constitute "federal financial assistance" under § 504) (quoting *Paralyzed Veterans of Am.*, 477 U.S. at 607-610).

ARCs provide food and shelter to beneficiaries, and are no more transformed into federal assistance recipients by a beneficiary assignment of benefits than is a grocery story that accepts SNAP benefits in exchange for its merchandise. As in *T.W.*, Plaintiffs' "demand [for] information and documents regarding all funding and in-kind transfers to [Defendant] from third-parties, whether or not the assistance received by [Defendant] originated from a federal source and was earmarked for [Defendant]'s use . . . constitute[s] an irrelevant and unduly burdensome fishing expedition." *T.W.*, 2018 WL 4185803 at *2.

### viii.   Non-ARC Programming

As Defendant explained in its Motion for Status Conference and Partial Stay at 5-7, Plaintiffs' requests seeking the details of specific non-ARC programs to argue that Defendant principally provides social, as opposed to religious, services for Section 504 coverage purposes is both overbroad and violates Defendant's First Amendment rights. Defendant has already produced

its Articles of Incorporation, Bylaws, and a financial Offering Memorandum from June 30, 2022

explaining the religious nature of Defendant and its high-level structure and organization.  *See*

Ex. P, Dec. 2, 2022 Letter from K. Erno to Plaintiffs' Counsel.  Permitting further discovery into

these matters, at this stage of the case, would inevitably embroil the Court in parsing Defendant's

sincerely held religious beliefs to determine what is "social" vs. "religious," thus impermissibly

entangling the Court in "controversies over religious doctrine and practice."  *Natal v. Christian &*

*Missionary All.*, 878 F.2d 1575, 1576-77 (1st Cir. 1989).

### C. Plaintiffs' Overbroad Request for Defendant's Communications Violates Its First Amendment Rights.

Contrary to Plaintiffs' assertion, Defendant does not seek to "use the First Amendment as a

pre-emptive strike to avoid generally applicable discovery obligations."  Mot. at 18 (citing *In re*

*The Bible Speaks*, 69 B.R. 643, 648 (Bankr. D. Mass. 1987).  Rather, Defendant believes that the

scope and breadth of Plaintiffs' discovery requests raise serious constitutional questions, and that

the Court should exercise its discretion under Rule 26(b) to limit and sequence discovery

accordingly.  *See* Motion for Status Conference and Partial Stay; *In re Bextra & Celebrex Mktg.*

*Sales Pracs. & Prod. Liab. Litig.*, 249 F.R.D. 8, 12 n.3 (D. Mass. 2008) (First Amendment

considerations are "factors in the balancing test" under Rule 26).  That discovery has the potential

to infringe on a religious institution's First Amendment rights is not a novel proposition.  *See*

*Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985) (noting that

entanglement might result if "[c]hurch personnel and records [are] subject to subpoena, discovery,

cross-examination, the full panoply of legal process designed to probe the mind of the church . . .")*;*

*NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 502 (1979) (It is not only a court's ultimate

conclusion regarding religious questions that may "impinge on rights guaranteed by the Religion

Clauses," but also "the very process of inquiry" itself.).  Indeed, Courts have recognized under a

number of circumstances that discovery may be limited in order to protect "intrusion into sensitive

religious matters." *Bollard v. Soc'y of Jesus*, 196 F.3d 940, 950 (9th Cir. 1999); *Collette v. Archdiocese of Chicago*, 200 F. Supp. 3d 730, 732 (N.D. Ill. 2016) (limiting discovery to the applicability of the ministerial exception); *see also Pardue v. Ctr. City Consortium Sch. of Archdiocese of Washington, Inc.*, 875 A.2d 669, 678 (D.C. 2005) ("In any event, the control of discovery lies within the sound discretion of the trial judge, and particularly 'when the First Amendment casts a shadow over the court's subject matter jurisdiction,' the judge acts responsibly in limiting the intrusiveness of the discovery afforded.") (internal citations omitted).

Here, Plaintiffs' requests for communications regarding Defendant's medication policy, along with other documents,[13] raise serious First Amendment and Religious Freedom Restoration Act ("RFRA"), 42 U.S.C.A. § 2000bb-1, concerns. This dispute is not "'purely secular,'" but rather involves issues of "'discipline, faith, internal organization, or ecclesiastical rule, custom, or law,'" and therefore "falls within the ecclesiastical sphere that the First Amendment protects from civil court intervention." *Bell v. Presbyterian Church,* 126 F.3d 328, 331 (4th Cir. 1997) (citations omitted). So too do Plaintiffs' discovery requests regarding its communications related to its medication policy and non-ARC programming, which are intended to enable Plaintiffs and the Court to impermissibly scrutinize Defendant's religious belief in abstinence and the religious focus of its work at the ARCs. Courts have long recognized that the First Amendment establishes a "general principle of church autonomy," requiring courts to refrain from infringing upon a religious institution's "autonomy with respect to internal management decisions that are essential to the institution's central mission." *Our Lady of Guadelupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060-61 (2020).[14] Plaintiffs' requests violate this long-standing principle of autonomy.

_____

[13] Defendant notes that its First Amendment objections are not limited to Plaintiffs' request for communications related to its medication policy. For example, Defendant also objected on First Amendment grounds to Plaintiffs' requests for its internal governance and financial documents. However, because Plaintiffs' First Amendment argument focused on communications related to its medication policy (Motion at 17-19), Defendant limits its response to such documents.
[14] Plaintiffs attempt to distinguish *Our Lady of Guadalupe* and *E.E.O.C. v. Catholic University of America*, 83 F.3d 455, 463 (D.C. Cir. 1996) because those cases "address religious institutions' ability to hire and fire employees."

In addition to encroaching on Defendant's autonomy, the requested discovery alone will result in unconstitutional entanglement. This Court will inevitably be called upon to adjudicate disputes and find facts that would "require the civil courts to engage in the forbidden process of interpreting and weighing church doctrine" if this discovery is permitted. *Presbyterian Church v. Hull Church*, 393 U.S. 440 (1969); *Natal v. Christian & Missionary All.*, 878 F.2d at 1575 ("[W]e deem it beyond peradventure that civil courts cannot adjudicate disputes turning on church policy and administration or on religious doctrine and practice.").

These requests also substantially burden Defendant's free exercise rights,[15] as well as its rights under RFRA. RFRA prohibits the government[16] from substantially burdening a religious exercise grounded in a sincerely held religious belief, "by, for example, forcing [Defendant] to engage in conduct that seriously violates [its] religious beliefs." *See Braidwood Mgmt. Inc. v. Becerra*, No. 4:20-cv-00283-O, 2022 WL 4091215, at *18 (N.D. Tex. Sept. 7, 2022). Here, Plaintiffs attempt to use the power of the discovery process to coerce Defendant to change its medication policy in violation of its religious beliefs, thereby infringing on both its free exercise and RFRA rights. *See* Murray Ex. 32 (Plaintiffs' demand that Defendant either stipulate to a 31-

---

Mot.at 19. That is not a meaningful distinction. Courts have recognized the autonomy of religious institutions in various contexts beyond employment situations, (*see e.g.*, *Watson v. Jones*, 80 U.S. 679 (1871)) and "the Supreme Court has been willing to extend the "right of church autonomy as far as necessary to include the cases before it." *E.E.O.C.*, 83 F.3d at 463.

[15] As Defendant explained in its Motion for Status Conference and Partial Stay, Defendant's free exercise claims (both on the merits and in relation to Plaintiffs' discovery requests) are tethered to independently viable constitutional claims (including entanglement and expressive association, as discussed herein) and are therefore not foreclosed by *Employment Division v. Smith*, 494 U.S. 872 (1990). *See Gary S. v. Manchester Sch. Dist.*, 241 F. Supp. 2d 111, 121 (D.N.H. 2003), *aff'd*, 374 F.3d 15 (1st Cir. 2004). Moreover, there is a serious question as to the continued force of *Smith* in light of recent Supreme Court jurisprudence. *See e.g., Fulton v. City of Philadelphia, Penn.*, 141 S. Ct. 1868, 1882 (2021) (Barrett, J., concurring) ("Petitioners, their amici, scholars, and Justices of this Court have made serious arguments that Smith ought to be overruled."); *see also id.* (Alito, J., concurring) (referring to *Smith* as "ripe for reexamination"), another reason for accelerated consideration of the First Amendment issues.

[16] While the application of RFRA in a case involving private parties is a matter of first impression in the First Circuit, "the RFRA's language surely seems broad enough to encompass" the issues in this case, as "[t]he statutory language states that it 'applies to all federal law, and the implementation of that law." *Hankins v. Lyght*, 438 F.3d 163, 441 F.3d 96 (2d Cir. 2006). Here, Defendant does not argue that its exercise of its religious rights is burdened by a private party, but rather that the application of a *federal law* through this lawsuit would burden its First Amendment rights. As in *Hankins*, the statutes at issue, here, are enforceable by a federal agency, the U.S. Department of Justice, "as well as private plaintiffs," and thus the RFRA properly applies. *Id.*

point stipulation that would effectively concede the merits of the case as well as class certification, or else agree to change its medication policy. *See also* Victor E. Schwartz & Christopher E. Appel, The Church Autonomy Doctrine: Where Tort Law Should Step Aside, 80 U. Cin. L. Rev. 431, 484 (2011) ("[d]iscovery demands of churches are often overly broad by design," including inquiries into "sensitive information about a church's doctrinal development, sacred ceremonies, organizational structure, decision-making bodies, policies, and personnel").

Plaintiffs' overly broad and burdensome requests for Defendant's communications related to its medication policy further "unconstitutionally disrupt the administration of [Defendant's] religious institution" by causing a "a significant diversion of [Defendant's] time and resources." *Alicea v. New Brunswick Theological Seminary*, 608 A.2d 218, 222 (N.J. 1992); *E.E.O.C. v. Cath. Univ. of Am.*, 83 F.3d 455, 467 (D.C. Cir. 1996). And the effort and expense required to respond to Plaintiffs' sweeping requests would "necessarily reduce the amount of ministry [Defendant] could perform." *Spencer v. Nigrelli*, No. 22-CV-6486 (JLS), 2022 WL 17985966, at *6 (W.D.N.Y. Dec. 29, 2022). Perhaps most concerning, the threat of intrusive discovery would likely lead Defendant to make decisions "with an eye to avoiding litigation or bureaucratic entanglement rather than upon the basis of [its] own personal and doctrinal" beliefs. *Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d at 1171. As courts have found, "[t]his is precisely the sort of meddling in religious practices that courts find time and again violates the Free Exercise Clause." *Spencer*, 2022 WL 17985966, at *6.

Defendant's right to expressive association is also burdened by Plaintiffs' demand for intrusive discovery into its internal communications. The Supreme Court has recognized that "'implicit in the right to engage in activities protected by the First Amendment' is 'a corresponding right to associate with others in pursuit of . . . religious, and cultural ends.'" *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647 (2000). "Intrusion into the internal structure or affairs of an association"

may pose an unconstitutional burden on this right if such intrusion "affects in a significant way the group's ability to advocate public or private viewpoints." *Id.* at 648. Defendant is a religious association of members who engage in the expression of religious beliefs and values; serving people at the ARCs is one of the principle ways in which Salvationists express and practice those beliefs. Plaintiffs seek discovery into communications regarding Defendant's policies, practices, and procedures. These documents concern Defendant's members' private viewpoints regarding their religious beliefs, as well as how those religious beliefs inform the policies, practices, and procedures of the association. Defendant's ability "to organize its [members] and circulate expressive materials with their views" on religious matters "would be hindered" if they were required to offer such materials up to Plaintiffs and the Court for scrutiny. *Our Lady's Inn v. City of St. Louis*, 349 F. Supp. 3d 805, 821 (E.D. Mo. 2018).

Plaintiffs' argument that their requests are "relevant" to their legal theories is insufficient to overcome these significant constitutional hurdles. Indeed, the Eastern District of New York recently rejected Plaintiffs' argument (Mot. at 17) that discovery is appropriate because Plaintiffs may want to assert both disparate treatment and disparate impact claims, noting that such inquiries are "constrained, to some degree, by the First Amendment." *Butler v. St. Stanislaus Kostka Cath. Acad.*, No. 19-CV-3574(EK)(ST), 2022 WL 2305567, at *12 (E.D.N.Y. June 27, 2022).

Additionally, Plaintiffs' suggestion that communications regarding "how Defendant developed and modified its medication policy, and how it has addressed questions about MAT and other similar medications" are relevant to whether accommodating individuals by allowing access to those medications would prove an undue burden is flawed. Mot. at 17. An undue burden obviously exists here, where the only accommodation (providing addictive medications) puts "substantial pressure on an adherent to modify [its] behavior and to violate [its belief]." *Silva v. Clarke*, No. CIV. A. 10-11381-RGS, 2010 WL 5441906, at *1 (D. Mass. Dec. 22, 2010) (quoting

*Thomas v. Review Bd. of Indiana Employment Sec. Div.*, 450 U.S. 707, 718 (1981)).  To the extent Plaintiffs seek such information to argue that certain medications *should* not be prohibited, the First Amendment does not countenance invasive scrutiny of Defendant's process for determining what its religious beliefs dictate regarding the provision of certain medications.  *See Thomas*, 450 U.S. at 714 ("[R]eligious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection.").  And to the extent Plaintiffs seek to inquire into the sincerity, as opposed to the correctness, of Defendant's beliefs, certainly a smaller subset of documents would be sufficient given the "light touch" with which such inquiries are required to be conducted.  *Moussazadeh v. Texas Dep't of Crim. Just.*, 703 F.3d 781, 792 (5th Cir. 2012) ("the 'truth' of a belief is not open to question," and "[s]incerity is generally presumed or easily established"); *see also Sabra as next friend of Baby M v. Pompeo*, 453 F. Supp. 3d 291, 328 (D.D.C. 2020) ("In applying the 'light touch' for the sincerity inquiry, the Court therefore finds that Mr. Sabra has demonstrated a sincerely held belief. . . .") (internal citation omitted). Finally, to the extent the Court finds there is a need for discovery on the First Amendment issues, there is undoubtedly a "less restrictive means" of furthering that interest: narrowing the discovery requests to only those necessary to resolve the First Amendment issues before it, as Defendant has proposed. The cases cited by Plaintiffs are distinguishable.[17]  The abundance of constitutional issues elicited by Plaintiffs' extensive discovery requests affirms the need for the Court's use of its sound discretion to manage discovery and resolve the First Amendment issues presented in this case.

## III.    CONCLUSION

For the aforementioned reasons, Defendant requests that the Court deny Plaintiffs' Motion.

---

[17] *See* Mot. at 18 (citing *In re The Bible Speaks*, 69 B.R. at 646 (relying on prior superseded version of Rule 26 in rejecting First Amendment arguments); *E.E.O.C. v. Electro-Term, Inc.*, 167 F.R.D. 344 (D. Mass. 1996) (involving a for-profit commercial company); *United States v. Freedom Church*, 613 F.2d 316, 320 (1st Cir. 1979) (involving IRS inquiry as to tax exempt status, not to examine or interfere with religious doctrine).

By:     */s/ Kevin Hensley*
        Kevin M. Hensley (BBO#554824)
        BARTON GILMAN LLP
        75 Federal Street, 9th floor
        Boston, Massachusetts 02110
        617-654-8200
        khensley@bglaw.com

        Thomas P. Gies
        Christine B. Hawes
        Kathryn K. Erno
        CROWELL & MORING LLP
        1001 Pennsylvania Avenue NW
        Washington, DC 20004
        202-624-2500
        tgies@crowell.com
        chawes@crowell.com
        kerno@crowell.com

        Attorneys for Defendant The Salvation Army,
        A NewYork Corporation (the "Eastern
        Territory")

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on January 20, 2023.

*/s/ Kevin Hensley*
Kevin Hensley