UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARK TASSINARI, RICHARD ESPINOSA, and JOSEPH ALMEIDA, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>THE SALVATION ARMY, A NEW YORK CORPORATION,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil No. 21-10806-LTS<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

ORDER ON PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION (DOC. NO. 138)
AND PROVISIONAL CLASS CERTIFICATION (DOC. NO. 139)

March 28, 2024

SOROKIN, J.

    This putative class action lawsuit challenges a policy prohibiting the use of Medication for Opioid Use Disorder ("MOUD") in the Salvation Army's residential Adult Rehabilitation Centers ("ARCs"). Before the Court is Plaintiffs' Motion for Preliminary Injunction, Doc. No. 138. Plaintiffs ask the Court to order Defendant to (1) refrain from implementing or enforcing any categorical ban on MOUD; (2) refrain from denying any person access to any ARC based on his or her use of, or desire to use, prescription MOUD; (3) refrain from denying any current ARC beneficiary access to MOUD; (4) refrain from involuntarily discharging any ARC beneficiary based on his or her use of, or desire to use, MOUD; (5) remove "DO NOT ADMIT" warnings from Plaintiffs' files; and (6) refrain from violating Section 504 of the Rehabilitation Act and the

Fair Housing Act in the operation or administration of the ARCs. Doc. No. 138 at 1–2. For the

following reasons the Motion is DENIED. The Provisional Motion for Class Certification is

DENIED WITHOUT PREJUDICE.

I.    BACKGROUND

    A.    Facts[1]

    Defendant is an "international movement related to evangelical Christianity." Doc. No.

30 ¶ 134. Defendant operates twenty-nine ARCs in the Eastern United States. Doc. No. 141-1 at

13. Defendant asserts ARCs "accept applications for admission from everyone," including

people of any religion or no religion at all, as part of a "wide open" admissions policy. Doc. No.

160-12 at 3 (emphasis in original); Doc. No. 141-1 at 27. ARCs serve "men and women with

social, emotional and spiritual needs who have lost the ability to cope with their problems and

provide for themselves." Doc. No. 141-4 at 11. This includes "the most vulnerable members of

[a] communit[y]," such as the poor, the homeless, LGBTQ people, and veterans. Doc. No. 160-

16 at 11. Most ARC residents have substance use disorders, though this is not a prerequisite to

admission. Doc. No. 141-1 at 33. ARC programming treats substance use disorder through a

spiritual, rather than clinical, approach. ARCs are not licensed medical facilities, are not licensed

---

[1] In deciding the pending motion for preliminary injunction, the Court accepts well-pleaded
allegations in the complaint and uncontroverted affidavits, and may also rely on otherwise
inadmissible evidence, including hearsay. See Asseo v. Pan Am. Grain Co., 805 F.2d 23, 26 (1st
Cir. 1986) (explaining that courts may consider inadmissible evidence, including hearsay, when
ruling on a motion for preliminary injunction, with the "dispositive question" being "whether,
weighing all the attendant factors, including the need for expedition, this type of evidence was
appropriate given the character and objectives of the injunctive proceeding"); Diaz v. Drew, 253
F. Supp. 3d 369, 372 (D. Mass. 2017). Because there are no material facts in dispute, the Court
proceeds without an evidentiary hearing. Rosario-Urdaz v. Rivera-Hernandez, 350 F.3d 219, 223
(1st Cir. 2003). The Court draws whatever inferences it might favor and decides the likely
ramifications. Indep. Oil & Chem. Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co., 864
F.2d 927, 933 (1st Cir. 1988).

substance abuse treatment programs, and employ no medical or licensed clinical personnel on staff. Doc. No. 141-1 at 60, 75; Doc. No. 141-4 at 47.

An ARC applicant must complete two admissions forms, which ask questions about the applicant's medical history and treatment history. Doc. No. 141-18 at 4; Doc. No. 160-12 at 3. An intake coordinator then conducts an Initial Assessment interview with the applicant. Doc. No. 160-12 at 3. The coordinator determines whether the ARC can meet the applicant's needs and provide the appropriate standard of care. Doc. No. 141-18 at 4–11. Defendant directs intake coordinators to seek guidance from The Salvation Army ("TSA") Headquarters when unsure about whether to admit an applicant. Id. at 8. In those circumstances, TSA Headquarters reviews whether an ARC can meet an applicant's needs in a process called a CARES Review. Id.

Although anyone can apply to the ARCs, the ARCs will not admit every applicant. For example, ARCs do not admit people who are unable to work forty hours per week due to medical reasons or mobility limitations. Doc. No. 141-1 at 85–86. As part of the Initial Assessment, an ARC intake coordinator reviews the medications, if any, prescribed to an applicant. Id. at 104. The coordinator verifies whether the prescribed medications include any medications banned from ARC facilities. Doc. No. 141-4 at 41. The ARC Medication Policy bans the use of roughly sixty medications that Defendant believes are "known to be abusive and addictive to [ARCs'] typical population." Doc. No. 160-13 at 3–4. Among the banned medications are two of the three leading prescription medications used to treat Opioid Use Disorder ("OUD"): methadone and buprenorphine. Doc. No. 141-13 at 9. The Medication Policy does not ban the third leading medication, naltrexone, and its use is permitted at the ARCs. Id. The Medication Policy, Defendant says, reflects Defendant's religious belief in abstinence-based rehabilitation. Doc. No. 160-16 at 13. Defendant allows naltrexone, as opposed to methadone and buprenorphine,

because in Defendant's view, naltrexone "is not an opioid and does not have similar addictive or abusive potential." Id. at 14.

After completing the initial screening process described above, every ARC applicant submits to an initial drug test to verify current abstinence from banned medications and illegal drugs. Doc. No. 141-1 at 87. Applicants who produce negative drug tests are admitted to the ARC, at which point they become ARC "beneficiaries," in Defendant's terms. See, e.g., Doc. No. 160-16 at 17. The Court follows suit in using the term "beneficiaries."

Beneficiaries must maintain sobriety and must submit to random urine drug tests at least once a month, Doc. No. 141-1 at 87–88, and perhaps as often as every seventy-two hours, Doc. No. 141-4 at 22. Any positive drug test results in an involuntary discharge from the ARC. Doc. No. 141-5 at 18. ARCs provide beneficiaries with housing and basic living necessities for approximately six to twelve months, during which time beneficiaries live on site, maintain sobriety, attend religious services, and work full-time for Defendant's thrift stores. Doc. No. 141-4 at 11, 13, 51, 70. Defendant imposes no charge for any of these services, except in the case of a beneficiary with an ongoing income. Id. at 54. The entire array of services is part of what Defendant describes as a "spiritual abstinence-based" rehabilitation program. Doc. No. 160-16 at 24. Beneficiaries are not paid for their work, though they do receive a weekly "gratuity grant" from the ARCs. Doc. No. 141-1 at 95.

During a typical day, a beneficiary might adhere to the following schedule: "work therapy" from approximately 7:30 a.m. to 4:00 p.m., Doc. No. 162 at 8, interspersed with pastoral counseling and any scheduled health appointments. Doc. No. 141-1 at 26. All beneficiaries are required to attend religious services, including Bible study once a week, church services twice a week, and daily devotions. Doc. No. 141-4 at 51–52. During such services,

beneficiaries must remain quiet and respectful. Id. They are not required to pray, to read, or to otherwise participate. Id. From Defendant's perspective, all beneficiaries participate voluntarily in the ARC's spiritual rehabilitation program. Defendant suggests that people who wish to utilize methadone or buprenorphine therapy should enroll in a different program, i.e., a program with a clinical approach. Doc. No. 160-16 at 35. That said, about a third of beneficiaries are completing the ARC program as a condition of their probation or parole, Doc. No. 141-1 at 40, and, in the absence of an available clinical program, withdrawal from the ARC may violate court-imposed conditions.[2]

Plaintiffs are three individuals with OUD. Doc. No. 83 ¶¶ 5–22. Mark Tassinari began using opioids more than two decades ago, when he was about fifteen years old. Doc. No. 144 ¶¶ 3–5. He has abused drugs for many years, though he has also accomplished extended periods of sobriety, including a four-and-a-half-year stint of sobriety from 2013 to 2017. Id. ¶ 9. In 2018, Tassinari entered an ARC as a condition of his probation. Id. ¶ 13. He remained there for about a month, until he was involuntarily discharged for using buprenorphine, which he says he obtained from a doctor with a valid prescription. Id. ¶¶ 16–22. When the pending motions were filed, Tassinari was a patient at Arbour Hospital. Id. ¶ 2. As of January 14, 2024, Tassinari did not have stable housing. Doc. No. 198-1 ¶¶ 8–9. He was "trying to get back on methadone" after a period of homelessness and hospital stays related to relapse. Id.

Joseph Almeida began using opioids almost two decades ago at about age twenty, when he was prescribed oxycodone for an elbow injury. Doc. No. 146 ¶¶ 2–3. In 2009, Almeida entered the Saugus ARC after a stint in jail for a probation violation. Id. ¶¶ 6–8. He remained

---

[2] The Court takes no position on whether there is an "excessive entanglement" between the ARCs, courts, and other government agencies, because Plaintiffs have not raised such a claim. See Doc. No. 72 at 21 n.15.

there for about a month, until he relapsed and voluntarily left the ARC. Id. ¶ 9. Almeida

continued to use opioids or other illegal drugs after he left the ARC, although he did achieve

periods of sobriety with the help of methadone. Id. ¶¶ 14–18. After a relapse in 2022, Almeida

contacted the Saugus and Springfield ARCs and was told that he could not come to either facility

while using methadone, even though the Springfield ARC did have space available for new

beneficiaries. Id. ¶¶ 21–22. When the pending motions were filed, Almeida was incarcerated. Id.

¶ 30. As of January 31, 2024, Almeida remained incarcerated while serving a two-year sentence.

Doc. No. 200 ¶ 3. Almeida is receiving methadone treatment while incarcerated. Id.

Richard Espinosa began using opioids almost two decades ago at about age twenty, when

he was prescribed Percocet to treat pain caused by kidney stones. Doc. No. 145 ¶¶ 3–4. Espinosa

successfully completed the ARC program from 2010 to 2011. Id. ¶ 10. He was readmitted to the

Providence ARC around November 2018. Id. ¶¶ 10, 15. He voluntarily left the ARC after about

five months, id. ¶ 19, and obtained a prescription for methadone to treat his OUD, id. ¶ 22. When

the pending motions were filed, Espinosa was sober and living with his fiancée and his father. Id.

¶¶ 2, 22. As of January 26, 2024, Espinosa had ceased methadone treatment with the help of a

doctor and was still maintaining his sobriety and living with his family. Doc. No. 199 ¶ 3.

Plaintiffs argue that Defendant's Medication Policy ban on methadone and buprenorphine

unlawfully discriminates against people with OUD in violation of Section 504 of the

Rehabilitation Act, 29 U.S.C. § 794(a), and the Fair Housing Act, 42 U.S.C. § 3604(f)(2).[3] Doc.

No. 154-1 at 9.

---

[3] The Court refers to Tassinari, Almeida, and Espinosa collectively as "Plaintiffs."

B.    <u>Procedural Posture</u>

In 2021, Tassinari filed suit against The Salvation Army National Corporation, The Salvation Army Eastern Territory, The Salvation Army Central Territory, The Salvation Army Southern Territory, and The Salvation Army Western Territory. Doc. No. 1. He alleged violations of the Americans with Disabilities Act ("ADA"), the Fair Housing Act, and the Rehabilitation Act. <u>Id.</u> at 1. The named defendants filed a series of Motions to Dismiss. Doc. Nos. 17, 19, 21. In response, Plaintiffs filed their First Amended Class Action Complaint, which added Richard Espinosa, Randy Owens, and Jonathan Anderson as plaintiffs. Doc. No. 30 ¶¶ 9–19. Plaintiffs also removed the Central, Southern, and Western Territories as defendants. <u>Id.</u> ¶¶ 20–33. The Court terminated the original motions to dismiss as moot. Doc. No. 35.

The remaining defendants—The Salvation Army National Corporation and The Salvation Army New York Corporation—filed two Motions to Dismiss, alleging lack of jurisdiction and failure to state a claim.[4] Doc. Nos. 37, 39. The Court allowed both motions in part and denied both motions in part—terminating the claims against The Salvation Army National Corporation for lack of personal jurisdiction. Doc. No. 72 at 15. In doing so, the Court also terminated the claims of Randy Owens and Jonathan Anderson, <u>id.</u> at 16, and dismissed Plaintiffs' ADA claim, <u>id.</u> at 21.

Plaintiffs subsequently filed their Second Amended Class Action Complaint, in which they added Joseph Almeida as a plaintiff and otherwise merely conformed the complaint to the Court's prior rulings. Doc. No. 83 ¶¶ 20–22. Two claims remain pending: (1) Tassinari, Espinosa, and Almeida's claim under the Rehabilitation Act; and (2) Tassinari and Almeida's

---

[4] The Salvation Army New York Corporation is sometimes called The Salvation Army Eastern Territory. Doc. No. 30 ¶ 26.

claim under the Fair Housing Act. Doc. No. 72 at 24. Both claims lie only against The Salvation Army New York Corporation. Id. at 25.

II.     LEGAL STANDARD

To demonstrate they are entitled to a preliminary injunction, Plaintiffs bear the burden to establish: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm; (3) that a balancing of the equities favors relief now; and (4) the public interest also favors relief now. Akebia Therapeutics, Inc. v. Azar, 976 F.3d 86, 92 (1st Cir. 2020). The first of these factors bears the most significance, id., and a Court need not engage with the other factors when it finds the first to be lacking. See, e.g., Orkin v. Albert, 603 F. Supp. 3d 1, 2 (D. Mass. 2022). Preliminary injunctive relief is an "extraordinary and drastic remedy," Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011), particularly when the injunction seeks to disrupt the status quo, as here. Braintree Labs. Inc. v. Citigroup Glob. Mkts. Inc., 622 F.3d 36, 41 (1st Cir. 2010).[5]

III.    DISCUSSION

Section 504 of the Rehabilitation Act requires that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). A plaintiff asserting a claim under Section 504 must establish that (1) he is disabled; (2) he sought services from a covered entity; (3) he is "otherwise qualified" to receive those services; and (4) he was denied those services "solely by reason of [his] . . . disability." Thiersaint v. Dep't of Homeland Sec., 85 F.4th

---

[5] The Court's resolution of the likelihood of success prong eliminates the need for the Court to address the other three factors.

653, 669 (1st Cir. 2023) (quoting Lesley v. Hee Man Chie, 250 F.3d 47, 53 (1st Cir. 2001)). In applying Section 504, courts rely interchangeably on decisional law applying Title II of the ADA.[6] Parker v. Universidad de P.R., 225 F.3d 1, 4 (1st Cir. 2000).

A.      Disability

As an initial matter, Plaintiffs must demonstrate they are likely to succeed in showing that they have a disability. Ramos-Echevarria v. Pichis, Inc., 659 F.3d 182, 187 (1st Cir. 2011). A disability is "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). Disability may be established by having a record of such an impairment or being regarded as having such an impairment. Id. § 12102(1)(B)–(C); see also Santiago Clemente v. Exec. Airlines, Inc., 213 F.3d 25, 30 (1st Cir. 2000).

Here, each Plaintiff has long struggled with OUD. Doc. No. 144 ¶ 3; Doc. No. 145 ¶ 3; Doc. No. 146 ¶ 2. Plaintiffs' affidavits detail the ways that OUD has affected every major aspect of their lives, including their physical health, their access to stable housing and employment, and their ability to maintain healthy relationships. Doc. No. 144 ¶¶ 2–4; Doc. No. 145 ¶¶ 23–24; Doc. No. 146 ¶ 18. These hardships persist even when Plaintiffs are in remission from illegal drug use. Plaintiffs also submit an affidavit from an experienced psychiatrist, who testifies that OUD is a chronic disease, and that the neurological effects of OUD can persist for years after drug discontinuation. Doc. No. 143 ¶ 22. In short, the facts demonstrate each Plaintiff suffers from a disability—a view also supported by caselaw. The Court of Appeals has held that the ADA

---

[6] The parties advance identical arguments in relation to Plaintiffs' Section 504 claim and their Fair Housing Act claim. Compare Doc. No. 154-1 at 27 (arguing that Plaintiffs succeed on this claim "for all the same reasons" as their Section 504 claim), with Doc. No. 160-16 at 26 (making unitary argument for failure of both Section 504 and Fair Housing claims). Accordingly, the Court applies its discussion and resolution of the Section 504 claim to the Fair Housing claim.

"aims to protect [recovering addicts] from the stigma associated with their addiction."[7] Jones v. City of Bos., 752 F.3d 38, 58 (1st Cir. 2014); cf. Bailey v. Ga.-Pac. Corp., 306 F.3d 1162, 1167 (1st Cir. 2002) (holding that "alcoholism is an impairment" under the ADA).

Nonetheless, not all people with OUD are covered by Section 504. The statute "explicitly excludes from protection any individual who is currently using [illegal] drugs, whether addicted or not when the covered entity acts on the basis of such use." 42 U.S.C. § 12114(a); Jones, 752 F.3d at 58. Defendant suggests Plaintiffs are still using illegal drugs, Doc. No. 160-16 at 27, which are banned at ARC facilities, Doc. No. 141-1 at 45. In their most recent supplemental affidavits, Tassinari reported that he was trying to maintain his sobriety, Doc. No. 198 ¶ 9, Espinosa reported that he was in remission from opioid use, Doc. No. 199 ¶ 3, and Almeida said that he was receiving methadone therapy while incarcerated, Doc. No. 200 ¶ 3. The same was true of the affidavits filed by each Plaintiff in support of the Motion for Preliminary Injunction. Doc. No. 144 ¶ 30; Doc. No. 145 ¶ 22; Doc. No. 146 ¶ 31. Thus, the Court finds Plaintiffs are likely to succeed in showing that they have a disability within the meaning of Section 504.

B.    Covered Entity

Section 504 applies only to covered entities, which are public entities and private organizations that receive federal funds and are "principally engaged in the business of providing education, health care, housing, [or] social services." 29 U.S.C. § 794(b)(3)(A)(ii). Defendant has stipulated that Section 504 of the Rehabilitation Act applies to Plaintiffs' claims, because: (1) Defendant acknowledges it "receives federal financial assistance, including grant funding, loans, and other assistance from the federal government, including but not limited to from the

---

[7] As noted, decisions applying the ADA are pertinent here. See Parker, 225 F.3d at 4.

Department of Housing and Urban Development"; and (2) Defendant concedes it "will not contest, for purposes of this litigation only, that it is principally engaged in the business of providing social services." Doc. No. 133 at 1. Thus, Defendant is a covered entity.

      C.    <u>Otherwise Qualified</u>

Plaintiffs must demonstrate they are likely to succeed in showing that they are "otherwise qualified" to receive ARC services, but for their disability. <u>Thiersaint</u>, 85 F.4th at 669. Defendant disputes this. Doc. No. 160-16 at 23–26.

ARCs require abstinence from all illegal drugs, Doc. No. 141-1 at 45, including marijuana.[8] <u>See</u> Doc. No. 160-16 at 26–27. An applicant's positive drug test will result in a denial of admission, and a beneficiary's positive drug test will result in involuntary discharge from the ARC. Doc. No. 141-5 at 18. At his deposition, Espinosa admitted he has used marijuana daily for the past twenty years, Doc. No. 160-4 at 42–43, which, in the absence of evidence that he has ceased this habit, renders him unqualified to receive ARC services. Of course, Espinosa could choose to discontinue his marijuana use, which would bear on the "otherwise qualified" analysis, but nothing before the Court suggests he has done so. Thus, Espinosa has not established a likelihood of succeeding in demonstrating that he is otherwise qualified for ARC admission.

Tassinari, at his deposition, stated he had not used any illegal drugs in the past week. Doc. No. 160-1 at 10. Almeida testified to using illegal stimulants four days prior to his deposition. Doc. No. 160-5 at 46. That Tassinari and Almeida had previously used illegal

---

[8] The Court infers that Defendant treats marijuana as an illegal drug because federal law criminalizes its use or possession, 21 U.S.C. § 844, even though some states do not.

substances is not disqualifying.[9] Indeed, Defendant regularly accepts applicants with a history of illegal drug use, Doc. No. 141-1 at 33, provided that the applicants are not <u>currently</u> using illegal drugs. Thus, the Court finds Tassinari and Almeida are likely to succeed in showing that they are "otherwise qualified" to receive ARC services.

    D.    <u>Denied Solely by Reason of Disability</u>

Finally, Plaintiffs must demonstrate they are likely to succeed in showing that they were denied participation in the ARC program solely by reason of their disability. Courts have recognized that a plaintiff seeking to satisfy this standard must establish: (1) intentional discrimination or disparate treatment; (2) a failure to make a reasonable accommodation; or (3) disparate impact. <u>Sosa v. Mass. Dep't of Corr.</u>, 80 F.4th 15, 30–31 (1st Cir. 2023) (collecting cases). Plaintiffs allege that Defendant's categorical ban on methadone and buprenorphine "constitutes all three kinds of unlawful discrimination." Doc. No. 154-1 at 24.

Before addressing the theories of discrimination advanced by Plaintiffs, the Court turns to the question of class certification. With their motion for injunctive relief, Plaintiffs have filed a motion for provisional class certification. Doc. No. 139. They propose a class composed of:

> All individuals with opioid use disorder (OUD) who are excluded from participating in any of Defendant The Salvation Army, a New York Corporation's

---

[9] Defendant submitted an affidavit by Don Coombs, the Program Development Director for the ARCs. Coombs stated, "Without a complete intake process . . . I cannot say one way or another whether Mr. Tassinari is otherwise qualified for the ARC program and/or needs a higher level of care than what the ARCs can offer, even without currently being prescribed methadone or buprenorphine." Doc. No. 207-9 ¶ 13. Coombs claims that Tassinari's benzodiazepine use, as reflected in his ARC admission file from February 2018, might disqualify him from receiving ARC services. <u>Id.</u> ¶ 14. Clearly, ARC intake coordinators made a different decision when they reviewed Tassinari's medical information, determined he was qualified, and chose to admit him. Additionally, the ARC Medication Policy does not include benzodiazepine on its list of banned medications. Doc. No. 141-13 at 6–10. Nor has Defendant pointed to evidence that Tassinari presently takes benzodiazepine, and nothing suggests that ARCs reject applications based on a person's use of benzodiazepine either currently or in the distant past. Thus, the Court rejects this argument in opposition to finding Tassinari "otherwise qualified."

Adult Rehabilitation Center (ARC) housing or services because of their use or desire to use any form of medication for opioid use disorder (MOUD), including methadone or buprenorphine, as prescribed; and all individuals with OUD who are denied access to, or are impeded from receiving, any form of prescribed MOUD, including methadone or buprenorphine, while participating in any Defendant ARC.

Doc. No. 139 at 1.

For purposes of resolving the motion for preliminary injunction, the Court assumes without deciding that Plaintiffs would prevail on this class certification motion. Therefore, the Court considers each theory of discrimination as to the entire class, rather than merely the three individual plaintiffs. In other words, the Court assesses, for example, whether accommodating the class is reasonable, as opposed to whether accommodating each individual plaintiff is reasonable. The Court adopts this assumption for three reasons. First, it favors the opponent of injunctive relief by encompassing a greater array of considerations in the analysis. See Together Emps. v. Mass Gen. Brigham Inc., 573 F. Supp. 3d 412, 437 (D. Mass. 2021), aff'd, 32 F.4th 82 (1st Cir. 2022) (holding that courts can consider the aggregate effects of many plaintiffs seeking the same accommodation when determining whether an accommodation would pose an undue hardship on an entity). Second, it is the framework Plaintiffs propose. Finally, it promotes judicial economy, for if the motion for preliminary injunction fails in any event, there is no present need to resolve the request for provisional class certification.

Through the lens of this assumption, the Court proceeds to evaluate Plaintiffs' three theories of discrimination.

1.     Reasonable Accommodation Theory

Covered entities are required to make reasonable modifications in their policies, practices, or procedures if such changes are necessary to avoid discrimination on the basis of disability. 28 C.F.R. § 35.130(b)(7)(i). A claim premised on a failure to accommodate alleges

that: "(1) due to the plaintiff's disability, he needs an individualized change to a covered entity's facially neutral policies, practices, or procedures if he is to meaningfully access some opportunity; but (2) the entity unjustifiably failed to make that change." Sosa, 80 F.4th at 31 (citing Payan v. L.A. Cmty. Coll. Dist., 11 F.4th 729, 738 (9th Cir. 2021)).

Plaintiffs request an accommodation in the form of an exception to the ARC Medication Policy's ban on methadone and buprenorphine. Without this accommodation, they argue, members of their proposed class are denied meaningful access to ARC rehabilitation services. Doc. No. 154-1 at 15–16. To meet the "meaningful access" standard, covered entities like ARCs "are not required to produce the identical result or level of achievement for handicapped and nonhandicapped persons, but must afford handicapped persons equal opportunity to . . . gain the same benefit." Alexander v. Choate, 469 U.S. 287, 305 (1985) (citing 45 C.F.R. § 84.4(b)(2)). Plaintiffs claim that they are not given an equal opportunity to gain the benefits provided by ARCs, such as housing, work experience, and pastoral counseling, because they are forced to either (1) forgo medication they need or (2) forgo the benefits. ARC applicants without OUD are not required to make this same choice.

Plaintiffs bear the burden of demonstrating that their proposed accommodations would enable them to access the services provided by Defendant, and that the accommodations are feasible for Defendant "at least on the face of things." Echevarria v. AstraZeneca Pharm. LP, 856 F.3d 119, 127 (1st Cir. 2017) (citing Reed v. LePage Bakeries, Inc., 244 F.3d 254, 259 (1st Cir. 2001)). If Plaintiffs succeed in carrying this burden, Defendant can show that the proposed accommodations are not reasonable, because they would result in a "fundamental alteration" of Defendant's services or impose an "undue burden." Parker, 225 F.3d at 5 (citing 28 C.F.R. § 35.150(a)(3)); Reed, 244 F.3d at 259 (describing allocation of burden between parties).

"[T]he determination of whether a particular modification is 'reasonable' involves a fact-specific, case-by-case inquiry that considers, among other factors, the effectiveness of the modification in light of the nature of the disability in question and the cost to the organization that would implement it." Sosa, 80 F.4th at 33 (citing Mary Jo C. v. N.Y. State & Loc. Ret. Sys., 707 F.3d 144, 153 (2d Cir. 2013)). Indeed, "terms like 'reasonable' and 'undue' are relative to circumstances," and a setting like a rehabilitation center presents circumstances that "are different from those of a school, an office, or a factory." Id. at 33 (cleaned up). Because the reasonable accommodation analysis is fact-specific, the Court examines the three leading medications for OUD—naltrexone, methadone, and buprenorphine—separately.

a)      Naltrexone

Defendant contends that Plaintiffs do not lack meaningful access to ARCs, because they are allowed to use a different medication to manage their OUD: naltrexone. Doc. No. 160-16 at 26. Not so. The evidence shows that "no single medication is a perfect fit for all patients." Doc. No. 143 ¶ 41. Different forms of MOUD will prove effective for different patients. See Doc. No. 160-1 at 59–60 (explaining Tassinari's experiences using different forms of MOUD, with varying degrees of success). Naltrexone is effective for some people with OUD, but medical practitioners cannot administer it to a patient until the patient has abstained from all forms of opioids for seven to fourteen days. Doc. No. 143 ¶ 85. In addition, research shows a much lower initiation rate for naltrexone therapy as compared to the other two MOUDs. Doc. No. 201 ¶ 10 (summarizing a randomized control trial, in which "[m]ore than a quarter (27.9%) of individuals assigned to the naltrexone treatment arm did not initiate the medication, compared to only 2.2% of those assigned to buprenorphine and 1.7% of those assigned to methadone who did not initiate those medications").

In short, the availability of naltrexone at ARCs does not defeat Plaintiffs' reasonable accommodations claim. The Court finds Plaintiffs are likely to succeed in showing that they are not afforded "meaningful access" to the ARCs under the current Medication Policy, regardless of the availability of naltrexone. The Court now turns to the question of whether Plaintiffs' proposed modifications are reasonable.

b)    Methadone

In determining whether permitting the use of methadone constitutes a reasonable accommodation, the Court considers factors including "the effectiveness of the modification in light of the nature of the disability in question and the cost to the organization that would implement it." Sosa, 80 F.4th at 33 (citing Mary Jo C., 707 F.3d at 153). Methadone is the most-used medication for the treatment of OUD and has the largest and oldest evidence base of all OUD treatment approaches. Doc. No. 143 ¶ 63; Doc. No. 143-2 at 30. There is no doubt that it can be medically effective for people with OUD, and Defendant does not contend otherwise.

Methadone is an oral medication sold in liquid or tablet form, intended to be taken daily. Doc. No. 143 ¶ 62. It must be administered by federally licensed Opioid Treatment Programs, Doc. No. 143-3 at 9, which are commonly known as methadone clinics. Clinics typically disperse dosages to patients on a daily or almost daily basis in the initial stages of treatment, with take-home doses provided to compensate for clinic closures on weekends and holidays. Doc. No. 143 ¶ 66. Patients are gradually permitted to receive more take-home doses the longer they have remained in treatment. Doc. No. 143-2 at 126. Plaintiffs' expert, Dr. Rodriguez, states that patients receiving methadone therapy receive all necessary treatment and monitoring from their healthcare provider or outpatient clinic and do not need additional medical monitoring or treatment in their personal lives, at their place of residence, or in rehabilitation or residential

16

programs. Doc. No. 143 ¶ 40. In contrast, Defendant's expert, Dr. Mangiacarne, recommends

that patients receiving methadone should also engage in behavioral therapy with a licensed

provider because of the "potentially addictive nature" of the medication—something he claims is

not necessary for patients receiving naltrexone.[10] Doc. No. 206 ¶ 12. The therapy Dr.

Mangiacarne describes is neither legally nor medically required. Thus, the Court considers the

accommodation as only involving the administration and use of methadone.[11]

Defendant challenges Dr. Rodriguez's statement by contending that people receiving

methadone therapy required some unspecified "higher level of care." See, e.g., Doc. No. 160-16

at 28. It claims that ARCs lack the budget, the correct type of staffing, and the necessary

protocols to appropriately and safely monitor beneficiaries who need methadone, because of the

risk of death if methadone is mixed with alcohol or other drugs. Id. at 37; Doc. No. 164 ¶ 11;

Doc. No. 163 ¶ 23. Coombs testified that this risk of death renders people using these

medications beyond the ARCs' capacities. Doc. No. 160-8 at 16.

The record evidence fails to support the conclusion that Defendant applies this principle

generally or in a manner that does not discriminate against people with OUD. That is, the record

fails to demonstrate that ARCs exclude all people facing the same or greater risk of death from

(a) overdose or consumption of certain substances, or (b) serious medical problems. ARCs

routinely accept people suffering from all forms of substance abuse, including many people with

---

[10] Dr. Mangiacarne's therapy recommendation applies to both methadone and buprenorphine.
Doc. No. 206 ¶ 12. Dr. Rodriguez agrees that patients receiving MOUD should be offered
psychotherapy and psychosocial support. Doc. No. 143 ¶ 39.
[11] The Court notes that Dr. Mangiacarne's therapy recommendation would impose a greater
burden on Defendant because it would further disrupt beneficiaries' participation in ARC
programming and work therapy. The present record does not fully address these concerns. The
Court will not consider the therapy recommendation in the reasonable accommodation analysis
for either drug, for this reason and for the reasons stated above.

OUD. Doc. No. 141-4 at 78. People with OUD who engage in "abstinence only" rehabilitation, such as the type Defendant offers, face a substantial risk of death from relapse to the use of drugs. Doc. No. 201 ¶ 7. Similarly, people with allergies to bees, nuts, or shellfish may face risk of death from exposure to or consumption of the allergen, but nothing in the record suggests that Defendant categorically bans people with these conditions from the ARCs. For these reasons, the Court rejects the concern over medical emergencies as a basis to find the proposed accommodation unreasonable.[12]

The Court discerns within the moving papers that Plaintiffs propose two different accommodations for methadone.[13] First, Plaintiffs propose the ARCs permit beneficiaries to travel offsite to federally licensed methadone clinics. Doc. No. 154-1 at 11. This may be a reasonable accommodation, subject to certain other religious considerations discussed below, but on the present record, the Court cannot say that Plaintiffs have demonstrated a likelihood of success in establishing the reasonableness of this proposed accommodation.

ARC policy currently allows beneficiaries to travel offsite for medical appointments if they are transported by an ARC staff member, Doc. No. 160-3 at 4, and sometimes beneficiaries may leave ARCs unaccompanied with a day pass, id. at 10. ARCs adjust beneficiaries' daily schedules and work obligations to accommodate their appointments. Doc. No. 141-1 at 26. ARCs also accommodate beneficiaries who observe religions other than Christianity, by

---

[12] Some evidence suggests the ARCs exclude people with schizophrenia because of the level of care they require, Doc. No. 208-5 at 3, as well as people posing a risk of violence, Doc. No. 207-9 ¶ 12. The first practice does not justify excluding beneficiaries on methadone, and the latter is an exclusion wholly different in kind.

[13] Plaintiffs' papers can be read as proposing a third accommodation, which would require Defendant to convert the ARCs into licensed methadone clinics. See Doc. No. 154-1 at 25–26. However, during a hearing on the instant motion, Plaintiffs clarified that they do not intend to pursue this accommodation, and, in any event, it would not be reasonable.

adjusting their schedules to accommodate prayer practices and the observance of holidays like Ramadan. Doc. No. 141-4 at 52–53. These examples demonstrate that ARCs routinely alter beneficiaries' schedules to accommodate individual needs, and nothing in the record shows that these alterations have proved unsuccessful or unmanageable for Defendant in the past. Plaintiffs provide evidence showing that patients receiving methadone therapy can still engage in daily life commitments including work and addiction treatment, Doc. No. 143 ¶ 62, suggesting that they could utilize this proposed accommodation and still participate meaningfully in ARC programming.

While this proposed accommodation is not free, given the presumed staffing cost of accompanying beneficiaries to methadone therapy, that alone fails to render the proposal necessarily unreasonable. See McDonald v. Town of Brookline, 863 F.3d 57, 66 (1st Cir. 2017) (citing 42 U.S.C. § 12111(9)) (noting that the term "reasonable accommodation" may include making existing facilities readily accessible for people with disabilities, adjusting work schedules, reassigning a disabled employee to a vacant position, granting employee leaves of absence, and leave extensions).

But without knowing more than the present record reveals, the Court cannot accurately estimate the number of beneficiaries who would require methadone therapy,[14] the cost of providing them with transportation, or the disruption (if any) to ARC programming, which might in turn depend upon the duration of time required to receive methadone therapy. Plaintiffs do not address the staffing that would be required to accompany the beneficiaries to appointments, the proximity of methadone clinics to ARC facilities, or whether beneficiaries could travel in groups to clinics. Plaintiffs note the existence of mobile methadone clinics, Doc. No. 143 at 32, but do

---

[14] Plaintiffs suggest this number may be in the "hundreds or thousands." Doc. No. 154-1 at 36.

not address whether such clinics are available and able to serve ARC beneficiaries. The reasonableness of this accommodation will depend, in part, on a detailed analysis of such facts. Of course, this offsite approach mitigates Defendant's concerns over diversion associated with take-home doses, discussed below. Still, for the reasons noted, even before reaching the religious considerations described below and alluded to above, Plaintiffs fail to carry their burden on this proposal at this juncture.

Second, Plaintiffs propose an accommodation in which ARCs would store doses of methadone and oversee beneficiaries' self-administration of the drug.[15] See Doc. No. 154-1 at 25–26. This proposal would accommodate beneficiaries who receive take-home doses of methadone by arrangement with a methadone clinic or their healthcare provider. Current ARC policy requires prescription medication to be stored in a locked central location.[16] Doc. No. 141-4 at 16. ARC staff members observe beneficiaries as they self-administer their medications. Doc. No. 141-5 at 53. Staff members also perform periodic checks of the locker to ensure that all medication is secure. Doc. No. 141-4 at 20–21. The frequency of these checks depends on the types of medication that are being stored in the locker at the time. Id.

Plaintiffs' proposed accommodation would require ARCs to verify methadone prescriptions brought into facilities, securely store doses of methadone, and oversee medication

---

[15] At this stage, the Court declines to consider the possibility of Plaintiffs keeping the medication on their own persons, which would raise numerous issues including risks of possible diversion, given the group-living situation at the ARCs and the large number of beneficiaries suffering from OUD. In this setting, this approach is not equivalent to permitting a person to access take-home doses of methadone while living in a private apartment or house.
[16] ARC policy does allow beneficiaries to keep certain emergency medications in their own possession—for example, inhalers to treat asthma, or glycerin tablets to treat heart conditions. Doc. No. 141-4 at 16.

self-administration at appropriate times, while taking care to prevent drug diversion. ARC staff would also be responsible for transporting beneficiaries to methadone appointments as needed.

While seeming complicated at first blush, this is the process Defendant already follows for beneficiaries who use other kinds of prescription medication. See Doc. No. 141-4 at 16–21 (describing the ARC policy of centrally storing prescription medication). Although the risk of methadone diversion is nonnegligible given the beneficiary population, Defendant's own expert categorizes the risk of methadone misuse as "relatively low." Doc. No. 163 ¶ 23. And the risk of diversion can be further mitigated through appropriate administration procedures—many of which the ARCs already implement.[17]

Defendant contends scaling up for methadone would be a massive undertaking requiring at least $200,000 per year at each ARC which, it asserts, is an undue burden. Doc. No. 164 ¶ 14. Defendant has not established that all the procedures and staff it identifies would be required for methadone, but not for any other medication; that the amount of medication ARCs presently store is generally de minimis in volume; or that the types of medication ARCs store generally pose little to no diversion risk. The Court also notes that the ARCs' frequent drug testing policy complements its present Medication Policy—and would do so if the Policy were altered to allow methadone. Indeed, under present practice, "[a]ll beneficiary medications are [already] stored in locked cabinets behind a locked door, and their use is [already] closely monitored." Doc. No. 162 ¶ 19. Accordingly, the Court finds Plaintiffs have sufficiently demonstrated a likelihood of success on their reasonable accommodations claim as to take-home doses of methadone.

---

[17] For example, Defendant has previously allowed beneficiaries to use medications that would otherwise be banned from the ARC—including narcotics—when they are recovering from surgery. Doc. No. 141-5 at 52–53. On at least one occasion, Defendant allowed a beneficiary to use methadone on a short-term basis, when the beneficiary's doctor had prescribed the drug for pain management. Id. at 7.

That said, two additional considerations bear on whether either of Plaintiffs' proposed accommodations for the class are reasonable. Both involve issues of religious liberty and implicate constitutional protections. Neither is susceptible to conclusive evaluation now.

First, Defendant describes the ARCs as abstinence-based, spiritual recovery programs. Doc. No. 160-16 at 10. In Defendant's view, methadone constitutes an addictive substance in a way that naltrexone and other permitted medications do not. Defendant advances a factual basis for this distinction: unlike naltrexone, methadone activates opioid receptors in the brain, thus causing intoxication and chemical dependence, and thereby undermines Defendant's belief in abstinence from all substances producing such effects.[18] Doc. No. 163 ¶ 23. Defendant argues that the proposed accommodations would violate its religious liberty, because they would require Defendant to permit the consumption of drugs that go against its religious beliefs, while also requiring Defendant to store and oversee the administration of the offending drugs. Doc. No. 205-1 at 2. Defendant asserts "[i]t is not for the Court to say that [its] religious beliefs . . . are mistaken or unreasonable." Doc. No. 160-16 at 24 (citing Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682, 686 (2014)). This consideration is expressly tied to Defendant's constitutional arguments.

Second, Defendant argues that the proposed accommodations would require a fundamental alteration of ARC programming, which presently focuses on recovery through abstinence, and that the accommodations are therefore unreasonable as a matter of statutory law. Doc. No. 160-16 at 31. The Court views this latter consideration as implicitly bound up in Defendant's constitutional arguments as well. In any event, the Court finds that both

---

[18] Defendant makes the same argument about buprenorphine, claiming that it is an opioid with the potential for abuse. Doc. No. 163 ¶ 23.

considerations more properly weighed and considered alongside the constitutional arguments (in the course of the trial, as explained below), rather than solely as part of the reasonable accommodation analysis.

c)    <u>Buprenorphine</u>

Buprenorphine is the third prescription medication used to treat OUD. It is sold in an oral form under the brand name Subutex and in a monthly injectable form under the brand name Sublocade. Doc. No. 143-3 at 14. Suboxone is a similar daily oral medication that combines buprenorphine and naloxone. <u>Id.</u> Defendant bans both buprenorphine and Suboxone from ARC facilities. Doc. No. 141-13 at 9. Both are effective medical treatments, Doc. No. 143-2 at 31, and Defendant does not contend otherwise. Plaintiffs propose an accommodation which would permit beneficiaries with OUD to use either the oral or injectable form of buprenorphine.

Plaintiffs are likely to succeed in showing that injectable buprenorphine is a reasonable accommodation, subject to the religious considerations discussed above regarding methadone. A healthcare provider administers buprenorphine to a patient via a monthly injection.[19] Doc. No. 143-2 at 237. Defendant already permits beneficiaries to receive naltrexone, which is administered in the same fashion. Doc. No. 141-16 at 13. Nothing in the record suggests that Defendant could not accommodate the same process for a different injection. Though the number of beneficiaries requiring the injections would likely be greater, monthly appointments are not so cumbersome as to defeat Plaintiffs' showing of a likelihood of success.

Alternatively, Plaintiffs propose that they be permitted to use the oral form of buprenorphine at the ARCs. This alternative raises the same considerations previously discussed

---

[19] Importantly, however, a patient must complete a seven-day course of sublingual buprenorphine before he can receive the buprenorphine injection, Doc. No. 143 ¶ 75, which would pose the same concerns as take-home doses of methadone, discussed above.

regarding the storage and observed administration of take-home doses of methadone. As a result, it also leads to the same conclusion. In sum, the Court finds Plaintiffs have sufficiently demonstrated a likelihood of success as to buprenorphine, subject to the religious considerations already noted.

      2.      <u>Disparate Treatment (Intentional Discrimination) Theory</u>

Plaintiffs allege that the ARC Medication Policy subjects them to disparate treatment, i.e., that the policy treats them differently than other beneficiaries because of their disability. Specifically, Plaintiffs allege that Defendant permits other beneficiaries to access methadone and buprenorphine but denies Plaintiffs access because of their OUD diagnoses. Doc. No. 154-1 at 24. Liability in a disparate-treatment case depends on whether the protected trait "actually motivated" the relevant decision-maker's treatment of the plaintiff. <u>Nunes v. Mass. Dep't of Corr.</u>, 766 F.3d 136, 144 (1st Cir. 2014). Plaintiffs can prove disparate treatment either (1) by direct evidence of discriminatory intent, or (2) by using the framework set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973). <u>Young v. United Parcel Serv., Inc.</u>, 575 U.S. 206, 213 (2015); <u>see also</u> <u>Nunes</u>, 766 F.3d at 145; <u>Smith v. Aroostook Cnty.</u>, 376 F. Supp. 3d 146, 158 (D. Me. 2019). Plaintiffs do not engage with the <u>McDonnell Douglas</u> burden-shifting framework, so the Court follows suit.

Here, Plaintiffs argue that Defendant bans methadone and buprenorphine specifically for beneficiaries with OUD, but not for others without that diagnosis, and that this practice is evidence of discriminatory intent. Doc. No. 154-1 at 24. As support, they cite the deposition of Coombs. Doc. No. 154-1 at 22. When asked whether ARCs had ever allowed beneficiaries to use methadone, Coombs recalled one example where a beneficiary was allowed to use methadone for pain management in the days following a surgery. Doc. No. 141-5 at 6–7. Coombs had "not a

clue" about that beneficiary's medical history or diagnoses. Id. at 7. Similarly, when asked about Suboxone, Coombs said that it was "typically not allowed," but that he knew doctors sometimes prescribed it for short-term treatment of conditions other than OUD. Id. at 69–70.

Coombs's deposition makes clear that ARCs do not allow the on-going use of methadone or buprenorphine for any reason, but that the medications might be allowed for brief short-term treatment in certain situations. The distinction turns not on the underlying diagnosis, but on the duration of the use, which is significant due to both Defendant's religious views and the burdens involved in the reasonable accommodation analysis. See also Doc. No. 141-4 at 19–20 (describing exceptions for short-term use of narcotics following beneficiary's surgery). While duration correlates with OUD, correlation here does not establish causation or intent. In any event, the Court rejects the notion that the foregoing evidence implies, let alone establishes a likelihood that Plaintiffs will successfully prove, that Defendant intentionally discriminates against people with OUD. Plaintiffs have not shown that they are likely to succeed on the merits of a disparate treatment theory.

### 3.     Disparate Impact Theory

Plaintiffs also argue that the ARC Medication Policy disparately impacts people with OUD. Doc. No. 154-1 at 25. To make out a prima facie case of disparate impact discrimination, Plaintiffs must (1) identify a challenged practice or policy and "pinpoint" Defendant's use of it; (2) "demonstrate a disparate impact on a group characteristic that falls within the protective ambit of" Section 504; and (3) "demonstrate a causal relationship between the identified practice and the disparate impact." E.E.O.C. v. Steamship Clerks Union, Loc. 1066, 48 F.3d 594, 601 (1st Cir. 1995); accord Frith v. Whole Foods Mkt., Inc., 517 F. Supp. 3d 60, 70 (D. Mass. 2021), aff'd on other grounds, 38 F.4th 263 (1st Cir. 2022).

Plaintiffs identify a challenged policy, which prohibits ARC beneficiaries from using methadone or buprenorphine for ongoing treatment. Doc. No. 154-1 at 16–17. Next, Plaintiffs need evidence showing that the Medication Policy has a "significantly adverse or disproportionate" impact on people with OUD. Rivera v. Mora Dev. Corp., 624 F. Supp. 3d 80, 92 (D.P.R. 2022) (quoting Del Rio Gordo v. Hosp. Ryder Mem'l Inc., No. 13-1145, 2018 WL 542222, at *3 (D.P.R. Jan. 23, 2018)). Statistics are often used in establishing a prima facie case of disparate impact discrimination. See Jones, 752 F.3d at 48–53 (describing the use of statistical analysis to show disparate racial impact as evidence of employment discrimination). Plaintiffs dispute that statistical evidence is required, citing Ruskai v. Pistole, 775 F.3d 61, 78 (1st Cir. 2014).[20] Nonetheless, they do make the following statistical argument.

Plaintiffs point to the deposition of Major Beth Muhs, who stated that each ARC in the Eastern Territory received somewhere between zero and three applications each month from people who reported needing MOUD.[21] Doc. No. 141-1 at 93–94. From this statement, Plaintiffs extrapolate that each ARC received thirty-six such applications per year from May 2018 until April 2023, which amounts to about 180 applications at each ARC, totaling approximately 5,000 applicants across all ARCs in the Eastern Territory. Doc. No. 168 at 13. Data from ARC discharge summary reports shows that ARCs accepted 941 people who identified opiates as their primary abused substance during this period.[22] Doc. No. 160-7 at 2. From these numbers,

---

[20] The Court assumes for the sake of argument that Plaintiffs' reading of Ruskai is correct. However, the Court of Appeals was referring to cases involving architectural barriers when it held that statistical evidence was not always required to establish a prima facie case of disparate impact discrimination. Ruskai, 775 F.3d at 78. It is unclear whether that holding applies to a broader set of disparate impact cases.

[21] At the time of Muhs's deposition, there were twenty-eight ARCs in the Eastern Territory. Doc. No. 141-1 at 93–94. The number has since increased to twenty-nine. Id.

[22] Defendant prepares a discharge summary for every beneficiary upon discharge without regard to the reason for discharge (e.g., graduation, termination, or voluntary departure).

Plaintiffs argue the "vast majority" of applicants with MOUD "presumably were turned away because of their need for doctor-prescribed methadone or buprenorphine." Doc. No. 168 at 13.

The Court is unpersuaded. Plaintiffs' estimated number of 5,000 requires twisting Muhs's testimony from zero to three applicants monthly to three applicants every single month, at every single ARC across the Eastern Territory. That is not what the witness said. Nor is the 941 figure particularly reliable. Only fifteen percent of the discharge summaries contain information in the field "primary abused substance." Doc. No. 160-7 at 2. Among the summaries that contained this information, opiates were listed as the second most abused substance. Id. Nor is it obvious that every applicant with OUD necessarily wants or uses MOUD or is "otherwise qualified" to be an ARC beneficiary (i.e., did not have other medical or psychiatric conditions that would have hindered their participation in the program). See Doc. No. 143 ¶ 45 (noting that 65% of people with OUD have other chronic conditions).

Putting aside these obvious problems, even if the Court were to assume that (1) the ARCs serve many beneficiaries with OUD; (2) many of these beneficiaries would want to use methadone or buprenorphine to treat their OUD; (3) no applicants or beneficiaries want or use methadone or buprenorphine for any condition other than OUD; and (4) based on the foregoing, Plaintiffs have demonstrated both a disparate impact and a causal connection between the ban and the disparate impact, the Court nevertheless would decline to grant the injunction. First, as to daily use of methadone, Defendant has shown enough at this stage regarding undue burden, for which it bears the burden of proof, to preclude Plaintiffs from demonstrating a likelihood of success on the merits for the reasons previously stated. Second, as to any form of administration of either drug, the Court declines to grant the injunction now given its determination that the two religious considerations identified above are appropriately evaluated on a fuller record.

IV.    <u>CONCLUSION</u>

For the foregoing reasons, the Motion for Preliminary Injunction, Doc. No. 138, is DENIED. As to the issues reserved or requiring fuller factual analysis, the ruling is WITHOUT PREJUDICE. The Motion for Provisional Class Certification, Doc. No. 139, is DENIED AS MOOT in light of the foregoing ruling.

In light of the parties' agreement to a bench trial, Doc. No. 217, the Court suggests the parties consider, as the next step in the case, a bench trial comprised of trial briefs supplemented by live testimony. The Court further suggests the live testimony, if necessary, concern material factual disputes, and the trial briefs address (factually and legally) (a) the two religious considerations specifically identified by and reserved upon by the Court in this decision; (b) any issues resolved by the Court for which a party reasonably believes further factual submissions are material; and (c) any other issues relevant and material to final judgment.

The parties shall confer and file, within fourteen days, a joint status report stating their joint or separate positions as to the Court's suggestions and any other proposals they have for the course of the remainder of the case. The status conference currently scheduled for April 4, 2024, is rescheduled for April 18, 2024, at 3:00 p.m. Counsel may appear by Zoom.

SO ORDERED.

 /s/ Leo T. Sorokin_____
United States District Judge