UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARK TASSINARI, RICHARD ESPINOSA, and JOSEPH ALMEIDA, individually and on behalf of all others similarly situated, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) Civil No. 21-10806-LTS |
| THE SALVATION ARMY, A NEW YORK CORPORATION, | ) ) ) |
| Defendant. | ) ) ) |

<u>ORDER ON MOTION FOR CLASS CERTIFICATION (DOC. NO. 230)</u>

March 26, 2025

SOROKIN, J.

Mark Tassinari, Joseph Almeida, and Richard Espinosa ("Named Plaintiffs") seek to represent three classes in suing The Salvation Army for discriminating against individuals with Opioid Use Disorder.[1] They assert that The Salvation Army maintains a policy at its Adult Rehabilitation Centers that prevents such individuals from accessing medication for their disorder, in violation of Section 304 of the Rehabilitation Act, 29 U.S.C. § 794, and the Fair Housing Act, 42 U.S.C. § 3604. Before the Court is Named Plaintiffs' Motion for Class

---

[1] The Court uses "The Salvation Army" and "Defendant" interchangeably to refer to The Salvation Army, A New York Corporation.

Certification, Doc. No. 230, pursuant to Federal Rule of Civil Procedure 23.[2]  For the reasons

that follow, that Motion is ALLOWED IN PART and DENIED IN PART.

I.    BACKGROUND

    A.    Facts[3]

The Court presumes familiarity with the case from its Order on Named Plaintiffs'

Motions for Preliminary Injunction and Provisional Class Certification, Doc. No. 218.[4]  As such,

the Court only briefly sketches the contours of this case here, borrowing from its previous Order

and supplementing its findings as necessary.  The Court finds further facts as relevant throughout

the course of its legal analysis.

The Salvation Army is an "international movement related to evangelical Christianity."

Doc. No. 30 ¶ 134.  It operates twenty-nine Adult Rehabilitation Centers ("ARCs") across the

eastern United States.  Doc. No. 141-1 at 11–13.  ARCs "serve[] men and women with social,

emotional and spiritual needs who have lost the ability to cope with their problems and provide

for themselves."  Doc. No. 141-8 at 23.  Although "ARCs are not licensed substance abuse

treatment programs," Doc. No. 106-2 ¶ 18, most ARC residents ("beneficiaries") have a

substance-use disorder.  Doc. No. 141-8 at 29; Doc. No. 141-1 at 33.  ARCs provide

beneficiaries with housing and basic living necessities for approximately six to twelve months,

during which time beneficiaries live on site and work full time for Defendant's thrift stores.

---

[2] Citations to "Doc. No. __" refer to documents appearing on the court's electronic docketing system ("ECF"); pincites are to the page numbers in the ECF header or to paragraph numbers where applicable.

[3] The Court considers only admissible evidence in determining whether to certify Named Plaintiffs' proposed classes.  DeRosa v. Mass. Bay Commuter Rail Co., 694 F. Supp. 2d 87, 95 (D. Mass. 2010).  Neither party has drawn the Court's attention to any possibly inadmissible evidence in the record.

[4] Both parties incorporated the documents submitted in support of and opposition to these prior motions into the record for the present motion.  Doc. No. 230-1; Doc. No. 244-1 at 8.

Doc. No. 141-4 at 11, 13, 51, 70.  All beneficiaries are required to attend religious services,

including Bible study once a week, church services twice a week, and daily devotions.  Id. at 51–

52.  Beneficiaries must also maintain sobriety and must submit to random urine drug tests at least

once a month, Doc. No. 141-1 at 87–88, and perhaps as often as every seventy-two hours, Doc.

No. 141-4 at 22.

Opioid Use Disorder ("OUD") is "a primary, chronic disease of brain reward, motivation,

memory, and related circuitry, characterized by inability to consistently abstain from [opioid]

use, impairment in behavioral control, craving, diminished recognition of significant problems

with one's behaviors and interpersonal relationships, and a dysfunctional emotional response."

Doc. No. 143 ¶ 15.  Over two million people nationwide suffer from OUD.  Id. ¶ 30.  In

Massachusetts alone, there were 2,281 confirmed opioid-related overdose deaths in 2021.  Id.

¶ 31.  There are three leading Medications for Opioid Use Disorder ("MOUD"): methadone,

buprenorphine, and vivitrol.[5]  Defendant maintains a policy ("Medication Policy") that bans

from ARCs the use of roughly sixty medications which Defendant believes are "known to be

abusive and addictive to [the ARCs'] typical population."  Doc. No. 160-13 at 3–4.  The banned

medications include methadone and buprenorphine but not vivitrol.[6]  Doc. No. 141-13 at 9.

Individuals using methadone and buprenorphine are not admitted to the ARCs, and any

beneficiary who tests positive for either medication is subject to discharge from the ARC.  Doc.

No. 141-5 at 18.

---

[5] Buprenorphine is also known as Subutex or Suboxone when taken orally or Sublocade when
administered by injection.
[6] Because the use of vivitrol is not at issue in this case, the Court uses "MOUD" to refer to
methadone and buprenorphine only.

Named Plaintiffs are three individuals with OUD. Doc. No. 83 ¶¶ 5–22. Mark Tassinari began using opioids more than two decades ago, when he was about fifteen years old, and has abused drugs for many years. Doc. No. 144 ¶¶ 3–5. In 2018, Tassinari entered an ARC as a condition of his probation. Id. ¶ 13. He remained there for about a month, until he was involuntarily discharged for using buprenorphine, which he says he obtained from a doctor with a valid prescription. Id. ¶¶ 16–22; Doc. No. 141-23. Thereafter, Tassinari suffered housing instability and a relapse. Doc. No. 144 ¶ 25. In 2021, he contacted an ARC again seeking admission but was told that the ARC would not admit him because he was on buprenorphine. Id. ¶ 31. As of January 2024, Tassinari had no stable housing, was trying to get back on MOUD after a relapse, and still wished to return to an ARC. Doc. No. 198 ¶¶ 3, 8–9.

Richard Espinosa also suffers from OUD and was first prescribed methadone as a treatment in 2014. Doc. No. 145 ¶¶ 3, 6. In 2018, after a relapse, Espinosa sought admission to an ARC and was told beneficiaries were not allowed to use methadone or buprenorphine. Id. ¶ 10. Eventually, off MOUD, Espinosa was admitted to the ARC. Id. ¶ 15. After suffering withdrawal symptoms, Espinosa voluntarily left the ARC roughly three months into his stay. Id. ¶¶ 15, 19. Espinosa resumed taking doctor-prescribed methadone in 2020. Id. ¶ 19. Espinosa reported in February 2024 that he had tapered off methadone around May or June 2023, from which the Court concludes that he does not now use MOUD. Doc. No. 199 ¶ 3. If he were to suffer a relapse of OUD, Espinosa says he would seek to return to an ARC. Doc. No. 234 ¶ 4.

Joseph Almeida has suffered from OUD since about 2006. Doc. No. 146 ¶ 2. He began taking prescribed buprenorphine in 2006 then prescribed methadone in 2008. Id. ¶¶ 4–5. In 2009, Almeida entered the Saugus ARC after a stint in jail for a probation violation. Id. ¶¶ 6–8. He remained there for about a month, until he relapsed and voluntarily left the ARC. Id. ¶ 9.

After a separate relapse in 2022, Almeida contacted the Saugus and Springfield ARCs and was told that he could not come to either facility while using methadone, even though the Springfield ARC did have space available for new beneficiaries.  Id. ¶¶ 21–22.  Almeida was sentenced to incarceration for approximately two years in July 2023, though he could be released earlier and does not know exactly when his incarceration will end.  Doc. No. 200 ¶ 3.  As of May 2024, Almeida was receiving methadone treatment while incarcerated and anticipated needing housing upon his release from prison.  Doc. No. 235 ¶ 4.

    B.   <u>Procedural Posture</u>

Two claims remain pending in this case: a claim by Tassinari, Espinosa, and Almeida under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; and a claim by Tassinari and Almeida under the Fair Housing Act ("FHA"), 42 U.S.C. § 3604.[7]

Named Plaintiffs, by their present motion, seek to certify three classes: (1) an injunctive-relief class, pursuant to Rule 23(b)(2), asserting claims under both the Rehabilitation Act and the FHA (the "Injunction Class"); (2) a damages class, pursuant to Rule 23(b)(3), asserting claims under only the Rehabilitation Act (the "Section 504 Damages Class"); and (3) a damages class, pursuant to Rule 23(b)(3), asserting claims under only the FHA (the "FHA Damages Class," and, together with the Section 504 Damages Class, the "Damages Classes").

In addition, Named Plaintiffs ask the Court to name Tassinari, Espinosa, and Almeida as class representatives for the Injunction Class and the Section 504 Damages Class and Tassinari and Almeida as class representatives for the FHA Damages Class.  Doc. No. 230 at 2–3.  Finally, they ask that the Court appoint Named Plaintiffs' counsel as class counsel.  Id.

---

[7] Named Plaintiffs do not specify—either in their Second Amended Complaint or in their filings on the Motion—under which provision of Section 3604 their FHA claims would lie.  However, their submissions in support of their earlier Motion for Preliminary Injunction cited Section 3604(f)(2), <u>see</u> Doc. No. 154-1 at 27, so the Court marches forward under that flag.

The parties fully briefed the Motion, and the Court held a hearing on it on February 6, 2025. The Motion is now ripe for resolution.

II.    LEGAL STANDARD

A.    Class Certification

A party seeking class certification has the burden of establishing that the proposed class satisfies all four requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation—and that class-wide adjudication is appropriate for one of the reasons set forth in Rule 23(b). See Smilow v. Sw. Bell Mobile Sys., Inc., 323 F.3d 32, 38 (1st Cir. 2003). A court confronted with a motion for class certification must engage in a "rigorous analysis" to determine whether the moving party has met its burden. Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 351 (2011). This analysis may "entail some overlap with the merits of the plaintiff's underlying claim," in which case, "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." Id. (quotations omitted). Thus, the Court briefly surveys the substantive law governing the putative class claims before proceeding to its class-certification analysis.

B.    Substantive Law

Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." To succeed on a Section 504 claim, a plaintiff must prove that: (1) he is disabled; (2) he sought services from a covered entity;[8] (3) he was "otherwise qualified" to receive those services; and (4) he was

_____

[8] Defendant has stipulated that, for the purposes of the present litigation, it constitutes a "covered entity" under Section 504. Doc. No. 133.

6

denied those services "solely by reason of [his] . . . disability." Thiersaint v. Dep't of Homeland Sec., 85 F.4th 653, 669 (1st Cir. 2023) (quoting Lesley v. Hee Man Chie, 250 F.3d 47, 53 (1st Cir. 2001)).

The Fair Housing Act makes it unlawful to "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a [disability]." 42 U.S.C. § 3604(f)(2). The analysis of the class FHA claims largely mirrors that of their Section 504 claims. See S. Middlesex Opportunity Council, Inc. v. Town of Framingham, 752 F. Supp. 2d 85, 114 (D. Mass. 2010) (noting that "legal framework under" Rehabilitation Act, FHA, and Americans with Disabilities Act ("ADA") "is largely the same").[9]

Under both statutes, Named Plaintiffs can show that they were denied participation in the ARC programs due to their disability by establishing: (1) intentional discrimination;[10] (2) disparate impact; or (3) failure to make reasonable accommodations. Sosa v. Mass. Dep't of Corr., 80 F.4th 15, 30–31 (1st Cir. 2023) (collecting cases). Here, Named Plaintiffs seek to prove that Defendant's Medication Policy constitutes all three kinds of unlawful discrimination.

III.    DISCUSSION

Named Plaintiffs seek to certify three classes: the Injunction Class and the two Damages Classes. Because the two types of classes engender distinct issues in this case, the Court will analyze them separately, starting with the Injunction Class before considering the Damages Classes together.

---

[9] The exception may be with respect to causation. The Rehabilitation Act prohibits discrimination "solely by reason of" disability. 29 U.S.C. § 794. The FHA does not include that "solely by reason of" language. See 42 U.S.C. § 3604(f)(2) (using "because of" disability). Because the parties have treated the two sets of claims identically and glossed over this potential difference, the Court does the same.

[10] "Intentional discrimination" is also called "disparate treatment."

A.   Injunction Class

Named Plaintiffs seek to certify the following Injunction Class, pursuant to Rule

23(b)(2):

> All individuals with opioid use disorder (OUD) who, in accordance with a healthcare provider's treatment plan, take any form of prescribed FDA approved methadone or buprenorphine medication for opioid use disorder, including Suboxone and Sublocade ("MOUD") and who are participating or seek to participate in any of Defendant The Salvation Army, a New York Corporation's Adult Rehabilitation Center (ARC) housing or services.

Doc. No. 230 at 1.  As explained below, the Court finds certification of the Injunction Class, with

a minor modification, to be proper under Rule 23.

1.   *Standing and Mootness*

As a threshold matter, Defendant asserts that Named Plaintiffs do not have standing to

seek injunctive relief.  Standing requires a plaintiff to establish: (1) "that he suffered an injury in

fact that is concrete, particularized, and actual or imminent"; (2) "that the injury was likely

caused by the defendant"; and (3) "that the injury would likely be redressed by judicial

relief."  TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021).  Here, Defendant targets the

first element, arguing that Named Plaintiffs "have not shown that they intend to return to an

ARC or that the Medication Policy will hinder their future participation."  Doc. No. 244-1 at 14.

The Court understands this argument as bifold, both challenging Named Plaintiffs' standing and

posing a mootness defense.  See Ramírez v. Sanchez Ramos, 438 F.3d 92, 97 (1st Cir. 2006)

(explaining that "standing measures whether a plaintiff has satisfied the 'personal stake'

requirement at the commencement of an action," while "mootness measures whether the

plaintiff's interest remains sufficient to justify continuing federal jurisdiction").  The Court

considers each aspect in turn.

As for standing, "[w]hen a plaintiff seeks prospective relief such as an injunction, the plaintiff must establish a sufficient likelihood of future injury." Food & Drug Admin. v. All. for Hippocratic Med., 602 U.S. 367, 381 (2024). The threat must be "certainly impending" or there must be a "substantial risk" that injury will occur. Roe v. Healey, 78 F.4th 11, 20 (1st Cir. 2023) (quoting Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014)). This requirement applies with equal force to plaintiffs who seek to represent an injunctive-relief class. See Amrhein v. eClinical Works, LLC, 954 F.3d 328, 331 (1st Cir. 2020) ("[E]ven named plaintiffs who represent a class must allege and show a past or threatened injury to them, and not just to other, unidentified members of the class to which they belong." (quotations omitted) (emphasis in original)).

Named Plaintiffs satisfy this requirement, based on the facts "as they existed when the action was commenced." Ramírez, 438 F.3d at 97. Under analogous ADA case law, "a disabled individual who is currently deterred from patronizing a public accommodation due to a defendant's failure to comply with the ADA has suffered 'actual injury,'" and one "who is threatened with harm in the future because of existing or imminently threatened non-compliance with the ADA suffers imminent injury.'" Pickern v. Holiday Quality Foods Inc., 293 F.3d 1133, 1138 (9th Cir. 2002) (quoted by Disabled Americans For Equal Access, Inc. v. Ferries Del Caribe, Inc., 405 F.3d 60, 64 (1st Cir. 2005)). Here, each Named Plaintiff alleged just such an injury at the time he joined this action. When Tassinari filed his original Complaint, he was managing his OUD with doctor-prescribed buprenorphine, anticipated an urgent need for housing, and had just been turned away from the Saugus ARC due to his MOUD use. Doc. No. 1 ¶¶ 35–36. When Espinosa joined the action via the First Amended Class Action Complaint, he was using doctor-prescribed methadone and expressed a desire to enroll in an ARC if not for the

Medication Policy.  Doc. No. 30 ¶¶ 10–11.  And when Almeida joined via the Second Amended

Complaint, he was also on doctor-prescribed methadone, was without a permanent address, and

had been denied by two ARCs that year.  Doc. No. 83 ¶¶ 21–22.  These allegations support a

finding of an actual or imminent injury sufficient to convey initial standing.  See Dudley v.

Hannaford Bros. Co., 146 F. Supp. 2d 82, 86 (D. Me. 2001) (finding an actual and imminent

injury where grocery store had once allegedly refused to sell plaintiff alcohol due to his

disability, store had not changed its policies since, and plaintiff alleged that he "would like to

purchase alcohol [at the store], but that based on the events of [the denial] he has not tried to do

so"), aff'd, 333 F.3d 299 (1st Cir. 2003).

Under the doctrine of mootness, though, standing "must be extant at all stages of review,

not merely at the time the complaint is filed."  Ramírez, 438 F.3d at 100; see also Goodwin v.

C.N.J., Inc., 436 F.3d 44, 46 (1st Cir. 2006) ("A case becomes moot if, at some time after the

institution of the action, the parties no longer have a legally cognizable stake in the outcome.").

The party raising a mootness defense bears the "heavy burden" of establishing that "after the

case's commencement, intervening events have blotted out the alleged injury and established that

the conduct complained of cannot reasonably be expected to recur."  Ramírez, 438 F.3d at 100.

Defendant has failed to establish its mootness defense as to two of the Named Plaintiffs.

Tassinari's most recent affidavit affirmed that he is currently taking doctor-prescribed

methadone and that he "continue[s] to need housing and services."  Doc. No. 239 ¶¶ 4, 6.  While

Defendant urges that Tassinari's assertion that he is back on methadone is "without support,"

Doc. No. 244-1 at 14, the burden to prove mootness is on Defendant, who has offered no

evidence to rebut Tassinari's affidavit.  Similarly, Defendant argues that "Almeida is currently

incarcerated and does not know 'exactly when' he will be released."  Id.  But Almeida was

sentenced to approximately two years of incarceration in July 2023; those two years should end around July 2025, even if Almeida does not know the exact date.  That means Almeida <u>will</u> be released and his release is imminent.  <u>Cf.</u> <u>In re New Motor Vehicles Canadian Exp. Antitrust Litig.</u>, 522 F.3d 6, 15 (1st Cir. 2008) (finding no standing where injury "contingent on several events which <u>may or may not</u> happen" (emphasis added)).  He has also unequivocally stated that, upon release, he will "need access to housing and services while being able to access medication for [his] OUD."  Doc. No. 235 ¶ 4.  In fact, from the record, it appears that a large proportion of ARC applicants have been individuals who are completing or have just completed a term of incarceration, with case workers or probation officers often helping to place such individuals in ARCs.  <u>See, e.g.</u>, Doc. No 144 ¶ 12; Doc. No. 146 ¶¶ 6–7; Doc. Nos. 197-3, -7, -12, -21, -24.  Simply put, Defendant has not met its heavy burden to prove mootness with respect to Tassinari's and Almeida's injunctive-relief claims.

In contrast, Espinosa's injunctive-relief claim is now moot.  Espinosa's OUD has been in remission since 2020, he stopped taking MOUD almost two years ago, and he has no present or imminent need for Defendant's ARC services.  Doc. No. 145 ¶ 22; Doc. No. 199 ¶ 3.  The Court recognizes that OUD is a chronic disease that "can involve cycles of relapse and remission," Doc. No. 143 ¶ 9, as Espinosa's own history shows, Doc. No. 199 ¶ 3.  However, injury from Defendant's Medication Policy is not certainly impending where there is no threat that Espinosa will seek MOUD or admission to an ARC anytime soon—or ever again.  Because Espinosa's injunctive-relief claim is moot, Espinosa cannot act as class representative for the Injunction

Class.  The Court proceeds with only Tassinari and Almeida as prospective Injunction Class representatives.[11]

2.    *Rule 23(a) Prerequisites*

a.    Numerosity

Rule 23(a)'s first requirement is met if "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Generally, numerosity will be met where the proposed class exceeds forty members.  Garcia-Rubiera v. Calderon, 570 F.3d 443, 460 (1st Cir. 2009).  Indeed, for an injunctive-relief class such as this, "[p]laintiffs need not establish the precise number or identity of class members."  Rolland v. Cellucci, No. CIV A 98-30208-KPN, 1999 WL 34815562, at *3 (D. Mass. Feb. 2, 1999).  In making this determination, "the court may draw a reasonable inference as to the size of a class given the facts before it."  Id.; accord McCuin v. Sec'y of Health & Hum. Servs., 817 F.2d 161, 167 (1st Cir. 1987).  Named Plaintiffs assert that the Injunction Class "far exceeds 40 members" because, since 2018, Defendant's twenty-nine ARCs have housed 34,000 people, 8,500 of whom suffered from OUD, and the ARCs "turn away dozens of applicants every month because of MOUD."  Doc. No. 231 at 17. Given the number of ARCs operated by Defendant, the number of people with OUD, and the type of population served by the ARCs, the Court reasonably infers that the Injunction Class exceeds forty members.  The Court is further convinced that numerosity is met in this case because of the impracticability of joinder.  The Injunction Class could number in the thousands, consists of individuals struggling with a potentially debilitating chronic disease, and spreads over a vast area from Maine to Ohio to Puerto Rico.  Doc. No. 141-1 at 11.  This is a case in which

---

[11] Notwithstanding the mootness of Espinosa's claim and for ease of reference, the Court will continue to use "Named Plaintiffs" for the remainder of its Injunction Class analysis except where the identity of the class representatives is relevant (i.e., in examining Rule 23(a)(3) typicality and Rule 23(a)(4) adequacy of representation).

"[t]he size of the class, the asserted disabilities of proposed class members, and geographic diversity, make it highly unlikely that separate actions would follow if class treatment were denied."  Kenneth R. ex rel. Tri-Cnty. CAP, Inc./GS v. Hassan, 293 F.R.D. 254, 265 (D.N.H. 2013) (quotations omitted); see also Rolland, 1999 WL 34815562, at *3 (giving "significant weight" to "the ability of class members to bring their own separate actions, their geographical diversity and the type of relief sought").  Named Plaintiffs have therefore met their burden on Rule 23(a)(1) numerosity.

b.    Commonality

Next, Named Plaintiffs must show that "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  This requires that class members "have suffered the same injury," such that their claims "depend upon a common contention" that is "capable of classwide resolution."  Wal-Mart, 564 U.S. at 349–50.  Named Plaintiffs can satisfy this requirement by identifying "[e]ven a single [common] question."  Id. at 359 (alterations in original) (quotations omitted).

Named Plaintiffs identify several common questions raised in this case: (1) whether Defendant maintains any policy or practice of denying prescribed MOUD to individuals; (2) whether OUD is an objectively serious medical condition; (3) whether Defendant's policy or practice of denying prescribed MOUD discriminates on the basis of disability; (4) whether Defendant's MOUD Policy violates the Rehabilitation Act or the FHA under an intentional discrimination, disparate impact, or failure-to-accommodate theory; and (5) whether Defendant is entitled to an exemption from these neutral laws based on its asserted religious nature.  Doc. No. 231 at 18.  In response, Defendant argues that litigating the Injunction Class members' claims will require individualized inquiries as to whether each member is disabled, whether each

13

member is "otherwise qualified" for an ARC, and whether each member can succeed on a theory of intentional discrimination, disparate impact, or failure to accommodate.  Doc. No. 244-1 at 19–22.

Named Plaintiffs have established commonality in this case.  Named Plaintiffs seek to "challenge a single policy barring MOUD that applies to all class members."  M.C. v. Jefferson Cnty., No. 6:22-CV-190, 2022 WL 1541462, at *2 (N.D.N.Y. May 16, 2022).  The existence of such a policy itself acts as a common factual contention capable of classwide resolution.  If Defendant does not maintain such a policy, then the entire class loses; if Defendant does maintain such a policy, then the entire class can move forward on its claims.  See Donovan v. Philip Morris USA, Inc., No. CIV.A. 06-12234-DJC, 2012 WL 957633, at *21 (D. Mass. Mar. 21, 2012) (finding commonality satisfied because "questions that go to the heart of the elements of the cause of action in this case . . . will each be answered either 'yes' or 'no' for the entire class; the answers will not vary by individual class member").  This stands in stark contrast to Wal-Mart Stores, Inc. v. Dukes, where "respondents provide[d] no convincing proof of a companywide discriminatory pay and promotion policy."  564 U.S. at 359.  The claims of the Injunction Class would be united by the common theory that Defendant did hold an organization-wide discriminatory Medication Policy.  That is, the Medication Policy would act as the "glue holding the alleged reasons for [Defendant's allegedly discriminatory] decisions together."  Id. at 352 (emphasis in original).

Similarly, Defendant's asserted religious defenses provide the Injunction Class with a common question of law.  Whether Defendant is exempt from the requirements of the Rehabilitation Act and the FHA will not vary by class member.  Instead, Defendant's own defenses "seem[] to promise that most or all cases, if individually litigated, would require

repetitious resolution of an objection by [Defendant] that is common to each one of them."

Gintis v. Bouchard Transp. Co., 596 F.3d 64, 67 (1st Cir. 2010).  The issue of religious

exemption, therefore, "apparently guarantees a crucial common issue of great importance."  Id.

(making this point as part of Rule 23(b)(3) superiority analysis).  These two common questions

suffice—without diving into Named Plaintiffs' other asserted common questions—for the Court

to find commonality satisfied.

      Ultimately, the gravamen of Defendant's challenges on commonality really goes not to

whether common issues exist but rather to whether common issues predominate over individual

ones; this is not a concern for a 23(b)(2) class, as predominance is a requirement for certifying a

class only under 23(b)(3).[12]  See Donovan v. Philip Morris USA, Inc., 268 F.R.D. 1, 11 (D.

Mass. 2010) (reviewing case law of First Circuit and district courts within Circuit refusing to

import Rule 23(b)(3)'s predominance inquiry into Rule 23(b)(2) analysis).  As mentioned, given

the nature of the Injunction Class, Named Plaintiffs need not even identify every class member.

Rolland, 1999 WL 34815562, at *3; see also Fed. R. Civ. P. 23(c)(2) (allowing, but not

requiring, court to direct appropriate notice to class certified under Rule 23(b)(2)).  As such, the

Court will address Defendant's commonality arguments—which are identical for all classes—in

its analysis of the Damages Classes below.  For the Injunction Class, it suffices that Named

---

[12] For example, Defendant's argument that individualized determinations of disability defeat
commonality for the Injunction Class does not really make sense given the relief sought.  Named
Plaintiffs need not prove the disabled status of every prospective class member.  The resulting
relief would, by definition, apply only to individuals with a disability.  Defendant's identified
individualized issues really boil down to one common question: Are otherwise qualified
individuals with OUD unlawfully excluded from Defendant's ARCs by the Medication Policy?
See Raymond v. N.Y. State Dep't of Corr. & Cmty. Supervision, 579 F. Supp. 3d 327, 338–39
(N.D.N.Y. 2022) (rejecting challenge to typicality for injunctive-relief class of incarcerated
individuals with disabilities because challenge similarly sounded in predominance inquiry
inapplicable to such a class).

Plaintiffs have identified at least one common question, the resolution of which would block or advance the claims of the entire class.

> c.    Typicality

The typicality prerequisite of Rule 23(a) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "[T]o satisfy the typicality requirement, the class representative's claims must arise from the same event or practice or course of conduct that gives rise to the claims of other class members, and are based on the same legal theory." Loughlin v. Vi-Jon, LLC, 728 F. Supp. 3d 163, 185 (D. Mass. 2024) (quotations omitted). This analysis "tend[s] to merge" with the commonality analysis, as "[b]oth serve as guideposts for determining whether . . . the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." Id. (quotations omitted) (alterations in original). Here, Tassinari and Almeida satisfy typicality. They assert the same claim, deriving from the same common policy, respecting the same disability status, as the rest of the proposed Injunction Class.

> d.    Adequacy of Representation

Finally, Rule 23(a) also requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). To satisfy adequacy, "[t]he moving party must show first that the interests of the representative party will not conflict with the interests of any of the class members, and second, that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation." Andrews v. Bechtel Power Corp., 780 F.2d 124, 130 (1st Cir. 1985). The record suggests no conflict of interest exists, and the Court finds no fault in Named Plaintiffs' counsel. See Doc. No. 148

(setting forth qualifications for counsel from Altshuler Berzon); Doc. No. 149 (same for Justice

Catalyst Law).  The only issues raised by Defendant are derivative of its standing and

commonality arguments, which the Court has already considered and rejected.  Tassinari and

Almeida have thus satisfied the adequacy-of-representation prerequisite.

3.    *Rule 23(b)(2)*

In order to certify a Rule 23(b)(2) injunction class, the Court must determine that "the

party opposing the class has acted or refused to act on grounds that apply generally to the class,

so that final injunctive relief . . . is appropriate respecting the class as a whole."  Fed. R. Civ. P.

23(b)(2).  Named Plaintiffs contend that Defendant has a uniform policy of denying admission

to, and discharging from, its ARCs individuals using doctor-prescribed MOUD.  Defendant does

not seem to dispute the existence of such a policy.  As such, "[t]his is a prime example of a Rule

23(b)(2) class action because plaintiffs are challenging a systemic policy or practice."  M.C.,

2022 WL 1541462, at *3.  The catch, however, is that not all members of the proposed

Injunction Class are necessarily subject to this policy.  As the class is defined, some members

may not be "otherwise qualified" for the ARCs and would thus be denied admission to (or

discharged from) the ARCs for another reason (e.g., illegal drug use).  Given that qualification,

the Court modifies the proposed Injunction Class slightly, as follows (with revisions underlined):

> All individuals with opioid use disorder (OUD) who, in accordance with a
> healthcare provider's treatment plan, take any form of prescribed FDA approved
> methadone or buprenorphine medication for opioid use disorder, including
> Suboxone and Sublocade ("MOUD"), who are participating or seek to participate
> in any of Defendant The Salvation Army, a New York Corporation's Adult
> Rehabilitation Center (ARC) housing or services, and who are otherwise qualified
> for such housing or services.

4.    *Conclusion*

Having found that Tassinari and Almeida have proved all prerequisites for a Rule

23(b)(2) class under this modified definition, the Court ALLOWS the Motion for Class

17

Certification with respect to the Injunction Class with only Tassinari and Almeida as class representatives.

    B.   <u>Damages Classes</u>

Named Plaintiffs seek to certify two Damages Classes pursuant to Rule 23(b)(3). The Section 504 Damages Class would consist of:

> All individuals with opioid use disorder (OUD) for whom, from the period May 14, 2018 to the date of class notice (the "Section 504 Class Period"): (1) Defendant's call logs, applicant files, or emails show they were denied access to any of Defendant The Salvation Army, a New York Corporation's Adult Rehabilitation Center (ARC) housing or services because they were taking or had taken any form of prescribed FDA-approved methadone or buprenorphine medication for opioid use disorder, including Suboxone and Sublocade ("MOUD"); (2) Defendant's beneficiary files show they were discharged from any of Defendant's ARCs because of taking MOUD; or (3) Defendant's files show they were admitted to an ARC and their primary "abused" substance upon intake was "opiates."

Doc. No. 230 at 2.

> The FHA Damages Class, nearly identical save for the class period, would comprise:

> All individuals with opioid use disorder (OUD) for whom, from the period May 14, 2019 to the date of class notice (the "FHA Class Period"): (1) Defendant's call logs, applicant files, or emails show they were denied access to any of Defendant The Salvation Army, a New York Corporation's Adult Rehabilitation Center (ARC) housing or services because they were taking or had taken any form of prescribed FDA-approved methadone or buprenorphine medication for opioid use disorder, including Suboxone and Sublocade ("MOUD"); (2) Defendant's beneficiary files show they were discharged from any of Defendant's ARCs because of taking MOUD; or (3) Defendant's files show they were admitted to an ARC and their primary "abused" substance upon intake was "opiates."

Doc. No. 230 at 2. As explained below, the Court finds certification of the Damages Classes proper only with respect to subpart (2) of each class and only to the extent the Damages Classes assert claims for intentional discrimination and disparate impact. Subparts (1) and (3) of each Damages Class, as well as the claims for failure to accommodate, are not appropriate for class resolution under Rule 23(b)(3).

1.    *Trial Plan*

Named Plaintiffs propose a two-phase bench trial for the Damages Classes.  See

generally Doc. No. 231-1.  In Phase I, Named Plaintiffs would seek to prove "Defendant's

liability on the grounds that Defendant's MOUD Policy violates the Rehabilitation Act and the

FHA."  Id. at 1.[13]  In Phase II, if Defendant were found liable in Phase I, the Court would

determine the amount of nominal, compensatory, and punitive damages, if any, to be awarded to

members of the Damages Classes.  Id. at 4.  According to Named Plaintiffs, in Phase II, the

Court could adopt a presumption, which Defendant could rebut with evidence or to which

Defendant could raise individualized affirmative defenses, that "each Damages Class member

suffered unlawful discrimination because the [Medication Policy] was applied to them."  Id. at 4.

The Court would then determine universal nominal damages and, if appropriate, punitive

damages.  Id. at 4–6.  The Court would calculate general compensatory damages for each

member of subparts (1), (2), and (3) of the Damages Classes according to, respectively: (1) the

number of times they were denied access to an ARC because of their MOUD use; (2) the number

of times they were discharged from an ARC because of their MOUD use; and (3) the number of

days they participated in an ARC without access to MOUD.  Id. at 5.  Named Plaintiffs do not

anticipate many class members seeking special damages, but, if any do, they say the Court could

appoint special masters to resolve those issues.  Id.

The Court generally approves of Named Plaintiffs' two-phase trial plan, though not

necessarily their formula for calculating damages or each specific detail of the plan.  This trial

plan derives from International Brotherhood of Teamsters v. United States, 431 U.S. 324, 357–

61 (1977), in which the Supreme Court approved of a two-phase trial where the government sued

---

[13] Phase I would also resolve liability on the Injunction Class's claims, as well as the remedy for
the Injunction Class if Defendant were found liable.  Doc. No. 231-1 at 2–3.

an employer and union for engaging in a pattern of racial discrimination in the hiring of

employees in violation of Title VII of the Civil Rights Act of 1964.  In such a pattern-or-practice

suit, "[a]t the initial, 'liability' stage . . . the Government is not required to offer evidence that

each person for whom it will ultimately seek relief was a victim of the employer's discriminatory

policy."  Id. at 360.  Instead, the government need only "demonstrate that unlawful

discrimination has been a regular procedure or policy followed by an employer."  Id.  The case

may then proceed to a "second, 'remedial' stage of trial," to "determine the scope of individual

relief."  Id. at 361.

       The Teamsters pattern-or-practice framework is appropriate here.  The Court is not aware

of any case in which Teamsters was applied to a private class action like this one under either the

Rehabilitation Act or the FHA.  But the framework has been used in a private class action under

Title VII in Cooper v. Federal Reserve Bank of Richmond, 467 U.S. 867, 876 n.9 (1984), and in

a government-initiated suit under the ADA in Davoll v. Webb, 194 F.3d 1116, 1147–48 (10th

Cir. 1999).  Moreover, "pattern or practice" is not "a term of art, but appears in several federal

civil rights statutes, and is interpreted consistently therein."  United States v. Di Mucci, 879 F.2d

1488, 1497 n.11 (7th Cir. 1989) (citing Teamsters, 431 U.S. at 336 n.16, in FHA case).  The

distinctions between different statutes or between a government suit and a class action do not

warrant different procedures; rather, the framework seems appropriate for both government suits

and private class actions, on the one hand, and inappropriate for individual private suits, on the

other.  Ramirez v. DeCoster, 194 F.R.D. 348, 361 n.23 (D. Me. 2000).

       Nonetheless, this framework cannot be used as a substitute for proof on the elements of a

plaintiff's claims.  Teamsters determines only the method of proof, not the "substantive

boundaries within which the method of proof must operate."  Hohider v. United Parcel Serv.,

Inc., 574 F.3d 169, 183 (3d Cir. 2009). For example, in Hohider, the Third Circuit reversed certification of an ADA class because the plaintiffs' proposed framework, based on Teamsters, would have delayed proof that each class member was "otherwise qualified" for the job in question until the damages phase. Id. at 177. That was improper, the court found, because "otherwise qualified" was an element of the claim under the ADA, and "adopting the Teamsters method of proof to adjudicate plaintiffs' claims does not obviate the need to consider the ADA's statutory elements." Id. The problems of Hohider do not plague this case, however. In light of the Court's winnowing of the Damages Classes described below, all elements of the class claims will be resolved for each putative class member in Phase I. Only the amount of damages will remain for Phase II.

Still, because of the additional issues raised infra regarding the proposed Damages Classes, the Court plans to separate the Injunction Class from the Damages Classes. Trying the Injunction Class first will allow the Court to focus on the core, common issues in this litigation, primarily whether Defendant's Medication Policy unlawfully discriminates against otherwise qualified individuals with OUD and, if so, whether Defendant is entitled to a religious exemption from the Rehabilitation Act and the FHA. Separation of the Injunction Class also accords with Teamsters. See 431 U.S. at 361 ("Without any further evidence from the Government, a court's finding of a pattern or practice justifies an award of prospective relief."). Notwithstanding the Court's partial certification of the Damages Classes below, the litigation will be stayed with respect to the Damages Classes. After judgment enters on the Injunction Class, the Court will revisit how to proceed on the Damages Classes. For now, the Court continues to consider certification of the Damages Classes.

2.    *Standing*

As with the Injunction Class, Defendant raises a threshold standing argument against certification of the Damages Classes.  Specifically, Defendant asserts that the Damages Classes cannot be certified because they each include uninjured class members who lack standing.  Doc. No. 244-1 at 15.  The Court agrees that the Damages Classes likely encompass some number of uninjured class members in subpart (3) of each class and strikes that portion of the class definitions as a result.

"Every class member must have Article III standing in order to recover individual damages."  TransUnion, 594 U.S. at 431.  However, every class member need not necessarily "demonstrate standing before a court certifies a class."  Id. at 431 n.4; see also In re Asacol Antitrust Litig., 907 F.3d 42, 58 (1st Cir. 2018) ("We have not previously required every class member to demonstrate standing when a class is certified, nor do we do so today.").[14]  Indeed, the First Circuit has concluded that "class certification is permissible even if the class includes a de minimis number of uninjured parties."  In re Nexium Antitrust Litig., 777 F.3d 9, 14 (1st Cir. 2015).  To certify a class under such circumstances, though, the Court must perceive that the presence of uninjured class members will not violate Rule 23(b)(3)'s predominance requirement. See supra Section III.B.5.a.  In other words, "the district court must at the time of certification offer a reasonable and workable plan" for removing uninjured class members "that is protective

---

[14] After briefing was complete on the present Motion, the Supreme Court granted certiorari in the case of Davis v. Laboratory Corp. of America Holdings, No. 22-55873, 2024 WL 489288 (9th Cir. Feb. 8, 2024), cert. granted in part sub nom. Laboratory Corp. of America v. Davis, 2025 WL 288305 (U.S. Jan. 24, 2025) (No. 24-304), to address: "Whether a federal court may certify a class action pursuant to Federal Rule of Civil Procedure 23(b)(3) when some members of the proposed class lack any Article III injury."  Until the Supreme Court decides that case, this Court is bound by the law of TransUnion and First Circuit precedent.

of the defendant's constitutional rights and does not cause individual inquiries to overwhelm common issues." Asacol, 907 F.3d at 58.[15]

For example, in Nexium, the First Circuit affirmed certification of a class that included uninjured class members. 777 F.3d at 14. The plaintiffs there alleged that the defendant had unlawfully kept generic versions of its Nexium drug from reaching the market, thereby causing class members to continue paying for Nexium, rather than cheaper, generic drugs. Id. at 13–14. The class, as defined, included "brand loyalists" who would have continued to purchase Nexium even if generic drugs entered the market, and these class members suffered no injury because the price of and copayment for Nexium actually would have been higher with competition from generics. Id. at 29–30. Based on expert testimony, the Circuit concluded that the number of uninjured class members was de minimis. Id. at 30. "Plaintiffs' evidence [showed] that the vast majority of class members were probably injured," and the number of uninjured members was comparable to 2.4 percent, an amount previously deemed de minimis by the Seventh Circuit. Id. at 31 (citing Messner v. Northshore Univ. HealthSystem, 669 F.3d 802, 826 (7th Cir. 2012)). In order to determine a mechanism for sorting uninjured from injured, the Circuit looked to "how injury would be established outside of the class action context," i.e., in an individual suit. Id. at 20. Just as in an individual suit, injury could be established by unrebutted testimony from the

---

[15] First Circuit case law deals with the issue of uninjured class members in a proposed damages class under Rule 23(b)(3)'s predominance inquiry, rather than under the rubric of standing. See Nexium, 777 F.3d at 31 (addressing "separate but related argument" of standing after dealing with presence of uninjured class members as part of predominance analysis); Asacol, 907 F.3d at 51 (noting that, to tackle issue of uninjured class members, "we must direct our attention to the requirement of Rule 23(b)(3) that common issues must predominate over individual issues in order to certify a class"). The Court attends to the issue here because it simplifies the rest of the Damages Classes analysis and because the parties briefed it as a matter of standing. Nevertheless, the analysis the Court here conducts is a predominance analysis according to the standards established by the First Circuit under that prong.

plaintiff that he would have purchased the generic drug if it had been available, the Circuit reasoned, "it follows that similar testimony in the form of an affidavit or declaration would be sufficient in a class action." Id.  Because a culling mechanism could be identified, the presence of a de minimis number of uninjured members did not defeat class certification. Id. at 32.

In contrast, in Asacol, the Circuit reversed class certification in another suit alleging that a drugmaker had unlawfully prevented generic versions of its product from becoming available. 907 F.3d at 44–45.  There, approximately ten percent of class members would have purchased the defendant's drug anyway and so suffered no injury. Id. at 45.  In certifying the class, the district court had approved a plan to use a claims administrator to review contested forms submitted by customers, potentially only after judgment, to determine who was and was not injured. Id. at 47.  The Circuit, reversing, stressed a key distinction from Nexium: whereas Nexium approved the use of unrebutted affidavits to weed out uninjured members, the Asacol plaintiffs did "not propose to rely on unrebutted testimony to eliminate the question of injury-in-fact." Id. at 52 (emphasis added).  Indeed, the Asacol defendants had "expressly stated their intention to challenge any affidavits that might be gathered." Id.  Because injury was an element of the plaintiffs' claims, a claims administrator's review of contested forms as to that element "would fail to be protective of defendants' Seventh Amendment and due process rights." Id. at 53 (quotations omitted).[16]  As for the de minimis question, the Circuit concluded, "this is not a case in which a very small absolute number of class members might be picked off in a manageable, individualized process at or before trial." Id.  In the absence of a feasible culling

---

[16] Writing in concurrence, then-Judge Barron also noted that, while Nexium's affidavits would filter out the uninjured pre-trial, in Asacol the "culling mechanism will be deployed only post-judgment." Asacol, 907 F.3d at 59 (Barron, J., concurring).

mechanism and with the presence of more than a de minimis number of uninjured class members, the proposed class failed on predominance.

Defendant's challenge on this standing-as-predominance issue takes aim at only subpart (3) of each Damages Class. This subpart covers individuals with OUD for whom "Defendant's files show they were admitted to an ARC and their primary 'abused' substance upon intake was 'opiates.'" Doc. No. 230 at 2.

The Court agrees that subpart (3) would contain uninjured class members. Principally, this subpart would include class members who would not have sought methadone or buprenorphine even if allowed to do so. These members would be similar to the brand loyalists in Nexium and Asacol. This subpart would also embrace individuals for whom methadone and buprenorphine were not even clinically appropriate. The definition of subpart (3), as currently framed, does not contain any prerequisite that a member have had a prescription for one of those medications or even have been able to obtain such a prescription. If an individual could not or would not have used methadone or buprenorphine absent the Medication Policy, then that individual suffered no injury. Named Plaintiffs have not demonstrated that the number of such uninjured class members would be de minimis. Unlike in Nexium, Named Plaintiffs have not presented "evidence . . . that the vast majority of class members were probably injured." Nexium, 777 F.3d at 31. The record does not establish at all the proportion of uninjured subpart (3) members relative to the size of each Damages Class, and the evidence suggests the number is well more than de minimis.

Furthermore, even assuming arguendo that the number of uninjured class members is de minimis, the Named Plaintiffs have not offered an administratively feasible plan for sorting uninjured from injured that is protective of Defendant's constitutional rights. Named Plaintiffs

submit that "class members seeking damages in this category could in Phase II provide a declaration stating that they had a MOUD prescription and would have used it while at an ARC but for Defendant's policy." Doc. No. 251 at 13. Named Plaintiffs' plan suffers from the same faults as the claims-administrator proposal in <u>Asacol</u>. The Court anticipates that Defendant would seek to contest such affidavits, and Named Plaintiffs have not shown that the number of genuine challenges would be "so small that it [would] be administratively feasible to require those challenged affiants to testify at trial." <u>Asacol</u>, 907 F.3d at 53; <u>see also</u> Doc. No. 244-1 at 15 n.7 (challenging individual circumstances of discharges for reasons other than MOUD use). This plan would also wait until after liability has been determined to address injury, thereby depriving Defendant of its constitutional rights to contest each element of Named Plaintiffs' claims.

Named Plaintiffs' proposed culling mechanism would, therefore, be neither administratively feasible nor protective of Defendant's rights. Without a proper mechanism, individualized inquiries into whether each class member under subpart (3) suffered injury would predominate over common issues. As to subpart (3), then, both Damages Classes fail on the predominance requirement. The Court will strike subpart (3) from each definition and continue its analysis to determine whether it may certify Damages Classes consisting of only subparts (1) and (2).

### 3. *Ascertainability*

For damages classes such as these, courts have recognized an implicit requirement that "the definition of the class must be 'definite,' that is, the standards must allow the class members to be ascertainable." <u>Nexium</u>, 777 F.3d at 19.[17] This requirement asks if "determining whether a

---

[17] This implied ascertainability requirement does not apply to classes seeking injunctive relief under Rule 23(b)(2). "[N]otice to the members of a (b)(2) class is not required and the actual

particular individual is a member of the class is administratively feasible." Shanley v. Cadle,

277 F.R.D. 63, 67 (D. Mass. 2011). "It is not necessary that all class members be identified at

the outset, but only that the class can be determined by stable and objective factors." Id. This

requirement arises because, under Rule 23(b)(3), "all class members must be identified in order

to notify each of his or her opt-out rights, and, later, to distribute monetary relief." Kenneth R.,

293 F.R.D. at 264.

The Damages Classes, as cabined to subparts (1) and (2), are ascertainable. Named

Plaintiffs have defined the classes by Defendant's own records. While Defendant asserts that its

"records do not reliably show whether individuals were denied or discharged solely for taking

prescribed methadone or buprenorphine for OUD," Doc. No. 244-1 at 24 (emphasis in original),

that argument misunderstands the class definitions. Subparts (1) and (2) encompass only those

individuals for whom the records do "show they were denied access" or do "show they were

discharged" solely because they were taking prescribed MOUD. Doc. No. 230 at 2; see also

Doc. No. 251 at 12 (making this point).[18] An individual for whom the records do not show why

they were denied access or discharged would not be in either Damages Class. Nor would an

individual for whom the records show they were denied access or discharged for other reasons in

addition to MOUD use. See supra note 9. In this way, the class definitions facilitate the Court's

"ability to ascertain [class] membership in some objective manner," to wit, by reference to

_____

membership of the class need not therefore be precisely delimited." Yaffe v. Powers, 454 F.2d
1362, 1366 (1st Cir. 1972), abrogated on other grounds by Gardner v. Westinghouse Broad. Co.,
437 U.S. 478 (1978); accord Kenneth R., 293 F.R.D. at 263–64.

[18] The subpart (2) definition does not expressly require that the MOUD be prescribed. The Court
reads subpart (2)'s reference to "MOUD" as incorporating subpart (1)'s language of "any form
of prescribed FDA-approved methadone or buprenorphine medication for opioid use disorder,
including Suboxone and Sublocade ('MOUD')." Doc. No. 230 at 2. Thus, to be a member of
either subpart, an individual must have had a valid MOUD prescription at the time they were
denied access to or discharged from an ARC.

Defendant's records.  Town of Lexington v. Pharmacia Corp., No. 12-CV-11645, 2015 WL 1321448, at *6 (D. Mass. Mar. 24, 2015) (quotations omitted).

Defendant asserts that the individualized issue of whether a specific class member has OUD defeats ascertainability.  Not so.  OUD diagnosis is an objective criterion either someone has been diagnosed with OUD or has not.  See Donovan, 268 F.R.D. at 9 (rejecting ascertainability challenge to class definition based on requirements that class member have a smoking history of at least twenty pack-years and not be under a physician's care for lung cancer).  Determining whether an individual has OUD would require some individualized fact finding, but that finding could be based on the affidavit of a treating physician or a medical record showing the diagnosis.  See Sheet Metal Workers Loc. No. 20 Welfare & Benefit Fund v. CVS Pharmacy, Inc., 540 F. Supp. 3d 182, 204–05 (D.R.I. 2021) (finding ascertainability met where membership was "objectively ascertainable from either documents . . . or datasets").  This is not a case where the Court would need to conduct a "detailed inquiry" into "the particular circumstances" around each putative class member's use of opiates.  Shanley, 277 F.R.D. at 68.  Nor would OUD determinations entail "legal judgments, rather than solely objective factual criteria."  Id. at 66.  In the end, "what [Defendant] complains of is a potential administrative burden in determining who is a class member, but this issue is primarily one of manageability, not ascertainability."  Donovan, 268 F.R.D. at 9 (quotations omitted).[19]

---

[19] Prior to the liability phase of trial on the Damages Classes, Named Plaintiffs will need to file a list of all members of the Damages Classes to whom the Court will direct notice pursuant to Rule 23(c)(2)(B), along with proof for each alleged member that, at the time of the alleged denial or discharge, they: (1) had an OUD diagnosis; and (2) had a valid prescription for MOUD.  The Court defers determination as to the timing of this filing, as well as further details regarding the process, until after judgment enters on the Injunction Class.

4.    *Rule 23(a) Prerequisites*

Defendant's challenges to the Damages Classes with respect to Rule 23(a) largely mirror those already discussed on the Injunction Class. Nevertheless, because the definitions for the Damages Classes differ substantially from the Injunction Class definition and raise several unique issues, the Court considers each prerequisite anew, with reference to the standards established above.

a.    Numerosity

Each Damages Class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). For a class seeking monetary relief under Rule 23(b)(3), "[t]he plaintiff need not pinpoint the exact number of class members, so long as she can demonstrate the impracticality of joinder." Donovan, 268 F.R.D. at 10. As relevant to subpart (1), emails disclosed by Defendant during discovery show at least forty instances of individuals being turned away from an ARC due to the ARC's Medication Policy. Doc. Nos. 197-3 to -41, -43, -45, -48 to -51. Defendant's internal communications also suggest this was a common occurrence. Doc. Nos. 197-42, -44; see also Doc. Nos. 197-22, -26. As relevant to subpart (2), Defendant's records show 28,570 individuals discharged from ARCs for any reason between January 1, 2018, and December 7, 2022. Doc. No. 141-27; see also Doc. No. 160-7. Of that number, 997 had opiates listed as their "Primary Abused Substance," though that does not mean they were discharged for the use of opiates or MOUD. Doc. No. 141-27. As for reasons for discharge, 1,380 individuals had "Drug Use" listed as the reason, while 1,208 had listed "Higher level of care," a term intake personnel often used to turn away applicants on MOUD. Id.; see, e.g., Doc. No. 197-9; see also Doc. No. 197-52. Not every individual identified in these records will necessarily meet the class definitions, and the Court has previously expressed its doubts about

Named Plaintiffs' calculations.  Doc. No. 218 at 26–27.  Still, given these records and the

difficulties of class members bringing individual suits, the Court is satisfied that the Damages

Classes are sufficiently numerous.

b.    Commonality

The common questions identified for the Injunction Class apply to the Damages Classes

as well.  As alluded to above, the bulk of Defendant's arguments against commonality are more

properly addressed to the issue of predominance.  The presence of individualized issues does not

strip a class of its common issues.  See Kenneth R., 293 F.R.D. at 269 ("[T]he existence of

preference differences among class members does not change the fact that the State's practices

with regard to community services have been shown, by substantial proof, to affect all class

members.").  The commonality requirement does not demand that every question central to a

proposed class's claims be susceptible of common proof.  The predominance requirement does

not even set the bar that high.  Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 469

(2013) ("Rule 23(b)(3), however, does not require a plaintiff seeking class certification to prove

that each element of her claim is susceptible to classwide proof." (cleaned up) (emphasis in

original)).  The Court addresses Defendant's arguments with respect to disability status, the

"otherwise qualified" element, and Named Plaintiffs' three theories of liability more fully in its

predominance analysis.

c.    Typicality and Adequacy of Representation

The Court combines the typicality and adequacy-of-representation inquiries to consider

an issue first raised by Defendant at the motion hearing: whether Named Plaintiffs are members

of the proposed Damages Classes.  An implicit requirement for class membership is that "a class

representative must be a member of the class she seeks to represent."  1 William B. Rubenstein,

30

Newberg and Rubenstein on Class Actions § 3:8 (6th ed. 2024).  Courts deal with this issue under the banner of typicality or adequacy.  See Belezos v. Bd. of Selectmen of Hingham, No. CV 17-12570-MBB, 2019 WL 6358247, at *9 n.11 (D. Mass. Nov. 27, 2019) (collecting cases on typicality); E. Tex. Motor Freight Sys. Inc. v. Rodriguez, 431 U.S. 395, 404–05 (1977) (adequacy); see also Shanley, 277 F.R.D. at 69 ("[T]he typicality and adequacy analyses tend to merge.").

Of course, whether a proposed class representative is a member of the class she seeks to represent depends on what that class is.  For this reason, the Court pauses to preview its ultimate determination on the Damages Classes.  As explained further below, subpart (1) of each Damages Class fails on Rule 23(b)(3)'s predominance prong, leaving subpart (2) as the only part of each Damages Class to be certified.  See infra Section III.B.5.a.  In considering typicality and adequacy of representation, then, the Court asks whether each Named Plaintiff is a member of subpart (2) of the Damages Classes.

For Tassinari, the answer to that question is yes.  He fits into subpart (2): Defendant's records show he was evicted from the Saugus ARC in 2018 because he tested positive for buprenorphine.  Doc. No. 144 ¶¶ 22–23, 31; Doc. No. 141-23.  Based on this fact, Tassinari fulfills the implicit requirement of membership in the classes he seeks to represent.

Conversely, neither Almeida nor Espinosa meet the membership requirement.  Almeida did seek admission to the Saugus ARC and the Springfield ARC in 2022, told each he was on methadone, and was told by each that the ARCs did not admit anyone on methadone.  Doc. No. 146 ¶¶ 21–22.  This would qualify him for membership only in the soon-to-be-removed subpart (1).  He was never discharged from an ARC for MOUD use, so he cannot be a member of subpart (2).  Similarly, Espinosa was admitted to the Providence ARC and left voluntarily due to

the agonizing effects of withdrawal brought on by his compliance with the Medication Policy. Doc. No. 145 ¶¶ 15, 19. While that may have brought Espinosa within subpart (3), that subpart is no longer a part of the class definitions. There is no evidence that Espinosa was discharged from an ARC due to his MOUD use at any other time. That being the case, neither Almeida nor Espinosa can act as a class representative for the Damages Classes.[20] Still, Tassinari is a member of the classes he seeks to represent, and the Court finds the typicality and adequacy-of-representation prerequisites otherwise met for the same reasons they were met for the Injunction Class.[21]

> 5. *Rule 23(b)(3)*

To certify their Damages Classes, Named Plaintiffs must show that their proposed classes meet Rule 23(b)(3)'s two requirements of predominance and superiority. In conducting its analysis on each of these prongs, the Court may consider:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). The Court examines predominance and superiority in turn.

---

[20] Named Plaintiffs do not offer Espinosa as a class representative for the FHA Damages Class, anyway.
[21] Again, notwithstanding Almeida's and Espinosa's failure to qualify as class representatives and for ease of reference, the Court continues to use "Named Plaintiffs" throughout the remainder of its analysis of the Damages Classes.

a.    Predominance

In this case, subpart (2) of each Damages Class passes Rule 23(b)(3)'s predominance test, while subpart (1) of each falls short of making the grade.  Predominance requires that "the court find[] that the questions of law or fact common to class members predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).  Under this analysis, a common question arises "where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof."  Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. 442, 453 (2016) (quotations omitted) (alteration in original).  An individual question, in contrast, is "one where members of a proposed class will need to present evidence that varies from member to member."  Id. (quotations omitted).  The Supreme Court has said:

> When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.

Id.  The question is "whether any dissimilarity among the claims of class members can be dealt with in a manner that is not inefficient or unfair."  Asacol, 907 F.3d at 51 (quotations omitted). In the predominance context:

> Inefficiency can be pictured as a line of thousands of class members waiting their turn to offer testimony and evidence on individual issues. Unfairness is equally well pictured as an attempt to eliminate inefficiency by presuming to do away with the rights a party would customarily have to raise plausible individual challenges on those issues.

Id. at 51–52.  In other words, "a class may be certified notwithstanding the need to adjudicate individual issues so long as the proposed adjudication will be both administratively feasible and protective of defendants' Seventh Amendment and due process rights."  Id. at 52 (quotations omitted).  The Court therefore considers whether any individualized issues may be dealt with

33

efficiently and without impinging on Defendant's rights to contest the putative class claims. Six categories of potentially individualized issues which could defeat predominance appear in this case.

Disability Status. In order to succeed on their claims, Named Plaintiffs must prove that each class member has a "disability" within the meaning of the Rehabilitation Act and the FHA.[22] "Disability," in this context, means "a physical or mental impairment that substantially limits one or more major life activities" of the person in question. 42 U.S.C. § 12102(1) (Section 504); 42 U.S.C. § 3602(h) (FHA).[23] To qualify as "disabled" under that definition, a plaintiff must establish: (1) "that she suffers from an impairment"; (2) "that the impairment affects a major life activity"; and (3) "that the impairment substantially limits the major life activity." McDonough, 673 F.3d at 47.

Named Plaintiffs assert a disability in their medical diagnoses of OUD. Both the Rehabilitation Act and the FHA undoubtedly cover OUD as an impairment. See 45 C.F.R. § 84.4(b)(2) ("Physical or mental impairment [for purposes of the Rehabilitation Act] includes, but is not limited to, . . . substance use disorder."); 24 C.F.R. § 100.210 (same for FHA). Although each class member will have to present individualized proof of an OUD diagnosis, such proof can be established solely by medical records and physicians' affidavits. Defendant has not shown any reason why the Court would doubt the diagnoses of medical professionals, and the Court need not allow "arguments woven entirely out of gossamer strands of speculation and

---

[22] The FHA uses the term "handicap." 42 U.S.C. § 3604. The definition of "handicap" under the FHA mirrors that of "disability" under Section 504 (as well as the ADA). Summers v. City of Fitchburg, 940 F.3d 133, 139 n.1 (1st Cir. 2019); McDonough v. Donahoe, 673 F.3d 41, 47 n.11 (1st Cir. 2012). For ease of reference, the Court uses the term "disability."

[23] A "disability" can also be "a record of having such an impairment," or "being regarded as having such an impairment." 42 U.S.C. § 12102(1); 42 U.S.C. § 3602(h). Named Plaintiffs in this case have not pursued either of those definitions.

surmise to tip the decisional scales in a class certification ruling." Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 298 (1st Cir. 2000); see also Sheet Metal Workers, 540 F. Supp. 3d at 210 ("[C]lass certification is precluded only where such [individualized proof] challenges are reasonably plausible in a given case." (quotations omitted)). The Court does not anticipate individualized proof of OUD diagnoses predominating.

Of course, proof of an OUD diagnosis would still leave the question of the effects of and limitations caused by that OUD on a given class member's major life activities. In this context, "major life activities" include "[c]aring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, writing, communicating, interacting with others, and working," as well as "[t]he operation of a major bodily function." 45 C.F.R. § 84.4(c)(1); see also 24 C.F.R. § 100.201(b) (providing a slightly shorter list for FHA purposes). The term "substantially limits" is construed broadly and "is not meant to be a demanding standard." 45 C.F.R. § 84.4(d)(i); accord Smith v. Pub. Sch. of Northborough-Southborough Mass., 133 F. Supp. 3d 289, 295 (D. Mass. 2015) (interpreting "substantially limits" in ADA context). Generally, whether an impairment affects and substantially limits a major life activity is a case-by-case determination. McDonough, 673 F.3d at 47.

In this case, the Court is satisfied that class members' proof on these points will not require the kind of individualized proof that would predominate over common issues. To begin with, Defendant seems to concede that a class member with a proven OUD diagnosis would have a "disability" for the purposes of this litigation. See Doc. No. 244-1 at 17. The evidence presented on OUD would generally support that proposition. According to Defendant's expert

Dr. Darrin Mangiacarne, OUD is defined as a "problematic pattern of opioid use leading to clinically significant impairment or distress." Doc. No. 163 ¶ 12 (emphasis added).

And putative class members do not just have OUD. Each one was either seeking treatment at or enrolled in an ARC. While the "ARCs are not licensed substance abuse treatment programs," Doc. No. 106-2 ¶ 18, they are designed to "serve[] men and women with social, emotional and spiritual needs who have lost the ability to cope with their problems and provide for themselves." Doc. No. 141-8 at 23. Most ARC beneficiaries have some kind of substance-use disorder. Id. at 29. These circumstances support an inference that class members' OUD substantially limited their ability to care for themselves and obtain housing outside of ARCs. See Rodriguez v. Vill. Green Realty, Inc., 788 F.3d 31, 49–50 (2d Cir. 2015) (finding "obtaining housing" to be major life activity).

In cases of licensed rehabilitation programs suing for discrimination against their residents, courts have commonly found residents with substance-use disorders to be individuals with disabilities without inquiry into the specific effects of or limitations caused by such disorders. See, e.g., Pac. Shores Props., LLC v. City of Newport Beach, 730 F.3d 1142, 1156 (9th Cir. 2013) ("It is well established that persons recovering from drug and/or alcohol addiction are disabled under the FHA and therefore protected from housing discrimination."); see also Toucan Partners, LLC v. Hernando Cnty., 571 F. App'x 737, 742 n.4 (11th Cir. 2014); Lakeside Resort Enters., LP v. Bd. of Supervisors of Palmyra Twp., 455 F.3d 154, 156 n.5 (3d Cir. 2006), as amended (Aug. 31, 2006); Innovative Health Sys., Inc. v. City of White Plains, 117 F.3d 37, 48 (2d Cir. 1997), abrogation on other grounds noted by Zervos v. Verizon N.Y., Inc., 252 F.3d 163, 171 n.7 (2d Cir. 2001); but see United States v. S. Mgmt. Corp., 955 F.2d 914, 918 n.1 (4th Cir. 1992) (noting that, as regards substance-use disorders, FHA "regulations

do <u>not</u> give a definitive answer to the second step of analysis, i.e., does the impairment

substantially limit a major life activity?" (emphasis in original)).

All putative class members would also have had a prescription for MOUD at the time of,

or shortly before, their denial or discharge.  <u>See</u> <u>supra</u> note 18.  Use of prescription medication

does not, alone, establish disability.  <u>Fuog v. CVS Pharmacy, Inc.</u>, No. CV 20-337 WES, 2021

WL 4355402, at *3 (D.R.I. Sept. 24, 2021) (stating that prescription for chronic pain medication

does not, by itself, show plaintiff's chronic pain was disabling).  But a doctor's prescription for

MOUD does imply that, as of the time of prescription, a putative class member's OUD was of

such a severity that MOUD was medically appropriate.  <u>See</u> Doc. No. 143-3 at 48 (discussing

factors that may support tapering off of buprenorphine).

One issue remains on disability status.  Both the Rehabilitation Act and the FHA exclude

from coverage individuals currently using illegal drugs.  29 U.S.C. § 705(20)(C)(i); 42 U.S.C. §

3602(h).  Defendant contends that this exclusion means each class member would need to prove

that: (1) their use of MOUD was pursuant to a valid prescription; and (2) they were not using any

other illegal drug.  Defendant's first argument is a hat on a hat; the class definitions already

require that each class member was "taking or had taken any form of prescribed" MOUD.  Doc.

No. 230 at 2; <u>see also</u> <u>supra</u> note 18.  As proof of prescription would be purely documentary, the

Court sees no inherent predominance problem there.  Defendant's second argument is similarly

unavailing.  The Rehabilitation Act only excludes from coverage "an individual who is currently

engaging in the illegal use of drugs, <u>when a covered entity acts on the basis of such use</u>."  29

U.S.C. § 705(20)(C)(i) (emphasis added).[24]  The class definitions require that the sole recorded

---

[24] The FHA's statutory exclusion, 42 U.S.C. § 3602(h), does not contain such language, but, as
noted, courts universally find the FHA's definition of an "individual with a disability"

reason for each member's denial or discharge was that individual's use of prescribed MOUD, not their illegal drug use, so in each individual case Defendant cannot be said to have acted "on the basis of [illegal-drug] use." It seems especially implausible that Defendant could lodge a large number of challenges on subpart (2); members of subpart (2) were living in ARCs and were drug-tested regularly, so if any were using illegal drugs, Defendant would have likely discovered it and discharged such members for that reason. Given that, Defendant has not shown that individualized issues with respect to illegal drug use would defeat predominance.

To be clear, Defendant would be entitled to challenge the disability status of any individual class member. Where each class member was diagnosed with OUD, sought admission or was admitted to an ARC, and had a prescription for MOUD, though, the prospect of a large number of such challenges does not strike the Court as reasonably plausible. In sum, although establishing each class member's disability status would necessitate some individualized inquiries, those inquiries would not raise a predominance problem.

"Otherwise Qualified." Named Plaintiffs also must show that each class member was "otherwise qualified" to receive ARC services. Thiersaint, 85 F.4th at 669. Defendant identifies two issues on this front.

First, ARCs require abstinence from all illegal drugs. Doc. No. 141-1 at 45.[25] This may appear to mirror the issue of illegal drugs under the definition of statutory coverage discussed above. However, there is a wrinkle. For an individual with a disability to be excluded from protection under the Rehabilitation Act, their illegal drug use needs to have been the basis upon

---

coextensive with that of the Rehabilitation Act. In any event, the Court disposes of subpart (1) on alternative grounds, and the Court's resolution on subpart (2) does not rely on this language.
[25] As noted in Section I.A, supra, Defendant also maintains a list of medications that it does not typically allow at its facilities. Doc. No. 160-13.

which the covered entity (here, Defendant) acted. No such distinction applies on the "otherwise qualified" element of Named Plaintiffs' claims. An individual is not qualified for admission to an ARC if they engage in illegal drug use, whether or not the ARC knew of that use and acted upon it.

Second, ARCs require participation in "devotions, worship services, and other special events." Doc. No. 247-1 at 8. While Defendant's ARCs do not limit their intake to individuals of a particular religion, ARC residents do need to be willing to attend this spiritual counseling. See Doc. No. 263 at 32 ("You have to be willing to be proselytized to.").

These two requirements pose a predominance issue on subpart (1) of each Damages Class. The putative members of subpart (1) were denied access to ARCs based on their use of MOUD. Each member would need to prove that, had they not been denied access, they would have been able to show that they were not using illegal drugs and were willing to participate in Defendant's spiritual counseling. Named Plaintiffs have not proposed any fair and efficient way of proving these two points for all subpart (1) members. Individualized issues with respect to the otherwise-qualified status of subpart (1) members would therefore predominate over issues common to the classes. As such, the Court will strike subpart (1) from each Damages Class.

Subpart (2) members present no such problem. Members of each class's subpart (2) were already admitted to, and therefore deemed qualified for, an ARC. At the motion hearing, Defendant conceded that such class members were otherwise qualified upon admission but contended they might not have been otherwise qualified when discharged. Doc. No. 263 at 35–36. For example, counsel argued, an individual discharged for using cocaine would not have been otherwise qualified at that point. Id. This is true. But that individual also would not fit within subpart (2). Subpart (2) encompasses only those individuals discharged solely for their

use of prescribed MOUD according to Defendant's records.  While Defendant can challenge whether any individual class member was nonetheless unqualified due to other rule violations as well, the definition of subpart (2) reasonably ensures that the number of meritorious challenges will be minimal.  As such, no predominance issue inheres in subpart (2).  The Court proceeds with its analysis of subpart (2) of each Damages Class only.

Intentional Discrimination.  Named Plaintiffs assert three theories of liability, the first being intentional discrimination.  In order to prove intentional discrimination, Named Plaintiffs must show "that the disability actually motivated [Defendant's] challenged adverse conduct." Nunes v. Mass. Dep't of Corr., 766 F.3d 136, 144 (1st Cir. 2014).  Defendant asserts that proving discriminatory intent will require predominance-defeating individualized inquiries into "whether each putative class member was specifically . . . discharged from an ARC by the relevant decisionmaker because of their OUD."  Doc. No. 244-1 at 19.  This is so, according to Defendant, because, "[a]s the Court previously observed [at the preliminary-injunction stage], the record does not show proof of discriminatory intent towards all individuals with OUD."  Id.

Defendant is wrong on two accounts.  First, Defendant misstates the Court's findings on Named Plaintiffs' preliminary-injunction motion.  At that stage, the Court found that Named Plaintiffs had not shown a likelihood of successfully proving "that Defendant intentionally discriminates against people with OUD."  Doc. No. 218 at 25.  While that remains the case, it does not mean Named Plaintiffs cannot prove as much on the merits, and class certification is not the time for a final merits determination.  Amgen, 568 U.S. at 470.  Second, Defendant confuses Named Plaintiffs' ability to prove discriminatory intent with their ability to do so on a classwide basis, and, in so doing, also misstates Named Plaintiffs' claim.  Named Plaintiffs claim that Defendant has a common policy motivated by discriminatory intent toward people with OUD;

they do not claim that individual decisionmakers discriminated by applying the policy to individual class members. If Named Plaintiffs cannot prove the policy was motivated by discriminatory intent, then their intentional-discrimination claim will fail, and no individualized issues will arise. See id. at 468 ("A failure of proof on the common question of materiality ends the litigation and thus will never cause individual questions of reliance or anything else to overwhelm questions common to the class." (emphasis added)). What Defendant really alleges here is "a fatal similarity—an alleged failure of proof as to an element of the plaintiffs' cause of action" which "should not be resolved in deciding whether to certify a proposed class." Id. at 470 (cleaned up).

Disparate Impact. Named Plaintiffs' second theory of liability is disparate impact. This type of claim "involve[s] . . . practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." Raytheon Co. v. Hernandez, 540 U.S. 44, 52 (2003). Again, Defendant attacks the predominance requirement on this theory of liability, and again Defendant misses the mark. Defendant's only contention is that "Plaintiffs' disparate impact argument rests only on conjecture." Doc. No. 244-1 at 20. Named Plaintiffs are not required to prove disparate impact at this stage, and their alleged inability to prove it is not a reason to deny class certification. Amgen, 568 U.S. at 468.

Failure to Accommodate. Named Plaintiffs' third and final theory of liability is that Defendant unlawfully failed to accommodate their OUD. To succeed on a failure-to-accommodate theory under the FHA, an individual must prove: (1) that he is disabled and "that the party charged knew or should reasonably have known of his" disability; (2) "that he requested a particular accommodation that is both reasonable and necessary to allow him an

41

equal opportunity to use and enjoy the housing in question"; and (3) "that the party charged refused to make the requested accommodation." Astralis Condo. Ass'n v. Sec'y, U.S. Dep't of Hous. & Urb. Dev., 620 F.3d 62, 67 (1st Cir. 2010); see also Calero-Cerezo v. U.S. Dep't of Just., 355 F.3d 6, 20 (1st Cir. 2004) (providing same under Rehabilitation Act).[26]  Thus, to succeed on their class failure-to-accommodate claims, Named Plaintiffs will have to prove that each class member requested an accommodation to the Medication Policy and that said accommodation was both reasonable and necessary for each member at the particular ARC from which that member was discharged.  This would require individualized inquiries dwarfing each class's common issues.  For this reason, Named Plaintiffs cannot proceed on their failure-to-accommodate theory on a classwide basis.[27]

    Damages.  Finally, Defendant also raises a predominance challenge on damages.  As limned above, Named Plaintiffs propose a two-phase bench trial in which Phase I would resolve liability issues and Phase II damages issues.  Defendant asserts no issue with Named Plaintiffs' plan to seek nominal and punitive damages.  Instead, Defendant focuses on compensatory damages.

---

[26] In its Order on Named Plaintiffs' preliminary-injunction motion, the Court cited the failure-to-accommodate standard used in Sosa v. Massachusetts Department of Correction, 80 F.4th 15, 31 (1st Cir. 2023).  Doc. No. 218 at 13–14.  The Sosa court, proceeding under the ADA, did not expressly include a request for accommodation as one of the elements of a failure-to-accommodate claim, but the Court implied as much in noting that "a reasonable accommodation claim focuses on an individualized request or need." Sosa, 80 F.4th at 31 (quotations omitted).

[27] While the Court previously found that Named Plaintiffs had demonstrated a likelihood of success on their failure-to-accommodate claims as to at least some of their proposed accommodations assuming class certification, see Doc. No. 218 at 13–24, the standard is different here.  As explained with regard to Defendant's intentional-discrimination argument, the question here is not one of ability to prove a claim but of ability to prove a claim on a classwide basis without individualized issues predominating.  Additionally, the Court here is considering a class seeking monetary damages, rather than injunctive relief.

Rule 23(b)(3)'s predominance prong does not require that damages be provable on a classwide basis. Tyson Foods, 577 U.S. at 453–54. So long as "common questions predominate regarding liability, . . . courts generally find the predominance requirement to be satisfied even if individual damages issues remain." Nexium, 777 F.3d at 21. And where plaintiffs do seek to prove classwide damages, at the class-certification stage, "[c]alculations need not be exact." Comcast Corp. v. Behrend, 569 U.S. 27, 35 (2013). Rather, it is only necessary that "any model supporting a plaintiff's damages case must be consistent with its liability case." Id. at 35.

Named Plaintiffs' plan for compensatory damages satisfies these requirements. They primarily plan to seek general damages using a formula that, as to the remaining subpart (2), would tie each class member's award to the number of times they were discharged from an ARC pursuant to the Medication Policy. That number could be established by reference to Defendant's discharge summaries and the individual class member's medical records, counting only those discharges that the summaries and medical records establish were due to the use of prescribed MOUD. That would limit the need for individualized damages inquiries. See Tardiff v. Knox Cnty., 365 F.3d 1, 6–7 (1st Cir. 2004) (approving damages by formula in class action challenging unconstitutional strip searches). Moreover, this model of general damages aligns with Named Plaintiffs' theory of liability. Named Plaintiffs assert that Defendant maintained a common discriminatory policy across all of its ARCs and uniformly applied that policy to the putative class members. Generalized damages would directly compensate putative class members for the effect of being discharged pursuant to that policy. Cf. Schonton v. MPA Granada Highlands LLC, No. 16-CV-12151-DJC, 2019 WL 1455197, at *10 (D. Mass. Apr. 2, 2019) (finding individual damages issues predominated in putative FHA class action in which plaintiffs "failed to identify a common discriminatory practice or policy").

Named Plaintiffs do not foreclose the possibility of a small number of class members seeking special damages, such as for economic harm or emotional distress.  Doc. No. 251 at 15. Special damages would, of course, present highly individualized issues.  If the number of class members seeking special damages is small, though, these claims would not predominate over the common liability issues identified.  See Tardiff, 365 F.3d at 7 (commenting on possibility of using "masters to determine the (potentially few) serious claims to special injury").  And in the event that more class members than anticipated seek special damages, the Court could then "enter a judgment of liability, leaving class members to pursue damages claims in separate law suits."  Id. at 7; see also Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment."); New Motor Vehicles, 522 F.3d at 28 ("[T]he class action can be limited to the question of liability, leaving damages for later individualized determinations."); Barnes v. District of Columbia, 278 F.R.D. 14, 22 (D.D.C. 2011) (certifying class as to general damages based on formula but decertifying class as to special damages due to individualized issues).  Given these options, the potential need for individualized determinations at the damages stage does not render class certification inappropriate in this case.  The Court will address further how to proceed on damages when and if liability is determined.

> b.    Superiority

The superiority prong of Rule 23(b)(3) is met where "the court finds . . . that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  This prong cuts to "the very reason for Rule 23(b)(3)": "to make room for claims that plaintiffs could never afford to press one by one."  Gintis, 596 F.3d at 68.

Here, superiority is present based, in part, on the Court's predominance analysis.  See id. at 67 ("While superiority is a separate base to be touched, it is addressed by many of the considerations that inform a trial court's judgment call about how clearly predominant the common issues must be.").  Further, there is no suggestion that class members would prefer to individually control separate actions, given that it is unlikely individual class members would be able to bring separate actions.  Nor is the Court aware of any ongoing litigation concerning Defendant's Medication Policy other than the instant action.  The Court finds that a class action is the superior mechanism for proceeding on Named Plaintiffs' proposed Damages Classes.

6. *Conclusion*

Having found that each Damages Class satisfies the requirements of Rule 23 only with respect to subpart (2), the Court ALLOWS the Motion for Class Certification with respect to subpart (2) of the Section 504 Damages Class and subpart (2) of the FHA Damages Class, as modified below, to the extent each asserts claims for intentional discrimination and disparate impact; otherwise, the Motion is DENIED.

IV.    CONCLUSION

For the reasons above, Named Plaintiffs' Motion for Class Certification, Doc. No. 230, is ALLOWED IN PART and DENIED IN PART.  The Court certifies the following classes:

Injunction Class: All individuals with opioid use disorder (OUD) who, in accordance with a healthcare provider's treatment plan, take any form of prescribed FDA approved methadone or buprenorphine medication for opioid use disorder, including Suboxone and Sublocade ("MOUD"), who are participating or seek to participate in any of Defendant The Salvation Army, a New York Corporation's Adult Rehabilitation Center (ARC) housing or services, and who are otherwise qualified for such housing or services.

Section 504 Damages Class: All individuals with opioid use disorder (OUD) for whom, from the period May 14, 2018, to the date of class notice (the "Section 504 Class Period"), Defendant's beneficiary files show they were discharged from any of Defendant's ARCs for taking prescribed FDA-approved methadone or

buprenorphine medication for opioid use disorder, including Suboxone and Sublocade ("MOUD").

<u>FHA Damages Class</u>: All individuals with opioid use disorder (OUD) for whom, from the period May 14, 2019, to the date of class notice (the "FHA Class Period"), Defendant's beneficiary files show they were discharged from any of Defendant's ARCs for taking prescribed FDA-approved methadone or buprenorphine medication for opioid use disorder, including Suboxone and Sublocade ("MOUD").

Each of the Damages Classes is further limited to claims based on intentional discrimination and disparate impact, not failure to accommodate. The Court names Tassinari, and Almeida as class representatives for the Injunction Class and Tassinari alone as representative for the Section 504 Damages Class and the FHA Damages Class. Finally, the Court appoints Named Plaintiffs' counsel as class counsel for all three classes.

After considering what the parties said at the hearing on this Motion, the Court has decided to bifurcate the proceedings between the Injunction Class and the Damages Classes, as certified. This case will proceed to a bench trial on the Injunction Class only, with further litigation concerning the Damages Classes stayed at least until judgment enters on the Injunction Class. The Court will then consider when and how to proceed with respect to the Damages Classes. The Court does not anticipate deciding motions for summary judgment before the Injunction Class bench trial, though the Court will consider combining briefing with the bench trial. The parties shall file, no later than April 14, 2025, a status report setting forth their joint or separate positions regarding how this case should proceed under that plan, after which the Court will convene a status conference.

SO ORDERED.

  /s/ Leo T. Sorokin
United States District Judge