# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

------------------------------------------X

MARK TASSINARI, RICHARD ESPINOSA and JOSEPH ALMEIDA, individually and on behalf of all others similarly situated,

PLAINTIFFS,

-against- Case No.: 1:21-CV-10806-LTS

THE SALVATION ARMY, A NEW YORK CORPORATION,

DEFENDANTS.

------------------------------------------X

DATE: February 8, 2023
TIME: 10:11 A.M.

VIDEOTAPED DEPOSITION of the Defendant, THE SALVATION ARMY, A NEW YORK CORPORATION, by a witness, JAMES BETTS, taken by the Plaintiff, pursuant to a Notice and to the Federal Rules of Civil Procedure, held at the offices of Justice Catalyst Law, 40 Rector Street, New York, New York 10006, before Anna Khodachnik, a Notary Public of the State of New York.

A P P E A R A N C E S:

ALTSHULER BERZON, LLP
Attorneys for the Plaintiff
MARK TASSINARI, RICHARD ESPINOSA and
JOSEPH ALMEIDA, individually and on
behalf of all others similarly situated
177 Post Street
San Francisco, California 94108
BY: MATTHEW MURRAY, ESQ.
CHRISTINE SALAZAR, ESQ. (Via Zoom)

JUSTICE CATALYST LAW
Attorneys for the Plaintiffs
40 Rector Street
New York, New York 10006
BY: MARIYAM HUSSAIN, ESQ.
LUCY BANSAL, ESQ. (Via Zoom)
ROSE FARLEY
Director of Investigations
SIMI SOLANKE, Paralegal

CROWELL & MORING, LLP
Attorneys for the Defendant
THE SALVATION ARMY, A NEW YORK
CORPORATION
590 Madison Avenue
New York, New York 10022
BY: THOMAS P. GIES, ESQ.
PAUL W. MOURNING, ESQ.

ALSO PRESENT:
CARLOS KING
Videographer
Veritext Legal Solutions
* * *

F E D E R A L S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the counsel for the respective parties herein that the sealing, filing and certification of the within deposition be waived; that the original of the deposition may be signed and sworn to by the witness before anyone authorized to administer an oath, with the same effect as if signed before a Judge of the Court; that an unsigned copy of the deposition may be used with the same force and effect as if signed by the witness, 30 days after service of the original & 1 copy of same upon counsel for the witness.

IT IS FURTHER STIPULATED AND AGREED that all objections except as to form, are reserved to the time of trial.

* * * *.

BETTS

continues to work. So officers within the Salvation Army would be ordained clergy who had gone through the Salvation Army's training college seminary and soldiers or lay people, members of the church would be just normal people that happen to wear the uniform, but they would hold no specific rank.

Q. Thank you. Is there a command structure similar to a military command structure in the Salvation Army?

A. There is.

Q. Do higher ranking officers -- what is the command structure within the Salvation Army?

A. In regard to how the command structure works, for instance in the eastern territory, there is a territory of commander who oversees the Salvation Army operations, everything that we do within this part of the country. And beneath him would be a chief secretary, his number two, and as you work down through, the Salvation Army eastern territory is broken into

BETTS

divisions. There are divisions all around the eastern territory, which would each have a divisional commander or a commander, in the case of our ARC command and then it would be officers within each of those divisions. So globally, we have a General in London and his leadership team. And they oversee, then the world is broken into five zones and then those zones are broken into territories and those territories are broken into divisions and those divisions are broken into local units in each community. So there would be officers in, at every one of those levels providing leadership to everything that the Salvation Army does.

Q. Do officers -- are officers required to follow the directives of superior officers?

A. Yes and no. Yes, I mean we still -- I have a leader. I have a supervisor. And I am certainly going to follow the direction of the supervisor. The Salvation Army is also very committed

BETTS

to recognizing that each scenario can be unique and they want our first priority to be the person sitting in front of me. And so there will be times that we would be given discretion to deviate from necessarily a specific direction of policy. Usually, we would refer back to our leadership and say hey, listen, we have a different situation. We would like leeway to approach this differently. And I have never been told no in those situations. People have always been responsive to the desire to meet the needs of the people in front of me.

Q. And what is your position currently within the Salvation Army?

A. I am commander of the ARC command.

Q. In the eastern territory?

A. Yes.

Q. Can you tell me about your previous positions at the Salvation Army? Can you walk me through your career?

A. I was commissioned as an

BETTS

officer in the Salvation Army and ordained as a minister of the gospel of Jesus Christ in 1996. And my first appointment was Mount Vernon, Ohio and I was what we call a corps officer. If you are familiar with churches, that would be the local pastor. In the Salvation Army a corps officer is a local pastor first, but then also organizing all the activities of the Salvation Army for that community and the fundraising and all the -- whatever it takes to do that within a community. So that is a corps officer. Corps as in C-O-R-P-S because we are representative of the body of Christ. So you will hear corps a lot, as in corpus. We were there for four-and-a-half years in our role as corps officer for Mount Vernon, Ohio. In 2001 I was appointed as the divisional youth secretary for the northeast Ohio division, which meant that I oversaw youth programming for the Salvation Army across northeast Ohio, youth programming, music programming and helped to process

BETTS

candidates for officership, people who believed they were called to the ministry. So I helped prepare their cases for consideration by leadership. We also ran a summer camp as part of that responsibility. That is what I referenced earlier. We were there for five-and-a-half years and then we received orders to change appointment. We went from northeast Ohio division to youth secretary to Akron, Ohio as the corps officer for Akron, the Salvation Army and the county coordinator. So I also provided leadership for, not only the one congregation in Akron, but also any other congregation and activities in the Salvation Army within Summit County, Ohio. I did that role for five years and then was transferred from Summit County to West Nyack, New York as the territorial youth secretary, so provided leadership and resource provision for all youth programming within the entire eastern territory. I was there for two years and then we were transferred to Manhattan, to

BETTS

14th Street, the Salvation Army Greater New York division and served as the general secretary, which is the number two in the hierarchy for Greater New York and served in that role. It's kind of a chief operating officer, if you will, for the Greater New York division. And I was there for five years. After that we were transferred to New Jersey to be the divisional commander or its state commander because that is one division that actually fits a state. Other divisions are straight lines, but New Jersey is one. Some people refer to me as the state commander, but I was the divisional commander for the State of New Jersey for four years. And then seven months ago I was transferred to West Nyack to be the commander of the ARC command.

Q. So you have had a long career in the Salvation Army?

A. Yes.

Q. Do you know about the Salvation Army's activities throughout the eastern

BETTS

A. There is both.

Q. Do you review and approve individual ARC budgets?

A. Yes.

Q. You mentioned auditing. Do you have a role in auditing of the eastern territory's financing as the whole territory?

A. I do not.

Q. Have you ever seen an audit of the eastern territory's finances?

A. I have not seen an audit of the eastern territory, no.

Q. You said one of your responsibilities is to -- you testified about bringing people into the room to talk about potential policy changes. If the eastern territory were to consider revising its medications policy to allow Methadone or buprenorphine at ARCs, who would need to be involved in that discussion?

A. That discussion would be beyond the type of things I was describing. That would be a policy that would, as you would

BETTS

say, over my pay grade, because that would be fundamentally a challenge for the Salvation Army and our approach to our ARC programs everywhere. So that level of conversation would be beyond me.

Q. Who would need to be involved in that conversation?

A. That would include leadership at the territorial level. That would include coordinating that conversation with other territories. That would be -- making sure that we have people who truly understand those things at the table.

Q. Could the eastern territory decide to revise its medication policy to allow methadone or buprenorphine for ARC participants without approval from the national Salvation Army?

A. For clarification, the national Salvation Army does not approve anything that we do in the eastern territory. They are not in any authority over the eastern territory. If your question is, could we legally attempt to do that, I don't know

BETTS

A. Twice a year, three times a year. I'm looking. I'm probably not allowed to look.

Q. I just want your --

A. Two or three times a year, I believe. I have never been invited.

Q. I am just looking for what you know.

A. I think it's three times a year.

Q. Do you know if they can call a meeting out of schedule?

A. I believe they can handle business outside of the normal three meetings on some level, but I don't know what the level of that business -- I don't know where the thresholds are.

Q. Who do you report to in your current position?

A. I report to the territorial commander.

Q. Who is the territorial commander?

A. Commissioner William Bamford.

BETTS

Q. And Commissioner Bamford is on the commissioners' conference, correct?

A. Yes.

Q. Who does Commissioner Bamford report to?

A. The general.

Q. Who is the general?

A. General Brian Peddle, P-E-D-D-L-E.

Q. And General Peddle -- and where is General Peddle located?

A. London, England.

Q. So if General Peddle gave Commissioner Bramford a directive, Commissioner Bramford would have to follow that directive?

A. Yes.

Q. If the eastern territory were to consider revising its medications policies for ARC participants, would General Peddle need to be involved in that conversation?

A. I don't know if he would need to be, but he would certainly -- I would

BETTS

want him at the table, for sure, because for us, these are questions of theology. These are questions of Christian belief and how we approach our program in general. And as I have never been a commissioner and I've never sat in those rooms, I don't know what that would look like, but I would think that we would want to reach out for, at least, dialogue regarding a decision of that magnitude.

Q. I am going to show you a document. It's previously been marked as Exhibit 149. We will mark it again as Exhibit 149.

(Whereupon, document was marked as Plaintiffs' Exhibit 149 for identification as of this date by the Reporter.)

Q. This is a -- one second. Let me get my version. This is a document that says "The Salvation Army, a New York corporation, taxable commercial paper notes" at the top. Do you see that?

A. I do.

BETTS

for all the ARCs in the eastern territory, correct?

A. Yes.

Q. And you said that eastern territory controls the funds for the ARC command for all the ARCs, is that correct?

A. Yes.

Q. You said the ARCs are funded by sales from the thrift stores, is that correct?

A. Yes.

Q. So for an individual ARC, is it funded by sales from its thrift store?

A. That is the hope. That's rarely the case.

Q. So the ARCs, in total, in the eastern territory are funded by the eastern territory as a whole?

MR. GIES: Objection to the form. Mischaracterizes the testimony.

A. The centers each month are reconciled back to zero. So if they have surplus funds from that month's activity,

BETTS

that is not my area, but the required level of care is beyond what we can do without impacting both their wellbeing because the care would be less than they deserve and also then preventing us from serving everybody else in the program just as deeply or effectively as we feel that we called to.

Q. How would allowing an ARC participant to receive a monthly shot of buprenorphine affect the way the ARC can serve other participants?

A. Because if we had to resource ourselves in such a way that those people would receive a higher level of care than is required, those resources have to come from somewhere. It comes from the rest of the program. So when someone receives that much of a higher level of care, that is beyond our ability to provide in our context.

Q. Just so I understand, when you refer to the higher level of care that would need to be provided in that

BETTS

circumstance for someone who receives a monthly shot of buprenorphine, what precisely are you referring to? What would need to be provided to that person?

A. The things that I just described a couple of minutes ago. If you'd like me to say it again, the oversight, the understanding of interactions with not only what they might be taking but the potential. Again, I cannot get into the specifics of that. You need to talk to the folks that understand those, but as I understand it, they come with a higher level of risk in relation to interactions for instance, alcohol if someone within the program were to relapse. And so we would never want to put our beneficiaries in that position within our context. That is one reason why we would struggle to do this, but the most important reason is related to our religious beliefs.

Q. Can you explain that reason for me?

A. I would love to. We absolutely

BETTS

believe -- we want more for our folks. We want more for those who we are serving from the perspective of, if I am saying to someone, you are on narcotics. We want to help you get off narcotics, so our answer is to give you another narcotic and call it a day. I don't believe that is good enough for the folks that we serve. We believe deeply that God has a plan to truly transform someone's life, which happens in a longer run and in community and in supportive community, where we have time to work through and allow that heart to change, to begin to look at everything related to their life in a context of why we are here in the first place, why did we end up in this situation in the first place. That takes longer. That is a much deeper process, and one that we don't believe happens in the same way when we are -- one narcotic to another narcotic. It's a continued addiction. It's not true deliverance as we would describe it in our religious tradition. We want for them true

BETTS

and complete deliverance.

Q. Most ARC participants are not members of the Salvation Army Church, correct?

A. Yes.

Q. About what percentage of ARC participants are members of the Salvation Army Church, what is your best estimate?

A. Miniscule. I would say less than one percent, if I had to estimate. When they come in, if some become members as a part of their participation, but that is not required nor forced.

Q. Do you have a best estimate of what percent become members?

A. I don't, but it is still very small. The goal of the program would be that they would find a church, a supportive community, a place where they could continue this lifelong journey, but that does not have to be at the Salvation Army. It is just one choice of many.

Q. ARC participants are allowed to practice their own religion, whatever that

BETTS

might be, is that right?

A. Not completely. The Salvation Army is a specifically Christian program with specific Christian doctrinal tenets and so while we would never turn somebody away because they have different religious beliefs, we would not necessarily welcome the practicing, the opening practicing of those other religious beliefs within our context, which is a conversation that we have right at the outset with applicants to say you are entering a residential church, if you will, and are you prepared for that context or not. In some cases, people from our faith and traditions found themselves absolutely comfortable with it and come in and do just fine participating as prescribed.

Q. Can you give me an example of a type of practice of another religion that would not be allowed by an ARC participant?

A. Dietary restrictions would be one that we would not be in a position to fulfill. Stopping in the middle of other

BETTS

Q. I understand the requirement to participate in all the aspects of the ARC program. And I understand the ARC is not making changes to the meals, for example, in response to an individual's request. Are there any examples of an activity, a religious activity that an ARC participant could do on their own that would be prohibited?

A. None that I am aware of. And to be clear, this isn't just non-Christian religions that we would wrestle with this. The Salvation Army is also a non-sacramental branch of the Christian church. It does not mean that we are anti-sacrament, but we don't practice the sacrament within our faith tradition. So if, for instance, someone came along and said, you know, I have accepted Jesus as my savior and I want to be baptized here at the center. We would say the Salvation Army does practice baptism. So it would be even fellow Christians that may struggle as times with this is our religion. It's a

BETTS

residential church. I would not ever think to walk into another faith, traditional Church service or worship service and demand that I be provided with the ability to do my faith traditions in their worship context. It would not make sense if the street ran the other direction.

Q. If an ARC participant were to be baptized outside of the ARC at another church, would that be a reason to not allow the participant to continue?

A. No.

Q. Do the ARCs have Narcan available on site for potential overdoses?

A. I can't answer that question.

Q. You don't know?

A. I don't know.

Q. You mentioned that some of my questions about medications and interactions, someone else would be a better person to answer.

A. Yes.

Q. Who would be a better person to answer those questions?

BETTS

allowed to use buprenorphine, correct?

A. All the technical names for it, I don't want to speak -- I believe that would be one, but I don't know all of the sub names to -- I am familiar with more of the general category, Suboxone, methadone would be the phases I'm familiar with. I know there are lots of other ways that things could be referred to or other versions, but I would leave that to Reverend Coombs.

Q. You are familiar with the phrase Suboxone?

A. I am familiar with the phrase. I don't know a whole lot about it, other than it is part of a class that we do not allow within the program.

Q. There are some instances where an ARC participant can use a prescribed narcotic if it's approved by command headquarters, correct?

A. My understanding is that can happen on a very short-term basis for a specific issue, but I don't know the

BETTS

details of how that plays out on a daily basis.

Q. Are you involved in the process?

A. I am not.

Q. Have you ever been involved?

A. I have never been involved in that process. That is a specific program practice that Major Beth Muhs, Reverend Coombs, those would be the folks' part of that process.

Q. If evidence from medical professionals established that methadone or Suboxone, if taken according to a doctor's prescription, was the standard of care and not subject to abuse, would the Salvation Army reevaluate whether those medications could be used by ARC participants?

MR. GIES: Objection to the form.

A. I don't believe so because we still have the theological challenges of that, religious reasons that I described earlier.

BETTS

Q. Who are those people?

A. Reverend Coombs, Major Beth Muhs, but she would have learned it from Reverend Coombs as well.

Q. Have you had any conversations with anyone about what the Salvation Army would do if the court in this case were to order the eastern territory to permit individuals using doctor-prescribed medication to access the ARC, doctor-prescribed medication meaning methadone or Suboxone?

A. I am not sure the Salvation Army would continue to do the program. It undermines the whole approach we are taking from a faith tradition to the rehabilitation of someone's life. And it would be very difficult to continue the ARC program as it's currently constituted, if that was interjected into the mix.

Q. Have you had any conversations with anyone about that?

A. I have not.

Q. Your testimony just now is your

BETTS

Q. Are you aware that the Harbor Light Centers allow beneficiaries to access Suboxone?

A. I am not aware of those. That wouldn't mean they don't happen. I am not aware of those.

Q. Would you be surprised to know that was the case?

A. I would not necessarily. Again, the ARC program is a very unique program with very unique needs and very unique approaches. The Salvation Army has a lot of programs and approaches that wouldn't necessarily line up with what we believe the ARC is to be for us as a faith tradition. There are many different reasons for those, but ultimately within the ARC program we have chosen a very specific religiously-based approach to life's transformation that is dependant upon a particular context to make that work. That context is not necessarily mirrored in any other Salvation Army program context, even though there may be

BETTS

aspects of it that are piecemeal around other Salvation Army. There are other Salvation Army that might run a thrift store. There are other Salvation Army that might help people in crisis, but the ARC is a comprehensive context with its own needs and its own standards that you can't really compare effectively to other contexts and settings that the Salvation Army might operate within.

Q. The Salvation Army operates other programs that are not religious in the same way as the ARC?

MR. GIES: Objection.

A. No.

MR. GIES: Object to the form.

You may answer.

A. No, everything that we do would be related to our religious faith. The Salvation Army is called to preach the gospel of Jesus Christ and to meet human needs in his name without discrimination. So as we do that, we recognize that there are -- sorry, I am worried these things are

BETTS

going to blow. We are -- we recognize out of love for our neighbor that we would never want to leave them in crisis. If someone is drowning, I am not going to ask them their faith tradition before I pull them out of the water. If someone is hungry, I am going to feed them, but why I am feeding them? I am feeding them out of my mandate from Jesus himself in the scripture to whatever we do unto the least of these is the quote, we do unto him. Our faith tradition, I am not made right with God through my works. I am made right with God through grace, through what Jesus has done in his own sacrifice, but my works is a direct response to that and a direct response to his charge to love God with all of our heart, soul, strength and mind and to love our neighbor as ourself. It takes many forms. And depending on the level of -- if I was to put it in clear terms, on one side you will see Salvation Army programs and activities that are dedicated to tempering a present crisis. We want to

BETTS

make sure that we don't leave people in a crisis, right, but there is only so much you can do with that. And that is oftentimes a short-term thing. Then there are aspects of what the Salvation Army does that not only tempers the present crisis but transforms the future. Those are much more long term, long range, long relationships and our Christian faith would come out much more overtly in those contexts, where we are talking to people about who they are as a person, who they were created to be, what is their divine design and how God can transform their heart. I am putting a roof over a guy's head. I am putting food on his table or hers, you know -- for instance, in Mumbai where there is, the sex trade is enormous, the Salvation Army provides child care overnight for the workers of the sex industry. Is that because we believe that that is what they were designed to do or what, that their God's design on their life, of course not. And we don't expect

BETTS

to be preaching to their children or to preaching to them, but building a relationship, dealing with a current crisis, building a relationship so that at some point it may lead to a longer term relationship where we can begin to talk about deep, long, life transformation activities and what that looks like. So the ARC is one of those long games, one of those long relationships where we are really -- I don't mean game in a flippant way, but a long approach to saying we are inviting you into a community where we are going to live life together and really get down to the deep stuff within your life. Harbor Light or any other program that the Salvation Army does of that type, isn't necessarily having that same -- it's not the same end goal for those programs. There is much more of an emergent, emergency type situation context where they are having to deal with things in a very different way. I don't know if that helps, but that is how it all fits together, in my

BETTS

understanding, all of which flows out of our faith tradition.

Q. You are just talking about the Salvation Army's activities, programs as a whole. And as a whole, those programs are -- would it be fair to say that they are intended to improve the welfare of the people that they serve?

A. Of course, yes.

Q. You talked about the Harbor Light Centers as being distinct from the ARC?

A. Yes.

Q. If the Harbor Light Centers provided services to beneficiaries that use methadone or -- doctor-prescribed methadone or buprenorphine, would that violate the Salvation Army's religious tenets?

A. It would.

Q. So would it surprise you if the Harbor Lights Centers provided services to people who use those medications?

A. Not necessarily. Their context, is completely different. Their

BETTS

context both from a practical standpoint of what they can support in their program and their context in regard to how our faith tradition plays out in that short-term context, very different from how our faith traditional plays out -- the way our faith tradition plays out on a Sunday morning during worship service is completely different than how it plays out on a Wednesday soup kitchen. There's different contexts. And so what may be okay, even from a faith tradition standpoint in one context, may not be okay in the same faith tradition in a different context. And for us it comes down to loving our neighbor. So we teach music. We have enormous music programs within the Salvation Army. When we are teaching music, we put a horn in their hand and we want them to make all the noise they want, but if they come into a Bible study and bring that horn with them and start blowing it at the top of their lungs, that would be inappropriate in our -- even from our faith tradition of love

BETTS

your neighbor who is trying to understand the Bible more deeply and you are blowing the horn, that is a very unloving act. So the faith tradition certainly can be contextualized as it relates to these programs and what is appropriate in these programs. You can't really compare apples to apples across programs or community contexts.

Q. Would the Salvation Army be -- violate its own religious tenets by providing services through the Harbor Light Centers to people that use methadone or -- doctor-prescribed methadone or buprenorphine?

MR. GIES: Objection. Asked and answered.

A. I think I have already answered that. I am not familiar enough to know all the contexts of Harbor Light, but there may be contexts which change the dynamic of that conversation. I would concede that, that they may have a different context where that makes sense. I don't know

BETTS

including anything more than a no or yes if that is what you need to have a complete answer.

A. Can you repeat the question, please, somebody.

(Whereupon, the referred to question was read back by the Reporter.)

A. I would say yes. Can I add one thing to that?

Q. Absolutely.

A. Someone shows up at our soup kitchen, but they are on that type of therapy, they would certainly not violate our religion to serve them within that context, of course.

Q. Okay, thank you.

MR. MURRAY: I think now might be a good time to break for lunch.

THE VIDEOGRAPHER: The time is 12:36 p.m. and we are off the record.

(Whereupon, an off-the-record discussion was held.)

THE VIDEOGRAPHER: The time is

BETTS

C E R T I F I C A T E

STATE OF NEW YORK )
: SS.:
COUNTY OF KINGS )

I, ANNA KHODACHNIK, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose examination is hereinbefore set forth was duly sworn and that such examination is a true record of the testimony given by that witness.

I further certify that I am not related to any of the parties to this action by blood or by marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 9th day of February 2023.

Anna Khodachnik

______________________________
ANNA KHODACHNIK

Mark Tassinari, et al. v. The Salvation Army, A New York Corporation
Deposition of Colonel James Betts

**Errata Sheet**

| Page/Line | Change | Reason |
|---|---|---|
| Page 17, line 5 | Replace "I am a technician" with "I am a not technician" | Transcription error |
| Page 17, line 13 | Replace "bringing" with "seeking" | Transcription error |
| Page 18, line 19 | Replace "office" with "officer" | Transcription error |
| Page 19, line 4 | Replace "in the days of" with "in the early days of" | Clarification as to time |
| Page 21, line 19 | Replace "territory of" with "territorial" | Transcription error |
| Page 25, line 10 | Replace "division to" with "divisional" | Transcription error |
| Page 26, line 13 | Replace "are straight" with "aren't state" | Transcription error |
| Page 30, line 2 | Replace "over" with "be over" | Transcription error |
| Page 33, line 19 | Replace "de" with "be" | Transcription error |
| Page 35, lines 15 and 16 | Replace "Bramford" with "Bamford" | Transcription error |
| Page 42, line 16 | Replace "present" with "prevent" | Transcription error |
| Page 47, line 15 | Replace "forced" with "enforced" | Transcription error |
| Page 47, line 24 | Replace "or it or not" with "of it or not" | Transcription error |
| Page 72, line 3 | Replace "recourses" with "resources" | Transcription error |
| Page 72, line 4 | Replace "to that and that" with "to us and that" | Transcription error |
| Page 74, line 4 | Replace "for" with "from" | Transcription error |
| Page 75, line 18 | Replace "on pack" with "to unpack" | Transcription error |
| Page 86, line 16 | Replace "our" with "other" | Transcription error |
| Page 88, line 17 | Replace "sacrament" with "sacramental" | Transcription error |
| Page 88, line 18 | Replace "sacrament" with "sacraments" | Transcription error |
| Page 88, line 23 | Replace "does practice" with "does not practice" | Transcription error |
| Page 88, line 24 | Replace "as" with "at" | Transcription error |
| Page 127, line 10 | Replace "my" with "by" | Transcription error |
| Page 129, line 19 | Replace "could speak" with "could not speak" | Transcription error |

[signature]
Colonel James Betts

3/14/2023
Date

**Acknowledgment of Deponent**

I, Colonel James Betts, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct, and complete transcript of the testimony given by me.

[signature]
Colonel James Betts

3/14/2023
Date

**CERTIFICATE OF SERVICE**

I hereby certify that on this 15th day of March, 2023, I electronically served the foregoing on all Plaintiff's counsel of record via email, per agreement of counsel, and on Veritext Legal Solutions.

/s/ Kathryn Erno