# Exhibit 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No.: 1:21-cv-10806-LTS

--------------------------------------------------x

MARK TASSINARI, RICHARD ESPINOSA, and JOSEPH ALMEIDA individually and on behalf of all others similarly situated,

Plaintiffs,

v.

THE SALVATION ARMY A NEW YORK CORPORATION,

Defendant.

--------------------------------------------------x

40 Rector Street
New York, New York
February 7, 2023
10:00 a.m.

30(b)(6)DEPOSITION OF MAJOR BETH MUHS, appearing at the above-mentioned time and place before ANNMARIE OAKLEY, a Notary Public of the State of New York.

A P P E A R A N C E S

ALTSHULER BERZON LLP
Attorneys for Plaintiffs
177 Post Street
San Francisco
BY: MATTHEW MURRAY, ESQ.

JUSTICE CATALYST LAW
Attorneys for Plaintiffs
40 Rector Street
Buffalo, New York 10006
BY: MARIYAM HUSSAIN, ESQ.

CROWELL & MORING LLP
Attorneys for Defendant
590 Madison Avenue
New York, New York 10022
BY: THOMAS GIES, ESQ.
PAUL W. MOURNING, ESQ.

Also present: Deverell Write, videographer



VIDEOGRAPHER: We are going on record at 10:03 a.m. on February 7, 2023. This is media unit one of the video recorded deposition of Beth Muhs taken by counsel for the plaintiff in the matter of Mark Tassinari et al versus the Salvation Army. This case is filed in United States District Court for the District of Massachusetts. My name is Deverell Write representing Veritext Legal Solutions. The court reporter is Ann Oakley representing Veritext Legal Solutions. At this time counsel, please, state your appearances.

MR. MURRAY: Matthew Murray from Altshuler Berzon for plaintiffs.

MS. HUSSAIN: Mariyam Hussain from Justice Catalyst law for plaintiffs.

MS. FARLEY: Rose Farley, Justice Catalyst Law, plaintiffs.

MR. GIES: Thomas Gies from Crowell Moring for the defendant.

MR. MOURING: Paul Mourning Crowell Moring for the defendant.

VIDEOGRAPHER: Will the court reporter, please, swear in the witness.

(witness sworn.)



Q Would you state your name for the record, please.
A Beth Muhs.
Q Would you state your address for the record, please.
A. 440 West Nyack Road, West Nyack, New York.
EXAMINATION BY MR. MURRAY
Q. Do you go by Major Muhs?
A. Yes.
Q. Good morning. I'm Matthew Murray one on plaintiffs attorney in this case I'm going to start by just going over some ground rules for today, this deposition, so we're on the same page. Do you understand you're testifying under oath today?
A. Yes.
Q. And you understand that everything that you say is being taken down by the court reporter today?
A. Yes.
Q. And for the court reporter it's important for your answers to be verbal. So if you can say yes or no rather that uh-huh or shake your head, do you understand that?
A. Yes.



B. MUHS
Q. If you don't understand a question will you, please, ask me to rephrase or let me know that you don't understand?
A. Yes.
Q. If I ask you a question and you answer I will assume that you understood, is that fair?
A. Correct.
Q. You should feel free to -- I would like your full and complete testimony so feel free to amend an answer, if you think of something later today. I'm going to ask you to, please, give me your full and complete testimony today, is that okay?
A. Yes.
Q. Also for the court reporter it's important that we don't interrupt each other so it's easier to take everything down, so is I will do my best to not interrupt you and I will do my best to let you finish, is that okay?
A. Yes.
Q. I don't want you to guess an answer today but I am entitled to your best estimate. If I ask you about how long is this table you can give me an estimate looking at it, it wouldn't be exact but you

Page 14

B. MUHS

potentially responsive documents in this case?
A. No.
Q. What is the Salvation Army a New York Corporation?
A. Salvation Army is an international movement. We're a part of the holiness movement. We're a church and we live by our Christian standard, as we do in anything that we do whether it be social services, institutional or core church settings.
Q. And you said that Salvation Army is an international movement?
A. Yes.
Q. And what is the -- how is the Salvation Army organized?
A. Very complexly.
Q. Walk me through, please.
A. I would not be able to walk you through internationally because there are many levels. International there are many levels, territorially we have a territorial commander who oversees 12 commands, one being the adult rehabilitation center command.
Q. When you say "territorially" what are you

Page 15

B. MUHS

referring to?
A. The eastern territory comprised from the State of Maine out to Ohio and Northeast Kentucky, Wilmington, Delaware and Puerto Rico.
Q. How many territories are there in the United States?
A. I don't know.
Q. But there are other territories besides the eastern territory?
A. Four. Sorry, I was thinking commands.
Q. There are four territories of the Salvation Army in the United States?
A. Yes.
Q. And is there a national headquarters of Salvation Army in the United States?
A. Yes.
Q. And how are the territories related to the national headquarters?
A. There territorial leaders work with the national leaders.
Q. How do they work together?
A. Through conferences and commissions.
Q. Does national headquarters set policies that apply to the territories.

Page 16

B. MUHS

A. For the Salvation Army, yes.
Q. What kinds of policies does the national headquarters set for the Salvation Army that apply to the territories?
A. I don't believe I can answer that because were specifically ARC and that doesn't necessarily trickle down to us. A lot of their policies will be for church related events.
Q. Are there national policies that apply to ARCs in the eastern territory?
A. Yes.
Q. What national policies apply to ARC in the eastern territory?
A. It would be the green handbook, our standards of policy.
Q. We'll get to that but the green handbook it includes national policies that govern all the ARCs in the eastern territories?
A. Yes.
Q. And when we refer to ARCs we're talking about adult rehabilitation centers?
A. Yes.
Q. Approximately how many ARCs are there in the eastern territory?

Page 17

B. MUHS

A. 29.
Q. There have been some that have closed since 2018, right?
A. Yes.
Q. And who decides when an ARC needs to close?
A. It's discussion within the command finance counsel with the commander, and the commander speaks to the chief secretary and the commissioner.
Q. And who is the commander?
A. Lieutenant Colonel James Bets.
Q. So that's the ARC commander?
A. Correct.
Q. And he's the ARC commander in the eastern territory?
A. Correct.
Q. And you referred to the --
A. -- chief secretary.
Q. The chief secretary, thank you. Who is that?
A. That's a Colonel Ivan Rock.
Q. Is that the chief secretary of the eastern territory?
A. Yes.

B. MUHS

Q. And you referred to the commander I believe?

A. Commissioner.

Q. And who is the commissioner?

A. William Bamford.

Q. Is commissioner Bamford someone in the eastern territory?

A. Yes.

Q. Does anybody at the national Salvation Army headquarters get involved in decisions about whether to open or close an ARC in the eastern territory?

A. No.

MR. MURRAY: I'm going to mark Exhibit 102. I'm going to mark Exhibit 102, a document entitled, "Defendant's Response to Plaintiff's Set of Interrogatories to Defendant Salvation Army (SET 1)." dated October 14, 2022. Do you recognize this document?

(Interrogatory Responses document was introduced as Exhibit 102.)

A. Yes.

Q. And at the very last page is that your signature on the verification?



B. MUHS

A. Yes.

Q. So you reviewed and verified the Salvation Army's answer to these interrogatories, is that right?

A. Yes.

Q. Towards the end there's something marked Exhibit 2, it is a chart of columns that say location, address, do you see that?

A. Yes.

Q. This chart shows all the ARCs that were opened at some point in the eastern territory from 2018 to the present, right?

A. Correct.

Q. And in each column line up the chart shows how many people lived at each ARC and received services each year, is that right?

MR. GIES: Objection to the question as vague.

Q. What was your answer?

A. I'm looking at the pages. Can you restate your question.

(The requested portion was read by the court reporter.)

A. Yes.



B. MUHS

Q. There's a total at the bottom 33,944. Do you see that?

A. Yes.

Q. About 34,000 people lived and received services at eastern territory ARCs from 2018 to the present, is that right?

A. Yes.

Q. You said you have 30 years of experience at ARC could you, please, describe your background. Let's start with your education. What education did you receive?

A. I have a bachelors in sociology from 1978 from Malone University in Canton, Ohio. I have my commission and ordained as a Salvation Army officer in 1991.

Q. When did you first start working for the Salvation Army?

A. When I was 14.

Q. And what did you do when you were 14?

A. I was a waitress at camp.

Q. Was that for the eastern territory?

A. Eastern territory and Pennsylvania.

Q. What kind of camp?

A. Salvation Army camp.



B. MUHS

Q. Is that a youth camp?

A. Yes.

Q. What was your next job with the Salvation Army?

A. Camp every summer for seven summers.

Q. I'm going to ask you go through all your jobs at Salvation Army.

A. I went to the school for officers training in 1979, was commissioned as a Salvation Army officer in 1981, was sent as an assistant officer to Middletown, Ohio specializing in youth, I was there for two years, and then I went to our school for officers training to teach on the staff, I as there for two years, then I got married and then we went to Marietta, Ohio as core officers overseeing a church and from there we went to Brooklyn, New York to train as ARC officers from Brooklyn, we went to Wilkes-Barre, from Wilkes-Barre to Harrisburg, Harrisburg to Syracuse, Syracuse to command headquarters to Cleveland, Ohio to Newark, New Jersey to Manhattan ARC and back to command headquarters.

Q. And what is your current position?

A. Assistant command secretary for

Page 22

B. MUHS

programming.

Q. And you mentioned being at the Manhattan, ARC, what did you do at the Manhattan ARC?

A. Administrator for program.

Q. Is that the person in charge of that ARC?

A. As a team, my ex-husband was the administrator for business and I was the administrator for programming.

Q. So you and your ex-husband together ran that ARC?

A. All of those ARCs.

Q. How many did you run at that time?

MR. GIES: Objection. Vague.

Q. When you say "all of those ARCs" what are you referring to?

A. Anything from Brooklyn on.

Q. And the list of the various locations that you gave me those were each locations where you were running an ARC?

A. Correct.

MR. MURRAY: I'm going to mark Exhibit 103.

(Organizational Chart was introduced as Exhibit 103.)

Page 23

B. MUHS

Q. Do you recognize this?

A. Yes.

Q. This is an ARC headquarters command organization chart. Does this -- what does this chart show?

A. Reflects what goes on in our command headquarters and who's responsible for what.

Q. And this is the command headquarters specifically for ARCs in the eastern territory?

A. Correct.

Q. And it says revised in October 26, 2022. Do you see that?

A. Yes.

Q. How was it different before that?

A. Personnel changes.

Q. But the overall structure was the same?

A. Yes.

Q. So what is the ARC command headquarters?

A. We oversee all of the programs and business that happens within the ARC in the eastern territory. We give support, encouragement, advice, approvals, procedures, policy.

Q. And you said -- did you -- forgive me if I already forgotten this, who did you say you report

Page 24

B. MUHS

to?

A. Lieutenant Colonel Betts is the commander, and Lieutenant Colonel Sue Betts as the secretary for programming.

Q. And what are Lieutenant Sue Betts' responsibilities?

A. She's the command secretary for program.

Q. What does that mean? What does she do?

A. She's my boss. She helps to just coordinate and overview everything going on and responsible for everything going on in the centers.

Q. And what are the responsibilities of Commander James Betts?

A. He has a broad overview of everything that goes on in the ARC command.

Q. Does he report to anyone?

A. Reports to the chief secretary.

Q. Who is the chief secretary?

A. Colonel Ivan Rock.

Q. Does Lieutenant Colone James Betts report to anybody else?

A. Ultimately the commissioner, William Bamford.

Q. And does Lieutenant James Betts know about

Page 25

B. MUHS

all aspects of the ARC programs in the eastern territory?

A. He would have a broad overview.

Q. Does he interact with commanders from other territories in the United States?

A. What type of commanders?

Q. ARC commanders, excuse me.

A. Yes.

Q. How does he interact with ARC commanders from other territories in the United States?

A. They have a yearly commission meeting to discuss anything that may need change or just to have discussions once a year.

Q. And how about territorial commissioner Bamford, does he report to anyone?

A. National commander.

Q. And does he interact with other territorial commanders from other territories in the United States?

A. I can't give a clear answer. I would be assuming.

Q. You don't know whether or not he --

A. No, I don't know.

Q. Over in the right there's an executive

Page 30

B. MUHS
A. It's a learning platform that we use in the eastern territory but specifically for the ARC. We use it in training of new personnel in the program department.
Q. Is there any training in the ARC E-Learning platform related to medications?
A. I believe the Talbott Medical Guide is there.
Q. Is there any other training in that platform related to medications?
A. No.
MR. MURRAY: All right. I'm going to mark Exhibit 104, which is titled, "Salvation Army Adult Rehabilitation Handbook of Standards, Principles and Policies." Do you recognize this?
(Handbook was introduced as Exhibit 104.)
A. It's not green, but yes.
Q. Is this the green book?
A. Yes.
Q. And this handbook contains policies that govern all the ARCs in the eastern territory, right?
A. Yes.
Q. This is the most recent version of the green book?

Page 31

B. MUHS
A. Yes.
Q. You see it's dated February 2020, what was different in the previous version?
A. Nothing.
Q. So this handbook contains policies that have governed all ARCs in the eastern territory since at least 2018, is that right?
A. Yes.
Q. And on the front says, "Approved by the Commissioners' Conference." What is the commissioners' conference?
A. That would be the conference of the four territorial commissioners or leaders of each of the four territories with the national commanders and his delegates.
Q. So this is a national handbook?
A. Yes.
Q. To make changes to this handbook the commissioners' conference would have to approve that, right?
A. Yes.
Q. And the eastern territory can't adopt policies that conflict with the polices in this handbook, right?

Page 32

B. MUHS
A. Correct.
Q. If you look at the page marked Bates number TSA 274 on the bottom middle, second to last full paragraph starting with, "Nationwide Uniformity Policy," do you see that?
A. Yes.
Q. It says, "Nationwide uniformity of policy is the responsibility of the commissioners' conference." So how does the commissioners' conference ensure nationwide uniformity of policy?
A. That would be out of my scope.
Q. Is part of that ensuring uniformity of policy nationwide adopting this handbook?
A. Yes.
Q. The last sentence of that paragraph says, "Standing commissioner -- excuse me, "Standing commissions study Salvation Army programs and procedures and then make recommendations to the commissioners conference." Do you see that?
A. Yes.
Q. Are there any standing commissions related to the ARCs?
A. The ARC commanders' conference.
Q. And who is in the ARC commanders'

Page 33

B. MUHS
conference?
A. Four ARC commanders.
Q. Are there any other standing commissions related to the ARCs?
A. Not to my knowledge.
Q. On the previous page marked TSA 273 there's a paragraph that begins, "The basic social services developed by William Booth." Do you see that paragraph?
A. Yes.
Q. Does that paragraph describes Salvation Army principal activities?
MR. GIES: Objection. The document speaks for itself.
Q. You can answer the question.
A. Yes.
Q. And on page TSA 275 the second paragraph beginning, "Salvation Army church membership consists of adherence soldiers and officers." Do you see that paragraph?
A. Yes.
Q. Does that paragraph describe the Salvation Army church membership?
MR. GIES: Same objection.

Page 74

B. MUHS

policy prohibiting ARC participants from receiving prescription medications at medical appointments in general; correct?

A. Correct.

Q. If you could look at page 660, I apologize, that same page 659, the next sentence, the sentence begins, "We do allow the usage of nicotine in designated areas." Do you see that?

A. No.

Q. After the big paragraph, the first paragraph, the next sentence.

A. Yes.

Q. So ARC participants are permitted to use nicotine in designated areas; correct?

A. Yes.

Q. And an ARC participant who uses nicotine is not expelled from the program correct?

A. Correct.

Q. Nicotine is addictive; correct?

A. Correct.

Q. And it can be abused; correct?

A. Correct.

Q. And the Salvation Army believes in abstinence from nicotine for its members; correct?

Page 75

B. MUHS

A. Yes.

Q. Why are ARC participants allowed to use nicotine?

A. They're not members of the Salvation Army.

Q. Allowing ARC participants to use nicotine doesn't prevent salvationists from practicing their religion; correct?

A. Correct.

Q. On page 663 there's a reference in some paragraph here about passes, do you see that?

A. Yes.

Q. ARC participants need permission to leave the center, is that right?

A. If it is during a program period, yes.

Q. And ARC participants can get permission from medical appointments to leave the center; correct?

A. Yes.

Q. And that's true including during the initial period? Which I forget what you called it, I'm sorry.

A. Stabilization.

Q. That's true during stabilization; correct?

A. Yes.

Page 76

B. MUHS

Q. What is personal reflection time?

A. When someone has made a choice to break a rule, sometimes the discipline will be, as we refer to personal reflection time, PRT for them to reflect on the negative choice that they made and it could be for a period of time, it could be a report, it could be watching a video, just depends on the nature.

Q. And how long does PRT last?

A. It depends on the offense and how many times the offense has occurred.

Q. Is an ARC participant allowed to leave the center during reflection time?

A. Not unless they choose to leave the program.

MR. MURRAY: I'm going to mark Exhibit 107.

(TSA0004160 to TSA0004232 was introduced as Exhibit 107.)

Q. This is a document entitled, "SOAR Standards of Adult Rehabilitation Salvation Army." Do you recognize this document?

A. Yes.

Q. What is this?

Page 77

B. MUHS

A. It is the standard of daily program at centers, what is expected.

Q. Does this document describe policies applicable to all the ARCs in the eastern territory?

A. Yes.

Q. And have the policies in this document been applicable since at least 2018?

A. SOAR I believe is a 2021 product, so yes.

Q. There is a date on the front, September 15, 2021, was there a prior version of this document?

A. No.

Q. In practice, the policies described in this document did they apply before 2021?

A. Yes.

Q. At least. And they have applied since at least 2018?

A. Yes.

Q. Why did the eastern territory create this document in 2021?

A. Trying to keep a unified program between the centers.

Q. Were you involved in the creation of this document?

Page 110

B. MUHS
beliefs; correct?
A. For a salvationist.
Q. What's the difference between nicotine and methadone? Why is one permitted for ARC participants and the other is not?
A. That is a good question and I wish nobody smoked but that is not going to cause our testing -- it will not come up in our testing as a dischargeable drug.
Q. Nicotine and methadone are both substances that the Salvation Army opposes as a matter of religious principle?
A. Yes.
Q. And the Salvation Army can continue to practice its religion while allowing ARC participants to use nicotine; correct?
A. Yes.
Q. And the Salvation Army can continue to practice its religion if it allowed ARC participants to use methadone; correct?
A. No.
Q. What is the difference between those two circumstances for purposes of the Salvation Army practices of its religion?

Page 111

B. MUHS
A. Of our religion of abstinence and being a drug-free house. A drug is a drug, whether methadone, Suboxone, buprenorphine. If it's a narcotic it's a drug and we don't allow those within our program.
Q. Isn't nicotine a drug?
A. Yes.
Q. What do you mean by "narcotic"? What's a narcotic in your view.
A. An opioid. We're talking about methadone, Suboxone, Sublocade, buprenorphine, those are listed in the Talbott Guide. They will show up.
Q. But there are some prescription narcotics that are allowed in ARCs; correct?
A. For short-term purposes.
MR. GIES: If you're at a logical stopping point.
MR. MURRAY: Yeah, I think that would be a good time for lunch. Let's take a break.
VIDEOGRAPHER: The time on the video monitor is 1:06 p.m. We're off-the-record. This ends media unit two.
VIDEOGRAPHER: We're back on-the-record. The time on the video monitor is

Page 112

B. MUHS
1:45 p.m. This starts media unit number three.
Q. Good afternoon. I'm going to show you a new exhibit marked 121. Do you recognize this document?
(Declaration was introduced as Exhibit 112.)
A. Yes.
Q. What is it?
A. It's my Declaration.
Q. This is a Declaration that you signed in this case?
A. Yes.
Q. If you could go to paragraph 27 you see the sentence that says, "I'm confident that the Salvation Army would elect to shut down the ARC program rather than operating them in a way that violates the Salvation Army's spiritual tenets."
A. Yes.
Q. Do you mean the Salvation Army would shut down the ARCs before allowing participants to use methadone or buprenorphine?
A. Yes.
Q. Why do you believe the Salvation Army would shut down the ARCs before allowing

Page 113

B. MUHS
participants to use methadone or buprenorphine?
A. Because we would have to restructure the whole program of abstinence and our religious beliefs because we would have to structure our whole program, get new stuff, because we're not a medical facility or treatment facility and those folks that are needing those types of care would need a higher level of care and we would have to change who we are in our pathway.
Q. What additional thing would an ARC participant need from the Salvation Army if they were to get a monthly Sublocade shot?
A. We would not allow that.
Q. And you just testified that allowing participants to access buprenorphine would require the ARCS to totally restructure, and I'm asking what restructuring would be required?
A. Again, it's a higher level of care.
Q. What does that mean to you?
A. That means to me we don't have the capacity to help someone that's on medications that we are not medically providing care for, should they need care.
Q. And if an individual were to get a monthly

Page 114

B. MUHS

Sublocade shot and not require any other medical attention or intervention in the month between the shots how would that effect the ARCs?

A. We would not be an abstinent program.

Q. If an individual receiving prescribed narcotic pain medication after surgery, an ARC participant received that, how would that effect the ARCs differently?

A. They would be monitored for the one to three days of needing it. If it was in their system beyond the time allowable they would we discharged for drug use.

Q. Could an ARC participant use methadone for one to three days, three to five days, taper off and then be done with it and still participate in the ARC program?

A. Not until they were done with it.

Q. And how is that different from an ARC participant receiving pain medication for a few days after surgery?

A. I think one is we are noticeable of what reaction we are looking for when someone is just discharged from the hospital, with the hospital notes, and we look at that and get them the medical

Page 115

B. MUHS

attention they need if there was any reaction, that way we would not know what that individual's reaction would be should they have alcohol outside of the center or mixed with another drug outside of the center because we're not a medical center.

Q. How would you get medical attention right away for somebody post surgery?

A. Ambulance.

Q. Have you had any discussion with anyone else in the Salvation Army about shutting down the ARCs before admitting participants who would use methadone or buprenorphine?

A. Yes.

Q. Who have you talked to about that?

A. Our counterparts, my counterparts have talked about it.

Q. When you say your counterparts what do you mean?

A. Other ARC officers.

Q. Within the eastern territory?

A. Yes.

Q. Have you talked about this with anyone outside the eastern territory?

A. No.

Page 116

B. MUHS

Q. Have you ever had a discussion with someone in the eastern territory about the fact that some other Salvation Army programs, like the Harbor Light Centers, allow participants to use methadone or buprenorphine?

MR. GIES: I'm going to object and not to answer it, it's beyond the scope. We're not going to let the witness answer if it's beyond the scope.

MR. MURRAY: You're directing the witness not to answer.

MR. GIES: About a topic for which she's not designated as a 30(b)(6) witness. I told you who the witness for that topic is and you will be able to ask him.

Q. Are you personally aware that there are other Salvation Army or any other Salvation Army programs outside of ARCs that allow participants to use methadone or buprenorphine?

MR. GIES: Same objection, same direction.

Q. You're not going to answer that question?

A. I'm listening to my attorney.

MR. MURRAY: I will state

Page 117

B. MUHS

for-the-record that's not a proper instruction not to answer but I understand that's what you're instructing.

Q. You testified earlier about the update to the Salvation Army medication policy in September 2022, do you recall that?

A. Yes.

Q. Was the Salvation Army currently considering making any changes to its medication policy?

A. No.

Q. Has a Salvation Army made any formal decision shutting down ARC programs if it were required to admit a participant who uses methadone or buprenorphine?

A. No.

MR. MURRAY: I'm going to mark Exhibit 122. This is a document says, "Intake Coordinator's/Counselor's Reference Guide."

(TSA0001070 to TSA0001072 was introduced as Exhibit 117.)

Q. Do you recognize this document?

A. Yes.

Q. What is this?

B. MUHS

CERTIFICATE

I, ANNMARIE OAKLEY, a Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify:

THAT BETH MUHS, the witness whose deposition is herein before set forth, was duly sworn by me, and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or by marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS THEREOF, I have hereunto set my hand this 7th day of February, 2023.

ANNMARIE OAKLEY



B. MUHS

ERRATA SHEET

DATE OF DEPOSITION: FEBRUARY 7, 2023
NAME OF DEPONENT: BETH MUHS

| PAGE | LINE(S) | CHANGE | REASON |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

______________________
BETH MUHS

SUBSCRIBED AND SWORN TO BEFORE ME
THIS _____ DAY OF __________________, 20___.

__________________________

Mark Tassinari, et al. v. The Salvation Army, A New York Corporation
Deposition of Major Beth Muhs

## Errata Sheet

| Page/Line | Change | Reason |
|---|---|---|
| Page 13, line 15 | Change "that's would be" to "that would be" | Transcription error |
| Page 20, line 16 | Change "1991" to "1981" | Transcription error |
| Page 21, line 16 | Change "core" to "corps" | Transcription error |
| Page 27, line 3 | Change "with" to "which" | Transcription error |
| Page 42, line 3 | Change "their" to "they're" | Transcription error |
| Page 46, line 25 | Change "core" to "corps" | Transcription error |
| Page 47, line 7 | Change "core" to "corps" | Transcription error |
| Page 91, line 23 | Change "we're" to "we're not" | Transcription error |
| Page 92, line 13 | Change "be discharge" to "be a basis for discharge" | Clarification |
| Page 95, line 4 | Change "on" to "of" | Transcription error |
| Page 113, line 6 | Change "stuff" to "staff" | Transcription error |
| Page 114, line 5 | Change "abstinent" to "abstinence" | Transcription error |
| Page 114, line 12 | Change "we" to "be" | Transcription error |
| Page 122, line 24 | Change "then" to "than" | Transcription error |
| Page 128, line 14 | Change "it" to "if" | Transcription error |
| Page 135, line 20 | Change "You're correct" to "You're not correct" | Clarification |
| Page 175, line 4 | Change "other" to "others" | Transcription error |

Major Beth Muhs
Major Beth Muhs

3/22/23
Date

## Acknowledgment of Deponent

I, Major Beth Muhs, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct, and complete transcript of the testimony given by me.

Major Beth Muhs
Major Beth Muhs

3/22/23
Date

**CERTIFICATE OF SERVICE**

I hereby certify that on this 22nd day of March, 2023, I electronically served the foregoing on all Plaintiff's counsel of record via email, per agreement of counsel, and on Veritext Legal Solutions.

/s/ Kathryn Erno