**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **MARK TASSINARI, RICHARD ESPINOSA, AND JOSEPH ALMEIDA**, individually and on behalf of all others similarly situated, <br><br> Plaintiffs <br><br> **v.** <br><br> **THE SALVATION ARMY, A NEW YORK CORPORATION,** <br><br> Defendant. | **CASE NO. 1:21-CV-10806-LTS** |

# COMBINED STATEMENT OF MATERIAL UNDISPUTED FACTS

## COMBINED STATEMENT OF MATERIAL UNDISPUTED FACTS

Pursuant to Local Rule 56.1 and this Court's Standing Order Regarding Briefing of Summary Judgment Motions, the Parties submit this Combined Statement of Material Undisputed Facts, which includes Defendant's Statement of Material Facts, Plaintiffs' Responses to Defendant's Statement of Material Facts, and Plaintiffs' Statement of Additional Material Facts.

## DEFENDANT'S STATEMENT OF MATERIAL FACTS

1. **The Salvation Army is an international religious and charitable organization that is part of the evangelical part of the universal Christian Church.** Doc. No. 276-1 (Ex. 1 to Declaration of Katie Erno in Support of Motion for Summary Judgement ("Erno Decl. ISO MSJ"), TSA Adult Rehabilitation Center ("ARC") Handbook of Standards Principles and Policies ("ARC Handbook") at TSA0000261); Doc. No. 72 at 21-23 (Court order determining that TSA is a religious organization for purposes of this litigation).

    a. RESPONSE: Undisputed.

2. **Defendant The Salvation Army, a New York corporation ("TSA"),[1] is the corporate instrumentality of The Salvation Army, and owns and operates the programs of The Salvation Army in The Salvation Army's Eastern Territory within the United States**. Doc. No. 38-1 at 1-2 (Declaration of Lt. Colonel Dennis Gensler, former ARC Commander of The Salvation Army's Eastern Territory ("Lt. Col. Gensler Decl."), ¶¶ 2-5); Doc. No. 72 at 2 (Court order acknowledging same).

    a. RESPONSE: Undisputed.

3. **The Salvation Army has a hierarchical command structure similar to a military command structure. For TSA, there is a Territorial Commander who oversees the 12 commands in the Eastern Territory, one of which is the ARC Command. The ARC Commander, in turn, oversees the ARC Command and reports to the Territorial Commander.** Doc. No. 276-2 (Ex. 2 to Erno Decl. ISO MSJ, Deposition of Lt. Colonel James Betts, former Commander of the ARC Command of the Eastern Territory ("Lt. Col. Betts Dep. Tr.") 21:10-22:7, 34:19-25); Doc. No. 276-3 (Ex. 3 to Erno Decl. ISO MSJ, Deposition of Major Beth Muhs, former Assistant Secretary for Program of the ARC Command of the Eastern Territory ("Major Muhs Dep. Tr.") 14:15-15:5, 21:24-22:2, 24:3-24).

    a. RESPONSE: Undisputed.

4. **The Salvation Army practices its religion by ministering to vulnerable members of society through a variety of charitable works and programs around the world,**

[1] In this Statement of Undisputed Facts, "TSA" is used to refer to the Defendant, whereas "The Salvation Army" is used to refer to the international religious and charitable organization of which TSA is a part.

**including food pantries, after-school programs, veteran services, homeless shelters and rehabilitation centers**. Doc. No. 276-1 (Ex. 1 to Erno Decl. ISO MSJ, ARC Handbook at TSA0000261 (The Salvation Army's "mission is to preach the gospel of Jesus Christ and to meet human needs in His name without discrimination."), at TSA0000262 ("The Social Work is as truly an integral part of The Salvation Army as are literature, its meetings, or any other of its manifold operations. …Without its Social Work, the Army would be only partially qualified for the work God has given it to do . . . . The Salvation Army has refused to separate the practice of religion from its ministry to those in need."), at TSA0000273 (describing the history of The Salvation Army, including that it began with the founder, William Booth, becoming "involved in the feeding and shelter of the hungry and homeless and in alcohol rehabilitation") and at TSA0000275-278 (describing the "Origins and Development of the Adult Rehabilitation Center")); Doc. No. 276-2 (Ex. 2 to Erno Decl. ISO MSJ, Lt. Col. Betts Dep. Tr. 23:16-26:23 (detailing personal history with The Salvation Army), 99:19-103:3 (explaining TSA's faith and belief system, including that "The Salvation Army is called to preach the gospel of Jesus Christ and to meet human needs in his name without discrimination")); Doc. No. 276-4 (Ex. 4, to Erno Decl. ISO MSJ, https://www.salvationarmyusa.org/usn/home/#whatwedo); Doc. No. 99-2 at 2-4 (Lt. Colonel Kathleen Steele Declaration, former Secretary for Program of the Eastern Territory ("Lt. Col. Steele Decl."), ¶¶ 6-8 (declaring "[a]t the heart of [The Salvation Army's] compassionate ministry is the belief that in reaching out to the hungry, thirsty, naked, sick and imprisoned, we are actually reaching out to Christ himself" and describing TSA's various religious ministries and charitable works as integral to their religious practice)).

a. <u>RESPONSE</u>: Undisputed that The Salvation Army provides a variety of programs and services to members of the general public, including food pantries, after-school programs, veterans services, homeless shelters and rehabilitations. Undisputed that The Salvation Army views the provision of these services as part of practicing its religion.

5. **One of the ways in which TSA practices its religion is through its Adult Rehabilitation Center ("ARC") programs.** Doc. No. 276-1 (Ex. 1 to Erno Decl. ISO MSJ, ARC Handbook at TSA0000262 ("[T]here is no [TSA] institution or program which better exemplifies the essential religious and charitable mission of the Army than the [ARCs]. By concentrating on those in serious need, through a pervasive program of religious services and counseling, through a work therapy program that is calculated to be character building, the centers represent the very essence of [The Salvation Army's] mission."), at TSA0000273 ("The basic social services developed by William Booth, including those of the Adult Rehabilitation Centers, have remained outward, visible expressions of the Army's strong religious principles."), and at TSA0000282 ("The entire program of an adult rehabilitation center is built on a spiritual motivation – a desire to help men and women as an expression of Divine love. This is the permeating and motivating force behind the work of every officer and staff member connected with the center as they apply a variety of spiritual, social, vocational, educational and counseling technique and approaches . . . . For this to be effective, the Spirit of God must pervade the entire center and all its activities. This is the base on which each

part of the program is built and from which each member of the staff operates.")); Doc. No. 99-1 at 5 (Declaration of Major Beth Muhs ("Major Muhs Decl."), ¶ 14 ("The ARCs are an essential part of The Salvation Army's faith. As one of our most visible ministries, the ARCs are the vehicles whereby Salvation Army Officers practice and preach our religion and express our religious beliefs.")).

a. RESPONSE: Undisputed that TSA asserts that one way TSA practices its religion is through providing social services to members of the general public through ARC programs.

6. **The ARC Handbook is applicable to all TSA ARCs.** Doc. No. 276-1 (Ex. 1 to Erno Decl. ISO MSJ, ARC Handbook at TSA0000262); Doc. No. 276-3 (Ex. 3 to Erno Decl. ISO MSJ, Muhs Dep. Tr. 16:13-23, 30:13-31:9 (confirming the most recent version of the handbook and its applicability to all ARCs in the Eastern Territory)).

a. RESPONSE: Undisputed.

7. **The ARC Handbook is "for the guidance of those who serve God through their work in [ARCs]."** Doc. No. 276-1 (Ex. 1 to Erno Decl. ISO MSJ., ARC Handbook at TSA0000262).

a. RESPONSE: Undisputed that the TSA Handbook includes this statement.

8. **ARC participants are referred to as "beneficiaries."** Doc. No. 276-1 (Ex. 1 to Erno Decl. ISO MSJ, ARC Handbook at TSA0000283).

a. RESPONSE: Undisputed that TSA refers to ARC participants as "beneficiaries."

9. **The ARCs are distinct from many other social service programs run by the TSA in that—while they provide basic human needs like food, clothing, and shelter—the highest priority of the ARCs is to bring the beneficiaries into a personal relationship with God.** Doc. No. 276-1 (Ex. 1 to Erno Decl. ISO MSJ, ARC Handbook at TSA0000262 ("The Salvation Army's distinguishing feature in its rehabilitation services continues to be its strong belief in spiritual regeneration. This spiritual core comes through those Army officers and all others who are privileged to be part of this Salvation Army service.") and at TSA0000283 (the "first and highest priority" of the ARCs "is to bring the beneficiary into a helpful and effective personal relationship with God."))**;** Doc. No. 276-2 (Ex. 2 to Erno Decl. ISO MSJ, Lt. Col. Betts Dep. Tr. 98:11-103:3 (explaining that "within the ARC program we have chosen a very specific religiously-based approach to life's transformation that is dependent upon a particular context to make that work. That context is not necessarily mirrored in any other Salvation Army program context."), 103:21-105:10, 107:13-17 (comparing the ARCs to Sunday morning worship in explaining why some programs may service individuals on medications prohibited at the ARCs without violating TSA's religious beliefs)); Doc. No. 160-4 (Filed Under Seal) (Ex. D to the Declaration of Kathryn Erno in support of TSA's Opposition to Plaintiffs' Motion for Preliminary Injunction ("Erno Decl. ISO PI Opp."), Deposition of Plaintiff Richard Espinosa ("Espinosa Dep. Tr.") 97:22–23 and 98:13 [redacted]).

a. RESPONSE:

i. Disputed as to ARCs being "distinct" from many other social services programs run by TSA. TSA provides many other social services programs that TSA views as being "religious in the same way as the ARC[s]." Doc. No. 276-2 (Ex. 2 to Erno Decl. ISO MSJ, Lt. Col. Betts Dep. Tr. 99:12-20).

ii. Disputed as to comparison of "ARCs to Sunday morning worship" in parenthetical regarding James Betts's deposition. In his deposition, Betts mentioned Sunday morning worship in explaining that members of the Salvation Army Church may practice their faith in different ways in different contexts. Doc. No. 276-2 (Ex. 2 to Erno Decl. ISO MSJ, Lt. Col. Betts Dep. Tr. 104:7-12 ("[T]he way our faith tradition plays out on a Sunday morning during worship service is completely different than how it plays out on a Wednesday soup kitchen. There's different contexts.")). He does not compare ARCs to Sunday morning worship or suggest that they are similar contexts for TSA's religious practice.

10. **TSA considers the ARCs to be "residential churches."** Doc. No. 276-6 (Ex. 6 to Erno Decl. ISO MSJ, SOAR: Standards of Adult Rehabilitation ("SOAR") at TSA0004200 ("The ARC ministry is a residential church program"); Doc. No. 276-3 (Ex. 3 to Erno Decl. ISO MSJ, Muhs Dep. Tr. 76:19-77:23 (explaining that the SOAR document applies to the ARCs in the Eastern Territory)); Doc. No. 160-8 (Ex. H to Erno Decl. ISO PI Opp., Deposition of Reverend Donald Coombs, Director of Program Development for ARC Command ("Rev. Coombs Dep. Tr.") 76:1-7); Doc. No. 276-5 (Ex. 5 to Erno Decl. ISO MSJ, Rev. Coombs Dep. Tr. 21:14-16); Doc. No. 276-2 (Ex. 2 to Erno Decl. ISO MSJ, Lt. Col. Betts Dep. Tr. 85:24-86:19, 88:2-89:8).

a. RESPONSE: Undisputed that TSA asserts the ARCs are "residential churches." Disputed to the extent the statement implies anything about ARC participants or programs. ARC participants are *not* members of the Salvation Army church. ARC housing and services are available to members of the general public without regard to religion. Doc. No. 141-2 (Ex. B to Salazar Decl. ISO PI Mot., Betts Dep. Tr. 85:3-6 (confirming that "[m]ost ARC participants are not members of the Salvation Army church"), 85:7-11 (stating that a "miniscule" percentage of ARC participants, probably "less than one percent," are members of the Salvation Army Church), 85:12-14 (explaining that some ARC participants "become members as a part of their participation, but that is not required nor forced")); Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 34:3-11 (confirming that "participation in a Salvation Army program" does not "make someone a salvationist," which is a "Salvation Army church member[]"), 35:10-15 (agreeing that "the Salvation Army doesn't give any preferences for admissions to the ARCs" and "[m]ost ARC participants are not salvationists"), 38:13-15 ("the Salvation Army policies do not discriminate on the basis [of] religion"), 39:14-17 ("ARCs are open to all people regardless of religion."), 62:13-15 (agreeing that "The Salvation Army admits

participants to ARCs regardless of religion"), 75:3-5 (ARC participants are "not members of the Salvation Army.")); Doc. No. 141-4 (Ex. D to Salazar Decl. ISO PI Mot., Swistak Dep. Tr. 31:5-1 ("If what you're asking is do [ARC participants] need to be a Christian, absolutely not. Whatever you may believe to be true in your faith you're certainly welcome in our center."), 111:15-112:7 (discussing that ARCs permit participants to practice other religions, including Islam)); Doc. No. 141-9 at 3 (Ex. 105 to Salazar Decl. ISO PI Mot., Printout of The Salvation Army National Website's "Adult Rehabilitation Services" Page ("The Salvation Army is committed to accommodating all those in need without unlawful discrimination or harassment based on age, race, color, religion, sex, national origin, marital status, disability, citizenship, sexual orientation, gender identity, gender expression, or any other characteristic in accordance with our capacity to help.")).

11. **TSA ARC beneficiaries must acknowledge that The Salvation Army is a church and agree to participate in religious activities as a condition of their participation in the ARC program**. Doc. No. 276-1 (Ex. 1 to Erno Decl. ISO MSJ, ARC Handbook at TSA0000282 ("Spiritual care includes individual and group spiritual counseling and attendance at religious services, bible classes and intentional modeling of Christian lifestyle by members of the center staff. The center requires each beneficiary to participate in all religious and spiritual activities and thus provides the opportunity for each beneficiary to gain full insight into spiritual values."), at TSA0000338 (describing "Spiritual Development" for beneficiaries at the ARCs)), at TSA0000341-342, at TSA0000343 (describing required religious activities), and at TSA0000400 (Beneficiary's Admittance Statement, whereby beneficiaries acknowledge, *inter alia*, "that The Salvation Army is a branch of the Christian church and a charitable organization and that this Adult Rehabilitation Center is a Christian religious facility" and agree, *inter alia*, "to participate in all religious services and program events.")).

    a. <u>RESPONSE</u>: Undisputed.

12. **Beneficiaries have a spiritual counselor while enrolled in the ARC program with whom they meet at least bi-weekly**. Doc. No. 276-1 (Ex. 1 to Erno Decl. ISO MSJ, ARC Handbook at TSA0000346-348 (describing bi-weekly "Individual Spiritual Counseling" as "the key to the center's entire rehabilitation program")).

    a. <u>RESPONSE</u>: Undisputed.

13. **TSA's ARC program includes chapel services, daily devotions, Bible Study, activities at the corps community center and spiritual counseling**. Doc. No. 276-1 (Ex. 1 to Erno Decl. ISO MSJ, ARC Handbook at TSA0000338).

    a. <u>RESPONSE</u>: Undisputed.

14. **TSA's ARC programs are overseen by Officers of TSA who are commissioned ministers of the Gospel or other religiously trained personnel.** Doc. No. 99-1 at 4 (Major Muhs

Decl., ¶ 15); Doc. No. 276-1 (Ex. 1 to Erno Decl. ISO MSJ, ARC Handbook at TSA0000291).

a. RESPONSE: Undisputed.

15. **TSA's ARCs are not licensed treatment facilities.** Doc. No. 276-1 (Ex. 1 to Erno Decl. ISO MSJ, ARC Handbook at TSA0000281); Doc. No. 160-3 at 4, 5 (Ex. C to Erno Decl. ISO PI Opp., Major Muhs Dep. Tr. 44:21-25, 91:13-25); Doc. No. 160-4 at 44-45 (Filed Under Seal) (Ex. D to Erno Decl. ISO PI Opp., Espinosa Dep. Tr. 97:22-23 and 98:11-13 [redacted]).

a. RESPONSE: Undisputed.

16. **A core tenet of The Salvation Army's religious beliefs is abstinence from alcohol and addictive substances.** Doc. No. 106-2 (Filed Under Seal) (Declaration of Major Beth Muhs in Support of TSA Opposition to Plaintiffs' Motion to Compel ("TSA MTC Opp."), ¶¶ 7-12, [redacted]); Doc. No. 99-1 at 4 (Major Muhs Decl. ISO MTC Opp., ¶¶ 1-12 (explaining, as a fourth generation Salvationist, that the religious belief that members should be "'sober-minded'" "are published tenets of the religion and have been a cornerstone of Salvationist faith since the organization was founded by William Booth in 1865 to minister to the least fortunate in the slums of East London, many of whom suffered from the effects of alcoholism")); Doc. No. 38-1 at 5 (Lt. Col. Gensler Decl., ¶ 23 ("Abstaining from alcohol and intoxicants is an essential tenet of the religion of The Salvation Army, and has been part of the religious underpinnings of the organization since its founding in the 19th century.")).

a. RESPONSE: Undisputed.

17. **TSA also sincerely believes that abstinence and the power of God unto salvation is the only form of successful rehabilitation.** Doc. No. 276-1 (Ex. 1 to Erno Decl. ISO MSJ, ARC Handbook at TSA0000409 (The Salvation Army's Position on Alcohol and Drugs, recognizing that "many drugs beneficial to health can produce addiction. . . . [o]nly the physician can weigh the advantages and risks" of prescriptions; TSA "still believes that total abstinence is the only successful course open to an addict" and "the power of God unto salvation has proved the most effective agent of character change and therefore the most effective force in rehabilitation.")); Doc. No. 106-2 (Filed Under Seal) (Major Muhs Decl. TSA MTC Opp., ¶¶ 7-12, at [redacted]

[redacted]).

a. RESPONSE: Disputed as to characterization of evidence from the ARC Handbook. The portion of the quoted text regarding rehabilitation through abstinence and the power of God refer to "the treatment of alcoholism," not to taking prescription medications. Doc. No. 276-1 at 151 (Ex. 1 to Erno Decl. ISO MSJ, ARC Handbook ("While attitudes toward both the cause and treatment of alcoholism have changed radically in the past 100 years, The Salvation Army, which maintains large treatment programs in many parts of the world, still believes that total abstinence is the only successful course open to an addict.")).

18. **Consistent with its sincerely held religious beliefs, TSA requires that, as a condition of participation, beneficiaries abstain from alcohol and drugs, including prescription drugs that are known to be abusive and addictive.** Doc. No. 276-5 (Ex. 5 to Erno Decl. ISO MSJ, Rev. Coombs Dep. Tr. 41:11-42:14, 54:13-55:16 (explaining that the medication policy prohibits drugs "known to be abusive and addictive" and referencing an earlier version of the medication guide, previously filed with the Court as Doc. No. 141-13 at 4 (Ex. 116 to Declaration of Christine Salazar in Support of Plaintiffs' Motion for Preliminary Injunction ("Salazar Decl. ISO PI"), Eastern Territory ARC Medication Reference Guide, TSA0000435))); Doc. No. 276-1 (Ex. 1 to Erno Decl. ISO MSJ, ARC Handbook at TSA0000304 ("The no drinking, no-drugs rule is standard for every center and for all persons who live in the center.")); Doc. No. 99-1 at 5 (Major Muhs Decl., ¶ 15 (explaining that "Salvation Army Officers oversee the Eastern Territory ARC Command and set policies and procedures, including Territory-wide policies regarding the use of various medications by beneficiaries of the ARCs based on scripture and The Salvation Army's religious beliefs.") and ¶ 23 ("Consistent with Salvationist belief, the medication policy implemented at all ARCs within the Eastern Territory prohibits use of certain medications with addictive properties, including methadone and buprenorphine, but allows alternative medications, such as naltrexone/Vivitrol (which is a non-narcotic, non-addictive medication used for treatment of opioid use disorder if appropriate conditions are met.")); Doc. No. 38-1 at 6 (Lt. Col. Gensler Decl., ¶ 25 ("The policy prohibiting use of intoxicants or mind-altering substances, including illicit drugs, alcohol, and even narcotic or addictive prescription medications, is based in part on [TSA's] long-standing religious beliefs.")); Doc. No. 276-2 (Ex. 2 to Erno Decl. ISO MSJ, Lt. Col. Betts Dep. Tr. 35:19-36:5 (testifying that the medication policies "are questions of theology . . . of Christian belief and how we approach our program in general")); Doc. No. 276-6 (Ex. 6 to Erno Decl. ISO MSJ, SOAR at TSA0004176 ("We don't allow medications that are known as substances of abuse (i.e., narcotics).")); Doc. No. 276-3

(Ex. 3 to Erno Decl. ISO MSJ, Muhs Dep. Tr. 76:19-77:23 (explaining that the SOAR document applies to the ARCs in the Eastern Territory)).

a. RESPONSE: Disputed. TSA allows ARC participants to take certain prescribed "narcotic" medications and medications that it acknowledges "have the possibility of abuse." Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 71:3-72:10, 72:22-25 ("There are some prescribed narcotics that … ARC participants can use and can be stored at the ARCs."), 92:24-93:14, 98:6-23, 103:6-104:13 ("[T]he Salvation Army does permit ARC participants to use some medications that have the possibility of abuse."), 123:21-125:5 (allowing ARC participants to use gabapentin for some uses, even though it "can be abused"), 207:21-25 (an ARC "is able to accommodate participants who have prescription medications that are permitted by the medication policy that they can self administer.")); Doc. No. 141-10 at 7 (Ex. 106 to Salazar Decl. ISO PI Mot., TSA ARC Center Guidelines for Posting (allowing "[p]rescribed narcotics" at ARCs if approved by Administrators)); Doc. No. 141-5 (Ex. E to Salazar Decl. ISO PI Mot., Coombs Dep. Tr. 55:20-56:7 (allowing ARC participants to take Sudafed, which can be abused), 74:22-75:4 (allowing ARC participants to take narcotic medications, which can be abused, for pain or surgery), 72:18-73:8, 78:15-79:16 (allowing Seroquel, which TSA recognizes "has been" "misuse[d]"), 84:9-21 (allowing Librium), 131:12-134:7 (allowing gabapentin, including for long-term use, even though TSA recognizes that people misuse it to "get high"), 107:14-108:4 (allowing loperamide, which can be "fatal" if combined with other medications and "misused"), 109:6-110:10 (allowing trimipramine, which can be abused)); Doc. No. 141-13 at 5 (Ex. 116 to Salazar Decl. ISO PI Mot., TSA ARC Medication Guide (highlighting Sudafed as an "over the counter medication allowed in the ARC to treat common ailments")); Doc. No. 141-4 (Ex. D to Salazar Decl. ISO PI Mot., Swistak Dep. 37:2-18, 39:6-21, 42:21-44:14, 62:10-20 (allowing ARC participants to take "analgesic for pain that was a narcotic" "as long as they're closely monitored")); Doc. No. 141-51 at 2 (Ex. L to Salazar Decl. ISO PI Mot., Email Thread from February 10, 2021 (gabapentin permitted case-by-case despite TSA's "concern" of potential risks)); Doc. No. 141-52 at 2 (Ex. M to Salazar Decl. ISO PI Mot., Email from May 3, 2021 (same)). TSA also allows ARC participants to use nicotine. Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 74:14-75:9 (acknowledging that nicotine is an "addictive" substance that "can be abused," but that ARC participants are allowed to use nicotine because "[t]hey're not members of the Salvation Army" and "[a]llowing ARC participants to use nicotine doesn't prevent salvationists from practicing their religion"), 109:24-110:18 (confirming that "the Salvation Army can continue to practice its religion while allowing ARC participants to use nicotine," even though nicotine is "a drug" and Salvationists are required to abstain.)); Doc. No. 141-4 (Ex. D to Salazar Decl. ISO PI Mot., Swistak Dep. Tr. 70:17-71:7 (providing that "ARC participants are permitted to use nicotine," because "the individuals are going through enough"), 73:19-74:19 (acknowledging that "nicotine is addictive," but explaining that it is permitted at ARCs despite the "abstinence-based rehabilitation program" to avoid "undue stress" on participants)).

19. **TSA's religious-based medication policy prohibits the use of nearly one hundred medications, which can be used to treat a variety of medical conditions.** Doc. No. 141-16 at 4-6 (Ex. 119 to Salazar Decl. ISO PI, TSA ARC Medication Guide at TSA0003470-3472 (prohibiting Xanax (typically used for anxiety and panic disorders), Adderall (typically used for ADD/ADHD and narcolepsy), and Klonopin (typically used for seizures, anxiety, and panic disorders)); Doc. No. 276-5 (Ex. 5 to Erno Decl. ISO MSJ, Rev. Coombs Dep. Tr. 99:7-24 (testifying that Ex. 119 is the updated medication guide)).

    a. <u>RESPONSE</u>: Disputed. TSA's medication policy lists medications as "not typically allowed," and TSA does allow ARC participants to take some such medications in certain case-by-case circumstances. *See* Doc. No. 141-16 at 5, 12 (Ex. 119 to Salazar Decl. ISO PI, The Salvation Army Adult Rehabilitation Center Medication Guide (categorizing buprenorphine and methadone as medicines whose use are "Not Typically Allowed" in ARCs)); Doc. No. 147 (Declaration of Shawn Arcidiacono ISO PI Mot., ¶¶9-11 (explaining that Mr. Arcidiacono was permitted to use Suboxone "during the first few days of [his] stay at the ARC," and transported by the Sergeant-Major "in her car to a clinic to refill [his] Suboxone prescription, which at the time was in the form of sublingual strips. There was no problem with [him] continuing [his] daily Suboxone, and the ARC did not need to give [him] any special care that it didn't provide to other ARC participants.")); Doc. No. 141-5 (Ex. E to Salazar Decl. ISO PI Mot., Coombs Dep. Tr. 15:21-16:19 (providing that the Eastern Territory ARC has made an "exception" to the no methadone policy for a "gentleman who needed [methadone] … as a pain medication."), 104:5-106:15 (confirming that "there are circumstances where an ARC participant could use buprenorphine not for opioid use disorder, but for some other reason" and that is "also true of methadone")); Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 122:2-123:11 ("CARES Assessment is when an applicant … ha[s] some questions on whether it is medication, mental health or something else that may be above our capacity so it is sent to headquarters to Dr. Coombs who goes over that and then makes the recommendation if we're the correct program or if they need a different type of program.")).

20. **TSA's religious-based medication policy is directed at specific medications; the medication policy is not directed at medical conditions themselves, or at treatments for medical conditions that do not include the use of the prohibited medications.** Doc. No. 141-16 (Ex. 119 to Salazar Decl. ISO PI, TSA ARC Medication Guide).

    a. <u>RESPONSE</u>: Disputed. The TSA ARC Medication Guide provides a list of medications, along with their typical usage and whether they are "allowed," "deserve caution," and are "not typically allowed." Doc. No. 141-16 (Ex. 119 to Salazar Decl. ISO PI, TSA ARC Medication Guide). The guide does not explain whether the medication policy is "directed at specific medications," "at medical conditions," or "at treatments for medical conditions that do not include the use of the prohibited medication." Moreover, Dr. Coombs testified that TSA categorically prohibits people with Opioid Use Disorder (OUD) from accessing methadone or buprenorphine

medication for opioid use disorder (MOUD), but ARC participants with other conditions may be permitted to access those same medications. Doc. No. 141-5 (Ex. E to Salazar Decl. ISO PI Mot., Coombs Dep. Tr. 15:21-16:19 (providing that the Eastern Territory ARC has made an "exception" to the no methadone policy for a "gentleman who needed [methadone] … as a pain medication."), 104:5-106:15 (confirming that "there are circumstances where an ARC participant could use buprenorphine not for opioid use disorder, but for some other reason" and that is "also true of methadone")).

21. **Beneficiaries or ARC applicants who are prescribed, actively taking, and plan to continue to take one of the prohibited medications are to be referred to a clinical program or healthcare provider.** Doc. No. 207 at 1-2 (Declaration of Reverand Donald Coombs ("Rev. Coombs Decl."), ¶¶ 1-4 (explaining that when a prospective or current beneficiary has medical needs beyond what the ARC program can provide they are referred to a "higher level of care")); Doc. No. 141-18 (Ex. 124 to Salazar Decl. ISO PI, CARES Assessment PowerPoint Presentation ("CARES Presentation")); Doc. No. 276-5 (Ex. 5 to Erno Decl. ISO MSJ, Rev. Coombs Dep. Tr. 129:21-131:9 (testifying that the CARES Presentation describes the "CARES" process at the ARCs) and 29:14-30:22 (explaining that "higher level of care" means a clinical program or healthcare provider)); Doc. No. 141-16 (Ex. 119 to Salazar Decl. ISO PI, TSA ARC Medication Guide (listing medications that are not allowed and typically require a higher level of care)).

    a. <u>RESPONSE</u>: Disputed. TSA's medication policy lists medications as "not typically allowed," Doc. No. 141-16 (Ex. 119 to Salazar Decl. ISO PI, TSA ARC Medication Guide), and TSA does allow ARC participants to take some such medications other than MOUD for OUD in certain case-by-case circumstances. Doc. No. 141-5 (Ex. E to Salazar Decl. ISO PI Mot., Coombs Dep. Tr. 15:21-16:19 (providing that the Eastern Territory ARC has made an "exception" to the no methadone policy for a "gentleman who needed [methadone] … as a pain medication."), 104:5-106:15 (confirming that "there are circumstances where an ARC participant could use buprenorphine not for opioid use disorder, but for some other reason" and that is "also true of methadone")). Moreover, in many cases individuals who are taking prescribed medication for opioid use disorder are not referred to any other clinical program or healthcare provider but rather are discharged from an ARC or prohibited access without any referral. Doc. No. 141-22 (Ex. 133 to Salazar Decl. ISO PI Mot., "Massachusetts/Rhode Island ARC Referral List" (providing that the Worcester ARC "doesn't have a specific place [to] refer people" that are taking MOUD)); Doc. No. 144 (Declaration of Mark Tassinari (Tassinari Decl. ISO PI Mot., ¶¶22-24 (Tassinari was "terminated … from participation in the ARC program" after testing positive for doctor-prescribed buprenorphine, which "forced [him] into the streets" as he did not have another option)); Doc. No. 146 (Declaration of Joseph Almeida (Almeida Decl. ISO PI Mot., ¶21 (Almeida was informed by the Saugus ARC that he "could not go to any of The Salvation Army ARC locations while taking, or weaning off, doctor prescribed methadone."), ¶22 ("[N]o Salvation Army ARC campus will admit anyone who is receiving methadone treatment."), ¶¶ 23-25 ("The Salvation Army did not

offer me any accommodations and did not offer me any other options to continue methadone at the ARC.”)).

22. **Two medications that TSA prohibits at its ARCs due to the religious-based medication policy are buprenorphine and methadone—two out of three medications used to treat opioid use disorder.** Doc. No. 141-16 (Ex. 119 to Salazar Decl. ISO PI, TSA ARC Medication Guide); Doc. No. 38-1 at 6 (Lt. Col. Gensler Decl., ¶ 26 (“The religious-based medication policy implemented at all ARCs within the Eastern Territory prohibits use of certain medication-assisted treatment (“MAT”), including methadone and buprenorphine, but allows alternative medications, such as vivitrol (which is a non-narcotic, non-addictive medication used for treatment of opioid use disorder if appropriate conditions are met.”))); Doc. 99-1 at 3-4, 6 (Major Muhs Decl., ¶¶ 9-14, 22-23 (same)); Doc. No. 160-3 (Ex. C to Erno Decl. ISO PI Opp., Major Muhs Dep. Tr. 110:19-111:6 (testifying that TSA could not continue to practice its religion if ARC participants were allowed to use methadone because “[o]f our religion of abstinence and being a drug-free house”) and 109:13-23 (testifying that allowing Sublocade would affect the practice of TSA’s religion “[b]ecause we ask for abstinence for our religious beliefs”); Doc. No. 276-3 (Ex. 3 to Erno Decl. ISO MSJ, Major Muhs Dep. Tr. 113:25-114:5 (permitting Sublocade would “effect the ARCs” because “[w]e would not be an abstinence program.”)); Doc. No. 276-2 (Ex. 2 to Erno Decl. ISO MSJ, Lt. Col. Betts. Dep. Tr. 82:23-83-85:2 (testifying that “the most important reason” for prohibiting buprenorphine at the ARCs is “our religious beliefs” and elaborating that the Salvationist belief in “true deliverance” cannot happen when beneficiaries go from “one narcotic to another”)); Doc. No. 162 at 1, 3 (Declaration of Captain Constance Graham, Administrator at the Springfield ARC (“Captain Graham Decl.”), ¶¶ 1, 12 (“our religious based medication policy . . . prohibits use of certain drugs that are known to be addictive” including Suboxone. “Suboxone is a narcotic and using Suboxone ot treat opioid use disorder is, in my and The Salvation Army’s religious beliefs, simply replacing one narcotic with another.”)).

    a. RESPONSE: Undisputed.

23. **Buprenorphine is a Schedule III drug under the Controlled Substances Act.** Doc. No. 276-7 (Ex. 7 to Erno Decl. ISO MSJ (U.S. Drug Enforcement Agency (“DEA”) Drug & Chemical Evaluation Section re: Buprenorphine, dated March 2025, https://www.deadiversion.usdoj.gov/drug_chem_info/buprenorphine.pdf).

    a. RESPONSE: Undisputed.

24. **Methadone is a Schedule II drug under the Controlled Substances Act.** Doc. No. 276-8 (Ex. 8 to Erno Decl. ISO MSJ, DEA Drug & Chemical Evaluation Section re: Methadone, dated March 2025, https://www.dea.gov/sites/default/files/2020-06/Methadone-2020.pdf).

    a. RESPONSE: Undisputed.

25. **Both buprenorphine and methadone are “Not Typically Allowed” at TSA’s ARCs for both “Pain” and “Opioid Dep[endency],” which are their only indicated uses.** Doc. No.

141-16 at 5, 12 (Ex. 119 to Salazar Decl. ISO PI, TSA ARC Medication Guide at TSA0003471, 3478).

a. RESPONSE: Undisputed that TSA' medication policy states these medications are "Not Typically Allowed" for pain or opioid dependency. Disputed to the extent the statement implies that TSA treats these medications the same for those two uses. TSA categorically prohibits access to methadone or buprenorphine for people with opioid use disorder. Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 8:4-9:13, 11:15-22 (MOUD "is something we do not allow in the ARC[s]."), 60:16-19, 85:13-25, 87:5-13, 93:21-24 (confirming that "buprenorphine and methadone are listed as not allowed medications"), 98:24-101:14 (agreeing that "there are no exceptions to the no methadone no buprenorphine [rule] for ARC participants"; "not typically allowed … means not ever allowed"), 167:10-22 (agreeing that "there have been no instances in which a person was allowed to participate in an ARC while taking methadone or buprenorphine"), 177:12-20 (explaining that ARC participants prescribed buprenorphine or methadone "would be discharged" from the program); Doc. No. 141-13 at 9 (Ex. 116 to Salazar Decl. ISO PI Mot., TSA ARC Medication Guide (classifying Methadone and Suboxone as "Not Allowed")); Doc. No. 141-15 at 4-5, 10 (Ex. 118 to Salazar Decl. ISO PI Mot., TSA ARC Medication Guide (highlighting both methadone and buprenorphine in red to classify them as "Not Allowed")); Doc. No. 141-16 at 5 (Ex. 119 to Salazar Decl. ISO PI Mot., TSA ARC Medication Guide (classifying Methadone and Suboxone as "Not Typically Allowed")); Doc. No. 38-1 (Declaration of Lt. Colonel Dennis Gensler (Lt. Col. Gensler Decl.)), ¶20 (explaining that ARCs are only open to individuals who commit to "not engage in the use of alcohol or drugs, including narcotic or addictive prescription medications. The specific medications that are prohibited are set forth in a medication policy that applies only to the ARCs operated by the New York Corporation."), ¶26 (providing that all Eastern Territory ARCs "prohibit[] use of certain medication-assisted treatment ("MAT"), including methadone and buprenorphine, but allow[] alternative medications, such as vivitrol")); Doc. No. 141-2 (Ex. B to Salazar Decl. ISO PI Mot., Betts Dep. Tr. 92:3-93:18 (confirming that "the ARC participants are not allowed to use methadone" and that Suboxone (which contains buprenorphine) "is part of a class that we do not allow within the program.")); Doc. No. 197-30 (Ex. 330 to Salazar Supp. Decl. ISO PI Mot., Email thread between Sherri Sinpunpakd, Springfield ARC lead counselor, and Dominick Ciuffreda, case worker at Hampden County Sherriff's Department (ARC counselor responding to referral from case worker: "methadone would be a no go for us, no matter what")).

But TSA may permit ARC participants with other conditions to access those same medications, for example for pain. Doc. No. 141-5 (Ex. E to Salazar Decl. ISO PI Mot., Coombs Dep. Tr. 15:21-16:19 (providing that the Eastern Territory ARC has made an "exception" to the no methadone policy for a "gentleman who needed [methadone] … as a pain medication."), 104:5-106:15 (confirming that "there are

circumstances where an ARC participant could use buprenorphine not for opioid use disorder, but for some other reason" and that is "also true of methadone")).

26. **Naltrexone/Vivitrol, a third medication prescribed to treat opioid use disorder, is permitted at TSA's ARCs because it is not a narcotic and is not addictive.** Doc. No. 99-1 at 7 (Major Muhs Decl. ¶ 23 (explaining that naltrexone/Vivitrol is allowed because it is a non-narcotic)); Doc. 160-3 (Ex. C to Erno Decl. ISO PI Opp., Major Muhs Dep. Tr. 93:12-16 (same)); Doc. No. 38-1 at 6 (Lt. Col. Gensler Decl.,¶ 26 (same)); Doc. No. 141-16 at 13 (Ex. 119 to Salazar Decl. ISO PI, TSA ARC Medication Guide at TSA0003479 (listing naltrexone as "allowed")).

    a. RESPONSE: Undisputed.

27. **Individuals with opioid use disorder are welcomed into TSA's ARC program if they are otherwise qualified and agree to abide by the rules that apply to all beneficiaries, including the medication policy.** Doc. No. 276-6 (Ex. 6 to Erno Decl. ISO MSJ, SOAR at TSA0004176 (describing the ARCs "wide open doors" admissions policy)); Doc. No. 160-7 (Ex. G to Erno Decl. ISO PI Opp., ARC Discharge Summary (showing 941 individuals who identify opiates as their primary drug abused were admitted to the program between 5/1/2008 and 4/17/2023)); Doc. No 38-1 at 4, 5 (Lt. Col. Gensler Decl., ¶ 17 ("The ARCs do not limit admission to, or otherwise target, persons who suffer from problems related to drugs or alcohol. Rather, the ARC programs are designed to provide for the spiritual and social rehabilitation of disaffiliated persons generally.") and ¶ 20 ("The ARC programs are open to individuals who are willing to comply with various Christian-based requirements of the program and who are otherwise eligible for admission. These requirements include attending religious services twice per week, undergoing spiritual counseling, and committing to not engage in the use of alcohol or drugs, including narcotic or addictive prescription medications.")).

    a. RESPONSE: Disputed. Individuals with opioid use disorder are banned from ARC housing or services if they take prescribed methadone or buprenorphine in accordance with their healthcare provider's treatment plan, even if they access those medications outside the ARCs. Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 89:24-91:8, 95:13-15 (confirming that an ARC has never "permitted a participant to use methadone or buprenorphine")); Doc. No. 141-5 (Ex. E to Salazar Decl. ISO PI Mot., Coombs Dep. Tr. 59:4-23 (agreeing that ARC participants are "not allowed" to take methadone or suboxone "to treat opioid dependency")); Doc. No. 144 (Declaration of Mark Tassinari (Tassinari Decl. ISO PI Mot., ¶¶14-17 (explaining that TSA prohibited Tassinari from seeing a doctor when he first joined the ARC, but after a month, when his "need to see a doctor to refill [his] prescriptions became critical," he was permitted to see a physician), ¶18 (stating that Tassinari's doctor prescribed him self-administered buprenorphine due to "concerns for [his] health"), ¶¶21-23 (recounting immediate termination of Tassinari's ARC participation following a positive urinalysis for his doctor-prescribed buprenorphine, leaving him unhoused)); Doc. No. 145 (Declaration of Richard Espinosa (Espinosa Decl. ISO PI Mot., ¶18

("The Salvation Army staff refused to let me access the medication I needed, [and] did not arrange for any medical assessment")); Doc. No. 146 (Declaration of Joseph Almeida (Almeida Decl. ISO PI Mot., ¶8 ("I asked if I could restart my methadone treatment for OUD when I arrived at the Saugus ARC and the Salvation Army staff told me I couldn't.")); Doc. No. 232-1 (Ex. A to Salazar Decl. ISO CCert. Mot., Mangiacarne Dep. Tr. 44:19-45:19 (confirming that individuals living "outside of a licensed clinical facility" can receive MOUD)).

Individuals who previously took prescribed methadone or buprenorphine for opioid use disorder are also banned from accessing ARCs for a period of time, even if they are no longer taking the medication. ARC intake officers tell callers they must stop taking their medication and undergo "detox" period before accessing ARC housing or services. Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 119:9-22 (confirming that an applicant who tests positive for methadone or buprenorphine will not be admitted unless they first attend a "detoxification facility")); Doc. No. 141-4 (Ex. D to Salazar Decl. ISO PI Mot., Swistak Dep. Tr. 58:15-17 (explaining that individuals who have used Suboxone "do detox before they come" to an ARC)); Doc. No. 145 (Declaration of Richard Espinosa (Espinosa Decl. ISO PI Mot., ¶12 ("The Salvation Army told me that I would have to detox before joining the ARC program")). Individuals with opioid use disorder are barred from ARC housing and services if they received a Sublocade injection up to a year in the past, even if they are no longer taking methadone or buprenorphine. Doc. No. 197-23 at 2 (Ex. 323 to Salazar Supp. Decl. ISO PI Mot., Email Thread Between Joseph Siejk, Harrisburg ARC intake coordinator, and Christina McLeod-Worthy (stating that an applicant "would need to come off Suboxone" prior to entry into the ARC, and that if he had received a "sublocade injection … within the past 11 months, [the ARC] would not be able to take him.")); Doc. No. 197-27 (Ex. 327 to Salazar Supp. Decl. ISO PI Mot., Email Thread Between Joseph Siejk, Harrisburg ARC intake coordinator, and Bonnie J. Campbell (providing that an applicant for an ARC would "have to be we[a]ned off the suboxone," before admission, and that receiving a sublocade injection "within the past year" would also disqualify the applicant)).

28. **Buprenorphine and methadone can be and are abused.** *See* Doc. No. 160-4 (Filed Under Seal) (Ex. D to Erno Decl. ISO PI Opp., Espinosa Dep. Tr. 102:23-103:9 [redacted]); Doc. No. 276-9 (Ex. 9 to Erno Decl. ISO MSJ, Deposition of Joseph Almeida ("Almeida Dep. Tr.") 39:1-23 [redacted]); *see also* Doc. No. 160-10 (Filed Under Seal) (Ex. J to Erno Decl. ISO PI Opp., Plaintiff Almeida's medical records from 9/22/2020 [redacted]); Doc. No. 160-11 (Filed Under Seal) (Ex. K to Erno Decl. ISO PI Opp., Plaintiff Tassinari's medical records from Brockton Hospital, July 30, 2020 [redacted]

[redacted]); Doc. No. 160-1 (Filed Under Seal) (Ex. A to Erno Decl. ISO PI Opp., Deposition of Plaintiff Tassinari, 50:17-19 [redacted]).

a. RESPONSE: Undisputed that these medications, like other medications, can be misused.

29. **Methadone and buprenorphine are physically addictive.** Doc. No. 143 (Declaration of Plaintiffs' Expert Witness, Dr. Claudia Rodriguez, ¶¶ 23-29).

a. RESPONSE: Disputed. Methadone and buprenorphine can cause physical dependence, which is distinct from addiction. Doc. No. 143 (Declaration of Plaintiffs' Expert Witness, Dr. Claudia Rodriguez, ¶25 ("There is an important distinction between physical dependence and substance use disorder/addiction that is often misunderstood by the public and in non-clinical settings. Physical dependence refers to withdrawal symptoms occurring with abrupt discontinuation of a drug. This can happen with many medications, such as antidepressants, like paroxetine or venlafaxine, and even blood pressure medications, such as propranolol and clonidine. Addiction or substance abuse disorder, by contrast, refers to the compulsive seeking of the drug despite negative consequences. Although some medications for opioid use disorder can cause physical dependence, individuals who take medication for opioid use disorder as prescribed are not addicted to that medication. The diagnosis of substance use disorder/addiction is associated with loss of control, consequences, cravings, and compulsive use which is different than solely becoming physically dependent on a medication. Dependence is not equal to addiction.")).

30. **Long term use of all narcotics by beneficiaries is prohibited at TSA's ARCs.** Doc. No. 141-13 at 8 (Ex. 116 to Salazar Decl. ISO PI, Eastern Territory ARC Medication Guide at TSA0000439); Doc. No. 276-1 (Ex. 1 to Erno Decl. ISO MSJ, ARC Handbook at TSA0000304 ("The no drinking, no-drugs rule is standard for every center and for all persons who live in the center.")); Doc. No. 99-1 at 5 (Major Muhs Decl., ¶ 15 (explaining that "Salvation Army Officers oversee the Eastern Territory ARC Command and set policies and procedures, including Territory-wide policies regarding the use of various medications by beneficiaries of the ARCs based on scripture and The Salvation Army's religious beliefs.") and ¶ 23 ("Consistent with Salvationist belief, the medication policy implemented at all ARCs within the Eastern Territory prohibits use of certain medications with addictive properties, including methadone and buprenorphine, but allows alternative medications, such as naltrexone/Vivitrol (which is a non-narcotic, non-addictive medication used for treatment of opioid use disorder if appropriate conditions are met.")); Doc. No. 38-1 at 6 (Lt. Col. Gensler Decl., ¶ 25 ("The policy prohibiting use of intoxicants or mind-altering substances, including illicit drugs, alcohol, and even narcotic or addictive prescription medications, is based in part on [TSA's] long-standing religious beliefs.")); Doc. No. 160-8 (Ex. H to Erno Decl. ISO PI Opp., Rev. Coombs Dep. Tr. 74:22-75:5 (ongoing use of prescribed narcotic is "beyond the scope" of the ARC program)).

a. RESPONSE: Disputed. None of the evidence cited by Defendant establishes that "long term use" of all narcotics is prohibited. Doc. No. 141-52 (Ex. M to Salazar Decl. ISO PI Mot., Email from May 3, 2021 (gabapentin permitted case-by-case despite TSA's "concern" of potential risks with no mention of restrictions on how long gabapentin use is allowed)); Doc. No. 141-5 (Ex. E to Salazar Decl. ISO PI Mot., Coombs Dep. Tr. 15:21-16:19 (providing that the Eastern Territory ARC has made an "exception" to the no methadone policy for a "gentleman who needed [methadone] … as a pain medication.")).

31. **Short-term use of narcotics, usually for less than a week, may be permitted at TSA's ARCs with approval.** Doc. No. 141-16 at 2 (Ex. 119 to Salazar Decl. ISO PI, TSA ARC Medication Guide at TSA0003468); Doc. No. 276-2 (Ex. 2 to Erno Decl. ISO MSJ, Lt. Col. Betts Dep. Tr. 93:19-94:3); Doc. No. 160-8 (Ex. H to Erno Decl. ISO PI Opp., Rev. Coombs Dep. Tr. 74:22-75:5); Doc. No. 160-3 (Ex. C to Erno Decl. ISO PI Opp., Major Muhs Dep. Tr. 92:24-93:7).

a. RESPONSE: Undisputed that use of narcotics may be permitted at TSA's ARCs with approval. Disputed to the extent the statement implies such permission only applies to "short-term" use or use "usually for less than a week." The cited evidence does not impose a one-week limit on possible exceptions. Doc. No. 141-5 (Ex. E to Salazar Decl. ISO PI Mot., Coombs Dep. Tr. 15:21-16:19 (providing that the Eastern Territory ARC has made an "exception" to the no methadone policy for a "gentleman who needed [methadone] … as a pain medication."), 104:5-106:15 (confirming that "there are circumstances where an ARC participant could use buprenorphine not for opioid use disorder, but for some other reason" and that is "also true of methadone")); Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 93:3-14 (explaining that ARC participants may be permitted to use prescription narcotics on a "temporary" basis, without any definition of "temporary")); Doc. No. 141-2 (Ex. B to Salazar Decl. ISO PI Mot., Betts Dep. Tr. 93:19-25 (confirming that there are "some instances where an ARC participant can use a prescribed narcotic" with approved from command headquarters on a "short-term basis," without specifying the duration of "short-term")); Doc. No. 141-51 at 2 (Ex. L to Salazar Decl. ISO PI Mot., Email Thread from February 10, 2021 ("Our goal is to ensure each center has the capacity to meet the individual needs of the applicant… In regards to gabapentin, we review this on a case by case basis")); Doc. No. 141-52 at 2 (Ex. M to Salazar Decl. ISO PI Mot., Email from May 3, 2021 (gabapentin permitted case-by-case despite TSA's "concern" of potential risks with no mention of restrictions on how long gabapentin use is allowed)).

32. **It is TSA's sincerely held belief based on Salvationist doctrine that long-term use of narcotics to treat addiction is not true rehabilitation and runs contrary to its religious mission and practice at the ARC programs, and that true rehabilitation can only be obtained through abstinence.** Doc. No. 276-2 (Ex. 2 to Erno Decl. ISO MSJ, Lt. Col. Betts Dep. Tr. 82:23-85:2] ("We absolutely believe—we want more for our folks. We want more

for those who we are serving from the perspective of, if I am saying to someone, you are on narcotics. We want to help you get off narcotics, so our answer is to give you another narcotic and call it a day. I don't believe that is good enough for the folks that we serve. We believe deeply that God has a plan to truly transform someone's life, which happens in a longer run and in community and in supportive community, where we have time to work through and allow that heart to change . . . . That is a much deeper process, and one that we don't believe happens in the same way when we are – one narcotic to another narcotic. It's a continued addiction. It's not true deliverance as we would describe it in our religious tradition. We want for them true and complete deliverance.")); Doc. No. 207 at 3 (Rev. Coombs Decl., ¶ 7 ("[F]rom the approximately 28 years I have worked with TSA, I have learned that TSA believes in rehabilitation through abstinence and salvation and practices that religious belief through its ministry to disassociated members of society at its ARCs.")); Doc. No. 99-1 at 8 (Major Muhs Decl., ¶ 26 ("Being forced to do that [permit methadone/buprenorphine] would be completely at odds with our religiously-based view that fostering abstinence is critical to our approach to rehabilitation. Permitting someone to continue to use a narcotic, even if prescribed, is just replacing one narcotic with another in a way that suggests that such a person is not committed to an abstinence-based approach to rehabilitation.")); Doc. No. 162 at 3 (Captain Graham Decl., ¶ 12 ("I would not have discussed any possibility of a beneficiary taking Suboxone at our Center with anyone who would have called, as it is contrary to our religious-based medication policy that prohibits use of certain drugs that are known to be addictive. The Salvation Army's beliefs, and my personal religious beliefs, are that true rehabilitation happens through abstinence. Suboxone is a narcotic and using Suboxone to treat opioid use disorder is, in my and The Salvation Army's religious beliefs, simply replacing one narcotic with another.")); Doc. No. 160-6 (Ex. F to Erno Decl. ISO PI Opp., Lt. Col. Betts Dep. Tr. 29:23-30:6 (permitting methadone or buprenorphine "would be fundamentally a challenge for the Salvation Army and our approach to our ARC programs") and 35:24-36:5 ("[T]hese are questions of theology. These are questions of Christian belief and how we approach our program in general.")); Doc. No. 276-2 (Ex. 2 to Erno Decl. ISO MSJ, Lt. Col. Betts Dep. Tr. 96:6-21 ("I am not sure the Salvation Army would continue to do the program [if required to introduce methadone and/or buprenorphine into its ARCs]. It undermines the whole approach we are taking from a faith tradition to the rehabilitation of someone's life.")); Doc. No. 99-1 at 8 (Major Muhs Decl., ¶ 27 ("I am confident that The Salvation Army would elect to shut down the ARC programs rather than operating them in a way that violates The Salvation Army's spiritual tenets.")); Doc. No. 38-1 (Lt. Col. Gensler Decl., ¶¶ 11-26 (explaining Salvationist beliefs and religious practice at the ARCs, including that "[i]t is the objective of The Salvation Army to make Jesus Christ an integral part of the lives of the beneficiaries, to instill in them a Christian philosophy of life, to teach them habits of industry and thereby make them moral, self-respecting and productive members of society" and that the ARC medication policy prohibiting, *inter alia*, methadone and buprenorphine, is consistent with TSA's religious beliefs and practices)).

a. RESPONSE: Undisputed that TSA's sincerely held belief is that long-term use of narcotics to treat addiction is not true rehabilitation.

33. **TSA ARCs do not receive federal funding**. Doc. No. 106-4 at 1-2 (Declaration of Lieutenant Colonel Hubert S. Steele III, the Secretary for Business Administration of the Eastern Territory ("Lt Col. Hubert S. Steele III Decl."), ¶¶ 2, 4-6 (explaining that the ARCs receive no federal funding and are run at a deficit)).

    a. RESPONSE: Disputed. The ARCs consistently operate at an annual deficit of more than $40 million per year, and TSA makes up for the deficit in ARC operating costs by partially funding ARCs with its general funds from other sources, which include millions of dollars of federal funding a year. Doc. No. 141-2 (Ex. B to Salazar Decl. ISO PI Mot., Betts Dep. Tr. 65:20-66:3 ("[T]he deficit annually of over 42 million dollars is important to remember … what we spend on the ARCs far exceeds any revenue that we receive for that program."), 68:18-23 (the ARC "program overall is run at a deficit and … the territory helps to subsi[dize] that.")); Doc. No. 141-37 at 5 (Ex. 151 to Salazar Decl. ISO PI Mot., The Salvation Army All Centers Net Remittance Report As of 9/30/2021 (ARC annual deficit of $42 million)); Doc. No. 141-2 (Ex. B to Salazar Decl. ISO PI Mot., Betts Dep. Tr. 39:20-40:22 (confirming that remittance report shows "actual income and expense for the [ARCs] within the eastern territory" "from 10/1/2020 to 9/30/2021")); Doc. No. 141-4 (Ex. D to Salazar Decl. ISO PI Mot., Swistak Dep. Tr. 124:21-125:5 (confirming that "the ARCs have operated at a deficit" "for a long time"), 125:9-20 (when asked where "the money come[s] from to make up the deficit," answering that "The Salvation Army has its own kind of stuff. … [T]here are some type of accounts somewhere that are paying other things … that don't have anything to do with the ARC. But the territory comes alongside to help in funding.")); Doc. No. 141-43 at 5-6, 11 (Ex. 165 to Salazar Decl. ISO PI Mot., Mission Support for 12 Months Ending September 30, 2022 ($45 million year to date in "grants from [Salvation Army] units" to ARCs)); Doc. No. 141-4 (Ex. D to Salazar Decl. ISO PI Mot., Swistak Dep. Tr. 136:17-138:8 (identifying Mission Support document as monthly document for administrators concerning "mission support" for "[a]ll the ARCs in the eastern territory")**,** 151:9-11, 152:12-16 (confirming document states that the Boston ARC's "expenses were [$]1,044,126 greater than the income"), 158:12-15, 159:8-10 (confirming document states that "[i]n 2020 [Salvation Army] command headquarters sent [$]1.6 million to Boston"), 163:6-14 (agreeing document states that the "total income expense year to date for all the ARCs was negative $45 million" and "'grants from [other Salvation Army] units' [was] [$]45,600,000 and some dollars")); Doc. No. 141-42 at 2 (Ex. 164 to Salazar Decl. ISO PI Mot., Adult Rehabilitation Center Command Proposed FY 2021 Budget (demonstrating consistent operating deficits of millions of dollars between 2018 and 2021)); Doc. No. 141-4 (Ex. D to Salazar Decl. ISO PI Mot., Swistak Dep. Tr. 132:14-133:3 (identifying document as proposed budget)); Doc. No. 133 (Stipulation Re Section 504 and Joint Report Re Case Schedule, ¶2 (TSA receives federal funding)); Declaration of Nina Harris In Support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment Exs. A & B (summarizing annual federal financial assistance); Doc. No. 141-45 at 7 (Ex. F to Salazar Decl. ISO PI Mot., Consolidated Financial Statements for Salvation Army Eastern Territory for

2020 and 2021 ($1.2 million in "Fees and grants from governmental agencies" in 2021 and $1.13 million in "Fees and grants from governmental agencies" in 2020)); Doc. No. 141-47 at 11, 14 (Ex. H to Salazar Decl. ISO PI Mot., The Salvation Army 2022 Annual Report ($5.9 million in "Fees and Grants from Government Agencies" in 2021 and $4.6 million in "Fees and Grants from Government Agencies" in 2020 for six Salvation Army corporations in the United States)).

34. **TSA ARCs are funded by sales from the thrift stores run by TSA.** Doc. No. 160-6 (Ex. F to Erno Decl. ISO PI Opp., Lt. Col. Betts Dep. Tr. 73:9-16); Doc. No. 106-4 at 1-2 (Lt. Col. Hubert S. Steele III Decl., ¶¶ 2, 4-6).

   a. <u>RESPONSE</u>: Undisputed that ARCs receive funding from sales from thrift stores. Disputed to the extent the statement implies this is the only source of funding for ARCs. ARCs consistently operate at an annual deficit of more than $40 million per year, and TSA makes up for the deficit in ARC operating costs by partially funding ARCs with its general funds from other sources, which include millions of dollars of federal funding a year. Doc. No. 141-2 (Ex. B to Salazar Decl. ISO PI Mot., Betts Dep. Tr. 39:20-40:22, 65:20-66:3 ("[T]he deficit annually of over 42 million dollars is important to remember … what we spend on the ARCs far exceeds any revenue that we receive for that program."), 68:18-23 (the ARC "program overall is run at a deficit and … the territory helps to subsi[dize] that.")); Doc. No. 141-37 at 5 (Ex. 151 to Salazar Decl. ISO PI Mot., The Salvation Army All Centers Net Remittance Report as of 09/30/2021 (ARC annual deficit of $42 million)); Doc. No. 141-4 (Ex. D to Salazar Decl. ISO PI Mot., Swistak Dep. Tr. 124:21-125:5 (confirming that "the ARCs have operated at a deficit" "for a long time"), 125:9-20 (when asked where "the money come[s] from to make up the deficit," answering that "The Salvation Army has its own kind of stuff. … [T]here are some type of accounts somewhere that are paying other things … that don't have anything to do with the ARC. But the territory comes alongside to help in funding.")); Doc. No. 141-43 at 5-6, 11 (Ex. 165 to Salazar Decl. ISO PI Mot., Mission Support for 12 Months Ending September 30, 2022 ($45 million year to date in "grants from [Salvation Army] units" to ARCs)); Doc. No. 141-4 (Ex. D to Salazar Decl. ISO PI Mot., Swistak Dep. Tr. 136:17-138:8 (identifying Mission Support document as monthly document for administrators concerning "mission support" for "[a]ll the ARCs in the eastern territory")**,** 151:9-11, 152:12-16 (confirming document states that the Boston ARC's "expenses were [$]1,044,126 greater than the income"), 158:12-15, 159:8-10 (confirming document states that "[i]n 2020 [Salvation Army] command headquarters sent [$]1.6 million to Boston"), 163:6-14 (agreeing document states that the "total income expense year to date for all the ARCs was negative $45 million" and "'grants from [other Salvation Army] units' [was] [$]45,600,000 and some dollars")); Doc. No. 141-42 at 2 (Ex. 164 to Salazar Decl. ISO PI Mot., Adult Rehabilitation Center Command Proposed FY 2021 Budget (demonstrating consistent operating deficits of millions of dollars between 2018 and 2021)); Doc. No. 141-4 (Ex. D to Salazar Decl. ISO PI Mot., Swistak Dep. Tr. 132:14-133:3 (identifying document as proposed budget)); Doc. No.

133 (Stipulation Re Section 504 and Joint Report Re Case Schedule, ¶2 (TSA receives federal funding)); Declaration of Nina Harris In Support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment Exs. A & B (summarizing annual federal financial assistance); Doc. No. 141-45 at 7 (Ex. F to Salazar Decl. ISO PI Mot., Consolidated Financial Statements for Salvation Army Eastern Territory for 2020 and 2021 ($1.2 million in "Fees and grants from governmental agencies" in 2021 and $1.13 million in "Fees and grants from governmental agencies" in 2020)); Doc. No. 141-47 at 11, 14 (Ex. H to Salazar Decl. ISO PI Mot., The Salvation Army 2022 Annual Report ($5.9 million in "Fees and Grants from Government Agencies" in 2021 and $4.6 million in "Fees and Grants from Government Agencies" in 2020 for six Salvation Army corporations in the United States)).

## PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 56.1, Plaintiffs respectfully submit the following additional statement of material facts in opposition to Defendant's motion for summary judgment.

### The opioid epidemic

35. **The United States is experiencing an opioid addiction epidemic. More than 9.3 million Americans have opioid use disorder (OUD), including the three named Plaintiffs, and that number continues to grow rapidly each year. More than 80,000 Americans die each year from opioid overdoses, driven in particular by fentanyl.** Ex. E to Declaration of Alice X. Wang In Support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgement (Wang Decl. ISO Opp. to MSJ), U.S. Centers for Disease Control and Prevention Report on Treatment for Opioid Use Disorder: Population Estimates — United States, 2022 (CDC Report) at 568 ("In 2022, an estimated 3.7% of U.S. adults (9,367,000) needed OUD treatment."); Doc. No. 201 (Second Supplemental Decl. of Dr. Claudia P. Rodriguez (2d Supp. Rodriguez Decl.), ¶¶3-4 ("According to the Centers for Disease Control, 220 people died each day from opioid overdoses in 2021," which amounts to more than 80,000 per year, "an increase from the 187 deaths per day in 2020.…Given the increases in opioid use disorder and opioid deaths in the most recent years of available data, these numbers are likely higher now."), ¶5 (opioid-related deaths in Massachusetts increased in 2022)); Doc. No. 143-2 (Ex. 2 to Rodriguez Decl., Treatment Improvement Protocol (TIP63) at 70 ("The United States is experiencing an epidemic of opioid overdose deaths. Opioids … killed 49,860 people in 2019, more than in any prior year. … From 2010 to 2018, heroin-related overdose deaths rose about fivefold. Overdose deaths from illicit fentanyl have also risen sharply."), 94 ("The United States is experiencing an opioid addiction epidemic."), 224 ("Opioid misuse has caused a growing nationwide epidemic of OUD … [that] affects people in all regions, of all ages, and from all walks of life.")); Doc. No. 143 (Declaration of Dr. Claudia Rodriguez (Rodriguez Decl. ISO PI Mot.), ¶30 (survey conducted in 2020 showed that "2.7 million people in the United States" aged 12 and older have OUD, not including unhoused or incarcerated individuals, and "187 people die each day from opioid overdoses"), ¶30c

(explaining that the current rise in overdose deaths in the opioid epidemic is attributable to the rise in fentanyl; "[t]he number of deaths related to fentanyl were 18 times more in 2020 compared to 2013"), ¶31 (providing that in Massachusetts alone there were "2,281 confirmed opioid-related overdose deaths in 2021"), ¶32 ("Opioid overdoses caused 49,860 deaths nationwide in 2019, exceeding the number of deaths caused by motor vehicle accident[s]."")); Doc. No. 144 (Tassinari Decl. ISO PI Mot., ¶¶3-6 (describing "struggling with [OUD] for more than twenty years")); Doc. No. 145 (Espinosa Decl. ISO PI Mot., ¶¶3-7 (detailing "struggle[s] with OUD for several long and painful years before deciding to seek medical treatment")); Doc. No. 146 (Almeida Decl. ISO PI Mot., ¶¶2-5 (noting "almost 20 years" of "wrestling with OUD and struggling with relapses until [he] was first prescribed methadone")).

36. **OUD is a chronic and complex brain disease marked by cognitive, behavioral, and physiological symptoms such as loss of control, cravings, and compulsive use. OUD is recognized as a disability under federal law.** Doc. No. 143 (Rodriguez Decl. ISO PI Mot., ¶27 ("Opioid use disorder (OUD) is a type of substance use disorder that consists of an addiction to opioids. … Having an opioid use disorder is associated with neurobiological adaptations that occur over time with opioid use, including changes in the brains dopaminergic reward system that result in difficulty enjoying any rewards."), ¶28 (explaining changes in opioid receptors in brain associated with OUD), ¶29 ("As a result of the neurobiological changes that occur with continued opioid use, individuals with OUD cannot choose to simply stop using the drug, despite experiencing the negative consequences of ongoing use.")); Doc. No. 143-2 at 94 (Ex. 2 to Rodriguez Decl., TIP63 ("OUD is a set of cognitive, behavioral, and physiological symptoms marked by an inability to stop opioid use despite negative consequences. When severe, it can present as a chronic, recurring condition with compulsive opioid use that is often termed 'addiction.'"), 326 (providing the DSM-5 characterization of OUD), 250 (Americans with Disabilities Act (ADA) protects individuals taking OUD from discrimination by employers)); Doc. No. 63-1 at 2 (Department Of Justice Civil Rights Division Guidance on the ADA and the Opioid Crisis ("People with OUD typically have a disability because they have a drug addiction that substantially limits one or more of their major life activities. Drug addiction is considered a physical or mental impairment under the ADA. … The ADA also protects individuals who are in recovery, but who would be limited in a major life activity in the absence of treatment and/or services to support recovery.")); Doc. No. 141-4 (Ex. D to Salazar Decl. ISO PI Mot., Swistak Dep. Tr. 35:19-21 (administrator of Boston ARC confirming he was aware that opioid use disorder is a recognized disability)).

37. **OUD involves genetic, environmental, and neurobiological changes that make it difficult or impossible for individuals to achieve recovery without medical treatment.** Doc. No. 143 (Rodriguez Decl. ISO PI Mot., ¶16 (noting that substance use disorders, like OUD, "involve[] genetic, neurobiological, and environmental changes that impact how we feel physically and emotionally, how we respond to stress, and how we are able to make decisions and prioritize our needs."), ¶20 (discussing impact of OUD on the prefrontal cortex

and explaining that these "neurobiological changes … perpetuate the cycle of addiction making it very difficult, and impossible for many patients, to break the cycle without medical intervention")); Doc. No. 143-2 at 94 (Ex. 2 to Rodriguez Decl., TIP63 ("OUD is a set of cognitive, behavioral, and physiological symptoms marked by an inability to stop opioid use despite negative consequences.")).

38. **OUD can lead to pain, suffering, worsening health, and death.** Ex. E to Wang Decl. ISO Opp. to MSJ, CDC Report, at 567 ("In 2022, more opioid-involved deaths (81,806) were reported in the United States than in any previous year."); Doc. No. 143 (Rodriguez Decl. ISO PI Mot., ¶30 ("187 people die each day from opioid overdoses."), ¶31 (providing data on opioid-related overdose deaths for states in TSA Eastern Territory, including "2,281 confirmed opioid-related overdose deaths in 2021" in Massachusetts), ¶32 ("Opioid use disorder contributes to isolation, illegal activity/incarceration, homelessness, HIV and hepatitis, as well as other infectious diseases, overdose, and death.")); Doc. No. 201 (2d Supp. Rodriguez Decl., ¶4 ("220 people died each day from opioid overdoses in 2021.")).

**<u>Medications for OUD (MOUD)</u>**

39. **The FDA has approved three medications for opioid use disorder: methadone, buprenorphine, and naltrexone.** Doc. No. 143 (Rodriguez Decl. ISO PI Mot., ¶38 ("There are three FDA approved medications for opioid use disorder (MOUD): methadone, buprenorphine, and extended release naltrexone.")); Doc. No. 143-2 at 24-35 (Ex. 2 to Rodriguez Decl., TIP63 (providing information on the three "FDA-approved medications used to treat OUD," methadone, buprenorphine, and naltrexone)).

40. **MOUD is the accepted standard of care for treating OUD and is backed by extensive scientific studies. Access to one MOUD and not another is not the standard of care and can be dangerous. MOUD is lifesaving and can be effective without counseling or other interventions.** Doc. No. 143 (Rodriguez Decl. ISO PI Mot., ¶29 ("The standard of care for treatment of OUD includes offering … buprenorphine, naltrexone, or methadone."), ¶33 ("Guidelines for standard of care and best practices for opioid use disorder are developed through a process that combines scientific evidence and clinical knowledge and expertise."), ¶39 ("[T]here is no requirement, and it is not the standard of care, that a patient receiving MOUD engage in any specific behavioral therapy or counseling as a condition of access to or enrollment in MOUD."), ¶40 ("MOUDs alone are cost effective, cost beneficial, lifesaving, and life changing."), ¶43 ("Access to one MOUD and not another is not the standard of care and can be dangerous."), ¶45 ("There are very few circumstances in which the standard of care treatment for opioid use disorder does not require offering all medications for opioid use disorder. … I am not aware of any circumstance in which the standard of care would permit offering an individual with opioid use disorder only naltrexone and not methadone or buprenorphine."), ¶48 ("Delaying treatment with the standard of care MOUD increases the risk of opioid use and overdose deaths.")); Doc. No. 143-2 at 13 (Ex. 2 to Rodriguez Decl., TIP63 ("The science demonstrating the effectiveness of medication for OUD is strong.")); Doc. No. 201 (2d Supp. Rodriguez Decl., ¶6 ("Recent literature reinforces and strengthens

the medical and academic consensus that access to all three forms of MOUD … is necessary to meet the standard of care for individuals with OUD."), ¶7 (explaining that study found "exposure to buprenorphine or methadone treatment reduced the relative risk of death by 34% and 38%, respectively," while individuals who received non-medication treatments like counseling with no MOUD had a relative risk of death that was equal or worse than those who received no treatment at all), ¶¶ 8-13 (summarizing studies consistently demonstrating efficacy of MOUD and emphasizing that the medications are "critical to confronting the opioid crisis")).

41. **The World Health Organization lists both methadone and buprenorphine as "essential" medications.** Doc. No. 143 (Rodriguez Decl. ISO PI Mot., ¶63 ("Methadone is the most used and most studied medication for opioid use disorder in the word. … Due to its effectiveness, the World Health organization has listed methadone as an essential medication.")); Doc. No. 143-2 (Ex. 2 to Rodriguez Decl., TIP63 at 30 ("Given the evidence of methadone's effectiveness, WHO lists it as an essential medication."), 31 ("Because of the evidence of buprenorphine's effectiveness, WHO lists it as an essential medication.")).

42. **Methadone and buprenorphine treat OUD by alleviating withdrawal symptoms, reducing cravings and risk of overdose, and blocking the euphoric effects of opioids. They do not cause the individual in treatment to feel intoxicated or "high" from taking them.** Doc. No. 143 (Rodriguez Decl. ISO PI Mot., ¶38 ("Buprenorphine and methadone can also help someone who is withdrawing from opioids, which can be very painful, feel better."), ¶46 ("Methadone improves retention in treatment and buprenorphine reduces the risk of overdose."), ¶54 ("[B]uprenorphine allows for the brain to slowly regain its function, … reduces risk of overdose, … and allows people to function normally without the need for constant dosing to eliminate symptoms of withdrawal or negative affect related with OUD."), ¶58 (buprenorphine and methadone "allow for individuals who are in treatment for OUD to achieve resolution of withdrawal symptoms, improvement in cravings, and regain control and function in their lives … [without] caus[ing] the individual in treatment to feel intoxicated or 'high' from taking them."), ¶64 ("[S]tudies have shown that methadone treatment is associated with a reduction in mortality related to opioid use … and morbidity associate with opioid use and injection drug use (e.g., reduced risk of HIV and hepatitis C infection)."), ¶65 ("When patients achieve a methadone dose that helps eliminate cravings and improve function, the dose of methadone also results in blockade of other opioids, so that if an individual uses an illicit opioid they will not experience the intoxication."), ¶72 ("At a standard dose, buprenorphine reduces opioid withdrawal, cravings, and blunts or blocks the effects of illicit opioids.")); Doc. No. 143-2 (Ex. 2 to Rodriguez Decl., TIP63 at 28-31 (explaining that methadone and buprenorphine treat OUD by "reducing or eliminating withdrawal symptoms," "blunting or blocking the effects of illicit opioids," and "reducing or eliminating cravings to use opioids"), 101-102 (providing additional information on methadone and buprenorphine), 104 (describing relative effectiveness of MOUDs and finding that "methadone and buprenorphine equally reduced illicit opioid use").

43. **Ongoing treatment with MOUD reduces the risk of relapse and overdose and is considered the most effective form of treatment for OUD.** Doc. No. 143 (Rodriguez Decl. ISO PI Mot., ¶¶41, 43, 48, 87 (delaying or interrupting treatment with MOUD can increase risks of relapse, "overdose deaths," and other harmful health consequences), ¶90 (individuals should not be "forced or coerced" to transition from buprenorphine or methadone to naltrexone, or to discontinue MOUD treatment altogether, as doing so is "unsafe, ethically unsound, and not the standard of care.")); Doc. No. 143-2 (Ex. 2 to Rodriguez Decl., TIP63 at 33 ("The best results occur when a patient receives medication for as long as it provides a benefit. This approach is often called 'maintenance treatment.'"), 34 ("Maintenance treatment also minimizes cravings and withdrawal symptoms," "let[ting people better manage other aspects of their life."), 95 (defining maintenance treatment as "[p]roviding medications to achieve and sustain clinical remission of signs and symptoms of OUD and support the individual process of recovery without a specific endpoint (as is the typical standard of care in medical and psychiatric treatment of other chronic illnesses)"), 104 ("Stable patients can continue on their selected OUD medication indefinitely as long as it is beneficial.")).

44. **Buprenorphine and methadone can be used for short-term withdrawal management, or "detox," but this approach carries risk of overdose.** Doc. No. 143 (Rodriguez Decl. ISO PI Mot., ¶50 (explaining that while methadone and buprenorphine can be used for medically supervised withdrawal ("detox"), individuals "frequently continue to experience opioid withdrawal symptoms and a negative affective state, as well as cravings, for months after discharge from medical withdrawal.")); Doc. No. 143-2 (Ex. 2 to Rodriguez Decl., TIP63 at 34, 104-105 ("most patients with OUD who undergo medically supervised withdrawal will start using opioids again" and are at risk of opioid overdose)).

45. **While methadone or buprenorphine may cause physical dependence, individuals taking MOUD as prescribed do not experience euphoria and are not addicted to these medications.** Doc. No. 143 (Rodriguez Decl. ISO PI Mot., ¶25 ("There is an important distinction between physical dependence and substance use disorder/addiction that is often misunderstood by the public and in non-clinical settings. Physical dependence refers to withdrawal symptoms occurring with abrupt discontinuation of a drug. This can happen with many medications, such as antidepressants … and even blood pressure medications …. Addiction or substance abuse disorder, by contrast, refers to the compulsive seeking of the drug despite negative consequences. Although some medications for opioid use disorder can create physical dependence, individuals who take medication for opioid use disorder as prescribed are not addicted to that medication. The diagnosis of substance use disorder/addiction is associated with loss of control, consequences, cravings, and compulsive use which is different than solely becoming physically dependent on a medication. Dependence is not equal to addiction."), ¶¶26, 68 (similar), ¶76 ("Individuals with opioid use disorder who take buprenorphine as prescribed are not addicted to buprenorphine as they do not have the negative consequences and compulsive use related to the diagnosis of addiction."), ¶¶65, 72, 80 ("[T]he use of methadone or buprenorphine [as prescribed] in

someone with an OUD does not result in euphoria, oblivion, or a feeling of intoxication."), ¶98 ("[O]ne of the goals of treatment with agonist MOUDs is to block euphoric effects of illicit opioids."), ¶100 ("[W]hile someone with OUD is physically dependent on buprenorphine or methadone while in treatment with these medications, they are not addicted to these medications.")); Doc. No. 143-2 (Ex. 2 to Rodriguez Decl., TIP63 at 95 (addiction involves "inability to consistently abstain, impairment in behavioral control, craving, diminished recognition of significant problems with one's behaviors and interpersonal relationships, and a dysfunctional emotional response"), 227 ("Physical dependence on a prescribed, properly taken opioid medication is distinct from OUD and opioid addiction."), 228 ("One common question about patients taking medication for OUD is 'Aren't they still addicted?' The new DSM-5 distinction makes the answer to this question 'No, they're not still addicted.' A person can require OUD medication and be physically dependent on it but still be in remission and recovery from OUD."), 247 ("People taking OUD medication rely on it to maintain daily function, like people with diabetes rely on insulin.")).

46. **Naltrexone (sold under brand name Vivitrol) is a more recently approved MOUD that blunts intoxicating effects of illicit opioids and reduces cravings. It is administered in a monthly injection.** Doc. No. 143 (Rodriguez Decl. ISO PI Mot., ¶83 (naltrexone "reduc[es] or blunt[s] intoxicating effects of illicit opioids. It also helps mitigate cravings for individuals with OUD. It is a monthly gluteal intramuscular injection that is approved for the treatment of alcohol use disorder and OUD.")); Doc. No. 143-2 at 99-101 (Ex. 2 to Rodriguez Decl., TIP63 ("Because the injectable form was approved more recently by FDA than methadone and buprenorphine, [naltrexone] has been less studied than those medications. … The oral formulation of naltrexone is not widely used to treat OUD because of low rates of patient acceptance and high rates of non-adherence leading to a lack of efficacy.")).

47. **Naltrexone requires complete abstinence from opioids, methadone, and buprenorphine for 7-14 days before use, creating barriers to successful treatment. Naltrexone results in worse treatment outcomes than methadone and buprenorphine.** Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 97:14-21 (acknowledging TSA is aware that doctors sometimes prescribe methadone or buprenorphine, not Vivitrol, to people with OUD because Vivitrol requires that "a person [goes] through a detox period first")); Doc. No. 143 (Rodriguez Decl. ISO PI Mot., ¶¶85-86 (Vivitrol cannot be started unless an individual is "completely free or abstinent from any short acting opioid use (e.g., oxycodone, heroin, fentanyl) for at least 7-10 days and … methadone, buprenorphine[] for 10-14 days prior to starting treatment. If naltrexone is given to an individual who is using or has recently used any opioid (including in treatment with methadone or buprenorphine), the naltrexone would displace the opioid … resulting in harmful, immediate, and potentially, severe withdrawal in the patient."), ¶87 ("[P]atients who are using and need to go through withdrawal … may fail to complete medically supervised withdrawal (detox), return to use, or get lost to follow up (not return to visits or respond to calls. These are significant clinical risks with not allowing individuals access to all MOUDs … [I]n individuals that need to go through medically supervised withdrawal, studies show that initiation rates for [naltrexone] are significantly

lower."), ¶88 (citing studies showing "a substantial induction hurdle or difficulties with [naltrexone] initiation."), ¶89 (explaining that many individuals choose methadone or buprenorphine over naltrexone, as studies indicate that naltrexone "have worse retention in treatment" and is associated with "a higher risk of overdose")).

48. **No single MOUD is effective for all individuals. Treatment decisions are typically made collaboratively between the patient and their healthcare provider, based on the individual's medical history, clinical needs, and treatment goals.** Doc. No. 143 (Rodriguez Decl. ISO PI Mot., ¶41 ("There is not a one size fits all in the treatment of OUD, and standard of care requires that patients have access and be offered all three MOUDs … no single medication is a perfect fit for all"), ¶87 ("In the absence of strong preference for [naltrexone], there is no indication to only offer [naltrexone] in someone who is actively using opioids."), ¶89 ("[I]f a patient does not have a strong preference for [naltrexone] and is actively using opioids, buprenorphine and methadone are considered better treatment options."), ¶92 ("deciding which medication to use for the treatment of OUD is a collaborative decision between the patient and provider" that requires consideration of the "patient's medical, psychiatric, and substance use history, their treatment preference, and access/availability of treatment" and "should not be determined by a non-medical program or housing provider.")); Doc. No. 232-1 (Ex. A to Salazar Decl. ISO CCert. Mot., Mangiacarne Dep. Tr. 83:2-84:8 (agreeing that treatment determinations for OUD should be "individualized" because "[t]here is no one-size-fits-all treatment")).

## Defendant The Salvation Army (TSA)

49. **TSA is a billion-dollar corporation operating Salvation Army programs in the Eastern United States.** Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 14:12-15:23 (explaining that Defendant's Eastern Territory is "comprised from the State of Maine out to Ohio and Northeast Kentucky, Wilmington, Delaware and Puerto Rico.")); Doc. No. 141-45 at 7 (Ex. F to Salazar Decl. ISO PI Mot., Consolidated Financial Statements for Salvation Army Eastern Territory for 2020 and 2021 (approximately $1.3 billion in "Total support and revenues" in 2021 and $935 million in "Total support and revenues" in 2020)); Doc. No. 141-47 at 11, 14 (Ex. H to Salazar Decl. ISO PI Mot., The Salvation Army 2022 Annual Report (approximately $5.8 billion in total revenue in 2021 and $4.2 billion in total revenue in 2020 for six Salvation Army corporations in the United States)).

50. **TSA is a corporation that "is principally engaged in the business of providing social services."** Doc. No. 133 (Stipulation Re Section 504 and Joint Report Re Case Schedule, ¶1).

51. **TSA provides various social services programs and activities to the general public.** Doc. No. 141-8 at 15 (Ex. 104 to Salazar Decl. ISO PI Mot., TSA ARCs Handbook of Standards, Principles and Policies ("basic social services" provided by TSA includes "those of the Adult Rehabilitation Centers," "disaster relief services, day care centers, summer camps, holiday assistance, services for the aging, shelters for battered women and children, family and career counseling, vocational training, correctional services and drug rehabilitation")); Ex. A to Wang Decl. ISO Opp. to MSJ, Muhs Dep. Tr. 33:7-17 (confirming that the social services

listed in the TSA ARCs Handbook are "Salvation Army['s] principal activities")); Doc. No. 141-35 at 4 (Ex. 148 to Salazar Decl. ISO PI Mot., Printout of The Salvation Army National Website's "About Us" Page (The Salvation Army "serve[s] 30 million people through a myriad of … services," including "heath care," "residential assistance, "abuse counseling," "food, shelter, clothing, and financial assistance")); Doc. No. 141-36 at 26-28 (Ex. 149 to Salazar Decl. ISO PI Mot., TSA Taxable Commercial Paper Notes (The Salvation Army's "Key Operating Programs" include "Adult Rehabilitation Services," "Emergency Disaster Services," "Programs for Seniors," "Youth Programs," "Financial Assistance Programs," "Group Homes," "Homeless Shelters," and "Feeding Programs")); Doc. No. 141-2 (Ex. B to Salazar Decl. ISO PI Mot., Betts Dep. Tr. 26:21-27:7, 36:12-39:19 (confirming "Key Operating Programs" listed in TSA Taxable Commercial Paper Notes are "the primary activities of the Salvation Army eastern territory")); Doc. No. 141-4 (Ex. D to Salazar Decl. ISO PI Mot., Swistak Dep. Tr. 122:11-123:1 (explaining that TSA provides "social services" including "after school programs," "soup kitchens and food pantries and those types of things")).

**<u>The Adult Rehabilitation Centers (ARCs)</u>**

52. **TSA operates 29 ARCs in the Eastern United States.** Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 16:21-17:5 (stating that there are approximately 29 ARCs in the Eastern Territory), 20:5-8 (confirming that "[a]bout 34,000 people lived and received services at eastern territory ARCs from 2018 to [2021]")); Doc. No. 141-7 at 36-37 (Ex. 102 to Salazar Decl. ISO PI Mot., Defendant's Response to Plaintiffs' Interrogatories, Set I (Ex. 2 table listing ARCs in Eastern Territory)); Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 18:15-19:25 (confirming that Ex. 2 table "shows all the ARCs that were opened at some point in the eastern territory from 2018 to [2021]")).

53. **The ARCs have capacity to house 2,208 people but operate at less than 50% capacity.** Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 20:5-8 (confirming that "[a]bout 34,000 people lived and received services at eastern territory ARCs from 2018 to the present.")); Doc. No. 141-4 (Ex. D to Salazar Decl. ISO PI Mot., Swistak Dep. Tr. 138:2-8, 138:16-140:4 (confirming that Boston ARC's yearly average participation was 29, despite having capacity for 90 individuals), 143:2-18 (agreeing that ARCs have a "monthly goal of meeting a 75 percent occupancy rate."), 147:6-8 (noting that at the time of deposition the Boston ARC had 17 occupants)); Doc. No. 141-43 at 3 (Ex. 165 to Salazar Decl. ISO PI Mot., ARC Eastern Territory Mission Support for 12 Months Ending Sept. 30, 2022 (table showing Eastern Territory ARCs' total capacity as 2,208 but operating at less than 50% capacity)); Doc. No. 141-4 (Ex. D to Salazar Decl. ISO PI Mot., Swistak Dep. Tr. 138:2-8 (confirming that Mission Support report is based on information submitted by the ARCs, is provided monthly to ARC administrators, and covers "all the ARCs in the eastern territory")).

54. **Ninety percent or more of ARC participants are indigent.** Doc. No. 141-4 (Ex. D to Salazar Decl. ISO PI Mot., Swistak Dep. Tr. 84:1-5 ("The individuals that are seeking help from [the ARCs], 90 percent of them or more are indigent.")).

55. **Approximately a third of ARC participants are required to complete the ARC program as a condition of probation or parole.** Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 60:20-61:19 (estimating that approximately "a third" of ARC participants participate in ARC programs as a court-mandated "condition of their probation or parole")).

56. **ARCs offer housing, food, counseling, healthcare, recreation, and other services to individuals with substance use disorders.** Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 44:15-17 (most ARC applicants and participants have "substance use disorders"), 45:2-13 (confirming that "the ARC program is designed to serve people with substance abuse disorders among others"), 199:13-200:14 (confirming that TSA "provides ARC participants shelter, food, and clothing"), 199:3-12 (agreeing that ARCs in Eastern Territory "provid[e] services to substance abusers")); Doc. No. 141-8 at 23, 29 (Ex. 104 to Salazar Decl. ISO PI Mot., TSA ARCs Handbook of Standards, Principles and Policies ("An Adult Rehabilitation Center serves men and women with social, emotional and spiritual needs who have lost the ability to cope with their problems and provide for themselves. The center provides adequate housing with group and individual counseling and work therapy in clean, wholesome surroundings.")); Doc. No. 141-4 (Ex. D to Salazar Decl. ISO PI Mot., Swistak Dep. Tr. 26:14-27:12 (confirming that description of ARCs in TSA ARCs Handbook "accurately describe the ARCs"), 95:22-98:15 (confirming that ARCs offer "counseling," "a place to live, food," "some education services," "training regarding seeking employment," and "some opportunity for leisure activities"), 121:1-122:19 (explaining that ARCs provide "social services," including "nutrition," "clothing," "counsel," "entertainment and a leisure area")); Doc. No. 141-9 at 3 (Ex. 105 to Salazar Decl. ISO PI Mot., Printout of The Salvation Army National Website's "Adult Rehabilitation Services" Page ("[ARCs] provide housing, food, counseling, community, and employment.")); Doc. No. 141-33 (Ex. 146 to Salazar Decl. ISO PI Mot., ARC Advertisement (characterizing ARC programs as "residential")); Doc. No. 141-34 (Ex. 147 to Salazar Decl. ISO PI Mot., ARC Advertisement (ARCs "meet the basics of a person's needs including shelter, food, and clothing.")); Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 199:13-200:14 (confirming that Eastern Territory uses ARC Advertisements)); Doc. No. 141-2 (Ex. B to Salazar Decl. ISO PI Mot., Betts Dep. Tr. 78:4-80:10 (agreeing that ARCs provide "continuing healthcare including health education"), 91:5-92:2 (agreeing that ARCs provide education services for a GED and for job training)).

57. **Most ARC participants have substance use disorders, and most younger participants have OUD.** Doc. No. 141-26 (Filed Under Seal) (Ex. 139 to Salazar Decl. ISO PI Mot., TSA ARC Discharge Summary [redacted]); Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 172:7-175:21 (confirming that ARC Discharge Summary shows that 997 individuals discharged from ARCs between 2018 and 2022 listed "opiates" as their "primary abused substance" on intake forms, which is likely an undercount because 86% of participants left this field blank and those 86% could include participants whose primary

abused substance was opiates)); Doc. No. 141-4 (Ex. D to Salazar Decl. ISO PI Mot., Swistak Dep. Tr. 171:4-172:7 (explaining that the "greater portion" of Boston ARC participants, particularly those under the age of 30, use opioids)).

58. **Participants live full-time at an ARC for six to twelve months (or longer) and cannot live or work elsewhere while in the program.** Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 40:9-11 (agreeing that "ARC participants live in [ARCs] for a period of 6 to 12 months full time"), 41:3-15 (confirming that "ARC participants get a room and a bed" and explaining that only participants in some centers can receive visitors), 207:15-20 (agreeing that ARC participants must "live at the ARC" and "can't live someplace else at the same time they're participating at an ARC")); Doc. No. 141-4 (Ex. D to Salazar Decl. ISO PI Mot., Swistak Dep. Tr. 149:5-24 ("[T]he normal phase [of participating in an ARC program] can go from 6 to 12 for months. 12 months maximum. After that you may or may not be able to get extensions given circumstances.")).

59. **TSA requires ARC participants to work 40 hours per week at ARCs or processing donated goods for resale in Salvation Army stores.** Doc. No. 141-2 (Ex. B to Salazar Decl. ISO PI Mot., Betts Dep. Tr. 77:20-78:3 (agreeing that "[w]ork therapy is one of the main components of the ARC program"), 117:11-14 (confirming that an ARC participant "needs to be able to work 40 hours per week"), 119:1-25 ("work therapy" includes "housekeeping," "answer[ing] some phones … help[ing]out in the dining room" at ARCs and other work "within [TSA's] processing centers")); Doc. No. 141-4 (Ex. D to Salazar Decl. ISO PI Mot., Swistak Dep. Tr. 28:8-11 (describing "work therapy" as a "40 hours per week … component of the [ARC] program")); Doc. No. 141-8 (Ex. 104 to Salazar Decl. ISO PI Mot., TSA ARCs Handbook of Standards, Principles and Policies at 23 ("The work therapy component of the center includes the collection and processing of donated materials and the operation of Salvation Army family/thrift stores."), 87 ("Work therapy is a major ingredient in the beneficiary's rehabilitation …. Every beneficiary must have a work therapy assignment.")); Doc. No. 141-19 at 40 (Ex. 125 to Salazar Decl. ISO PI Mot., TSA ARCs Beneficiary Information Tracking System User Manual (providing list of work therapy assignments, including "accessory processor," "shoe processor," hanger," and "hanger sorter")); Doc. No. 141-2 (Ex. B to Salazar Decl. ISO PI Mot., Betts Dep. Tr. 173:23-174:20 (confirming that TSA ARCs Beneficiary Information Tracking System User Manual lists examples of options for "work therapy")).

60. **TSA requires ARC participants who receive government benefits to pay a portion of those benefits to the ARC.** Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 79:14-17 (agreeing that per Salvation Army policies, "[r]oom and board is charged to all persons with an income"), 80:8-18 (confirming that "it's the policy of Salvation Army" that ARC participants who "receive[] social security benefits … need to pay some of those benefits to the ARC"), 80:25-81:12 (explaining that under the room and board agreement, ARC participants must direct "75% of their [Social Security] check … to the ARC")); Doc. No. 141-4 (Ex. D to Salazar Decl. ISO PI Mot., Swistak Dep. Tr. 117:3-10 (confirming that when an ARC "participant or an applicant says they are receiving Social Security … they

would be required to pay a portion of that to cover room and board … but if someone is not receiving outside income, then they are not required to pay"), 131:19-132:2 (providing that the ARC "program dictates" that the "rule" is if "a participant receives Social Security income they would need to pay to cover a portion of their room and board")); Doc. No. 141-8 at 143 (Ex. 104 to Salazar Decl. ISO PI Mot., TSA ARCs Handbook of Standards, Principles and Policies (TSA ARC "Room and Board Agreement" requiring ARC participants to pay "75% of the outside income" to ARCs, not exceeding the cost of room and board)); Doc. No. 141-12 (Ex. 108 to Salazar Decl. ISO PI Mot., USA Eastern Territory Minute ("[A]ll beneficiaries admitted to the Center who are receiving 'outside' income such as Social Security, state and local welfare benefits, military or disability benefits shall be required to pay a fee for room and board. The room and board fee shall be equal to the lesser of (1) 75% of the 'outside' income, and (2) the reasonable cost of room and board.")); Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 81:20-83:10 (confirming that the "eastern territorial minute" describes policy at all Eastern Territory ARCs regarding fee payment for room and board)).

**ARCs are open to the general public**

61. **TSA provides ARC housing and services to the general public without regard to the religion of the participants. TSA also advertises itself as offering ARC housing and services "regardless of [participants'] disability in accordance with the Salvation Army['s] capacity to help them."** Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 38:13-15 (agreeing that "the Salvation Army policies do not discriminate on the basis [of] religion"), 39:5-13 (confirming that "[T]he Salvation Army's policy on nondiscrimination in programs and services" is "Serving all without discrimination"), 39:14-40:2 (agreeing that "The Salvation Army advertises that its ARCs are open to all people regardless of religion" and "regardless of disability in accordance with the Salvation Army['s] capacity to help them"), 62:13-15 (agreeing that "The Salvation Army admits participants to ARCs regardless of their religion")); Doc. No. 141-9 at 3 (Ex. 105 to Salazar Decl. ISO PI Mot., Printout of The Salvation Army National Website's "Adult Rehabilitation Services" Page (describing The Salvation Army as "Serving All Without Discrimination" and explaining that "[i]n providing its alcoholism and addiction recovery programs and services, The Salvation Army is committed to accommodating all those in need without unlawful discrimination or harassment based on age, race, color, religion, sex, national origin, marital status, disability, citizenship, sexual orientation, gender identity, gender expression, or any other characteristic in accordance with our capacity to help.")); Doc. No. 141-4 (Ex. D to Salazar Decl. ISO PI Mot., Swistak Dep. Tr. 31:5-11 ("If what you're asking is do [ARC participants] need to be a Christian, absolutely not. Whatever you may believe to be true in your faith you're certainly welcome in our center.")).

62. **ARCs are distinct from TSA's churches, which are called Corps Community Centers.** Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 47:7-11 (explaining that the Corps Community Center is "what you would refer to as our church," which is "distinct from the ARC")).

63. **ARC participants do not have to be members of the Salvation Army church, who are called Salvationists. Less than one percent of ARC participants are members of The Salvation Army church. ARCs do not require or force participants to become members of the Salvation Army church while they are participating in the ARC program.** Doc. No. 141-2 (Ex. B to Salazar Decl. ISO PI Mot., Betts Dep. Tr. 85:3-6 (confirming that "[m]ost ARC participants are not members of the Salvation Army church"), 85:7-11 (stating that a "miniscule" percentage of ARC participants, probably "less than one percent," are members of the Salvation Army Church), 85:12-14 (explaining that some ARC participants "become members as a part of their participation, but that is not required nor forced")); Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 34:3-11 (confirming that "participation in a Salvation Army program" does not "make someone a salvationist," which is a "Salvation Army church member[]"), 35:10-15 (agreeing that "the Salvation Army doesn't give any preferences for admissions to the ARCs" and "[m]ost ARC participants are not salvationists")); Doc. No. 141-4 (Ex. D to Salazar Decl. ISO PI Mot., Swistak Dep. Tr. 112:8-14 ("My hope is that I'll show you the love of Christ that helps convert you, but I'm not going to force it on you. I'm not going to browbeat you to death if you say, 'I don't want to hear anymore outside of what I need to hear,' then okay. I'm still going to pray for you, though.")).

64. **The Salvation Army demands abstinence for Salvation Army church members, but not for non-members.** Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 109:18-110:18 (explaining that The Salvation Army requires abstinence "[f]or a salvationist"), 212:7-14 (agreeing that The Salvation Army "believes in abstinence for its members," but "does not condemn nonmembers who do not participate in abstinence")).

65. **ARC participants can continue to practice their own religion.** Doc. No. 141-4 (Ex. D to Salazar Decl. ISO PI Mot., Swistak Dep. Tr. 111:1-14 ("If you're of an Islamic faith you're just as welcome in our program as anybody else. You have to be at our church services, but I'm not going to try to convert you. … I'm not going to force it on you. … [Y]ou will need to be respectful. Which just means sitting there and being quiet. It doesn't mean anything else. … I'm not going to ask you to read out of the Bible ... [or] to pray, I'm not going to do anything. But I am going to profess my faith and preach it around everybody."), 111:15-23 (agreeing that "an ARC participant who is not a Christian can continue to practice their own religion" if they do so "[o]n their time … and not to the point of being [] a disruption and everything.")).

**TSA' voluntary and knowing agreement not to discriminate against ARC applicants and participants on the basis of disability in exchange for millions of dollars of federal funding**

66. **TSA "receives federal financial assistance, including grant funding, loans, and other assistance from the federal government."** Doc. No. 133 (Stipulation Re Section 504 and Joint Report Re Case Schedule, ¶1).

67. **TSA receives millions of dollars of federal funding for its social services programs each year.** Declaration of Nina Harris In Support of Plaintiffs' Opposition to Defendant's Motion

for Summary Judgment Exs. A & B (summarizing annual federal financial assistance); Doc. No. 141-45 at 7 (Ex. F to Salazar Decl. ISO PI Mot., Consolidated Financial Statements for Salvation Army Eastern Territory for 2020 and 2021 ($1.2 million in "Fees and grants from governmental agencies" in 2021 and $1.13 million in "Fees and grants from governmental agencies" in 2020)); Doc. No. 141-47 at 11, 14 (Ex. H to Salazar Decl. ISO PI Mot., The Salvation Army 2022 Annual Report ($5.9 million in "Fees and Grants from Government Agencies" in 2021 and $4.6 million in "Fees and Grants from Government Agencies" in 2020 for six Salvation Army corporations in the United States)).

68. **In exchange for federal funding, TSA voluntarily and knowingly agreed not to discriminate against ARC applicants and participants on the basis of disability.** Doc. No. 133 (Stipulation Re Section 504 and Joint Report Re Case Schedule, ¶2 ("Defendant voluntarily and knowingly consented to the conditions of federal financial assistance received, including by providing written assurances of compliance with Section 504 of the Rehabilitation Act … with respect to programs and activities that received federal funding to the extent required by the terms of the federal financial assistance or by law.")); 29 U.S.C. §794(b) ("program or activity receiving Federal financial assistance" means "all of the operations of … an entire corporation … or other private organization … which is principally engaged in the business of providing education, health care, housing, social services, or parks and recreation … any part of which is extended Federal financial assistance.").

69. **ARCs consistently operate at an annual deficit of more than $40 million per year. TSA makes up for the deficit in ARC operating costs by partially funding ARCs with its general funds from other sources.** Doc. No. 141-2 (Ex. B to Salazar Decl. ISO PI Mot., Betts Dep. Tr. 65:20-66:3 ("[T]he deficit annually of over 42 million dollars is important to remember … what we spend on the ARCs far exceeds any revenue that we receive for that program."), 68:18-23 (the ARC "program overall is run at a deficit and …the territory helps to subsi[dize] that.")); Doc. No. 141-37 at 5 (Ex. 151 to Salazar Decl. ISO PI Mot., The Salvation Army All Centers Net Remittance Report As of 9/30/2021 (ARC annual deficit of $42 million)); Doc. No. 141-2 (Ex. B to Salazar Decl. ISO PI Mot., Betts Dep. Tr. 39:20-40:22 (confirming that remittance report shows "actual income and expense for the [ARCs] within the eastern territory" "from 10/1/2020 to 9/30/2021")); Doc. No. 141-4 (Ex. D to Salazar Decl. ISO PI Mot., Swistak Dep. Tr. 124:21-125:5 (confirming that "the ARCs have operated at a deficit" "for a long time"), 125:9-20 (when asked where "the money come[s] from to make up the deficit," answering that "The Salvation Army has its own kind of stuff. … [T]here are some type of accounts somewhere that are paying other things … that don't have anything to do with the ARC. But the territory comes alongside to help in funding.")); Doc. No. 141-43 at 5-6, 11 (Ex. 165 to Salazar Decl. ISO PI Mot., ARC Eastern Territory Mission Support for 12 Months Ending Sept. 30, 2022 ($45 million year to date in "grants from [Salvation Army] units" to ARCs)); Doc. No. 141-4 (Ex. D to Salazar Decl. ISO PI Mot., Swistak Dep. Tr. 136:17-138:8 (identifying Mission Support document as monthly document for administrators concerning "mission support" for "[a]ll the ARCs in the eastern territory"), 151:9-11, 152:12-16 (confirming document states that the Boston ARC's "expenses were [$]1,044,126 greater than the income"), 158:12-15, 159:8-10 (confirming

document states that "[i]n 2020 [Salvation Army] command headquarters sent [$]1.6 million to Boston"), 163:6-14 (agreeing document states that the "total income expense year to date for all the ARCs was negative $45 million" and "'grants from [other Salvation Army] units' [was] [$]45,600,000 and some dollars")); Doc. No. 141-42 at 2 (Ex. 164 to Salazar Decl. ISO PI Mot., ARC Command Proposed Fiscal Year 2021 Budget (demonstrating consistent operating deficits of millions of dollars between 2018 and 2021)); Doc. No. 141-4 (Ex. D to Salazar Decl. ISO PI Mot., Swistak Dep. Tr. 132:14-133:3 (identifying document as proposed budget)).

70. **TSA is a single, integrated entity providing social services programs and activities, which allows it to use general funds on programs like ARCs that are operating at a deficit.** Doc. No. 141-8 (Ex. 104 to Salazar Decl. ISO PI Mot., TSA ARCs Handbook of Standards, Principles and Policies at 15 ("The General, with headquarters in London, is the international leader of The Salvation Army. In the United States, the National Commander coordinates the functions of The Salvation Army from headquarters in Alexandria, Virginia. For administrative purposes, the nation is divided into four territories: Eastern with headquarters in West Nyack, New York."), 16 ("Territories are made up of smaller units known as divisions. There are 40 in the United States and a divisional commander heads each. Divisions consist of corps community centers, which are the basic units of The Salvation Army … The adult rehabilitation centers located geographically in the divisions are administered by the Adult Rehabilitation Centers Command in each territory. … Nationwide uniformity of policy is the responsibility of the Commissioners' Conference.")), 44 (acknowledging that ARCs operate at a deficit)); Doc. No. 141-36 (Ex. 149 to Salazar Decl. ISO PI Mot., TSA Taxable Commercial Paper Notes at 16 (discussing the "aggregate" amount of fees and grants TSA received from government sources), 24 (providing that the United States operations of the Salvation Army are coordinated through its "National Headquarters … under the direction of a National Commander," who serves as the "chairman of the board of trustees/directors" for each of the corporations for the four territories)); Doc. No. 141-43 (Ex. 165 to Salazar Decl. ISO PI Mot., ARC Eastern Territory Mission Support for 12 Months Ending Sept. 30, 2022 at 9 (providing total sums "transfer[ed] from other funds"), 11 (showing millions of dollars of deficits at ARCs, which is made up by "grants from [Salvation Army] units").

**<u>TSA's categorical ban on individuals with OUD who take prescribed methadone and buprenorphine from ARC housing and services</u>**

71. **TSA categorically bans individuals with OUD who take prescribed methadone and buprenorphine from ARC housing and services.** Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 8:4-9:13, 11:15-22 (MOUD "is something we do not allow in the ARC[s]"), 60:16-19, 85:13-25, 87:5-13, 93:21-24 (confirming that "buprenorphine and methadone are listed as not allowed medications"), 98:24-101:14 (agreeing that "there are no exceptions to the no methadone no buprenorphine [rule] for ARC participants"; "not typically allowed … means not ever allowed"), 101:15-24, 119:9-22, 167:10-22 (agreeing that "there have been no instances in which a person was allowed to participate in an ARC while taking

methadone or buprenorphine"), 177:12-20 (explaining that ARC participants who gets prescription for buprenorphine or methadone "would be discharged" from the program), 179:15-17); Doc. No. 141-13 at 9 (Ex. 116 to Salazar Decl. ISO PI Mot., TSA ARC Medication Guide (classifying Methadone and Suboxone as "Not Allowed")); Doc. No. 141-15 at 4-5, 10 (Ex. 118 to Salazar Decl. ISO PI Mot., TSA ARC Medication Guide (highlighting both methadone and buprenorphine in red to classify them as "Not Allowed")); Doc. No. 141-16 at 5 (Ex. 119 to Salazar Decl. ISO PI Mot., TSA ARC Medication Guide (classifying Methadone and Suboxone as "Not Typically Allowed")); Doc. No. 38-1 (Declaration of Lt. Colonel Dennis Gensler (Lt. Col. Gensler Decl.)), ¶20 (explaining that ARCs are only open to individuals who commit to "not engage in the use of alcohol or drugs, including narcotic or addictive prescription medications. The specific medications that are prohibited are set forth in a medication policy that applies only to the ARCs operated by the New York Corporation."), ¶26 (providing that all Eastern Territory ARCs "prohibit[] use of certain medication-assisted treatment ("MAT"), including methadone and buprenorphine, but allow[] alternative medications, such as vivitrol")); Doc. No. 141-2 (Ex. B to Salazar Decl. ISO PI Mot., Betts Dep. Tr. 92:3-93:18 (confirming that "the ARC participants are not allowed to use methadone" and that Suboxone (which contains buprenorphine) "is part of a class that we do not allow within the program.")); Doc. No. 197-30 (Ex. 330 to Salazar Supp. Decl. ISO PI Mot., email thread between Sherri Sinpunpakd, Springfield, Massachusetts ARC lead counselor, and Dominick Ciuffreda, case worker at Hampden County Sheriff's Department (ARC counselor responding to referral from case worker: "methadone would be a no go for us, no matter what")).

72. **TSA knows that prescribed methadone and buprenorphine medications for opioid use disorder are the "standard of care" for OUD.** Doc. No. 141-5 (Ex. E to Salazar Decl. ISO PI Mot., Coombs Dep. Tr. 58:12-59:23 (confirming that "the Salvation Army knows that methadone is sometimes prescribed to treat opioid dependency" and that "doctors sometimes prescribe Suboxone to treat opioid dependency"), 60:13-16 (confirming that TSA is aware that prescribed methadone and buprenorphine "is considered the standard of care for opioid use disorder"), 71:5-9 ("Q: Did you know that Talbott Recovery Campus now recognizes methadone and Suboxone as medications that increase the success of rehabilitation? A: I think most treatment programs do.")).

73. **TSA denies ARC access to individuals who take MOUD. TSA trains its intake coordinators to inform applicants of the MOUD ban.** Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 111:3-6 ("A drug is a drug, whether methadone, Suboxone, buprenorphine. …[W]e don't allow those within our program."), 184:2-21 (confirming that methadone and buprenorphine are not permitted in the ARCs and that intake coordinators are trained to convey this information), 184:22-185:15 (agreeing there was instance where caller interested in ARC program was denied entry and "told that they needed a higher level of care" because of MOUD use), 186:5-9 (confirming that when the ARC call logs say "Suboxone" it refers to instances where a caller was told that "participants at ARCs are not permitted to use Suboxone"), 187:18-189:13 (confirming that "people call ARCs regularly who are on methadone or Suboxone"), 192:21-193:16 (caller denied entry to ARC because

they were "on methadone")); Doc. No. 141-4 (Ex. D to Salazar Decl. ISO PI Mot., Swistak Dep. Tr. 79:8-17 (explaining that intake worker has "an … understanding that [methadone and buprenorphine are] not allowed" under the "intake policies"), 84:14-18 ("we on a whole do not allow medically-assisted treatment," such as methadone and buprenorphine)); Doc. No. 141-28 (Filed Under Seal) (Ex. 140 to Salazar Decl. ISO PI Mot., TSA ARC Intake Contact Tracker); Doc. No. 141-29 (Filed Under Seal) (Ex. 141 to Salazar Decl. ISO PI Mot., TSA ARC Intake Contact Tracker); Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 181:21-182:19 (explaining that the Intake Contact Tracker is the document where "intake coordinators or intake counselors" record "calls of people interested in coming into the program or finding more information about the program.")); Doc. No. 141-30 (Filed Under Seal) (Ex. 142 to Salazar Decl. ISO PI Mot., Referrals Tracker [redacted]); Doc. No. 141-32 (Filed Under Seal) (Ex. 144 to Salazar Decl. ISO PI Mot., ARC Reason for Denial Tracker [redacted]); Doc. No. 141-41 (Filed Under Seal) (Ex. 163 to Salazar Decl. ISO PI Mot., Beneficiary Application for Admission [redacted]); Doc. No. 141-4 (Ex. D to Salazar Decl. ISO PI Mot., Swistak Dep. Tr. 98:16-24 (confirming Beneficiary Application for Admission is an ARC applicant's application for admission)); Doc. No. 142 (Declaration of Maria Wenzell (Wenzell Decl. ISO PI Mot.), ¶¶3-8 (summarizing attached Exhibits)); Doc. No. 142-1 (Filed Under Seal) (Ex. A to Wenzell Decl. ISO PI Mot., [redacted]); Doc. No. 142-2 (Filed Under Seal) (Ex. B to Wenzell Decl. ISO PI Mot., Summary Charts [redacted]; Doc. No. 142-3 (Filed Under Seal) (Ex. C to Wenzell Decl. ISO PI Mot., Applicant File [redacted]); Doc. No. 142-4 (Filed Under Seal) (Ex. D to Wenzell Decl. ISO PI Mot., Applicant File [redacted]); Doc. No. 142-5 (Filed Under Seal) (Ex. E to Wenzell Decl. ISO PI Mot., Applicant File [redacted]); Doc. No. 197-26 at 2 (Ex. 326 to Salazar Supp. Decl. ISO PI Mot., Email Thread Between Ann Polk, Philadelphia ARC intake coordinator, and Judith Luker (intake coordinator: "unfortunately we don't take anybody with MAT. And that stinks. I get at least 3 calls a week asking.")); Doc. No. 197-42 at 2 (Ex. 342 to Salazar Supp. Decl. ISO PI Mot., Email thread between Don Coombs, Lynn Gensler, and Lori Schoch ("we are running into quite a few p[ro]spective beneficiaries whom we are having to refer to a higher level of care due to the use of the medication subl[o]cade")); Doc. No. 197-44 at 2 (Ex. 344 to Salazar Supp. Decl. ISO PI Mot., Email from Don Coombs to Lynn Gensler ("many persons are declined admission … due to their prescribed use of methadone and suboxone")); Doc. No. 197-47 at 4 (Ex. 347 to Salazar Supp. Decl. ISO PI Mot., Email Thread Between Don Coombs, Lynn Gensler, and Bethannie Dolder ("policy" prohibiting "Sublocade or any form of buprenorphine" bars access to "a large number of persons")); Doc. No. 197-48 to 197-54 (Exs. 348-354 to Salazar Supp. Decl. ISO PI Mot. (email threads documenting policy against MOUD)).

74. **TSA denies ARC access to individuals based on their prior use of MOUD. TSA requires ARC applicants who took MOUD to undergo a "detox" period before accessing an ARC. TSA also rejects ARC applicants who received buprenorphine injections up to a**

**year before applying and who no longer take MOUD.** Doc. No. 197-23 at 2 (Ex. 323 to Salazar Supp. Decl. ISO PI Mot., Email Thread Between Joseph Siejk, Harrisburg ARC intake coordinator, and Christina McLeod-Worthy (stating that an applicant "would need to come off Suboxone" prior to entry into the ARC, and that if he had received a "sublocade injection … within the past 11 months, [the ARC] would not be able to take him.")); Doc. No. 197-27 at 2 (Ex. 327 to Salazar Supp. Decl. ISO PI Mot., Email Thread Between Joseph Siejk, Harrisburg ARC intake coordinator, and Bonnie J. Campbell (providing that an applicant for an ARC would "have to be we[a]ned off the suboxone," before admission, and that receiving a Sublocade injection "within the past year" would also disqualify the applicant)); Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 119:9-22 (confirming that an applicant who tests positive for methadone or buprenorphine will not be admitted unless they first attend a "detoxification facility")); Doc. No. 141-4 (Ex. D to Salazar Decl. ISO PI Mot., Swistak Dep. Tr. 58:15-17 (explaining that individuals who have used Suboxone "do detox before they come" to an ARC)).

75. **TSA categorically bans participants from taking MOUD while they are at ARCs.** Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 89:24-91:8, 95:13-15 (confirming that an ARC has never "permitted a participant to use methadone or buprenorphine")); Doc. No. 141-5 (Ex. E to Salazar Decl. ISO PI Mot., Coombs Dep. Tr. 59:4-23 (agreeing that "ARC participants are not allowed to use methadone to treat opioid dependency")); Doc. No. 144 (Declaration of Mark Tassinari (Tassinari Decl. ISO PI Mot., ¶¶14-16 ("I was prohibited from seeking a doctor for medical help and I was told … that MOUD was not permitted at the ARC and I would not be allowed to access buprenorphine during my stay.")); Doc. No. 145 (Declaration of Richard Espinosa (Espinosa Decl. ISO PI Mot., ¶¶12-18, 20-21 (explaining that TSA "forb[ade]" him from "using methadone while at the ARC")); Doc. No. 141-49 (Filed Under Seal) (Ex. J to Salazar Decl. ISO PI Mot., Almeida Dep. Tr. 46:24-49:6 [redacted]); Doc. No. 146 (Declaration of Joseph Almeida (Almeida Decl. ISO PI Mot., ¶¶7-8 ("I asked if I could restart my methadone treatment for OUD when I arrived at the Saugus ARC and the Salvation Army staff told me I couldn't.")).

76. **TSA acknowledges that individuals rejected by ARCs due to MOUD must find other housing and services, which may not be available.** Doc. No. 141-49 (Filed Under Seal) (Ex. J to Salazar Decl. ISO PI Mot., Almeida Dep. Tr. 102:8-106:12 [redacted]); Doc. No. 141-22 (Ex. 133 to Salazar Decl. ISO PI Mot., "Massachusetts/Rhode Island ARC Referral List" ("Worcester doesn't have a specific place [to] refer people that are specifically taking MAT.")).

77. **TSA requires ARC applicants to undergo regular urine testing, and TSA selected a specific urinalysis test that can detect methadone or buprenorphine. TSA discharges participants from ARCs if they test positive for methadone or buprenorphine.** Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 141:15-142:16 (confirming that

ARC participants are "required to undergo a drug test when they first apply" and are "required to undergo drug tests at other times too"), 144:6-146:22 (explaining that the Salvation Army chose particular drug testing products "to ensure that [it] can detect if a participant uses methadone and/or buprenorphine"), 154:23-155:18 (providing that Tassinari was discharged from an ARC "because he tested positive for Suboxone"), 180:7-181:20 (noting that a positive test for methadone or buprenorphine results in a discharge summary listing "drug use" as the reason for discharge)); Doc. No. 141-20 (Ex. 129 to Salazar Decl. ISO PI Mot., Compliance Testing and Medication Record); Doc. No. 141-21 (Ex. 130 to Salazar Decl. ISO PI Mot., Compliance Testing Slideshow); Doc. No. 141-4 (Ex. D to Salazar Decl. ISO PI Mot., Swistak Dep. Tr. 45:3-13 (explaining that ARC participants are drug tested "on average once every 72 hours, or just under 72 hours"), 55:1-4 (confirming that individuals have been "discharged from an ARC for testing positive for Suboxone")); Doc. No. 141-5 (Ex. E to Salazar Decl. ISO PI Mot., Coombs Dep. Tr. 29:14-21 ("[W]e test people pretty much every time they come into the building to see if they're complying with our rule to be absent from alcohol. And then periodically we do a urinary compliance test to make sure they're being abstinent from substances known to be misused."), 121:1-122:24); Ex. D to Wang Decl. ISO Opp. to MSJ, Coombs Dep. Tr. 123:1 (indicating that specific drug testing product was selected because it detects methadone)); Doc. No. 197-56 (Filed Under Seal) (Ex. 356 to Salazar Supp. Decl. ISO PI Mot., Rehabilitation Record [redacted]); Doc. No. 197-57 at 2 (Ex. 357 to Salazar Supp. Decl. ISO PI Mot., Discharge Letter (discharge from ARC for "Unsatisfactory-Positive Urinalysis for Suboxone")); Doc. No. 197-58 (Filed Under Seal) (Ex. 358 to Salazar Supp. Decl. ISO PI Mot., Discharge Summary [redacted]); Doc. No. 197-59 at 2 (Ex. 359 to Salazar Supp. Decl. ISO PI Mot., Email from Bayode Agbaje, Assistant to Administrator for Business at Philadelphia ARC to Kevin Schoch (discharge from ARC for testing "+ve for Methadone")); Doc. No. 197-60 at 2 (Ex. 360 to Salazar Supp. Decl. ISO PI Mot., Email from Mark Taylor, Buffalo ARC intake coordinator, to Pamela Lamancuso ("discharge from [ARC] program for use of Suboxone")); Doc. No. 197-61 at 3 (Ex. 361 to Salazar Supp. Decl. ISO PI Mot., Discharge Summary (discharge from ARC for "Suboxone")); Doc. No. 197-62 at 3 (Ex. 362 to Salazar Supp. Decl. ISO PI Mot., Discharge Summary (discharge from ARC for "positive for Suboxone")); Doc. No. 197-63 (Filed Under Seal) (Ex. 363 to Salazar Supp. Decl. ISO PI Mot., Rehabilitation Record [redacted]).

78. **TSA sometimes allows ARC participants who do not have OUD to take methadone and buprenorphine, including for pain management.** Doc. No. 141-5 (Ex. E to Salazar Decl. ISO PI Mot., Coombs Dep. Tr. 15:21-16:19 (providing that the Eastern Territory ARC has made an "exception" to the no methadone policy for a "gentleman who needed [methadone] … as a pain medication."), 104:5-106:15 (confirming that "there are circumstances where an ARC participant could use buprenorphine not for opioid use disorder, but for some other reason" and that is "also true of methadone")); Doc. No. 141-16 at 5, 12 (Ex. 119 to Salazar Decl. ISO PI, TSA ARC Medication Guide (classifying buprenorphine and methadone as "Not Typically Allowed").

79. **TSA also denies ARC access to individuals with physical disabilities and individuals TSA considers too old for participation.** Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 70:21-71:2 (confirming that the Salvation Army "does not accept people to the ARCs that are not physically able to engage in the work program"), 135:23-136:7 (admitting that an individual who "couldn't engage in work for 40 hours a week because they had, for example, chronic fatigue syndrome would … not be admit[ted] to the ARC")); Doc. No. 233-1 (Filed Under Seal) (Ex. A to Wenzell Decl. ISO CCert. Mot., Summary Chart [redacted]); Doc. No. 233-2 (Filed Under Seal) (Ex. B to Wenzell Decl. ISO CCert. Mot., ECF 141-30 Summary Chart [redacted]; Doc. No. 233-3 (Filed Under Seal) (Ex. C to Wenzell Decl. ISO CCert. Mot., ECF 141-32 Summary Chart [redacted].

**<u>TSA's MOUD policy and its religion</u>**

80. **TSA's MOUD policy is based on outdated guidance from the Talbott Recovery Campus, a non-religious rehabilitation provider that now promotes MOUD for treating OUD.** Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 28:21-29:5 (TSA's medication policy is simply to follow "the Talbott Medical Guide"), 85:22-86:7, 86:22-23. 87:12-23 (TSA's "guide itself is taken from the Talbott guide"), 101:25-102:16, 110:23-111:13, 121:13-25 (confirming that the "Talbott Recovery Campus Medication's Guide" is the "basis for the Salvation Army medication policy.")); Doc. No. 141-17 at 3 (Ex. 120 to Salazar Decl. ISO PI Mot., Printout of a Webpage Within the Website talbottcampus.com ("The safest, most successful detox option is known as medically supervised detox…Supported by years of research, medications like methadone, Suboxone and buprenorphine increase the short-term detox…and longer-term success of detox, rehabilitation and recovery")); Doc. No. 141-4 (Ex. D to Salazar Decl. ISO PI Mot., Swistak Dep. Tr. 40:6-13 ([T]he Talbot[t] Medication Guide … is the guide that we follow."), 56:3-11); Doc. No. 141-5 (Ex. E to Salazar Decl. ISO PI Mot., Coombs Dep. Tr. 65:5-66:4 ("[I]s there any other reason why you put any medication on this medication policy? A: None that I can think of, no. That's why we cited the sources where we got the opinion because it wasn't just our own thoughts."), 70:13-14, 80:6-20 ("we typically just try to refer that over to the Talbott Medications Guide")); Doc. No. 141-52 at 2 (Ex. M to Salazar Decl. ISO PI Mot., Email from May 3, 2021 (prompting email recipient to "review" various Talbott websites)); Doc. No. 141-14 at 4, 8 (Ex. 117 to Salazar Decl. ISO PI Mot., 2008 Talbott Recovery Campus Medication Guide).

81. **TSA acknowledges that "it is not against the Salvation Army religion for a nonmember to use doctor prescribed methadone or buprenorphine."** Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 213:5-9); Ex. C to Wang Decl. ISO Opp. to MSJ, Swistak Dep. Tr. 68:2-6 (Swistak confirming that he is "a member of the Salvation Army faith"); Doc. No. 141-4 (Ex. D to Salazar Decl. ISO PI Mot., Swistak Dep. Tr. 69:2-8 (ARC provision of

services to someone taking prescribed methadone would "absolutely not" violate religion of Swistak, who is a member of the Salvation Army church), 75:16-77:13 (explaining that if ARCs provided services to participants taking methadone or buprenorphine, it would not violate his religion: "It has nothing to do with my religion … It's not based on my religion. My religion, again, says love everyone. Care for everyone.")).

82. **TSA itself provides buprenorphine to participants with OUD at TSA's Harbor Light Centers, which provide services to individuals with substance use disorders and are advertised together with ARC programs.** Doc. No. 141-3 (Ex. C to Salazar Decl. ISO PI Mot., Hill Dep. Tr. 23:14-25:15, 44:9-45:15, 54:8-17 ("Q. Does the substance abuse program provide [MOUD]? A. We offer [MOUD] after they leave, and some people would say that the medications that we provide while they're in detox are part of -- would be inclusive of [MOUD]."), 55:14-25, 81:13-83:4, 90:2-92:6); Ex. B to Wang Decl. ISO Opp. to MSJ, Hill Dep. Tr. 59:9-60:23 (Hill confirming that he has discussed use of MOUD at Harbor Light substance abuse program with the program's medical director), 60:24-61:23 (explaining that taking MOUD is "pervasive" among participants in TSA's social services programs and that "there are many pathways to recovery, … one of them could be use of [MOUD], and … whatever pathway that individual believes is the best pathway, then that's the one that we should encourage."), 105:2-106:6 (providing that buprenorphine is allowed at Harbor Light as part of the "detoxification program[]" and that MOUD "is considered to be an evidence-based treatment"), 126:11-25 (confirming that participants in the Habor Light program are "allowed access to medication for opioid use disorder," including methadone, Suboxone, and Sublocade)); Doc. No. 141-38 (Ex. 153 to Salazar Decl. ISO PI Mot., Plaintiffs' Notice of Deposition of Beau Hill); Doc. No. 141-39 (Ex. 154 to Salazar Decl. ISO PI Mot., The Salvation Army Eastern Territory's "Combat Addiction" webpage); Doc. No. 141-40 at 3 (Ex. 157 to Salazar Decl. ISO PI Mot., The Salvation Army Central Territory's "Licensed Treatment Centers" webpage (listing "Medication-Assisted Treatment (MAT)," which refers to the "use of medication" to treat substance abuse, as a service provided by Salvation Army Licensed Treatment Centers to treat opioid addiction; recognizing that "MAT is considered by experts to be the gold standard of care when treating opioid disorders" and that "[t]he medications used are approved by the Food and Drug Administration")); Doc. No. 141-54 at 2 (Ex. O to Salazar Decl. ISO PI Mot., Revised MAT Policy for Clinical Programs – 04-21-2021 ("Salvation Army … recognize[s] that MAT is a best practice in addressing [the opioid] crisis.")).

83. **TSA has explained that providing buprenorphine to participants with OUD at its Harbor Light Centers does not violate its religion "because the program is done in conjunction with government funding and government regulations, so we understand that by doing that program and that service, that we have to abide by those guidelines."** Doc. No. 141-3 (Ex. C to Salazar Decl. ISO PI Mot., Hill Dep. Tr. 99:1-16 (Q: It doesn't violate Salvation Army's religious beliefs to provide buprenorphine to participants in [the Harbor Light Centers] program, is that correct? A. It's -- under the guidelines of the medical thing, no, because the program is done in conjunction with government funding and government regulation, so we understand that by doing that program and that service, that we

have to abide by those guidelines."), 65:5-66:7 (confirming that "[i]f someone is on a particular form of MAT that they've been provided in a correctional facility and want to continue that treatment while participating in the community corrections program, they're allowed to do that"), 67:7-68:21 (TSA's PASS program, which provides homeless services, does not prohibit individuals taking methadone from participating in the program), 72:4-8, (same for TSA's Zelma George Family Shelter), 100:1-101:5 ("Q: Are you aware of any policy of the Harbor Light programs that would prohibit participants from accessing MAT? A. No. We recently changed that over the last year and those program participants can access it if deemed medically appropriate. … Q: And what was the reason for the change? A: It would depend on the program area, but it was driven by government guidelines. Q: Federal government guidelines? A: Mostly state."), 101:21- 102:23 (agreeing that "because of the government guidelines," "it doesn't violate Salvation Army's religious beliefs to allow participants in the community corrections program to access [methadone and Suboxone]")).

84. **TSA permits ARC participants to use nicotine, even though it recognizes that nicotine is addictive and subject to abuse. TSA acknowledges that nicotine use by ARC participants does not interfere with TSA's religion.** Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 74:14-75:9 (acknowledging that nicotine is an "addictive" substance that "can be abused," but that ARC participants are allowed to use nicotine because "[t]hey're not members of the Salvation Army" and "[a]llowing ARC participants to use nicotine doesn't prevent salvationists from practicing their religion"), 109:24-110:18 (confirming that "the Salvation Army can continue to practice its religion while allowing ARC participants to use nicotine," even though nicotine is "a drug" and Salvationists are required to abstain.)); Doc. No. 141-4 (Ex. D to Salazar Decl. ISO PI Mot., Swistak Dep. Tr. 70:17-71:7 (providing that "ARC participants are permitted to use nicotine," because "the individuals are going through enough"), 73:19-74:19 (acknowledging that "nicotine is addictive," but explaining that it is permitted at ARCs despite the "abstinence-based rehabilitation program" to avoid "undue stress" on participants)).

**TSA's accommodation of ARC participants who take other prescription medications**

85. **TSA allows ARC participants to take many prescription medications other than MOUD, including "narcotic" medications and medications that TSA claims carry risk of "abuse." For these other medications, TSA makes individualized determinations for each individual with respect to the medications they may take.** Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 71:3-72:10, 72:22-25 (acknowledging that there are "some prescribed narcotics that an ARC participant[] can use and can be stored at the ARCs"), 92:24-93:14, 98:6-23, 103:6-104:13 ("[T]he Salvation Army does permit ARC participants to use some medications that have the possibility of abuse."), 122:2-123:11 ("CARES Assessment is when an applicant … ha[s] some questions on whether it is medication, mental health or something else that may be above our capacity so it is sent to headquarters to Dr. Coombs who goes over that and then makes the recommendation if we're the correct program or if they need a different type of program."), 123:21-125:5 (allowing ARC participants to take gabapentin for some uses, even though it "can be abused"), 207:21-

25 (an ARC "is able to accommodate participants who have prescription medications that are permitted by the medication policy that they can self administer.")); Doc. No. 141-10 at 7 (Ex.106 to Salazar Decl. ISO PI Mot., TSA ARC Center Guidelines for Posting (allowing "[p]rescribed narcotics" at ARCs if approved by Administrators)); Doc. No. 141-5 (Ex. E to Salazar Decl. ISO PI Mot., Coombs Dep. Tr. 55:20-56:7 (allowing ARC participants to take Sudafed, which can be abused), 72:18-73:8 (allowing gabapentin, which TSA recognizes "has the potential for abuse"), 74:22-75:4 (allowing ARC participants to take narcotic medication, which can be abused, for pain or surgery), 77:8-79:16 (allowing Seroquel, which TSA recognizes "has been" "misuse[d]"), 84:9-21 (allowing Librium), 131:12-134:7 (allowing gabapentin, including for long-term use, even though TSA recognizes that people misuse it to "get high"), 107:14-108:4 (allowing loperamide, which can be "fatal" if combined with other medications and "misused"), 109:6-110:10 (allowing trimipramine, which can be abused)); Doc. No. 141-13 (Ex. 116 to Salazar Decl. ISO PI Mot., TSA ARC Medication Guide); Doc. No. 141-4 (Ex. D to Salazar Decl. ISO PI Mot., Swistak Dep. Tr. 37:2-18, 39:6-21, 42:21-44:14, 62:10-20 (allowing ARC participants to take "analgesic for pain that was a narcotic" "as long as they're closely monitored")); Doc. No. 141-18 (Ex. 124 to Salazar Decl. ISO PI Mot., TSA ARC Eastern Territory CARES Assessments PowerPoint); Doc. No. 141-51 at 2 (Ex. L to Salazar Decl. ISO PI Mot., Email Thread from February 10, 2021 ("Our goal is to ensure each center has the capacity to meet the individual needs of the applicant… In regards to gabapentin, we review this on a case by case basis.")); Doc. No. 141-52 at 2 (Ex. M to Salazar Decl. ISO PI Mot., Email from May 3, 2021 (gabapentin permitted case-by-case despite TSA's "concern" of potential risks)).

86. **TSA prevents "abuse" of certain prescription medications by storing them in a central, locked location and requiring participants to take them under staff supervision.** Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 56:22-57:14 (confirming that "all medications at ARC are kept in a central secure space" and access is "restricted to specified personnel"), 58:15-23, 120:23-121:12 (confirming that TSA uses central storing "for all medication storage" to prevent "abuse" of medications and supplements)); Doc. No. 141-8 at 47 (Ex. 104 to Salazar Decl. ISO PI Mot., TSA ARCs Handbook of Standards, Principles and Policies ("Medications, prescriptions and over-the-counter drugs should be stored in a secured space, with access restricted to specified personnel.")); Doc. No. 141-5 (Ex. E to Salazar Decl. ISO PI Mot., Coombs Dep. Tr. 25:6-13 ("Most of the medication has to be centrally stored and personally identified to limit sharing of medications."), 26:23-27:1, 49:4-20 (confirming that "monitoring occurs to ensure that the participants don't share their medications with people" for whom the medication is not intended), 73:2-13 ("We essentially store and personally identify all medications, and then we typically monitor the person tak[ing] it."), 75:6-14, 108:21-109:5, 133:4-10 ("[W]e essentially store and personally identify the medication, and then we observe them taking their medication."), 133:22-134:7).

87. **ARC participants attend appointments and receive care at outside clinics.** Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 42:11-13, 42:17-43:13, 57:15- 58:14, 208:2-6 (confirming that "the ARC is able to work with participants to take them to medical appointments while they're participating in the ARC program")).

88. **Outside healthcare providers visit ARCs to provide treatment to ARC participants.** Doc. No. 141-5 (Ex. E to Salazar Decl. ISO PI Mot., Coombs Dep. Tr. 48:15-24 (confirming that TSA "may have had some providers come on site" to give ARC participants naltrexone injections)).

89. **TSA allows participants to receive monthly naltrexone injections.** Doc. No. 141-5 (Ex. E to Salazar Decl. ISO PI Mot., Coombs Dep. Tr. 47:24-49:20 (confirming that ARC participants are allowed to receive monthly naltrexone injections, which treat OUD), 48:10-24 (explaining that ARC participants receive naltrexone injections from their "prescribers" and that "most of the time [ARC participants] go off site" to receive naltrexone injections)); Doc. No. 141-4 (Ex. D to Salazar Decl. ISO PI Mot., Swistak Dep. Tr. 180:20-22 ("[T]he ARCs can accommodate people who need Vivitrol.")).

**TSA could allow ARC participants to take MOUD using the same procedures that apply to other prescription medications**

90. **Individuals taking MOUD can receive all needed treatment from their healthcare providers, without requiring special medical monitoring, allowing individuals to live in communal arrangements without doctors onsite.** Doc. No. 143 (Rodriguez Decl., ¶40 (individuals on MOUD "do not need additional medical monitoring or 'treatment' in their personal lives, at their place of residence, or in rehabilitation or residential programs."), ¶65, ¶67 ("After dosing visits, patients are able to carry on with other aspects of their lives without special monitoring or treatment."), ¶75 (explaining that individuals receiving buprenorphine may have weekly, biweekly, monthly, or less frequent visits, which can be conducted via telemedicine, and that no additional medical monitoring is required outside of these scheduled check-ins), ¶93 ("Individuals who use any of the FDA-approved medications for opioid use disorder … do not need any special medical monitoring or care in their daily living environments, and can receive all the medical treatment they need from their medical providers. A living facility does not require medical or other training, medical monitoring, or special safety standards to be able to house someone who is using … medications for their opioid use disorder."), ¶96 ("Buprenorphine and methadone are medications prescribed in the ambulatory setting and do not require a higher level of care or additional precautions relative to other prescribed medications.")); Doc. No. 232-1 (Ex. A to Salazar Decl. ISO CCert. Mot., Mangiacarne Dep. Tr. 44:19-45:19 (confirming that individuals living "outside of a licensed clinical facility" can receive MOUD), 52:5-20 (describing choice to open MOUD outpatient practice for registered patients and general community members), 92:8-94:9 (providing that individuals can take MOUD while living at home, with roommates, in group sober living facilities, or while unhoused, without facing medical barriers to treatment), 128:9-18, 130:3-11 (confirming that individuals can safely take MOUD "while living in settings that don't have doctors and nurses on-site)); Doc. No. 147 (Declaration of Shawn Arcidiacono ISO PI Mot., ¶¶9-10 (ARC participant explaining that he took prescribed Suboxone for a few days when he began ARC program without requiring higher level of care: "ARC staff retrieved my Suboxone dose from the central location each day and watched me self-administer it. Within the first few days of my arrival at the Worcester ARC, the Sergeant-Major drove me in her car to a clinic to refill my Suboxone prescription, which at the time

was in the form of sublingual strips. There was no problem with my continuing my daily Suboxone, and the ARC did not need to give me any special care that it didn't provide to other ARC participants."), ¶¶11-13 (explaining that he was forced to stop taking Suboxone after "the Salvation Army headquarters apparently became aware that [he] was taking [it]," which made him "seriously ill" and he "required hospitalization"), ¶¶14-15 (stating that he was then discharged from ARC program, was not allowed to return to the program, and was not referred to another program)).

91. **Methadone can be self-administered by individuals with OUD or taken daily at outside clinics.** Doc. No. 143 (Rodriguez Decl. ISO PI Mot., ¶62 ("Methadone … is an oral medication that is dispensed directly to the patient with OUD in liquid form … [and] can also be provided in acute care settings … in tablet form."), ¶67 ("Federal OTP regulations allow for take home doses of methadone once a patient has achieved a period of time free of drug use, is achieving treatment goals, and has adhered to treatment as expected in the program.")); Doc. No. 143-2 (Ex. 2 to Rodriguez Decl. ISO PI Mot., TIP63 at 99-100 (methods of methadone administration), 101 ("roughly 1,500 federally certified opioid treatment programs (OTPs) offer methadone for OUD," and provide medical oversight of this treatment, direct onsite observation of dose administration, and offer take-home dose dispensing)).

92. **Buprenorphine can be injected on a monthly basis (Sublocade) or self-administered orally (Subutex or Suboxone).** Doc. No. 143 (Rodriguez Decl. ISO PI Mot., ¶40 ("Patients on medications like buprenorphine … are not evaluated daily, and frequency of visits with their prescriber may vary from weekly to every three to four months."), ¶¶70-71 ("I use the term 'buprenorphine' to refer to all buprenorphine products, including the commonly used buprenorphine/naloxone combination with the brand name Suboxone. Other associated brand names include Subutex (mono-product buprenorphine) and Sublocade (long acting injectable buprenorphine)."), ¶74 ("Buprenorphine/naloxone (Suboxone) is the most commonly prescribed formulation and is taken orally. … For the treatment of OUD, [buprenorphine] is available as a sublingual tablet, film, and a monthly injectable formulation."), ¶75 ("Patients for whom buprenorphine is the appropriate treatment can initiate buprenorphine in the office setting or in the comfort of their home with clinical guidance.")); Doc. No. 143-2 (Ex. 2 to Rodriguez Decl. ISO PI Mot., TIP63 at 99-100 (methods of buprenorphine administration), 102 (buprenorphine is available by prescription through pharmacies), 144 (providing the formulations of buprenorphine).

93. **Opioid Treatment Program (OTP) clinics are located within a 15-minute drive of each ARC, with some clinics just one minute away.** Doc. No. 233 (Declaration of Maria Wenzell (Wenzell Decl. ISO PI CCert. Mot. (describing attached exhibits)); Doc. No. 233-4 (Ex. D to Wenzell Decl. ISO CCert. Mot., Chart Showing Each of the 29 ARCs and the SAMSHA-certified OTP Locations in the Same City (demonstrating proximity between ARCs and OTP locations)); Doc. No. 233-5 (Ex. E to Wenzell Decl. ISO CCert. Mot., Chart Summarizing ARC Addresses and Closest OTP Locations (showing that all listed ARCs are located within 15 minutes or less of an OTP, with several having OTPs less than five minutes

away)); Doc. No. 232-3 (Ex. B to Salazar Decl. ISO CCert. Mot., Rodriguez Dep. Tr. 148:16-25 (receiving a methadone dose at an OTP can take as little as 15 minutes)).

**TSA applied its MOUD ban to each named Plaintiff, causing serious harm.**

94. **TSA applied its MOUD ban to each Plaintiff, denying them access to MOUD while they stayed at an ARC and informing them that methadone and buprenorphine were prohibited. Plaintiffs were not given accommodations.** Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 96:3-97:2 (TSA expelled Tassinari from the Boston ARC for testing positive for Suboxone), 160:5-20 (explaining that when Tassinari called the ARC in 2021 to request admission, he was "told he could not come to an ARC if he remained on methadone"), 165:19-22 ("Mr. Espinosa was not allowed to use methadone or buprenorphine while he was a participant at the ARC."), 168:21-169:2 (confirming that Almeida "was told that he could not come to the ARC while he was on methadone."), 191:2-192:5 (explaining that the call log entry following Almeida's June 2022 call states "on methadone," indicating he was told he could "not come to the ARC while on methadone")); Doc. No. 141-4 (Ex. D to Salazar Decl. ISO PI Mot., Swistak Dep. Tr. 53:19-21 (confirming that Tassinari was "discharged for testing positive for Suboxone"), 167:13-21 (ARC participants on probation or parole must sign release permitting ARC to inform court of discharge), 179:7-14 (confirming that Tassinari "was discharged immediately" after testing positive for Suboxone and that Swistak, administrator of the Boston ARC, was "not aware of any offer being made … to accommodate his use of that medication")); Doc. No. 141-23 at 2-3 (Ex. 134 to Salazar Decl. ISO PI Mot., Mark Tassinari Beneficiary File (TSA informing Lynn District Court Probation Department of discharge from ARC program because completion of program was condition of probation: "Tassinari was administratively discharged from [ARC] program for violating our drug and alcohol policy by testing positive for Suboxone.")); Doc. No. 141-4 (Ex. D to Salazar Decl. ISO PI Mot., Swistak Dep. Tr. 88:19-89:3 (identifying Tassinari Beneficiary File, including document sent by Daniel Ellis, ARC program director, to Lynn District Court Probation Department)); Doc. No. 144 (Declaration of Mark Tassinari (Tassinari Decl. ISO PI Mot., ¶14 ("I was suffering from withdrawal symptoms when I arrived at the Saugus ARC … and was told … that MOUD was not permitted at the ARC and I would not be allowed access to buprenorphine during my stay."), ¶16 ("About a month into joining the ARC program, my need to see a doctor to refill my prescriptions became critical. I had been off my psychiatric medications and MOUD for approximately three months and was suffering physical pain, anxiety, frayed emotions, loss of appetite, and difficulty sleeping."), ¶22 ("After testing positive for doctor-prescribed buprenorphine, The Salvation Army immediately terminated me from participation in the ARC program."), ¶24 (providing that TSA offered no accommodations), ¶¶26-28 (describing Tassinari's subsequent probation hearing, at which he was found "in violation" of probation for not being enrolled in the ARC program), ¶31 (recounting an intake call with the Saugus ARC in which Tassinari was told "that a bed was available, but that [he] could not have the bed because [he] was taking buprenorphine as MOUD. … [I]f [he] wanted to have the bed and participate in the ARC, [he] would have to stop taking MOUD.")); Doc. No. 145 (Declaration of Richard Espinosa (Espinosa Decl. ISO PI Mot., ¶12 ("The Salvation Army told me that I would have to detox

before joining the ARC program … Throughout that detox program, I experienced symptoms of withdrawal including tremors, excessive sweating, headaches, insomnia, nausea, vomiting, and diarrhea. Many of these symptoms persisted after the detox program ended."), ¶14 (describing initial intake call with the ARC where Espinosa was told that "in order to get a bed [he] needed to focus [his] intake on [his] alcohol use … [the intake coordinator] made it clear that The Salvation Army wasn't interested in … discussing my OUD."), ¶¶15-17 ("The lack of access to methadone made my withdrawal symptoms worse than they needed to be."), ¶18 ("It was clear to The Salvation Army that I was experiencing terrible withdrawal symptoms, but … [the] staff refused to let me access the medication I needed, did not arrange for any medical assessment regarding my treatment and needs, and required me to perform work for them full-time."), ¶21 ("Not being able to access methadone while at the ARC delayed my progress in my journey with sobriety. … The delay imposed by The Salvation Army cost me valuable time with my family and time I could have used to get to a better place in my life, financially and otherwise.")); Doc. No. 146 (Declaration of Joseph Almeida (Almeida Decl. ISO PI Mot., ¶8 ("I asked if I could restart my methadone treatment for OUD when I arrived at the Saugus ARC and the Salvation Army staff told me I couldn't."), ¶21 (Almeida was informed by the Saugus ARC that he "could not go to any of The Salvation Army ARC locations while taking, or weaning off, doctor prescribed methadone."), ¶22 ("[N]o Salvation Army ARC campus will admit anyone who is receiving methadone treatment."), ¶¶ 23-25 ("The Salvation Army did not offer me any accommodations and did not offer me any other options to continue methadone at the ARC.")); Doc. No. 141-49 (Filed Under Seal) (Ex. J to Salazar Decl. ISO PI Mot., Almeida Dep. Tr. 46:24-49:6 [redacted], 59:5-60:3 [redacted], 64:14-66:21 [redacted], 112:4-113:6 [redacted]).

95. **TSA's denial of ARC housing and services based on MOUD use caused serious harm to each Plaintiff, all of whom are at risk of needing housing and rehabilitative services.** Doc. No. 141-49 (Filed Under Seal) (Ex. J to Salazar Decl. ISO PI Mot., Almeida Dep. Tr. 96:4-24 [redacted], 99:7-100:1 [redacted], 102:8-106:12 [redacted], 116:2-9 [redacted], 116:22-117:1 [redacted], 124:20-125:18 [redacted]

[redacted], 159:19-160:11 [redacted]);
Doc. No. 144 (Declaration of Mark Tassinari (Tassinari Decl. ISO PI Mot., ¶¶23-28 ("Expulsion from the ARC program was extraordinarily difficult and debilitating. I became homeless, suffered a harmful relapse, lost many of my personal belongings and personal paper records, did not have reliable access to a phone or computer, lost contact with my probation officer, and needed lengthy hospitalizations before I could even get back front of the court for a hearing on my probation conditions."), ¶¶34-42 (describing months of housing instability following expulsion from ARC, leading to a serious foot infection, an acute mental health crisis, frostbite, and near-death experiences)); Doc. No. 145 (Declaration of Richard Espinosa (Espinosa Decl. ISO PI Mot., ¶23 ("If I do suffer a relapse, I would be in dire need of housing, medication, and rehabilitation, as I was in the past. I would want to be able to return to an ARC, since I have had some success with them in the past (albeit while suffering from painful withdrawal) and they provide a unique long-term environment to help my recovery. However, attempting recovery without the assistance of methadone would jeopardize my recovery, my health, and potentially my life.")); Doc. No. 146 (Declaration of Joseph Almeida (Almeida Decl. ISO PI Mot., ¶¶26-28 ("I believe that all of this could have been avoided if I had been able to stay at a Salvation Army ARC and continue my methadone treatment for OUD."), ¶29-32 ("I would like to be able to be considered for housing at a Salvation Army ARC to avoid being houseless and to have access to rehabilitation services. However, I also need to continue my methadone treatment in order to keep progressing in my recovery. As long as The Salvation Army continues to prohibit residents from using methadone as MOUD at ARCs, the organization is actively preventing me from taking the best steps for my recovery and is preventing me from following my doctor's medical advice for my OUD.")); Doc. No. 198 (Supp. Decl. of Tassinari ISO PI Mot., ¶¶3, 7-9 (Tassinari currently has no stable housing and is in desperate need of housing and rehabilitation services in an environment where he can continue accessing medication for his OUD.)); Doc. No. 200 (Supp. Decl. of Almeida ISO PI Mot., ¶¶3-4 (Almeida is currently incarcerated; he will need access to his prescribed methadone to treat his OUD while he is incarcerated, but he will need housing and services when he is released, and there is uncertainty as to when that will be)).

96. **Each Plaintiff would be eligible for ARC admission but for their use of MOUD.** Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 160:21-161:11 (explaining no knowledge of any reason, other than Tassinari's use of methadone or buprenorphine, that would render him ineligible for ARC participation), 166:10-19 (providing same for Espinosa), 169:3-17 (providing same for Almeida)); Doc. No. 141-4 (Ex. D to Salazar Decl. ISO PI Mot., Swistak Dep. Tr. 90:17-22 ("Q: If Mr. Tassinari was not taking buprenorphine or methadone right now, would he be eligible for enrollment in an ARC? A: I see no reason why not.")).

Respectfully submitted,

Dated: August 14, 2025

By: /s/ *Matthew J. Murray*

Matthew J. Murray* (CA Bar No. 271461)
Connie K. Chan* (CA Bar No. 284230)
Alice X. Wang* (CA Bar No. 335224)
**ALTSHULER BERZON LLP**
177 Post Street, Suite 300
San Francisco, CA 94108
Phone: (415) 421-7151
Fax: (415) 362-8064
Email: mmurray@altber.com
cchan@altber.com
awang@altber.com
**Pro Hac Vice*

Janet Herold (Bar No. 632479)
**Justice Catalyst Law**
40 Rector Street, Floor 9
New York, NY 10006
Main: 518-732-6703
Email: jherold@justicecatalyst.org
**Pro Hac Vice*