**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

**MARK TASSINARI, RICHARD ESPINOSA, AND JOSEPH ALMEIDA**, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

**THE SALVATION ARMY, a NEW YORK CORPORATION,**

Defendant.

**CASE NO. 1:21-CV-10806-LTS**

**NOTICE OF SUPPLEMENTAL AUTHORITY**
**(LEAVE TO FILE GRANTED ON JANUARY 30, 2026)**

Defendant The Salvation Army, a New York Corporation ("The Salvation Army") submits this Notice of Supplemental Authority to inform this Court of the decision of the U.S. Court of Appeals for the Ninth Circuit in *Union Gospel Mission of Yakima Washington v. Brown*, No. 24-7246 (9th Cir. Jan. 6, 2026), which, for the reasons stated in Defendant's motion for leave to file this notice, is relevant to The Salvation Army's pending Motion for Summary Judgment (Dkt. 274).

Respectfully submitted,

Dated: January 30, 2026

/s/ Daniel W. Wolff
Daniel W. Wolff
Kathryn Erno
Christine Hawes
Crowell & Moring LLP
Washington, DC 20004
Telephone: (202) 624-2500
Facsimile: (202) 628-5116 (fax)

Email: dwolff@crowell.com
kerno@crowell.com
chawes@crowell.com (*pro hac vice*)

Andrew Holmer
Crowell & Moring LLP
515 Flower Street, 41st Floor
Los Angeles, CA 90071
Telephone: (213) 622-4750
Facsimile: (213) 622-2690
Email: aholmer@crowell.com

BARTON GILMAN LLP

/s/ Kevin M. Hensley
Kevin M. Hensley (BBO#554824)
Barton Gilman LLP
75 Federal Street, 9th floor
Boston, Massachusetts 02110
Telephone: (617) 654-8200
Facsimile: (617) 482-5350
khensley@bglaw.com

*Attorneys for Defendant The Salvation Army, a New York Corporation*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing notice was filed through the ECF system and sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on January 30, 2026.

/s/ Daniel W. Wolff
Daniel W. Wolff

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNION GOSPEL MISSION OF YAKIMA WASHINGTON,

*Plaintiff - Appellee*,

v.

NICK BROWN, in his official capacity as Attorney General of Washington State; ANDRETA ARMSTRONG, in her official capacity as Executive Director of the Washington State Human Rights Commission; DEBORAH COOK, in her official capacity as Commissioner of the Washington State Human Rights Commission; GUADALUPE GAMBOA, in her official capacity as Commissioner of the Washington State Human Rights Commission; JEFF SBAIH, in his official capacity as Commissioner of the Washington State Human Rights Commission; HAN TRAN, in his official capacity as Commissioner of the Washington State Human Rights Commission,

*Defendants - Appellants*.

No. 24-7246

D.C. No. 1:23-cv-03027-MKD

OPINION

Appeal from the United States District Court
for the Eastern District of Washington
Mary K. Dimke, District Judge, Presiding

Argued and Submitted June 3, 2025
Seattle, Washington

Filed January 6, 2026

Before: Johnnie B. Rawlinson, Daniel A. Bress, and Patrick J. Bumatay, Circuit Judges.

Opinion by Judge Bumatay

## SUMMARY*


### First Amendment/Church Autonomy Doctrine

The panel affirmed the district court's preliminary injunction prohibiting the enforcement of the Washington Law Against Discrimination ("WLAD") against the Union Gospel Mission of Yakima, Washington —a Christian ministry—for preferring and hiring co-religionists for non-ministerial roles.

WLAD prohibits employment discrimination based on several protected grounds, including sexual orientation. Because of its religious purpose, Union Gospel requires its employees to agree with and live out its Christian


* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

beliefs and practices, including "abstaining from any sexual conduct outside of biblical marriage between one man and one woman." Union Gospel brought this pre-enforcement action against the Washington State Attorney General and the Washington State Human Rights Commission, alleging violations of the First Amendment and requesting an injunction prohibiting defendants from enforcing WLAD against it.

The panel held that Union Gospel is likely to succeed on the merits of its claim that enforcing WLAD against it for hiring only co-religionists violates the church autonomy doctrine, as established by the First Amendment's Religion Clauses. The church autonomy doctrine encompasses more than just the ministerial exception. It forbids interference with "an internal church decision that affects the faith and mission of the church itself." In this case, Union Gospel's co-religionist hiring policy constitutes an internal management decision that is essential to the institution's central mission. It is uncontested that (1) Union Gospel is a religious institution, (2) Union Gospel has a sincerely held religious belief that only co-religionists may advance its religious mission, and (3) Union Gospel's co-religionist hiring policy is based on that religious belief.

Under the church autonomy doctrine, Union Gospel may decline to hire as non-ministerial employees those who do not share its religious beliefs about marriage and sexuality. But unlike the ministerial exception, the church autonomy doctrine protects only Union Gospel's non-ministerial hiring decisions based on religious beliefs. Union Gospel cannot discriminate on any other ground. The panel emphasized that its decision was limited to religious organizations like Union Gospel and that it did not consider the scope of the doctrine on other types of

entities run by religious institutions, such as businesses or hospitals.

The panel held that the remaining preliminary injunction factors—irreparable harm, the public interest and balance of the equities—favored Union Gospel.

---

## COUNSEL

Jeremiah Galus (argued), Katherine L. Anderson, and Ryan J. Tucker, Alliance Defending Freedom, Scottsdale, Arizona; David A. Cortman and John J. Bursch, Alliance Defending Freedom, Washington, D.C.; James A. Campbell and Jacob E. Reed, Alliance Defending Freedom, Lansdowne, Virginia; David K. Dewolf, Albrecht Law PLLC, Spokane Valley, Washington; for Plaintiff-Appellee.

Cynthia L. Alexander (argued) and Tera M. Heintz, Deputy Solicitors General; Nicholas W. Brown & Robert W. Ferguson, Washington Attorneys General; Office of the Washington Attorney General, Olympia, Washington; Daniel Jeon and David Ward, Assistant Attorneys General, Office of the Washington Attorney General, Seattle, Washington; for Defendants-Appellants.

Anastasia R. Sandstrom, Senior Counsel; Robert W. Ferguson, Washington Attorney General, Office of the Washington Attorney General, Seattle, Washington, for Amicus Curiae Washington State Department of Labor & Industries.

Joshua A. Block and Louise Melling, American Civil Liberties Union Foundation, New York, New York; Aditi Fruitwala and Daniel Mach, American Civil Liberties Union

Foundation, Washington, D.C.; Adrien Leavitt and La Rond Baker, American Civil Liberties Union of Washington Foundation, Seattle, Washington; Alex Luchenitser and Jenny Samuels, Americans United for Separation of Church and State, Washington, D.C.; for Amici Curiae American Civil Liberties Union, American Civil Liberties Union of Washington, and Americans United for Separation of Church and State.

Ian S. Speir I, Covenant Law PLLC, Colorado Springs, Colorado, for Amici Curiae Colson Center for Christian Worldview, et al..

Vince R. Eisinger, Cranfill Sumner LLP, Raleigh, North Carolina, for Amici Curiae Professors Stephanie Barclay, Robert F. Cochran Jr., David F. Forte, Richard Garnett, Douglas Laycock, Michael W. McConnell, and Robert J. Pushaw.

Michael P. Farris, National Religious Broadcasters, Washington, D.C., for Amicus Curiae National Religious Broadcasters.

Randall L. Wenger, Jeremy L. Samek, and Janice Martino-Gottshall, Independence Law Center, Harrisburg, Pennsylvania; Deborah J. Dewart, Hubert, North Carolina; for Amicus Curiae Wyoming Rescue Mission.

Peter M. Torstensen Jr., Deputy Solicitor General; Christian B. Corrigan, Solicitor General; Austin Knudsen, Montana Attorney General; Office of the Montana Attorney General, Helena, Montana; Steve Marshal, Alabama Attorney General, Office of the Alabama Attorney General, Montgomery, Alabama; Tim Griffin, Arkansas Attorney General, Office of the Arkansas Attorney General, Little Rock, Arkansas; John Guard, Florida Acting Attorney

General, Office of the Florida Attorney General, Tallahassee, Florida; Raul R. Labrador, Idaho Attorney General, Office of the Idaho Attorney General, Boise, Idaho; Brenna Bird, Iowa Attorney General, Office of the Iowa Attorney General, Des Moines, Iowa; Kris Kobach, Kansas Attorney General, Office of the Kansas Attorney General, Topeka, Kansas; Liz Murrill, Louisiana Attorney General, Office of the Louisiana Attorney General, Baton Rouge, Louisiana; Lynn Fitch, Mississippi Attorney General, Office of the Mississippi Attorney General, Jackson, Mississippi; Andrew Bailey, Missouri Attorney General, Office of the Missouri Attorney General, Jefferson City, Missouri; Michael T. Hilgers, Nebraska Attorney General, Office of the Nebraska Attorney General, Lincoln, Nebraska; Dave Yost, Ohio Attorney General, Office of the Ohio Attorney General, Columbus, Ohio; Gentner F. Drummond, Oklahoma Attorney General, Office of the Oklahoma Attorney General, Oklahoma City, Oklahoma; Alan Wilson, South Carolina Attorney General, Office of the South Carolina Attorney General, Columbia, South Carolina; Marty J. Jackley, South Dakota Attorney General, Office of the South Dakota Attorney General, Pierre, South Dakota; Jonathan Skrmetti, Tennessee Attorney General, Office of the Tennessee Attorney General, Nashville, Tennessee; Ken Paxton, Texas Attorney General, Office of the Texas Attorney General, Austin, Texas; Derek E. Brown, Utah Attorney General, Office of the Utah Attorney General, Salt Lake City, Utah; Jason Miyares, Virginia Attorney General, Office of the Virginia Attorney General, Richmond, Virginia; John B. McCuskey, West Virginia Attorney General, Office of the West Virginia Attorney General, Charleston, West Virginia; for Amici Curiae State of Montana and 19 Other States.

Steven T. McFarland, Christian Legal Society Center for Law & Religious Freedom, Springfield, Virginia, for Amici Curiae Christian Legal Society, the Center for Public Justice, the Christian Medical and Dental Associations, Citygate Network, CRISTA Ministries, the General Conference of Seventh-Day Adventists, the Institutional Religious Freedom Alliance, and the Islam and Religious Freedom Action Team of the Religious Freedom Institute.

John T. Melcon, Taylor Huse, and Stuart Lark, Taft Stettinius & Hollister LLP, Colorado Springs, Colorado, for Amici Curiae the Christian and Missionary Alliance, Council for Christian Colleges and Universities, Grace to You, Eco, A Covenant Order of Evangelical Presbyterians, Church Educational System of the Church of Jesus Christ of Latter-Day Saints, Alliance Redwoods Conference Grounds, the Master's University and Seminary, Town & Country Manor of the Christian and Missionary Alliance, and the Fuller Foundation.

Eric N. Kniffin, Ethics & Public Policy Center, Colorado Springs, Colorado, for Amicus Curiae Ethics & Public Policy Center.

George M. Ahrend, Ahrend Law Firm PLLC, Spokane, Washington, for Amici Curiae American Association of Christian Schools, Association for Biblical Higher Education, Association of Christian Schools International, and Association of Classical Christian Schools.

# OPINION

BUMATAY, Circuit Judge:

The Religion Clauses of the First Amendment protect religious institutions from government interference over their internal affairs involving faith and doctrine. Known as the church autonomy doctrine, the Clauses work in tandem to prohibit state meddling in the religious matters of religious organizations. Under the ministerial exception, the church autonomy doctrine bars the government from intruding in religious organizations' choice of ministers and clergy. The freedom of religious institutions to establish their own doctrine and faith is so fundamental that they may categorically hire and fire their ministers without regard to anti-discrimination laws—even if the termination is for non-religious reasons. Simply, the government has no business in policing who spreads the word on behalf of churches, synagogues, mosques, religious organizations, and other similar institutions.

But the church autonomy doctrine is not so narrowly drawn. The First Amendment may also shield religious institutions' hiring of non-ministerial employees when it involves matters of faith and doctrine. For example, a religious institution may decide that its religious mission is best served by hiring only employees who adhere to and follow its religious beliefs—even for those not acting in ministerial roles. The religious institution may also believe that it can more effectively promote its view of moral and spiritual well-being if its own employees do not lead lives contrary to the institution's teachings. And a religious institution may conclude that it would undermine the institution's identity and mission as a religious organization

if its own employees contradict or disavow the tenets it teaches.

Hiring based on religious criteria may conflict with laws prohibiting employment decisions based on protected characteristics. Ordinarily, even religious institutions must follow generally applicable employment laws. But if state law were to prevent religious institutions from employing only co-religionists, those institutions could be forced to hire employees who openly flout and disagree with their religious principles. This, the First Amendment doesn't tolerate. Because who a religious organization hires may go to the very character of its religious mission, the church autonomy doctrine protects the decision to hire co-religionists for non-ministerial roles if that decision is based on the organization's sincerely held religious beliefs.

Applying these principles, we hold that the district court correctly enjoined enforcing the Washington Law Against Discrimination against Union Gospel Mission of Yakima, Washington—a Christian ministry—for preferring and hiring co-religionists for non-ministerial roles. This is a narrow ruling. Under the church autonomy doctrine, Union Gospel may decline to hire as non-ministerial employees those who do not share its religious beliefs about marriage and sexuality. But unlike with the ministerial exception, the church autonomy doctrine only protects Union Gospel's non-ministerial hiring decisions based on religious beliefs. So Union Gospel cannot discriminate on any other ground. And our decision is limited to religious organizations like Union Gospel. We do not consider the scope of the doctrine on other types of entities run by religious institutions, such as businesses or hospitals.

Finally, and importantly, we emphasize that what Union Gospel seeks here is already protected under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-1(a) and many other state anti-discrimination laws, which likewise exempt religious organizations from general prohibitions on religious discrimination. Indeed, we address this question here only because Washington has narrowly construed a similar exemption in its own anti-discrimination law. But Washington cannot override the First Amendment's church autonomy doctrine, and so the district court's injunction must be affirmed.

## I.

## Background

### A.

The Washington Law Against Discrimination ("WLAD") prohibits employment discrimination based on several protected grounds, including sexual orientation. *See* Wash. Rev. Code §§ 49.60.030(1)(a), 49.60.180(1)-(3). Since its enactment in 1949, WLAD establishes that,

> It is an unfair practice for any employer: To refuse to hire any person because of . . . sexual orientation. . . . To discharge or bar any person from employment because of . . . sexual orientation. . . . To discriminate against any person in compensation or in any other terms or conditions of employment because of . . . sexual orientation.

*Id.* § 49.60.180(1)-(3). WLAD defines "sexual orientation" to mean "heterosexuality, homosexuality, bisexuality, and gender expression or identity." *Id.* § 49.60.040(29). The

law further prohibits employers from inquiring into protected grounds or from publishing job advertisements containing hiring limitations based on protected grounds. *Id.* § 49.60.180(4). WLAD also prevents employers from "[r]equir[ing] an employee to disclose his or her sincerely held religious affiliation or beliefs." *Id.* § 49.60.208(1).

WLAD empowers the Washington State Human Rights Commission to investigate and evaluate complaints filed by aggrieved parties. *Id.* §§ 49.60.120(4), 49.60.140, 49.60.230. At the Commission's discretion, complaints can be resolved through "conference, conciliation, and persuasion" or, failing that, through an enforcement action before an administrative law judge. *Id.* §§ 49.60.240(3), 49.60.250. The attorney general may also enforce WLAD. *See State v. Sunnyside*, 550 P.3d 31, 41-45 (Wash. 2024) (en banc). So can private parties. Wash. Rev. Code § 49.60.030(2).

By its terms, WLAD exempts nonprofit religious organizations from its definition of "employer." *Id.* § 49.60.040(11) ("Employer . . . does not include any religious or sectarian organization not organized for private profit."). In 2021, however, the Washington Supreme Court interpreted this exemption narrowly to avoid a perceived conflict with the state constitution's Privileges and Immunities Clause. *See Woods v. Seattle's Union Gospel Mission*, 481 P.3d 1060, 1067 (Wash. 2021) (en banc), *cert. denied*, 142 S. Ct. 1094 (2022) (limiting the protection to "ministers" as defined in the U.S. Supreme Court's First Amendment jurisprudence). So after the Washington Supreme Court's decision, WLAD applies to nonprofit religious organizations in their hiring of non-ministerial employees.

The Union Gospel Mission of Yakima is a private, nonprofit religious organization whose mission is to "spread the Gospel of the Lord Jesus Christ." By its constitution and bylaws, Union Gospel provides "Christ[-]centered rescue, recovery and restoration to men, women and children in need." Union Gospel also seeks to "follow Christ" by "helping people move from homelessness to wholeness." To these ends, it operates a homeless shelter, faith-based recovery programs, health clinics, and meal services. According to Union Gospel, in one year, it provided 30,167 nights of shelter to adults and children, gave out 141,629 free meals, and helped dozens regain sobriety.

Union Gospel maintains that its religious purpose infuses all its work. It encourages everyone that it helps to "develop a relationship with Jesus Christ"—thus, the Gospel is shared with "everyone at all times." To Union Gospel, "spiritual welfare carries more weight than physical assistance."

Because of its religious purpose, Union Gospel requires its employees to agree with and live out its Christian beliefs and practices, including "abstaining from any sexual conduct outside of biblical marriage between one man and one woman." It expects its employees to further its evangelical mission and provide an example to others of a proper Christian life. To help facilitate this fellowship, employees attend daily prayers and weekly chapel services, and are encouraged and expected to pray for one another and share devotionals.

Before applying for a job with Union Gospel, the organization notifies applicants of its religious mission and its requirement that its employees comply with its religious tenets. On receiving an offer of employment, applicants must sign and agree to comply with Union Gospel's

statement of faith, core values, and job duties and requirements. Every year, Union Gospel receives applications from those who express disagreement with—and sometimes hostility to—its religious beliefs, particularly those about marriage and sexuality. Union Gospel screens out those applications.

Ordinarily, Union Gospel operates with just over 150 employees. In 2023, when this litigation started, Union Gospel anticipated needing to fill more than 50 positions, including an IT technician and an operations assistant. The IT technician serves the IT needs of Union Gospel's employees, such as configuring and troubleshooting computers, printers, and phones; assisting employees with hardware and software issues; and creating keycards and operating the access control system. Likewise, the operations assistant serves a traditional administrative role—running errands and acquiring supplies, performing administrative tasks, and generally helping the organization's operations. Neither the IT technician nor operations assistant act as official clergy for the organization and their roles are mostly "inward" facing—largely assisting Union Gospel employees, not the members of the public helped by the organization. Because of this, Union Gospel doesn't consider these jobs as ministerial positions and doesn't claim them to be protected by any ministerial exception.

**B.**

In early March 2023, Union Gospel brought this pre-enforcement action against the Washington State Attorney General and the Washington State Human Rights Commission (collectively, "the State"). Union Gospel sought a declaratory judgment that WLAD violated its First

Amendment rights of (1) hiring only co-religionists for non-ministerial positions, (2) free exercise, (3) expressive association, (4) free speech, and (5) freedom from excessive governmental entanglement. It also requested an injunction prohibiting the State from enforcing WLAD against it.

The district court first dismissed Union Gospel's complaint for lack of standing and denied its motion for a preliminary injunction as moot. Union Gospel appealed, and we concluded that Union Gospel's claims satisfied Article III standing and remanded to the district court. *See Union Gospel Mission of Yakima v. Ferguson*, 2024 WL 3755954, at *1–3 (9th Cir. Aug. 12, 2024). On remand, the district court held that Union Gospel was likely to succeed on the merits of its free exercise claim. It ruled that WLAD treats other secular employers—small businesses—more favorably and thus must satisfy strict scrutiny under *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam). Under strict scrutiny, the district court concluded that the law was not the least restrictive means available to the State and that it was impermissibly underinclusive. It then entered a preliminary injunction, enjoining the State from enforcing WLAD against Union Gospel for preferring and hiring only co-religionists for its non-ministerial positions.

The State now appeals.

## II.

## Justiciability

Before turning to the merits, we start with the State's justiciability arguments. The State argues that Union Gospel now lacks standing to obtain a preliminary injunction because it has expressly disclaimed enforcement of WLAD

against Union Gospel for its hiring of an IT technician or operations assistant. We disagree.

Because "standing is determined as of the commencement of litigation," *Yamada v. Snipes*, 786 F.3d 1182, 1203 (9th Cir. 2015) (simplified), we take the State's argument to be grounded in mootness doctrine. A claim is moot if it "has lost its character as a present, live controversy." *Flint v. Dennison*, 488 F.3d 816, 823 (9th Cir. 2007) (simplified). "The basic question is whether there exists a present controversy as to which effective relief can be granted." *Vill. of Gambell v. Babbitt*, 999 F.2d 403, 406 (9th Cir. 1993) (simplified). "Defendants bear a heavy burden to establish mootness at the appellate stage." *Ctr. for Biological Diversity v. Exp.-Imp. Bank of the United States*, 894 F.3d 1005, 1011 (9th Cir. 2018) (simplified). It must be "absolutely clear that [the defendant's] allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 189 (2000).

After the case was remanded to the district court but before entry of the preliminary injunction, the State stipulated that it will not enforce WLAD against Union Gospel in connection with the hiring of the positions explicitly referenced in its complaint—the IT technician and operations assistant positions. The State argues that this stipulation moots this case. But this disavowal provides little assurance to Union Gospel. It only covers two positions, and the State has expressly refused to disavow enforcing WLAD against Union Gospel for the hiring of other non-ministerial positions. Recall that Union Gospel anticipated needing 50 new hires in 2023. Open positions included a wide range of non-ministerial roles, such as people to work at its thrift stores, to run its soup kitchens, and to help provide its

healthcare services. Thus, while we may take the State at its word that it won't sue Union Gospel for hiring its IT and operations support roles, the State has not confirmed what it will do if Union Gospel seeks to fill its cashiers, cooks, or nurses roles with members of its religion.

So the State's disavowal does not grant Union Gospel the relief it seeks. Union Gospel sought assurances that it could prefer and hire co-religionists for all its non-ministerial positions without threat of a WLAD investigation. The examples of the IT technician and operations assistant openings in its complaint are only that—examples of the type of positions Union Gospel sought to hire. The complaint didn't limit Union Gospel's requested relief to these particular positions. Because the threat of state enforcement of WLAD for many non-ministerial positions still exists, Union Gospel's requested relief can still be granted. And because effective relief can be granted, this case is not moot.

## III.

## Preliminary Injunction Factors

We now turn to the merits of the disputed preliminary injunction. Under the familiar preliminary injunction factors, a plaintiff must establish (1) a likelihood of success on the merits, (2) likely irreparable harm absent an injunction, (3) that the equities tip in his favor, and (4) that an injunction benefits the public interest. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 683–84 (9th Cir. 2023) (en banc). When a government entity opposes injunctive relief, "the third and fourth factors—the balance of equities and the public interest—merge." *Id.* at 695 (simplified). We review

the grant of a preliminary injunction for abuse of discretion. *Id.* at 680.

## A.

## Likelihood of Success on the Merits

While the district court concluded that Union Gospel was likely to succeed on the merits of its free exercise claim under *Tandon*, we affirm because Union Gospel is likely to succeed under the church autonomy doctrine. *See Enyart v. Nat'l Conf. of Bar Exam'rs, Inc.*, 630 F.3d 1153, 1159 (9th Cir. 2011) ("We may affirm . . . on any ground supported by the record.").

Whether the church autonomy doctrine permits a religious institution to favor co-religionists in its hiring of non-ministerial employees is largely a question of first impression. That's likely because "Congress has long exempted religious employers from federal employment laws that would otherwise interfere with their ability 'to define and carry out their religious missions' by imposing 'potential liability' for hiring practices that favor co-religionists." *See Seattle's Union Gospel Mission v. Woods*, 142 S.Ct. 1094, 1094 (2022) (Alito, J., respecting the denial of certiorari) (quoting *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 335–36 (1987)). Because of "federal statutory exemptions and their state analogs," the Supreme Court has "yet to confront whether freedom for religious employers to hire their co-religionists is constitutionally required." *Id.* Although the WLAD contains a similar exemption for religious employers as federal law, the Washington Supreme Court narrowly limited that exemption to ministers to avoid what it concluded would be a conflict with the State's constitution. *See id.* at 1094, 1096. Thus, while the church

autonomy doctrine protects Union Gospel's hiring of co-religionists over and above the WLAD, this protection overlaps considerably with what it would have already enjoyed under federal and state employment laws.

We first consider the church autonomy doctrine's scope in the hiring context and then apply the doctrine to Union Gospel's claims.

**i.**

**Church Autonomy Doctrine**

**a.**

**The Doctrine's Deep Roots**

The First Amendment's Establishment Clause and Free Exercise Clause bar laws "respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. From this wellspring, the Religion Clauses establish the church autonomy doctrine. Under the doctrine, religious institutions have "the right . . . 'to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'" *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 736 (2020) (quoting *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952)). That's because the Free Exercise Clause guarantees religious groups the right "to shape [their] own faith and mission," *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 188 (2012), and the Establishment Clause "prohibits government involvement in . . . ecclesiastical decisions," *id.* at 189. So any government interference with matters of faith and doctrine both "violate[s] the free exercise of religion" and "constitute[s] one of the central attributes of an establishment of religion."

*Our Lady of Guadalupe*, 591 U.S. at 746. Simply, the Religion Clauses take "matters of faith and doctrine" out of the sphere of "government intrusion." *Id.* (simplified).

The church autonomy doctrine has deep roots in our Nation's historical tradition. *See Hosanna-Tabor*, 565 U.S. at 182–85; *see also Cath. Charities Bureau, Inc. v. Wisc. Lab. & Indus. Rev. Comm'n*, 605 U.S. 238, 257 (2025) (Thomas, J. concurring). And the Supreme Court first examined the doctrine over 150 years ago. *See Watson v. Jones* 80 U.S. (13 Wall.) 679, 733–34 (1871). That case involved a congregational schism and dispute over the right to use church property. *Id.* at 726. *Watson* noted that when a matter "concerns theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them," courts may not get involved. *Id.* at 733. So courts must abstain from deciding "questions of discipline, or of faith, or ecclesiastical rule, custom, or law." *Id.* at 727.

The Court revisited the doctrine 80 years later. *Kedroff*, 344 U.S. at 116. *Kedroff* tied the church autonomy doctrine to the First Amendment—recognizing it as "part of the free exercise of religion." *Id.* It recognized the constitutional moorings of the *Watson* holding, explaining that the doctrine "radiate[d] . . . a spirit of freedom for religious organizations, an independence from secular control or manipulation," and provided churches the "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Id.*

Almost 50 years ago, the Court emphasized that, under the Constitution, "religious controversies are not the proper subject of civil court inquiry." *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 713 (1976). Instead, "the First

and Fourteenth Amendments permit hierarchical religious organizations to establish their own rules and regulations for internal discipline and government" and "the Constitution requires that civil courts accept their decisions as binding upon them." *Id.* at 724–25.

And more recently, in considering the ministerial exception, the Court reaffirmed the doctrine in *Hosanna-Tabor* and *Our Lady of Guadalupe*. *See* 565 U.S. at 185–90; 591 U.S. at 746–51.

Thus, it's well established that the church autonomy doctrine protects religious institutions' independence in matters of faith and doctrine.

Today, the church autonomy doctrine is most often invoked in the employment context. It is widely recognized that religious institutions may appoint their spiritual leaders and clergy without any government interference. *See Hosanna-Tabor*, 565 U.S. at 185–88. Under this "ministerial exception," "it is impermissible for the government to contradict a church's determination of who can act as its ministers." *Id.* at 185. So religious institutions may select or terminate their ministers regardless of any federal or state employment laws. *See id.*; *see also Our Lady of Guadalupe*, 591 U.S. at 747 ("[A] church's independence on matters 'of faith and doctrine' requires the authority to select, supervise, and if necessary, remove a minister without interference by secular authorities."). As the Court explained, "[r]equiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so" would "interfere[] with the internal governance of the church" and "depriv[e] the church of control over the selection of those who will personify its beliefs." *Hosanna-Tabor*, 565 U.S. at 188. "[I]mposing an unwanted minister,"

then, would frustrate free exercise by diminishing "a religious group's right to shape its own faith and mission through its appointments." *Id.* And it would create an establishment if the state had "the power to determine which individuals will minister to the faithful." *Id.* at 189. So the ministerial exception applies whenever an employee performs "'vital religious duties' *at the core of the organization's mission*." *McMahon v. World Vision Inc.*, 147 F.4th 959, 977 (9th Cir. 2025) (simplified).

Thus, given the central role they provide in shaping a religious organization's mission and character, any government interference into who may serve as a "minister" is an inherently religious undertaking barred by the First Amendment. That's why the ministerial exception does not require any additional showing that the employment action was "made for a religious reason." *Hosanna-Tabor*, 565 U.S. at 194. Once an employment dispute involves "an employee [who] qualifies as a minister," *id.* at 190, the First Amendment commands courts to abstain. For example, even if a church employment decision is alleged to be "pretextual," the government still may not interfere with church governance. *Id.* at 194–95. Rather, the overriding principle is that "the authority to select and control who will minister to the faithful . . . is the church's alone." *Id.* at 195. Thus, "religious organization[s] need not provide any religious justification to invoke the ministerial exception." *Markel v. Union of Orthodox Jewish Congregations of Am.*, 124 F.4th 796, 808 (9th Cir. 2024).

**b.**

**The Doctrine's Scope**

But the church autonomy doctrine is broader than the ministerial exception. That exception is only a "component"

of church autonomy. *See Our Lady of Guadalupe*, 591 U.S. at 746; *see also Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021, 1028–29 (10th Cir. 2022) ("The 'ministerial exception' is a narrower offshoot of the broader church autonomy doctrine; it only precludes employment discrimination claims brought by a 'minister' against his religious employer."). Indeed, none of the three foundational Supreme Court cases—*Watson, Kedroff,* and *Milivojevich*—"exclusively concerned the selection or supervision of clergy." *Our Lady of Guadalupe*, 591 U.S. at 747. While the ministerial exception protects a religious organization's narrow right to select its ministers, the church autonomy doctrine more generally prohibits "government interference with an *internal church decision* that affects the faith and mission of the church itself." *Hosanna-Tabor*, 565 U.S. at 190 (emphasis added). Thus, the First Amendment forbids government intrusion into the "internal management decisions that are essential to the institution's central mission." *Our Lady of Guadalupe*, 591 U.S. at 746.

We conclude that these "internal management decisions" may include a religious organization's policy of hiring co-religionists for non-ministerial roles. Deciding who can work non-ministerial roles for a religious organization may be a matter of religious faith and doctrine. For example, religious organizations may rely on their non-ministerial personnel to advance their religious mission and message. Take Union Gospel. It insists that hiring only co-religionists in non-ministerial roles is critical to serving its mission and spreading its message. That's because its non-ministerial employees foster a community and support system for its outward-facing ministry. They do this by supporting one another in their faith journeys, praying for each other, sharing Scripture, and setting an example of how to live a

Christian life. Union Gospel also maintains that employing likeminded believers in non-ministerial roles helps ensure that it communicates a united and consistent religious message to the public. At the very least, its employment policy prevents Union Gospel's own employees from openly undermining its religious message. And the policy helps shield employees and the public it serves from what it perceives to be sinful habits or behaviors. Indeed, if a religious organization were forced to hire those who flout and disregard its religious beliefs, it may forgo engagement with the public in the first place. *See Seattle's Union Gospel Mission*, 142 S. Ct. at 1096 (Alito, J., respecting the denial of certiorari) ("To force religious organizations to hire messengers and other personnel who do not share their religious views would undermine not only the autonomy of many religious organizations but also their continued viability.").

As the adage goes, "personnel is policy." *Demkovich v. St. Andrew the Apostle Par.*, 3 F.4th 968, 979 (7th Cir. 2021) (en banc). This applies perhaps even more so for religious organizations. Indeed, selecting what "activities are in furtherance of an organization's religious mission" and requiring that "only those committed to [its] mission should conduct them" is one way "a religious community defines itself." *Amos*, 483 U.S. at 342 (Brennan, J., concurring). *See also Hosanna-Tabor*, 565 U.S. at 200–01 (Alito, J., joined by Kagan, J., concurring) (observing that some religious group's "very existence is dedicated to the collective expression and propagation of shared religious ideals," and "there can be no doubt that the messenger matters").

And direct interference with a religious organization's "faith and doctrine" conflicts with the First Amendment. *Our Lady of Guadalupe*, 591 U.S. at 746 (simplified). If a

religious institution sincerely believes that its non-ministerial employees must adhere to and live according to its religious principles to accomplish its religious mission, the only way a court could adjudicate a dispute for a plaintiff would be to rule that the religious institution cannot seek that "mission" or that the hiring policy isn't necessary to that "mission"—inherently religious questions. Such a ruling would violate the institution's free exercise rights to "shape [its] own faith and mission" and would improperly establish an "ecclesiastical decision" for the institution. *See Hosanna-Tabor*, 565 U.S. at 188–89. And if the institution were forced to disregard or alter its religious mission to satisfy secular law, that could limit or remove its mission from the public sphere altogether. And so, in some cases, we may permit "a religious organization . . . to condition employment," even non-ministerial employment, "on subscription to particular religious tenets." *Amos*, 483 U.S. at 342 (Brennan, J., concurring).

**c.**

**The Doctrine's Limits**

Of course, the church autonomy doctrine has its limits. It "does not mean that religious institutions enjoy a general immunity from secular laws." *Our Lady of Guadalupe*, 591 U.S. at 746.

First, as we've said, the First Amendment only protects "sincerely held religious belief" and acts "rooted in religious belief." *Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994) (quoting in part *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972)). So the church autonomy doctrine has no place when a religious organization's actions are "patently devoid of religious sincerity" or based on "'purely secular' philosophical concerns." *Id.* (simplified). *See also Bryce v.*

*Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 657 (10th Cir. 2002) ("The church autonomy doctrine is not without limits . . . and does not apply to purely secular decisions, even when made by churches. Before the church autonomy doctrine is implicated, a threshold inquiry is whether the alleged misconduct is 'rooted in religious belief.'" (simplified)); *see also* Lael Weinberger, The Limits of Church Autonomy, 98 Notre Dame L. Rev. 1253 (2023).

And because the hiring of non-ministerial positions is not *necessarily* a religious matter, the church autonomy doctrine only protects religious institutions' non-ministerial hiring policy on a showing that the employment decision was "rooted in religious belief" that was "sincerely held." *Malik*, 16 F.3d at 333 (simplified). Succinctly, the church autonomy doctrine applies to "closely linked matters of internal government," *Our Lady of Guadalupe*, 591 U.S. at 747, which may include a religious organization's decision to hire co-religionists for non-ministerial roles when the hiring decision rests on the institution's sincerely held religious beliefs. Of course, this doesn't mean that courts may question the veracity of sincerely held religious views. *See, e.g.*, *Thomas v. Review Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 716 (1981) ("[I]t is not within the judicial function and judicial competence to inquire whether the petitioner . . . correctly perceived the commands of [his] common faith."); *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 584 U.S. 617, 639 (2018) ("It hardly requires restating that government has no role in deciding or even suggesting whether the religious ground for Phillips' conscience-based objection is legitimate or illegitimate.").

Second, the church autonomy doctrine in the context of hiring of non-ministerial employees differs in some important respects from the ministerial exception. While the

ministerial exception immunizes religious organizations from *all* employment-discrimination laws in the case of ministers, *see Hosanna-Tabor*, 565 U.S. at 188; *Our Lady of Guadalupe*, 591 U.S. at 747, the protection for other employees is more limited. The church autonomy doctrine protects a religious organization from an employment-discrimination suit only to the extent the hiring of co-religionist non-ministerial employees is based on sincerely held religious beliefs. Unlike with the broader protection of the ministerial exception, a religious organization cannot discriminate on other grounds, and the religious motivation cannot be a "pretext[]" for non-religious discrimination. *Cf. Hosanna-Tabor*, 565 U.S. at 194–95.

Finally, our decision today is limited to religious ministries, like Union Gospel, which plainly qualify for protection under the church autonomy doctrine. We do not consider whether other types of entities under the umbrella of a religious organization, such as commercial businesses or hospitals, would receive similar First Amendment protection in the hiring of co-religionists.

**d.**

**The State's Arguments Fail**

Contrary to the State's argument, there is no "wall of Circuit authority" categorically excluding the hiring of non-ministerial employees from the protection of the church autonomy doctrine. Indeed, the opposite is true.

Start with *Seattle Pacific University v. Ferguson*, 104 F.4th 50 (9th Cir. 2024). In that case, we observed that "[a] religious employer is not given carte blanche with respect to all employees, ministerial and non-ministerial alike." *Id.* at 58. But that was in the context of deciding whether a request

for a religious institution's employment records constituted an injury in fact. *Id.* at 57. We concluded that the request itself wasn't an injury—otherwise, it would effectively immunize religious employers from any secular law. *Id.* at 58. We said nothing about the scope of the church autonomy doctrine in hiring non-ministerial employees. In fact, in the very next sentence, we recognized that the church autonomy doctrine more generally protects "internal management decisions that are essential to the institution's central mission." *Id.* (quoting *Our Lady of Guadalupe*, 591 U.S. at 746).

Next, the State observes that *Puri v. Khalsa* framed the ministerial exception as applicable "to any state law cause of action that would otherwise impinge on the church's prerogative to choose its ministers or to exercise its religious beliefs in the context of employing its ministers." 844 F.3d 1152, 1158 (9th Cir. 2017). But that single statement in *Puri* was not aimed at narrowing the church autonomy doctrine's broader scope. Instead, *Puri* recognized that the church autonomy doctrine more widely bars courts from deciding "matters of religious doctrine and administration." *Id.* at 1154. It then deemed the doctrine inapplicable because the defendants didn't assert a "religious justification" for denying plaintiffs a seat on a religious entity's board. *Id.* at 1167 (simplified). As stated above, the church autonomy doctrine applies precisely where a "religious justification" is at the heart of a disputed hiring policy, as here.

Nor does *EEOC v. Fremont Christian School*, 781 F.2d 1362 (9th Cir. 1986), carve out the hiring of non-ministers from the protection of the church autonomy doctrine. In that case, we held that the Free Exercise Clause didn't prevent the applicability of anti-discrimination laws when the laws had "no significant impact" on the religious employer's

religious beliefs or doctrines. *Id.* at 1368. In considering the Establishment Clause, *Fremont Christian School* only considered whether the ministerial exception applied under the now-defunct *Lemon* test to determine whether there was excessive entanglement. *See id.* at 1370 ("[T]he duties of the teachers at Fremont Christian School do not fulfill the function of a minister."). That case didn't resolve the scope of free exercise when a law significantly impacts religious beliefs, the reach of the church autonomy doctrine, or whether the doctrine has salience outside the ministerial exception. Thus, it doesn't answer the question here—whether the church autonomy doctrine has anything to say about the hiring of non-ministerial employees at religious organizations.

So too with the State's reliance on *EEOC v. Pacific Press Publishing Association*, 676 F.2d 1272, 1279 (9th Cir. 1982). Like *Fremont Christian School*, *Pacific Press* found "no significant impact" on the religious organization's beliefs under the Free Exercise Clause and that an employee at a religious publisher didn't qualify as a "minister" under the Establishment Clause. *Id.* at 1279, 1278. *Pacific Press*, however, still considered the church autonomy doctrine. *Id.* at 1281. It seemingly applied a balancing test to the doctrine—allowing the suit to go forward because of the "compelling public interest" in anti-discrimination laws despite their conflict with the publisher's religious doctrine. *Id.*; *but see Hosanna-Tabor*, 565 U.S. at 196 ("[T]he First Amendment has struck the balance for us."). Even so, *Pacific Press* shows that the church autonomy doctrine applies outside the ministerial context. If the State is correct that the doctrine only protects the hiring of ministers, then *Pacific Press* could have easily rejected the applicability of the church autonomy doctrine with the finding that the

employee was not a minister. It didn't do that. That *Pacific Press* analyzed the doctrine on the merits shows it sweeps more broadly than the State claims.

Finally, *Bollard v. California Province of the Society of Jesus* doesn't withdraw First Amendment protections for employment decisions involving "lay employees." 196 F.3d 940, 947 (9th Cir. 1999), *overruled in part by Markel*, 124 F.4th at 810 n.6. *Bollard* starts with a syllogism—that the ministerial exception "does not apply to lay employees of a religious institution if they are not serving the function of ministers." *Id.* That's because, unlike with ministers, "[i]n the case of lay employees, the particularly strong religious interests surrounding a church's choice of its representative are missing." *Id.* And in that particular case, even though the employee filled a ministerial role, because the religious organization offered no "religious justification" for its challenged conduct, *Bollard* considered the "danger" of "interfere[nce] with [the organization's] religious faith or doctrine . . . particularly low." *Id.* at 948; *but see Markel*, 124 F.4th at 808. So *Bollard* is confined to cases devoid of any "religious justification." *See Werft v. Desert Sw. Ann. Conf. of United Methodist Church*, 377 F.3d 1099, 1101–02 (9th Cir. 2004) (holding *Bollard* inapplicable when claims "would require a civil court to inquire into religious justifications for personnel decisions"). But rather than announce a categorical rule limiting church autonomy to ministerial claims, *Bollard* suggested that courts conduct a "balancing test" to determine whether a lay employee's employment claim violates the First Amendment. 196 F.3d at 948. So if anything, *Bollard* supports a broader church autonomy doctrine. *Id.* If the First Amendment categorically excludes any protection of employment

decisions involving "lay employees," then it would be unnecessary to engage in any balancing whatsoever. *Id.*

And none of the out-of-circuit cases cited by the State support its view that the church autonomy doctrine is confined only to ministers. In fact, they suggest the opposite. *See Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985) (observing generally that "employment decisions may be subject to Title VII scrutiny, where the decision does not involve the church's spiritual functions," which doesn't preclude the hiring of non-ministerial positions from involving a spiritual function); *EEOC v. Miss. Coll.*, 626 F.2d 477, 485–86 (5th Cir. 1980) (holding that a religious institution must be allowed to engage in "discrimination on the basis of religion" to avoid a conflict with the "rights guaranteed by the religion clauses of the first amendment" and remanding to determine whether an employment decision involving a non-ministerial psychology professor was motivated by religious preference).

Several circuits also recognize the First Amendment concerns raised by interfering with a religious institution's hiring of non-ministerial employees. In *Bryce*, a fired church employee alleged that statements made by other church officials about her sexuality and same-sex marriage constituted sex discrimination under Title VII. 289 F.3d at 651–53. Rather than resolve the claims on the "ministerial exception," the Tenth Circuit avoided deciding whether the employee was a "minister" and instead relied on the "broader church autonomy doctrine." *Id.* at 658 n.2. To the Tenth Circuit, the doctrine protects a church when it "makes a personnel decision based on religious doctrine"—even decisions involving non-ministers. *Id.* at 660. Thus, the church's actions fell "squarely within the areas of church

governance and doctrine protected by the First Amendment." *Id.* at 658. *See also Little v. Wuerl*, 929 F.2d 944, 945, 947–49 (3rd Cir. 1991) (observing that applying Title VII to a Catholic school's hiring of a teacher would "be constitutionally suspect because it would arguably violate both the free exercise clause and the establishment clause of the first amendment"); *Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 191 n.6 (4th Cir. 2011) (noting the potential "First Amendment implications" of deciding a nurse's employment discrimination and retaliation claims against a Catholic nursing-care facility); *Hall v. Baptist Mem. Health Care Corp.*, 215 F.3d 618, 622, 626–28 (6th Cir. 2000) (acknowledging that the "First Amendment does not permit federal courts to dictate to religious institutions how to carry out their religious missions or how to enforce their religious practices" in a case denying a discrimination claim by a fired services specialist at a church-affiliated hospital); *Killinger v. Samford Univ.*, 113 F.3d 196, 200–01 (11th Cir. 1997) (concluding, without invoking the ministerial exception, that Title VII doesn't protect a divinity school professor fired because "his religious beliefs . . . differ[ed] from those of the school's dean," which "avoid[s] the First Amendment concerns which always tower over us when we face a case that is about religion").

* * *

In sum, the church autonomy doctrine encompasses more than just the ministerial exception. The church autonomy doctrine forbids interference with "an internal church decision that affects the faith and mission of the church itself." *Hosanna-Tabor*, 565 U.S. at 190. So in cases involving the hiring of non-ministerial employees, a religious institution may enjoy its protection when a challenged hiring decision is rooted in a sincerely held

religious belief. That is, under the church autonomy doctrine, religious organizations may decide to hire co-religionists to further their religious missions.

**ii.**

**Application of Church Autonomy Doctrine**

Union Gospel is a religious organization, as the State concedes. Under its articles of incorporation, Union Gospel's mission is to "spread the Gospel of the Lord Jesus Christ." It fulfills its mission by offering services to the homeless, the hungry, the sick, and the addicted. It operates shelters, health clinics, soup kitchens, and faith-based recovery services. Union Gospel's religious beliefs guide everything it does. It shares the Gospel with all whom it serves and encourages everyone to develop a relationship with Jesus Christ. At the heart of its mission, Union Gospel believes that "spiritual welfare" is more important than any "physical assistance" it can provide. As part of its religious faith, Union Gospel has specific views about marriage and sexuality. According to Union Gospel, sexual expression is only proper between one man and one woman in the context of marriage.

Union Gospel accomplishes its religious mission through its employees. As the organization emphasizes, its employees are its "hands, feet, and mouthpiece." It expects its employees to participate in the group's evangelism and be an example to others of what Union Gospel believes it means to be a Christian. Union Gospel teaches that Christians should encourage one another in their faith and engage in personal fellowship. Besides exemplifying a Christian life, this fellowship means helping other Christians grow in their faith and praying for each other. Consistent with this religious mission, Union Gospel seeks to maintain

a community within the organization of shared faith to facilitate "Christian fellowship, mentoring, and discipleship."

Based on its religious views, Union Gospel only employs those who share its Christian beliefs and practices. Union Gospel requires its employees to agree with and live out those beliefs and practices, including abstaining from sexual conduct outside of marriage between a man and a woman. Applicants to Union Gospel are informed about its co-religionist policy both before and during the hiring process. It screens out any application that expresses disagreement with these religious views. On receiving an offer of employment, all employees must sign and agree to Union Gospel's statement of faith, core values, and job duties and requirements.

As a matter of faith, Union Gospel believes that only co-religionists advance its religious mission. And the State doesn't challenge the sincerity of these beliefs. Union Gospel believes its employees create an internal "faith community" that contributes to its outward ministry. As mentioned earlier, all its employees, even the "inward" facing ones, must undertake the religious responsibility of supporting each other's faith journey, praying with and for one another, sharing scripture and devotionals, and setting an example on how to live a Christian life as Union Gospel believes. According to Union Gospel, this "spiritually supportive environment" facilitates Union Gospel's social service mission. Union Gospel understands that its mission to spread the Gospel through its social welfare work can be achieved only by those who "seek to advance the same goals with the same spirit." Thus, the group says that only those who share its Christian views can build this essential environment.

Union Gospel also believes that fostering a "community of likeminded believers" ensures that it presents a "united, correct, and consistent Christian message to the people it cares for and to the world." Its message, Union Gospel says, would be undermined if its own employees openly disagree with that message. At the very least, hiring only fellow believers shields its employees and the people it serves from what it thinks are "sinful habits, behaviors, and temptations." Thus, employing staff whose actions or beliefs go against its teachings would hamper its ability to achieve its religious goals.

Finally, Union Gospel believes hiring only likeminded believers maintains its very identity. *See Amos*, 483 U.S. at 342 (Brennan, J., concurring) (employing co-religionists is one way "a religious community defines itself"); *Hosanna-Tabor*, 565 U.S. at 200–01 (Alito, J., joined by Kagan, J., concurring) ("messenger matters" to religious organizations). If forced to hire those who are hostile to its Christian teachings, Union Gospel fears it will lose its unique and important Christian message.

Together, these reasons show that Union Gospel's co-religionist hiring policy constitutes an "internal management decision[] that [is] essential to the institution's central mission." *Our Lady of Guadalupe*, 591 U.S. at 746.

In sum, the State doesn't contest three things: (1) that Union Gospel is a religious institution, (2) that Union Gospel has a sincerely held religious belief that only co-religionists may advance its religious mission, and (3) that Union Gospel's co-religionist hiring policy is based on that religious belief. Given all three, Union Gospel is likely to succeed on the merits of its claim that enforcing WLAD against it for hiring only co-religionists violates the church

autonomy doctrine. The alternative would mean that the State could interfere with a religious mission and drive it from the public sphere. Such a result is contrary to the First Amendment's principles.

## B.

## Irreparable Harm and Balance of Interests

The remaining preliminary injunction factors don't merit lengthy discussion—they easily favor Union Gospel.

Union Gospel satisfies the irreparable harm requirement because it has "demonstrate[d] the existence of a colorable First Amendment claim." *Fellowship of Christian Athletes*, 82 F.4th at 694–95. "It is axiomatic that 'the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Id.* at 694 (quoting *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020)) (simplified). And if Union Gospel is unable to fill the more than 50 positions required under its hiring policy, its operations would suffer irreparable harm.

Union Gospel has likewise established that the public interest and balance of the equities "tips sharply" in its favor. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* at 695. And for over 70 years, WLAD has exempted non-profit religious organizations, like Union Gospel, from its scope. The protections Union Gospel receives here are what it previously enjoyed before the Washington Supreme Court narrowly construed the WLAD's exception for religious employers, and what Union Gospel otherwise would receive under Title VII and various state analogs.

## IV.

## Conclusion

Union Gospel has shown it is likely to succeed on the merits of its claims based on the church autonomy doctrine. If a religious organization's hiring of co-religionists for non-ministerial positions rests on its sincerely held religious beliefs, then the church autonomy doctrine forbids government interference with that hiring decision. And recognizing the limits of employment law breaks no new ground. Congress has long exempted religious employers from federal employment laws that interfere with their ability "to define and carry out their religious missions." *Amos*, 483 U.S. at 329, 339 (interpreting 42 U.S.C. § 2000e-1). Other States within the Ninth Circuit have similar exemptions in their state analogs. *See, e.g.*, Ariz. Rev. Stat. § 41-1462; Cal. Gov. Code § 12926(d); Haw. Rev. Stat. § 378-3(5); Idaho Code § 67-5910(1); Or. Rev. Stat. § 659A.006(5)(c); Mont. Code Ann. § 49-2-101(11); Nev. Rev. Stat. § 613.320(1)(b). Even Washington's Legislature understood the importance of religious freedom in exempting religious organizations from WLAD's scope—an exemption that stood for over 70 years. *See* Wash. Rev. Code § 49.60.040(11). This tension with the First Amendment arises only from Washington courts' recent reading of WLAD. Given that interpretation's outlier status, adhering to the church autonomy doctrine here is unlikely to have broader impact. We affirm the preliminary injunction.

**AFFIRMED.**