UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

MARK TASSINARI, RICHARD ESPINOSA, RANDY OWENS, JONATHAN ANDERSON, and JOSEPH ALMEIDA individually and on behalf of all others similarly situated,

Plaintiffs,

v.

THE SALVATION ARMY NATIONAL CORPORATION; THE SALVATION ARMY, A NEW YORK CORPORATION

Defendants.

Civil Action.
No. 21-10806-LTS

BEFORE THE HONORABLE LEO T. SOROKIN
UNITED STATES DISTRICT JUDGE

MOTION HEARING

February 13, 2026

John J. Moakley United States Courthouse
Courtroom No. 13
One Courthouse Way
Boston, Massachusetts 02210

Kelly Mortellite, RPR, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 3200
Boston, Massachusetts 02210
mortellite@gmail.com

APPEARANCES:

Counsel on behalf of Plaintiff:
Matthew John Murray
Alice Xiaohe Wang
Altshuler Berzon LLP
177 Post Street
Suite 300
San Francisco, CA 94108
415-421-7151
mmurray@altshulerberzon.com

Counsel on behalf of Defendant:
Daniel William Wolff
Crowell & Moring LLP
Kathryn K. Erno
1001 Pennsylvania Avenue, NW
Washington, DC 20004
202-624-2500
dwolff@crowell.com

P R O C E E D I N G S

(Case called to order.)

COURTROOM CLERK: Will counsel identify themselves for the record.

MR. MURRAY: This is Matthew Murray for the plaintiffs.

MS. WANG: Alice Wang for the plaintiffs.

THE COURT: Good afternoon.

MR. WOLFF: Daniel Wolff for defendant.

03:04 MS. ERNO: Katie Erno for defendant.

THE COURT: Okay. I've read all the papers. I'll hear you. It's your motion.

MR. WOLFF: Thank you, Your Honor.

First I just want to thank the Court for giving us this opportunity --

THE COURT: Sure.

MR. WOLFF: -- to address our motion in this hearing. I'd like to start at a high level because I think in these First Amendment cases context is important.

03:04 So we know that the First Amendment, through the religion clauses, protects freedoms and provides a zone of autonomy for religious organizations to operate free from secular law, not in all instances but in that particular autonomous zone. The Supreme Court has told us this over and over again.

We know also that legislators in their wisdom, whether it's the federal congress or state legislators, can, in their own wisdom, design other protections by way of statute through various public accommodation laws, antidiscrimination laws, et cetera.

And we just know because life teaches us that there are times when those rights of some butt up against the rights of others. We also know that when the rights that come from statutory rights butt up against the First Amendment, the First Amendment usually wins.

03:05

THE COURT: So let me ask you this. I wanted to ask you this at the outset and I didn't. If you don't say something here today, you don't waive it. I have the papers. I'm obviously not ruling from the bench. I will take it under advisement, and I will do my best to address all the arguments that I think are relevant and are required to be addressed in disposing it. So if you didn't touch on a particular thing, either one of you, it doesn't mean I think you didn't care about it. You certainly didn't waive it or anything like that, just as an aside.

03:06

So if I understand the theory correctly, your theory is the church autonomy doctrine, primary theory, right?

MR. WOLFF: Correct, Your Honor. We think we win four or five different ways, but we think the church autonomy doctrine is the easiest, simplest, and most straightforward way

to decide this.

THE COURT: All right. So you would say, I think if I read the papers correctly, that the ARCs are an expression, the way they're formed and the way they operate expresses the religious belief of the members of the Salvation Army participating in the ARCs, right?

MR. WOLFF: Yeah, I think I would say it slightly differently. I think it represents the church's position.

THE COURT: Yeah, yeah. So it's both the church's position that this activity is an expression of the religious belief of the church, right, and the members participating not only subscribe to the beliefs of the church but in particular that this is part of that expression.

MR. WOLFF: Correct.

THE COURT: That is, they are participating to express their religious beliefs.

MR. WOLFF: Yes, so far so good.

THE COURT: Okay. So creating the ARCs and creating them the way they are structured and created expresses the beliefs of the church and the members. And I don't mean to separate them in any way, I guess I'm saying them together, and that the members who participate in it are essentially practicing their religion or expressing their religious beliefs by serving in the ARCs, or no?

MR. WOLFF: Well, I think I agree with all of that,

although I would just note that I don't think that's the full set of what we are saying here.

THE COURT: Okay. Go ahead and tell me.

MR. WOLFF: Because this is also about the execution, the following and the execution of church and doctrine in the performance of the acts and the mission of the church. So in the same way, just to take mainstream religion that I'm familiar with, in the same way that the Catholic mass expresses the reception of Jesus Christ through the taking of the communion or the drink of the wine, that's a sacrament, right?

03:08

Salvation Army, through its ARCs, is expressing and pursuing its mission by servicing this very sympathetic and at-risk population in the manner by which pursuant to church doctrine it thinks it is the right and best and spiritual way of doing so.

THE COURT: So it's both the general act of doing it is part of church doctrine, right, that is to serve people, but it's also the specific way in which it's being done, it is part of the church doctrine, much in the way that in the Catholic church, an important doctrine, but perhaps it doesn't matter if it's important, though it is, I think, in the Catholic church, that taking the sacrament, that would be the wine and the wafer I think, but I'm not super familiar, and so that would be both a religious belief and the way it's done, right? So there may be particular, whether you call it religious rules or doctrine

03:09

or beliefs or scriptures or practices or customs, but some words that describe how it's done.

MR. WOLFF: Correct.

THE COURT: In fact, it may be that it's done differently even in the Catholic church. It might be done differently in different churches and different places, either in the United States or around the world, and it wouldn't be for a secular court to direct how to do that.

MR. WOLFF: That's absolutely correct.

03:10 THE COURT: Okay. So my question is, I understand the application of principle to the sacrament in the Catholic church. That's within the house of worship. That seems self-evident almost. And so my question with respect to how you're applying church doctrine, I'm wondering about the reach of that principle.

So, for example, there are some religions that believe or might believe that welcoming and caring for the stranger is an important principle that's part of their religious beliefs, okay? And so they might say that part of that is we should -- 03:11 the way that that general position do that, okay, they might view the strangers as people who, one manifestation of stranger would be people in the United States who have no lawful status, okay? And whether they have no -- all the different myriad of ways in which people either never have lawful status or have lawful status and then no longer have it, right? Then that

general belief might be to feed them, clothe them, house them, be that in their house of worship or elsewhere, and it may instruct them to do it in particular ways, like do it in the house of worship, or do it in your own home or both.

And so it would seem that on the principle you articulate, I'm just wondering, I'm thinking about this, does that mean that -- what does that do when that comes into conflict, for example, with a statute that says you can't harbor people, the religious adherence who are pursuing this 03:12 belief sincerely and it's part of their religion to do this and to do it in this way, and they know these people are here without status, they know that ICE is looking for them. When either civil or criminal law conflicts with that in some way, how does that get resolved?

MR. WOLFF: Well, so with respect, there's a lot loaded into that question. So I think facts matter. What I would say at a high level, I would think that the religious liberties of a church acting in its church capacity harboring those -- and I'm taking your hypothetical -- harboring those 03:13 individuals because it's consistent with their faith that that --

THE COURT: Not just consistent, because I'm not sure you've limited -- "consistent" is a broader word. You're not saying the ARCs are consistent with it. You are saying the ARCs is the thing.

MR. WOLFF: Thank you for that. I will take your --

THE COURT: I don't know if you're pressing consistent. That's a much broader position.

MR. WOLFF: I will absolutely adopt your articulation.

THE COURT: I know you're not taking the position, I take it, that religious organizations have -- the church autonomy doctrine means that anything people do that's consistent with their religion beliefs has a First Amendment protection against any civil law.

03:13 MR. WOLFF: Yeah. Let me state it expressly. When a church is acting as a church, doing its churchly things, that's when the church autonomy doctrine applies. Taking your hypothetical, I would say that whatever secular laws would otherwise apply yield when the church says --

THE COURT: Including criminal laws?

MR. WOLFF: -- we're just acting as a church.

THE COURT: Including criminal laws?

MR. WOLFF: Probably including criminal laws, but obviously that brings up the *Smith* case. And that's where more facts might matter.

03:14

THE COURT: Right. How would facts suggest it plays out one way or the other way?

MR. WOLFF: Well, for example, if you take like the pamphleting case, the *Watchtower* case in 2002 that we cite.

THE COURT: Jehovah's witnesses.

MR. WOLFF: Jehovah's witnesses and others practicing their faith, the court drew a distinction that the city did not maintain a criminal justice theory of defending that law. So the court departed from *Smith*, right, saying we're not dealing with *Smith*.

I think *Smith* is very much, and I think the Supreme Court has told us, should be really seen as limited to individuals facing a truly generally applicable and content-neutral law in that criminal setting. If we're in that sphere, then we obviously have to contend with *Smith*, but obviously as certain justices have opined, we see it in the *Fulton* case --

THE COURT: There are clearly some justices who think *Smith* should be overturned or reconsidered or reconfigured in some way.

MR. WOLFF: Exactly. *Smith* has not weathered well. Even in the criminal context, we may find ourselves with the church prevailing. I will note, I know you know this, that's not this case. We're now far afield from this case.

THE COURT: Right, no. I'm just thinking about the -- I recognize that what I say is not the law of the land. What I say resolves this case until some higher court weighs in. That's as far as what I have to say matters. But I'm thinking about the implications of what you're advancing because it strikes me that it has far -- the Supreme Court has not

overturned *Smith*.

MR. WOLFF: Can I respond to that?

THE COURT: Sure.

MR. WOLFF: I would direct your attention both to *Hosanna-Tabor* and to the D.C. Circuit's decision in *EEOC v. Catholic University* in 1994, which was just four years after *Smith*. And in both of those cases, both the D.C. Circuit and then later the Supreme Court really -- and this is where I think this case could be resolved and frankly in a fairly easy way for Your Honor so that you're not doing too much. This is not about the rights of individuals, and this is not about criminal law. This is about the right of a church acting as a church. And both the Supreme Court and the D.C. Circuit in the *Catholic University* decision take that on squarely and put *Smith* to the side on those grounds. And I think for just reference, I could reference a number of statement of facts --

THE COURT: Let me ask you this. The church, acting as a church, decides to run a hospital, not for profit, so it's not within the exception and gospel where they said hospitals for profit that that church ran might be different. They said we're going to run a hospital the way, what we believe in, and it's the church acting as the church, just as you described. But to the extent their religious beliefs conflict with state regulatory authority's views about safe medical practice, do they just -- they're not subject to that?

MR. WOLFF: Well, again, the facts matter, and I think we would have to look at not only the church autonomy cases but also more recently *Mahmoud* and the cases that sort of reconsider free exercise. It may very well be in the scenario that you've just given to me with the hospital that the state laws do have to yield, and it's really, again, it's a question of line-drawing. But if there is a sincerely held belief that's animating the church's practice and that's not in dispute, as I think is true here, then you have to look at that as a church. And if it's a core church function, I think --

03:18

THE COURT: Who decides whether it's a core church function?

MR. WOLFF: Well, you take a very light touch. I do think in our case, to bring it back to this case, it's helpful when there's really no genuine issue of material fact, I think the harder cases -- and there isn't a lot on this. I mean, we obviously see the Supreme Court say you always take a very light touch. You have to listen to the church because, otherwise, you're sort of getting caught up in the entanglement issues and trying to suss out --

03:19

THE COURT: Is it only churches?

MR. WOLFF: I'm sorry?

THE COURT: Is it only churches?

MR. WOLFF: For purposes of church autonomy, it's only churches.

THE COURT: You mean churches, not all religious organization have churches. You mean church in the --

MR. WOLFF: Generically.

THE COURT: Generically.

MR. WOLFF: Exactly.

THE COURT: Okay. Go ahead.

MR. WOLFF: So I guess I'll --

THE COURT: Actually, there is another example that this whole case has made me think about. So a religious

03:19 organization needs the teaching be fruitful and multiply, and their religious belief is that the way that happens is men take multiple wives. And so it's an act -- it's a religious belief of the church. It's an expression, sincerely held -- I mean, sincerity not an issue in this case. I view sincerity as if, you know, there's evidence -- we don't really believe this, right? This is all just made up. But that's not this case. No one suggests it is. I don't think it is. That's not the case. The situation doesn't arise in any of these kinds of cases.

03:20 So its core religious belief, it's part of religious teaching, the acts are expression of the religion. And is that a secular law that says you can only have one partner or one person at a time as a spouse, would that yield to that or potentially yield to that?

MR. WOLFF: So with the caveat that here --

THE COURT: It's not this case, I understand.

MR. WOLFF: The Salvation Army is not advancing that position.

THE COURT: I understand.

MR. WOLFF: As advocate, I can tell you that's actually a softball because the Supreme Court decided that over a century ago and told us that's okay, that outlawing polygamy is okay.

THE COURT: Your answer suggests to me that -- the 03:21 Supreme Court said that 100 years ago, right, about 100 years ago?

MR. WOLFF: About 1892, I think.

THE COURT: Okay. 1892. But I mean, one, so that would make it easy for me to resolve because I'm bound by the decisions in court. That decision hasn't been overruled, and there's no -- there's nothing that seriously called it into question. But in terms of the theory of your case, like, what I'm wondering about is that, first of all, Supreme Court has shown a willingness to overturn precedent if they think the 03:22 precedent is inconsistent with the historical understanding or the original language of the Constitution, if it's wrong, it's wrong. I think that would be a fair way --

MR. WOLFF: Right.

THE COURT: So the fact that it's 100 years old almost doesn't undermine it before me because I'm bound, even if I

think they're going to overrule it, it's not my job to say, oh, six justices in six different cases said this and this and totaling up they're going to vote six of them or seven of them or five of them or whatever, it's not for me to do that. That wouldn't be right, and I wouldn't do that. But I'm wondering if the theory doesn't -- like, what's the difference?

MR. WOLFF: Well, I certainly don't want to limit other advocates in other forum in other cases for making the argument.

03:23 THE COURT: I guess what I'm trying to understand, though, is there anything that the church -- any tenant of a church that's a religious belief that, anything that the church then does in acting on that religious belief, is that just outside the scope of all civil law?

MR. WOLFF: So two answers to that, and I do want to address it. I think that there are some things that just historically are outside the scope. Whether it withstands scrutiny today, I'm not sure for the reasons you said, but the polygamy issue, that's been decided. I think human sacrifice, 03:23 I think -- and part of that is probably history and tradition, that just wasn't consonant with what the founders were likely thinking when they crafted the First Amendment. So it's not an absolutist position. I think the safe space for us is we are well within the heartland of church autonomy.

THE COURT: So one limiting principle is, taking human

sacrifice, that the history and tradition of the country did not permit or did not recognize human sacrifice as protected by religious exercise.

MR. WOLFF: Correct.

THE COURT: Whether or not, even if in 1789, there were people, if not in the United States, elsewhere in the world who were practicing in human sacrifices as part of what we might call religion.

MR. WOLFF: Correct.

03:24 THE COURT: So one limitation would be things that were out of bounds in 1789 remain out of bounds, even if the theory might otherwise encompass it.

MR. WOLFF: Correct.

THE COURT: Okay.

MR. WOLFF: I think you're also buffered a little bit by, again, these weren't decided on church autonomy grounds, but they're within the orbit. The *Lukumi* case, which dealt with animal sacrifice, the *O'Centro* case, that dealt with an herbal tea that had an intoxicating effect that came from the 03:25 Amazon. And those were all sort of recognized as sincere religious beliefs that could be pursued.

So, again, I think you have a big buffer zone in terms of recognizing that this is more or less a pretty ordinary -- even if it were a little bit on the fringe, which this is not, you've got those cases that protect you, right? Because the

First Amendment protects even the minority religions.

But here, first of all, we're talking about a church that is pretty well established, right, not only in the public record but also in the case law. We have the Fifth Circuit, Seventh Circuit, Third Circuit and this court have all recognized it. There's no doubt here that Salvation Army is a church, and I don't think there's any really disagreement that it's acting in a church way. So I think you have a lot of --

THE COURT: Well, part of the things I'm wondering 03:26 about is what that means. Well, first of all, I have you here, and it's a really interesting issue, and so I am interested in probing the limits and understanding it in its contours. And since I have you here, I can ask you all these things.

MR. WOLFF: I'm a big target, Your Honor.

THE COURT: No, not a target. I don't mean that. These are serious issues, and the Supreme Court is grappling with those issues. I mean, that's one way to understand some of these decisions, right? There was a fair bit of unanimity about how to resolve the outcome of the Philadelphia case but 03:26 not the same degree of unanimity over the reasoning.

MR. WOLFF: Yeah.

THE COURT: So I read that as the justices themselves grappling with issues in this area. But you said "acting as the church," and I guess, how do you understand that phrase?

MR. WOLFF: Well, again, it all reduces to the same

principle that, you know, we had a clarifying colloquy 15 minutes ago, I'm talking about a church with a church doctrine, and through its actions it is executing to that church doctrine. That's what I mean by a church being a church.

THE COURT: So that's why the stranger, if the church believes in caring for the stranger and if that stranger, if their view of stranger encompasses caring, housing, feeding, sheltering and nurturing people who are here without lawful status, if that's their sincere religious beliefs in their religion and that's part of it, then they do that. But then on this theory they might well be able to defend themselves from charges from immigration authorities about harboring or concealing from detection people who are here without lawful status.

MR. WOLFF: That's right. I pulled out my pocket Constitution just to anchor this conversation. "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof." I mean, it is right there in the First Amendment of the Bill of Rights. And that means something that's super important, right?

THE COURT: But what you're saying about free exercise then is that free exercise is more than just in a very narrow sense going to a church on Sabbath and engaging in religious practices there.

In other words, what you're saying is that the free

exercise is not merely depending on -- to take some of the bigger religions -- on Friday, Saturday or Sunday, going to the house of worship and engaging in worship. It certainly protects that, but it's more than that.

MR. WOLFF: Well, what I'm saying, to be clear, because I do want to distinguish between the parishioner who goes to the mass or the synagogue versus the entity, the religious entity that has that infrastructure in place and performs as the religious organization.

03:29 So for purposes of church autonomy, that draws in equal part from the free exercise clause and the establishment clause, which is why I read them both. It's sort of the alchemy of those two things, and the Supreme Court has made that clear.

And I think, again, I want to try to give you some comfort in maybe how to decide this case, and I would just direct your attention, I could go through more, but statement of fact 32 in particular says -- and this is all within the scope of what we both had a chance to respond to, to articulate

03:29 and respond to -- "It is TSA's sincerely held belief based on salvationist doctrine that long-term use of narcotics to treat addiction is not true rehabilitation and runs contrary to its religion mission and practice at the ARC programs, and that true rehabilitation can only be obtained through abstinence."

Then the plaintiff's response was "Undisputed that

TSA's sincerely held belief is that long-term use of narcotics to treat addiction is not true rehabilitation."

So, again, I know you told me and I appreciate it that sincerity is not really in question here, but I really think that that is the beginning and end of our summary judgment motion. That's why you rule for us, is because there's no dispute here, whatever the ramifications, and I would urge this district court not to go too broadly. You don't have to.

THE COURT: I'm not writing an opinion about all these other things because they're beyond the scope of this case, but I am interested in the -- as I am in many cases -- in what are the ramifications of the principles that are at issue in the case. I mean, I'm not writing a decision about polygamy and human sacrifice or if this or any other church decided that part of its religious mission was to shelter strangers and build a building, build a hotel, if you will. Our mission is to house people and, boom, bring in people and brought them all in. I'm not writing an opinion about that, but I'm trying to understand the application of these principles.

03:31 Okay. Go ahead. Anything else you want to add?

MR. WOLFF: Well, I don't want to take up all the time. I do want to make sure first and foremost that I've answered all of your questions.

THE COURT: I don't think I have others for you, no.

MR. WOLFF: Okay. So, again, I won't belabor the

point. I think we're in general agreement that what we're dealing with here is a church acting pursuant to core religious beliefs in the operation of the ARCs. And there's really no -- because that is all true, I think, again, that crystalizes this concept of separation of church and state.

There are things that the First Amendment allows churches to do that secular law can't penetrate, so that's why we think we win this case because we are dealing here with a church doing what the church does pursuant to doctrine and 03:32 secular law can't accommodate, which, just to pivot to them, my friends' response -- well, first of all, I'll say that's why, as you know, we have responses on the merits to the Section 504 and the FHA claim, but the reason we don't think we need to go there and the reason that we urge the court to consider our motion for summary judgment is because, irrespective of what the findings might be there, we think we win on the merits, but irrespective of that, we think the First Amendment is the bulwark that in all respects requires judgment in favor of defendant.

03:33 So the plaintiffs, I would say -- I'll say two things. One is that church autonomy is really limited to ministerial exception cases, and this isn't a case about a minister. We don't think that that flows from the cases. *Our Lady of Guadeloupe* talked about the ministerial exception being a component. And then with your indulgence, we recently brought

to the court's attention a recently decided Ninth Circuit decision that said quite plainly that the ministerial exception is just one form of church autonomy, and church autonomy is broader, which then takes my friends to the second sort of major argument, which is that we waived. And that runs into -- well, they also bring up *Smith*, and I'm happy to talk about *Smith* more, but I think *Hosanna Tabor* and *EEOC v. Catholic University* respond to the *Smith* argument.

On waiver, there's two problems. One is we know that 03:34 the Salvation Army's acceptance of funds, and they haven't -- my friends do not put this into the record, but they've made this argument that, well, Section 504 in the stipulation means they agree to all this, but that's not true. What we agreed to, pursuant to the contracts, is to use the money given for those particular projects for those particular projects. And there's no evidence, and beyond ipse dixit, there's no suggestion, evidentiary suggestion in the record that any of those funds went to the funding of the ARC.

Secondly, and you just said it 25 minutes ago, Your 03:34 Honor, and I'm glad you did, and you've said it, I haven't been in all the hearings but I've read all the transcripts, and you open up every hearing with the same admonition to counsel that if you don't say it, don't worry, you haven't waived it. And that is exactly true here, and I'd say because we're talking about a fundamental constitutional right even more so.

THE COURT: Congress doesn't say that, though.

MR. WOLFF: Well, but they cite to the *Janus* decision, among other things, to say constitutional rights can be waived. Here is what *Janus* actually said. "To be effective, the waiver must be freely given and shown by clear and compelling evidence," and this was about labor unions paying dues, but they said, "Unless the employees clearly and affirmatively consent before any money is taken from them, this standard cannot be met."

03:35 And as Your Honor has told us as counsel, both today and before, unless the words "we waive" come out of your mouth, you haven't waived. They haven't pointed to anything and there is nothing to demonstrate that we waived anything.

So even if it could be waived, even if Congress could condition, which we don't think they could because of the unconstitutional condition status -- for that I would cite the *USAID* case, we cite it in our briefs and it came up I think in the motion to dismiss hearing as well or the PI hearing.

Absent that, they're basically stuck with a public

03:36 accommodations law, and we have cited the cases that, as well meaning as public accommodation laws can be, whether it's from Congress or from the statehouses, they yield when they get to the church door. And we saw that in *Hosanna-Tabor*. We've seen that in the free speech realm in *303 Creative*. We see it in *EEOC v. Catholic University* over and over again that, as well

meaning as they are, public accommodation laws cannot trump constitutional rights found in the First Amendment.

THE COURT: Thank you.

MR. WOLFF: I know I haven't waived. I'm not going to go into everything.

THE COURT: You haven't waived, not here.

MR. WOLFF: We think we win on free exercise, free exercise and free speech as well for other reasons, but we think this case should begin and end with church autonomy. And 03:37 with that, I'll yield the floor.

THE COURT: Okay.

MR. MURRAY: Thank you, Your Honor.

Facts matter, and there are two facts in this case that are dispositive. One, Salvation Army voluntarily and knowingly agreed to comply with Section 504's prohibition on disability discrimination in the adult rehabilitation centers in exchange for federal money. That fact is dispositive. There is no First Amendment right to consent to a nondiscrimination requirement in exchange for money, millions 03:37 of dollars of federal funding every year in this case, and then renege on that commitment.

The Supreme Court said so, in *Grove City College v. Bell*, the *Rust v. Sullivan* case, the *Regan v. Taxation With Representation* case stand for the principle that Congress can choose what it will and will not subsidize. I think *Regan v.*

*Taxation With Representation* is a great analogy. The Supreme Court said the rule that a 501(c)(3) organization that accepts tax deductible donations cannot engage in political lobbying is constitutional. That does not violate the First Amendment rights of that organization because they can create an affiliate, 501(c)(4), that is a separate entity and funding is distinct. That entity can engage in lobbying, and then Congress doesn't have to worry that its money is being effectively subsidizing the lobbying that it doesn't want to subsidize.

03:38

The Salvation Army could avoid the requirements of 504 by not taking federal money or by creating a separate affiliate to take federal money and operate programs without discrimination as they do with the other programs, like the Harbor Lights Center where participants are allowed to access medication for opiate use disorder and making sure that the subsidization of discrimination with federal money doesn't happen.

The reason 504 is structured the way it is, which says

03:39

that if you're a business primarily engaged in the provision of social services and you receive federal financial assistance to any part, then all of the social services are covered, is because those are traditionally sort of public services, and Congress doesn't want monies fungible, it doesn't want to be subsidizing discrimination. And again, they could avoid that

by creating actual separation.

The facts here show that the ARCs are operating at a 40-million-dollar deficit every year and that they are subsidized by the Salvation Army's general funds. The Salvation Army gets funding from the federal government. The point of the way the 504 is structured is to avoid that potential subsidization.

Now, they cite the *USAID* case. In that case the court reaffirmed *Regan v. Taxation With Representation*, said that the
03:40 separation of 501(c)(3)s and 501(c)(4)s makes sense. And *USAID* wouldn't work because the requirement at issue was a requirement that the recipient of funds adopt as its own policy and belief an opposition to prostitution. So they couldn't create an affiliate. They still had to adopt that position.

And that's not the case here. The 504 doesn't require the Salvation Army to change any of its positions or beliefs or speech or attitude. All that it requires is that it not deny access to otherwise publicly accessible services based on disability.

03:40 And that's the other, the second fact that's dispositive that matters here is that we're not talking -- the participants, the beneficiaries of the programs are not members of the religion. They're not members of the Salvation Army. They're members of the general public, one third of whom are required to comply as a condition of probation or parole. So

this is the principle that distinguishes the church autonomy doctrine, that distinguishes this case from the hiring of a minister, from the --

THE COURT: The Salvation Army is not imposing the requirement to participate as a condition of probation. That is, that condition is being imposed by the court.

MR. MURRAY: That condition is imposed by the court. The Salvation Army accepts those people as a fact. It is emphasizing that what we're talking about is the behavior of an entity --

03:41

THE COURT: I'm not sure how that's legal. I don't think it's a Salvation Army issue. Just from my own perspective, I would never require someone as a condition of their liberty to go to a place where they're required to pray or they're required to attend religious services even if they can sit silently. That strikes me as not a proper condition of a person's liberty.

And I have had a case, at least one or two, where people went not to the Salvation Army but went to a program and it turned out the program required that, and I gave the person the option to go to a different program, because it strikes me that the government should not be requiring people to pray or requiring them to pray to a specific religion. And that was one understanding I have of the First Amendment, that that's not proper.

03:42

I don't think that, in the case I had, which had nothing to do with the Salvation Army, I don't think the organization did anything wrong by having the person participate in their program, which included prayer.

So you say that, I understand that, but I'm not -- I don't see how the Salvation Army, it may be a violation, if any one or all of those one third do not wish to participate in a program that would require them to attend religious services, even if they don't have to participate, that might well violate
03:43 -- the order might violate their rights, but I'm not sure that the Salvation Army did anything wrong there.

MR. MURRAY: And I'm not saying that's something that the Salvation Army did wrong. I point to the fact to emphasize the point that what we're talking about here is not what the church autonomy doctrine is about, which is a religious organization's internal dealing with itself, with its own members, with its own employees, how its internal governance -- the way the courts have described it, and it's not just the ministerial exception, but what it is is questions of internal
03:43 church governance of, you know, doctrinal disputes about what's the correct interpretation of our own religion, how we interact with our own members. That is distinct from how the organization interacts with the outside world.

THE COURT: Suppose you had this. San Francisco is where you guys are from, right?

MR. MURRAY: Yes.

THE COURT: Suppose the city of San Francisco passed the following law: All restaurants open to the public, all places that serve food that are open to the public must provide certain various kinds of options. They must provide a vegetarian option. Let's just say they said that, okay?

And suppose a religious organization believes that when they celebrate their Sabbath, at the end of their Sabbath, they should be opening -- they should be sharing a meal, those members, the people who choose to go to the Sabbath services, and they believe they should open that to any member of the public who wishes to come. They're thinking they most wish to serve people who might not be able to feed themselves completely but they'll open it to anybody, even lawyers like yourselves who probably can afford to feed yourselves. But their religious view is that a meal is a meat meal. They don't offer a vegetarian option. And it's not a meal where there's meat plus salad, plus broccoli where you could choose to just eschew the meat. They just offer the meat. And that's the meal they'll share, and they open it to everyone so it meets the definition of a restaurant or public accommodation. It's not just the ARCs, just for members of the religion. They say that's our religious belief, it's just the way we express it, much the way the ARCs. Can the City of San Francisco really require them to offer a vegetarian meal?

MR. MURRAY: So I guess I would wonder what the rational basis of that law is, but if there were a rational basis --

THE COURT: They want to encourage people to wean themselves from meat because meat consumes too much carbon, and the feeding of -- first of all, the slaughter of animals they think is bad, the City of San Francisco has decided that because of the carbon impacts of meat, so they have a rational basis that strikes me as an arguable -- follows a rational basis, that's what they say.

03:46

MR. MURRAY: If the law is generally applicable and neutral and applies to all facilities that offer food to the general public, then the city could impose that law. You don't have to go anywhere near that. Binding precedent, that's *Smith* which binds this court. This case you don't have to go anywhere near that because, primarily, the Salvation Army agreed in exchange for federal funding. My friend says this is a narrow case. It is a narrow case for that reason.

THE COURT: Let me ask you a different question. What evidence is there, if I think about the case in the way you tell me to think about it, of intentional discrimination? In other words, what is the inference of intentional discrimination here? It seems undisputed that they serve people with OUD. And it seems fairly clear that there's two forms of medication assisted treatment they don't offer. And

03:47

what is the inference that that is intentional discrimination?

MR. MURRAY: Their policy is explicitly the intention. They intend not to serve people who have OUD and use this medication. Intentional discrimination doesn't require animus against the protected class. It requires intentionality. And I don't think there's any dispute here that their policy is an intentional policy. We have a categorical policy, we ban access to our ARCs for people who have this condition and use this medication.

03:48 THE COURT: Intentional discrimination in your view against the subset of people suffering from OUD?

MR. MURRAY: Yes, yes. And I don't think that there's a dispute that that's what they're intentionally doing. And as a matter of law, and we can brief this if you would like, that is intentional discrimination under the discrimination laws. But for purposes of this motion, as has been said, they're taking for granted that their policy violates the statute.

They're saying assuming we are engaged in discrimination, intentional discrimination that is unlawful 03:48 under these federal statutes, we have a right to be exempted from those statutes under the First Amendment. And their primary argument is the church autonomy doctrine. That is internal facing, not external facing, and it certainly doesn't get over their knowing and voluntary agreement to comply with Section 504 in exchange for federal funds, which they could

avoid, again, if they made different choices about their funding. We have an independent argument under *Smith* that these are neutral generally applicable laws with a rational basis, that's binding precedent.

THE COURT: But even under that view of *Smith*, don't these laws have individual components that they allow for reasonable accommodation, so they're sort of an individualized -- my hypothetical about the restaurants, boom, that's it. You're a restaurant, you have to offer meat if 03:49 you're a public restaurant, okay, period. There's no exceptions. There's no accommodations. There's no nothing. Here, there's the reasonable accommodation analysis.

MR. MURRAY: But that's generally applicable law. I mean, the individual exception analysis that the Supreme Court talked about in *Fulton*, for example, in Philadelphia was about does a government official --

THE COURT: Have individual discretion.

MR. MURRAY: -- have discretion to grant an individualized exemption for this reason but not some other 03:50 reason. That's not how these laws work.

THE COURT: Even though there's an accommodation, it's reasonable or it's not, but it's not a discretionary decision.

MR. MURRAY: So, yes, but again, I would say you don't even have to reach the *Smith* argument if you don't want to. I mean, I think it's controlling and binding precedent, but you

can deny their motion on the first round alone on the federal funding ground, which is also binding precedent. And their response is --

THE COURT: Your response essentially to their entire First Amendment argument is it's just not applicable in this case.

MR. MURRAY: It's not. They agree to comply. You can't agree to comply, take the money and then say but now we're not going to comply after we agree. And that's what the
03:51 Supreme Court said in *Grove City College v. Bell*. That's what *Regan*, again, *Rust v. Sullivan* --

THE COURT: Why isn't there the religious reasons that animate their -- well, they have created this program in a certain way. There are lots of different kinds of programs for people with OUD and for other people who are suffering from other disabilities and people who are struggling for mental health reasons, for poverty, for other reasons, and they've created a particular kind of program as defined in the papers in the record, and they've done it certainly motivated by their
03:51 religious beliefs. And so why doesn't that, just under the ordinary analysis, have significance in terms of just like in my restaurant example, it's just changing the program?

Like, I understand your view is that it's not, well, maybe rational or not consistent. There are distinctions they make with respect to certain medications or other medications

or when they allow them or when they don't. But it seems that they have created something they view as an abstinence program. And why does that -- why wouldn't it be changing the program in a deep and meaningful way to require them to offer this?

MR. MURRAY: I think you're asking me a question about whether they're violating the statute as opposed to whether they have a First Amendment right to violate the statute.

THE COURT: Yes.

MR. MURRAY: Which is not an issue in this motion, but 03:53 they're assuming that they are violating the statute, right? And I think our response on the fundamental alteration defense is that they have an individualized exception process, exception process, you know, for dealing with medication, and they can apply that same process to this medication. This is a protected group of people with a disability. These folks could be allowed to access their medication offsite. They could be allowed to access their medication onsite with self-administration, so the Salvation Army would be -- what we are asking is that they stop denying access --

03:53 THE COURT: But that's like saying to the restaurant, you know, you can bring in your vegetarian meal. They're like, no, we don't want to. If you want to eat here, we want you to eat meat.

MR. MURRAY: So I think that -- well, the example with the restaurant, I think that a general applicable neutral law

can be applied to someone who is providing a good or service to the general public.

THE COURT: If they were providing it only to the people who come to their religious services, you would view it differently?

MR. MURRAY: If they were limiting access to their own members saying you have to be a member of our religion, that would be an entirely different case. That would be like *Union Gospel,* the Ninth Circuit case. They said you're allowed to hire co-religious members of your own religion. You're not allowed to discriminate on other grounds in hiring of non-ministers.

Even in that case, the Ninth Circuit is cabining the extent of the church autonomy doctrine because it's getting farther away from the internal facing core decisionmaking that that doctrine is about. When the entity goes out into the world and engages with people who are not members of the church to provide goods and services like anybody else, we regulate that in this country, and that is okay.

THE COURT: On the other hand, many people find it deeply annoying, if not offensive, if somebody rings the doorbell who is not an invited guess to their home. And that's why many communities or at least probably -- I don't recall -- but might well be why the community at issue in that Supreme Court case passed a rule that said no solicitation or what have

you, and the Supreme Court said, well, that might be fine, but the various people who are going for religious purposes, they can go up to the door and ring the bell. And so they said that was all right.

MR. MURRAY: I admit to not recalling the exact facts of that case, but my recollection is that, as with *Smith* and in other cases, the Supreme Court is concerned about discrimination against religion, treating people with religious beliefs or motives differently from secular beliefs or motives, 03:56 and that's not this case. Again, 504 and Fair Housing Act treating --

THE COURT: Everybody the same.

MR. MURRAY: -- everybody the same way, and the First Amendment allows that.

THE COURT: Okay. If there's anything else --

MR. MURRAY: If you have other questions, I'm happy to answer them.

THE COURT: No. Anything you want to say in response?

MR. WOLFF: If I may, Your Honor, just a few remarks 03:56 in response. Frankly I think, although he would view it differently, my friend's comments about *Union Gospel* being an entirely different case that would come out differently is again dispositive of this case.

*Union Gospel* shows that the church autonomy doctrine is not purely internal. And I want to start with sort of a

bedrock case, the *Kedroff* decision from the mid-last century that spoke in terms of churches being, drawing from the 19th Century decision in *Watson*, churches having independence from secular control or manipulation, in short, power to decide for themselves free from state interference matters of church government as well as those of faith and doctrine. So it doesn't have this limiting principle of being purely internal.

And here we are very much talking about faith and doctrine, no differently than the *Union Gospel* case was talking about faith and doctrine in its employment of outsiders coming in. And there's no distinction in the church autonomy doctrine between outsiders seeking to join, whether as employees or parishioners, and outsiders seeking to participate in a church program that is operated pursuant to church doctrine.

So I think we're pretty much on all fours with the employees in *Union Gospel*, notwithstanding the fact that was, technically speaking, an employment matter. And I would say to your hypothetical, I think there's a big difference, and I want to make this point clear, we are not here talking about the operation of a restaurant by a church or the operation of any other kind of storefront. We are talking about the operation of a church by a church. And that's different because, again, when folks come in, whether they are coming in as parishioners or members --

THE COURT: Well, what's the difference between what

you're doing and my hypothetical about the dinner?

MR. WOLFF: Well, at the end of the day, the result may be the same, i.e., a decision in favor of the restaurant, the church restaurant on First Amendment grounds. But again, as my friend said, facts do matter; on that much we agree. And so there may be a difference there in terms of how that entity is being viewed or how that operation is being viewed.

THE COURT: It's hard to imagine a world where lawyers can't agree to the facts of the matter, at least in the

03:59 judicial branch. You might not agree what the evidence shows the facts are but that facts matter. I mean, I agree with you that they do matter, and I agree you both agree to that, but it strikes me as a rather noncontroversial principle.

MR. WOLFF: Understood. And all I wanted to do for purposes of the record is bring us back --

THE COURT: I understand why you might say it.

MR. WOLFF: -- to home base and saying we're actually being a church, right, and this is the fruition of a church being a church. Just a couple of other things --

04:00 THE COURT: So when you say, "We're being a church," what does that mean to you in your argument?

MR. WOLFF: It means, and again, recognizing that the First Amendment is a big tent for many different religions, whether it's mainstream or minority, that there is a bona fide church, and I think this is how you again think or how I would

suggest the court think of a church autonomy case, is there a bona fide church as defendant? Here, yes, check that box. And is the church being accused of something because it's doing something as a matter of faith or as a matter of doctrine? Yes, here we are.

The thing that the plaintiffs -- and again, the plaintiffs present a sympathetic case, and at the end of the day we're actually trying to solve the same problem. But the First Amendment allows a church to try to solve for problems in 04:00 a way that the church designs its functions and its doctrine, and plaintiffs are allowed, of course, to have a disagreement with that, but that is at the end of the day not the plaintiffs' decision to make, and frankly it's not Congress's decision to make. It's the church's decision to make.

THE COURT: So you would come back, if I go back to my restaurant example, you would say if it's a church in the generic sense, if that church is a defendant and if it is offering food, say for free, as a matter of faith and doctrine, because its faith and doctrine says offer food to feed the 04:01 hungry, so that's a matter of faith and the way they offer -- so it's not just the fact that the doctrine says to offer food, but if their doctrine says to offer food in a particular way, that is my somewhat perhaps facetious example, but to offer meat only, and that's their doctrine, be it that's just on Friday night that they eat meat or whatever, then you would say

that the states stay out or cities stay out?

MR. WOLFF: That's exactly right. The method is the message, and that's doctrinal.

I want to address two more points quickly. One is the comment that nothing that they're seeking is going to require the Salvation Army to do anything against its faith and doctrine, but that's foundationally not true.

They're asking us, again, just referencing the statement of fact 32, we all agree that the sincerely held belief is rehabilitation through abstinence, but they're seeking an exception from that. And that's asking the church not to be the church. And just as one other example, and it's not at issue in this case but I think it's a compelling one because it could be the next case, also on this list is cannabis. And we know now in many --

THE COURT: When you say "list," which list are you referring to?

MR. WOLFF: Well, the Salvation Army medicine list. The same place --

THE COURT: Yeah, yeah. I just wasn't sure.

MR. WOLFF: We know in many jurisdictions, and Massachusetts may be one of them, that marijuana is being used on a prescription basis to treat a number of disorders.

THE COURT: Not prescription -- well, prescription certainly but --

MR. WOLFF: Well, walking to the court today I realized it's not just on a prescription basis because it's everywhere.

THE COURT: It's actually not legal in Massachusetts, notwithstanding your experience, because federal law makes possession of marijuana a crime, and federal law applies here and everywhere else. Whether the federal government chooses to enforce the law is itself a decision for the executive branch. But, yes, Massachusetts law, without a doubt, my understanding is it's not only available for prescription medication but nonprescription. You can just buy it in the store if you're over 18. I'm not sure it's illegal in public places. But, yes, your experience is a common one.

MR. WOLFF: But the point I want to make, just to put the finer point on it, is that at least in some jurisdictions, you now have diagnosed, let's say, depression that's being treated with prescription marijuana. And if someone were to come to an ARC and say, well, I've got this disability of depression, and my doctor is saying I need to smoke marijuana, and if you --

THE COURT: You don't want to take that person. You're happy to take that person but not while they're taking marijuana.

MR. WOLFF: Exactly, and for the same reason. And every chemical that the Salvation Army --

THE COURT: In your view this really comes down to, in your view, are we a church, yes; is the church the defendant, yes; are we doing it as a matter of faith, yes. And then the fourth prong is how are we doing it. That is that we're helping the people with addictions, or poor, that's number three. And number four is how we're doing it. Three is the purpose, and four is the method. And the method you're saying is the way we're doing it is church doctrine, and so requiring you to do it a different way violates church autonomy.

04:05 MR. WOLFF: Exactly, yes.

THE COURT: I understand, I got it.

MR. WOLFF: Okay.

THE COURT: I don't have any other questions.

MR. WOLFF: That's all I've got, Your Honor.

THE COURT: That's okay. Thank you. Two minutes if you want, or a minute.

MR. MURRAY: I just -- -

THE COURT: I understand you disagree with them on the last point. You would say that the generally applicable law trumps, so to speak, the doctrine theory, and you have quarrels with whether it is really their doctrine.

04:05 MR. MURRAY: We don't have quarrels about whether something is really their doctrine. That's not what the case is. It's about, under *Smith*, generally applicable neutral laws apply. But, again, more importantly, you don't have to get

there because under 504 they agreed. They took federal money in exchange for agreeing to comply with this nondiscrimination law. They took money, if a church took money from the government and said I'm not going to discriminate on the basis of race but our religious belief is that we don't believe in interracial marriage so we're not going to accept members of the general public to receive our services who are in interracial marriages, that would be a violation of Title VI, and there wouldn't be a First Amendment right to be exempt from that law. Analytically, it's the same analysis here.

04:06

So we urge you to deny the motion for summary judgment. They don't have a right to take federal money and then discriminate after they've committed not to.

THE COURT: One procedural question for both of you. I understand what happens, if I allow the motion for summary judgment, that's the end of it. That's the end of the injunction -- that's really the end of the whole case I take it.

MR. MURRAY: If I may, I think we discussed this at a status conference before the motion. If you were to -- the damages classes have been stayed, so this is just about the injunction class. They did move against both classes, but we've objected to that ---

04:07

THE COURT: Yeah, yeah.

MR. MURRAY: -- damages classes, they can't be bound

by a judgment. And so if there were a judgment against the injunction class, which obviously we don't think there should be, then I think it would make sense to come back and talk about what happens with the damages class.

THE COURT: Okay. And if I deny the motion for summary judgment, then we probably would have a status conference, but then the question is how to proceed with the damage classes and how to proceed, this would need to be -- at some point there would need to be a trial on the merits with respect to the injunction class.

04:07

MR. MURRAY: That's right, Your Honor. And I think at our last status conference we put in competing views about what discovery would be necessary before scheduling that trial.

THE COURT: Okay. All right. Anything you want to add just procedurally to that? I mean, the way I see is it there's two outcomes to the motion: It's allowed or it's denied. I don't really see another outcome, unless you do.

And if it's allowed, he's saying then have a status conference to talk about what to do about the damage classes. And he's saying, if it's denied, we eventually have a status conference because you have competing views about what to do about all three classes. It seems to make sense, but it would be helpful to hear your view of those two potential outcomes. I think once I resolve it, what would be -- usually the last thing I would have in a decision is what's next.

04:08

MR. WOLFF: Yeah, I think everything you said is right.

THE COURT: Okay.

MR. WOLFF: Can I just go back one step to the 504 question?

THE COURT: Sure.

MR. WOLFF: I just want to make abundantly clear that the stipulation was a backward-looking acknowledgment that we had accepted 504, Salvation Army. There's nothing in the 04:09 record, and he has the contracts, there's nothing in the record showing that we were waiving our right --

THE COURT: You're saying the stipulation doesn't waive. The stipulation is just we did take federal money.

MR. WOLFF: Right.

THE COURT: You're saying whether we waived or not is determined not by the stipulation but by whatever the statutes, regulations and contracts are when we took the money.

MR. WOLFF: Right.

THE COURT: And you're saying that's not in the 04:09 record.

MR. WOLFF: Right.

THE COURT: The statutes and regulations I can look at.

MR. WOLFF: This court just confronts what's required from 504 versus what the First Amendment protects and makes

that decision. But that's like a public accommodation law at that point. That's frankly how he presented the case.

THE COURT: Okay.

MR. MURRAY: Just to respond on that point, we have argued that they've waived the defense that's in there. But the primary argument is they consented to comply with 504 by taking the federal money. There's no dispute that 504 applies to the ARCs, requires them not to discriminate in the ARCs. They're taking federal money. Whether it went to ARCs or 04:10 another part of their organization, there's no First Amendment right to renege on that commitment.

THE COURT: Okay. Got it. Thank you very much. Have a good day. I appreciate the argument, very helpful, and I'll do my best to resolve it as quickly as I can. Thank you.

(Adjourned, 3:10 p.m.)

CERTIFICATE OF OFFICIAL REPORTER

I, Kelly Mortellite, Registered Professional Reporter, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing transcript is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter to the best of my skill and ability.

Dated this 23rd day of February, 2026.

/s/ Kelly Mortellite

________________________________

Kelly Mortellite, RPR, RMR, CRR

Official Court Reporter