# Exhibit 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No.: 1:21-cv-10806-LTS

---------------------------------------------------x

MARK TASSINARI, RICHARD ESPINOSA, and JOSEPH ALMEIDA individually and on behalf of all others similarly situated,

Plaintiffs,

v.

THE SALVATION ARMY A NEW YORK CORPORATION,

Defendant.

---------------------------------------------------x

40 Rector Street
New York, New York
February 7, 2023
10:00 a.m.

30(b)(6)DEPOSITION OF MAJOR BETH MUHS, appearing at the above-mentioned time and place before ANNMARIE OAKLEY, a Notary Public of the State of New York.

Page 114

B. MUHS

Sublocade shot and not require any other medical attention or intervention in the month between the shots how would that effect the ARCs?
A. We would not be an abstinent program.
Q. If an individual receiving prescribed narcotic pain medication after surgery, an ARC participant received that, how would that effect the ARCs differently?
A. They would be monitored for the one to three days of needing it. If it was in their system beyond the time allowable they would we discharged for drug use.
Q. Could an ARC participant use methadone for one to three days, three to five days, taper off and then be done with it and still participate in the ARC program?
A. Not until they were done with it.
Q. And how is that different from an ARC participant receiving pain medication for a few days after surgery?
A. I think one is we are noticeable of what reaction we are looking for when someone is just discharged from the hospital, with the hospital notes, and we look at that and get them the medical

Page 115

B. MUHS

attention they need if there was any reaction, that way we would not know what that individual's reaction would be should they have alcohol outside of the center or mixed with another drug outside of the center because we're not a medical center.
Q. How would you get medical attention right away for somebody post surgery?
A. Ambulance.
Q. Have you had any discussion with anyone else in the Salvation Army about shutting down the ARCs before admitting participants who would use methadone or buprenorphine?
A. Yes.
Q. Who have you talked to about that?
A. Our counterparts, my counterparts have talked about it.
Q. When you say your counterparts what do you mean?
A. Other ARC officers.
Q. Within the eastern territory?
A. Yes.
Q. Have you talked about this with anyone outside the eastern territory?
A. No.

Page 116

B. MUHS

Q. Have you ever had a discussion with someone in the eastern territory about the fact that some other Salvation Army programs, like the Harbor Light Centers, allow participants to use methadone or buprenorphine?
MR. GIES: I'm going to object and not to answer it, it's beyond the scope. We're not going to let the witness answer if it's beyond the scope.
MR. MURRAY: You're directing the witness not to answer.
MR. GIES: About a topic for which she's not designated as a 30(b)(6) witness. I told you who the witness for that topic is and you will be able to ask him.
Q. Are you personally aware that there are other Salvation Army or any other Salvation Army programs outside of ARCs that allow participants to use methadone or buprenorphine?
MR. GIES: Same objection, same direction.
Q. You're not going to answer that question?
A. I'm listening to my attorney.
MR. MURRAY: I will state

Page 117

B. MUHS

for-the-record that's not a proper instruction not to answer but I understand that's what you're instructing.
Q. You testified earlier about the update to the Salvation Army medication policy in September 2022, do you recall that?
A. Yes.
Q. Was the Salvation Army currently considering making any changes to its medication policy?
A. No.
Q. Has a Salvation Army made any formal decision shutting down ARC programs if it were required to admit a participant who uses methadone or buprenorphine?
A. No.
MR. MURRAY: I'm going to mark Exhibit 122. This is a document says, "Intake Coordinator's/Counselor's Reference Guide."
(TSA0001070 to TSA0001072 was introduced as Exhibit 117.)
Q. Do you recognize this document?
A. Yes.
Q. What is this?

B. MUHS

A. Intake coordinator's reference guide.

Q. Is this a document that ARC intake coordinators use when considering whether to admit someone to an ARC?

A. Yes, one of them.

Q. Under, "Principles for admission without a detoxification." do you see where it say, "We can admit a person with a positive urine test if they are not under the influence and report not using drugs in the last 48 hours and the detoxification center has said detoxification is unnecessary."

A. Yes.

Q. So if an -- strike that. Applicants for admission undergo urine testing before being admitted to the ARC; correct?

A. Yes.

Q. And if an applicant's urine tests positive for methadone or buprenorphine they would not be admitted; correct?

A. It says if they have not been to detox. I know you want a yes or no but.

Q. I would like the truth.

A. The truth is if someone had been to a detox and they still have it in their system we



B. MUHS

still allow them in but continue to monitor their drug testing.

Q. When you say "been to detox" what do you mean by that?

A. Gone to a hospital for detoxification or another medical facility for detoxification. We do not do detoxification in our centers.

Q. If someone has not been to a detoxification facility first and they test positive for methadone or buprenorphine they would not be admitted; correct?

A. We would ask them to go to a detox.

Q. They would not be admitted.

A. Correct.

Q. And so the only way that someone, who is an applicant, who tested positive for methadone and buprenorphine could we admitted to an ARC is if they report not using methadone or buprenorphine within the last 48 hours and a detoxification center says that detoxification is not necessary, is that right?

A. Correct.

Q. The bottom of this page, "Persons requiring medication while residing at the ARC must be able to administer their own medication while it



B. MUHS

is centrally stored for safety." That describes the policy that applies to all the ARCs in the eastern territory; correct?

A. Correct.

MR. MURRAY: I'm going to mark Exhibit 123. This is a document that says, "2012 Supplements Policy." at the top.

(2012 Supplements Policy was introduced as Exhibit 123.)

Do you recognize this?

A. Yes.

Q. What is this?

A. This is -- we don't allow protein or energy drinks within our center.

Q. This is a policy that applies to all the ARCs in the eastern territory?

A. Yes.

Q. And it has applied since at least 2018?

A. Yes.

Q. And in the middle paragraph there you see a reference to a physician note of approval and centrally storing. Is it the eastern territory's policy that an ARC participants can use a supplement if they get a physician's note of approval and the



B. MUHS

supplement is centrally stored?

A. Yes.

Q. And the requirement of a physician's note and central storage that prevents abuse of the supplement, is that right?

A. Say it again.

Q. The requirements of a physician's note of approval and central storing of the supplement those prevent the abuse of the supplement; correct?

A. Correct. It's our policy for all medication storage.

Q. You referred earlier to the Talbott Recovery Campus Medication's Guide as a basis for the Salvation Army medication policy, do you recall that testimony?

A. Yes.

Q. Has the Salvation Army used any other references as a basis of its medication policy?

A. Not to my knowledge.

Q. There are no other references or guidebooks or other documents that you're aware of that the Salvation Army has looked to or relied upon in developing its medication policy; correct?

A. To my knowledge; correct.

B. MUHS

C E R T I F I C A T E

I, ANNMARIE OAKLEY, a Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify:

THAT BETH MUHS, the witness whose deposition is herein before set forth, was duly sworn by me, and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or by marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS THEREOF, I have hereunto set my hand this 7th day of February, 2023.

ANNMARIE OAKLEY



B. MUHS

ERRATA SHEET

DATE OF DEPOSITION: FEBRUARY 7, 2023
NAME OF DEPONENT: BETH MUHS

| PAGE | LINE(S) | CHANGE | REASON |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

_________________________
BETH MUHS

SUBSCRIBED AND SWORN TO BEFORE ME
THIS _____ DAY OF ___________________, 20___.

____________________________