**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| **MARK TASSINARI, RICHARD ESPINOSA, AND JOSEPH ALMEIDA**, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**THE SALVATION ARMY, A NEW YORK CORPORATION,**<br><br>Defendant. | **CASE NO. 1:21-CV-10806-LTS** |

**SUPPLEMENTAL COMBINED STATEMENT OF MATERIAL UNDISPUTED FACTS**

1

## SUPPLEMENTAL COMBINED STATEMENT OF FACTS ("SCSOF" OR "SSF")

Pursuant to Local Rule 56.1 and this Court's Standing Order Regarding Briefing of Summary Judgment Motions, the Parties submit this Supplemental Combined Statement of Material Undisputed Facts, which includes Defendant's Supplemental Statement of Material Facts, Plaintiffs' Responses to Defendant's Supplemental Statement of Material Facts, and Plaintiffs' Statement of Additional Material Facts in Opposition to Supplemental Motion for Summary Judgment.

## DEFENDANT'S SUPPLEMENTAL STATEMENT OF MATERIAL FACTS

1. **Opioid use disorder ("OUD") does not, by itself, render an applicant unqualified for the ARC program.** Doc. No. 276-6 at 18 (Standards of Adult Rehabilitation, "The ARC has 'wide open' doors regarding our admissions policy"); *id.* at 18-19 (listing "medical and/or mental health conditions that typically warrant a review by CHQ prior to admission"—OUD is not listed); Doc. No. 276-1 at 29 (ARC Handbook, "The majority of the men and women admitted to the adult rehabilitation centers may be described as alcohol or drug abusers. . . . The adult rehabilitation center serves . . . the abuser of other substances [besides alcohol] as well as those with other and sometimes multiple addictions and other challenges. The challenge is to help such men and women develop a more lasting and satisfying way to deal with their problems. The center's program leading to rehabilitation is designed for this purpose."); Doc. No. 160-7 at 2 (showing that at least 941 individuals use primary abused substance is listed as opiates participated in the ARC program between 5/1/2018 and 4/17/2023);

    a. RESPONSE: Disputed. TSA categorically bans individuals with OUD who take prescribed methadone and buprenorphine from accessing ARC housing and services. *See* Doc. No. 281 (Combined Statement of Material Undisputed Facts ("SoF")) ¶¶71, 73-76.[1] For many individuals with OUD, ongoing treatment with methadone or buprenorphine is the only treatment that is medically appropriate, effective, and prescribed for their disability. *See* SoF ¶¶39-44, 48. Naltrexone alone and other treatments that do not include prescribed medications for opioid use disorder ("MOUD"), such as behavioral therapy or counseling, are not medically appropriate, effective, or prescribed for these individuals. *See* SoF ¶¶40, 46-47. For these individuals, their OUD, by itself, renders them categorically excluded from the ARC program. They are banned from ARCs for taking the only treatments that are medically appropriate, effective, and prescribed for their disease.

        i. *See* Doc. No. 38-1 (Declaration of Lt. Colonel Dennis Gensler (Lt. Col. Gensler Decl.), ¶26 (providing that all Eastern Territory ARCs "prohibit[]

---

[1] Plaintiffs' citations to Doc. No. 281 (Combined Statement of Material Undisputed Facts ("SoF")) throughout their opposition brief and this Supplemental Combined Statement of Facts refer to the unredacted version of the SoF filed with the Court under seal on August 15, 2025 (Doc. No. 287).

use of certain medication-assisted treatment ('MAT'), including methadone and buprenorphine, but allow[] alternative medications, such as vivitrol")); Doc. No. 141-7 (Response to ROG 10 at 22-23 (TSA prohibits "certain addictive drugs that are often prescribed to individuals with OUD, specifically methadone and buprenorphine")); Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 89:24-91:8, 95:13-15 (confirming that an ARC has never "permitted a participant to use methadone or buprenorphine" for OUD)); 97:14-21 (acknowledging TSA is aware that doctors sometimes prescribe methadone or buprenorphine, not Vivitrol, to people with OUD because Vivitrol requires that "a person [goes] through a detox period first")); Doc. No. 143 (Rodriguez Decl. ISO PI Mot., ¶39 ("[T]here is no requirement, and it is not the standard of care, that a patient receiving MOUD engage in any specific behavioral therapy or counseling as a condition of access to or enrollment in MOUD."), ¶43 ("Access to one MOUD and not another is not the standard of care and can be dangerous."), ¶45 ("I am not aware of any circumstance in which the standard of care would permit offering an individual with opioid use disorder only naltrexone and not methadone or buprenorphine."), ¶63 ("Methadone is the most used and most studied medication for opioid use disorder in the world. … Due to its effectiveness, the World Health organization has listed methadone as an essential medication."), ¶¶85-86 (Vivitrol cannot be started unless an individual is "completely free or abstinent from any short acting opioid use (e.g., oxycodone, heroin, fentanyl) for at least 7-10 days and … methadone, buprenorphine[] for 10-14 days prior to starting treatment. If naltrexone is given to an individual who is using or has recently used any opioid (including in treatment with methadone or buprenorphine), the naltrexone would displace the opioid … resulting in harmful, immediate, and potentially, severe withdrawal in the patient."), ¶87 ("[P]atients who are using and need to go through withdrawal … may fail to complete medically supervised withdrawal (detox), return to use, or get lost to follow up (not return to visits or respond to calls. These are significant clinical risks with not allowing individuals access to all MOUDs … [I]n individuals that need to go through medically supervised withdrawal, studies show that initiation rates for [naltrexone] are significantly lower."), ¶88 (citing studies showing "a substantial induction hurdle or difficulties with [naltrexone] initiation."), ¶89 (explaining that many individuals choose methadone or buprenorphine over naltrexone, as studies indicate that naltrexone "have worse retention in treatment" and is associated with "a higher risk of overdose")); Doc. No. 143-2 at 99-101 (Ex. 2 to Rodriguez Decl., TIP63 ("Because the injectable form was approved more recently by FDA than methadone and buprenorphine, [naltrexone] has been less studied than those medications. … The oral formulation of naltrexone is not widely used to treat OUD because of low rates of patient acceptance and high rates of non-adherence leading to a lack of efficacy.")); Doc. No. 201 (2d Supp. Rodriguez Decl., ¶7 (explaining that study found "exposure to buprenorphine or methadone treatment reduced the relative

3

risk of death by 34% and 38%, respectively," while individuals who received non-medication treatments like counseling with no MOUD had a relative risk of death that was equal or worse than those who received no treatment at all); ¶¶ 8-13 (summarizing studies consistently demonstrating efficacy of MOUD and emphasizing that the medications are "critical to confronting the opioid crisis")).

2. **Beneficiaries are not discharged from the ARC program simply because they have OUD.** *See* SCSOF No. 1; *see also* Doc No. 276-01 (ARC Handbook at 149, Discharge Summary listing reasons for discharge—OUD is not listed).

   a. <u>RESPONSE:</u> Disputed. TSA discharges individuals with OUD who take prescribed methadone and buprenorphine from the ARC program. *See* Doc. No. 281 (SoF) ¶77. For many individuals with OUD, ongoing treatment with methadone or buprenorphine is the only treatment that is medically appropriate, effective, and prescribed for their disease. *See* SoF ¶¶39-44, 48. Naltrexone alone and other treatments that do not include MOUD, such as behavioral therapy or counseling, are not medically appropriate, effective, or prescribed for these individuals. *See* SoF ¶¶40, 46-47. TSA discharges individuals with this form of OUD from the ARC program simply because they have OUD that requires ongoing treatment with prescribed methadone or buprenorphine.

      i. *See* Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 154:23-155:18 (providing that Tassinari was discharged from an ARC "because he tested positive for Suboxone" following treatment by an outside medical provider), 180:7-181:20 (noting that a positive test for methadone or buprenorphine results in a discharge summary listing "drug use" as the reason for discharge)); Doc. No. 141-4 (Ex. D to Salazar Decl. ISO PI Mot., Swistak Dep. Tr. 55:1-4 (confirming that individuals have been "discharged from an ARC for testing positive for Suboxone")); Doc. No. 197-56 (Filed Under Seal) (Ex. 356 to Salazar Supp. Decl. ISO PI Mot., Rehabilitation Record ███████████████ Doc. No. 197-57 at 2 (Ex. 357 to Salazar Supp. Decl. ISO PI Mot., Discharge Letter (discharge from ARC for "Unsatisfactory-Positive Urinalysis for Suboxone")); Doc. No. 197-58 (Filed Under Seal) (Ex. 358 to Salazar Supp. Decl. ISO PI Mot., Discharge Summary ███████████ Doc. No. 197-59 at 2 (Ex. 359 to Salazar Supp. Decl. ISO PI Mot., Email from Bayode Agbaje, Assistant to Administrator for Business at Philadelphia ARC to Kevin Schoch (discharge from ARC for testing "+ve for Methadone")); Doc. No. 197-60 at 2 (Ex. 360 to Salazar Supp. Decl. ISO PI Mot., Email from Mark Taylor, Buffalo ARC intake coordinator, to Pamela Lamancuso ("discharge from [ARC] program for use of Suboxone")); Doc. No. 197-61 at 3 (Ex. 361 to Salazar Supp. Decl. ISO PI Mot., Discharge Summary (discharge from ARC for "Suboxone")); Doc. No. 197-62 at 3 (Ex. 362 to Salazar Supp. Decl. ISO PI Mot., Discharge Summary (discharge from ARC for "positive for Suboxone")); Doc. No. 197-63 (Filed Under Seal) (Ex. 363 to Salazar Supp.

4

Decl. ISO PI Mot., Rehabilitation Record ████████████████████████
███████████████ *see also* Response to SSF ¶1, *supra*.

3. **TSA's religious-based medication policy lists nearly one hundred medications—used to treat a variety of medical conditions—as "[t]ypically not allowed."** Doc. No. 141-16 (Medication Guide).

    a. <u>RESPONSE</u>: Undisputed to the extent that TSA has a medication policy that lists nearly 100 medications as "Not Typically Allowed."

    b. Disputed to the extent that the statement suggests that TSA categorically bans other "Not Typically Allowed" medications in the same way that it bans MOUD for individuals with OUD. TSA allows ARC participants to take some such medications listed as "Not Typically Allowed," including methadone and buprenorphine, on a case-by-case basis under certain circumstances for individuals with conditions other than OUD, but does not allow such individualized exceptions for MOUD.

        i. *See* Doc. No. 281 (SoF) ¶85 (TSA allows individualized exceptions to prohibition on prescribed "narcotics" for conditions other than MOUD); Doc. No. 141-5 (Ex. E to Salazar Decl. ISO PI Mot., Coombs Dep. Tr. 15:21-16:19 (providing that the Eastern Territory ARC has made an "exception" to the no methadone policy for a "gentleman who needed [methadone] … as a pain medication."), 104:5-106:15 (confirming that "there are circumstances where an ARC participant could use buprenorphine not for opioid use disorder, but for some other reason" and that is "also true of methadone")); Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 122:2-123:11 ("CARES Assessment is when an applicant … ha[s] some questions on whether it is medication, mental health or something else that may be above our capacity so it is sent to headquarters to Dr. Coombs who goes over that and then makes the recommendation if we're the correct program or if they need a different type of program.")); *see also* Doc. No. 141-51 at 2 (Ex. L to Salazar Decl. ISO PI Mot., Email Thread from February 10, 2021 ("Our goal is to ensure each center has the capacity to meet the individual needs of the applicant… In regards to gabapentin, we review this on a case by case basis")); Doc. No. 141-52 at 2 (Ex. M to Salazar Decl. ISO PI Mot., Email from May 3, 2021 (gabapentin permitted case-by-case despite TSA's "concern" of potential risks with no mention of restrictions on how long gabapentin use is allowed)).

    c. Disputed to the extent that the statement suggests that the medication policy is based solely on TSA's religious beliefs. TSA's witnesses confirmed that whether any particular medication is listed on its medication policy is actually based on outdated guidance from the Talbott Recovery Campus, a non-religious rehabilitation provider that now promotes MOUD for treating OUD. *See* Doc. No. 281 (SoF) ¶80.

i. *See also* Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 28:21-29:5 (TSA's medication policy is simply to follow "the Talbott Medical Guide"), 85:22-86:7, 86:22-23. 87:12-23 (TSA's "guide itself is taken from the Talbott guide"), 101:25-102:16, 110:23- 111:13, 121:13-25 (confirming that the "Talbott Recovery Campus Medication's Guide" is the "basis for the Salvation Army medication policy.")); Doc. No. 141-17 at 3 (Ex. 120 to Salazar Decl. ISO PI Mot., Printout of a Webpage Within the Website talbottcampus.com ("The safest, most successful detox option is known as medically supervised detox…Supported by years of research, medications like methadone, Suboxone and buprenorphine increase the short-term detox…and longer-term success of detox, rehabilitation and recovery")); Doc. No. 141-4 (Ex. D to Salazar Decl. ISO PI Mot., Swistak Dep. Tr. 40:6-13 ([T]he Talbot[t] Medication Guide … is the guide that we follow."), 56:3-11); Doc. No. 141-5 (Ex. E to Salazar Decl. ISO PI Mot., Coombs Dep. Tr. 65:5-66:4 ("[I]s there any other reason why you put any medication on this medication policy? A: None that I can think of, no. That's why we cited the sources where we got the opinion because it wasn't just our own thoughts."), 70:13-14, 80:6-20 ("we typically just try to refer that over to the Talbott Medications Guide")); Doc. No. 141-52 at 2 (Ex. M to Salazar Decl. ISO PI Mot., Email from May 3, 2021 (prompting email recipient to "review" various Talbott websites)); Doc. No. 141-14 at 4, 8 (Ex. 117 to Salazar Decl. ISO PI Mot., 2008 Talbott Recovery Campus Medication Guide).

4. **TSA's religious-based medication policy lists both methadone and buprenorphine as "[t]ypically not allowed" at its ARCs and indicates that their uses are for both pain and opioid use disorder.** Doc. No. 141-16 (Medication Guide).

   a. <u>RESPONSE:</u> Undisputed that TSA's medication policy states these medications are "Not Typically Allowed" for pain or opioid dependency.

   b. Disputed to the extent the statement implies that TSA treats these medications the same for those two uses. TSA categorically prohibits access to methadone or buprenorphine for people with opioid use disorder. But TSA may permit ARC participants with other conditions to access those same medications, for example for pain.

      i. Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 8:4-9:13, 11:15-22 (MOUD "is something we do not allow in the ARC[s]."), 60:16-19, 85:13-25, 87:5-13, 93:21-24 (confirming that "buprenorphine and methadone are listed as not allowed medications"), 98:24-101:14 (agreeing that "there are no exceptions to the no methadone no buprenorphine [rule] for ARC participants"; "not typically allowed … means not ever allowed"), 167:10-22 (agreeing that "there have been no instances in which a person was allowed to participate in an ARC while taking methadone or buprenorphine"), 177:12-20 (explaining that ARC participants prescribed buprenorphine or methadone "would be discharged"

6

from the program)); Doc. No. 141-13 at 9 (Ex. 116 to Salazar Decl. ISO PI Mot., TSA ARC Medication Guide (classifying Methadone and Suboxone as "Not Allowed")); Doc. No. 141-15 at 4-5, 10 (Ex. 118 to Salazar Decl. ISO PI Mot., TSA ARC Medication Guide (highlighting both methadone and buprenorphine in red to classify them as "Not Allowed")); Doc. No. 141-16 at 5 (Ex. 119 to Salazar Decl. ISO PI Mot., TSA ARC Medication Guide (classifying Methadone and Suboxone as "Not Typically Allowed")); Doc. No. 38-1 (Lt. Col. Gensler Decl., ¶26 (stating that all Eastern Territory ARCs "prohibit[] use of certain medication-assisted treatment ('MAT'), including methadone and buprenorphine, but allow[] alternative medications, such as vivitrol")); Doc. No. 141-2 (Ex. B to Salazar Decl. ISO PI Mot., Betts Dep. Tr. 92:3-93:18 (confirming that "the ARC participants are not allowed to use methadone" and that Suboxone (which contains buprenorphine) "is part of a class that we do not allow within the program.")); Doc. No. 197-30 (Ex. 330 to Salazar Supp. Decl. ISO PI Mot., Email thread between Sherri Sinpunpakd, Springfield ARC lead counselor, and Dominick Ciuffreda, case worker at Hampden County Sherriff's Department (ARC counselor responding to referral from case worker: "methadone would be a no go for us, no matter what")); Doc. No. 141-5 (Ex. E to Salazar Decl. ISO PI Mot., Coombs Dep. Tr. 15:21-16:19 (providing that the Eastern Territory ARC has made an "exception" to the no methadone policy for a "gentleman who needed [methadone] … as a pain medication."), 104:5-106:15 (confirming that "there are circumstances where an ARC participant could use buprenorphine not for opioid use disorder, but for some other reason" and that is "also true of methadone")).

   c.  Disputed to the extent that the statement suggests that the medication policy is based solely on TSA's religious beliefs. TSA's medication policy is based on outdated guidance from the Talbott Recovery Campus, a non-religious rehabilitation provider that now promotes MOUD for treating OUD. *See* Response to SSF ¶3, *supra*; Doc. No. 281 (SoF) ¶80.

5. **TSA does not allow ongoing or long-term use of narcotics at its ARCs for any medical reason.** Doc. No. 141-16 (Medication Guide); Doc. No. 276-6 at 18 (Standards of Adult Rehabilitation, "We don't allow medications that are known as substances of abuse (i.e., narcotics)); Doc. No. 160-8 at 10-11 (Ex. H to Declaration of Katie Erno in Support of Preliminary Injunction Opposition "Erno Decl. ISO PI Opp.", Deposition of Reverand Don Coombs, Director of Program Development for the ARCs ("Coombs Dep. Tr.") 74:22-75:5 (explaining that applicant may be permitted to use a narcotic if they had "two or three days left of a prescription . . . [b]ut for an ongoing basis, that's beyond the scope.")); Declaration of Katie Erno in Support of TSA's Supplemental Summary Judgment Motion ("Erno Decl. ISO Supp. MSJ"), Ex. 1 (Coombs Dep. Tr. at 21:14-16, 93:5-13 (narcotic pain medications following surgery allowed for short-term basis); Doc. No. 141-5 (Ex. E to Salazar Decl. ISO PI Mot., Coombs. Dep. Tr. 106:3-15 (there may be circumstances when buprenorphine is allowed for a short-term basis)); Doc. No. 160-3 at 5 (Ex. C to Erno Decl. ISO PI Opp., Deposition of Major Muhs, 30(b)(6) witness for TSA ("Major Muhs Dep. Tr.") 92:24-93:7 (testifying that prescription narcotics that are allowed are "temporary" "where someone

had surgery or something of that nature" and not "ongoing.")); Doc. No. 141-2 at 24 (Ex. B to Salazar Decl. ISO PI Mot., Deposition of Lt. Col. Betts, former Commander of the ARC Command of the Eastern Territory ("Betts Dep. Tr.") 93:19-25 (confirming that there are "some instances where an ARC participant can use a prescribed narcotic" with approved from command headquarters on a "short-term basis.")

    a. <u>RESPONSE</u>: Disputed to the extent that the statement suggests that TSA's medication policy is based on banning "ongoing or long-term use of narcotics at its ARCs for any medical reason." Rather, TSA's policy documents and witness testimony demonstrate that its medication policy is based on prohibiting access to medications "that are known to be abusive and addictive." *See* Doc. No. 276-5 at 54:13-55:16 (Ex. 5 to Erno Decl. ISO MSJ, Rev. Coombs Dep. Tr.); *see* Doc. No. 281 (SoF) ¶16 (Salvation Army's Statement of Fact: "A core tenet of The Salvation Army's religious beliefs is abstinence from alcohol and addictive substances."), ¶18 (Salvation Army's Statement of Fact: "Consistent with its sincerely held religious beliefs, TSA requires that, as a condition of participation, beneficiaries abstain from alcohol and drugs, including prescription drugs that are known to be abusive and addictive."); Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 89:7-19 (confirming that TSA's medication policy is "based on Salvation Army's view of what medications are abusive and addictive to the particular ARC population," which is informed by "the use of the Talbott Medical Guide.")); Doc. No. 276-5 (Ex. 5 to Erno Decl. ISO MSJ, Coombs Dep. Tr. 54:13-55:16 (confirming that "prohibit[ing] the general use of medications that are known to be abusive and addictive to our typical population" is "the basis of the ARC[] medication policy.")). TSA bans buprenorphine and methadone MOUD based on outdated guidance from the Talbott Recovery Campus, a non-religious provider, that previously recommended barring access to these medications based on views that they were addictive and subject to abuse (but that now promotes MOUD for treating OUD). *See* Statement of Facts ¶80; Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 28:21-29:5 (TSA's medication policy is simply to follow "the Talbott Medical Guide"), 85:22-86:7, 86:22-23, 87:12-23 (TSA's "guide itself is taken from the Talbott guide"), 101:25-102:16, 110:23-111:13, 121:13-25 (confirming that the "Talbott Recovery Campus Medication's Guide" is the "basis for the Salvation Army medication policy.")); Doc. No. 141-4 (Ex. D to Salazar Decl. ISO PI Mot., Swistak Dep. Tr. 40:6-13 ("[T]he Talbot[t] Medication Guide … is the guide that we follow."), 56:3-11); Doc. No. 141-5 (Ex. E to Salazar Decl. ISO PI Mot., Coombs Dep. Tr. 65:5-66:4 ("[I]s there any other reason why you put any medication on this medication policy? A: None that I can think of, no. That's why we cited the sources where we got the opinion because it wasn't just our own thoughts."), 70:13-14, 80:6-20 ("we typically just try to refer that over to the Talbott Medications Guide")); Doc. No. 141-52 at 2 (Ex. M to Salazar Decl. ISO PI Mot., Email from May 3, 2021 (prompting email recipient to "review" various Talbott websites)); Doc. No. 141-14 at 4, 8 (Ex. 117 to Salazar Decl. ISO PI Mot., 2008 Talbott Recovery Campus Medication Guide).

    b. Based on current medical knowledge, however, prescribed methadone and buprenorphine for OUD do not cause addiction and are not substances of abuse.

8

i. Doc. No. 281 (SoF) ¶45; *see* Doc. No. 143 (Declaration of Plaintiffs' Expert Witness, Dr. Claudia Rodriguez, ¶25 ("There is an important distinction between physical dependence and substance use disorder/addiction that is often misunderstood by the public and in non-clinical settings. Physical dependence refers to withdrawal symptoms occurring with abrupt discontinuation of a drug. This can happen with many medications, such as antidepressants, like paroxetine or venlafaxine, and even blood pressure medications, such as propranolol and clonidine. Addiction or substance abuse disorder, by contrast, refers to the compulsive seeking of the drug despite negative consequences. Although some medications for opioid use disorder can cause physical dependence, individuals who take medication for opioid use disorder as prescribed are not addicted to that medication. The diagnosis of substance use disorder/addiction is associated with loss of control, consequences, cravings, and compulsive use which is different than solely becoming physically dependent on a medication. Dependence is not equal to addiction.")).

c. TSA allows ARC participants to take certain prescribed "narcotic" medications and medications that it acknowledges "have the possibility of abuse."

i. *See* Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 71:3- 72:10, 72:22-25 ("There are some prescribed narcotics that … ARC participants can use and can be stored at the ARCs."), 92:24-93:14, 98:6-23, 103:6-104:13 ("[T]he Salvation Army does permit ARC participants to use some medications that have the possibility of abuse."), 123:21-125:5 (allowing ARC participants to use gabapentin for some uses, even though it "can be abused"), 207:21-25 (an ARC "is able to accommodate participants who have prescription medications that are permitted by the medication policy that they can self administer.")); Doc. No. 141-10 at 7 (Ex. 106 to Salazar Decl. ISO PI Mot., TSA ARC Center Guidelines for Posting (allowing "[p]rescribed narcotics" at ARCs if approved by Administrators)); Doc. No. 141-5 (Ex. E to Salazar Decl. ISO PI Mot., Coombs Dep. Tr. 55:20-56:7 (allowing ARC participants to take Sudafed, which can be abused), 74:22-75:4 (allowing ARC participants to take narcotic medications, which can be abused, for pain or surgery), 72:18-73:8, 78:15-79:16 (allowing Seroquel, which TSA recognizes "has been" "misuse[d]"), 84:9-21 (allowing Librium), 131:12-134:7 (allowing gabapentin, including for long-term use, even though TSA recognizes that people misuse it to "get high"), 107:14-108:4 (allowing loperamide, which can be "fatal" if combined with other medications and "misused"), 109:6-110:10 (allowing trimipramine, which can be abused)); Doc. No. 141-13 at 5 (Ex. 116 to Salazar Decl. ISO PI Mot., TSA ARC Medication Guide (highlighting Sudafed as an "over the counter medication allowed in the ARC to treat common ailments")); Doc. No. 141-4 (Ex. D to Salazar Decl. ISO PI Mot., Swistak Dep. 37:2-18, 39:6-21, 42:21-44:14, 62:10-20 (allowing ARC participants to take "analgesic for pain that was a narcotic" "as long as they're closely monitored")); Doc. No. 141-51 at 2 (Ex. L to

9

Salazar Decl. ISO PI Mot., Email Thread from February 10, 2021 (gabapentin permitted case-by-case despite TSA's "concern" of potential risks)); Doc. No. 141-52 at 2 (Ex. M to Salazar Decl. ISO PI Mot., Email from May 3, 2021 (same)). TSA also allows ARC participants to use nicotine. Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 74:14- 75:9 (acknowledging that nicotine is an "addictive" substance that "can be abused," but that ARC participants are allowed to use nicotine because "[t]hey're not members of the Salvation Army" and "[a]llowing ARC participants to use nicotine doesn't prevent salvationists from practicing their religion"), 109:24-110:18 (confirming that "the Salvation Army can continue to practice its religion while allowing ARC participants to use nicotine," even though nicotine is "a drug" and Salvationists are required to abstain.)); Doc. No. 141-4 (Ex. D to Salazar Decl. ISO PI Mot., Swistak Dep. Tr. 70:17-71:7 (providing that "ARC participants are permitted to use nicotine," because "the individuals are going through enough"), 73:19-74:19 (acknowledging that "nicotine is addictive," but explaining that it is permitted at ARCs despite the "abstinence-based rehabilitation program" to avoid "undue stress" on participants)).

d. But TSA does not allow ARC participants to take prescribed buprenorphine or methadone for OUD, even for short-term use, because "a drug is a drug."

   i. Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 110:23-111:13).

6. **The sole evidence in the record of any exception to the prohibition on the use of methadone by beneficiaries that occurred more than a decade ago for pain and the witness had "not a clue" what medical condition the beneficiary had, how long they stayed at the ARC, or whether it was more than a few days.** Doc. No. 141-5 at 6-7 (Ex. E to Salazar Decl. ISO Pls' PI Motion, Coombs Dep. Tr. 15:21-16:24 (recalling a single instance when a beneficiary was permitted to use methadone for pain 10 years ago, with "not a clue" of what the person's medical condition was, how long the person stayed at the ARC, or whether it was more than a few days).

   a. RESPONSE: Disputed. Reverend Donald Coombs, who developed TSA's medication policy, testified that TSA determines on a case-by-case basis whether ARC participants may take methadone for conditions other than opioid use disorder and "tri[es] to be accommodating, especially if [the methadone is being taken] on an ongoing basis." Doc. No. 141-5 (Ex. E to Salazar Decl. ISO PI Mot., Coombs Dep. Tr. 105:12-106:15); *see also id.* 105:12-106:22 (testifying that he changed TSA's medication policy for methadone from "not allowed" to "not typically allowed" because "sometimes [TSA] find[s] out that" an ARC participant may be using methadone "not for opioid use disorder, but for some other reason" and "tr[ies] to be accommodating").

7. **The sole evidence in the record of any exception to the prohibition of buprenorphine for any reason is the testimony of Shawn Arcidiacono, who claims he was permitted**

**to take Suboxone for OUD for two days while at an ARC.** Erno Decl. ISO Supp. MSJ, Ex. 2 (Deposition of Shawn Arcidiacono 96:22-24); Doc. No. 147 at 2 (Declaration of Mr. Shawn Arcidiacono, ¶ 8, stating that his Suboxone prescription was to treat his OUD); Doc. No. 141-5 (Ex. E to Salazar Decl. ISO Pls' Motion for PI, Coombs Dep. Tr. 17:19-18:2 at 8-9 (testifying to having no knowledge of any instance in which a beneficiary has been permitted to use buprenorphine at the ARCs.)).

  a. <u>RESPONSE:</u> Disputed. Reverend Donald Coombs, who developed TSA's medication policy, testified that TSA determines on a case-by-case basis whether ARC participants may take buprenorphine for conditions other than opioid use disorder and "tr[ies] to be accommodating." Doc. No. 141-5 (Ex. E to Salazar Decl. ISO Pls' Motion for PI, Coombs Dep. Tr. 105:12-106:15); *see also id.* 105:12-106:22 (testifying that he changed TSA's medication policy for buprenorphine from "not allowed" to "not typically allowed" because "sometimes [TSA] find[s] out that" an ARC participant is using "buprenorphine … for other conditions than opioid use disorder" and "tr[ies] to be accommodating").

  Reverend Coombs also testified that he could not recall any instances in which a participant was allowed to use buprenorphine, not that he had no knowledge of any such instances. Doc. No. 141-5 (Ex. E to Salazar Decl. ISO Pls' Motion for PI, Coombs Dep. Tr. 17:19-18:2 ("Q: So an ARC participant is not permitted to use … buprenorphine while they are participants in the ARC, correct? A: Typically, no. Q: Are you aware of any circumstances in which a participant has been permitted to use buprenorphine? A: I can't think of any.")).

8. **Requiring the ARCs to accommodate the use of methadone and buprenorphine would fundamentally undermine TSA's religious-based approach to rehabilitation at its ARCs.** Doc. No. 276-2 at 27 (Ex. 2 to Erno Decl. ISO PI Opp., Lt. Col. Betts Dep. Tr. 98:11-103:3 (explaining that "within the ARC program we have chosen a very specific religiously-based approach to life's transformation that is dependent upon a particular context to make that work); Erno Decl. ISO Supp. MSJ, Ex. 6, Lt. Col. Betts Dep. Tr. 29:23-30:6 (permitting methadone or buprenorphine "would be fundamentally a challenge for the Salvation Army and our approach to our ARC programs") and 35:19-36:11 ("[T]hese are questions of theology.  These are questions of Christian belief and how we approach our program in general.")); Doc. No. 276-2 at 26 (Ex. 3 to Erno Decl. ISO MSJ, Lt. Col. Betts Dep. Tr. 96:14-18 ("I am not sure the Salvation Army would continue to do the program [if required to introduce methadone and/or buprenorphine into its ARCs]. It undermines the whole approach we are taking from a faith tradition to the rehabilitation of someone's life.")); Doc. No. 99-1 at 8 (Major Muhs Decl., ¶ 27 ("I am confident that The Salvation Army would elect to shut down the ARC programs rather than operating them in a way that violates The Salvation Army's spiritual tenets.")); Doc. No. 38-1 at 4-8 (Declaration of Lt. Col. Gensler, former ARC Commander of the Eastern Territory, ¶¶ 11-26 (explaining Salvationist beliefs and religious practice at the ARCs, including that "[i]t is the objective of The Salvation Army to make Jesus Christ an integral part of the lives of the beneficiaries, to instill in them a Christian philosophy of life, to teach them habits of industry and thereby make them moral, self-respecting and productive members of society" and that the ARC medication policy prohibiting, *inter alia,* methadone and buprenorphine,

is consistent with TSA's religious beliefs and practices)); Doc. No. 99-1 at 8 (Major Muhs Decl., ¶ 26 ("Being forced to do that [permit methadone/buprenorphine] would be completely at odds with our religiously-based view that fostering abstinence is critical to our approach to rehabilitation. Permitting someone to continue to use a narcotic, even if prescribed, is just replacing one narcotic with another in a way that suggests that such a person is not committed to an abstinence-based approach to rehabilitation.")).

a. RESPONSE: Disputed. Requiring the ARCs to accommodate participants with OUD who take MOUD would not fundamentally undermine TSA's religious-based approach to rehabilitation at its ARCs. *See* SSF ¶¶21-27, 33-37, *infra*.

b. TSA could continue to promote its religious-based belief in "abstinence" from illegal or addictive substances while allowing individuals with OUD who take prescribed MOUD to access ARCs. In fact, TSA's Harbor Light Centers, which provide housing and rehabilitation services similar to the services provided at Adult Rehabilitation Centers, allow individuals with OUD to access buprenorphine and methadone medication to treat their OUD. This shows that TSA can promote "abstinence" in its social services and housing programs while allowing access to those programs by individuals who take prescribed buprenorphine or methadone medication for opioid use disorder. *See* SSF ¶¶33-37, *infra*.

   i. Doc. No. 141-3 (Ex. C to Salazar Decl. ISO PI Mot., Deposition of Arthur Beau Hill ("Hill Dep. Tr.") 99:7-16 (Q: It doesn't violate Salvation Army's religious beliefs to provide buprenorphine to participants in [the Harbor Light Centers] program, is that correct? A. It's -- under the guidelines of the medical thing, no, because the program is done in conjunction with government funding and government regulation, so we understand that by doing that program and that service, that we have to abide by those guidelines."), 100:1-101:5 ("Q: Are you aware of any policy of the Harbor Light programs that would prohibit participants from accessing MAT? A. No. We recently changed that over the last year and those program participants can access it if deemed medically appropriate. … Q: And what was the reason for the change? A: It would depend on the program area, but it was driven by government guidelines. Q: Federal government guidelines? A: Mostly state."), 101:21- 102:23 (agreeing that "because of the government guidelines," "[i]t doesn't violate Salvation Army's religious beliefs to allow participants in the community corrections program to access [methadone and Suboxone]")).

c. The existence of other sober houses that promote abstinence while allowing access to individuals taking MOUD also shows that TSA could do the same. For instance, there are many programs certified by the Massachusetts Alliance for Sober Housing (MASH) as sober homes providing "abstinence-based pathways to recovery" that accept and accommodate residents taking MOUD. *E.g.*, Ex. E to Declaration of Alice X. Wang in Support of Plaintiffs' Opposition to Defendant's Supplemental Motion for Summary Judgment at 4 ("Wang Decl. ISO Opp. to Supp. MSJ") (Jordan Matthew House); *id.* Ex. F at 2 (Recovery House); *id.* Ex. G

12

at 1 (Royal Sober Homes). Similarly, the National Alliance of Recovery Residences (NARR), which promotes quality standards for substance-free, home-like recovery programs recognizes MOUD as "one of many viable recovery tools" and "recognizes that it is illegal to deny residency based solely on MOUD-status under the American Disabilities Act." Ex. P to Wang Decl. ISO Opp. to Supp. MSJ, Claire A. Wood et al., *Acceptance of medications for opioid use disorder in recovery housing programs in Missouri*, 138 J. of Substance Abuse Treatment 1, 2 (2022). Additionally, some sober homes are embracing "medication-assisted recovery," which is an approach that "refers to using a FDA-approved medication to address a substance use disorder, and emphasizes a person's commitment to engaging with abstinence-based recovery supports" based on the understanding that prescribed buprenorphine and methadone medications are compatible with an "abstinence"-based approach to treating OUD. Ex. J to Wang Decl. ISO Opp. to Supp. MSJ, The National Alliance for Recovery Residences, *Helping Recovery Residences Adapt to Support People with Medication Assisted Recovery*, at 3-4; Ex. K to Wang Decl. ISO Opp. to Supp. MSJ, The National Alliance for Recovery Residences, *MAT-Capable Recovery Residences: How State Policymakers Can Enhance and Expand Capacity to Adequately Support Medication Assisted Recovery*, at 6-7 (tracing the emerging "concept of MAR 'medication-assisted recovery' (the use of medications in combination with abstinence-based recovery)" as a bridge between MAT and traditional views of abstinence-based programming and particularly salient in light of growing recognition of categorical exclusions of residents taking prescribed medications as discriminatory). Integrity Sober Living is one example of a MASH-certified sober living facility that "welcomes Medication Assisted Recovery." Ex. L to Wang Decl. ISO Opp. to Supp. MSJ at 1.

d. TSA could also, as a practical matter, allow individuals with OUD who take prescribed MOUD to access ARCs without changing the social services or housing that it provides at the ARCs. *See* Doc. No. 281 (SoF) ¶¶85-93; SSF ¶¶21-27, *infra*.

    i. Doc. No. 143 (Rodriguez Decl., ¶40 (individuals on MOUD "do not need additional medical monitoring or 'treatment' in their personal lives, at their place of residence, or in rehabilitation or residential programs."), ¶65, ¶67 ("After dosing visits, patients are able to carry on with other aspects of their lives without special monitoring or treatment."), ¶96 ("Buprenorphine and methadone are medications prescribed in the ambulatory setting and do not require a higher level of care or additional precautions relative to other prescribed medications.")); Doc. No. 147 (Declaration of Shawn Arcidiacono ISO PI Mot., ¶¶9-10 (ARC participant explaining that he took prescribed Suboxone for a few days when he began ARC program without requiring higher level of care: "ARC staff retrieved my Suboxone dose from the central location each day and watched me self-administer it. Within the first few days of my arrival at the Worcester ARC, the Sergeant-Major drove me in her car to a clinic to refill my Suboxone prescription, which at the time was in the form of sublingual strips. There was no problem with my continuing my daily Suboxone, and the ARC did not need to give me any

special care that it didn't provide to other ARC participants."), ¶¶11-13 (explaining that he was forced to stop taking Suboxone after "the Salvation Army headquarters apparently became aware that [he] was taking [it]," which made him "seriously ill" and he "required hospitalization"), ¶¶14-15 (stating that he was then discharged from ARC program, was not allowed to return to the program, and was not referred to another program)).

9. **ARC policy is to admit a person with a positive urine test "if they are not under the influence and report not using drugs in the last 48 hours and the detoxification center has said detoxification is not necessary." This policy also applies to applicants who test positive for methadone or buprenorphine.** Erno Decl. ISO Supp. MSJ. Ex. 3, (Intake Coordinator's/Counselor's Reference Guide, TSA0001070); *id.*, Ex. 4, Muhs Dep. Tr. 117:18-119:22 (30(b)(6) witness testifying that a person with a positive urine test, including for methadone or buprenorphine, could be admitted to an ARC "if they report not using methadone or buprenorphine within the last 48 hours and a detoxification center says that detoxification is not necessary.")

   a. <u>RESPONSE</u>: Disputed to the extent that the statement suggests that TSA does not usually require individuals with a positive urine test to undergo "detoxification" before being admitted to an ARC. ARC policy requires an applicant with a positive urine test, including for methadone or buprenorphine, to "apply for detoxification" and go to "a hospital … or another medical facility for detoxification." Doc. No. 299-3 (Intake Coordinator's/Counselor's Reference Guide, TSA0001070); Doc. No. 299-4 (Muhs Dep. Tr. 118:18-119:15). It is only if "a detoxification center has said detoxication is unnecessary" that an applicant who tests positive for a prohibited substance could be admitted to an ARC. Doc. No. 299-3 (Intake Coordinator's/Counselor's Reference Guide, TSA0001070); Doc. No. 299-4 (Muhs Dep. Tr. 119:16-22). Even in that circumstance, though, ARC policy indicates that "[s]ubstances usually requiring a clean urine test prior to admission to an ARC" include "opiates." Doc. No. 299-3 (Intake Coordinator's/Counselor's Reference Guide, TSA0001070) (capitalization adjusted).

   b. Moreover, TSA categorically bars access to ARCs to individuals who took methadone or buprenorphine to treat their OUD for a period of time, even if they are no longer taking the medication. *See* Doc. No. 281 (SoF), Plaintiffs' Response to ¶27. ARC intake officers tell callers they must stop taking their medication and undergo "detox" period before accessing ARC housing or services. Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 119:9-22 (confirming that an applicant who tests positive for methadone or buprenorphine will not be admitted unless they first attend a "detoxification facility")); Doc. No. 141-4 (Ex. D to Salazar Decl. ISO PI Mot., Swistak Dep. Tr. 58:15-17 (explaining that individuals who have used Suboxone "do detox before they come" to an ARC)); Doc. No. 145 (Declaration of Richard Espinosa (Espinosa Decl. ISO PI Mot., ¶12 ("The Salvation Army told me that I would have to detox before joining the ARC program")).

   c. Individuals with opioid use disorder are barred from ARC housing and services if they received a Sublocade injection up to a year in the past, even if they are no

14

longer taking methadone or buprenorphine. Doc. No. 197-23 at 2 (Ex. 323 to Salazar Supp. Decl. ISO PI Mot., Email Thread Between Joseph Siejk, Harrisburg ARC intake coordinator, and Christina McLeod-Worthy (stating that an applicant "would need to come off Suboxone" prior to entry into the ARC, and that if he had received a "sublocade injection … within the past 11 months, [the ARC] would not be able to take him.")); Doc. No. 197-27 (Ex. 327 to Salazar Supp. Decl. ISO PI Mot., Email Thread Between Joseph Siejk, Harrisburg ARC intake coordinator, and Bonnie J. Campbell (providing that an applicant for an ARC would "have to be we[a]ned off the suboxone," before admission, and that receiving a sublocade injection "within the past year" would also disqualify the applicant)).

10. **Gabapentin is not a narcotic.** Erno Decl. ISO Supp. MSJ, Ex. 5 (U.S. Drug Enforcement Administration, Diversion Control Division, Drug & Chemical Evaluation Section: Gabapentin, March 2025, **https://deadiversion.usdoj.gov/drug_chem_info/gabapentin.pdf**)

   a. RESPONSE: Undisputed that gabapentin is not a narcotic. Disputed to the extent that the statement suggests that gabapentin is not addictive or subject to abuse. TSA allows ARC participants to take gabapentin on a case-by-case basis, including for long-term use, even though TSA recognizes that the medication "has the potential for abuse" and is "concern[ed]" about its potential risks.

      i. *See* Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 103:6-104:13 ("[T]he Salvation Army does permit ARC participants to use some medications that have the possibility of abuse."), 123:21-125:5 (allowing ARC participants to use gabapentin for some uses, even though it "can be abused")); Doc. No. 141-5 (Ex. E to Salazar Decl. ISO PI Mot., Coombs Dep. Tr. 72:18-73:8 (allowing gabapentin, which TSA recognizes "has the potential for abuse"), 131:12-134:7 (allowing gabapentin, including for long-term use, even though TSA recognizes that people misuse it to "get high")); Doc. No. 141-51 at 2 (Ex. L to Salazar Decl. ISO PI Mot., Email Thread from February 10, 2021 (gabapentin permitted case-by-case despite TSA's "concern" of potential risks)); Doc. No. 141-52 (Ex. M to Salazar Decl. ISO PI Mot., Email from May 3, 2021 (gabapentin permitted case-by-case despite TSA's "concern" of potential risks with no mention of restrictions on how long gabapentin use is allowed)).

11. **Beneficiaries who suffer from OUD are permitted to take other medications permitted under the medication policy while participating in the ARC program, including Vivitrol, which is a form of medication for OUD.** Doc. No. 141-16 (Medication Guide).

   a. RESPONSE: Undisputed that ARC participants with OUD are permitted to take Vivitrol and other medications permitted under TSA's medication policy while in the ARC program. Disputed to the extent that the statement suggests that Vivitrol or other medications may be used to treat OUD in the same way as methadone and buprenorphine. For many individuals with OUD, ongoing treatment with methadone or buprenorphine is the only treatment that is medically appropriate,

15

effective, and prescribed for their condition. *See* Doc. No. 281 (SoF) ¶¶39-44, 48; *see also* Response to SSF ¶1, *supra*. Naltrexone alone and other treatments that do not include MOUD, such as behavioral therapy or counseling, are not medically appropriate, effective, or prescribed for these individuals. *See* SoF ¶¶40, 46-47; *see also* Response to SSF ¶1, *supra*.

12. **Methadone and buprenorphine may be prescribed by healthcare providers for reasons other than routine maintenance treatment for OUD.** Doc. No. 245 at 2, 4 (Declaration of TSA's Expert Dr. Mangiacarne ("Mangiacarne Decl."), ¶¶ 2, 10).

    a. RESPONSE: Undisputed that methadone and buprenorphine may in some circumstances be prescribed for pain. There are no other medical indications for these medications other than treatment for OUD. *See* Doc. No. 281 (SoF) ¶25 (Salvation Army's statement of fact: "Pain" and "Opioid Dep[endency]" are the "only indicated uses" of buprenorphine and methadone); Doc. No. 143-2 at 107-08 (Ex. 2 to Rodriguez Decl. ISO PI Mot., TIP63) (listing treatment of OUD and pain as "FDA indications" for methadone and buprenorphine).

13. **Not everyone with OUD benefits from or needs treatment using methadone or buprenorphine.** Doc. No. 163 at 15 (Mangiacarne Decl., ¶¶ 27, 28); Doc. No. 254 at 3-4 (Mangiacarne Decl., ¶ 6).

    a. RESPONSE: Disputed to the extent that all individuals with OUD benefit from being able to access methadone or buprenorphine, which is categorically banned by TSA. "The standard of care for treatment of OUD includes offering … buprenorphine, naltrexone, or methadone." Doc. No. 143 (Rodriguez Decl. ISO PI Mot., ¶29). "There are very few circumstances in which the standard of care treatment for opioid use disorder does not require offering all medications for opioid use disorder." Doc. No. 143 (Rodriguez Decl. ISO PI Mot., ¶45). The standard of care does not permit "offering an individual with opioid use disorder only naltrexone and not methadone or buprenorphine." *Id.*

        i. *See also* Doc. No. 143 (Rodriguez Decl. ISO PI Mot., ¶33 ("Guidelines for standard of care and best practices for opioid use disorder are developed through a process that combines scientific evidence and clinical knowledge and expertise."), ¶39 ("[T]here is no requirement, and it is not the standard of care, that a patient receiving MOUD engage in any specific behavioral therapy or counseling as a condition of access to or enrollment in MOUD."), ¶40 ("MOUDs alone are cost effective, cost beneficial, lifesaving, and life changing."), ¶43 ("Access to one MOUD and not another is not the standard of care and can be dangerous."), ¶48 ("Delaying treatment with the standard of care MOUD increases the risk of opioid use and overdose deaths."), ¶87 ("In the absence of strong preference for [naltrexone], there is no indication to only offer [naltrexone] in someone who is actively using opioids."), ¶89 ("[I]f a patient does not have a strong preference for [naltrexone] and is actively using opioids, buprenorphine and methadone are considered better treatment options."), ¶90 (individuals should not be "forced or coerced" to

16

transition from buprenorphine or methadone to naltrexone, or to discontinue MOUD treatment altogether, as doing so is "unsafe, ethically unsound, and not the standard of care."), ¶92 ("deciding which medication to use for the treatment of OUD is a collaborative decision between the patient and provider" that requires consideration of the "patient's medical, psychiatric, and substance use history, their treatment preference, and access/availability of treatment" and "should not be determined by a non-medical program or housing provider.")); Doc. No. 143-2 at 13 (Ex. 2 to Rodriguez Decl., TIP63 ("The science demonstrating the effectiveness of medication for OUD is strong.")); Doc. No. 201 (2d Supp. Rodriguez Decl., ¶6 ("Recent literature reinforces and strengthens the medical and academic consensus that access to all three forms of MOUD … is necessary to meet the standard of care for individuals with OUD."), ¶7 (explaining that study found "exposure to buprenorphine or methadone treatment reduced the relative risk of death by 34% and 38%, respectively," while individuals who received non-medication treatments like counseling with no MOUD had a relative risk of death that was equal or worse than those who received no treatment at all), ¶¶8-13 (summarizing studies consistently demonstrating efficacy of MOUD and emphasizing that the medications are "critical to confronting the opioid crisis")).

## PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS IN OPPOSITION TO SUPPLEMENTAL MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 56.1, Plaintiffs respectfully submit the following additional statement of material facts in opposition to Defendant's supplemental motion for summary judgment.

**Denying access to social services and housing to people who take prescribed MOUD causes harm and is not objectively reasonable based on current medical knowledge.**

14. **Based on current medical knowledge, denying individuals with opioid use disorder (OUD) access to prescribed methadone or buprenorphine medication for opioid use disorder (MOUD) is not objectively reasonable.** *See* Doc. No. 281 (SoF) ¶¶35-48; Doc. No. 143 (Rodriguez Decl. ISO PI Mot., ¶38 ("There are three FDA approved medications for opioid use disorder (MOUD): methadone, buprenorphine, and extended release naltrexone.")); Doc. No. 143-2 at 24-35 (Ex. 2 to Rodriguez Decl., TIP63 (providing information on the three "FDA-approved medications used to treat OUD," methadone, buprenorphine, and naltrexone)); Doc. No. 143 (Rodriguez Decl. ISO PI Mot., ¶29 ("The standard of care for treatment of OUD includes offering … buprenorphine, naltrexone, or methadone."), ¶33 ("Guidelines for standard of care and best practices for opioid use disorder are developed through a process that combines scientific evidence and clinical knowledge and expertise."), ¶39 ("[T]here is no requirement, and it is not the standard of care, that a patient receiving MOUD engage in any specific behavioral therapy or counseling as a condition of access to or enrollment in MOUD."), ¶40 ("MOUDs alone are cost effective, cost beneficial, lifesaving, and life changing."), ¶43 ("Access to one MOUD and not another is not the standard of care and can be dangerous."), ¶45 ("There

17

are very few circumstances in which the standard of care treatment for opioid use disorder does not require offering all medications for opioid use disorder. … I am not aware of any circumstance in which the standard of care would permit offering an individual with opioid use disorder only naltrexone and not methadone or buprenorphine."), ¶48 ("Delaying treatment with the standard of care MOUD increases the risk of opioid use and overdose deaths.")).

"The science demonstrating the effectiveness of medication for OUD is strong." Doc. No. 143-2 at 13 (Ex. 2 to Rodriguez Decl., TIP63); *see also* Doc. No. 201 (2d Supp. Rodriguez Decl., ¶6 ("Recent literature reinforces and strengthens the medical and academic consensus that access to all three forms of MOUD … is necessary to meet the standard of care for individuals with OUD."), ¶7 (explaining that study found "exposure to buprenorphine or methadone treatment reduced the relative risk of death by 34% and 38%, respectively," while individuals who received non-medication treatments like counseling with no MOUD had a relative risk of death that was equal or worse than those who received no treatment at all), ¶¶ 8-13 (summarizing studies consistently demonstrating efficacy of MOUD and emphasizing that the medications are "critical to confronting the opioid crisis")); Ex. M to Wang Decl. ISO Opp. to Supp. MSJ, Luis Sordo et al., *Mortality risk during and after opioid substitution treatment: systematic review and meta-analysis of cohort studies*, 357 BMJ 1, 1 (2017) ("Retention in methadone and buprenorphine treatment is associated with substantial reductions in the risk for all cause and overdose mortality in people dependent on opioids.")); *id.* Ex. N, Rahul Gupta et al., *Transforming Management of Opioid Use Disorder with Universal Treatment*, 387(15) New Eng. J. of Med. 1341, 1341-42 (2022) ("MOUD can significantly reduce the risk of overdose death; a recent study showed that people with OUD were 82% less likely to die of an overdose when they were receiving MOUD than when they were not.").

15. **Based on current medical knowledge, denying access to social services or housing to individuals because they take prescribed buprenorphine or methadone MOUD to treat their condition causes harm and is not objectively reasonable.** *See* Doc. No. 281 (SoF) ¶¶35-48, 94-95; Doc. No. 141-22 (Ex. 133 to Salazar Decl. ISO PI Mot., "Massachusetts/Rhode Island ARC Referral List" ("Worcester doesn't have a specific place [to] refer people that are specifically taking MAT.")); Doc. No. 141-49 (Filed Under Seal) (Ex. J to Salazar Decl. ISO PI Mot., Almeida Dep. Tr. 96:4-24



99:7-100:1

102:8-106:12

116:2-9

116:22-117:1

124:20-125:18

159:19-160:11

██████████████████████████████████████████████
████████████████████████ Doc. No. 146 (Declaration of Joseph Almeida (Almeida Decl. ISO PI Mot., ¶¶26-28 ("I believe that all of this could have been avoided if I had been able to stay at a Salvation Army ARC and continue my methadone treatment for OUD."), ¶29-32 ("I would like to be able to be considered for housing at a Salvation Army ARC to avoid being houseless and to have access to rehabilitation services. However, I also need to continue my methadone treatment in order to keep progressing in my recovery. As long as The Salvation Army continues to prohibit residents from using methadone as MOUD at ARCs, the organization is actively preventing me from taking the best steps for my recovery and is preventing me from following my doctor's medical advice for my OUD.")); Doc. No. 144 (Declaration of Mark Tassinari (Tassinari Decl. ISO PI Mot., ¶¶23-28 ("Expulsion from the ARC program [for taking Suboxone] was extraordinarily difficult and debilitating. I became homeless, suffered a harmful relapse, lost many of my personal belongings and personal paper records, did not have reliable access to a phone or computer, lost contact with my probation officer, and needed lengthy hospitalizations before I could even get back front of the court for a hearing on my probation conditions."), ¶¶34-42 (describing months of housing instability following expulsion from ARC, leading to a serious foot infection, an acute mental health crisis, frostbite, and near-death experiences)); Doc. No. 145 (Declaration of Richard Espinosa (Espinosa Decl. ISO PI Mot., ¶12 ("The Salvation Army told me that I would have to detox before joining the ARC program … Throughout that detox program, I experienced symptoms of withdrawal including tremors, excessive sweating, headaches, insomnia, nausea, vomiting, and diarrhea. Many of these symptoms persisted after the detox program ended."), ¶¶15-17 ("The lack of access to methadone made my withdrawal symptoms worse than they needed to be."), ¶18 ("It was clear to The Salvation Army that I was experiencing terrible withdrawal symptoms, but … [the] staff refused to let me access the medication I needed, did not arrange for any medical assessment regarding my treatment and needs, and required me to perform work for them full-time."), ¶21 ("Not being able to access methadone while at the ARC delayed my progress in my journey with sobriety. … The delay imposed by The Salvation Army cost me valuable time with my family and time I could have used to get to a better place in my life, financially and otherwise.")), ¶23 ("[A]ttempting recovery without the assistance of methadone would jeopardize my recovery, my health, and potentially my life.")); Ex. O to Wang Decl. ISO Opp. to Supp. MSJ,  Jake J. Smith et al, *Potential health impacts of comprehensive access to opioid use disorder treatment in United States correctional facilities: A synthetic analysis*, Addiction 108, 114 (2025) ("[E]xpanding MOUD availability to people recently released from jails and prisons could help avert a substantial portion of opioid overdose deaths in the United States.").

16. **TSA's opposition to MOUD stems from widely held but medically erroneous stereotyped views that a "drug is a drug."** *See* Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 110:11-111:13 ("Q: Nicotine and methadone are both substances that the Salvation Army opposes as a matter of religious principle? A: Yes. Q: And the Salvation Army can continue to practice its religion while allowing ARC participants to use nicotine; correct? A: Yes. Q: And the Salvation Army can continue to practice its religion if it allowed ARC participants to use methadone; correct? A: No. Q:

What is the difference between those two circumstances for purposes of the Salvation Army practices of its religion? A: Of our religion of abstinence and being a drug-free house. A drug is a drug, whether methadone, Suboxone, buprenorphine. If it's a narcotic it's a drug and we don't allow those within our program. Q: Isn't nicotine a drug? A: Yes. Q: What do you mean by 'narcotic'? What's a narcotic in your view. Q: An opioid. We're talking about methadone, Suboxone, Sublocade, buprenorphine, those are listed in the Talbott Guide.")); Doc. No. 141-4 (Ex. D to Salazar Decl. ISO PI Mot., Swistak Dep. Tr. 56:23-58:11 (Swistak, regarding Suboxone: "To me that is abuse of an individual to put you on that for life. It's worse to get off of than the actual opiate. … I don't believe it's maintenance." Regarding methadone: "It's even worse. People are rotting away from extended use of methadone. … To me, in my mind, it's just government sponsored drug abuse."), 81:8-14 ("I can't wrap my personal head and thoughts around this idea that I'm going to try to help you get away from being shackled to a drug that really does no great thing for you, I'm talking about the opiate itself, by putting you on another one. Which is no great thing to do. Which is, you know, I just don't get it. I don't get it.")).

"Antimedication stigma affects the uptake of MOUD in the substance use field (Allen et al., 2019) and often stems from the belief that a treatment course with MOUD is not equivalent to abstinence but instead is 'just another form of addiction.'" Ex. P to Wang Decl. ISO Opp. to Supp. MSJ, Claire A. Wood et al., *Acceptance of medications for opioid use disorder in recovery housing programs in Missouri*, 138 J. of Substance Abuse Treatment 1, 2-3 (2022) (noting also the "disproportionate stigma toward methadone and buprenorphine"); *id.* Ex. Q, Sarah E. Wakeman & Josiah D. Rich, *Barriers to Medications for Addiction Treatment: How Stigma Kills*, 53 Substance Use & Misuse 330, 332 (2018) (discussing importance of combatting the deeply entrenched stigma against medications for addiction treatment, particularly against methadone and buprenorphine, as they "may be the most powerful tool we have to stop the death toll from the current opioid epidemic"); *id.* Ex. R, Julia Dickson-Gomez et al., *"You're Not Supposed to be on it Forever": Medications to Treat Opioid Use Disorder (MOUD) Related Stigma Among Drug Treatment Providers and People who Use Opioids*, 16 Substance Abuse: Research and Treatment 1, 1-2 (2022) (stigma around MOUD, including view of it "as one drug replacing another," limits use even though MOUD "is considered the gold standard" for treating OUD). MOUD stigma permeates, including shaping views "about the duration of providing MOUD" and manifesting in opposition to "long term use of MOUD as suggested by medical guidelines." *Id.* Ex. R.

### Defendant the Salvation Army's (TSA) policy
### expressly excludes people with certain forms of OUD.

17. **Not all individuals with OUD have the same disability. There are some individuals who have a form of OUD for whom the only effective treatment is buprenorphine or methadone medication.** *See* Doc. No. 281 (SoF) ¶¶47-48; Doc. No. 143 (Rodriguez Decl. ISO PI Mot.), ¶46 ("Methadone improves retention in treatment and buprenorphine reduces the risk of overdose."), ¶54 ("[B]uprenorphine allows for the brain to slowly regain its function, … reduces risk of overdose, … and allows people to function normally without the need for constant dosing to eliminate symptoms of withdrawal or

negative affect related with OUD."), ¶64 ("[S]tudies have shown that methadone treatment is associated with a reduction in mortality related to opioid use … and morbidity associate with opioid use and injection drug use (e.g., reduced risk of HIV and hepatitis C infection)."), ¶65 ("When patients achieve a methadone dose that helps eliminate cravings and improve function, the dose of methadone also results in blockade of other opioids, so that if an individual uses an illicit opioid they will not experience the intoxication."), ¶72 ("At a standard dose, buprenorphine reduces opioid withdrawal, cravings, and blunts or blocks the effects of illicit opioids.")); Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 97:14-21 (acknowledging TSA is aware that doctors sometimes prescribe methadone or buprenorphine, not Vivitrol, to people with OUD because Vivitrol requires that "a person [goes] through a detox period first")); Doc. No. 143 (Rodriguez Decl. ISO PI Mot., ¶¶85-86 (Vivitrol cannot be started unless an individual is "completely free or abstinent from any short acting opioid use (e.g., oxycodone, heroin, fentanyl) for at least 7-10 days and … methadone, buprenorphine[] for 10-14 days prior to starting treatment. If naltrexone is given to an individual who is using or has recently used any opioid (including in treatment with methadone or buprenorphine), the naltrexone would displace the opioid … resulting in harmful, immediate, and potentially, severe withdrawal in the patient."), ¶87 ("[P]atients who are using and need to go through withdrawal … may fail to complete medically supervised withdrawal (detox), return to use, or get lost to follow up (not return to visits or respond to calls. These are significant clinical risks with not allowing individuals access to all MOUDs … [I]n individuals that need to go through medically supervised withdrawal, studies show that initiation rates for [naltrexone] are significantly lower."), ¶88 (citing studies showing "a substantial induction hurdle or difficulties with [naltrexone] initiation."), ¶89 (explaining that many individuals choose methadone or buprenorphine over naltrexone, as studies indicate that naltrexone "have worse retention in treatment" and is associated with "a higher risk of overdose")); (Rodriguez Decl. ISO PI Mot., ¶41 ("There is not a one size fits all in the treatment of OUD, and standard of care requires that patients have access and be offered all three MOUDs … no single medication is a perfect fit for all"), ¶87 ("In the absence of strong preference for [naltrexone], there is no indication to only offer [naltrexone] in someone who is actively using opioids."), ¶89 ("[I]f a patient does not have a strong preference for [naltrexone] and is actively using opioids, buprenorphine and methadone are considered better treatment options."), ¶92 ("deciding which medication to use for the treatment of OUD is a collaborative decision between the patient and provider" that requires consideration of the "patient's medical, psychiatric, and substance use history, their treatment preference, and access/availability of treatment" and "should not be determined by a non-medical program or housing provider.")); Doc. No. 232-1 (Ex. A to Salazar Decl. ISO CCert. Mot., Mangiacarne Dep. Tr. 83:2-84:8 (agreeing that treatment determinations for OUD should be "individualized" because "[t]here is no one-size-fits-all treatment")); Doc. No. 141-49 (Filed Under Seal) (Ex. J to Salazar Decl. ISO PI Mot., Almeida Dep. Tr. 89:2-9 ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. Y to Wang Decl. ISO Opp. to Supp. MSJ (Filed Under Seal), Deposition of Joseph Almeida ("Almeida Dep. Tr.") 36:10-16 ▮▮▮▮▮▮▮▮



█████████████████████████████████████████████████████
██████████████████████████ 36:23-37:2 ██████████████████
█████████████████████████████████████████████████████
██████████████████████ Doc. No. 141-49 (Filed Under Seal) (Ex. J to Salazar Decl. ISO PI Mot., Almeida Dep. Tr. 49:11-17 ██████); Doc. No. 160-5 (Filed Under Seal) (Ex. E to Erno Decl. ISO PI Opp., Almeida Dep Tr. 76:1-15 ██████ ███████████████████████████████████████████████ 79:19-80:22, 137:22-138:14 ███████████████████████████████████████ Doc. No. 160-1 (Filed Under Seal) (Ex. A to Erno Decl. ISO PI Opp., Tassinari Dep. Tr. 114:24-115:4 ███████████████████████████████████████████████████████████████████████████████████████████████ 114:4-20 █████████████████████████ ██████████████████); Ex. Z to Wang Decl. ISO Opp. to Supp. MSJ (Filed Under Seal), Deposition of Mark Tassinari ("Tassinari Dep. Tr.") 195:18-25 ██████████ ███████████████████████████████████████████████████████████████████████ ████

18. **Denying access to services to those who take prescribed methadone or buprenorphine to treat their OUD has the effect of excluding individuals who have a form of OUD that is not effectively treatable by any other medication or approach.** *See* Doc. No. 281 (SoF) ¶¶47-48; Doc. No. 143 (Rodriguez Decl. ISO PI Mot., ¶46 ("Methadone improves retention in treatment and buprenorphine reduces the risk of overdose."), ¶54 ("[B]uprenorphine allows for the brain to slowly regain its function, … reduces risk of overdose, … and allows people to function normally without the need for constant dosing to eliminate symptoms of withdrawal or negative affect related with OUD."), ¶64 ("[S]tudies have shown that methadone treatment is associated with a reduction in mortality related to opioid use … and morbidity associate with opioid use and injection drug use (e.g., reduced risk of HIV and hepatitis C infection)."), ¶65 ("When patients achieve a methadone dose that helps eliminate cravings and improve function, the dose of methadone also results in blockade of other opioids, so that if an individual uses an illicit opioid they will not experience the intoxication."), ¶72 ("At a standard dose, buprenorphine reduces opioid withdrawal, cravings, and blunts or blocks the effects of illicit opioids.")); Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 97:14-21 (acknowledging TSA is aware that doctors sometimes prescribe methadone or buprenorphine, not Vivitrol, to people with OUD because Vivitrol requires that "a person [goes] through a detox period first")); Doc. No. 143 (Rodriguez Decl. ISO PI Mot., ¶¶85-86 (Vivitrol cannot be started unless an individual is "completely free or abstinent from any short acting opioid use (e.g., oxycodone, heroin, fentanyl) for at least 7-10 days and … methadone, buprenorphine[] for 10-14 days prior to starting treatment. If naltrexone is given to an individual who is using or has recently used any opioid (including in treatment with methadone or buprenorphine), the naltrexone would displace the opioid … resulting in harmful, immediate, and potentially, severe withdrawal in the

patient."), ¶87 ("[P]atients who are using and need to go through withdrawal … may fail to complete medically supervised withdrawal (detox), return to use, or get lost to follow up (not return to visits or respond to calls. These are significant clinical risks with not allowing individuals access to all MOUDs … [I]n individuals that need to go through medically supervised withdrawal, studies show that initiation rates for [naltrexone] are significantly lower."), ¶88 (citing studies showing "a substantial induction hurdle or difficulties with [naltrexone] initiation."), ¶89 (explaining that many individuals choose methadone or buprenorphine over naltrexone, as studies indicate that naltrexone "have worse retention in treatment" and is associated with "a higher risk of overdose")); ¶41 ("There is not a one size fits all in the treatment of OUD, and standard of care requires that patients have access and be offered all three MOUDs … no single medication is a perfect fit for all"), ¶87 ("In the absence of strong preference for [naltrexone], there is no indication to only offer [naltrexone] in someone who is actively using opioids."), ¶89 ("[I]f a patient does not have a strong preference for [naltrexone] and is actively using opioids, buprenorphine and methadone are considered better treatment options."), ¶92 ("deciding which medication to use for the treatment of OUD is a collaborative decision between the patient and provider" that requires consideration of the "patient's medical, psychiatric, and substance use history, their treatment preference, and access/availability of treatment" and "should not be determined by a non-medical program or housing provider.")); Doc. No. 232-1 (Ex. A to Salazar Decl. ISO CCert. Mot., Mangiacarne Dep. Tr. 83:2-84:8 (agreeing that treatment determinations for OUD should be "individualized" because "[t]here is no one-size-fits-all treatment")); Doc. No. 146 (Declaration of Joseph Almeida (Almeida Decl. ISO PI Mot., ¶¶26-28 ("I believe that all of this could have been avoided if I had been able to stay at a Salvation Army ARC and continue my methadone treatment for OUD."), ¶29-32 ("I would like to be able to be considered for housing at a Salvation Army ARC to avoid being houseless and to have access to rehabilitation services. However, I also need to continue my methadone treatment in order to keep progressing in my recovery. As long as The Salvation Army continues to prohibit residents from using methadone as MOUD at ARCs, the organization is actively preventing me from taking the best steps for my recovery and is preventing me from following my doctor's medical advice for my OUD.")); Doc. No. 145 (Declaration of Richard Espinosa (Espinosa Decl. ISO PI Mot., ¶12 ("The Salvation Army told me that I would have to detox before joining the ARC program … Throughout that detox program, I experienced symptoms of withdrawal including tremors, excessive sweating, headaches, insomnia, nausea, vomiting, and diarrhea. Many of these symptoms persisted after the detox program ended."), ¶¶15-17 ("The lack of access to methadone made my withdrawal symptoms worse than they needed to be."), ¶18 ("It was clear to The Salvation Army that I was experiencing terrible withdrawal symptoms, but … [the] staff refused to let me access the medication I needed, did not arrange for any medical assessment regarding my treatment and needs, and required me to perform work for them full-time."), ¶21 ("Not being able to access methadone while at the ARC delayed my progress in my journey with sobriety. … The delay imposed by The Salvation Army cost me valuable time with my family and time I could have used to get to a better place in my life, financially and otherwise.")), ¶23 ("[A]ttempting recovery without the assistance of methadone would jeopardize my recovery, my health, and potentially my life.")); Doc. No. 144 (Declaration of Mark Tassinari (Tassinari Decl. ISO PI Mot., ¶14 ("I was

23

suffering from withdrawal symptoms when I arrived at the Saugus ARC … and was told … that MOUD was not permitted at the ARC and I would not be allowed to access buprenorphine during my stay."), ¶16 ("About a month into joining the ARC program, my need to see a doctor to refill my prescriptions became critical. I had been off my psychiatric medications and MOUD for approximately three months and was suffering physical pain, anxiety, frayed emotions, loss of appetite, and difficulty sleeping."), ¶18 (stating that Tassinari's doctor prescribed him self-administered buprenorphine due to "concerns for [his] health"), ¶¶21-23 (recounting immediate termination of Tassinari's ARC participation following a positive urinalysis for his doctor-prescribed buprenorphine, leaving him unhoused)), ¶24 (TSA offered no accommodations), ¶¶26-28 (describing Tassinari's subsequent probation hearing, at which he was found "in violation" of probation for not being enrolled in the ARC program), ¶31 (recounting an intake call with the Saugus ARC in which Tassinari was told "that a bed was available, but that I could not have the bed because I was taking buprenorphine as MOUD. They also told me that if I wanted to have the bed and participate in the ARC, I would have to stop taking MOUD.")).

### The federal government intends for government funding to support expanded access to MOUD.

19. **The federal government supports expanding access to MOUD for individuals suffering from opioid use disorder.**

   a. In 2022, Congress passed and former President Biden signed into law the Mainstreaming Addiction Treatment (MAT), and Medication Access and Training Expansion (MATE) Acts, which expanded access to and training about buprenorphine to treat OUD. *See* Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, §1262, 136 Stat. 4459 (2022); *id.* §1263.

   b. As the White House's 2022 National Drug Control Strategy explained, "research shows that the Food and Drug Administration (FDA) approved MOUD save lives and can outperform treatment without medication," and "[t]hus, they should be accessible to any individuals with OUD." Ex. S to Wang Decl. ISO Opp. to Supp. MSJ, Executive Office of the President, *National Drug Control Strategy*, 1, 49 (2022) (citing studies). Indeed, in the government's effort to make recovery possible for more Americans, the report proclaimed that the government should foster consistent recovery housing standards that "should ensure that people following all recovery pathways, including those receiving medications for opioid use disorder (MOUD), have access to quality recovery housing." *Id.* at 68.

      i. The 2022 report emphasized how "essential" it was to "prioritize utilizing treatment dollars efficiently," so "[w]herever possible, inexpensive oral methadone and sublingual buprenorphine should be the backbone of our treatment system for caring for people with opioid use disorder." *Id.* at 49. As a White House report affirmed last year, there is a severe cost of OUD in the form of both mortality and financial burden on the country's healthcare system and labor force. Ex. T to Wang Decl. ISO Opp. to Supp.

24

MSJ, White House, *The Staggering Cost of the Illicit Opioid Epidemic in the United States* (2025) (citing Curtis Florence et al., *The economic burden of opioid use disorder and fatal opioid overdose in the United States, 2017*, https://pmc.ncbi.nlm.nih.gov/articles/PMC8091480/).

ii. Evidence supports the government's endorsement of buprenorphine and methadone's cost-efficacy. *See* Ex. U to Wang Decl. ISO Opp. to Supp. MSJ at 18, Michael Fairley et al., *Cost-effectiveness of Treatments for Opioid Use Disorder*, 78(7) JAMA Psychiatry (2021) ("Methadone and buprenorphine generated the largest savings and health benefits.").One study of the outcomes and costs of providing MOUD to individuals during and following their release from incarceration in Massachusetts found that MOUD was a "highly cost-effective intervention" and including methadone and buprenorphine was less costly and saved more lives than providing naltrexone only. Ex. V to Wang Decl. ISO Opp. to Supp. MSJ, Avik Chatterjee et al., *Estimated Costs and Outcomes Associated With Use and Nonuse of Medications for Opioid Use Disorder During Incarceration and at Release in Massachusetts*, 6(4) JAMA Network Open, 1, 8 (2023).

c. The Substance Abuse and Mental Health Services Administration (SAMHSA)'s Treatment Improvement Protocol on Medications for Opioid Use Disorder explicitly describes MOUD as "the clinical standard of care," and notes the "proven effectiveness of methadone, naltrexone, and buprenorphine." Doc. No. 143-2 (Ex. 2 to Rodriguez Decl. ISO PI Mot., TIP63, at 98). The Protocol explains how "OUD medication may be lifesaving," and "patients with OUD should have access to all three FDA-approved pharmacotherapies." *Id.* at 227.

20. **The federal government recognizes denial of access to methadone or buprenorphine MOUD is a form of discrimination on the basis of disability.** *See* Doc. No. 63-1 at 2 (DOJ Guidance: ADA "protect[s] individuals who are taking legally prescribed medication to treat their opioid use disorder" including "medications for opioid use disorder (MOUD)"); Ex. B to Wang Decl. ISO Opp. to Supp. MSJ, Settlement Agreement Between the United States of America and Ready to Work, LLC under the Americans with Disabilities Act ¶7 ("Ready to Work advised the Complainant that she would not be admitted to Ready to Work's residency and social services program because of her Suboxone use. … By refusing to provide residency to the Complainant because she has OUD, Ready to Work discriminated against her on the basis of disability in the full enjoyment of Ready to Work's goods, services, facilities, privileges, advantages or accommodations. By turning away the Complainant, and any other prospective residents with OUD, Ready to Work imposed eligibility criteria that screen out or tend to screen out individuals with OUD."); *id.* Ex. C, Settlement Agreement Between the United States and the Massachusetts Parole Board at 2 (finding non-compliance with the ADA's non-discrimination requirements where Parole Board provided individual assessments for mental health disabilities other than SUD but required those with SUD to take Vivitrol "without an individualized assessment to ascertain the efficacy or appropriateness of the medication" and "fail[ed] to implement a practice of allowing a parolee to reasonably modify a condition of release requiring that a current or prospective parolee with SUD

take a specific form of medication where the parolee requests, or his or her health care provider recommends, a different prescription medication or medically-indicated treatment decision"); *id.* Ex. W, United States Attorney's Office, District of Massachusetts, Press Release, *Four Skilled Nursing Facility Entities Agree to Resolve Allegations of Americans with Disabilities Act Violations* (Sept. 27, 2021) at 2 ("The United States allege that CareOne Realty, LLC; Hebrew Senior Life, Inc.; Sheehan Health Group, LLC (which manages Laurel Ridge and Presentation Rehabilitation Centers); and Wingate Healthcare violated the Americans with Disabilities Act (ADA), the Rehabilitation Act and the Patient Protection and Affordable Care Act by denying admission to individuals because they were being treated with buprenorphine or methadone, medications used to treat OUD."); *id.* Ex. H, Settlement Agreement Between the United States of America and Hebrew SeniorLife at 3 (investigation found "Hebrew SeniorLife has denied admission to patients based on their prescription for MOUD and/or on the basis of their OUD" and thus "engaged in discrimination by … [i]mposing eligibility criteria that screened out individuals with disabilities, specifically individuals with OUD, without assessing actual risks" and "[d]enying them the opportunity to equally participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations being offered, on the basis of disability"); *id.* Ex. X, United States Attorney's Office, District of Massachusetts, Press Release, *U.S. Attorney's Office Settles Disability Discrimination Allegations with the Massachusetts Trial Court Concerning Access to Medications for Opioid Use Disorder*, at 1-2 (settling case alleging that "as a condition of participating in drug court, participants were ordered or pressured to stop taking their lawfully prescribed MOUD, without an individualized assessment by a medical professional" in violation of the ADA); *id.* Ex. D, Settlement Agreement Between the United States of America and Ashland Hospital Corporation d/b/a King's Daughters Medical Center, Under the Americans with Disabilities Act ¶¶14(h)-(i) ("By refusing to provide the Complainant with psychiatric medication management because of her MOUD prescription, the Clinic discriminated against her[,]" and "[b]y turning away the Complainant and other prospective patients who are treated with MOUD or who have been treated with MOUD within six months, the Clinic imposed eligibility criteria that screen out or tend to screen out individuals with OUD.").

State governments have similarly recognized the importance of MOUD. *See, e.g. id.* Ex. I at 1 (National Opioids Settlement between States and several pharmaceutical companies, Ex. E) (recognizing MAT distribution as a "core strateg[y]" for use of settlement funds); *id.* at 4 (treatment "through evidence-based or evidence informed programs or strategies," including MAT).

### TSA could allow access to ARCs for people taking prescribed MOUD without changing the social services or housing that TSA provides at the ARCs.

21. **TSA could, as a practical matter, allow access to ARCs to people who take prescribed Sublocade injections, or who took a prescribed Sublocade injection up to a year in the past, following the same procedures that TSA already applies to other ARC participants who receive monthly injections from outside healthcare providers.** *See* Doc. No. 281 (SoF) ¶¶85-93; *see also* Doc. No. 143 (Rodriguez Decl. ISO PI Mot.,

¶40 ("Patients on medications like buprenorphine … are not evaluated daily, and frequency of visits with their prescriber may vary from weekly to every three to four months."), ¶74 (For the treatment of OUD, [buprenorphine] is available as … a monthly injectable formulation."), ¶75 ("Patients for whom buprenorphine is the appropriate treatment can initiate buprenorphine in the office setting or in the comfort of their home with clinical guidance.")); Doc. No. 141-5 (Ex. E to Salazar Decl. ISO PI Mot., Coombs Dep. Tr. 47:24-49:20 (confirming that ARC participants are allowed to receive monthly naltrexone injections, which treat OUD), 48:10-24 (explaining that ARC participants receive naltrexone injections from their "prescribers" and that "most of the time [ARC participants] go off site" to receive naltrexone injections)); Doc. No. 141-4 (Ex. D to Salazar Decl. ISO PI Mot., Swistak Dep. Tr. 180:20-22 ("[T]he ARCs can accommodate people who need Vivitrol.")); Doc. No. 143 (Rodriguez Decl., ¶40 (individuals on MOUD "do not need additional medical monitoring or 'treatment' in their personal lives, at their place of residence, or in rehabilitation or residential programs."), ¶65, ¶67 ("After dosing visits, patients are able to carry on with other aspects of their lives without special monitoring or treatment."), ¶93 ("Individuals who use any of the FDA-approved medications for opioid use disorder … do not need any special medical monitoring or care in their daily living environments, and can receive all the medical treatment they need from their medical providers. A living facility does not require medical or other training, medical monitoring, or special safety standards to be able to house someone who is using … medications for their opioid use disorder."), ¶96 ("Buprenorphine and methadone are medications prescribed in the ambulatory setting and do not require a higher level of care or additional precautions relative to other prescribed medications.")); Doc. No. 232-1 (Ex. A to Salazar Decl. ISO CCert. Mot., Mangiacarne Dep. Tr. 44:19-45:19 (confirming that individuals living "outside of a licensed clinical facility" can receive MOUD), 52:5-20 (describing choice to open MOUD outpatient practice for registered patients and general community members), 92:8-94:9 (providing that individuals can take MOUD while living at home, with roommates, in group sober living facilities, or while unhoused, without facing medical barriers to treatment), 128:9-18, 130:3-11 (confirming that individuals can safely take MOUD "while living in settings that don't have doctors and nurses on-site)).

22. **TSA could, as a practical matter, allow access to ARCs to at least some people who receive daily methadone medication from an opioid treatment program (OTP) clinic, following the same procedures that TSA already applies to other ARC participants who receive healthcare from outside healthcare providers.** *See* Doc. No. 281 (SoF) ¶¶85-93; Doc. No. 143-2 (Ex. 2 to Rodriguez Decl. ISO PI Mot., TIP63 at 99-100 (methods of methadone administration), 101 ("roughly 1,500 federally certified opioid treatment programs (OTPs) offer methadone for OUD," and provide medical oversight of this treatment, direct onsite observation of dose administration, and offer take-home dose dispensing)); Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 42:11-13, 42:17-43:13, 57:15- 58:14, 208:2-6 (confirming that "the ARC is able to work with participants to take them to medical appointments while they're participating in the ARC program")); Doc. No. 141-5 (Ex. E to Salazar Decl. ISO PI

27

Mot., Coombs Dep. Tr. 48:15-24 (confirming that TSA "may have had some providers come on site" to give ARC participants naltrexone injections)); SSF ¶21, *supra* (no special medical monitoring in rehabilitation program needed for individuals taking methadone); Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 58:7-10 ("Q: And a participant who needed dialysis could go to a dialysis appointment while living at the ARC; correct? A: Correct.")).

23. **For example, some ARCs are located within a one-minute drive from an OTP clinic, and TSA could, as a practical matter, allow a reasonable number of participants at such an ARC to access outside daily treatment from such a clinic without significantly affecting the operations of the ARC.** *See* Doc. No. 281 (SoF) ¶93; Doc. No. 233 (Declaration of Maria Wenzell (Wenzell Decl. ISO PI CCert. Mot. (describing attached exhibits)); Doc. No. 233-4 (Ex. D to Wenzell Decl. ISO CCert. Mot., Chart Showing Each of the 29 ARCs and the SAMSHA-certified OTP Locations in the Same City (demonstrating proximity between ARCs and OTP locations)); Doc. No. 233-5 (Ex. E to Wenzell Decl. ISO CCert. Mot., Chart Summarizing ARC Addresses and Closest OTP Locations (showing that all listed ARCs are located within 15 minutes or less of an OTP, with several having OTPs a one-minute drive away)); Doc. No. 232-3 (Ex. B to Salazar Decl. ISO CCert. Mot., Rodriguez Dep. Tr. 148:16-25 (receiving a methadone dose at an OTP can take as little as 15 minutes)).

24. **The fact that TSA permits participants at its Harbor Light Programs to access daily methadone treatment for OUD at nearby clinics demonstrates that it could do the same for ARC participants.** *See* Doc. No. 141-3 (Ex. C to Salazar Decl. ISO PI Mot., Hill Dep. Tr. 66:1-22 (participants in community corrections program can access methadone at facility "that is a block or so from our facility")); Ex. A to Wang Decl. ISO Opp. to Supp. MSJ, Hill Dep. Tr. 114:9-116:19 (participants transport themselves to that clinic), 127:5-15 (participants in residential treatment program in Pittsburgh can access methadone at outside clinics)); Doc. No. 282-2 (Ex. B to Wang Decl. ISO Opp. to MSJ, Hill Dep. Tr. 126:11-25) (confirming that participants in the Habor Light program are "allowed access to medication for opioid use disorder," including methadone, Suboxone, and Sublocade)); *see also* Doc. No. 141-3 (Ex. C to Salazar Decl. ISO PI Mot., Hill Dep. Tr. 67:7-68:21 (TSA's PASS program, which provides homeless services, does not prohibit individuals taking methadone from participating in the program)).

25. **TSA could, as a practical matter, allow access to ARCs to people who take prescribed oral buprenorphine or take-home oral methadone medication, following the same procedures that the TSA already applies to other ARC participants who self-administer prescribed medications received from outside healthcare providers.** *See* Doc. No. 281 (SoF) ¶¶85-93; *see also* Doc. No. 143 (Rodriguez Decl. ISO PI Mot., ¶62 ("Methadone … is an oral medication that is dispensed directly to the patient with OUD in liquid form … [and] can also be provided in acute care settings … in tablet form."), ¶67 ("Federal OTP regulations allow for take home doses of methadone once a patient has achieved a period of time free of drug use, is achieving treatment goals, and has adhered to treatment as expected in the program.")); Doc. No. 143 (Rodriguez Decl. ISO PI Mot., ¶40 ("Patients on medications like buprenorphine … are not evaluated daily,

and frequency of visits with their prescriber may vary from weekly to every three to four months."), ¶74 ("Buprenorphine/naloxone (Suboxone) is the most commonly prescribed formulation and is taken orally."), ¶75 ("Patients for whom buprenorphine is the appropriate treatment can initiate buprenorphine in the office setting or in the comfort of their home with clinical guidance.")); Doc. No. 143-2 (Ex. 2 to Rodriguez Decl. ISO PI Mot., TIP63 at 102 (buprenorphine is available by prescription through pharmacies)); Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 207:21-25 (an ARC "is able to accommodate participants who have prescription medications that are permitted by the medication policy that they can self administer"), 56:22-57:14 (confirming that "all medications at ARC are kept in a central secure space" and access is "restricted to specified personnel"), 58:15-23, 120:23-121:12 (confirming that TSA uses central storing "for all medication storage" to prevent "abuse" of medications and supplements)); Doc. No. 141-8 at 47 (Ex. 104 to Salazar Decl. ISO PI Mot., TSA ARCs Handbook of Standards, Principles and Policies ("Medications, prescriptions and over-the-counter drugs should be stored in a secured space, with access restricted to specified personnel.")); Doc. No. 141-5 (Ex. E to Salazar Decl. ISO PI Mot., Coombs Dep. Tr. 25:6-13 ("Most of the medication has to be centrally stored and personally identified to limit sharing of medications."), 26:23-27:1, 49:4-20 (confirming that "monitoring occurs to ensure that the participants don't share their medications with people" for whom the medication is not intended), 73:2-13 ("We essentially store and personally identify all medications, and then we typically monitor the person tak[ing] it."), 75:6-14, 108:21-109:5, 133:4-10 ("[W]e essentially store and personally identify the medication, and then we observe them taking their medication."), 133:22-134:7); *see* SSF ¶21, *supra* (no special medical monitoring in rehabilitation program needed for individuals taking methadone or buprenorphine); SSF ¶26, *infra* (experience of Shawn Arcidiacono).

26. **The experience of Shawn Arcidiacono, who was permitted to take buprenorphine MOUD while at an ARC until TSA superiors learned and ended that practice, demonstrates that TSA could similarly accommodate other individuals.** *See* Doc. No. 147 (Decl. of Shawn Arcidiacono ¶10 ("During the first few days of my stay at the ARC, I was able to continue taking my medications as prescribed, including taking my daily Suboxone for my OUD. ARC staff retrieved my Suboxone dose from the central location each day and watched me self-administer it. Within the first few days of my arrival at the Worcester ARC, the Sergeant-Major drove me in her car to a clinic to refill my Suboxone prescription, which at the time was in the form of sublingual strips. There was no problem with my continuing my daily Suboxone, and the ARC did not need to give me any special care that it didn't provide to other ARC participants." ), ¶11 ("Shortly thereafter, the Salvation Army headquarters apparently became aware that I was taking Suboxone, and Salvation Army staff  told me that I would not be able to stay in the ARC program if I continued taking my prescribed Suboxone because of the Salvation Army's policy prohibiting ARC participants from taking Suboxone for OUD.").

27. **TSA could continue to provide the same social services and housing at ARCs while allowing access to individuals who take prescribed MOUD.** *See* Doc. No. 281 (SoF) ¶¶85-93; *see also* Doc. No. 143 (Rodriguez Decl., ¶40 (individuals on MOUD "do not

need additional medical monitoring or 'treatment' in their personal lives, at their place of residence, or in rehabilitation or residential programs."), ¶65, ¶67 ("After dosing visits, patients are able to carry on with other aspects of their lives without special monitoring or treatment."), ¶75 (explaining that individuals receiving buprenorphine may have weekly, biweekly, monthly, or less frequent visits, which can be conducted via telemedicine, and that no additional medical monitoring is required outside of these scheduled check-ins), ¶93 ("Individuals who use any of the FDA-approved medications for opioid use disorder … do not need any special medical monitoring or care in their daily living environments, and can receive all the medical treatment they need from their medical providers. A living facility does not require medical or other training, medical monitoring, or special safety standards to be able to house someone who is using … medications for their opioid use disorder."), ¶96 ("Buprenorphine and methadone are medications prescribed in the ambulatory setting and do not require a higher level of care or additional precautions relative to other prescribed medications.")); Doc. No. 232-1 (Ex. A to Salazar Decl. ISO CCert. Mot., Mangiacarne Dep. Tr. 44:19-45:19 (confirming that individuals living "outside of a licensed clinical facility" can receive MOUD), 52:5-20 (describing choice to open MOUD outpatient practice for registered patients and general community members), 92:8-94:9 (providing that individuals can take MOUD while living at home, with roommates, in group sober living facilities, or while unhoused, without facing medical barriers to treatment), 128:9-18, 130:3-11 (confirming that individuals can safely take MOUD "while living in settings that don't have doctors and nurses on-site")).

### TSA does not consistently apply its asserted policy of prohibiting ARC participants from using substances that are "known to be abusive and addictive."

28. **TSA asserts that it categorically bans access to ARCs for people who take prescribed buprenorphine or methadone medication for opioid use disorder due to its "religious-based medication policy," which prohibits ARC participants from taking medications "that are known to be abusive and addictive to [the ARC's] typical population."** Doc. No. 281 (SoF) ¶22; Doc. No. 276-5 (Ex. 5 to Erno Decl. ISO MSJ, Coombs Dep. Tr. 54:13-55:16 (confirming that "prohibit[ing] the general use of medications that are known to be abusive and addictive to our typical population" is "the basis of the ARC[] medication policy.")); *see* Doc. No. 281 (SoF) ¶16 (Salvation Army's Statement of Fact: "A core tenet of The Salvation Army's religious beliefs is abstinence from alcohol and addictive substances."), ¶17 (Salvation Army's Statement of Fact: "TSA also sincerely believes that abstinence and the power of God unto salvation is the only form of successful rehabilitation."), ¶18 (Salvation Army's Statement of Fact: "Consistent with its sincerely held religious beliefs, TSA requires that, as a condition of participation, beneficiaries abstain from alcohol and drugs, including prescription drugs that are known to be abusive and addictive."); Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 89:7-19 (confirming that TSA's medication policy is "based on Salvation Army's view of what medications are abusive and addictive to the particular ARC population," which is informed by "the use of the Talbott Medical Guide.")).

29. **TSA does not apply that asserted policy consistently. For example, TSA permits ARC participants to use nicotine, which TSA concedes is addictive and subject to**

abuse. *See* Doc. No. 281 (SoF) ¶84; *see also* Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 74:14-75:9 (acknowledging that nicotine is an "addictive" substance that "can be abused," but that ARC participants are allowed to use nicotine because "[t]hey're not members of the Salvation Army" and "[a]llowing ARC participants to use nicotine doesn't prevent salvationists from practicing their religion"), 109:24-110:18 (confirming that "the Salvation Army can continue to practice its religion while allowing ARC participants to use nicotine," even though nicotine is "a drug" and Salvationists are required to abstain.)); Doc. No. 141-4 (Ex. D to Salazar Decl. ISO PI Mot., Swistak Dep. Tr. 70:17-71:7 (providing that "ARC participants are permitted to use nicotine," because "the individuals are going through enough"), 73:19-74:19 (acknowledging that "nicotine is addictive," but explaining that it is permitted at ARCs despite the "abstinence-based rehabilitation program" to avoid "undue stress" on participants)); *see also* Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 103:6-104:13 ("[T]he Salvation Army does permit ARC participants to use some medications that have the possibility of abuse."), 123:21-125:5 (allowing ARC participants to take gabapentin for some uses, even though it "can be abused")); Doc. No. 141-5 (Ex. E to Salazar Decl. ISO PI Mot., Coombs Dep. Tr. 55:20-56:7 (allowing ARC participants to take Sudafed, which can be abused), 72:18-73:8 (allowing gabapentin, which TSA recognizes "has the potential for abuse"), 74:22-75:4 (allowing ARC participants to take narcotic medication, which can be abused, for pain or surgery), 77:8-79:16 (allowing Seroquel, which TSA recognizes "has been" "misuse[d]"), 84:9-21 (allowing Librium), 131:12-134:7 (allowing gabapentin, including for long-term use, even though TSA recognizes that people misuse it to "get high"), 107:14-108:4 (allowing loperamide, which can be "fatal" if combined with other medications and "misused"), 109:6-110:10 (allowing trimipramine, which can be abused)); Doc. No. 141-13 (Ex. 116 to Salazar Decl. ISO PI Mot., TSA ARC Medication Guide); Doc. No. 141-4 (Ex. D to Salazar Decl. ISO PI Mot., Swistak Dep. Tr. 37:2-18, 39:6-21, 42:21-44:14, 62:10-20 (allowing ARC participants to take "analgesic for pain that was a narcotic" "as long as they're closely monitored")); Doc. No. 141-51 at 2 (Ex. L to Salazar Decl. ISO PI Mot., Email Thread from February 10, 2021 ("Our goal is to ensure each center has the capacity to meet the individual needs of the applicant… In regards to gabapentin, we review this on a case by case basis.")); Doc. No. 141-52 at 2 (Ex. M to Salazar Decl. ISO PI Mot., Email from May 3, 2021 (gabapentin permitted case-by-case despite TSA's "concern" of potential risks)).

30. **TSA also permits ARC participants, on an individualized basis, to take long-term prescribed gabapentin, despite acknowledging that it is subject to "abuse."** *See* Doc. No. 281 (SoF) ¶85; *see also* Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 123:21-125:5 (allowing ARC participants to take gabapentin for some uses, even though it "can be abused")); Doc. No. 141-5 (Ex. E to Salazar Decl. ISO PI Mot., Coombs Dep. Tr. 72:18-73:8 (allowing gabapentin, which TSA recognizes "has the potential for abuse"), 131:12-134:7 (allowing gabapentin, including for long-term use, even though TSA recognizes that people misuse it to "get high")); Doc. No. 141-51 at 2 (Ex. L to Salazar Decl. ISO PI Mot., Email Thread from February 10, 2021 ("Our goal is to ensure each center has the capacity to meet the individual needs of the applicant… In regards to gabapentin, we review this on a case by case basis")); Doc. No. 141-52 at 2

(Ex. M to Salazar Decl. ISO PI Mot., Email from May 3, 2021 (gabapentin permitted case-by-case despite TSA's "concern" of potential risks)).

31. **TSA's decision regarding which particular medications are "abusive and addictive" is not based on its religion, but rather based on old guidance from the Talbott Medical Campus, a non-religious provider.** *See* Doc. No. 281 (SoF) ¶80; Doc. No. 141-1 (Ex. A to Salazar Decl. ISO PI Mot., Muhs Dep. Tr. 89:7-19 (confirming that TSA's medication policy is "based on Salvation Army's view of what medications are abusive and addictive to the particular ARC population," which is informed by "the use of the Talbott Medical Guide."), 28:21-29:5 (TSA's medication policy is simply to follow "the Talbott Medical Guide"), 85:22-86:7, 86:22-23. 87:12-23 (TSA's "guide itself is taken from the Talbott guide"), 101:25-102:16, 110:23-111:13, 121:13-25 (confirming that the "Talbott Recovery Campus Medication's Guide" is the "basis for the Salvation Army medication policy.")); Doc. No. 141-4 (Ex. D to Salazar Decl. ISO PI Mot., Swistak Dep. Tr. 40:6-13 ([T]he Talbot[t] Medication Guide … is the guide that we follow."), 56:3-11); Doc. No. 141-5 (Ex. E to Salazar Decl. ISO PI Mot., Coombs Dep. Tr. 65:5-66:4 ("[I]s there any other reason why you put any medication on this medication policy? A: None that I can think of, no. That's why we cited the sources where we got the opinion because it wasn't just our own thoughts."), 70:13-14, 80:6-20 ("we typically just try to refer that over to the Talbott Medications Guide")); Doc. No. 141-52 at 2 (Ex. M to Salazar Decl. ISO PI Mot., Email from May 3, 2021 (prompting email recipient to "review" various Talbott websites)); Doc. No. 141-14 at 4, 8 (Ex. 117 to Salazar Decl. ISO PI Mot., 2008 Talbott Recovery Campus Medication Guide); *see also* Doc. No. 141-17 at 3 (Ex. 120 to Salazar Decl. ISO PI Mot., Printout of a Webpage Within the Website talbottcampus.com ("The safest, most successful detox option is known as medically supervised detox…Supported by years of research, medications like methadone, Suboxone and buprenorphine increase the short-term detox…and longer-term success of detox, rehabilitation and recovery")); Doc. No. 141-5 (Ex. E to Salazar Decl. ISO PI Mot., Coombs Dep. Tr. 71:5-9 ("Q: Did you know that Talbott Recovery Campus now recognizes methadone and Suboxone as medications that increase the success of rehabilitation? A: I think most treatment programs do.")).

32. **The old guidance from the Talbott Medical Campus on which TSA relies in calling buprenorphine and methadone MOUD "abusive and addictive" is outdated. Based on currently accepted medical understanding, prescribed buprenorphine and methadone medication for opioid use disorder are not addictive substances of abuse.** *See* Doc. No. 281 (SoF) ¶45; *see also* Doc. No. 143 (Rodriguez Decl. ISO PI Mot., ¶25 ("There is an important distinction between physical dependence and substance use disorder/addiction that is often misunderstood by the public and in non-clinical settings. Physical dependence refers to withdrawal symptoms occurring with abrupt discontinuation of a drug. This can happen with many medications, such as antidepressants … and even blood pressure medications …. Addiction or substance abuse disorder, by contrast, refers to the compulsive seeking of the drug despite negative consequences. Although some medications for opioid use disorder can create physical dependence, individuals who take medication for opioid use disorder as prescribed are not addicted to that medication. The diagnosis of substance use disorder/addiction is associated with loss of control, consequences, cravings, and compulsive use which is

32

different than solely becoming physically dependent on a medication. Dependence is not equal to addiction."), ¶¶26, 68 (similar), ¶76 ("Individuals with opioid use disorder who take buprenorphine as prescribed are not addicted to buprenorphine as they do not have the negative consequences and compulsive use related to the diagnosis of addiction."), ¶¶65, 72, 80 ("[T]he use of methadone or buprenorphine [as prescribed] in someone with an OUD does not result in euphoria, oblivion, or a feeling of intoxication."), ¶98 ("[O]ne of the goals of treatment with agonist MOUDs is to block euphoric effects of illicit opioids."), ¶100 ("[W]hile someone with OUD is physically dependent on buprenorphine or methadone while in treatment with these medications, they are not addicted to these medications.")).

The federal government recognizes this distinction. *See* SAMHSA, *Treatment Improvement Protocol 63* (Doc. No. 143-2, Ex. 2 to Rodriguez Decl.) at 227 ("Physical dependence on a prescribed, properly taken opioid medication is distinct from OUD and opioid addiction."); *see also id.* at 228 ("One common question about patients taking medication for OUD is "Aren't they still addicted?" The new DSM-5 distinction makes the answer to this question "No, they're not still addicted.").

### TSA could continue to promote "abstinence" from illegal or addictive substances while allowing access to ARCs to people who take prescribed MOUD.

33. **Ending TSA's categorical ban on access for people who take prescribed MOUD to treat their condition would not require TSA to change any of its speech. It could continue to promote "abstinence," and it could continue to assert that it believes treatment with MOUD does lead to "true" rehabilitation, including to ARC participants.** *See* Doc. No. 281 (SoF) ¶¶85-93; *see also* Doc. No. 141-3 (Ex. C to Salazar Decl. ISO PI Mot., Hill Dep. Tr. 99:1-16 (Q: It doesn't violate Salvation Army's religious beliefs to provide buprenorphine to participants in [the Harbor Light Centers] program, is that correct? A. It's -- under the guidelines of the medical thing, no, because the program is done in conjunction with government funding and government regulation, so we understand that by doing that program and that service, that we have to abide by those guidelines."), 100:1-101:5 ("Q: Are you aware of any policy of the Harbor Light programs that would prohibit participants from accessing MAT? A. No. We recently changed that over the last year and those program participants can access it if deemed medically appropriate. … Q: And what was the reason for the change? A: It would depend on the program area, but it was driven by government guidelines."), 101:21-102:23 (agreeing that "because of the government guidelines," "it doesn't violate Salvation Army's religious beliefs to allow participants in the community corrections program to access [methadone and Suboxone]")).

34. **Experience from other housing and social service providers demonstrates that providers of such services can as a practical matter offer "sober" or "abstinence"-based programs that promote "abstinence" from illegal or addictive substances while allowing access to those programs by individuals who take prescribed buprenorphine or methadone medication for opioid use disorder.** For instance, there are many programs certified by the Massachusetts Alliance for Sober Housing (MASH)

as sober homes providing "abstinence-based pathways to recovery" that accept and accommodate residents taking MOUD. Wang Decl. ISO Opp. to Supp. MSJ ¶7; *see, e.g. id.* Ex. E at 4 (Jordan Matthew House); *id.* Ex. F at 2 (Recovery House); *id.* Ex. G at 1 (Royal Sober Homes); *id.* Ex. L at 1 (Integrity Sober Living). Similarly, the National Alliance of Recovery Residences (NARR), which promotes quality standards for substance-free, home-like recovery programs recognizes MOUD as "one of many viable recovery tools" and "recognizes that it is illegal to deny residency based solely on MOUD-status under the American Disabilities Act." Ex. P to Wang Decl. ISO Opp. to Supp. MSJ, Claire A. Wood et al., *Acceptance of medications for opioid use disorder in recovery housing programs in Missouri*, 138 J. of Substance Abuse Treatment 1, 2 (2022).

Additionally, some sober homes are embracing "medication-assisted recovery," which is an approach that "refers to using a FDA-approved medication to address a substance use disorder, and emphasizes a person's commitment to engaging with abstinence-based recovery supports" based on the understanding that prescribed buprenorphine and methadone medications are compatible with an "abstinence"-based approach to treating OUD. *Id.* Ex. J, The National Alliance for Recovery Residences, *Helping Recovery Residences Adapt to Support People with Medication Assisted Recovery*, at 3-4; *id.* Ex. K, The National Alliance for Recovery Residences, *MAT-Capable Recovery Residences: How State Policymakers Can Enhance and Expand Capacity to Adequately Support Medication Assisted Recovery*, at 6-7 (tracing the emerging "concept of MAR 'medication-assisted recovery' (the use of medications in combination with abstinence-based recovery)" as a bridge between MAT and traditional views of abstinence-based programming and particularly salient in light of growing recognition of categorical exclusions of residents taking prescribed medications as discriminatory). Integrity Sober Living is one example of a MASH-certified sober living facility that "welcomes Medication Assisted Recovery." *Id.* Ex. L at 1.

35. **TSA's Harbor Light Centers provide housing and social services, including rehabilitation services, similar to the services provided at Adult Rehabilitation Centers.** *See* Doc. No. 281 (SoF) ¶82; Ex. A to Wang Decl. ISO Opp. to Supp. MSJ, Hill Dep. Tr. 44:9-47:4, 56:16-25, 62:3-63:14, 70:16-71:4, 77:11-78:14 (Cleveland Harbor Light Center includes (a) residential and intensive outpatient substance abuse programs including include "a lot of services" such as "recovery-based, life skills, relapse prevention, addressing criminogenic needs," and "counseling"; (b) a community corrections program that "assists people in lieu of going to jail" or "prison" at provides "employment services, relapse prevention services, cognitive behavioral therapy" and "lots of services" for people living in the facility typically for three to four months; (c) family shelter for homeless families and programs for homeless men that provide "case management," "employment," "educational," and "life skills services," amongst other things, and (d) religious ministry programming "that is available to every single person … in our fold" including "bible studies and a whole host of spiritual-based programs that the Salvation Army believes in"), 80:7-13, 84:22-85:3, 85:19-21, 123:9-19, 124:10-20 (Pittsburgh Harbor Light Center includes long-term "residential treatment" that provides "case management, counseling, group therapy, life skills," and "residential treatment"),

34

107:24-108:18 & Ex. 158 (summarizing Harbor Light Center programs, including chapel where "Salvation Army officers provide spiritual guidance and support that reinforces the recovery and rehabilitation process"); Doc. No. 141-3 (Ex. C to Salazar Decl. ISO PI Mot., Hill Dep. Tr. 67:7-20, 91:24-92:6 (TSA markets Harbor Light Centers and ARCs together as programs that offer substance abuse services)); Doc. No. 141-39 (Ex. 154 to Salazar Decl. ISO PI Mot., The Salvation Army Eastern Territory's "Combat Addiction" webpage (TSA website describing TSA's "holistic programs at our Adult Rehabilitation Centers and Harbor Light Centers" together as TSA's programs "helping those battling substance abuse"; "Our rehabilitation programs can help you break free and reclaim the hope that was once lost. … [W]ith counseling, patience, prayer, and a limitless supply of God's love, we offer a starting point on the path to freedom from addiction."; TSA's "rehabilitation programs … heal addiction")); Ex. A to Wang Decl. ISO Opp. to Supp. MSJ, Hill Dep. Tr. Ex. 155 (similar).

36. **TSA permits participants at the Harbor Light Center programs, including those participating in residential rehabilitation programs, to access buprenorphine and methadone medication for opioid use disorder.** *See* Doc. No. 281 (SoF) ¶82; Doc. No. 282-2 (Ex. B to Wang Decl. ISO Opp. to MSJ, Hill Dep. Tr. 61:15-23 ("there are many pathways to recovery, and of those pathways to recovery, one of them could be use of MAT, and -- and whatever pathway that individual believes is the best pathway, then that's the one that we should encourage.")); Doc. No. 141-3 (Ex. C to Salazar Decl. ISO PI Mot., Hill Dep. Tr. 65:5-14, 66:1-22 (participants in community corrections program can access "any form of MAT," including Suboxone and including by accessing methadone at facility "that is a block or so from our facility"), 68:10-20 (participants in PASS program can take MOUD), 72:4-8 (same for participants in family shelter), 100:1-13 (There is no "policy of the Harbor Light programs that would prohibit participants from accessing MAT. … program participants can access it if deemed medically appropriate."), 101:21-102:23 ("allowing participants … to access those medications is not a violation of Salvation Army's religious beliefs" "because every path – like we discussed earlier, people in recovery have many paths" and "because of the government guidelines")); Ex. A to Wang Decl. ISO Opp. to Supp. MSJ, Hill Dep. Tr. 126:11-25 (participants in Pittsburgh residential treatment program are "allowed to access medication for opioid use disorder," including "Methadone," "Suboxone," and "Sublocade").

37. **TSA's operation of the Harbor Light Center programs demonstrates that it can as a practical matter promote "abstinence" in its social services and housing programs while allowing access to those programs by individuals who take prescribed buprenorphine or methadone medication for opioid use disorder.** *See* Doc. No. 141-3 (Ex. C to Salazar Decl. ISO PI Mot., Hill Dep. Tr. 91:24-92:6 (TSA markets Harbor Light Centers and ARCs together as programs that offer substance abuse services)); Doc. No. 141-39 (Ex. 154 to Salazar Decl. ISO PI Mot., The Salvation Army Eastern Territory's "Combat Addiction" webpage (TSA website describing TSA's "holistic programs at our Adult Rehabilitation Centers and Harbor Light Centers" together as TSA's programs "helping those battling substance abuse"; "Our rehabilitation programs can help you break free and reclaim the hope that was once lost. … [W]ith counseling, patience,

35

prayer[,] and a limitless supply of God's love, we offer a starting point on the path to freedom from addiction."; TSA's "rehabilitation programs … heal addiction")); Ex. A to Wang Decl. ISO Opp. to Supp. MSJ, Hill Dep. Tr. Ex. 155 (similar); *id.*, Hill Dep. Tr.107:24-108:18 & Ex. 158 (summarizing Harbor Light Center programs, including chapel where "Salvation Army officers provide spiritual guidance and support that reinforces the recovery and rehabilitation process"); Doc. No. 141-3 (Ex. C to Salazar Decl. ISO PI Mot., Hill Dep. Tr. 99:1-16 ("Q: It doesn't violate Salvation Army's religious beliefs to provide buprenorphine to participants in [the Harbor Light Centers] program, is that correct? A. It's -- under the guidelines of the medical thing, no, because the program is done in conjunction with government funding and government regulation, so we understand that by doing that program and that service, that we have to abide by those guidelines."), 65:5-66:7 (confirming that "[i]f someone is on a particular form of MAT that they've been provided in a correctional facility and want to continue that treatment while participating in the community corrections program, they're allowed to do that"), 67:7-68:21 (TSA's PASS program, which provides homeless services, does not prohibit individuals taking methadone from participating in the program), 72:4-8 (same for TSA's Zelma George Family Shelter), 100:1-101:5 ("Q: Are you aware of any policy of the Harbor Light programs that would prohibit participants from accessing MAT? A. No. We recently changed that over the last year and those program participants can access it if deemed medically appropriate. … Q: And what was the reason for the change? A: It would depend on the program area, but it was driven by government guidelines."), 101:21-102:23 (agreeing that "because of the government guidelines," "it doesn't violate Salvation Army's religious beliefs to allow participants in the community corrections program to access [methadone and Suboxone]")).

Respectfully submitted,

Dated: March 25, 2026          By:    */s/ Matthew J. Murray*

Matthew J. Murray* (CA Bar No. 271461)
Connie K. Chan* (CA Bar No. 284230)
Alice X. Wang* (CA Bar No. 335224)
**ALTSHULER BERZON LLP**
177 Post Street, Suite 300
San Francisco, CA 94108
Phone: (415) 421-7151
Fax: (415) 362-8064
Email: mmurray@altber.com
        cchan@altber.com
        awang@altber.com
*Pro Hac Vice*

Janet Herold (Bar No. 632479)
**Justice Catalyst Law**
40 Rector Street, Floor 9
New York, NY 10006
Main: 518-732-6703
Email: jherold@justicecatalyst.org

36