# EXHIBIT K

# MAT-CAPABLE RECOVERY RESIDENCES:

# HOW STATE POLICYMAKERS CAN ENHANCE AND EXPAND CAPACITY TO ADEQUATELY SUPPORT MEDICATION ASSISTED RECOVERY

NARR
National Alliance for Recovery Residences
Community ▪ Standards ▪ Ethics ▪ Education

# Table of Contents

**Executive Summary** ............ 2
**Key Terms** ............ 3
**Background** ............ 6
Evolving definitions of abstinence and recovery ............ 6
Appropriate Placement within the Housing Support Continuum ............ 7
Civil Rights and Applicant Screening ............ 7
Limited Recovery Residence System Capacity and Underutilization ............ 8
Research Gaps ............ 9
**Feasibility Considerations** ............ 10
Capacity for On-site Oversight and Support ............ 10
Medication Diversion ............ 11
Resident Privacy Policies ............ 11
Working with Prescribers ............ 11
**Recommendations** ............ 13
Assessing Recovery Housing Capacity and Capability ............ 13
Expanding Recovery Housing Capacity and Capability ............ 13
Education and Workforce Development ............ 14
Recovery Housing Research and Evaluation ............ 15
**Conclusion** ............ 15
**References** ............ 16

# Executive Summary

Individuals with opioid use disorders often return from institutions and treatment programs to living environments in the community that promote alcohol and other drug use, putting those in early recovery at risk for relapse. Recovery residences are a vital resource for individuals seeking a supportive housing environment that promotes abstinence-based recovery. Medication-assisted treatment (MAT) is another vital resource needed by many individuals with an opioid use disorder. However, MAT and recovery residences evolved out of separate communities, siloed service delivery systems, and disparate belief systems, which has resulted in a severely limited supply of recovery residences that adequately support persons receiving MAT.

In addition to these philosophical differences, this policy brief will discuss numerous other barriers that contribute to the limited supply of recovery residences that are capable of supporting residents on MAT. Clearer guidance for determining whether an individual with an opioid use disorder (OUD) is appropriate for a recovery residence is needed by states and operators; operators need support with understanding and properly implementing anti-discrimination protections for potential residents, and state agencies need support with understanding recovery housing placement criteria. Few public funding options are available to recovery residences, resulting in a limited supply of this support generally, and of those that are capable of supporting residents on MAT. Protecting resident privacy while also ensuring the safety and well-being of the other residents and staff is also a challenge, especially given the increased risk of on-site diversion for some opioid agonist treatments. Operators have reported that prescribers are unwilling or unable to collaborate or coordinate with them. Due to the variety in staffing and on-site supports, some recovery residences may be better equipped than others to support residents on MAT. Furthermore, the number of recovery residences overall as well as those that are capable of supporting residents on MAT across states is currently unknown. While some residences have begun to implement policies and practices aimed at supporting residents on MAT, a consensus on best practices for supporting residents on MAT during their stay in a recovery residence has not been established.

This policy brief will then present recommendations for how states can focus their efforts to improve recovery housing options that are supportive of recovery for individuals with OUDs. For example, states are encouraged to assess the capacity of recovery residences overall, and of those that are capable of supporting residents on MAT to better understand how well the supply of these supports meets demand. Increasing capacity will require a multi-pronged approach, including working with existing operators who may have varied capability or willingness for supporting residents on MAT, as well as creating new capacity specific to residents on MAT. Workforce development in the form of training and education is critical, both for recovery residence operators and for prescribers in the community who may be working with individuals on MAT who are also living in a recovery residence. Finally, increasing funding for research and evaluation that is aimed at developing evidence-based applicant screening tools and best practices for MAT-capable recovery housing is crucial to better supporting state level efforts to increase access to these vital resources.

As states make decisions about where best to target the recent influx of State Opioid Response dollars, consideration should be made for implementing the solutions laid out in this policy brief. Recovery residences are an important component of the recovery support system, but they are currently underutilized, and in many cases do not meet the demand for MAT-capable recovery housing. Taking a systems-level approach to improving operator capability will more rapidly improve the capacity of MAT-capable recovery residences and, ultimately, enable residents and their families to make informed decisions about a potentially life-saving recovery support service.

# Key Terms

**Medication-Assisted Treatment -** Medication assisted treatment (MAT) refers to three FDA approved and evidence-based pharmacological approaches to treating OUDs: full agonist (e.g., methadone), partial agonist (e.g., buprenorphine), and antagonist (e.g., naltrexone). Each medication works differently in the brain, has different phases of treatment, and has different side effects that are important to consider when deciding which option is best for an individual. For more information, consult with prescribers, counselors, and refer to SAMHSA TIP 63 "Medications to treat opioid use disorder: Clinical guidance for healthcare and addiction professionals, policymakers, patients, and families" (Substance Abuse and Mental Health Services Administration, 2018).

**Recovery** - Recovery is a strengths-based and holistic conceptualization of what it means to be well for individuals with a substance use disorder, including those with an OUD. The Substance Abuse and Mental Health Services Administration (SAMHSA) defines recovery as "a process of change through which individuals improve their health and wellness, live a self-directed life, and strive to reach their full potential" with the support of health, home, purpose, and community (SAMHSA, 2012).

**Recovery capital** - the internal and external resources available to an individual necessary to sustain recovery. Examples of these resources include having a regular source of income, having social support from family and friends, and/or having job or life skills. The quality and density of recovery capital factors influence one's ability to enter and/or sustain progressive recovery (Cloud & Granfield, 2001, 2008).

**Recovery support services** - Recovery support services refer to a broad category of resources that are intended to assist individuals in maintaining recovery. Some examples of such resources include employment support, social support, peer support, mutual aid societies, housing, etc. The recent US Surgeon General's report highlights the importance of including recovery support services as part of a chronic care approach to treating substance use disorders (US Department of Health and Human Services (HHS) Office of the Surgeon General, 2016).

**Social model** - an approach to care that focuses on interrelationship among peers, rather than a top-down relationship between caregiver and patient as is seen in a medical model, and is the foundational characteristic of all recovery residences. Social model programs use robust networks of senior residents, alumni and other peers who share their experiences, model recovery, and offer opportunities for increasing responsibilities and status (Thomasina Borkman, 1982; T Borkman, Kaskutas, Room, Bryan, & Barrows, 1998; Kaskutas, 1999).

**Recovery Residences -** Recovery residences (RR) are one type of recovery support service. RRs adhere to the social model and provide a family-like living environment free from alcohol and illicit drug use, centered on peer support and connections that promote sustained recovery from substance use (Society for Community Research and Action, 2013). They are often called by various names (sober homes, sober livings, recovery homes, recovery residences, Oxford Houses™, and halfway houses). In most states, "recovery housing" refers to the non-clinical portion of the recovery residence continuum. The National Alliance for Recovery Residences (NARR) has emerged as a leader in developing standards for recovery residences and identifies different types of recovery residences that provide various levels of support. Individuals may stabilize their recovery in any level, and authoritative oversight and the availability of on-site peer recovery and/or clinical services vary by level. Each NARR level is distinguished along several different components, e.g., staffing, governance, and the bundle of available supports (see Table 1).

The recovery housing workforce is comprised of different stakeholders:

- **Recovery residence operators**: individuals who own and/or are involved with the daily tasks of running a recovery residence or group of residences, and may (NARR Levels 3 and 4) or may not (NARR Levels 1 and 2) have clinical training

- **House manager**: individuals who assist with the daily tasks of running a recovery residence, may be paid (either in the form of a regular income or through rent-free residence on-site) or unpaid; may (NARR Levels 3 and 4) or may not (NARR Levels 1 and 2) have clinical training
- **Senior residents**: individuals with an extended tenure at a recovery residence and typically assist new residents as they acclimate to living in the recovery residence
- **Residents, peers**: fellow housemates and individuals in recovery who provide either formal or informal peer-to-peer support
- **Community-based recovery support service providers**: individuals working or volunteering in the community to deliver other recovery support services (e.g., recovery coaches, employees of community organizations who may deliver services at a recovery residence, or to residents of recovery residences), some of whom have received clinical or other related training, licensing, or certification although this varies by state
- **Prescribers**: physicians who prescribe medications (e.g., psychotropic medications, medications for general medical conditions, MAT) to residents of recovery residences

Overall, research suggests that recovery residences promote recovery and are cost-effective, however more research is needed to better understand how, and for whom recovery residences are helpful (Reif et al., 2014).

*Table 1. Characteristics of NARR Levels of Support*

| NARR Level | Typical Resident | On-site Staffing | Governance | On-site Supports |
|---|---|---|---|---|
| **Level 1**<br><br>**(e.g., Oxford Houses)** | Self-identifies as in recovery, some long-term, with peer-community accountability | No on-site paid staff, peer to peer support | Democratically run | On-site peer support and off-site mutual support groups and, as needed, outside clinical services |
| **Level 2**<br><br>**(e.g., sober living homes)** | Stable recovery but wish to have a more structured, peer-accountable and supportive living environment | Resident house manager(s) often compensated by free or reduced fees | Residents participate in governance in concert with staff/recovery residence operator | Community/house meetings, peer recovery supports including "buddy systems", outside mutual support groups and clinical services are available and encouraged |
| **Level 3** | Those who wish to have a moderately structured daily schedule and life skills supports | Paid house manager, administrative support, certified peer recovery support service provider | Resident participation varies; senior residents participate in residence management decisions; depending on the state, may be licensed; peer recovery support staff are supervised | Community/house meetings, peer recovery supports including "buddy systems". Linked with mutual support groups and clinical services in the community, peer or professional life skills training on-site, peer recovery support services |
| **Level 4**<br><br>**(e.g., therapeutic community)** | Require clinical oversight or monitoring, stays in these settings are typically briefer than in other levels | Paid, licensed/ credentialed staff and administrative support | Resident participation varies, organization authority hierarchy, clinical supervision | On-site clinical services, on-site mutual support group meetings, life skills training, peer recovery support services |

**MAT-capable recovery residences** - MAT-capable recovery residences are recovery residences that are capable of adequately supporting one or more residents undergoing all forms of MAT while supporting the safety and recovery of other residents and peer staff who may not be undergoing MAT and/or who have had negative experiences on MAT. The distinction is in contrast to an RR that may begrudgingly accept an applicant on MAT under legal guidance or due to economic incentives. MAT-capable recovery residences can use a mixed population approach, meaning both individuals on MAT and those not on MAT are living in the same household, or a MAT-specific approach.

# Background

## Evolving definitions of abstinence and recovery

Traditionally, abstinence was defined as the complete discontinuation of *any* psychoactive substance, including medications that might be used to treat substance use or psychiatric disorders. This definition of abstinence is the primary historical tenet of many mutual aid groups, including many recovery residences. In recent years the concept of what it means to be "abstinent" has evolved. In many cases nicotine products and caffeine are deemed acceptable despite having psychoactive properties. Additionally, as more effective and safe medications have become available to treat psychiatric disorders, the list of acceptable medications has grown. However, medications that could be habit-forming or that have been used in active addiction largely remain prohibited or are frowned upon by many members of mutual aid groups and recovery residences.

What it means to be in recovery has also evolved. Historically, abstinence was the primary measure of whether an individual was in recovery. In 2007 the Betty Ford Center introduced a new definition of recovery: "a voluntarily maintained lifestyle characterized by sobriety, personal health, and citizenship" (Betty Ford, 2007). This definition explicitly identifies sobriety, as defined as "abstinence from alcohol and all other non-prescribed drugs", as essential to, but not the sole component of, recovery (Betty Ford Institute Consensus Panel, 2007). In 2012 SAMHSA further developed this definition to acknowledge the role of health, home, purpose, and community as dimensions of support for recovery (SAMHSA, 2012). Furthermore, the "multiple pathways" concept promotes the idea that recovery can be achieved in many different ways, whether that be through an abstinence-based approach as described above, a moderation approach wherein individuals reduce but do not discontinue use, a harm-reduction approach wherein measures are taken to reduce the harmful effects of substance use without requiring that one moderate or discontinue use, or the use of medications that block or minimize the psychoactive effects of opiates or alcohol on the brain.

For many individuals with an opioid use disorder (OUD), medications such as methadone, buprenorphine, or naltrexone are increasingly used as one pathway to recovery (see Key Terms, "Medication-Assisted Treatment**"** for more information on this recovery pathway). Medication-assisted treatment (MAT) has traditionally been excluded as a recovery support in many recovery residences given the tendency for operators to implement abstinence-based approaches that prohibit the use of psychoactive substances by residents. Recently, however, the concept of MAR "medication-assisted recovery" (the use of medications in combination with abstinence-based recovery) has emerged that blends progressive recovery goals and services, and potentially offers a bridge between the distinct philosophies of abstinence-based and medication-assisted approaches (White & Kurtz, 2005). Many individuals that are associated with mutual aid societies including many recovery residences have begun to transition toward MAR. This transition represents a significant shift in philosophy for those that espoused approaches based on traditional abstinence definitions. It also represents a significant shift in philosophy for those who espoused medication-assisted treatment, who often focused primarily on the discontinuation of the substance for which medications were used without regard for other psychoactive substance use (licit or illicit) that may have co-occurred. Figure 1 illustrates this shift for both philosophies– i.e., in some cases abstinence-based approaches are moving toward allowing the use of medications, and in some cases medication-assisted approaches are moving toward the prohibition of all other psychoactive substances in addition to those that are targeted by the medication.

*Figure 1. Relationship of Recovery Pathways*



## Appropriate Placement within the Housing Support Continuum

The housing support continuum offers supportive living environments that range from harm-reduction housing to alcohol and drug-free living environments, such as recovery residences (see Key Terms, "Recovery Residences"). Harm-reduction housing refers to environments wherein individuals are offered housing that is not contingent on a commitment to abstinence, akin to a moderation-based approach to recovery. "Alcohol and drug-free living environment" refers to recovery housing settings wherein resident tenure is contingent upon complete discontinuation of the use of alcohol and illicit drugs, or an abstinence-based approach.

Not everyone on MAT who are seeking housing support are looking for abstinence-based housing, and this is a key consideration when determining housing options. Figure 1 above depicts how individuals may or may not overlap across these categories. Individuals who are capable of thriving in an abstinence-based environment but do not wish to use medications are appropriate for abstinence-based recovery housing. This is the traditional recovery housing population. People who use MAT divide into two groups:

1. Those who desire and are capable of thriving in an abstinence-based environment (the MAR group)
2. Those who do not desire and are not capable of thriving in an abstinence-based environment (i.e. the MAT but not MAR group).

Whereas harm reduction housing approaches (e.g., Housing First) might be a better option for some undergoing MAT who do not wish to adhere to the requirements of recovery housing, individuals engaged in MAR are more likely to seek the abstinence-based, recovery-oriented focus and peer support of a recovery residence. To adequately support MAR, recovery residence providers will however need to adapt their abstinence-based perceptions, policies, and procedures, and gain a better understanding of available MAT medications. Even with these adaptations, some forms of MAT such as opioid replacement or opioid agonist therapy pose distinct risks and challenges when integrated into abstinence-based recovery housing (discussed below).

## Civil Rights and Applicant Screening

Persons in recovery from substance use disorders meet the civil rights definition of "disabled" under the Americans with Disabilities Act (ADA) and the equivalent definition of "handicapped" under the Fair Housing Amendments Act (FHAA). Together these provide protection from discrimination for persons in recovery when accessing services and housing. Fair housing issues are not a new subject for recovery housing providers. Local government discrimination against recovering individuals in their access to the housing of their choice has been an unfortunate fact of life in many parts of the country for decades.

However, the same laws also govern aspects of an individual's access to services, not just to housing itself. Many recovery housing operators will not consider an applicant for residency who is taking certain prescribed medications, no matter how otherwise suitable and qualified the applicant may be. According to a recent decision, these blanket bans, usually called "categorical exclusions", are discriminatory under the ADA (U.S. Department of Justice, 2018).

Some see denying recovery housing access to an applicant on MAT as discriminatory based on their medication status. Many valid reasons justify why a given applicant, receiving MAT or not, is inappropriate for a given recovery residence. Categorical determinations are permitted to protect certain target populations. All recovery residences require residents to be in recovery from a substance use disorder, but a residence may be further restricted to serving men or women exclusively. Every residence has other admission criteria, which usually include willingness to comply with the residence's requirements, ability to engage in the activities of daily living, and compatibility with the rest of the resident household. A residence may deny residency based on eligibility requirements that are essential to the safety and welfare of the residents and maintenance of the recovery support environment. While an applicant prescribed MAT can be legally denied for these other reasons, categorical exclusions solely based on the MAT prescription violate provisions of

the ADA. For more specific information on this topic consult "Know Your Rights: Rights for Individuals on MAT", a document published by SAMHSA that is available here on the NARR website.

Policy makers should understand some of the challenges encountered by many residence providers and their staff in the screening and acceptance process. Many individuals screening applicants for recovery residences (and most individuals in Level 1 and Level 2 residences) are not trained clinicians. In all Level 1 residences and many other residences, residents themselves assist in determining the suitability of an applicant. Furthermore, no single assessment tool accurately predicts who is or is not a good fit for a recovery residence. This coupled with the variety of recovery residence cultures results in a great deal of variation in determining an applicant's suitability. This variation leads many to conclude that some form of discrimination must be involved. A discussion of additional challenges related to supporting residents on MAT can be found below in **Feasibility Considerations.**

**NARR (2015) Position Statement addressing Medication-assisted Treatment**

- Medication-assisted treatment (MAT) is one of many viable recovery tools. Research shows MAT with other recovery support services improves engagement and outcomes.
- Recovery residence owners/operators cannot legally deny admission solely on the basis of an applicant's current use of physician-prescribed medications. See Know your rights: Rights for individuals on medication-assisted treatment (2009)
- Recovery residences may decline referrals of individuals who use certain medications because the recovery residence does not provide pertinent staff or services. In those cases, referrals should be made to available alternatives.
- Consistent with a recently-approved NARR standard, recovery residences are required to maintain a supply of naloxone and ensure staff are trained periodically in overdose reversal procedures.
- Based on the NARR Standard, certified recovery residences maintain accommodations for residents that are consistent with the residence population. See Item #25, The NARR Standard (2015, revised 2017).

## Limited Recovery Residence System Capacity and Underutilization

Currently there is no comprehensive capacity assessment of the supply of and demand for recovery residences broadly, or of those that are MAT-capable. Anecdotal reports suggest, however, that the current supply does not meet the demand for recovery housing generally, or the demand for MAT-capable recovery housing. Without an adequate supply of this recovery support service, individuals with OUDs will not have the freedom to choose the recovery pathway that is best for them. Self-determination and self-direction are the foundations of recovery as individuals define their life goals and design unique combinations of paths towards those goals. Recovery residences reflect the culture of the local recovery communities that support them, which historically have been predominantly abstinence-based 12-Step and faith-based communities (Majer et al., 2018). Therefore, individual choice is based on a complex mixture of cultural values, socioeconomic status, psychological and behavioral needs, constrained choices, and resilience.

The US Department of Housing and Urban Development advocates for housing choice and identifies recovery housing as an important option for persons who choose abstinence-based recovery (US Department of Housing and Urban Development, 2015). True choice must include the ability for individuals to afford the supports they desire to receive. Unlike other types of recovery support services that are supported through state block grants (e.g., recovery coaches, recovery centers), most recovery residences are not eligible for these funding streams and thus are self-financed

through resident fees and charitable donations. This makes it challenging for operators to sustain substantial improvements to physical structures or to provide additional supports on-site. In some cases, the very nature of the setting may inhibit effective support. For example, resident fees for the vast majority of sober homes in the country require that residents be employed, and operators must strike a balance between what supports they can afford based on the income they receive from resident fees.

Some state and local governments have instituted financial assistance for recovery residences. For example, over the last 20 years the City of Philadelphia has funded a small number of recovery residences that meet certain operational requirements. The State of Ohio allocated $20 million over two years of general revenue funding toward recovery housing capital costs, plus $5 million toward operating costs. Ohio also allocated 21st Century Cures Act funding toward recovery housing that has the capacity to support residents on MAT. Texas provides funding to the Oxford House organization to increase the number of outreach workers and to deliver MAT workforce development training. Missouri directed a small portion of their State Targeted Response Grant (STR) funding to help finance recovery housing that is both NARR certified and deemed to be "MAT-friendly" via an operator survey.

While the need for MAT-capable recovery housing grows, few resources have been invested in codifying best practices for a MAR approach. The number of recovery residences that have the capacity *and competence* to offer individuals on MAT the supports that are often necessary for their success is unknown.

## Research Gaps

Research evidence has established MAT as an evidence-based approach to treating OUD. While the research field acknowledges the growing evidence base for recovery residences, more research is needed to establish how and for whom recovery residences are helpful. Furthermore, there is little research on the intersection of MAT and RRs. Federal and state policies that require existing abstinence-based recovery housing to integrate persons on opioid replacement therapy are not based on research or the application of integrated evidence-based practices. Emerging research suggests that individuals on MAT often voluntarily discontinue their medication upon moving into recovery homes (Majer et al., 2018). Moreover, no known studies have evaluated the effect of a new resident using MAT on roommates or housemates who have chosen to not be on MAT, especially the effect on those who were addicted to MAT drugs and/or who previously diverted their medications. Anecdotal reports by recovery housing providers who have new residents on Vivitrol and others whose residents are titrating off Suboxone as part of a detox protocol are mixed with some reporting success, while others report challenges and compelling concerns about mixing MAT and non-MAT residents in the same recovery home.

*Implementation Success Story*

**Missouri and the Missouri Coalition of Recovery Support Providers**

The Missouri Department of Mental Health, Division of Alcohol and Drug Abuse recently began offering financial support for NARR-certified recovery residences using State Targeted Response to the Opiate Crisis funding. Eligibility for the funding is based on a SSA-developed survey inquiring as to degree to which operators support residents on MAT. Operators whose responses indicate that they are not supportive of individuals on MAT do not qualify for funding.

# Feasibility Considerations

## Capacity for On-site Oversight and Support

> *"I would also add peers that had experience with MAT because I think we hire these peers and case managers because of their personal experience… I would definitely ramp up on the peers who have the same experience as the population we're trying to serve."*
> *-- Recovery Residence Operator*

Today, recovery housing operators are beginning to develop protocols for supporting residents who may be on MAT. This represents a significant shift in previous operating procedures that may have been inadequate or inappropriate for assisting this population. Often this transition occurs through a process that includes self-reflection and education on MAT in discussions among staff, residents, and MAT recovery community stakeholders.

Just as there is not one singular pathway to recovery, different types of recovery residences are appropriate for different people. Each type of recovery residence has unique characteristics that affect its ability to support individuals with varying degrees of symptom severity or need for support. For example, NARR Level 1 democratically elects peer officers, e.g., House President and Treasurer, while NARR Levels 3 and 4 utilize credentialed and supervised staff. Similarly, while NARR Level 3 offers staff-delivered supportive services (e.g., recovery coaching, transportation or medication supervision) and life skills development (e.g., job readiness, budgeting or parenting classes), NARR Level 2 encourages residents to participate in off-site mutual support groups or engage in off-site clinical services when appropriate. Individuals with OUDs who wish to utilize MAT while residing in a recovery residence may require degrees of oversight and support that differ from an individual who is not utilizing MAT. Managing this population in a recovery residence may in and of itself bring added financial and logistic challenges. For example:

- **Staff capacity to monitor medications**: *"If I had the staffing to watch every guy take his medication every day I wouldn't have any problems with any of it, personally, but I don't have that kind of staffing. I'm a very small operation there's just two of us here, on the weekends it's just one guy."*
- **Concern for the safety of residents and staff**: *"I think we're on the right track, I'm very supportive of medication assisted treatment in any form if it helps somebody, it just comes down to the day to day, how do we handle it so we don't have a drug that can give a high to some people floating around the house and people misusing it."*
- **Access to naloxone**: *"In some places it is cost-prohibitive [to obtain naloxone], there is no state distributor readily available, it's very hard to get, and when we do get it, it is in a needle form and really our residences need either the Evzio with the box that has the tutorial in it or the Narcan spray..."*

To a certain extent all levels are capable of assessing medication compliance via regular, random drug testing. For example, point-of-care tests are available that differentiate buprenorphine and methadone from other opioids. Table 2 provides a brief description of the staffing capacity of each NARR level to address the needs of individuals on MAT on-site:

*Table 2. NARR Levels and Provision of On-site Monitoring*

| ***NARR Level*** | ***Provision of On-site Monitoring*** |
|---|---|
| ***Level 1*** | No on-site paid staff, peer-support is available during non-working hours as most residents are employed and away from the residence during the day |
| ***Level 2*** | Few, if any, paid staff to provide the oversight necessary for some individuals taking MAT medications on-site |
| ***Level 3*** | Paid staff and an organizational structure that can facilitate appropriate oversight for individuals using some forms of MAT and/or who are in early recovery via MAT |
| ***Level 4*** | Staffing levels that can easily provide the appropriate oversight for individuals newly on MAT |

## Medication Diversion

Full and partial agonist medications are particularly prone to diversion due to their mechanism of action in the brain (Maxwell & McCance-Katz, 2010). Diversion in this case refers to the illicit misuse of pharmacotherapy prescribed by a licensed provider for the treatment of an OUD. This is a growing concern and is evidenced by the increase in emergency room visits due to misuse of buprenorphine (Crane, 2015). In addition to their psychoactive properties (Bazazi, Yokell, Fu, Rich, & Zaller, 2011), other reasons for diversion include difficulty legally accessing these medications (Fox, Chamberlain, Sohler, Frost, & Cunningham, 2015) and the potential to be a source of income (Lofwall & Walsh, 2014).

In a recovery residence, diversion, dependence, and the addictive qualities of full or partial-agonist medications are a serious concern. When misuse of these medications occurs the residents' and staff's sense of safety and community are at risk. SAMHSA (2018) guidelines suggest that the diversion risk is lower when administered in settings where direct observation of medications occurs. For many recovery residences, however, monitored administration of these medications presents a challenge given existing staffing characteristics.

## Resident Privacy Policies

Another consideration when developing MAT-capable recovery housing regulation is the challenge this presents for resident privacy. Preventing and managing potential diversion of medications may require sharing personal information among the residents who are accountable to one another. While 42 CFR and the Health Insurance Portability and Accountability Act (HIPAA) do not apply to recovery residences that do not provide treatment (except under specific circumstances, e.g., requirements of external funders), there is an expectation that resident medical records be kept private by residence operators. The NARR Standard requires protections of resident privacy through "policies and procedures that keep resident's records secure, with access limited to authorized staff", and "policies and procedures that comply with applicable confidentiality laws." Residents may authorize service providers or other persons to receive their protected information via a delimited "consent to release information" form that is signed, witnessed, and stored in the resident's individual file.

*Implementation Success Story*

**Central City Concern, Portland, OR**

The housing program has evolved to support of residents on MAT across the care continuum. While CCC had years of experience with their supportive housing residents using methadone, recently integrating with a federally-qualified health center (FQHC) enabled them to offer buprenorphine to outpatient clients. FQHC prescribers observed that many clients in this population were also in need of housing support. This led to the development and implementation of a protocol wherein individuals in OP and receiving buprenorphine could also receive transitional housing support.

## Working with Prescribers

Coordinated information sharing with prescribers is essential to the success of residents on MAT. While MAT-capable recovery residence operators value building relationships with their residents' prescribers, many physicians feel unprepared to support the needs of this population (Keller et al., 2012; Wakeman, Baggett, Pham-Kanter, & Campbell, 2013). Continued education regarding the management of patients on MAT is vital for primary care physicians and recovery residence staff, alike. As one recovery housing operator stated, "*not all prescribers want to be in dialogue with*

*us… our hope is that the longer we're doing this the more they see us as partners…*". This relationship is especially important because of the challenges of establishing appropriate doses and protecting against diversion or drug-seeking behavior: "*We want to make sure that the person's not going in and just saying 'I think I need more meds', that it's a conversation with staff and their prescriber and that everyone's kind of on the same page*"; "*there is a role for sharing information with the resident and the provider about the behavioral signs of whether or not dosage is adequate or appropriate.*" It is also important for prescribers to understand the impact of certain medications and medication interactions on their patients' recovery.

# Recommendations

## Assessing Recovery Housing Capacity and Capability

The number of individuals in the United States that use and/or could benefit from recovery housing, including those who also receive MAT, is unknown. Therefore, assessing the current recovery housing capacity and quality is essential to developing and implementing successful policies that support ongoing quality and outcome improvement. States should support resources that assist systems responsible for referring individuals to recovery housing to understand what recovery residence are, and the circumstances under which an individual is or is not a good fit for such a setting.

**Recommendation:** *Conduct and publish the results of environmental scans of recovery housing capacity at the state level, including assessments of:*

- *the capacity of certified and non-certified recovery housing,*
- *the characteristics of currently served populations including individuals that are currently served overall, and those on MAT,*
- *geographical distribution, costs and accessibility*
- *the quality of recovery housing options*

**Recommendation:** *Compile a comprehensive database (?) that describes all of the available housing supports, and provides details on the abstinence culture and requirements for engaging with associated recovery supports as well as other pertinent information for potential referees to make informed decisions.*

**Recommendation:** *Improve the capability for conducting recovery capital assessments to assist clinicians and peer recovery support service providers along with research on matching services, including recovery housing and individual supports, on an individual basis including MAT.*

➢ Examples of assessment tools: the Assessment of Recovery Capital scale (Groshkova, Best, & White, 2013), its ten-question variant the BARC-10 (Vilsaint et al., 2017), or the Substance Use Recovery Evaluator (SURE) (Neale et al., 2016).

**Recommendation:** *Fund efforts to measure self-assessed, strengths-based recovery processes that short- and long-term comparisons of MAT and non-MAT outcomes, using previously-validated measures that focus on recovery capital and WHO Quality of Life metrics***.**

**Recommendation:** *Develop recovery housing tools for assessing suitability for recovery housing that help answer efficiency, effectiveness and matching questions such as: "Is recovery housing right for me?", and "What type of recovery housing setting is right for me?", and "Where is an appropriate bed available?"*

➢ For example, Rhode Island's "942-Stop" hotline enables callers to speak with clinicians who can assess the individual's clinical and non-clinical support needs, including whether recovery housing is appropriate.

## Expanding Recovery Housing Capacity and Capability

Offering choice is crucial. Relatively few dollars have been allocated towards recovery housing expansion. Funding the development of new MAT recovery housing can parallel incentives for existing abstinence-based recovery housing stock to become MAT capable. Additionally, recovery residences that support residents on MAT are met with upfront costs (e.g., lock boxes, safes, transportation to/from MAT providers) that can be prohibitive for smaller operators. Similarly, the rising cost of naloxone may also prove to be prohibitive particularly for smaller operators.

**Recommendation:** *Fund pilot programs for the development of recovery residences that are supportive of residents on MAT, either that are of mixed population or MAT-specific.*

**Recommendation:** *Assist existing recovery housing operators with the upfront costs related to increasing their capability for supporting residents on MAT*

**Recommendation:** *Assess both the willingness and capability of recovery housing stock to support residents on MAT.*

- For example, the Missouri Department of Mental Health developed a survey assessing willingness to support individuals on MAT that is administered to all recovery housing operators applying for state funding. Beyond attitudes a survey should be developed which accurately accounts for the competencies needed to support individuals on MAT in a recovery housing setting.

**Recommendation:** *Increase access to affordable naloxone and training in overdose prevention for residents and operators.*

**Recommendation:** *Expand MAR housing vouchers to NARR Level 3 recovery residences in addition to what may already be available for Levels I and II given their suitability* for MAT participants who are new to recovery or who have less recovery capital

**Recommendation**: *Fund NARR Affiliates to 1) help place/link consumers in/with recovery residences that are supportive of persons undergoing MAT 2) certify recovery residences that meet best practices including those who have demonstrated proficiency are supporting person on MAT 3) maintain a grievance process to promote consumer rights and 4) act as liaison between MAT prescribers and recovery residence providers*.

**Recommendation**: *Education and tools around screening applicants in accordance with fair housing and ADA; including guidance around reasonable accommodations process*.

## Education and Workforce Development

The current workforce (see Key Terms, "*Recovery Residences*" for more detail on who comprises the recovery residence workforce) is insufficient and lacks proficiencies needed to meet the needs of individuals on MAT who wish to use recovery housing. Even if an operator is willing, they may not be equipped with the strategies and resources needed to support individuals on MAT, and many prescribers do not feel equipped to support this population. Therefore, it is critical to increase both the willingness of operators as well as their capability for supporting residents on MAT. Furthermore, prescribers and clinicians lack necessary processes and tools that would facilitate partnerships to coordinate resources. Facilitating training and cross-system dialogue will improve this coordination.

**Recommendation:** *Engage with NARR Affiliates and recovery housing operators and offer opportunities for learning about MAT, the benefits, challenges and best practices and their capability for supporting residents on MAT.*

**Recommendation:** *Develop and deliver curricula to promote the transition from MAT-ambivalent to MAT-capable*

- For example, recovery housing endorsements for Managers, Supervisors, Coaches, MAT specialists, etc.

**Recommendation:** *Develop and deliver training/toolkit for operators, providers/prescribers in best practices for recovery housing operation generally, and for MAT resident support specifically*

**Recommendation:** *Develop and disseminate a Housing Choice resource for consumers and advocates to understand various housing options and how to assess which one is the best fit*

**Recommendation:** *Incentivize collaboration and shared learning between MAT prescribers and recovery residences providers and individuals with lived experience*

## Recovery Housing Research and Evaluation

The evidence base for recovery residences is promising but limited. Additional research is needed to better understand whether, how, and for whom recovery residences are effective, including for individuals on MAT. Existing policies and practices should be evaluated for the purposes of identifying best practices.

**Recommendation:** *Fund research that examines recovery housing outcomes generally, and comparative outcomes based on individual characteristics of residents and recovery housing characteristics*

- For example, Texas is using SOR dollars to fund and evaluate outcomes in a small number of pilot houses

**Recommendation:** *Evaluate policies and practices that support residents on MAT to identify and disseminate best practices*

# Conclusion

Due to their philosophical roots in abstinence-based recovery, recovery residences historically have prohibited the use of psychoactive substances on-site including medications for OUDs. Recent changes in this philosophy both for abstinence-based and medication-assisted approaches are promising, opening the door to recovery housing for individuals using MAT. Engaging with operators and increasing financial and other support is crucial for the continued development of MAT-capable recovery houses. More information is needed to better understand the supply and demand for such an option. Additionally, workforce development opportunities for both operators and prescribers will enhance capacity across systems to address the needs of individuals on MAT who also seek recovery housing support. States are encouraged to implement the recommendations outlined in this policy brief, all of which are aimed at improving patient choice for this vital recovery support.

## Acknowledgements

This product was supported in part by requisition number SAM200916 from the Substance Abuse and Mental Health Services Administration (SAMHSA). The content of this publication does not necessarily reflect the views or polices of SAMHSA or the U.S. Department of Health and Human Services (HHS). The authors would like to express their gratitude to Matthew Clune at SAMHSA for his guidance and support, and Sharon Amatetti at SAMHSA for providing comments and feedback on an earlier draft. Numerous recovery residence operators offered their expertise and insights on this topic including participants of the 2017 NARR Best Practices Summit in Chicago, as well as Beth Fisher-Sanders, Sharon Fitzgerald, Ron Luce, Joe McNally, and Alan Muia. Representatives of key stakeholder groups also lent their expertise: William White and Jackson Longan, as well as representatives of state agencies including Ray Caesar (OK), Alexandra Duello (MO), Linda Mahoney (RI), Jenna Neasbitt (TX), Cassandra Price (GA), and Mark Shields (MO).

# References

Bazazi, A. R., Yokell, M., Fu, J. J., Rich, J. D., & Zaller, N. D. (2011). Illicit use of buprenorphine/naloxone among injecting and noninjecting opioid users. *Journal of Addiction Medicine, 5*(3), 175.

Betty Ford Institute Consensus Panel. (2007). What is recovery? A working definition from the Betty Ford Institute. *Journal of substance abuse treatment, 33*(3), 221.

Borkman, T. (1982). *A social-experiential model in programs for alcoholism recovery: A research report on a new treatment design*: US Department of Health and Human Services, Public Health Service, Alcohol, Drug Abuse, and Mental Health Administration, National Institute on Alcohol Abuse and Alcoholism.

Borkman, T., Kaskutas, L. A., Room, J., Bryan, K., & Barrows, D. (1998). An historical and developmental analysis of social model programs. *Journal of substance abuse treatment, 15*(1), 7-17.

Cloud, W., & Granfield, R. (2001). Natural recovery from substance dependency: Lessons for treatment providers. *Journal of Social Work Practice in the Addictions, 1*(1), 83-104.

Cloud, W., & Granfield, R. (2008). Conceptualizing recovery capital: Expansion of a theoretical construct. *Substance use & misuse, 43*(12-13), 1971-1986.

Crane, E. (2015). The CBHSQ report: emergency department visits involving narcotic pain relievers. *Substance Abuse and Mental Health Services Administration, Center for Behavioral Health Statistics and Quality: Rockville, MD*.

Fox, A. D., Chamberlain, A., Sohler, N. L., Frost, T., & Cunningham, C. O. (2015). Illicit buprenorphine use, interest in and access to buprenorphine treatment among syringe exchange participants. *Journal of substance abuse treatment, 48*(1), 112-116.

Groshkova, T., Best, D., & White, W. (2013). The assessment of recovery capital: Properties and psychometrics of a measure of addiction recovery strengths. *Drug and alcohol review, 32*(2), 187-194.

Kaskutas, L. (1999). The social model approach to substance abuse recovery: A program of research and evaluation. *Rockville, MD: Center for Substance Abuse Treatment*.

Keller, C. E., Ashrafioun, L., Neumann, A. M., Van Klein, J., Fox, C. H., & Blondell, R. D. (2012). Practices, perceptions, and concerns of primary care physicians about opioid dependence associated with the treatment of chronic pain. *Substance Abuse, 33*(2), 103-113.

Lofwall, M. R., & Walsh, S. L. (2014). A review of buprenorphine diversion and misuse: the current evidence base and experiences from around the world. *Journal of Addiction Medicine, 8*(5), 315.

Majer, J. M., Beasley, C., Stecker, E., Bobak, T. J., Norris, J., Nguyen, H. M., . . . Wiedbusch, E. (2018). Oxford House residents' attitudes toward medication assisted treatment use in fellow residents. *Community mental health journal*, 1-7.

Maxwell, J. C., & McCance-Katz, E. F. (2010). Indicators of buprenorphine and methadone use and abuse: what do we know? *The American journal on addictions, 19*(1), 73-88.

Neale, J., Vitoratou, S., Finch, E., Lennon, P., Mitcheson, L., Panebianco, D., . . . Marsden, J. (2016). Development and validation of 'SURE': A patient reported outcome measure (PROM) for recovery from drug and alcohol dependence. *Drug & Alcohol Dependence, 165*, 159-167.

Reif, S., George, P., Braude, L., Dougherty, R. H., Daniels, A. S., Ghose, S. S., & Delphin-Rittmon, M. E. (2014). Recovery housing: assessing the evidence. *Psychiatric Services, 65*(3), 295-300.

SAMHSA. (2012). *Working Definition of Recovery: 10 Guiding Principles*. (PEP12-RECDEF). Rockville, MD.

Society for Community Research and Action. (2013). The Role of Recovery Residences in Promoting Long-Term Addiction Recovery. *American Journal of Community Psychology, 52*(3), 406-411. doi:10.1007/s10464-013-9602-6

Substance Abuse and Mental Health Services Administration. (2018). *TIP 63: Medications to treat opioid use disorder*. ((SMA) 18-5063). Washington, DC Retrieved from https://store.samhsa.gov/shin/content/SMA13-3992/SMA13-3992.pdf.

Settlement agreement between the United States of America and Charlwell Operating, LLC, USAO#2018CV00025 & DJ# 202-36-306 C.F.R. (2018).

US Department of Health and Human Services (HHS) Office of the Surgeon General. (2016). *Facing addiction in America: The Surgeon General's report on alcohol, drugs, and health*. Washington, DC.

US Department of Housing and Urban Development. (2015). *Recovery housing policy brief*. Washington, DC.

Vilsaint, C. L., Kelly, J. F., Bergman, B. G., Groshkova, T., Best, D., & White, W. (2017). Development and validation of a Brief Assessment of Recovery Capital (BARC-10) for alcohol and drug use disorder. *Drug & Alcohol Dependence, 177*, 71-76.

Wakeman, S. E., Baggett, M. V., Pham-Kanter, G., & Campbell, E. G. (2013). Internal medicine residents' training in substance use disorders: a survey of the quality of instruction and residents' self-perceived preparedness to diagnose and treat addiction. *Substance Abuse, 34*(4), 363-370.

White, W., & Kurtz, E. (2005). The varieties of recovery experience: A primer for addiction treatment professionals and recovery advocates. *International Journal of Self Help and Self Care, 3*(1/2), 21.