# EXHIBIT O

Received: 7 January 2025 | Accepted: 7 July 2025

DOI: 10.1111/add.70170

RESEARCH REPORT

ADDICTION SSA

# Potential health impacts of comprehensive access to opioid use disorder treatment in United States correctional facilities: A synthetic analysis

Jake J. Smith[1] | Margaret Noonan[1] | Christian E. Johnson[1] | Keith Humphreys[1,2,3] | Rahul Gupta[1]

[1]White House Office of National Drug Control Policy, Washington, DC, USA

[2]US Department of Veterans Affairs, Menlo Park, California, USA

[3]Department of Psychiatry, Stanford University, Palo Alto, California, USA

**Correspondence**
Christian Johnson, White House Office of National Drug Control Policy 1800 G Street NW, Ninth Floor, Washington, DC 20006, USA.
Email: christian.e.johnson@ondcp.eop.gov

**Funding information**
This work was fully funded by the salaries of employees and detailees who, at the time the study was conducted, worked for the White House Office of National Drug Control Policy.

## Abstract

**Background and aims:** Providing comprehensive access to medications for opioid use disorder (MOUD) for people transitioning from United States (US) jails and prisons is important to addressing the substance use disorder (SUD) epidemic. Such policies have augmented public health in other countries, but a precise estimate of its potential impact in the US is lacking. This study sought to estimate: (1) the annual number of opioid overdose deaths (OODs) among individuals released from US jails and prisons, and (2) the number of OODs preventable by providing comprehensive MOUD programs in carceral settings and linkage to care post-release.

**Methods:** Nationally weighted synthetic estimates of opioid overdose mortality incidence rates among people released from US jails and prisons in a given year were calculated using mortality rates obtained from published studies. Previously published mortality rates were adjusted, using state-year multipliers, to account for temporal variation among study cohorts. Adjusted rates were weighted and combined to produce synthetic national estimates, then rescaled to reflect national OOD patterns from 2017 to 2022. These rescaled mortality rates were then applied to US jail and prison release statistics to estimate the annual number of OODs among the recently incarcerated. Estimates of MOUD efficacy 12 months post-release were used to estimate the number of potential lives saved through expanded MOUD access.

**Results:** We estimate that 21,784 people [95% synthetic confidence interval (SCI) 18,425 to 25,142] released from US jails and prisons in 2022 died from opioid overdose that year, constituting 27% of annual OODs nationwide. If all jails and prisons provided SUD screening upon entry, MOUD while incarcerated and linkage to care upon release, we estimate that 13,288 OODs (95% SCI 11,239 to 15,337), or 16% of the national total, may have been prevented in 2022.

**Conclusions:** Approximately 27% of opioid overdose deaths in the United States in 2022 occurred among individuals recently released from carceral settings. Expanding access to medications for opioid use disorder to people in custody and those recently released could potentially prevent a substantial portion of opioid overdose deaths in the United States.

Jake J. Smith, Margaret Noonan, Keith Humphreys and Rahul Gupta are no longer with ONDCP, but were at the time the study was conducted in 2024.

Published 2025. This article is a U.S. Government work and is in the public domain in the USA.

13600443, 2026, 1, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/add.70170 by Brendan Saloner - NASA Shared Services Center (NSSC), Wiley Online Library on [01/03/2026]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

**KEYWORDS**
opioid overdose, jails, prisons, formerly incarcerated, in custody, MOUD, linkage to care, prevalence study

## INTRODUCTION

In 2022, more than 81 000 Americans died of an opioid overdose, an increase of 76% since 2018 [1]. To address this epidemic, it is important to prioritize expanded access to evidence-based treatment for populations at greatest risk of substance use disorder (SUD) and overdose death. This includes the more than 1.8 million people who are in custody [2, 3], approximately half of whom are estimated to have a drug use disorder [4, 5]. A related population of concern are people transitioning from correctional facilities into the community. In the first two weeks after release, these individuals have a drug-related mortality risk that is 27 times as high as the general population [6], because of the loss of opioid tolerance during incarceration as well as other factors [7, 8].

The United States (US) Food and Drug Administration has approved three medications for the treatment of opioid use disorder (OUD): methadone, buprenorphine and naltrexone. Comparative effectiveness research has found these treatments to be associated with reductions in overdose and other serious opioid-related events compared to other treatment modalities [9, 10]. Yet as of 2019, less than a quarter of local jail jurisdictions report initiating (19.2%) or continuing (23.5%) medications for opioid use disorder (MOUD) during incarceration, and less than a third of jails (27.9%) report linking people with OUD to MOUD in the community on release [11]. Additionally, as of June 2019, fewer than 1% of people in local jails were receiving MOUD, despite the fact that MOUD is associated with a number of benefits for people exiting correctional facilities, such as lower rates of illicit opioid use, fewer fatal and nonfatal overdoses, higher adherence to treatment, lower rates of re-incarceration and greater employment outcomes post-incarceration [12,13].

Given the high prevalence of OUD in jails and prisons, the benefits of MOUD and the current lack of access to MOUD treatment in carceral settings, expanding access to MOUD among people in custody and those recently released from jails and prisons has been proposed by many policymakers. Key principles of these treatment programs include screening all people admitted to jails and prisons for OUD and other SUDs on entry using a validated screening and assessment tool, initiating or continuing treatment (including access to MOUD) while incarcerated and connecting people with treatment and overdose prevention services in their community post-release. Transition plans should be established for people before release to ensure a smooth transition to treatment in the community. These plans could include establishing partnerships with treatment providers in the community, helping arrange appointments with treatment providers, hiring peer support specialists to help navigate the treatment system, offering a take-home supply of MOUD to bridge the treatment gap and ensuring people are enrolled in insurance before re-entry [14].

The First Step Act, signed into law in 2018, required the Federal Bureau of Prisons to provide a plan to expand access to evidence-based treatment to prisoners with opioid abuse problems (including MOUD) [15]. Although treatment services during incarceration have not historically been covered by Medicaid, in April 2023 the Centers for Medicare and Medicaid Services began allowing states to apply for '1115 waivers' that would permit state Medicaid systems to cover SUD services for people in custody in the weeks before their release [16]. Section 1115 of the Social Security Act allows states to design and evaluate new pilot projects to deliver and pay for health care services in the Medicaid system. As of August 2024, 11 states have received such waivers and 12 more states and the District of Columbia have applications pending [17]. Through other funding mechanisms, Massachusetts and Rhode Island have also initiated novel approaches to increase MOUD access in carceral settings and facilitate the continuation of MOUD in the community on release [18–20]. However, the potential effects of such policies are not well quantified, as the number of annual post-release opioid overdose deaths (OODs) in the United States is not presently known. We are aware of only one study that has attempted to estimate the impact of expanding MOUD access on post-release opioid mortality at a national level. Using Monte Carlo simulations, Macmadu *et al.* estimated 4400 lives (or 10% of all OODs) would have been saved nationally in 2016 if all people with OUD had received MOUD while in custody and were retained in treatment post-release [21]. However, recent trends in both incarceration (that has fluctuated substantially since 2016) and potency of the illicit opioid supply (that has been rising) have likely rendered these estimates obsolete. Updated estimates would allow policymakers at county, city, state and federal levels to better assess the societal impact of expanding MOUD among people recently released from jails and prisons.

This study provides synthetic estimates of the annual number of OODs occurring among individuals released from US jails and prisons and of the total number of potential deaths preventable by comprehensive MOUD programs and linkage to care on release, among those released in 2017 to 2022.

## METHODS

### Identification of relevant post-release mortality studies

Obtaining an accurate estimate of post-release mortality requires identifying studies that are comparable in terms of: (1) outcomes measured, because mortality can be quantified in different ways; (2) recency, because the scale of OODs has precipitously increased in recent years; (3) exposure period, because mortality incidence varies with time post-release; and (4) release population characteristics, to ensure generalizability. Correspondingly, studies were included in our synthetic analysis if they met the following criteria: (1) individual-level overdose mortality incidence rate, in deaths per person-year (i.e. the




**FIGURE 1** Identification of relevant publications.

probability that the average member of the study population dies from opioid overdose if observed for 1 year) could be determined (further discussion of this criterion can be found in the Supporting Information); (2) some subset of the analysis cohort was released no earlier than 2013; (3) overdose mortality outcomes were assessed for a 12-month exposure period (prospectively or retrospectively); (4) the analysis cohort consisted of releases from US jails or prisons; and (5) the analysis was not limited to a specific subgroup (e.g. veterans, people with OUD, people receiving MOUD).

We systematically reviewed prior literature for studies that met these criteria. First, all references included in a recently published scoping review of post-release drug-related deaths were reviewed individually [6]. Additional citations were identified using the National Library of Medicine PubMed database, searching abstracts of articles published in scholarly journals since 2014 using the query: (jail OR prison OR carceral) AND (postrelease OR post-release OR release OR reentry OR decarcera*) AND ((overdose OR drug) AND (death OR mortalit* OR fatal* OR poisoning OR risk)).

In total, this strategy yielded 545 publications; after deduplication, this was reduced to 462. Of the 462 unique publications, 422 were eliminated following title/abstract review. Of the remaining 40 publications, two did not track releases in the United States, six limited analyses to a particular subgroup, 17 did not provide mortality outcomes for a 12-month exposure period, eight did not allow for calculating deaths per person-year, one was a meta-analysis and one was the scoping review described above. Additionally, three studies analyzed the same cohort of releases from North Carolina, and to avoid double-counting findings from that cohort, only the most recent analysis was included. Figure 1 summarizes the selection process.

OOD mortality incidence rates were determined from the three publications that met all criteria. Ranapurwala *et al*. [22] provided separate mortality incidence rates in North Carolina for release cohorts by year, and in the interest of recency, the average rate from the most recent three years (2016–2018) was used. Larochelle *et al*. [23] provided mortality incidence rates in a 12-month exposure window for a 2014 cohort of people released from state prison or county jail in Massachusetts. Klemperer *et al*. [24] compared fatal overdose outcomes before and after MOUD implementation in Vermont's state carceral system. An incidence rate was calculated using outcomes reported from the pre-MOUD period only.

## Incidence rates and CI

Ranapurwala *et al*. [22] estimated a 12-month OOD mortality incidence rate of 359 deaths per 100 000 person-years (95% CI = 314–404). Larochelle *et al*. [23] estimated a mortality incidence rate of 858 deaths per 100 000 person-years (95% CI = 708.8–1007.1) and data from Klemperer *et al*. [24] indicate a mortality incidence rate of 700 deaths per 100 000 person-years (95% CI = 456.4–943.6). The latter two studies did not directly provide SEs or CIs for these estimates, but both included sufficient data about the sample such that standard errors could be calculated (see Table S1).

For all three studies, the lower and upper bounds of the CI were subjected to the same adjustments for cohort year and cohort state as the primary estimates, and were then synthesized in the same fashion as the primary estimates. We refer to these time-adjusted and synthesized bounds as '95% synthetic confidence intervals (SCIs)'.

## Adjusting and synthesizing mortality incidence rates

Given the precipitous rise in OODs over the last decade across the United States and the wide distribution of overdose rates from state

13600443, 2026, 1, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/add.70170 by Brendan Saloner - NASA Shared Services Center (NSSC), Wiley Online Library on [01/03/2026]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Case 1:21-cv-10806-LTS Document 308-15 Filed 03/25/26 Page 5 of 10


to state, it is critical to carefully account for the time and geographic context in which the included studies were conducted. This will ensure that any differences we observe across studies are not simply a consequence of the year the study was conducted. For each of the three studies included, opioid overdose mortality rates and 95% CI bounds were, therefore, adjusted to account for differences in the cohort year(s) and for year-to-year changes in overdose mortality rates in the state analyzed. A state-year multiplier, $X_T$, was calculated for each year $T \in \{2017, 2018, 2019, 2020, 2021\}$ using the formula:

$$X_T = \frac{r_{S,T}}{r_{S,Y_M}}, \quad (1)$$

where $r_s$ is the age-adjusted general population opioid overdose mortality rate for the state, $S$, in which the study was conducted [1]. The multiplier $X_T$ is the ratio of this rate in year $T$, to this rate in $Y_M$, the median year(s) that the study cohort was released from prison or jail (see Table S2). Adjusting raw post-release overdose mortality rates by this multiplier yields time-adjusted rates and CIs for each year of analysis, which can then be synthesized.

Time-adjusted rates from the three studies were synthesized by weighting by the combined jail and prison population of each state in 2018 (the most recent year for which these data were available) [25]. As a sensitivity analysis, we also synthesized overdose rates using three alternative sets of weights: state resident population, state prison population and state prison releases (see Table S3). Sensitivity analysis results are provided in the Supporting Information (see Tables S4–S6).

The three included studies were conducted in states with above-average opioid overdose mortality rates. To ensure that the synthetic weighted rate is representative of the entire country, rather than just these specific states, the weighted synthetic rate for each year, $T$, was rescaled by the ratio

$$Y_T = \frac{r_{N,T}}{r_{w,T}}, \quad (2)$$

where $r_{N,T}$ is is the nationwide age-adjusted general population opioid overdose mortality rate in year $T$ and $r_{w,T}$ is is the weighted average of age-adjusted general population opioid overdose mortality rates in year $T$ for the three states in our synthetic analysis.

## Carceral release data

Estimates of total annual jail and prison releases in the United States were obtained from Bureau of Justice Statistics publications [2, 3, 25]. Release estimates were rescaled to account for repeat releases of the same individual within the same calendar year; sensitivity analyses using different frequencies of repeat releases were also conducted (see Tables S7–S8). Release counts were converted to person-time under the simplifying assumption that jail and prison releases were uniformly distributed over the course of each year. Final time-adjusted, weighted and rescaled national mortality incidence rates were then applied to person-year totals to estimate the expected number of same-year OODs among each year's release population.

## Estimating potential deaths prevented with comprehensive treatment programs

Using the time-adjusted, synthesized OOD estimates as a basis, we then estimated the total number of potential deaths that may be prevented with comprehensive access to OUD treatment in jails and prisons. Various studies have found that comprehensive access to MOUD has the propensity to reduce fatal and non-fatal overdose post-incarceration. One study in Australia found opioid substitute therapy reduced the risk of overdose death by 75% in the first four weeks post-release, while another study in New York City observed a 51% reduction in the risk of non-fatal overdose within 2 weeks post-release, but no effect after 2 weeks [26, 27]. Other studies have found only modest reductions in overdose mortality [28, 29]. To produce our estimates, we sought studies that evaluated post-release MOUD efficacy in a manner consistent with our mortality selection criteria (i.e. measuring efficacy at 12 months post-release and analyzing a general population cohort released from a US prison/jail no earlier than 2013). We identified one evaluation of a comprehensive MOUD program in Rhode Island that included OUD screening, discharge planning and linkage to care after release for all people in custody, which was found to have reduced overdose deaths by 61% (95% CI = 18.4%–80.9%) at 12-months post-release [30]. Given that this estimate is from one study in a single state, we performed a sensitivity analysis estimating the number of potential deaths that may be prevented using two alternative assumptions if comprehensive access to OUD treatment in carceral settings only reduced OODs by 15% or 30%, respectively. Sensitivity analysis results are provided in the Supporting Information (see Tables S9–S10). This analysis was not pre-registered, therefore, the results should be considered exploratory.

# RESULTS

Table 1 provides characteristics of studies included in our analysis. Three studies met inclusion criteria for our analysis. These studies analyzed release cohorts from North Carolina, Vermont and Massachusetts. The North Carolina study assessed opioid overdose mortality among people released from all state prisons. The Vermont study assessed opioid overdose mortality among people released from a combined jail and state prison system. The Massachusetts study assessed opioid overdose mortality among people released from state prisons and county jails.

Table 2 provides post-release opioid overdose mortality rates from the three studies, adjusted using the state-year multiplier. The time-adjusted mortality rate in the 12-months post-release increased for all three states from 2017 to 2022. In 2022, of the three states whose carceral populations were studied, the Massachusetts cohort

13600443, 2026, 1, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/add.70170 by Brendan Saloner - NASA Shared Services Center (NSSC), Wiley Online Library on [01/03/2026]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Case 1:21-cv-10806-LTS Document 308-15 Filed 03/25/26 Page 6 of 10



**TABLE 1** Characteristics of studies included in analysis.

| Publication | Cohort state | Carceral setting | Release date window | Cohort size |
|---|---|---|---|---|
| Ranapurwala *et al.* [22] | NC | All state prisons | 2016–2018 | 259 861 persons |
| Klemperer *et al.* [24] | VT | Jails and state prisons (combined system) | July 2017–June 2018 | 4501 releases |
| Larochelle *et al.* [23] | MA | State prisons and county jails | January–December 2014 | Unknown |

Authors' analysis of estimates published by Ranapurwala *et al.* [22], Klemperer *et al.* [24] and Larochelle *et al.* [23].
Abbreviations: MA, Massachusetts; NC, North Carolina; VT, Vermont.

**TABLE 2** Twelve-month post-release opioid overdose mortality rates, 2017–2022.

| Cohort state | Raw post-release opioid overdose mortality rate, deaths per 100 000 person-years (95% CI) | Time-adjusted post-release opioid overdose mortality rate, deaths per 100 000 person-years (95% CI) | | | | | |
|---|---|---|---|---|---|---|---|
| | Overall | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
| NC | 359[a] (314–404) | 359.0 (314–404) | 324.6 (284–365) | 328.2 (287–369) | 475.0 (416–535) | 603.8 (528–680) | 647.3 (566–728) |
| VT | 700[b] (456–944) | 654.2 (427–882) | 745.8 (486–1005) | 677.1 (442–913) | 896.3 (584–1208) | 1223.4 (798–1649) | 1337.9 (872–1803) |
| MA | 858[c] (709–1,007) | 1423.3 (1176–1671) | 1478.8 (1222–1736) | 1458.6 (1205–1712) | 1544.4 (1276–1813) | 1640.3 (1355–1925) | 1670.6 (1380–1961) |

Authors' analysis of estimates published by Ranapurwala *et al.* [22], Klemperer *et al.* [24] and Larochelle *et al.* [23].
Abbreviations: MA, Massachusetts; NC, North Carolina; VT, Vermont.
[a]Incidence rate described as the overall age-, sex-, race- and calendar year-standardized post-release opioid overdose death rate among formerly incarcerated persons from 2016–2018 at 12 months after release.
[b]Incidence rate calculated using rate of fatal overdose within 1-year post-release among all individuals released from incarceration.
[c]Incidence rate described as opioid overdose mortality following release from incarceration in 12-month lookback period.




**FIGURE 2** Estimated number of opioid overdose deaths among same-year carceral releases and potential deaths prevented with comprehensive access to medications for opioid use disorder treatment, United States, 2017–2022.

13600443, 2026, 1, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/add.70170 by Brendan Saloner - NASA Shared Services Center (NSSC) , Wiley Online Library on [01/03/2026]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Case 1:21-cv-10806-LTS Document 308-15 Filed 03/25/26 Page 7 of 10


had the highest time-adjusted mortality rate (1670.6 deaths per 100 000 person-years; 95% SCI = 1 380.1–1960.9), followed by the Vermont cohort (1337.9 deaths per 100 000 person-years; 95% SCI = 872.3–1803.4) and the North Carolina cohort (647.3 deaths per 100 000 person-years; 95% SCI = 566.2–728.4).

Figure 2 displays estimates of the annual number of OODs post-release from jail or prison, as well as the number of overdose deaths that could be prevented with comprehensive access to MOUD and linkage to care on release, both bounded by 95% SCI. OODs post-release from jail or prison increased from 20 728 to 23 423 between 2017 and 2020 before declining to 20 624 in 2021. We estimate that in 2022, 21 784 (95% SCI = 18 425–25 142) people released from US jails and prisons died from opioid overdose during that same calendar year or 27% of the national total. Over the 6-year study period from 2017 to 2022, we estimate that approximately 129 301 (95% SCI = 109 038–149 559) individuals died from opioid overdose in the same calendar year that they were released from jail or prison. If all jails and prisons provided MOUD and successful linkage to care on release, we estimate that approximately 13 288 OODs (95% SCI = 11 239–15 337), or 16% of the national total, may have been prevented in 2022. Additionally, we estimate that 78 874 (95% SCI = 66 513–91 231) OODs among this population could have been prevented over the 6-year period from 2017 to 2022.

## Sensitivity analyses

We repeated the analysis using alternative assumptions about the carceral release population, alternative population weights and different treatment efficacy rates. Depending on what portion of the annual jail/prison releases we assume are released from a carceral setting repeatedly in a calendar year, our estimate of the number of deaths preventable with comprehensive access to MOUD in carceral settings ranges in 2022 from 12 421 (95% SCI = 10 505–14 335) to 14,156 (95% SCI = 11 973–16 338). Depending on the state-level population weights used to synthesize OOD incidence rates, our estimate of the number of deaths preventable with comprehensive access to OUD treatment in carceral settings ranges in 2022 from 11 523 (95% SCI = 9732–13 314) to 15 653 (95% SCI = 13 083–18 223). Depending on the treatment efficacy rate, our estimate of the number of deaths preventable with comprehensive access to OUD treatment ranges in 2022 from 3268 (95% SCI = 2764–3771) to 6535 (95% SCI = 5527–7543). See Supporting Information for full results and discussion of sensitivity analyses.

# DISCUSSION

Although the growth in opioid mortality in the United States has showed signs of slowing after a decade of severe increases, the more than 81 000 overdose deaths that occurred in 2022 represent a public health tragedy that merits significant policy innovation [1]. The findings from the present study suggest that more than a quarter of these decedents were released from incarceration during the same year, and approximately 13 288 of these deaths could have been prevented with comprehensive MOUD programs and linkage to care post-release. This estimate is consistent with 2022 data from the state of Indiana that showed 23% of the state's overdose decedents had been booked in a jail and 3% were released from a prison in the 12-months before death [31]. This suggests that if federal, state and local policymakers made comprehensive evidence-based treatment for OUD available in correctional facilities, the life-saving potential would be substantial. These findings, in concert with prior research on drug treatment efficacy, suggest that expanding MOUD and other drug treatments to people currently or recently in custody could substantially reduce mortality. This analysis updates the study published by Macmadu *et al*. [21], which predicted that approximately 4400 OODs would have been prevented in the United States in 2016 if all people who were clinically diagnosed with OUD had received MOUD while in custody and retained in treatment post-release. We provide more recent estimates through 2022, using a more conservative treatment efficacy rate of 61% from a study conducted in the US state of Rhode Island with a 12-month post-release exposure period (compared to the previous study, which used a 75% efficacy rate observed in Australia with a 4-week post-release exposure period) [26,30]. Providing more recent estimates is critical to informing drug policies in the current environment, where overdose deaths involving more potent synthetic opioids have increased 280% in the United States since 2016, which is the year analyzed in the Macmadu *et al*. [21] analysis. Our study also estimates the total number of same-year OODs among people released from jails or prisons, which has not previously been published.

The study period used in this analysis encompassed the coronavirus disease 2019 (COVID-19) pandemic, which began in March 2020, and significantly disrupted society at large, as well as the criminal justice and health care systems. OODs nationally increased 61% from 2019 to 2021, while jail admissions decreased by approximately 33%. This analysis accounts for the rise in overdose deaths by adjusting for state- and year-specific OOD trends and accounts for falling carceral populations by determining the jail and prison population for each year during this time period, and scaling that number by the synthetic mortality rate that we calculated. We observe a 9% increase in OODs among people recently released from jails and prisons from 2019 to 2020, followed by a 12% decrease from 2020 to 2021.

Rolling out comprehensive access to MOUD across the US correctional system poses significant implementation challenges. Continued efforts are needed to reduce stigma, train and educate staff to treat people with OUD, build partnerships to facilitate linkage to community-based treatment and cover the cost for providing treatment [14]. That said, substantial progress toward comprehensive access has already been made. The First Step Act required the Federal Bureau of Prisons to expand access to MOUD for opioid abuse [15], and nearly half of states have sought or obtained 1115 waivers granting expanded Medicaid authorities. Given the potential benefits suggested by this analysis, sustained efforts to secure rapid rollout seem well justified.

13600443, 2026, 1, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/add.70170 by Brendan Saloner - NASA Shared Services Center (NSSC) , Wiley Online Library on [01/03/2026]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

## Limitations

This analysis is limited by the small number of studies that met our inclusion criteria: the studies cover only three states, which may not be generalizable to opioid overdose outcomes nationwide. Additionally, the mathematical adjustments performed assume that the recently in custody experience the same opioid overdose mortality patterns as the general population, an assumption that cannot currently be verified. Although the included studies analyzed a 12-month exposure period, individuals released in a given calendar year have ≤12 months post-release exposure before the year ends, and shorter post-release exposure windows tend to yield higher mortality incidence rates [32], therefore, actual mortality rates, post-release overdose deaths and the total number of deaths prevented by comprehensive access to MOUD may be higher than we estimated.

Our analysis relies on various simplifying assumptions about the distribution of jail and prison releases over the course of the calendar year and the fraction of incarcerated people who are released from carceral settings more than once in a given year. Estimates of the impact of increased MOUD access in jails and prisons assume that all incarcerated people with OUD had been diagnosed accordingly. In reality, not all people with OUD are diagnosed, which highlights the need for all people admitted into a jail or prison to be screened for SUDs on entry using a validated screening and assessment tool. As discussed, the COVID-19 pandemic led to significant shifts in overdose, treatment and incarceration. One study found that people with OUD released from jail during the pandemic had a higher overdose mortality rate compared to those released pre-pandemic. Another observed decreases in treatment engagement while incarcerated and post-release following the onset of the pandemic [33, 34]. Therefore, some of the pre-pandemic studies on which we rely to determine mortality and MOUD efficacy may not generalize to this unique period. Finally, focusing on opioid overdose mortality as a key outcome likely understates policy benefits, since MOUD treatment also reduces illicit drug use, infectious disease transmission and crime [35].

Last, our estimate of the number of deaths preventable with comprehensive access to OUD treatment were derived based on an estimate from one study in the state of Rhode Island, which observed a 61% reduction in overdose deaths [30]. This was the only study identified that was consistent with our mortality selection criteria (i.e. measuring efficacy at 12 months post-release and analyzing a general population cohort released from a US prison/jail no earlier than 2013). To provide alternative estimates, a sensitivity analysis was performed estimating the number of deaths preventable if this treatment efficacy assumption was lower at 15% or 30%.

# CONCLUSIONS

Synthesized opioid overdose mortality rates from three studies in the United States indicate that approximately 21 784 individuals released from jails and prisons in 2022 died from opioid overdose the same year, comprising 27% of nationwide overdose deaths in 2022. If all US jails and prisons provided SUD screening on entry, MOUD and linkage to care on release to those in need, this analysis estimates that approximately 13 288 opioid overdose deaths, or 16% of the national total, may have been prevented in 2022. This suggests that expanding MOUD availability to people recently released from jails and prisons could help avert a substantial portion of opioid overdose deaths in the United States.

## AUTHOR CONTRIBUTIONS

**Jake J. Smith:** Conceptualization (equal); data curation (lead); formal analysis (lead); methodology (equal); validation (equal); writing—original draft (equal); writing—review and editing (equal). **Margaret Noonan:** Conceptualization (equal); methodology (equal); project administration (equal); writing—original draft (equal); writing—review and editing (equal). **Christian E. Johnson:** Methodology (equal); project administration (equal); validation; writing—original draft (equal); writing—review and editing (equal). **Keith Humphreys:** Project administration (equal); writing—review and editing (equal). **Rahul Gupta:** Conceptualization (equal); supervision (equal); writing—original draft (equal); writing—review and editing (equal).

## ACKNOWLEDGEMENTS

None.

## DECLARATION OF INTERESTS

K.H. is a non-executive director of Indivior PLC.

## DATA AVAILABILITY STATEMENT

Research data are not shared.

## AUTHOR DISCLAIMER

The views and opinions expressed in this manuscript are those of the authors only and do not necessarily represent the views, official policy or position of the Office of National Drug Control Policy or any of its affiliated programs or agencies. In 2024, at the time the study was conducted, J.S., M.N., K.H, and R.G. were with the Office of National Drug Control Policy.

## ORCID

*Christian E. Johnson* https://orcid.org/0009-0007-2699-9827
*Keith Humphreys* https://orcid.org/0000-0003-0694-5761

## REFERENCES

1. Multiple cause of death files, 2018-2022 on CDC WONDER (Wide-ranging online data for epidemiologic research). Centers for Disease Control National Center for Health Statistics. Available from: http://wonder.cdc.gov (2024). Accessed 28 Aug 2024.
2. Carson EA, Kluckow R. Prisoners in 2022 – Statistical Tables. U.S. Department of Justice. Office of Justice Programs Bureau of Justice Statistics; 2023 NCJ 307149. https://bjs.ojp.gov/document/p22st.pdf
3. Zheng Z. Jail Inmates in 2022 – Statistical Tables. U.S. Department of Justice. Office of Justice Programs Bureau of Justice Statistics; 2023 NCJ 307086. https://bjs.ojp.gov/document/ji22st.pdf

13600443, 2026, 1, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/add.70170 by Brendan Saloner - NASA Shared Services Center (NSSC) , Wiley Online Library on [01/03/2026]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

4. Maruschak LM, Bronson J, Alper M. Alcohol and drug use and treatment reported by prisoners U.S. Department of Justice. Office of Justice Programs. Bureau of Justice Statistics; 2021 NCJ 252641. https://bjs.ojp.gov/sites/g/files/xyckuh236/files/media/document/adutrpspi16st.pdf
5. Karberg JC, James DJ. Substance Dependence, Abuse, and Treatment of Jail Inmates, 2002 Office of Justice Programs. Bureau of Justice Statistics; 2005 NCJ 209588. https://bjs.ojp.gov/content/pub/pdf/sdatji02.pdf
6. Cooper JA, Onyeka I, Cardwell C, Paterson E, Kirk R, O'Reilly D, et al. Record linkage studies of drug-related deaths among adults who were released from prison to the community: a scoping review. BMC Public Health. 2023 May 5;23(1):826. https://doi.org/10.1186/s12889-023-15673-0
7. Joudrey PJ, Khan MR, Wang EA, Scheidell JD, Edelman EJ, McInnes DK, et al. A conceptual model for understanding post-release opioid-related overdose risk. Addict Sci Clin Pract. 2019;14:17. https://doi.org/10.1186/s13722-019-0145-5
8. Pizzicato LN, Drake R, Domer-Shank R, Johnson CC, Viner KM. Beyond the walls: Risk factors for overdose mortality following release from the Philadelphia Department of Prisons. Drug Alcohol Depend. 2018 Aug;1(189):108–15.
9. Wakeman SE, Larochelle MR, Ameli O, Chaisson CE, McPheeters JT, Crown WH, et al. Comparative effectiveness of different treatment pathways for opioid use disorder. JAMA Netw Open. 2020 Feb 5;3(2):e1920622. https://doi.org/10.1001/jamanetworkopen.2019.20622
10. Lee JD, Friedmann PD, Kinlock TW, Nunes EV, Boney TY, Hoskinson RA Jr, et al. Extended-release naltrexone to prevent opioid relapse in criminal justice offenders. N Engl J Med. 2016;374(13):1232–42.
11. Maruschak LM, Minton TD, Zheng Z. Opioid use disorder screening and treatment in local jails, 2019 U.S. Department of Justice Statistics. Office of Justice Programs. Bureau of Justice Statistics; 2023 NCJ 305179. https://bjs.ojp.gov/document/oudstlj19.pdf
12. Malta M, Varatharajan T, Russell C, Pang M, Bonato S, Fischer B. Opioid-related treatment, interventions, and outcomes among incarcerated persons: A systematic review. PLoS Med. 2019;16(12):e1003002. Published 2019 Dec 31. https://doi.org/10.1371/journal.pmed.1003002
13. Kinlock TW, Gordon MS, Schwartz RP, O'Grady KE. Individual patient and program factors related to prison and community treatment completion in prison-initiated methadone maintenance treatment. J Offender Rehabil. 2013;52(8):509–28. https://doi.org/10.1080/10509674.2013.782936
14. Abuse S, Administration MHS. Use of medication-assisted treatment for opioid use disorder in criminal justice settings. HHS Publication No. PEP19-MATUSECJS Rockville, MD: National Mental Health and Substance Use Policy Laboratory. Substance Abuse and Mental Health Services Administration; 2019.
15. Nathan J. The First Step Act of 2018: An overview. Congressional Research Service Report. 2019. Accessed May 22, 2025. https://www.congress.gov/crs-product/R45558
16. Tsai D. Opportunities to test transition-related strategies to support community reentry and improve care transitions for individuals who are incarcerated Centers for Medicare & Medicaid Services; 2023. Letter to state Medicaid directors. https://www.medicaid.gov/sites/default/files/2023-12/smd23003.pdf. Accessed 29 Aug 2024.
17. Kaiser Family Foundation. Section 1115 waiver watch: Medicaid pre-release services for people who are incarcerated. 2024. Accessed August 29, 2024. https://www.kff.org/medicaid/issue-brief/section-1115-waiver-watch-medicaid-pre-release-services-for-people-who-are-incarcerated/
18. General Court of the Commonwealth of Massachusetts. General Laws. Title XVIII, chapter 127, sections 17B-17C, General Court of the Commonwealth of Massachusetts The General Court of the Commonwealth of Massachusetts; 2024. https://malegislature.gov/Laws/GeneralLaws/PartI/TitleXVIII/Chapter127
19. Rhode Island Department of Corrections. Fiscal Year 2017 Annual Population Report, 2017. Accessed 29 Aug 2024. https://doc.ri.gov/sites/g/files/xkgbur681/files/docs/FY17-Annual-Population-Report.pdf
20. Humphreys K, Shover CL, Andrews CM, Bohnert ASB, Brandeau ML, Caulkins JP, et al. Responding to the opioid crisis in North America and beyond: recommendations of the Stanford-Lancet Commission. Lancet. 2022;399(10324):555–604. https://doi.org/10.1016/S0140-6736(21)02252-2
21. Macmadu A, Goedel WC, Adams JW, Brinkley-Rubinstein L, Green TC, Clarke JG, et al. Estimating the impact of wide scale uptake of screening and medications for opioid use disorder in US prisons and jails. Drug Alcohol Depend. 2020;208:107858. https://doi.org/10.1016/j.drugalcdep.2020.107858
22. Ranapurwala SI, Figgatt MC, Remch M, Brown C, Brinkley-Rubinstein L, et al. Opioid Overdose Deaths Among Formerly Incarcerated Persons and the General Population: North Carolina, 2000–2018. Am J Public Health. 2022;112(2):300–3. https://doi.org/10.2105/AJPH.2021.306621
23. Larochelle MR, Bernstein R, Bernson D, Land T, Stopka TJ, Rose AJ, et al. Touchpoints - Opportunities to predict and prevent opioid overdose: A cohort study. Drug Alcohol Depend. 2019;204:107537. https://doi.org/10.1016/j.drugalcdep.2019.06.039
24. Klemperer EM, Wreschnig L, Crocker A, King-Mohr JK, Ramniceanu A, Brooklyn JR, et al. The impact of the implementation of medication for opioid use disorder and COVID-19 in a statewide correctional system on treatment engagement, postrelease continuation of care, and overdose. J Subst Use Addict Treat. 2023;152:209103. https://doi.org/10.1016/j.josat.2023.209103
25. Maruschak LM, Minton TD. Correctional populations in the United States, 2017-2018 U.S. Department of Justice. Office of Justice Programs. Bureau of Justice Statistics; 2020 NCJ 252157. https://bjs.ojp.gov/content/pub/pdf/cpus1718.pdf
26. Degenhardt L, Larney S, Kimber J, Gisev N, Farrell M, Dobbins T, et al. The impact of opioid substitution therapy on mortality post-release from prison: retrospective data linkage study. Addiction. 2014;109(8):1306–17. https://doi.org/10.1111/add.12536
27. Cherian T, Lim S, Katyal M, Goldfeld KS, McDonald R, Wiewel E, et al. Impact of jail-based methadone or buprenorphine treatment on non-fatal opioid overdose after incarceration. Drug Alcohol Depend. 2024;259:111274. https://doi.org/10.1016/j.drugalcdep.2024.111274
28. Bovell-Ammon BJ, Yan S, Dunn D, Evans EA, Friedmann PD, Walley AY, et al. Prison buprenorphine implementation and postrelease opioid use disorder outcomes. JAMA Netw Open. 2024;7(3):e242732.
29. Evans EA, Wilson D, Friedmann PD. Recidivism and mortality after in-jail buprenorphine treatment for opioid use disorder. Drug Alcohol Depend. 2022;231:109254.
30. Green TC, Clarke J, Brinkley-Rubinstein L, et al. Postincarceration Fatal Overdoses After Implementing Medications for Addiction Treatment in a Statewide Correctional System. JAMA Psychiatry. 2018;75(4):405–7.
31. Indiana Management Performance Hub. Fatal Drug Overdose Touchpoints Dashboard. https://www.in.gov/mph/projects/fortress/. Accessed 13 May 2025.
32. Hartung DM, McCracken CM, Nguyen T, Kempany K, Waddell EN. Fatal and nonfatal opioid overdose risk following release from prison: A retrospective cohort study using linked administrative data. J Subst Use Addict Treat. 2023;147:208971. https://doi.org/10.1016/j.josat.2023.208971

13600443, 2026, 1, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/add.70170 by Brendan Saloner - NASA Shared Services Center (NSSC) , Wiley Online Library on [01/03/2026]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

33. Friedmann PD, Dunn D, Michener P, Bernson D, Stopka TJ, Pivovarova E, et al. COVID-19 impact on opioid overdose after jail release in Massachusetts. Drug Alcohol Depend Rep. 2023;6:100141.
34. Klemperer EM, Wreschnig L, Crocker A, King-Mohr J, Ramniceanu A, Brooklyn JR, et al. The impact of the implementation of medication for opioid use disorder and COVID-19 in a statewide correctional system on treatment engagement, postrelease continuation of care, and overdose. J Subst Use Addict Treat. 2023;152:209103.
35. Strang J, Babor T, Caulkins J, Fischer B, Foxcroft D, Humphreys K. Drug policy and the public good: evidence for effective interventions. Lancet. 2012;379(9810):71–83. https://doi.org/10.1016/S0140-6736(11)61674-7

## SUPPORTING INFORMATION

Additional supporting information can be found online in the Supporting Information section at the end of this article.

**How to cite this article:** Smith JJ, Noonan M, Johnson CE, Humphreys K, Gupta R. Potential health impacts of comprehensive access to opioid use disorder treatment in United States correctional facilities: A synthetic analysis. Addiction. 2026;121(1):108–16. https://doi.org/10.1111/add.70170

13600443, 2026, 1, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/add.70170 by Brendan Saloner - NASA Shared Services Center (NSSC) , Wiley Online Library on [01/03/2026]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License