# EXHIBIT P

Journal of Substance Abuse Treatment 138 (2022) 108747

Contents lists available at ScienceDirect

Journal of Substance Abuse Treatment

journal homepage: www.elsevier.com/locate/jsat

# Acceptance of medications for opioid use disorder in recovery housing programs in Missouri

Claire A. Wood[a,*], Alex Duello[a], Jennifer Miles[b], Brenna Lohmann[a], Tatiana Gochez-Kerr[c], Kori Richardson[a], Rosie Anderson-Harper[d], Rachel P. Winograd[a]

[a] University of Missouri – St. Louis, Missouri Institute of Mental Health, United States of America
[b] Rutgers University – New Brunswick, New Jersey, School of Social Work, United States of America
[c] Parents as Teachers National Center, United States of America
[d] Missouri Department of Mental Health, Division of Behavioral Health, United States of America

ARTICLE INFO

*Keywords:*
Recovery housing
Sober housing
Recovery
Opioid use disorder
Medications for opioid use disorder
MAT

ABSTRACT

*Background:* Recovery housing plays an important role in supporting individuals in their recovery by building recovery capital and providing stable living environments; however, the extent to which medications for opioid use disorder (MOUD), the gold standard for OUD treatment, are accepted in recovery housing settings is unclear. The purpose of this study, as part of a larger statewide evaluation of Missouri recovery homes, was to identify the extent to which Missouri recovery houses were accepting of methadone, buprenorphine, and naltrexone as well as the extent to which the acceptance of each medication was linked to whether the recovery home encouraged tapering off MOUDs.
*Methods:* Sixty-four recovery housing managers and/or staff, out of 66 eligible recovery homes in Missouri completed the survey.
*Results:* Results indicated that methadone was the least accepted medication for long-term use followed by buprenorphine and then naltrexone. Recovery houses that had significantly lower overall acceptance of methadone encouraged tapering; however, the overall acceptance for buprenorphine and naltrexone was not significantly related to the encouragement of tapering off MOUDs.
*Conclusion:* This work highlights the need to develop reliable instruments to measure and assess MOUD-capable recovery homes and to increase knowledge and acceptance of MOUD within recovery home settings.

## 1. Introduction

Opioid overdoses claimed an estimated 50,828 lives in 2019 (Ahmad et al., 2010), and in 2018, approximately 2.0 million people ages twelve or older had an opioid use disorder (OUD) diagnosis (SAMHSA, 2019). Access to evidence-based treatment for OUD has increased, in part due to federal funding through the 21st Century Cures Act and the Comprehensive Addiction Recovery Act (21st Century Cures Act, H.R. 34, 2016), which has promoted the use of medications for opioid use disorder (MOUD) (i.e. methadone, buprenorphine, and naltrexone) (Winograd et al., 2019). However, despite extensive evidence of their effectiveness (e.g., Bart, 2012; Ma et al., 2018; Sordo et al., 2017; Wakeman et al., 2020), gaps in access to MOUD have persisted (e.g. Beetham et al., 2020; David & Carr, 2019; Jones et al., 2015).

Access to MOUD is not the only barrier for individuals seeking evidence-based treatment. Under-dosing medications or tapering too quickly can increase the risk of a recurrence in use and overdose (Bentzley et al., 2015; Velander, 2018), yet both individual- and physician-led decisions to taper off medications are common. A review of five studies that quantitatively assessed outcomes following involuntary discontinuation of buprenorphine found that 50% of participants who tapered off buprenorphine experienced a recurrence in use within one month (Bentzley et al., 2015). Discontinuation of medications may be voluntary or involuntary and result from internalized stigma toward medications, external pressure from individuals and/or organizations who have not adopted MOUD-inclusive definitions of abstinence, and structural or environmental factors that make continued treatment participation untenable (e.g., psychosocial treatment requirements or

* Corresponding author at: University of Missouri – St. Louis, Missouri Institute of Mental Health, 207 Benton Hall, One University Blvd., St. Louis, MO 63121, United States of America.
*E-mail address:* Claire.Wood@mimh.edu (C.A. Wood).

https://doi.org/10.1016/j.jsat.2022.108747
Received 16 April 2021; Received in revised form 5 January 2022; Accepted 14 February 2022
Available online 20 February 2022
0740-5472/© 2022 Elsevier Inc. All rights reserved.

burdensome dosing schedules) (Joudrey et al., 2020; Szalawitz, 2018; Winograd et al., 2019). Given the mortality risk associated with discontinuation of MOUD (Ma et al., 2018; Sordo et al., 2017; Velander, 2018), research should address the barriers related to long-term use of MOUD in recovery housing settings.

Many individuals with OUD need access to recovery resources including recovery housing (Damian et al., 2017; US Substance Abuse, 2019). Access to safe and stable housing can play a crucial role in supporting individuals' recovery (SAMHSA, 2020), and recovery housing providers need to support individuals' personal recovery goals and treatment plan, which may or may not include the use of MOUD. Although the provision of MOUD has increased in treatment settings in recent years (Mojtabai et al., 2019), we still do not know the extent to which recovery housing providers have adapted to a philosophy of abstinence that is inclusive of MOUD. A growing body of empirical literature on recovery housing does exist (Mericle et al., 2017; Polcin et al., 2016); however, research specifically on the integration of MOUD in existing recovery housing capacity remains limited. Our work sought to address this gap by examining the acceptance of different types and courses of MOUD among recovery housing programs in Missouri that have expanded their abstinence-based programs to be inclusive of MOUD (i.e., accept residents using MOUD and removing tapering requirements).

### 1.1. Recovery housing standards and legal protections/requirements

The National Alliance of Recovery Residences (NARR) is a recovery housing advocacy organization that promotes quality standards in recovery housing (NARR, 2019). NARR supports state-level recovery housing accreditation bodies, such as the Missouri Coalition of Recovery Support Providers (MCRSP), and serves more than 25,000 individuals across more than 2500 accredited houses in the United States (NARR, 2019). NARR developed a set of nationally recognized quality standards for recovery housing providers interested in certification through their state affiliates. NARR standards include the following domains: administrative operations; physical environment; recovery support; and being a good neighbor (NARR, 2018).

In addition to quality standards, NARR developed a taxonomy to define the different types of recovery residences. The different residence types vary based on their size, structure, and staffing capabilities (Mericle et al., 2017). Peer-run residences (e.g., Oxford Houses) do not offer any clinical services on-site and do not have any staff overseeing the daily operations of the residence (Jason & Ferrari, 2010). Sober living houses typically have a house manager or in-house staff that provide oversight to residences and require that residents attend mutual aid meetings as a contingency of their stay (Polcin & Henderson, 2008). In addition to on-site staff and mutual aid participation, some recovery homes require residents to attend outpatient treatment during their stay (Mericle et al., 2015). The most intensive settings (therapeutic communities) offer clinical services on-site through licensed or credentialed staff (Malivert et al., 2012).

All houses regardless of type are required to establish and provide a substance-free home-like environment, informed by the social model philosophy of recovery (Jason et al., 2013; Mericle et al., 2019). The social model of recovery is a philosophy that emphasizes the role of community in the life-long recovery process (Polcin et al., 2014). Peers with experiential knowledge serve as a functional family, and provide "structure, nurturing, kindness, guidance, and unconditional positive regard" (Luce, p. 2). Peers help individuals in early stages of recovery begin to reform their identity, develop a recovery network, and build their recovery capital through exposure to recovery processes and values (Best, 2019). The social model of recovery is an inclusive model, which supports autonomous person-driven recovery decisions and goals and, in theory, supports all recovery pathways including MOUD.

While no specific standard exists regarding MOUD-inclusive recovery pathways, NARR's official stance on MOUDs is that, "[MOUDs are] one of many viable recovery tools" (NARR, 2018, p. 9). Furthermore, NARR recognizes that it is illegal to deny residency based solely on MOUD-status under the American Disabilities Act (ADA). However, NARR does state that an individual can be denied residency if they are not eligible under requirements that are deemed "essential to the safety and welfare of the residents and maintenance of the recovery support environment" (NARR, 2018, p. 7).

The Fair Housing Act (FHA), which provides special protections for recovery housing to operate in residential areas, does not extend protections to homes in which there is active drug and alcohol use (Gorman et al., 2010). Differences in interpretation of the language of the ADA and FHA can make it difficult for recovery housing providers to implement policies that are in compliance with the laws and do not jeopardize the federal protections afforded to recovery housing programs. Varying interpretation of the ADA and FHA poses a particular challenge for operators who are concerned about the risk of diversion and/or non-prescribed use of some types of MOUD (Lofwall & Walsh, 2014), but may not have the resources necessary to mitigate these concerns. For example, settings that are more intensive may have the staffing and infrastructure to monitor residents' MOUD and communicate dosage concerns with prescribers, while less staffed recovery homes may have limited ability to monitor and manage residents' MOUD (NARR, 2018). Therefore, some housing providers may feel obligated to exclude individuals taking MOUD from their recovery residence based on the fear that diversion of such medications could jeopardize their legal protections as a recovery home or put the safety and welfare of others within the home at risk.

### 1.2. MOUD stigma

Antimedication stigma affects the uptake of MOUD in the substance use field (Allen et al., 2019) and often stems from the belief that a treatment course with MOUD is not equivalent to abstinence but instead is "just another form of addiction" (Szalawitz, 2018). Indeed, 12-step groups commonly use the term "drug replacement therapy" when referring to MOUDs, which further perpetuates the idea that individuals using MOUD are "replacing one drug for another" (Narcotics Anonymous, 2016). In recent years, 12-step groups such as NA acknowledged their definition of abstinence has alienated individuals from their community. Specifically, a motion was put forth during a 2018 conference to address the language related to MOUD in their literature to send a unifying message, noting, "newcomers are prescribed MAT and often find their lives improve, then are directed to or voluntarily find NA only to often face controversy, judgment and sometimes outright rejection" (Narcotics Anonymous, 2018, slide 9). Although some 12-step groups may be adapting MOUD-inclusive philosophies of recovery, the emphasis on mutual aid participation within NARR standards may provide a challenge to housing residents who are unable to find MOUD-supportive mutual aid groups among predominantly non-MOUD-inclusive abstinence-based groups.

The mismatch between MOUD-inclusive and non-MOUD inclusive philosophies of abstinence has critical implications for people accessing recovery services, including recovery housing. One recent study found that a quarter of 360 sampled providers, many of which were recovery-focused or recovery housing programs, were unwilling to serve individuals receiving MOUDs (Kepple et al., 2019). Given the life-saving benefits of MOUD and the sizable portion of people with OUD who lack stable housing, the lack of providers willing to serve individuals receiving MOUD is particularly concerning. If recovery homes are unable or unwilling to accept individuals taking MOUD, individuals must choose between their medicine and access to housing (Patel et al., 2020). Indeed, rising demand for MOUD-supportive housing is underpinned by the assertion that continued adherence to a non-MOUD-inclusive abstinence model presents an untenable and dangerous situation for those who are prescribed MOUD and seeking recovery housing (NARR, 2018).

Research also shows that the level of antimedication stigma differs based on the type of MOUD prescribed, which may be due to differences in potential for psychoactive effect, the length of time an individual may use the medication, the development of physical dependence, and the potential for diversion. If not dosed appropriately, full and partial opioid agonists (methadone and buprenorphine, respectively) have the potential to cause a physiological response that is similar to that of short-acting illicit substances (National Academies of Sciences, Engineering, & Medicine, 2019). In contrast, an antagonist (e.g., naltrexone) blocks any physiological response to opioids. These differences may lead providers to believe the use of naltrexone is "consistent with being drug-free" (Uebelacker et al., 2016, p. 49). Although methadone, buprenorphine, and naltrexone may all be taken long-term, because of the psychoactive effect, individuals may be more likely to divert methadone and buprenorphine than naltrexone. Combined, the physiological response and risk of diversion may increase receptivity to the use of naltrexone over methadone or buprenorphine (Randall-Kosich et al., 2020; Wakeman, 2017).

A study among Oxford House residents taking MOUDs observed preferences for naltrexone and buprenorphine over methadone (i.e., antagonist and partial agonist over full agonist). Majer et al. (2018) found that none of the residents said they would vote against accepting a new resident who was taking a partial agonist or antagonist, but 50% said they would vote against a prospective resident who takes methadone. Further, residents did not consider those taking naltrexone or buprenorphine as "addicts" but still identified those taking methadone as "addicts" (Majer et al., 2018). The disproportionate stigma toward methadone and buprenorphine exists outside of recovery organizations as well. For example, a study measuring attitudes of criminal justice personnel regarding MOUDs found a preference for naltrexone over buprenorphine and buprenorphine over methadone (Andraka-Christou et al., 2019). A cohort of patients in one treatment setting also had a preference for naltrexone over buprenorphine and buprenorphine over methadone (Uebelacker et al., 2016).

The length of time people are prescribed medication may cause differential stigma toward specific MOUDs. Individuals often take methadone long-term, for many years or indefinitely, whereas buprenorphine is used both for short-term withdrawal management (with the intention of tapering off) as well as for long-term maintenance (Fiellen et al., 2014). We do not know the extent to which greater stigma toward methadone and buprenorphine is driven more so by their long-term use rather than their potential for physiological effects. Despite their associated stigma, long-term use of methadone and buprenorphine continue to demonstrate the greatest effectiveness, with discontinuation not recommended (Samples et al., 2020). Indeed, recent evidence suggests that the risk of overdose significantly increases even after the discontinuation of long-term use of buprenorphine (Williams et al., 2020). Every effort should be made to ensure individuals with OUD have access to their preferred MOUD type and empowered to maintain a treatment regimen that is recommended by a trained provider.

### 1.3. *Federal funding to address the overdose crisis*

To address the overdose crisis and facilitate access to evidence-based treatment for OUD, the Substance Abuse and Mental Health Services Administration (SAMHSA) awarded funds in the form of State Targeted Response (STR) and State Opioid Response (SOR) grants to all states and territories in May 2017 and October 2018, respectively. In Missouri, the Department of Mental Health (DMH) administered these grants, and the vast majority of funds went toward direct treatment services for uninsured individuals with OUD. However, recognizing the importance of stable housing in maintaining recovery long-term, DMH designated a sizable portion of the funding specifically for recovery housing support for individuals engaged in grant-funded treatment. At the same time, MCRSP adapted a set of standards based on those promoted by NARR and began accrediting recovery homes in Missouri.

To be eligible to receive reimbursement through STR, recovery home operators were required to become both MCRSP-certified and deemed "medication friendly" based on their responses to a survey administered by DMH. Conceptually, DMH viewed medication friendly to mean that MOUD is accepted and supported by housing staff and administrators, and that houses should demonstrate a culture of MOUD acceptance (J. Crum, personal communication, June 15th, 2021). Pragmatically, however, DMH deemed houses medication friendly if individuals on MOUD were accepted as residents and were not required to taper off their MOUD medications as a condition of residency. The purpose of requiring these designations to be eligible for reimbursement was twofold: 1) to incentivize recovery homes to become MCRSP-certified to promote a "positive, safe recovery environment", and 2) to ensure individuals receiving both treatment and housing through STR would not be required to discontinue their treatment medications or feel stigmatized for using medication. As recovery housing is playing an increasingly critical role in addressing the intersecting domains of substance use and homelessness (Blue & Rosenberg, 2017), the substance use field should understand the extent to which recovery homes receiving federal funding adhere to the standards under which they were funded (e.g., being accepting of MOUD).

### 1.4. *Current study*

To our knowledge, no empirical studies have examined outcomes for residents from recovery houses that have accepted and integrated residents taking MOUD with those that have not. In the absence of empirical evidence or clearly outlined and established "best practices" for how to maintain residents on MOUD, housing providers are left to identify and implement strategies based on anecdotes, personal experience, and peer-to-peer learning.

Heeding calls to assess the extent to which recovery housing operators support residents who are receiving MOUDs (NARR, 2018), the current study sought to a) identify the extent to which recovery houses receiving funding through STR were accepting of MOUDs, and b) identify the extent to which recovery homes' views of MOUDs were related to their encouragement of tapering off MOUDs. Based on the literature we have summarized here, we hypothesized that recovery houses would be less accepting of full agonist (methadone) and partial agonist (buprenorphine) medications relative to antagonist medications (naltrexone). We also hypothesized that houses that were more accepting of methadone and buprenorphine would be less likely to encourage tapering off MOUDs.

## 2. Materials and methods

The study team collected data as part of an evaluation of MCRSP-certified STR/SOR-funded recovery homes in Missouri between March 2019 and August 2019 on a rolling basis as new houses gained accreditation and access to STR/SOR funding. The study did not include homes that were not STR/SOR-funded, even if they were MCRSP-certified. Of the 78 recovery houses that were certified by MCRSP as of May 2019, 68 completed the "Medication Friendliness Survey" to access funding through the STR/SOR grant. The study excluded two of the funded houses from the evaluation because they were not accepting clients during the data collection. Two things are important to note about the surveyed recovery houses: 1) although all houses that participated in the survey were eligible for SOR-funding, many of them may not have received this funding (e.g., were not referred clients who's housing was covered by SOR funding) and 2) recovery houses are not solely dedicated to supporting residents with OUD, but encompass residents with a broad spectrum of substance use including amphetamines and alcohol.

Most of the houses are concentrated in the eastern region of the state (29), primarily in the St. Louis city area, with four houses located in St. Louis County and four located in St. Charles County. Missouri's southwest region has 13 houses, with one organization in Springfield

operating a large number of houses. The western region in and around Kansas City has 12 houses. The central region has 11 houses and the southeast region has one house. More than half of the STR/SOR houses are for men only (57%); one house accepts men and women; and only one STR/SOR approved house specifically accepts children within the home. The houses that were excluded because of a lack of residents were located in the St. Louis and southeast regions. Of the 66 eligible recovery houses, operators from 64 (97%) completed the survey.

### 2.1. Participants

Executive directors of each MCRSP-certified and STR/SOR-funded house provided contact information for their live-in house manager. The study targeted on-site, live-in house managers for data collection due to their knowledge of the day-to-day operations of the home. Sixteen (25%) homes did not have on-site housing managers. For these homes, the study asked the person who was most directly involved in the day-to-day functioning of the house to complete the survey. The study distributed the surveys electronically with periodic reminders and follow-ups with house managers and executive directors. Due to reported barriers accessing and completing electronic versions of the survey, the study sent 29 (45%) participants a paper copy with a pre-addressed stamped return envelope. One house manager filled out two surveys for two different sites and another manager completed surveys for three sites.

### 2.2. Measures

#### 2.2.1. Medications allowed in the home

The survey asked house managers at each of the funded houses which types of MOUD were allowed in the home (methadone, buprenorphine, extended-release (XR) naltrexone, oral naltrexone, other, or none; each separated into unique dichotomous variables of “yes, allowed”, or “no, not allowed”).

#### 2.2.2. Acceptance of medication

For methadone, buprenorphine, and antagonist medications (e.g., injectable or oral naltrexone), the survey asked house managers to “rate the overall climate for the long-term utilization” of that form of MOUD in the house and to what extent housing staff are accepting of the long-term use of that MOUD. The study grouped antagonist medications together, such that the study did not ask separately about extended release/injectable and oral naltrexone products. Respondents rated each of these variables on a scale of 1 to 4, with 1 being “very unaccepting” and 4 “very accepting.”

#### 2.2.3. Encouragement of medication tapering

The survey asked house managers whether the recovery house encouraged residents to taper off their OUD medications (“yes”/”no”).

### 2.3. Analytic strategy

We examined descriptive statistics for our sample, including bivariate correlations between study variables. Additionally, because participants reported on the acceptance of medications among house managers/staff as well as the overall climate in the house for methadone, buprenorphine, and naltrexone, we assessed whether differences in overall medication acceptance were significantly different than house manager/staff acceptance using paired *t*-tests. For our primary research questions, we assessed differences in overall and house manager acceptance of the long-term use of methadone, buprenorphine, and naltrexone using a series of paired *t*-tests, applying a Bonferroni correction to reduce the likelihood of a type I error due to small cell sizes (Sedgwick, 2012). Then, we used independent samples t-tests to determine the extent to which encouragement of tapering off MOUD was related to the overall climate and acceptance of methadone, buprenorphine, and naltrexone. The study team conducted all analyses using SPSS version 27.

## 3. Results

### 3.1. Descriptive statistics and bivariate correlations

Of the 64 STR/SOR houses in the final sample, 98.4% allowed at least one MOUD in the house. According to the house managers/staff, only one house permitted all three FDA-approved MOUD types. The remainder ($n$ = 62) permitted one or more type: 68.8% allow methadone, 89.1% allow buprenorphine, 82.8% permit XR naltrexone, and 81.3% oral naltrexone. Sixty-seven percent ($n$ = 43) of house managers reported the overall climate around methadone use was somewhat to very accepting; 84% ($n$ = 54) reported the same for buprenorphine; and 94% ($n$ = 60) reported this for naltrexone. More than half of managers reported that tapering off MOUD is encouraged ($n$ = 37; 57.8%). Results showed similar patterns (i.e., greatest acceptance of naltrexone) by housing manager/staff of their own acceptance (72% accepting methadone, 87% buprenorphine, and 92% naltrexone).

Table 1 provides the bivariate correlations, means, and standard deviations (SDs) for the primary variables studied. In general, the overall acceptance of any form of MOUD was positively associated with acceptance of all other forms of MOUD. The overall acceptance for each MOUD was strongly and positively correlated with housing staffs' acceptance. Both the overall acceptance of long-term use of methadone and house managers/staff acceptance was negatively associated with endorsement of encouraging tapering ($r = -0.26$, $p = .041$; $r = -0.26$, $p = .038$ respectively). However, neither acceptance of buprenorphine nor acceptance of naltrexone medications were significantly associated with endorsement of encouraging tapering.

House managers/staff rated their own acceptance of buprenorphine significantly higher than their reports of overall buprenorphine acceptance (M [SD] = −0.13, [0.38], $t(63) = -2.65$, $p = .010$), but this difference was not significant for methadone and naltrexone (M [SD] = −0.11, [0.51], $t(63) = -1.72$, $p = .090$; M [SD] = 0.00, [0.00], $t(63) = 0.00$, $p = 1.000$).

### 3.2. Differences in the climate and acceptance of different forms of MOUD

Results of the paired *t*-tests indicated the overall acceptance of methadone was lower relative to the overall acceptance of either buprenorphine (M [SD] = −0.42, [0.87], $t(63) = -3.88$, $p = .001$) or naltrexone (M [SD] = −0.75, [1.02], $t(63) = -5.86$, $p < .001$). Similarly, the reported overall acceptance of buprenorphine was lower than the overall acceptance of naltrexone (M [SD], −0.33 [0.71] $t(63) = -3.68$, $p = .001$).

The pattern for medication acceptance was similar but not identical for house managers/staff medication acceptance. Although house managers/staff reported that they were more accepting of both buprenorphine and naltrexone than methadone (M [SD] = 0.44, [0.91], $t(63) = 3.86$, $p < .001$; (M [SD] = 0.64, [1.09], $t(63) = 4.71$, $p < .001$, respectively), the difference between acceptance of buprenorphine and naltrexone was not significant (M [SD] = −0.20, [0.80], $t(63) = -2.03$, $p = .047$) once the study applied the Bonferroni correction.

### 3.3. Association between MOUD acceptance and tapering encouragement

Among recovery houses in which tapering is encouraged, house managers/staff reported significantly less overall acceptance of methadone [$t(61.84) = 2.21$ $p = .031$] (Table 2; Fig. 1). The overall acceptance of buprenorphine and naltrexone was not significantly related to the encouragement of tapering off MOUD [$t(62) = 0.94$, $p = .351$, $t(62) = 0.52$, $p = .605$, respectively]. House managers'/staff's attitude demonstrated an identical pattern to their reports of the overall climate.

**Table 1**
Descriptive statistics and correlations for study variables ($N = 64$).***

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| 1. Encourage Tapering[a] | – | | | | | | |
| 2. Overall Methadone Acceptance | 0.26* | – | | | | | |
| 3. HM/S Methadone Acceptance | 0.26* | 0.89** | – | | | | |
| 4. Overall Buprenorphine Acceptance | 0.12 | 0.64** | 0.57** | – | | | |
| 5. HM/S Buprenorphine Acceptance | 0.11 | 0.59** | 0.60** | 0.91** | – | | |
| 6. Overall Naltrexone Acceptance | −0.07 | 0.42** | 0.34** | 0.64** | 0.58** | – | |
| 7. HM/S Naltrexone Acceptance | 0.02 | 0.37** | 0.35* | 0.52** | 0.55** | 0.83** | – |
| Mean | 0.58 | 2.86 | 2.97 | 3.28 | 3.41 | 3.61 | 3.61 |
| Standard Deviation | | 1.10 | 1.08 | 0.92 | 0.90 | 0.70 | 0.77 |

[a] Encourage Tapering was binary 0 “no” 1 “yes” with 58% of respondents endorsing this item (n = 37); HM/S indicates house manager/staff.
* $p < .05$.
** $p < .01$.
*** $p < .001$.

**Table 2**
Results of independent samples t-test: medication acceptance by encouragement of tapering.

| | Encourage Tapering | | Do not Encourage Tapering | | t | p |
|---|---|---|---|---|---|---|
| | M | SD | M | SD | | |
| Overall Acceptance | | | | | | |
| Methadone[a] | 2.62 | 1.21 | 3.19 | 0.83 | 2.21 | 0.031 |
| Buprenorphine | 3.19 | 0.94 | 3.41 | 0.89 | 0.94 | 0.351 |
| Naltrexone | 3.65 | 0.68 | 3.56 | 0.75 | 0.52 | 0.605 |
| House Manager/Staff Acceptance | | | | | | |
| Methadone[a] | 2.73 | 1.17 | 3.30 | 0.87 | 2.22 | 0.030 |
| Buprenorphine | 3.32 | 0.92 | 3.52 | 0.89 | 0.85 | 0.400 |
| Naltrexone | 3.59 | 0.80 | 3.63 | 0.74 | 0.18 | 0.859 |

[a] The assumption of equal variances did not hold for methadone, thus equal variances was not assumed for these tests.

## 4. Discussion

MOUD is the most effective treatment modality for reducing illicit drug use, fatal opioid overdoses, and increasing treatment retention (Connery, 2015; Ma et al., 2018; Sordo et al., 2017). However, negative attitudes toward MOUD create significant barriers to treatment, and negatively affect individuals who use MOUD (Wakeman & Rich, 2018). For example, individuals who report feeling stigmatized related to their substance use disorder (SUD) have lower treatment retention (Livingston et al., 2012). Twelve-step groups, such as NA, also recognize the harm that may result from members feeling unwelcome due to the use of MOUDs. With the intention of supporting all paths to recovery, including MOUD, recovery homes in Missouri were required to be “medication friendly” (i.e., accept individuals using MOUD and not require tapering off MOUD) prior to being eligible to receive funding through the STR/SOR grants. We designed our study to assess the extent to which MOUDs were accepted in practice in “medication friendly” MCRSP-certified recovery residences. This is the first study to our knowledge to empirically assess MOUD acceptance among recovery housing operators specifically and establish a critical baseline for where MOUD-related housing support stands among a geographically limited set of housing providers.

The first goal of the study was to determine the extent to which the use of MOUD was accepted within Missouri's STR-funded recovery residences. Although recovery homes were required (per funding restrictions) to accept residents using medication, variation existed in the extent to which house managers/staff reported medication acceptance as common practice. Although more than 80% of respondents indicated residents using buprenorphine and naltrexone would be allowed, fewer indicated residents using methadone would be accepted. Consistent with previous work highlighting differential medication stigma resulting in a preference for (and overreliance on) naltrexone (Uebelacker et al., 2016; Wakeman, 2017), we found that the overall climate around medication acceptance was highest for naltrexone, followed by buprenorphine and methadone, respectively. Although house managers'/staff's own attitudes were similar, with less acceptance of methadone, house managers'/staff's attitudes did not demonstrate a significant preference for




**Fig. 1.** Results of independent samples *t*-test: medication acceptance by encouragement of tapering.
* $p < .05$.

naltrexone over buprenorphine.

Our second goal was to examine the extent to which house managers'/staff's encouragement of residents to taper off MOUDs is associated with acceptance of the various types of MOUD. Although individuals are not *required* to taper from MOUDs as per funding requirements, residents at more than half of the residences were reportedly *encouraged* to taper. While not an outright disapproval of MOUD use, encouraging MOUD tapering implicitly perpetuates a culture of unacceptance of MOUD. Because social model and 12-step mutual aid groups (from which recovery housing programs largely emerged) have historically not been accepting of MOUDs, the experiential knowledge of house managers and other residents may be limited to a conventional interpretation of abstinence that is not inclusive of medication treatment. Because research has demonstrated that counselors' attitudes toward MOUD are significantly associated with the social norms within a care setting (Rieckmann et al., 2007), the perspectives of house managers and housing staff on the acceptance of MOUD may shape cultural norms within recovery housing environments.

Because we cannot determine more details about what encouraging tapering looked like in practice from the survey results, resident-led tapering discussions may have played a role in how housing managers and staff responded to this question. For example, if a resident discussed wanting to taper with their house manager, a house manager who encouraged that resident to discuss his/her/their desire with the prescribing physician might have also endorsed this item. We additionally found that houses with more accepting climates surrounding methadone were significantly less likely to encourage tapering. Acceptance of buprenorphine and naltrexone, however, was not significantly associated with the encouragement of tapering. Methadone may already be perceived as a long-term medication given the historical context in which it has been prescribed (National Academies of Sciences, Engineering, & Medicine, 2019) and likelihood of withdrawal symptoms, whereas tapering may be more expected or assumed with buprenorphine, as this has been a common practice (Cioe et al., 2020).

These findings align with anecdotes from recovery housing providers and people in recovery emphasizing methadone as a major factor in negative experiences with MOUD and highlighting how diversion of MOUD, improper usage, or incorrect dosages can lead to triggering experiences (e.g., nodding and visible drowsiness) for other residents (Lopez, 2019; Stringfellow et al., 2019). Housing organizations may have a difficult time adopting MOUD protocols and integrating residents using MOUDs into the home, given the associated challenges with medication management (Miles, Bunn, et al., 2020). However, increasing housing providers' capacity to mitigate concerns of MOUD (e.g., work collaboratively with treatment providers to help inform dosing decisions as needed, increased funding to assist with medication management) may decrease stigma of MOUD. SAMHSA (2020), acknowledging the potential disruption of misusing medication in recovery housing, recommends several strategies as part of MOUD protocols including:

> locking medication up and house staff providing medication at specified time to clients, medication counts with staff and resident, increase drug testing (if suspected of diversion), communication between stakeholders, providers & staff (releases of information), maintain proper documentation, monitor specific residents as needed, open discussion of medications (e.g., group topic, potential triggers, etc.), and daily dosing within a licensed facility. (p. 8)

The attitudes and support provided by executive directors, house managers, and other peer role models within a home are also critical in shaping homes' culture surrounding MOUD. Some scholars further suggested incorporating the voices and experiences of individuals successfully using MOUDs as part of their recovery pathway to reduce stigma (Miles, Howell, et al., 2020). For recovery housing providers to fully embrace the social model's emphasis on experiential knowledge, a stronger integration must occur of housing managers and residents with lived experience with MOUDs. Given the social model's focus on the role of the broader community in the recovery process, a better understanding of residents' perspectives on existing MOUD-relevant community supports could allow for housing staff and peers to connect residents with these services. As part of their medication management suggestions, SAMHSA (2020) also highlighted integrating open discussion of MOUD-inclusive recovery pathways. Thoughtful and open discussion of MOUD-inclusive pathways in recovery homes, which may be especially critical in the absence of embedded peer models, may help residents using MOUD to feel that their recovery goals are celebrated particularly when met with unconditional positive regard.

Additional research should aim to understand the mechanisms that support organizational change, particularly as it relates to the uptake and acceptance of MOUDs in recovery housing. Research on the diffusion of evidence-based practices in organizational settings has highlighted that authoritative decisions (i.e., making adoption compulsory), such as was done with mandates prohibiting tapering, "may reduce the chance that the innovation is successfully implemented and routinized" (Greenhalgh et al., 2004, p. 600; Rogers, 1995). Ongoing feedback, support, and access to resources and information promotes the successful adoption of evidence-based practices across other organizational settings (Greenhalgh et al., 2004; Hall & Hord, 1987; Rogers, 1995). Prior research demonstrates greater endorsement of MOUD following training and/or education program completion, and scholars have suggested that providing greater access to factual information on MOUD may be a good way to decrease stigma (Andraka-Christou et al., 2019; Carroll, 2018; Haug et al., 2016; Rao, 2018). Tangible training and guidance for house managers, which numerous scholars have cited as a need (Polcin et al., 2014) and operators have expressed (Miles, Howell, et al., 2020), on how to support residents on maintenance MOUD may also improve their ability to champion multiple recovery pathways and align more closely with the central pillars of the social model. Future research can help to identify specific "competencies needed to support individuals on [MOUD] in a recovery housing setting" (NARR, 2018, p. 14).

### 4.1. *Limitations*

Our results should be interpreted in light of several limitations. This survey only captured medication-related attitudes as reported by housing managers/staff, not residents. Future research would benefit from assessing both housing managers' and residents' self-reported perceptions of the housing climate around MOUD concurrently to better triangulate the perspectives of multiple reporters involved in the system as well as pursuing a more in-depth examination of residents' perspectives on existing MOUD-relevant community supports and how to ensure MOUD-inclusive recovery residences. Although our goal was to survey live-in house managers as they are most familiar with the "on-the-ground" housing practices, approximately 25% of responses were from executive directors or other administrative professionals affiliated with the housing organization, as these homes did not have live-in house managers.

This study was cross-sectional and therefore we are unable to determine the direction of the relationship between study variables. However, our results are in line with theoretical expectations. Although we suspect that attitudes about methadone shape tapering discussions and the extent to which tapering is encouraged, longitudinal research should determine the direction of this effect, as it is possible that the tapering expectations shape attitudes about methadone in particular. While our sample of 64 residences is large relative to other studies of recovery homes, the small sample size could limit the ability to detect statistical significance, which is a common issue in research on recovery housing (Polcin et al., 2016).

The current study included recovery houses as they deemed them "medication friendly" and were eligible to receive funding to support

individuals with OUD receiving treatment through the STR/SOR grants. Additional research with a broader spectrum of recovery houses may identify variability that we did not capture through our inclusion criteria; specifically, the MOUD policies and climate within recovery houses that did not "opt-in" to the STR/SOR grant program may, therefore, be less accepting of MOUD than the housing organizations studied here.

The final limitations relate to the study measures. Due to a lack of validated and standardized measures assessing circumstances surrounding MOUD in recovery housing, such as the climate of acceptance for methadone or buprenorphine, we developed our own measures. A distinct need exists for more rigorous testing and standardized measures to assess medication acceptance and capacity to support residents on maintenance MOUD. Additionally, although a key variable of interest and discussion was if the housing managers or culture was encouraging of medication tapering, we lacked additional variables to outline what such "encouragement" looks like in practice. Additional measures and standardized research applications should address these limitations. Furthermore, future qualitative work with house managers and staff might better capture the nuances in how discussion around tapering occur in practice.

## 5. Conclusion

The current study identified variation in the acceptance of various forms of MOUD and encouragement of MOUD tapering among recovery homes self-identified as being "medication friendly." Future research is needed to a) develop standardized and validated measures of MOUD acceptance and tapering decisions within recovery homes, b) cultivate an understanding of residents' perspectives on existing MOUD supports and needs, and c) assess the impact of both operator-level and resident-level attitudes toward different types of treatment medications on residents' recovery-related outcomes. Recovery homes provide valuable services for individuals in recovery; however, more work needs to enumerate the existing capacity of recovery housing that is supportive of MOUD, and identify key drivers of MOUD-supportive housing environments. In addition to accepting individuals on MOUD, recovery housing operators, funders, and recovery residence-certifying bodies must support residents' medical treatment programs and work to promote an MOUD-inclusive culture within the recovery home. Although funding incentives and certifying bodies can incentivize standards, the ultimate challenge for recovery residences is to build a diverse and equitable environment in which all recovery pathways, including MOUD, are accepted and celebrated.

## Funding

This work was funded by the Substance Abuse and Mental Health Services Administration through the State Targeted Response Grant 1H79TIO80271 and the State Opioid Response Grant 6H79TI081697 awarded to the Missouri Department of Mental Health, Division of Behavioral Health. Although the work described in this article has been funded wholly or in part by the Missouri Department of Mental Health to the Curators of the University of Missouri on behalf of the University of Missouri, St. Louis, it does not necessarily reflect the views of either Agency, and no official endorsement should be inferred. The funding organization had no role in the design and conduct of the study; collection, management, analysis, and interpretation of the data; preparation, review, or approval of the manuscript; and decision to submit the manuscript for publication.

## CRediT authorship contribution statement

**Claire A. Wood:** Conceptualization, Writing – original draft, Formal analysis, Supervision. **Alex Duello:** Conceptualization, Writing – review & editing. **Jennifer Miles:** Writing – review & editing. **Brenna Lohmann:** Investigation. **Tatiana Gochez-Kerr:** Data curation, Software. **Kori Richardson:** Investigation. **Rosie Anderson-Harper:** Funding acquisition, Writing – review & editing. **Rachel P. Winograd:** Funding acquisition, Writing – review & editing.

## Declaration of competing interest

None.

## Acknowledgements

We would like to acknowledge Greg Smith with the Missouri Coalition of Recovery Support Provides (MCRSP) who provided significant insight and feedback on this article.

## References

Ahmad, F. B., Rossen, L. M., & Sutton, P. (2010). *Provisional drug overdose death counts*. National Center for Health Statistics. https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm.

Allen, B., Nolan, M. L., & Paone, D. (2019). Underutilization of medications to treat opioid use disorder: What role does stigma play? *Substance Abuse, 40*(4), 459–465. https://doi.org/10.1080/08897077.2019.1640833

Andraka-Christou, B., Gabriel, M., Madeira, J., & Silverman, R. D. (2019). Court personnel attitudes towards medication-assisted treatment: A state-wide survey. *Journal of Substance Abuse Treatment, 104*, 72–82. https://doi.org/10.1016/j.jsat.2019.06.011

Bart, G. (2012). Maintenance medication for opiate addiction: The foundation of recovery. *Journal of Addictive Diseases, 31*(3), 207–225. https://doi.org/10.1080/10550887.2012.694598

Beetham, T., Saloner, B., Gaye, M., Wakeman, S. E., Frank, R. G., & Barnett, M. L. (2020). Therapies offered at residential addiction treatment programs in the United States. *JAMA, 324*(8), 804–806. https://doi.org/10.1001/jama.2020.8969

Bentzley, B. S., Barth, K. S., Back, S. E., & Book, S. W. (2015). Discontinuation of buprenorphine maintenance therapy: Perspectives and outcomes. *Journal of Substance Abuse Treatment, 52*, 48–57. https://doi.org/10.1016/j.jsat.2014.12.011

Best, D. (2019). *Pathways to recovery and desistance: The role of the social contagion of hope*. Chicago, IL: Policy Press.

Blue, S. C., & Rosenberg, L. (2017). *Recovery housing issue brief: Information for state policymakers*. National Council for BehavioralHealth. https://www.thenationalcouncil.org/wp-content/uploads/2017/05/Recovery-Housing-Issue-Brief_May-2017.pdf?daf=375ateTbd56.

Carroll, M. M. (2018). The impact of recovery narratives on stigmatizing attitudes toward medication-assisted treatment (718). Published undergraduate thesis. In *Digital Repository*. North Kentucky University.

Cioe, K., Biondi, B. E., Easly, R., Simard, A., Zheng, X., & Springer, S. A. (2020). A systematic review of patients' and providers' perspectives of medications for treatment of opioid use disorder. *Journal of Substance Abuse Treatment*. https://doi.org/10.1016/j.jsat.2020.108146

<collab>21st Century Cures Act, H. R.34., 114th Congress</collab> (2016). https://www.congress.gov/bill/114th-congress/house-bill/34/text.

National Academies of Sciences, E., &amp, & Medicine. (2019). *Medications for opioid use disorder saves lives*. Washington, D.C.: The National Academies Press. Press.

Connery, H. S. (2015). Medication-assisted treatment of opioid use disorder. *Harvard Review of Psychiatry, 23*(2), 63–75. https://doi.org/10.1097/hrp.0000000000000075

Damian, A. J., Mendelson, T., & Agus, D. (2017). Predictors of buprenorphine treatment success of opioid dependence in two Baltimore City grassroots recovery programs. *Addictive Behaviors, 73*, 129–132. https://doi.org/10.1016/j.addbeh.2017.05.010

David, C., & Carr, D. H. (2019). Legal and policy changes urgently needed to increase access to opioid agonist therapy in the United States. *International Journal of Drug Policy, 73*, 42–48. https://doi.org/10.1016/j.drugpo.2019.07.006

Fiellen, D. A., Schottenfeld, R. S., Cutter, C. J., Moore, B. A., Barry, D. T., & O'Connor, P. G. (2014). Primary care-based buprenorphine taper vs maintenance therapy for prescription opioid dependence. *JAMA Internal Medicine, 174*(12), 1947. https://doi.org/10.1001/jamainternmed.2014.5302

Gorman, M., Marinaccio, A., & Cardinale, C. (2010). Fair housing for sober living: How the fair housing act addresses recovery homes for drug and alcohol addiction. *The Urban Lawyer, 42*(3), 607–614. https://www.jstor.org/stable/i27895806 https://www.jstor.org/stable/i27895806.

Greenhalgh, T., Robert, G., Macfarlane, F., Bate, P., & Kyriakidou, O. (2004). Diffusions of innovations in service organizations: Systematic review and recommendations. *The Milbank Quarterly, 82*(4), 581–629. https://doi.org/10.1111/j.0887-378x.2004.00325.x

Hall, G. E., & Hord, S. M. (1987). *Change in schools: Facilitating the process*. State University of New York Press.

Haug, N. A., Bielenberg, J., Linder, S. H., & Lembke, A. (2016). Assessment of provider attitudes toward #naloxone on Twitter. *Substance Abuse, 37*(1), 35–41. https://doi.org/10.1080/08897077.2015.1129390

Jason, L., Mericle, A., Polcin, D., & White, W. (2013). The role of recovery residences in promoting long-term addiction recovery. *American Journal of Community Psychology, 52*, 406–411. https://doi.org/10.1077/s10464-013-9602-6

Jason, L. A., & Ferrari, J. R. (2010). Oxford house recovery homes: Characteristics and effectiveness. *Psychological Services, 7*(2), 92–102. https://doi.org/10.1037/a0017932

Jones, C., Campopiano, M., Baldwin, G., & McCance-Katz, E. (2015). National and state treatment need and capacity for opioid agonist medication-assisted treatment. *American Journal of Public Health, 105*(8). https://doi.org/10.2105/ajph.2015.302664

Joudrey, P. J., Edelman, J. E., & Wang, E. A. (2020). Methadone for opioid use disorder – Decades of effectiveness but still miles away in the US. *JAMA Psychiatry, 77*(11), 1105–1106. https://doi.org/10.1001/jamapsychiatry.2020.1511

Kepple, N. J., Parker, A., Whitmore, S., & Comtois, M. (2019). Nowhere to go? Examining facility acceptance levels for serving individuals using medications for opioid used disorder. *Journal of Substance Abuse Treatment, 104*, 42–50. https://doi.org/10.1016/j.jsat.2019.06.004

Livingston, J. D., Milne, T., Fang, M. L., & Amari, E. (2012). The effectiveness of interventions for reducing stigma related to substance use disorders: A systematic review. *Addiction, 107*(1), 39–50. https://doi.org/10.1111/j.136-0443.2011.03601.x

Lofwall, M. R., & Walsh, S. L. (2014). A review of buprenorphine diversion and misuse: The current evidence base and experiences from around the world. *Journal of Addiction Medicine, 8*(5), 315–326. https://doi.org/10.1097/adm.0000000000000045

Lopez, A. M. (2019). *The co-use of methamphetamine and opioids among patients in treatment in Oregon, USA*. The National Drug Early Warning System, National Institutes of Health. https://com-phhp-epi-ndews.sites.medinfo.ufl.edu/wordpress/files/2020/07/NDEWS-Hotspot-Serenity-Lane-Sept2019-FINAL.pdf.

Luce, R. (n.d.). The social model of recovery handout. The John W. Clem Recovery House. https://mha.ohio.gov/Portals/0/assets/SchoolsAndCommunities/CommunityAndHousing/HousingResources/The-Social-Model-of-Recovery-Handout.pdf.

Ma, J., Bao, Y. P., Wang, R. J., Su, M. F., Liu, M. X., Li, J. Q., Degenhardt, L., Farrell, M., Blow, F. C., Ilgen, M., Shi, J., & Lu, L. (2018). Effects of medication-assisted treatment on mortality among opioids users: A systematic review and meta-analysis. *Molecular Psychiatry, 24*(12), 1868–1883. https://doi.org/10.1038/s41380-018-0094-5

Majer, J. M., Beasley, C., Stecker, E., Bobak, T. J., Norris, J., Nguyen, H. M., Ogata, M., Siegel, J., Wiedbusch, E., Dovale, I., Gelfman, N., Callahan, S., & Jason, L. A. (2018). Oxford house residents' attitudes toward medication assisted treatment use in fellow residents. *Community Mental Health Journal, 54*(5), 571–577. https://doi.org/10.1007/s10597-017-0218-4

Malivert, M., Fatséas, M., Denis, C., Langlois, E., & Auriacombe, M. (2012). Effectiveness of therapeutic communities: A systematic review. *European Addiction Research, 18*(1), 1–11. https://doi.org/10.1159/000331007

Mericle, A. A., Mahoney, E., Korcha, R., Delucchi, K., & Polcin, D. L. (2019). Sober living house characteristics: A multilevel analyses of factors associated with improved outcomes. *Journal of Substance Abuse Treatment, 98*, 28–38. https://doi.org/10.1016/j.jsat.2018.12.004

Mericle, A. A., Miles, J., & Cacciola, J. (2015). A critical component of the continuum of care for substance use disorders: Recovery homes in Philadelphia. *Journal of Psychoactive Drugs, 47*(1), 80–90. https://doi.org/10.1080/02791072.2014.976726

Mericle, A. A., Polcin, D. L., Hemberg, J., & Miles, J. (2017). Recovery housing: Evolving models to address resident needs. *Journal of Psychoactive Drugs, 49*(4), 352–361. https://doi.org/10.1080/02791072.2017.1342154

Miles, J., Bunn, T., Kizewski, A., Jennings, T., Waters, T., Johnson, D., Sheridan, D., & Fletcher, E. (2020). Assessing technical assistance needs among recovery residence operators in the United States. *Journal of Psychoactive Drugs*. https://doi.org/10.1080/02791072.2021.1941442

Miles, J., Howell, J., Sheridan, D., Braucht, G., & Mericle, A. (2020). Supporting individuals using medications for opioid use disorder in recovery residences: Challenges and opportunities for addressing the opioid epidemic. *The American Journal of Drug and Alcohol Abuse, 46*(3), 266–272. https://doi.org/10.1080/00952990.2020.1719410

Mojtabai, R., Mauro, C., Wall, M. M., Barry, C. L., & Olfson, M. (2019). Medication treatment for opioid use disorders in substance use treatment facilities. *Health Affairs, 38*(1), 14–23. https://doi.org/10.1377/hlthaff.2018.05162

Narcotics Anonymous. (2016). *Narcotics anonymous and persons receiving medication-assisted treatment*. NA World Services, Inc.. ISBN 9781633800922.

Narcotics Anonymous. (2018). Conference Agenda Report [PowerPoint Slides]. https://na.org.

National Alliance for Recovery Residences (NARR). (2018). MAT-capable recovery residences: How state policymakers can enhance and expand capacity to adequately support medication-assisted recovery. https://narronline.org/resources/.

National Alliance for Recovery Residences (NARR). (2019). NARR National Standard 3.0 Compendium Residences. https://narronline.org/wp-content/uploads/2019/02/NARR-Standard-Compendium-v3.pdf.

Patel, P., Ramaswamy, R., & Mardam Bey, R. (2020). Persisting gaps in M-OUD coverage at post-discharge recovery houses necessitate our continued advocacy. *Substance Abuse, 41*(1), 11–13. https://doi.org/10.1080/08897077.2019.1695038

Polcin, D. L., & Henderson, D. M. (2008). A clean and sober place to live: Philosophy, structure, and purported therapeutic factors in sober living houses. *Journal of Psychoactive Drugs, 40*(2), 153–159. https://doi.org/10.1080/02791072.2008.10400625

Polcin, D. L., Mericle, A., Callahan, S., Harvey, R., & Jason, L. A. (2016). Challenges and rewards of conducting research on recovery residences for alcohol and drug disorders. *Journal of Drug Issues, 46*(1), 51–63. https://doi.org/10.1177/0022042615616432

Polcin, D. L., Mericle, A., Howell, J., Sheridan, D., & Christensen, J. (2014). Maximizing social model principles in residential recovery settings. *Journal of Psychoactive Drugs, 46*(5), 436–443. https://doi.org/10.1080/02791072.2014.960112

Randall-Kosich, O., Andraka-Chrstou, B., Totaram, R., Alamo, J., & Nadig, M. (2020). Comparing reasons for starting and stopping methadone, buprenorphine, naltrexone treatment among a sample of white individuals with opioid use disorder. *Journal of Addiction Medicine, 14*(4), 44–52. https://doi.org/10.1097/ADM.0000000000000584

Rao, D. (2018). *Community pharmacists and substance use disorders: Attitudes, knowledge and practices*. Published Master's thesis. Duquesne University https://dsc.duq.edu/cgi/viewcontent.cgi?article=2569&context=etd.

Rieckmann, T., Daley, M., Fuller, B. E., Thomas, C. P., & McCarty, D. (2007). Client and counselor attitudes toward the use of medications for treatment of opioid dependence. *Journal of Substance Abuse Treatment, 32*(2), 207–215. https://doi.org/10.1016/j.jsat.2006.09.002

Rogers, E. M. (1995). *Diffusion of innovations*. Free Press.

Samples, H., Williams, A. R., Crystal, S., & Olfson, M. (2020). Impact of long-term buprenorphine treatment on adverse health care outcomes in Medicaid. *Heath Affairs, 39*(5). https://doi.org/10.1377/hlthaff.2019.01085

Sedgwick, P. (2012). Multiple significance tests: The Bonferroni correction. *BJM, 344*. https://doi.org/10.1136/bmj.e509

Sordo, L., Barrio, G., Bravo, M. J., Indave, B. I., Degenhardt, L., Wiessing, L., Ferri, M., & Pastor-Barriuso, R. (2017). Mortality risk during and after opioid substitution treatment: Systematic review and meta-analysis of cohort studies. *BMJ*. https://doi.org/10.1136/bmj.j1550

Stringfellow, E., Lohmann, B., Richardson, K., Duello, A., Ilavarasan, V., Kondai, R., Wood, C. A., & Winograd, R. P. (2019). *The recovery housing system in Missouri: Community-based system dynamics group model building workshop report*. University of Missouri St. Louis: Missouri Institute of Mental Health. https://static1.squarespace.com/static/5d3f05dde2442800011cca16/t/5eb064ca3c9e9c74eb305725/1588618459787/Recovery+Housing+Evaluation_CBSD+Report_FINAL.pdf.

Substance Abuse and Mental Health Services Administration (SAMHSA). (2019). Key substance use and mental health indicators in the United States: Results from the 2018 National Survey on Drug Use and Health. (HHS Publication No. PEP19-5068, NSDUH Series H-54). Rockville, MD. https://www.samhsa.gov/data/.

Substance Abuse and Mental Health Services Administration (SAMHSA). (2020). Recovery housing: Best practices and suggested guidelines. https://www.samhsa.gov/node/664942.

Szalawitz, M. (2018, January 17). *The wrong way to treat opioid addiction*. New York Times. https://www.nytimes.com/2018/01/17/opinion/treating-opioid-addiction.html.

Uebelacker, L. A., Bailey, G., Herman, D., Anderson, B., & Stein, M. (2016). Patients' beliefs about medications are associated with stated preference for methadone, buprenorphine, naltrexone, or no medication-assisted therapy following inpatient opioid detoxification. *Journal of Substance Abuse Treatment, 66*, 48–53. https://doi.org/10.1016/j.jsay.2016.02.009

US Substance Abuse. (2019). *Mental Health Services Administration. 2017 National Survey on Drug Use and Health: Detailed Tables*. Rockville, MD: SAMHSA.

Velander, J. R. (2018). Suboxone: Rationale, science, misconceptions. *Ochsner Journal, 18*(1), 23–29. http://www.ochsnerjournal.org/content/18/1/23.short http://www.ochsnerjournal.org/content/18/1/23.short.

Wakeman, S. E. (2017). Why it's inappropriate not to treat incarcerated patients with opioid agonist therapy. *AMA Journal of Ethics, 19*(9), 922–930. https://doi.org/10.1001/journalofethics.2017.19.9.stas1-1709

Wakeman, S. E., Larochella, M. R., Ameli, O., Chaisson, E., McPheeters, J. T., & Crown, W. H. (2020). Comparative effectiveness of different treatment pathways for opioid use disorder. *JAMA Network Open, 3*(2), Article e1920622. https://doi.org/10.1001/jamanetworkopen.2019.20622

Wakeman, S. E., & Rich, J. D. (2018). Barriers to medications for addiction treatment: How stigma kills. *Substance Use & Misuse, 53*(2), 330–333. https://doi.org/10.1080/10826084.2017.1363238

Williams, A. R., Samples, H., Crystal, S., & Olfson, M. (2020). Acute care, prescription opioid use, and overdose following discontinuation of long-term buprenorphine treatment for opioid use disorder. *American Journal of Psychiatry, 177*(2), 117–124. https://doi.org/10.1176/appi.ajp.2019.19060612

Winograd, R. P., Presnall, N., Stringfellow, E., Wood, C., Horn, P., Duello, A., Green, L., & Rudder, T. (2019). The case for a medication first approach to the treatment of opioid use disorder. *The American Journal of Drug and Alcohol Abuse, 45*(4), 333–340. https://doi.org/10.1080/00952990.2019.1605372