# EXHIBIT S

# NATIONAL DRUG CONTROL STRATEGY

THE WHITE HOUSE
EXECUTIVE OFFICE OF THE PRESIDENT
OFFICE OF NATIONAL DRUG CONTROL POLICY

# Table of Contents

Glossary ........ 1
To the Congress of the United States ........ 5
Preface from Dr. Gupta, Director ........ 6
Introduction: Saving Lives is Our North Star ........ 8
Prevention and Early Intervention ........ 17
Harm Reduction ........ 30
Substance Use Disorder Treatment ........ 45
Building a Recovery-Ready Nation ........ 60
Reduce the Supply of Illicit Substances through Domestic Collaboration ........ 76
Reduce the Supply of Illicit Substances through International Engagement ........ 85
Criminal Justice and Public Safety ........ 98
Data Systems and Research ........ 106
Appendix A—Developing a Data Plan ........ 123
Works Cited ........ 126

★ ★ ★ ★ ★ ★

# Glossary

AAMC: American Association of Medical Colleges

ACEs: Adverse Childhood Experiences

ACF: Administration for Children and Families

ADAM: Arrestee Drug Abuse Monitoring

AML: Anti-Money Laundering

APG: Alternative Peer Group

ARTS: Addiction and Recovery Treatment Services

ASPE: Assistant Secretary on Planning and Evaluation

BIPOC: Black, Indigenous, and People of Color

BJA: Bureau of Justice Assistance

BOP: Federal Bureau of Prisons

BSA: Bank Secrecy Act

CADCA: Community Anti-Drug Coalitions of America

CBP: United States Customs and Border Protection

CCDB: Consolidated Counterdrug Database

CDC: Centers for Disease Control and Prevention

CDEWS: Community Drug Early Warning System

CICAD: Organization of American States Inter-American Drug Abuse Control Commission

CMS: Centers for Medicare & Medicaid Services

CoP: Community of Practice

CRP: Collegiate Recovery Program

DAWN: Drug Abuse Warning Network

DEA: Drug Enforcement Administration

DFC: Drug-Free Communities

DHS: United States Department of Homeland Security

DIO: Drug Intelligence Officer

DOD: United States Department of Defense

DOI: United States Department of the Interior

DOJ: United States Department of Justice

DOL: United States Department of Labor

DOS: Department of State

DOT: United States Department of Transportation

EBPRC: Evidence-Based Practices Resource Center

EBT: evidence-based treatment

ED: United States Department of Education

EDR: electronic death registration

EDWG: Equitable Data Working Group

EMCDDA: European Monitoring Centre of Drugs and Drug Addiction

EMS: Emergency Medical Services

EPA: United States Environmental Protection Agency

FDA: Food and Drug Administration

FTS: fentanyl test strips

HHS: United States Department of Health and Human Services

HIDTA: High Intensity Drug Trafficking Area

HRSA: Health Resources and Services Administration

HUD: U.S. Department of Housing & Urban Development

ICD: International Classification of Diseases

IHS: Indian Health Service

INCB: International Narcotics Control Board

INL: Bureau of International Narcotics and Law Enforcement Affairs

IRS: Internal Revenue Service

LGBTQ: lesbian, gay, bisexual, transgender, queer

ME/C: medical examiner or coroner

MEXK-54: Monitoring System of Illicit Crops in Mexico Program

MOUD: medications for opioid use disorder

N-SSATS: National Survey of Substance Abuse Treatment Services

NADCP: National Association of Drug Court Professionals

NADD: North America Drug Dialogue

NARR: National Alliance for Recovery Residences

NASADAD: National Association of Alcohol and Drug Abuse Directors

NCHS: National Center for Health Statistics

NDCI: National Drug Court Institute

NIAAA: National Institute on Alcohol Abuse and Alcoholism [1]

NIC: National Institute of Corrections

NIDA: National Institute on Drug Abuse[1]

NIH: National Institutes of Health

NIJ: National Institute of Justice

NIOSH: National Institute on Occupational Safety and Health

NPS: U.S. National Park Service

NRC: National Research Council

NREPP: National Registry of Evidence-based Programs and Practices

NRO: National Reconnaissance Office

NSDUH: National Survey on Drug Use and Health

NSS: National Seizure System

NTBI: National Prescription Drug Take Back Initiative

NHTSA: National Highway Traffic Safety Administration

OCDETF: Organized Crime Drug Enforcement Task Forces

ODMAP: Overdose Map Detection Program

OIG: Office of Inspector General

OJJDP: Office of Juvenile Justice and Delinquency Prevention

OJP: Office of Justice Programs

ONDCP: Office of National Drug Control Policy

ORS: Overdose Response Strategy

OTP: opioid treatment program

OUD: opioid use disorder

PHA: Public Health Analyst

PRC: People's Republic of China

PRSS: peer recovery support services

[1] The FY2023 Budget proposes to change the name of the National Institute on Alcohol Abuse and Alcoholism to the National Institute on Alcohol Effects and Alcohol-Associated Disorders, the name of the National Institute on Drug Abuse to the National Institute on Drugs and Addiction, and the name of the Substance Abuse and Mental Health Services Administration to the Substance use And Mental Health Services Administration.

PWUD: people who use drugs

RCC: recovery community center

RCO: recovery community organization

SAMHSA: Substance Abuse and Mental Health Services Administration[1]

SAPs: Student Assistance Programs

SAPT: Substance Abuse Prevention and Treatment

SBHCs: school-based health centers

SCM: specialized case management

SDOH: Social determinants of health

SSP: Syringe Services Program

SUD: Substance Use Disorder

TCO: Transnational Criminal Organization

TEDS: Treatment Episode Data Set

TTHY: Talk. They Hear You.

UCR: Uniform Crime Reporting/ Uniform Crime Reports

UNODC: United Nations Office of Drugs and Crime

USAID: United States Agency for International Development

USDA: United States Department of Agriculture

USFS: United States Forest Service

USFWS: United States Fish and Wildlife Service

USPIS: United States Postal Inspection Service

USSC: United States Sentencing Commission

VA: United States Department of Veterans Affairs

VHA: Veterans Health Administration

WBE: wastewater-based epidemiology

WONDER: Wide-ranging Online Data for Epidemiologic Research

YRBS: Youth Risk Behavior Survey

# To the Congress of the United States:

I am pleased to transmit the 2022 *National Drug Control Strategy*. This inaugural *Strategy* proposes bold, targeted, and consequential actions to bend the curve on overdose deaths in the immediate term and reduce drug use and its damaging consequences over the longer term. These actions are based on the best science, evidence, and data available. Through them, we strive to usher in a new era of drug policy centered on individuals and communities.

This *Strategy* is the product of a rigorous process led by the Office of National Drug Control Policy in close collaboration with the 18 National Drug Control Agencies. In developing this *Strategy*, my Administration sought the input of more than 2,000 leaders and stakeholders including the entirety of the Congress; all 50 Governors; and advocates representing public safety, public health, community groups, local governments, and Tribal communities.

In my State of the Union Address, I identified addressing the opioid epidemic as part of a unity agenda for the Nation – something that could bring Americans together in service of a goal we all share. As this *Strategy* lays out, there is so much more we can do to expand access to evidence-based prevention, harm reduction, treatment, and recovery services, while also working to reduce the supply of harmful drugs in our communities.

I look forward to working with the Congress as well as State, local, and Tribal leaders as we implement this *Strategy*. Together, we can create safer and healthier communities for everyone.

President Joseph R. Biden

The White House

# Preface from Dr. Gupta, Director

The overdose epidemic affects all Americans, and in his first State of the Union, President Biden called on all Americans to work together to address it as part of a unity agenda for the Nation. As the President said, "Let's beat the opioid epidemic."

This call to action comes at a critical moment. For the first time in our Nation's history we have passed the tragic milestone of 100,000 deaths resulting from drug overdoses in a 12-month period. Since 1999, drug overdoses have killed approximately 1 million Americans. These are sons and daughters, parents and grandparents, neighbors and friends, and classmates and coworkers. This level of loss is heartbreaking and frankly, unacceptable. As we continue to lose an American life to drug overdose every five minutes around the clock, we find ourselves at an inflection point where we, as a Nation, must commit ourselves to doing what we know will help us triumph over this crisis.

As a practicing physician, I have seen firsthand the barriers that prevent people from obtaining the substance use treatment they need. As a researcher, I have observed the pervasive biases that have enabled ineffective drug policy approaches to be repeated over and over with the same results. And as a policymaker, I have encountered the roadblocks to progress in our legal and medical systems. This is part of the reason why I have seen too many succumb to their disease. Too often, stigma hinders Americans from seeking and receiving the help they need.

People with substance use disorder are in need of compassion and care. With the proper treatment and recovery support services, individuals go on to overcome addiction and lead successful lives.

Every family in America, regardless of their background or beliefs, has been impacted by addiction in some way. This is the reality we are facing today. The epidemic has taken a devastating toll on public health as well as the economy. Addiction prevents someone from reaching their full potential and contributing to their families and communities in a productive manner. Previous research has estimated that the economic costs of the epidemic are roughly $1 Trillion per year. If this trend continues, our national security and prosperity may be compromised considerably in the long-term.

Because the destruction caused by this epidemic in recent years is unrivaled, and the Biden-Harris Administration is determined to take unprecedented steps. There is a complex interplay between the availability of drugs in the United States and their use. Our *Strategy* will focus on two critical drivers of the overdose epidemic: untreated addiction and drug trafficking profits.

We are changing how we help people when it comes to drug use, by meeting them where they are with high-impact harm reduction services and removing barriers to effective treatment for addiction, while addressing the underlying factors that lead to substance use disorder head on. We are also striking drug trafficking organizations where it hurts them the most, in their wallets, by disrupting the operating capital they need to sustain their criminal enterprise. We need to apply both elements of this approach together, so we can disrupt the trafficking of drugs into the United States while allowing our historic investments in public health interventions to take hold. If it is easier to get illicit drugs in America than it is to get treatment, we will never bend the curve.

We can change this. We can make sure people get the help they need while also making our communities safer. President Biden's inaugural *National Drug Control Strategy* lays out our plans to achieve just that. It is based on the best science, evidence, and data available, and strives to usher in a new era of drug policy centered on individuals and communities.

As a Nation we must consider the legacy we are leaving behind for future generations. When it comes to drug policy, the Biden-Harris Administration is determined that our legacy will be healthier people and safer communities. This means building a better addiction infrastructure for preventing and treating substance use disorder, supporting recovery, and embracing evidence-based harm reduction strategies that keep people alive. This means building a better way of addressing addiction in the criminal justice system, reducing crime and making our communities safer while also making sure people get the help they need. And this means reducing the supply of illicit substances entering our communities. Every time one of our law enforcement professionals seizes illicit fentanyl, cocaine, or methamphetamine, they are helping to save lives and are cutting into the profits of the criminal organizations that fuel violence, breed corruption, and destabilize our partner nations, which makes our country and the world safer.

Our mandate from President Biden is clear: Reduce the number of drug overdose deaths, put quality public health services within reach for people with substance use disorder, and stop the drug trafficking organizations that seek profits by harming Americans. Working together, we can build healthy, safe and resilient communities where we have reduced the adverse experiences that can lead to substance use disorder, where public health services are available to everyone who needs them, and where the millions of Americans living in recovery have their health, their home, their community, and their purpose in life.

As President Biden said in his State of the Union, "If you're suffering from addiction, you should know you're not alone. I believe in recovery, and I celebrate the 23 million Americans in recovery… Now is our moment to meet and overcome the challenges of our time together. And we will." Our work cannot wait because every five minutes is a chance to save and transform a life.



Dr. Rahul Gupta

Director of National Drug Control Policy

# Introduction: Saving Lives is Our North Star

The drug overdose epidemic has taken a heartbreaking toll on Americans and their families. Provisionally, in the 12-months ending October 2021, an historic 105,752 persons are predicted to have died from a drug overdose; a 71-percent increase over this time period in 2016.[1] This was a greater rate of increase than for any other type of injury-related death in the United States.[2] Synthetic opioids, including illicit fentanyl, has been involved in 66-percent of these overdose deaths.

Saving lives is our North Star, and the 2022 *National Drug Control Strategy* calls for immediate actions that will save lives in the short term and outlines long-term solutions to reduce drug use and its associated harms, including overdose.

## The Biden-Harris Administration's Drug Policy Priorities for Year One

The passage and signature of the Substance Use-Disorder Prevention that Promotes Opioid Recovery and Treatment for Patients and Communities (SUPPORT) Act in 2018 required the Office of National Drug Control Policy to produce a statement of drug policy priorities by April 1 of the first year of an Administration and an inaugural *National Drug Control Strategy* in the second year.

President Biden understood the urgency of the issue when he took office and the Biden-Harris Administration submitted its first-year drug policy priorities to Congress on April 1, 2021.

These seven priorities proposed specific and targeted actions to reduce overdoses and promote recovery, including expanding access to quality treatment, reducing an increasingly lethal supply of illicit substances, and enhancing harm reduction services that engage and build trust with people who use drugs, among others.

The seven Biden-Harris Administration drug policy priorities for the first year were:

1. Expanding access to evidence-based treatment, particularly medication for opioid use disorder.
2. Advancing racial equity in our approach to drug policy.
3. Enhancing evidence-based harm reduction efforts.
4. Supporting evidence-based prevention efforts to reduce youth substance use.
5. Reducing the supply of illicit substances.
6. Advancing recovery-ready workplaces and expanding the addiction workforce.
7. Expanding access to recovery support services.

ONDCP worked closely with agencies, Congress, and other partners in support of these priorities.

## Significant Actions Taken to Save Lives

The Biden-Harris Administration has taken several actions that support the first-year drug policy priorities:

- President Biden signed the American Rescue Plan into law, which invested nearly $4 billion in expanding access to vital mental health and substance use disorder services.
- The Department of Health and Human Services (HHS) released a new Overdose Prevention Strategy that supports substance use prevention by expanding research of new and improved prevention efforts, investing in community resources to help prevent harms related to substance use, increasing access to high-quality pain management to reduce preventable suffering, and promoting responsible prescription of medications to protect patient safety.
- The Administration made it easier for health care providers to prescribe buprenorphine to treat more patients with opioid use disorder; Thousands of providers signed up to do this within a few months.
- The Administration also announced rulemaking intentions to extend pandemic related treatment flexibilities to allow:
- people with opioid use disorder to begin buprenorphine treatment by telehealth, including through phone consultation; and
- patients receiving methadone to receive a higher amount of take-home e medication instead of visiting a clinic every day.
- The DEA revised regulations to allow treatment providers to operate mobile methadone vans, bringing treatment to rural, incarcerated, and underserved communities.
- President Biden announced two Executive Orders to counter transnational criminal organizations and illicit drug trafficking, first by formally establishing the U.S. Council on Transnational Organized Crime, and second, by modernizing and expanding the U.S. Government's ability to target drug trafficking organizations, their enablers, and financial facilitators through sanctions and other related actions.

These key actions represent a fraction of the total. For a comprehensive list, visit White House Releases List of Actions Taken by the Biden-Harris Administration Since January 2021 to Address Addiction and the Overdose Epidemic | The White House.

## The Administration's Inaugural *National Drug Control Strategy:* A Comprehensive Path Forward

The first-year policy priorities served as the basis for President Biden's inaugural *National Drug Control Strategy*, which builds upon the significant actions taken during the Administration's first year to reduce overdose deaths and improve the way this Nation approaches drug use and its harms.

Specifically, this *Strategy* seeks to build the foundation for the Nation's work to reduce drug overdose deaths by addressing both the demand and supply sides of drug policy. This includes

building a stronger substance use disorder treatment infrastructure and reducing the supply of illicit substances through targeted law enforcement actions and commercially disrupting criminal organizations by undermining the illicit finance networks that make drug trafficking both possible and profitable. Additional top priorities include expanding evidence-based harm reduction strategies to meet people where they are, preventing drug use from beginning, building a recovery-ready Nation, addressing drug policy challenges in criminal justice, and improving data systems and research that guide drug policy development.

This *Strategy* charts a comprehensive path forward beyond what past federal drug policies have attempted. The increased focus on improving racial equity, which has been a longstanding problem in drug policy affecting both public health and public safety, is long overdue. The new focus on evidence-based harm reduction addresses a historic gap in past U.S. drug policy. The renewed focus on collaboration across public health and public safety has implications for every community in the Nation.

Each chapter of this *Strategy* supports saving lives with specific principles and action items for Federal agencies and departments to lead:

## *Prevention and Early Intervention*

Adolescence is a critical risk period for substance use initiation and adverse outcomes related to substance use, particularly as drug use has been found to escalate between ages 12 and 19.[3] The goal of substance use prevention efforts is to prevent and/or delay the first use of substances. Research shows that early age of onset is an important predictor for the development of a substance use disorder later in life.[4,5] Further, research shows that prevention interventions can have positive long-term effects in reducing substance use.[6,7] Recognizing that preventing or delaying initiation of substance use can confer important health and social benefits, the Biden-Harris Administration is focused on addressing the social factors that put some youth at increased risk for substance use, preventing use before it starts, and avoiding the escalation of use during the most critical period for substance use initiation.

### Harm Reduction

Harm reduction is an approach that emphasizes working directly with people who use drugs to prevent overdose and infectious disease transmission, improve the physical, mental, and social wellbeing of those served, and offer flexible options for accessing substance use disorder treatment and other health care services. In other words, harm reduction is people-centered. It means helping people who use drugs access services they need to stay alive. It means building trust with them so that when they wish to seek help, they know where to turn.

> **Focus Area:** Expanding access to naloxone, an opioid overdose reversal medication, which could save tens of thousands of lives in a short period of time.

Specifically, the Biden-Harris Administration's focus on harm reduction includes naloxone, drug test strips, and syringe services programs. Syringe services programs are community-based programs that can provide a range of services, including links to substance use disorder treatment; access to and disposal of sterile syringes and injection equipment; and vaccination, testing, and links to care and treatment for infectious diseases. Syringe services programs can be a critical intervention to reduce overdose deaths and communicable disease. Access to these

★ ★ ★ ★ ★ ★

proven, lifesaving interventions[8] should not depend on where someone lives and instead should be available to all who need them. The types of interventions proposed in this *Strategy* will save lives, improve health, and likely have a favorable economic benefit to society.

## Substance Use Disorder Treatment

According to the 2020 National Survey on Drug Use and Health (NSDUH), nearly all of the almost 20 million people living in the United States who need treatment are not currently receiving addiction treatment services.[9] People with SUD face prejudice, stigma, and discrimination, and this may especially be true for Black individuals seeking treatment.[10] Stigmatizing attitudes towards drug use and people who use drugs exist throughout our society, including in health care.[11] It is vital that the Nation reduces the barriers to substance use treatment so everyone who needs it can access it. Similarly, important is building a system of care that proactively seeks, diagnoses, and treats those who need it rather than waiting until they interact with the criminal justice system or experience an overdose. Treatment works and tens of millions of people in this country are in recovery.[12] However, additional work is necessary to meet the *Strategy*'s stated treatment goals of increasing access to quality treatment, reducing stigma, ensuring dedicated interventions for the most vulnerable, and building a trained addiction workforce.

**Focus Area:**
Expanding access to high-quality treatment, including medications for opioid use disorder (MOUD), to prevent overdoses and put recovery within reach.

## Building a Recovery-Ready Nation

The four major dimensions of recovery prioritized in the *Strategy* are home, health, purpose, and community.[13] Recovery is measured as a positive—by what it brings, including quality of life, a sense of self-efficacy and purpose, and improvements in social and emotional functioning and wellbeing. Americans follow diverse trajectories from SUD to recovery or remission. In 2020, an estimated 29.2 million Americans perceived ever having a substance use problem.[14] Of these, 21 million (72-percent) identified as in recovery or recovered from a substance use problem.[15] A 2017 study found that, among people who reported having resolved an alcohol or other drug program, the most common recovery supports included mutual aid groups (45-percent), treatment (28-percent), and emerging recovery support services (22-percent).[16] Reaching recovery is more important than the specific path taken to it.

The Administration will work to increase scientific understanding of recovery, foster adoption of more consistent certification and accreditation standards nationally, expand the peer recovery support services (PRSS) workforce and the organizational infrastructure that supports it, address stigma and misunderstanding, and eliminate barriers to safe and supportive housing, employment, and education for people in recovery.

## Domestic Supply Reduction

Law enforcement agencies at all levels—federal, state, local, Tribal, and territorial—work to combat domestic cultivated and synthetic drug production and trafficking with the goal of protecting Americans from a lethal drug supply contributing to record levels of fatal drug overdoses. However, traffickers continue to refine their methods and adopt new techniques of distributing drugs throughout our communities.

Responding effectively to the illicit production, trafficking, and distribution methods of domestic criminal organizations and Transnational Criminal Organizations (TCOs) is a significant challenge and remains a Biden-Harris Administration priority. Four principal lines of effort are necessary to improve domestic collaboration, reduce the supply of illicit substances, and decrease the harms caused by these substances in the United States and abroad:

- Improve information sharing and cooperation across all levels of government to strengthen the domestic response to drug trafficking;
- Deny and disrupt domestic production, trafficking, and distribution of illicit substances;
- Improve assessments of supply reduction initiative effectiveness and efficiency and allocate resources accordingly; and
- Protect individuals and the environment at home from criminal exploitation by those associated with drug production and trafficking.

## International Supply Reduction

The majority of illicit drugs consumed in the United States are produced abroad by TCOs and smuggled into the country. Large TCOs, wherever they are based, threaten the health and safety of our communities by exposing our citizens to illicitly manufactured substances. These include synthetic drugs, such as opioids like fentanyl and stimulants like methamphetamine, and cultivated drugs like heroin and cocaine. The plentiful supply and widespread availability of high potency illicit drugs fuel drug consumption across all sectors of American society.

**Focus Area:** Disrupting illicit finance networks to commercially disrupt drug trafficking operations and prevent illicit substance from reaching communities in the United States.

Large and influential TCOs pose a threat to national security and effectively responding to their illicit manufacturing, trafficking and distribution methods is an Administration priority. Countering corruption and its deleterious impact, including its role in facilitating transnational crime, is a core national security interest of the U.S. government.

The U.S. must strengthen international partnerships and foster bilateral exchanges to collaboratively address drug-related problems as a shared responsibility. The increasingly dynamic and complex nature of the international illicit drug trade demands enhanced cooperation with international partners that reflects the reality of a globalized supply chain for illicit drugs and their precursor chemicals. In addition to confronting TCOs' illicit drug manufacturing and trafficking activities directly, the U.S. must also pursue the financial enablers of this illicit activity to deny TCOs their ill-gotten proceeds and to disrupt their ability to transfer working capital to fund their range of illicit activities including procuring precursor ingredients, trafficking, bribery, and corruption. A global approach is essential since traffickers exploit national boundaries to insulate their operations and limit the impact of any single nation's control efforts.[17]

## Criminal Justice and Public Safety

Americans with undiagnosed or untreated substance use disorders too often end up interacting with the justice system, creating severe consequences for individuals, their families and communities, society, and taxpayers. Further, attaching criminal penalties to substance use alone

has contributed to lost lives, hope and opportunity. Untreated substance use disorder is overrepresented in the prison population; A study published in 2010 estimated that 65-percent of persons incarcerated had an active SUD.[18] The impact begins at arrest and continues through incarceration and after release back into the community. Arrest and incarceration for crimes related to substance use and possession disproportionately affect *Black, Indigenous and People of Color (BIPOC)* communities. According to an analysis of National Registry data through mid-October of 2016, African Americans may be nearly five times as likely to go to prison for drug possession as Whites, and data on exoneration outcomes suggest innocent Black people are about 12 times more likely to be convicted of drug crimes than innocent White people.[19]

The arrest and incarceration of people who use drugs (PWUD) has not only led to significant harms in BIPOC communities, but it increases risks of overdose as well. Upon release, incarcerated individuals are at a meaningfully elevated risk to die from an overdose than the general population.[20,21] It is clear that the criminal justice system must play an important role in ensuring that people within its custody or supervision and upon reentry who use drugs do not overdose and instead have access to the continuum of services and support.

## Data and Research

The Biden-Harris Administration is committed to employing a multi-faceted and evidence-based approach to policy-making as directed in the Presidential Memorandum on scientific integrity and evidence-based policymaking.[22] This is particularly significant in the area of drug policy where the ultimate impact is typically measured in American lives. Timely and accurate data are essential to grasp the extent and evolving nature of the drug problem, guide policy, assess the effectiveness of our nation's efforts, and continually improve these efforts over time. Data systems and research to generate this information must be maintained, enhanced, and supplemented so drug control practitioners, researchers, and policy-makers are continually informed by the most up to date and accurate information, while also protecting privacy and confidentiality. Further, when well communicated, such data can help inform the American public as to the types of policies and programs most likely to successfully address substance use challenges in their own communities.

**Focus Area:** Improving data collection, particularly for non-fatal overdoses, to obtain a full picture of overdoses in America and identify people who need substance use treatment.

Considering the costs of drug use to society, which have vastly increased due to the opioid epidemic over the past decade, our data systems lack the timeliness, scope and precision required for the most impactful national response. As we assess the data and research landscape to address the Administration's commitment to implementing evidence-based drug policy, we have much more work to do to close information and knowledge gaps. This chapter focuses on three themes: strengthening existing data systems, establishing new data systems and analytical methods to fill gaps, and enhancing the utility of drug data for policymakers, program developers and administrators, practitioners, and researchers. It concludes with recommendations for sustaining data systems and research to inform drug control policy.

★★★★★★

# Substance Use Disorder Treatment

According to the 2020 National Survey on Drug Use and Health (the National Survey),[2] 40.3 million people aged 12 or older had a past-year substance use disorder (SUD).[160] Among these, 70.3-percent (or 28.3 million people) had a past year alcohol use disorder, 45.7-percent (or 18.4 million people) had a past year illicit drug use disorder, and 16-percent (or 6.5 million people) had both an alcohol use disorder and an illicit drug use disorder.[161] This survey also shows that, in 2020, among the 41.1 million people who needed treatment only 2.7 million (6.5-percent) of received treatment received treatment at a specialty treatment facility in the past year.[162] This disparity in unmet needs of SUD is known as the "treatment gap."

Substantial federal funding in recent years has expanded and improved treatment services; however, access to diagnostic and treatment opportunities do not exist in the same manner that they do for other chronic illnesses (e.g., the rate of undiagnosed diabetes is about 39-percent).[163] Research shows that more than 95-percent of people identified in the 2020 National Survey as meeting criteria for SUD who did not seek treatment felt they did not need treatment.[164] Another 3-percent of those individuals thought they should get treatment but did not try to get it.[165]

SUDs including alcohol, prescription and illicit drug use disorders are medical conditions[166] that respond to evidence-based treatments (EBTs).[167,168,169] EBTs have scientific evidence supporting the effectiveness of the treatments, and may be pharmacotherapies, such as methadone (for opioid use disorder, or OUD) or naltrexone (used for both OUD and alcohol use disorder), or evidence-based therapies, such as contingency management. It is clear that if we were to appropriately screen, diagnose, and treat individuals with SUD similarly to chronic conditions we would be able to significantly reduce mortality and several aspects of morbidity associated with substance use. As such, the more people who are treated, the fewer lives will be lost. Treating more people who have SUD is one of the highest drug policy priorities.

Certain factors are associated with an elevated risk of overdose for people with cocaine, methamphetamine, other stimulant, or OUD (or a combination of these) such as experiencing homelessness,[170] injecting drugs,[171] having a prior history of non-fatal overdose,[172] using non-prescribed benzodiazepines,[173] and detoxification without follow-up medication treatment (in people who use opioids ).[174] Additionally, overdose is the highest risk factor for death among people leaving incarceration.[175,176] Geographic and other barriers to accessing services can confer vulnerability and even differ based on race.[177] Studies have shown racial disparity in naloxone prescribing and delivery is a health inequity that must be addressed.[178] Treatment for high-risk populations is especially important. Evidence-based treatments have been shown to reduce overdose risk and mortality.[179] However, people of color, pregnant people and individuals with children may find it difficult to access or complete treatment due to the barriers erected by some social determinants of health.[180,181,182] Pregnant and postpartum individuals experience additional barriers given the lack of integration between OB/Gyn care and SUD treatment. Some individuals live in treatment deserts without any treatment at all or with treatment too distant to be accessible via available or affordable transportation.[183] Finally, while the recent overdose epidemic began as a problem predominately in White people related to the oversupply of prescription opioids, overdose rates have begun climbing in people of color. [184,185]

---

[2] These numbers do not include people in institutional settings like prisons, jails, dormitories, or hospitals, and they also do not count individuals who are experiencing homelessness, leading to an undercount of people who may benefit from treatment

Neighborhoods with smaller White populations may have less access to certain treatments (e.g., buprenorphine).[186] Other underserved areas include rural counties, Tribal communities, and states that thus far have chosen not to expand Medicaid.[3]

EBTs can improve outcomes but are not as widely available as they need to be.[187] Research has shown that for OUDs, the U.S. Food and Drug Administration (FDA) approved medications most effectively reduce overdose mortality, increase abstinence, and improve quality of life.[188] Research with office-based buprenorphine has shown that adding additional behavioral therapy sometimes does not improve outcomes.[189,190] For OUDs related to prescription opioids, research reported that medicine managed by a prescriber can produce abstinence outcomes as good as medication plus a very robust psychosocial evidence-based treatment.[191] Recognizing the overall effectiveness of FDA approved MOUD, they should be accessible to any individual with an OUD regardless of the availability of, or their willingness to participate in, additional therapy except where that participation is mandated by regulation.

People with SUD often face prejudice, stigma, and discrimination, and this especially affects Black individuals.[192] Stigmatizing attitudes towards drug use and people who use drugs (PWUD) exist throughout our society, including in health care.[193] One study found that PWUD were discouraged from accessing medical care because they do not trust health care providers to maintain their privacy from law enforcement.[194] We must continue to ensure privacy protections for people in treatment while removing stigma in health care to enhance patient engagement in treatment.[195,196] Systems engineering and behavioral health research suggest that a focus on validation and elements of process improvement science are critical for engagement in treatment.[197,198,199]

Research shows that people with SUD are viewed more negatively than people with physical or other mental disorders.[200,201] When the subject of a vignette was referred to as a "substance abuser" rather than as a "person having a substance use disorder," even highly trained SUD and mental health clinicians were significantly more likely to assign blame and believe that an individual should be subjected to punitive (e.g., jail sentence) rather than therapeutic measures.[202] Blame is counterproductive because many factors other than individual decision-making impact whether a person tries a drug or develops SUD. Adverse Childhood Experiences (ACEs), like growing up in a home with a parent with SUD increases the risk for developing SUD.[203] To increase the number of people in treatment, societal attitudes towards people with SUD must change. The U.S Preventive Services Task force recently recommended screening adults for unhealthy substance use as a Grade B recommendation.[204] Members of the health, child welfare and justice systems should receive training to recognize SUD as a medical condition like diabetes or cancer. Practitioners and support staff should receive training to serve these individuals. Finally, attitudes more broadly about people in need of treatment can change but this likely only will happen if individuals feel safe to speak up.

Treatment is effective and an estimated 23 million people in this country are in recovery.[205] However, additional work is necessary to eliminate the unmet need for evidence-based SUD treatment. To meet the *Strategy*'s stated treatment goals, including increased access to quality treatment, reduced stigma, dedicated interventions for the most vulnerable, and a trained

[3] The Patient Protection and Affordable Care Act (ACA, P.L. 111-148, as amended) extended Medicaid eligibility to all adults under age 65 with incomes below 133 percent of the federal poverty level. However, the June 2012 National Federation of Independent Business (NFIB) v. Sebelius Supreme Court decision effectively made the expansion optional for states.

workforce are necessary. In addition, novel approaches such as the use of technology[206] to facilitate entrance and retention in treatment must also be supported. Federal agencies must support efforts nationwide to identify people most at risk of overdose, expand access to evidence-based treatments, improve reimbursement models, and build the workforce and infrastructure needed so more people can enter long term recovery.

## Principle 1: Improve Treatment Engagement by Meeting People Where They Are

It is imperative to find ways to identify and engage people with SUD into treatment that will benefit them. Medical practitioners routinely screen for and treat other conditions that have few if any obvious symptoms (e.g., diabetes), and SUD should be no different. Primary care providers should be at the forefront of screening for SUD. To do that they must be equipped to routinely screen, assess, and treat SUD. Technological supports (such as screening reminders) can be of help as providers incorporate and deliver such services.

Engagement opportunities in locations where people who use drugs (PWUD) spend time is essential. Hospitals, syringe services programs (SSPs, discussed in detail in the previous chapter), infectious disease clinics, and health departments are all ideal locations to conduct screening and improve engagement rates. People with SUD encounter law enforcement in multiple settings. Programs that partner with law enforcement to divert and deflect appropriate individuals away from the justice system and into treatment and prevent incarceration without negatively impacting public safety are important.

Making treatments more accessible for people with different needs is essential to increasing treatment engagement. For example, housing for people with SUD who are experiencing homelessness, or providing childcare for children of a parent in treatment may decrease barriers to treatment participation and ultimately help more individuals enter recovery.[207,208] Transportation is also a significant barrier to treatment, particularly in rural areas, where treatment services may not exist and individuals must travel distances for treatment but lack public or reliable transportation.

The "Treatment Cascade" concept suggests that the more individuals are successfully diagnosed, entering treatment and receiving tailored evidence-based treatment, the more people who will enter long term recovery.[209] Unfortunately, as the figure below demonstrates, the U.S. has gaps in these rates and needs to radically increase them starting with the percentage diagnosed.

Figure: Hypothetical substance use disorders cascade of care for US population 12+, 2020. SUD = substance use disorders[210],[211]




**A. Implement a national case-finding initiative.** *(Agencies Involved: DOD; HHS/CMS, HRSA, SAMHSA; VA/VHA; ONDCP)*

A medical provider screening, assessing, and then recommending treatment to a patient especially coupled with feedback concerning the health effects and risks of ongoing use can raise awareness and motivation for change. All sectors should be involved including state, county and city health departments; clinics that offer testing for HIV/Hepatitis C and sexually transmitted diseases; crisis centers, emergency departments; and hospital trauma units. All patients who meet screening thresholds should have an assessment and efforts should be made to engage that patient in appropriate treatment. Agency principals should engage with national stakeholder organizations and establish this as a standard of practice, and all federal agencies that include providers who treat SUD should fully implement case-finding, assessment, and primary care feedback in their primary care patient population by 2024.

**B. Scale up primary care screening technology and computerized brief interventions to promote treatment entry.** *(Agencies Involved: DOD; DOJ/BOP; HHS/HRSA, IHS, NIH; VA/VHA)*

During the COVID-19 pandemic many of us have gotten used to being screened for symptoms by providers at the start of medical visits. Use of screening including tech-enabled screening tools and non-judgmental brief interventions like the National Institute on Drug Abuse's (NIDA) "Video Doctor"[212] program and other technology assisted motivational interviewing (TAMI) tools can help screen people with SUD and may motivate some to attend treatment. These approaches may reduce the need to train providers to do screening. Approaches like these should be widely deployed.[213]Providers should link those who screen positive to substance use disorder assessment and then treatment if they have substance use disorders.

★ ★ ★ ★ ★ ★

**C. Support engagement through "low-threshold" or "low barrier to entry" settings.** *(Agencies Involved: HHS/SAMHSA; DOD, VA/VHA)*

"Low-threshold" programs that make it relatively easy to get started or participate in treatment can include hospital clinics, telemedicine treatment initiation, mobile methadone programs or other programs which do not require people to "jump through hoops" to start in care. Although drug use has been historically grounds for dismissal from some treatment programs, providers are learning that flexibility can be offered to accommodate a person who might be willing to stop opioid use but not all other drugs. Education about other drug use and the need to take precautions when using benzodiazepines and buprenorphine, for example, may be an area that a provider negotiates with a patient because the benefits of being on buprenorphine outweigh the risks of co-use. Agencies should review their policies to allow greater flexibility and site treatment access where people already live or spend time such as in health care for the homeless programs or in SSPs.

## Principle 2: Improving Treatment Quality Including Payment Reform

Ample research shows that people with cocaine and methamphetamine use disorder respond to specific psychosocial and behavioral treatments.[214,215,216,217] Also, research shows that the Food and Drug Administration (FDA) approved MOUD save lives[218] and can outperform treatment without medication.[219,220] Thus, they should be accessible to any individuals with OUD regardless of whether that individual has access to, or chooses to participate in psychosocial or behavioral treatment unless the behavioral treatment is required by regulation.

A number of policy barriers prevent access to the most efficacious treatments for SUD. To vastly increase the percentage of people needing treatment who participate in evidence-based treatment in a given year, it is important to make evidence-based treatment as accessible and available as primary care. It is also essential that we prioritize utilizing treatment dollars efficiently by recognizing treatment dollars are limited, but the need is vast. Wherever possible, inexpensive oral methadone and sublingual buprenorphine should be the backbone of our treatment system for caring for people with opioid use disorder, and selected far more often because of their relative safety, efficacy, and low cost.

In addition, approaches such as motivational incentives, which utilize tangible rewards to reinforce positive behaviors such as abstinence from opioids and to motivate and sustain treatment adherence in patients who suffer from SUD, should be more widely available. These incentives are an integral part of protocol-driven and evidenced-based contingency management programs and can be offered through smartphone applications and smart debit card technology designed to provide comprehensive and personalized treatment for SUD (including, for opioid, stimulant, alcohol, and nicotine use disorders). These programs include tools that enable, for example, automated appointment reminders and attendance verification, automated medication reminders, drug, alcohol, and tobacco/nicotine testing, self-guided cognitive behavioral therapy, and recovery coaching.

In addition, prescription digital therapeutics are software-based disease treatments intended to prevent or treat a disease that are regulated by the US Food and Drug Administration. For

example, one prescription digital therapeutic authorized in 2018 delivers cognitive behavioral therapy for individuals receiving buprenorphine for opioid use disorder.[221] Further exploration of such digital therapeutics and other health technology in the form of digital screening, assessment and treatment could help increase services for a wide array of patients.

Payment reform is also essential. Insufficient insurance coverage, provider reimbursement rates that do not cover activities required to sustain a practice, and non-compliance with federal parity laws requiring certain insurance plans to provide comparable coverage of physical and behavioral health services all may impact access to treatment as well as whether people can succeed in treatment. Research shows lower overdose rates in Medicaid expansion states.[222] Although the Substance Abuse Prevention and Treatment Block Grants (Block Grant) as well as new money from Congress through the 21st Century Cures Act and State Opioid Response (SOR) provide for certain services in all States (Medicaid expansion and non-expansion), these sources of funding do not replace the more comprehensive access to care through Medicaid which would otherwise be offered if all States expanded coverage via opportunities offered through the Affordable Care Act. Reform is needed so that those treating groups most at risk receive funding, and so providers can make a business case for treating more of these patients and for accepting insurance.

A. **Provide technical assistance and support to Congress to remove outdated requirements that limit access to MOUD.** *(Agencies Involved: HHS/FDA, SAMHSA; DOJ/DEA; ONDCP)*

   The Office of National Drug Control Policy (ONDCP) will work with interagency partners to provide technical assistance and support to Congress in order to eliminate the outdated requirements and overregulation that prevents widespread use of buprenorphine products for OUD treatment by licensed medical treatment providers.

B. **Explore linkages to training on controlled substance prescribing to DEA registration or another prescriber requirement.** *(Agencies Involved: DOJ/DEA; HHS/FDA, SAMHSA; ONDCP)*

   ONDCP will work with interagency partners to explore linkages to training on the use of controlled substances for both pain and addiction treatment by exploring options to either (1) require minimum training as part of the Drug Enforcement Administration (DEA) registration or (2) create a requirement for training through the Opioid Analgesic Risk Evaluation Mitigation Strategy (REMS), pursuing a legislative solution if necessary.

C. **Explore reimbursement for evidence-based motivational incentives such as contingency management, and explore emerging evidence for digital screening, assessment, and treatment (digital therapeutics).** *(Agencies Involved: HHS/ASPE, CMS; VA/VHA, DOD)*

   Coverage for the provision of motivational incentives could be considered within health plans. This will require considering billing codes and setting reimbursement parameters. Coverage should be explored for the incentives themselves, as well as for the provider costs for administering them and the digital tools that help enable the treatment (including FDA-cleared and evidence-based approaches). Revisions to existing payment bundles could be assessed by the Department of Health and Human Services (HHS) payers to include these programs alongside MOUD and psychotherapy, as patients with OUD and other SUDs may need concurrent treatment. If needed, HHS, VHA, and DOD

should request authority from Congress to cover the costs of motivational incentives and reimburse providers who work with patients using incentives and digital services for contingency management.

**D. Incentive-Based Treatment using section 1115 Medicaid Demonstration Authority.** *(Agencies Involved: HHS/ASPE, CMS, NIH, SAMHSA)*

States may apply to the Centers for Medicare & Medicaid Services (CMS) for Medicaid section 1115 demonstration programs to test innovative programs that may not otherwise be eligible for Medicaid reimbursement.

**E. Treatment Navigation and Entry Assistance.** *(Agencies Involved: HHS/CMS, NIH, SAMHSA; ONDCP)*

Parents, caregivers, and family members may not understand how to access care. To help individuals navigate options, providers and health care systems can be helpful in making referrals. However, these services are often not reimbursable under most plans. Requiring primary care providers to be responsible for ensuring patients access care without reimbursement to support care coordination and management can result in referrals to treatment that patients do not ultimately access without a navigator to hand a patient off to a treatment provider. For these reasons, insured patient's insurance plans should take a more active role in treatment access navigation, and monitor this coverage by virtue of their awareness of in- and out-of-network participation by providers in their plans. Federal agencies and external stakeholders, including state governments and national organizations, should engage with insurance companies to discuss the increased involvement of insurance case managers to help patients navigate treatment options and arrange for care. Reimbursement for patient navigation services should be researched.

**F. Review Medicare reimbursement rates.** *(Agencies Involved: DOJ/ DEA; HHS/CMS,)*

The level of reimbursement can affect providers' decision to furnish services to patients covered under Medicare.[223] At least one study of commercial claims databases shows that psychiatrists receive lower reimbursement relative to other medical specialists in network but higher reimbursement when out of network for patients with private insurance.[224] Moreover, people with SUD may have more medically complex conditions that require more time and resources to treat. Standard reimbursement models centered around a 15-minute office visit may be unlikely to adequately reflect the resources needed for treating patients with SUD, many of whom have comorbid conditions, and few resources. The federal government should evaluate the most effective strategies for addressing concerns regarding reimbursement rates in order to encourage maximum participation among SUD treatment providers in health plans.

**G. Make methadone more accessible for patients in federal health care systems.** *(Agencies Involved: DOJ/BOP; HHS/IHS; VA/VHA)*

Many federal treatment providers are ineligible to offer methadone to treat their patients with OUD because they do not work in federally regulated opioid treatment programs (OTPs). However, these systems should be able to offer the full complement of medication to treat OUD. Federal health service providers should not be hampered by regulations meant for the public and private sectors, especially when federal departments have direct control over the health care professionals they employ. The Administration

should explore changes to the Controlled Substances Act to permit federal health service practitioners to offer opioid treatment with all forms of MOUD outside the OTP system.

**H. Review and update withdrawal management programs and policies to be followed by treatment programs and services.** *(Agencies Involved: DOD; DOJ/DEA; HHS/CMS, IHS, SAMHSA; VA/VHA)*

Research shows that withdrawal management programs (formerly referred to as a "detoxification" programs for OUD) can actually raise the risk of overdose death because the patient participates in treatment only for a short period of time, loses opioid tolerance, and is not protected by medication in the event of relapse.[225] Withdrawal management should never be considered a complete episode of care. If patients do not desire to be on maintenance medication, withdrawal should be managed according to standards of care using medications to help wean patients from the drugs on which they are dependent, and the patient should be transitioned to appropriate additional treatment services. Withdrawal management service provider should arrange for additional care as needed including scheduling appointments, arranging transportation and other "warm handoff" type of logistics arrangements, as well as overdose education and naloxone access. Agencies should review and update their policies to include these services in an effort to decrease fatalities associated with withdrawal management programs.

**I. Review and revise regulations to support low-barrier buprenorphine programs.** *(Agencies Involved: HHS/SAMHSA)*

Low-barrier to entry buprenorphine programs are controversial in part because they involve letting patients start treatment without complete abstinence from other drugs.[226,227] To help mitigate this risk, the regulations and guidance to providers for buprenorphine treatment outside of Federal Opioid Treatment Programs should be revised to address needed risk mitigation like issuing naloxone, educating the patient about the dangers of benzodiazepines, and recommending monitoring to prevent overdose.

★ ★ ★ ★ ★ ★

**Veteran Health Administration's Contingency Management "Incentives" Intervention**

Contingency management interventions use incentives in the form of tangible goods or services for completing certain treatment related activities or for maintaining abstinence. They are among the most effective treatments for stimulant use disorder but they are rarely used outside of research settings.[1,2] The Department of Veterans Affairs supports contingency management (CM) incentive interventions by offering incentives linked to drug negative urine samples which patients enrolled in treatment can then spend in the VA hospital canteen.[3] To be effective at engaging patients with anhedonia, a condition of disinterest similar to depression that can occur following stimulants cessation, contingency management interventions should offer incentives at values shown effective in research trials or risk failure.. Much developmental research has been conducted on ways to decrease the overall cost of incentives while maintaining the effects and new models like prize drawing protocols have been shown to be cost-effective.[4] The VA is the first organization to implement this evidence-based treatment on a wide-scale. Its experience can serve as a model for other health care systems interested in using incentives to treat stimulant use disorder, particularly its training and supervision.

Sources:

1. Higgins ST, Kurti AN, Davis DR. Voucher-Based Contingency Management is Efficacious but Underutilized in Treating Addictions. Perspect Behav Sci. 2019;42(3):501-524. Published 2019 Jul 29. doi:10.1007/s40614-019-00216-z https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6768932/pdf/40614_2019_Article_216.pdf

2. Rash CJ, DePhilippis D. Considerations for Implementing Contingency Management in Substance Abuse Treatment Clinics: The Veterans Affairs Initiative as a Model. Perspect Behav Sci. 2019;42(3):479-499. Published 2019 Jun 26. doi:10.1007/s40614-019-00204-3 https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6768930/pdf/40614_2019_Article_204.pdf

3. Petry NM, DePhilippis D, Rash CJ, Drapkin M, McKay JR. Nationwide dissemination of contingency management: the Veterans Administration initiative. Am J Addict. 2014;23(3):205-210. doi:10.1111/j.1521-0391.2014.12092.xhttps://www.ncbi.nlm.nih.gov/pmc/articles/PMC3986725/pdf/nihms507133.pdf

4. Olmstead TA, Petry NM. The cost-effectiveness of prize-based and voucher-based contingency management in a population of cocaine- or opioid-dependent outpatients. Drug Alcohol Depend. 2009;102(1-3):108-115. doi:10.1016/j.drugalcdep.2009.02.005 https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2679219/pdf/nihms99385.pdf

**J. Review and update opioid treatment program regulations.** *(Agencies Involved: DOJ/DEA; HHS/SAMHSA)*

Existing federal regulations for opioid treatment with methadone pose barriers like requiring people under 18 to "fail first" on non-medication treatment before starting methadone.[228] They also do not require overdose prevention education, access to naloxone, or training on naloxone's use. ONDCP is currently supporting a review of these regulations by an independent organization. Once that is completed, and if warranted and approved by the interagency, Federal Opioid Treatment Program regulations should be updated to permit safer and better access to methadone treatment for OUD, and to require overdose prevention education and naloxone training. Regulators should consider allowing methadone dispensing from pharmacies as is done in the United Kingdom because of their greater accessibility in most communities relative to OTPs.

## Principle 3: Supporting At-Risk Populations

To substantially decrease overdose deaths and the burden from SUD, we must strategically address the barriers for treatment among those groups that are most at risk for overdose deaths and other negative consequences. One example is individuals who are incarcerated or reentering after incarceration- a disproportionate number of whom are Black, Indigenous or People of Color (BIPOC).[229] Although it would be ideal to treat people before or, where appropriate, as an alternative to arrest, bringing treatment "behind the walls" is an underutilized opportunity to treat people with SUD.

Certain populations could benefit from treatment but it may be close to impossible for them to participate without first having met their needs for shelter, childcare, or other health issues resulting from drug use like overdose or infections. We also must continue to maintain strong privacy protections for people with SUD as we reform treatment so people who need care will attend without fear of shame, nor social or legal repercussions. Research has shown that people avoided treatment over concerns that providers might turn them into law enforcement.[230, 231] Pregnant people[232] and parents may avoid seeking care and assistance out of fear of being reported to child welfare.[233]

**A. Utilize federal grant mechanisms to support people most in need of treatment to include reimbursing for wrap around services.** *(Agencies Involved: DOJ/OJP; HHS/CMS, NIH, SAMHSA; HUD; USDA)*

The Substance Abuse Prevention and Treatment Block Grant and other relatively new grant programs provide money to states to offer payment to certain non-profit treatment providers to care for the uninsured or under-insured, as well as to implement prevention services. But treatment needs often extend beyond simply provider reimbursement and should include support and reimburse for wrap around services. The Administration should examine ways existing grant mechanisms may be better utilized to best serve people most in need of treatment through the provision of safe, child-friendly housing or by widening access to cover care of people who are incarcerated. Use of federal grant dollars by for-profit treatment providers who have significant capacity to provide services also should be considered as a more widely utilized option. Changes should consider availability of state Medicaid dollars, opioid litigation settlement dollars, and the behavioral health infrastructure so economically vulnerable and people with stimulant, opioid, and cocaine use disorders always receive evidence-based treatment and wrap around social support services.

**B. Expand mobile units for MOUD including to prisons and jails.** *(Agencies Involved: DOJ/BOP, DEA, OJP; HHS/SAMHSA; VA/VHA; ONDCP)*

The DEA recently published a rule entitled "Registration Requirements for Narcotic Treatment Programs with Mobile Components"[234] that enables OTPs to deliver MOUD treatment to clients who are unable to access brick and mortar OTPs nearby. States and federal agencies that have not been able to start their own OTPs should be encouraged to invest in these units so they may offer treatment with MOUD to incarcerated individuals and people with limited transportation options. ONDCP should encourage states to consider whether state laws concerning mobile units hamper clinic's ability to use this service so they may determine if changes are needed in the state.

**C. Arrange for treatment funding for people who are incarcerated.** *(Agencies Involved: HHS/ASPE, CMS, SAMHSA; DOJ/BOP)*

Currently by law, states generally[4] may not spend federal Medicaid dollars on health care for individuals who are incarcerated, under the "inmate exclusion." The federal government could convene an interagency working group to identify the best way to provide SUD services for people in state prisons and jails, and then work to advance policies that address the lack of access for SUD services for incarcerated individuals.

**D. Expand evidence-based treatment in federal prison.** *(Agencies Involved: DOJ/BOP, DEA; ONDCP)*

The federal prison system needs to expand its treatment programming so evidence-based behavioral therapy and all medications to treat addiction are available to incarcerated persons who use drugs. Choice of treatment should be based on provider and patient agreement, and medication access should not be contingent on additional therapy participation (as medication alone may be lifesaving). The federal government should work to help coordinate treatment options so the Federal Bureau of Prisons (BOP) may offer all evidence-based treatments, including all MOUDs approved by the FDA. It also should work to support individuals in its custody so that they may participate meaningfully in treatment, which may include providing MOUD, individual psychotherapy or counseling appointments in lieu of group counseling, or implementing other measures to enhance their privacy and confidentiality.

**E. Pilot methadone programs in federal prisons to leverage telemedicine and bureau of prison pharmacists.** *(Agencies Involved: DOJ/BOP, DEA; HHS/NIH; ONDCP)*

The BOP is a unique treatment environment because patients reside in prisons, and much of the practice of medicine in these facilities involves dispensing chronically-needed medication to patients on the premises under close observation. The BOP permits pharmacists to perform duties that advanced practice nurses and physicians complete outside of federal prison. However, these pharmacists are not allowed to store and dispense methadone to treat addiction. The executive branch could explore options to allow BOP pharmacists to dispense methadone prescribed by BOP physicians using telemedicine visit induction as an exception to the Controlled Substances Act statute requiring dispensing in OTPs.

**F. Arrange for treatment for people leaving incarceration.** *(Agencies Involved: DOJ/BOP, OJP; HHS/ASPE, CMS, HRSA, SAMHSA; VA/VHA)*

The Department of Veterans Affairs (VA) allows reimbursement for transportation to treatment for eligible veterans enrolled in the VA health care system. However, few other health programs, systems, or insurers provide a similar benefit. Having treatment available and transportation to that treatment upon release from incarceration is a common-sense way to help prevent overdose deaths among people leaving incarceration.[235] Case management to connect people to treatment and transportation upon release should be an allowable cost for program services reimbursement.

---

[4] The exceptions are that Medicaid dollars are available for an inmate experiencing an inpatient stay of 24 hours or more at a health care facility. See https://www.medicaid.gov/sites/default/files/Federal-Policy-Guidance/Downloads/sho16007.pdf

## Principle 4: Build the Treatment Workforce and Infrastructure

Government estimates suggest the nation's behavioral health, including the SUD, workforce will continue to experience staffing shortages,[236] and we need to address future workforce needs for several behavioral health occupations.[237] Racial disparities in health care utilization may be partially explained by the lack of providers of similar race and ethnicity as the populations being served.[238] Hiring diverse practitioners who reflect the people and cultures they serve is an important workforce issue.[239] Research has shown that PWUD may avoid health systems, particularly people who inject drugs,[240] because they are often treated poorly. Fear of discrimination and stigmatization discourages people with SUD from seeking care and compromises the care they receive when they do seek it. Training all health professionals about SUD as a medical condition could improve the health care experience for PWUD, and integrating health services into organizations frequented by PWUD could increase use of health services by this population.[241,242] As depicted in the HHS map[243] below (Exhibit 1), the majority of counties in the United States are experiencing shortages of mental health professionals. The second HHS map[244] below (Exhibit 2) highlights areas with low or no access to buprenorphine treatment for OUD at doctors' offices.

**EXHIBIT 1**




**EXHIBIT 2**




SUD treatment providers in criminal justice settings are also severely lacking. According to the Bureaus of Justice Statistics, in 2019 the US federal and state prison population was 1,430,800[245] and local jails reported about 734,500 inmates at midyear 2019.[246] According to the National Center on Addiction and Substance Abuse, this is a population in which an estimated 65-percent has an active SUD, most of whom go untreated.[247]

A. **Expand Certified Community Behavioral Health Clinics (CCBHCs) and SUD services in Federally Qualified Health Centers (FQHCs).** *(Agencies Involved: HHS/ASPE, HRSA, SAMHSA)*

Multiple points of entry to treatment in communities are required to increase access to treatment services. States should explore establishing additional Certified Community Behavioral Health Clinics in places with greatest need to ensure local 24-hour access to SUD treatment services or linkage to services. Federal agencies should work with stakeholders to raise awareness and help improve uptake of these services, including access for law enforcement drop off and referral. Also, Federally Qualified Health Centers (FQHCs), a core provider of health services to underserved populations, should

work to provide the full spectrum of SUD services. Federal agencies should work with stakeholders to raise awareness and help improve uptake of these services.

**B. Continue low-interest Federal loans for treatment program initiation in Rural Areas.** *(Agencies Involved: Treasury; USDA)*

Hospitals and treatment programs wishing to start or expand SUD treatment services programs in rural areas may need low-interest loans for brick and mortar expansion and program start-up funding. USDA Rural Development can provide support for infrastructure, equipment, and start-up costs for treatment services in rural areas through a variety of programs. Rural Development provides guaranteed loans through lenders to public bodies, non-profit organizations, federally recognized American Indian Tribes, and for-profit businesses in communities with populations of 50,000 or less through the Rural Development Community Facilities and Business and Industry Guaranteed Loan programs covered under the OneRD Guarantee Program. Direct loans and grants are available for government, non-profit, and tribal entities for projects in communities with populations of 20,000 or less through the Rural Development Community Facilities programs.

Other support for treatment services includes funding for equipment and startup costs for treatment and workforce development through the Distance Learning and Telemedicine Program in communities of 20,000 or less. Additionally, utilities can obtain zero interest loans from the Rural Economic Development Loan and Grant program to relend to local businesses to support projects that create and retain employment in rural areas with a population of 50,000 or less. Funding for hospitals and other types of care facilities are common uses of this program. Rural Development also administers the Delta Health Care Services Grant program that funds consortiums in the 252 counties and parishes in Alabama, Arkansas, Illinois, Kentucky, Louisiana, Mississippi, Missouri, and Tennessee in the Delta Region to develop healthcare services, health education programs, healthcare job training programs and the development and expansion of public health-related facilities. Additionally, the cooperative model provides a unique approach for healthcare and SUD treatment, and Rural Development provides both financial and technical assistance support for cooperative development. For example, the Rural Cooperative Development Grant Program offers grants to nonprofit corporations and institutions of higher education to operate Rural Cooperative Development Centers that serve communities with a population of 50,000 or less. The Socially Disadvantaged Group Grants Program also supports technical assistance to socially disadvantaged groups through cooperatives and Cooperative Development Centers serving rural communities of 50,000 or less.

With the variety of programs that can support treatment services and infrastructure, federal agencies should work with stakeholders to raise awareness and help increase use of these programs to support treatment services.

**C. *Prioritize Efforts to Build Capacity in the behavioral health workforce.*** *(Agency Involved: HHS/CDC, HRSA, SAMHSA)*

The Department of Health and Human Services should prioritize efforts to advance capacity building in the behavioral health workforce to be responsive to the increasing mental health and SUD workforce needs through programs that provide scholarships,

loan reimbursement, and fellowships in the behavioral health professions to increase workforce capacity. This should include continued support of the Addiction Medicine Fellowship program. All workforce recruitment efforts should be designed to address equity, diversity inclusion and accessibility.

**D. Develop addiction curriculum for medical, public health, and nursing schools.** *(Agencies Involved: HHS/HRSA, SAMHSA)*

The Substance Abuse and Mental Health Services Administration (SAMHSA) and HRSA—in collaboration with the American Association of Medical Colleges (AAMC), the Association of Schools and Programs of Public Health, and the American Nurses Association—should establish a core curriculum on SUD studies for all medical, public health, and nursing schools so that every student is educated on SUD and has basic knowledge of strategies to identify, assess, intervene, and treat addiction, as well as support recovery. This will build on work started by AAMC in 2019 working with medical schools to develop core curriculum to advance educational content related to pain and addiction. To the extent practicable, HRSA should consider including this core curriculum as a requirement for schools applying for fellowships and grants for licensed practitioners.

**E. Train nurses, psychologists, pharmacists and social workers to care for people with substance use disorders.** *(Agencies Involved: HHS/HRSA, SAMHSA; ONDCP)*

The federal government should work with leadership of these disciplines to request that they set goals for tracking their workforce's engagement in SUD treatment and training for it. These professionals engage with people who have SUD regularly. With training, nurses, pharmacists and psychologists who prescribe may also be in position to offer quality treatment—including MOUD—as part of workforce expansion although new authorities would be needed for these prescriber categories.

**F. Examine models for office-based buprenorphine treatment to address financial disincentives.** *(Agency Involved: HHS)*

Research suggests some office-based buprenorphine models do not reimburse providers enough to make a business case for delivering care.[248] Research reinforces that persistent provider workforce barriers to buprenorphine provision include insufficient training and education on opioid use disorder treatment, lack of institutional and clinician peer support, poor care coordination, provider stigma, inadequate reimbursement from private and public insurers, and regulatory hurdles to obtain the waiver needed to prescribe buprenorphine in non-addiction specialty treatment settings.[249] The Administration should examine this research and consider developing models that improve incentives to provide care.

**G. Extend telemedicine flexibilities across state lines.** *(Agency Involved: DOJ/DEA; HHS)*

During the COVID-19 pandemic, the DEA temporarily waived the requirements that providers be licensed in the same state as a patient whom they serve via telemedicine. Now, many providers offer treatment via telemedicine to patients who live nearby but in another state. However, at the end of the pandemic, this may change. Federal agencies should work with Congress to establish a mechanism with appropriate safeguards for providers to engage in controlled substance prescribing across state lines by telemedicine,

and address licensing and payment obstacles across state lines for professionals and paraprofessionals through federal guidance/oversight/incentives to encourage states to allow interstate licensing reciprocity which would require collaboration with states.

**H. Pursue opportunities to advocate for global capacity to respond to substance use disorders and related health needs by prioritizing training of the global drug prevention, treatment and recovery workforce.** *(Agencies Involved: DOS; HHS; ONDCP)*

Executive branch agencies should advocate through multinational organizations for increasing global capacity to respond to SUD and related unmet health needs including by prioritizing training of the global workforce consisting of drug prevention, treatment and recovery professionals. Federal agencies will work with international partners to finalize the development of a universal accreditation system, and encourage adoption of the international standards on prevention and treatment.

# Building a Recovery-Ready Nation

In 2010, the Substance Abuse and Mental Health Services Administration (SAMHSA) convened diverse recovery stakeholders to develop the following consensus working definition of recovery from mental illness and SUD: "Recovery is a process of change through which individuals improve their health and wellness, live a self-directed life, and strive to reach their full potential." Participants identified four major dimensions of recovery: home; health; purpose; and community.[250] These dimensions can be viewed as the four corners of the foundation upon which a life in recovery is built.

Because recovery is a process, and not an event, it generally begins before substance use is stopped, continues after the cessation of use, can be sustained through a return to use, and may accommodate reduced levels of use when these permit improvements in health, wellness, and functioning. Recovery is measured as a positive—by what it brings, including improved quality of life, a sense of self-efficacy and purpose, and improvements in social and emotional functioning and wellbeing. It is distinct from both abstinence and remission, which are measured by the absence of symptoms.

> Recovery is a process of change through which individuals improve their health and wellness, live a self-directed life, and strive to reach their full potential.
>
> - SAMHSA, 2010

Recovery may be best understood as the process of building recovery capital, the internal and external resources upon which individuals can draw to pursue, achieve, sustain, and enhance a life in recovery.[251,252,253] Examples of internal recovery capital include knowledge, coping skills, resilience, hope, and perseverance. External recovery capital includes assets such as family, a supportive community of recovering peers, treatment, mutual aid meetings (e.g., A.A., N.A., SMART Recovery, Women for Sobriety), transportation, housing, employment, and income. Discrimination, inequitable access to resources and opportunities, and social determinants of health all intersect with recovery capital and should be considered concurrently.

Americans follow diverse trajectories from SUD to recovery or remission. In 2020, an estimated 29.2 million Americans aged 18 or older reported a lifetime alcohol or other drug (AOD) problem. Of these, 21.2 million (72 percent) identified as in recovery or recovered from a substance use problem. [254] A national study found that, among people who reported having resolved an alcohol or other drug program, 45 percent participated in mutual aid groups, 28-percent had received treatment, and 22-percent had received recovery support services (RSS), including from recovery community centers.[255] A smaller percentage of participants in this study (46-percent) described themselves as "in recovery." These data suggest that it is critical not only to expand access to treatment, but to understand the diverse characteristics, trajectories and needs of those whose journey from addiction to recovery or remission does not include treatment. We must understand these trajectories and their intersections with various systems in order to identify engagement and other intervention opportunities and develop strategies to increase the percentage of Americans with SUD who achieve recovery, to shorten the duration and severity of SUD, and to save lives.

RSS can be instrumental in engaging individuals with SUD and helping them navigate the early stages of recovery. Non-clinical services provided to individuals with or in recovery from SUD, RSS are distinct from treatment and can be more flexibly sequenced and delivered. These services are most commonly provided by individuals who have lived experience of addiction and

recovery. When that occurs, these services are referred to as peer recovery support services (PRSS).

While clinical services are based primarily on the specialty training and expertise of the practitioner, PRSS are anchored in experience of SUD and recovery that is supplemented by training. Peer specialists work in diverse settings where they engage, link, and otherwise serve both those in recovery and those with active SUD, including overdose survivors and others with SUD in emergency departments, those who can be reached through inpatient hospital and primary care settings, and through SSPs, street outreach programs, mobile clinics, drug court programs, and elsewhere.

Peers play diverse roles across systems, sectors, and settings, providing a vital connective tissue linking diverse points on the intervention continuum.

While they can be valuable components of clinical, medical, or other teams, when working through peer-led organizations such as recovery community organizations (RCOs), peers are not limited to serving the patients of a specific treatment provider, can serve individuals who are not in and have not received treatment, and are not limited by the length of reimbursable treatment episodes. Peer workers employed by RCOs provide a bi-directional bridge between formal systems (e.g., SUD treatment, health care, child welfare, or criminal justice systems) and community-based resources such as family, mutual aid groups, housing, employment, faith groups, and the broader recovery community. Across systems, sectors, and settings, peers play varied roles, serving as vital connective tissue linking diverse points on the intervention continuum.

Recovery takes place at the family/caregiver and community levels as well as the individual level. A recovery-ready community recognizes the unique humanity and potential contributions of every person affected by addiction, not only those who are currently in or seeking recovery. Such communities embark on a community-wide healing and recovery process reducing the toll of substance use and helping more of their members achieve recovery and become productive, contributing citizens. By building recovery-ready communities, schools, and workplaces, and by fostering increased public health/ public safety partnerships, we will build a healthier, more equitable, and more resilient nation. This is a key goal of Biden-Harris Administration drug policy in both the supply and demand reduction arenas.

We are steadily learning more about recovery's dimensions and diverse trajectories, how recovery relates to remission and abstinence, what kinds of RSS may be effective, and whom they may most benefit. However, our scientific understanding in this domain is still emerging. Targeted, actionable research is needed to inform policy and resource allocation decisions in the recovery domain.

Available scientific evidence suggests that common forms of RSS can be beneficial. For example, positive outcomes are associated with receipt of services through recovery community centers (RCCs), local peer service hubs that can serve as drop-in centers for people in or seeking recovery, and through which recovery coaching and other services are available. RCCs can offer a range of services, including relapse prevention, housing and employment support, social and recreational activities, and other services.[256] One study found that receipt of services at an RCC is associated with greater recovery duration and improved psychological well-being and quality of life. The authors noted that RCCs played a unique role that differed from those of treatment and mutual aid groups: They facilitated recovery capital acquisition, "thereby enhancing

functioning and quality of life." This study found that RCCs served people facing multiple challenges; nearly half of RCC participants had a high school diploma or less, close to half had an annual household income of $10,000 or less, over 80-percent reported use of multiple substances, and close to half reported a lifetime psychiatric diagnosis. Notably, participants often remained engaged with the RCC for an extended period of time and over 35-percent of study participants had been receiving services at the RCC for over one year with some having remained engaged over multiple years. [257] Given the chronic nature of SUD, this extended engagement—which is typically not attainable in treatment—is invaluable.

Evidence of the effectiveness of recovery coaching is also emerging. One study found that parents with SUD who were involved in the child welfare system and who were randomly assigned to receive recovery coaching were significantly more likely to achieve and maintain reunification with their children than parents randomly assigned to usual services.[258] Other studies found that recovery coaches benefit those they serve by improving relationships with providers and social supports,[259] increasing treatment utilization[260] and retention,[261] and reducing relapse rates.[262,263] Additionally, compared to a control group receiving treatment as usual, pregnant and post-partum people receiving services from a peer counselor in a treatment program were found to more strongly recommend the program at which they received services than members of the control group. They described their peer counselors as empathic, identifying them as the most helpful aspect of their treatment. [264]

> "The CCAR philosophy is that 'our tent is big enough for everyone.' We don't really pay attention to what your illness is, your drug of choice, your recovery support, the medication you may be on (or not on), etc. 'You are in recovery if you say you are' and you are welcome. Our thriving all-recovery groups support this notion. As a result, we have become an incredibly diverse organization."
>
> —Phil Valentine
>
> Source: https://doi.org/10.1007/978-1-60327-960-4_14

RCOs operate many, but not all, RCCs. RCOs lead or coordinate recovery-focused policy advocacy activities and recovery-focused community education and outreach programs and often provide PRSS—typically through one or more RCCs. Serving a broad recovery community that includes not only people in or seeking recovery, but their families, friends and allies, RCOs may be local or statewide. They share an overarching mission: mobilizing people and resources to increase the prevalence and quality of long-term recovery from alcohol and other SUDs.[265]

Ideally, the peers who staff RCCs should have the knowledge and skills needed to help individuals find and follow pathways to recovery that may differ from theirs. Connecticut Communities for Addiction Recovery (CCAR) captured this inclusive vision in one oft-quoted statement: "You are in recovery if you say you are."[266,267] This reminds peer workers that there are many pathways to recovery and that their role is not to judge, exclude, or promote a specific pathway, but rather to help those they serve find and follow a pathway that works for them.

Research on Collegiate Recovery Programs (CRPs) is limited, but is growing as well. As of February 2022, the association representing CRPs had over 150 members throughout the United States and one member in the United Kingdom.[268] A survey of 29 CRPs found that annual

abstinence rates among participating students ranged from 75- to 100-percent, averaging 92-percent. Across these sites, most CRP members had not used substances for several years, while 5 percent reported past month alcohol or other drug use. This is a much lower rate than is found among age group peers in the first year following treatment. [269,270] CRP members also have been found to have higher grade-point averages than the student population as whole.[271] For example, students participating in the Texas Tech CRP had a consistently higher average GPA from 2002 through 2005 than the student body as a whole, averaging 3.181 over that period compared to the overall average of 2.926.[272]

A survey of 29 CRPs found that annual abstinence rates among CRP students ranged from 75 to 100-percent and averaged 92-percent. Across these sites, 5-percent of students reported past year alcohol or other drug use, a much lower rate than is found among youth in the first year following treatment. CRP members also have higher retention and graduation rates and higher grades than the student population as whole.

Additionally, research suggests that CRPs may be an effective marketing tool for colleges and universities. For example, 34-percent of CRP participants responding to one survey indicated that they would not have been in college were it not for a CRP and 20-percent reported that they would not have enrolled at their institution if it had not offered a CRP.[273]

Racial and ethnic minority students appear to be underrepresented in CRPs. The survey of 29 CRPs cited above found that 91-percent of participants identified as White.[274] An earlier study involving one of the 29 CRPs observed that 95% of CRP members were non-Hispanic Whites while 81% of the larger student body were non-Hispanic Whites. The authors hypothesized that the disproportionately low representation of minorities may reflect lower rates of access to treatment and to four-year universities due to historic inequities.[275]

Nationally, there are over 40 recovery high schools (RHS) in operation across 21 states as of May 2021.[276] Most RHS have licensed counselors or other clinical staff and require students to participate in mutual aid groups. Recovery high schools are small, with enrollment ranging from six to 50 students.[277] Some RHS have dedicated facilities and others share space as part of public high schools.[278,279] One study found that RHS students tend to reflect the racial and ethnic composition of the communities in which they are located and have more risk factors for substance use and relapse relative to youth completing treatment locally who did not enroll in a recovery high school. These students also had more risk




*Finch, AJ. Recovery high schools growth chart: 1979-2021. Association of Recovery Schools. 2021. Retrieved at https://recoveryschools.org/rhs-growth-chart/*

factors than a national sample of their peers exiting treatment. RHS students also had higher rates of mental illness than members of both the local and national comparison groups. Additionally, they tended to have greater substance use problem severity than members of the two control groups. [280] Another study found that RHS students were more likely than age-group controls who had received treatment but were not enrolled in a RHS to be abstinent from alcohol and drugs and more likely to graduate from high school than members of the control group. The authors estimated that increased graduation rates associated with RHS attendance resulted in mean net savings per student from $16,000 to $52,000, a benefit-to-cost ratio of 3.0 to 7.2.[281] One study noted that young people of color often did not have access to treatment before enrolling in an RHS[282] and another suggested the RHS model could be well suited to serving Hispanic communities as the schools can be customized to meet local needs, such as reducing stigma, which was cited as an important barrier to help-seeking among Hispanics.[283] While small, the number of RHSs has been climbing slowly over the past 30 years as shown in the chart, above.[284]

Like an RHS, an Alternative Peer Group (APG) combines clinical and peer recovery support. APGs adopt a family-centered model, offering a supportive community of recovering peers and a broader positive social environment. They combine these with counseling and case management services.[285] APGs differ from RHSs in that they are community- rather than school-based. APGs are also small in number but growing. There were 24 established APGs in 16 states in 2019. At that time, 20 more were in development.[286] APGs can become key components of integrated youth service networks, linking with adolescent SUD treatment programs, RHSs, and other youth-serving organizations. While APGs incorporate many practices and elements associated with positive outcomes, effectiveness research is currently lacking.

Recovery housing is the most widely available form of recovery support infrastructure in the United States. In 2020, it was estimated that there may be more than 17,500 recovery residences nationally.[287] Research on Oxford Houses—rented homes jointly operated by residents who share a lease and other costs—found that residents who stay for six months or more are less likely to return to substance use than those who remain a shorter period of time.[288] A study of recovery residences found that residents achieved significant improvements in alcohol and drug use, employment, psychiatric symptoms, and criminal justice system involvement.[289] Further, an experiment in which participants with OUD were randomly assigned to usual care, abstinence-contingent recovery housing, or a combination of reinforcement-based treatment and recovery housing found that abstinence-contingent recovery housing was associated with higher rates of abstinence and that the addition of intensive reinforcement-based treatment (RBT) further improved outcomes.[290] A subsequent study with a similar population yielded similar results.[291]

Sustainable financing for PRSS is indispensable. While time-limited discretionary grants have been instrumental in initiating, expanding, or enhancing peer services and RCOs, reliable long-term revenue streams are essential to developing a sustainable RSS infrastructure. The Administration's call for an expanded Substance Abuse Prevention and Treatment Block Grant (Block Grant) with a 10-percent RSS set-aside, included in the President's budget, represents an important step in this direction. In addition, Medicaid—can play a role in funding PRSS, including in the context of accountable care organizations, chronic care models, and alternative payment mechanisms focusing on outcomes or values-based purchasing, which can offer flexible options for covering the cost of this service. Medicare may also be able to play a role in reimbursing PRSS.

Virtually all of our efforts to address substance use and SUD—from primary prevention and harm reduction, to law enforcement, treatment, and recovery support—are impeded, to a greater or lesser degree, by still pervasive stigma. A phenomenon most acutely experienced by people with SUD and those in recovery, stigma is a cross-cutting concern that requires significant coordinated efforts to address. The stigma associated with substance use manifests in many ways and intersects with a range of factors, including race, gender, and socio-economic status. Social stigma is embodied in negative attitudes and beliefs about substance use and people with SUD and can be reflected in discriminatory policies and practices based on or influenced by those negative attitudes and beliefs. When embodied in policies and practices that limit the opportunities, access to resources, and wellbeing of stigmatized groups, social stigma is sometimes referred to as structural stigma.[292] Finally, people with SUD apply the negative attitudes and beliefs reflected in social stigma to themselves, resulting in a phenomenon known as self-stigma. As this occurs individuals may blame themselves for having SUD and/or may believe that their SUD is the result of inherent moral weakness on their part. This leads to shame and fear of social exclusion or other negative results if their condition is exposed. This can result in individuals avoiding treatment or other services.[293,294,295] The Administration's planned activities to address stigma are discussed throughout this chapter.

As part of its effort to build back better following the COVID-19 pandemic, the Administration will work to increase our scientific understanding of recovery, foster adoption of more consistent certification and accreditation standards for peer workers and the organizations that employ them nationally, expand the PRSS workforce and the organizational infrastructure that supports it, address stigma and misunderstanding, and eliminate barriers to safe and supportive housing, employment, and education for people in recovery. In all of these efforts, the Administration will continue to solicit input from and build partnerships with the recovery community and others directly impacted by substance use, keeping in mind the recovery community dictum, "Nothing about us without us."

## Principle 1: Expand the Science of Recovery.

*(Agencies Involved: DOJ/BOP, OJP; ED/IES; HHS/ASPE, AHRQ, CDC, CMS, HRSA, NIH, SAMHSA; HUD/OPDR; ONDCP; VA/VHA; DOD)*

Given the need to continually expand our scientific understanding of the recovery process, RSS, and the many factors that mediate outcomes, further targeted, actionable research is needed to guide policy and resource allocation decisions in the recovery domain. To prioritize and stage such translational research, ONDCP will partner with the National Institute on Drug Abuse (NIDA), and the National Institute on Alcohol Abuse and Alcoholism, the National Institute on Justice (NIJ), the National Institute on Corrections (NIC), and the Department of Health and Human Services (HHS) Assistant Secretary on Planning and Evaluation (ASPE) to convene a cross-agency workgroup to develop, prioritize, and coordinate the implementation of a federal recovery agenda. The findings and recommendations of this group will be transmitted to the drug data interagency workgroup, described in the Data Systems and Research chapter. In addition, they will be used to identify federal recovery research priorities and suggest specific existing or proposed funding streams that could support studies on prioritized topics.

A. **Establish a federal recovery research agenda to support the development of science-based policy in relation to recovery.** *(Agencies Involved: DOD/CDMRP;*

*DOL/ETA/DRE; DOJ/NIC, OJP; ED/IES; HHA/AHRQ, ASPE, CMS, CDC, NIH, SAMHSA; HUD/OPDR; OMB; ONDCP; VA/VHA)*

In partnership with key federal research agencies, ONDCP should convene the research and evaluation components of other drug control agencies to: (1) summarize the current scientific knowledge of the recovery process and RSS; (2) catalogue current federally-funded research and evaluation efforts germane to these topics, and; (3) identify key areas where additional research is needed to inform policy and resource allocation decisions. This interagency team should assess the extent to which current federal research and program evaluation portfolios address identified priorities and will recommend research to inform policy development and resource allocation decisions. To prepare for an initial convening of the *Recovery Research Workgroup*, ONDCP and NIDA should jointly coordinate the efforts of participating agencies as they: (1) catalogue current and recent federally-funded research with a SUD recovery nexus, and; (2) identify, list, and prioritize areas of research that will support the development of evidence-based policy and programs in the recovery domain. Subsequently, ONDCP and NIDA should: (1) summarize the findings of the group and provide specific recommendations regarding the prioritization and funding of relevant research and evaluation efforts by agency; and, (2) obtain interagency clearance of a document summarizing these recommendations and secure the commitment of agency leaders to implement the recommendations as feasible, given resource availability and broader research priorities.

**B. Establish targets and monitor progress.**

Following approval of the research priorities by Administration leadership, NIDA and ONDCP should coordinate a process through which participating agencies would identify: (1) prioritized research they would undertake with existing resources, and; (2) additional research they would undertake subject to the availability of resources. ONDCP, in partnership with participating agencies, should monitor progress toward meeting recovery research commitments and share progress through the interagency workgroup.

**C. Incorporate identified recovery research needs in the President's budget.**

To ensure that agencies have the resources needed to support priority recovery research, ONDCP, in consultation with NIDA and other participating agencies, will continue to recommend relevant research funding priorities and funding levels annually for the President's Budget through the Drug Control Budget.

## Principle 2: Make Recovery Possible for More Americans

People with SUD follow many pathways to recovery or remission and interact with diverse sectors, including law enforcement and other first responders, the criminal justice and child welfare systems, primary care, hospitals, harm reduction programs, housing and homeless services, and SUD treatment. It is critical not only that we understand the many trajectories to recovery, but that we adopt flexible, responsive approaches for helping people with SUD navigate the many challenges they encounter and both find and follow a pathway to recovery or remission that works for them. Our nation's emerging PRSS infrastructure, supported by a growing number of peer-led organizations, is essential to developing and implementing such

strategies. Therefore, sustainable financing for PRSS and for the organizations through which they are offered is critically important. Consistent standards are also needed to ensure quality and safety, to facilitate reimbursement from payers operating in multiple jurisdictions, and to permit reciprocity of credentials for peer recovery specialists.

Training and technical assistance, including through SAMHSA's National Peer-Run Training and Technical Assistance Center for Addiction Recovery Peer Support, are also indispensable to efforts to develop capacity and help states, organizations, and peer recovery support workers adopt more consistent standards nationally. Accessible and affordable training for individuals seeking to become peer specialists is essential to developing the peer workforce. More consistent standards for peer workers and for organizations through which PRSS are offered will also improve quality, create opportunities for reciprocity of credentials from one jurisdiction to another, and facilitate funding from public and private insurers with national or multi-state regional coverage areas.

When provided by an institution of higher education, training to become a peer specialist can be reimbursed under the Health Resources and Services Administration (HRSA) Substance Use Disorder Treatment and Recovery Loan Repayment Program. While this is a valuable resource that should be expanded, training provided by an institution of higher education may not be accessible or culturally appropriate to all those seeking to become a peer support worker. For many prospective peer workers, educational loans may be inaccessible, and, to them, higher education settings may seem far removed from the world in which they will operate and the experience they will bring to bear in their work. A broader array of training and technical assistance will be needed to develop the peer workforce.

**A. Expand PRSS capacity and foster the adoption of more consistent standards for the peer workforce, RCCs, RCOs, and similar peer-led organizations.** *(Agencies Involved: HHS/CMS, HRSA, IHS, SAMHSA; Labor/ETA, ODEP; VA/VHA)*

SAMHSA, with support from ONDCP, CMS, and HRSA, should convene key federal partners and external stakeholders with a role in developing peer workforce and RCO/RCC capacity and applicable credentialing and accreditation standards. Examples of external stakeholders germane to this effort include: the International Society of Substance Use Professionals (ISSUP); the International Certification and Reciprocity Consortium (IC&RC); the Association for Addiction Professionals (NAADAC) and its certification arm, the National Certification Commission for Addiction Professionals (NCC-AP); the Association of Recovery Community Organizations (ARCO); the Council on Accreditation of Peer Recovery Support Services (CAPRSS); the Global Centre for Credentialing and Certification (GCCC); and, the National Association of Alcohol and Drug Abuse Directors (NASADAD)

Through this process, SAMHSA should develop recommendations for: (1) expanding the capacity of the existing workforce and peer organizational infrastructure through training, technical assistance, and related efforts; and, (2) promoting the adoption of more consistent credentialing and accreditation standards and improving quality across states nationally, taking into consideration existing national peer certification and recovery support service provider organization accreditation standards. Recommendations could include support to states, RCCs, RCOs, and other entities through existing federally-funded training and technical assistance providers, such as the Addiction Technology Transfer Network, the technical assistance contracts for various federal discretionary

★ ★ ★ ★ ★ ★

grant programs, and the National Peer-Run Training and Technical Assistance Center for Addiction Recovery Peer Support.

Upon approval of the plan, SAMHSA should spearhead efforts to implement recommendations, reporting periodically on progress. Capacity-building through training, technical assistance, and adoption of more consistent credentials and standards for peer workers, recovery community centers, and other entities providing PRSS could allow for expanded public and private insurance coverage, improved quality overall, and permit greater reciprocity of credentials across state lines to support increased workforce mobility in response to evolving needs.

**B. Foster the adoption of more consistent recovery housing standards.** *(Agencies Involved: DOJ/CRD, OJP; HHS/ASPE, HRSA, SAMHSA; HUD; ONDCP; USDA/RD)*

More consistent recovery housing standards across states would help prevent exploitation of residents and funders by unscrupulous operators, better ensure quality across states, and help consumers, addiction professionals, and payers identify quality recovery residences.

SAMHSA and the Department for Housing and Urban Development (HUD) should co-lead efforts to promote adoption of nationally recognized recovery residence standards, engaging stakeholders such as National Alliance for Recovery Residences (NARR), Oxford House, NASADAD, the National Conference of State Legislatures (NCSL), the National Governors' Association (NGA), the National Association of Counties (NACO), and the ONDCP Model State Drug Law contractor, Legislative Analysis and Public Policy Association (LAPPA), which convened a consultative process through which a Model State Recovery Residence Certification Act was developed in 2021.[296] Standards should ensure that people following all recovery pathways, including those receiving medications for opioid use disorder (MOUD), have access to quality recovery housing. Recovery housing does not replace Housing First resources which provide low-/no-barrier housing coupled with wrap around services. Ideally, recovery housing should be linked to Housing First resources, complementing them and permitting a bi-directional flow of residents between the two settings based on resident need and desires and the fit of residents within the respective housing contexts. Outside of federally-subsidized housing settings, the standards that govern recovery housing are set at the state level. Moreover, local zoning laws and building codes can facilitate, hinder, or prevent the establishment of recovery housing and may even represent violations of applicable federal civil rights laws such as the Americans with Disabilities Act, the Rehabilitation Act, and the Fair Housing Act. SAMHSA and HUD should work to support state and local governments and standards organizations in developing and implementing recovery housing standards that will ensure access to recovery housing to protect the rights of individuals in or seeking recovery from SUD. Additionally, SAMHSA and HUD should develop recommendations for policy, training and technical assistance. These recommendations should include guidance related to recovery housing through the HUD Continuum of Care and in the context of other federally-subsidized housing programs. Additionally, SAMHSA and HUD may elect to publish a guidance document developed in collaboration with these stakeholders.

**C. Expand and sustain funding for recovery support services and recovery housing.** *(Agencies Involved: AmeriCorps, HHS/CMS, HRSA, IHS, SAMHSA; HUD/CPD, OCPD; ONDCP; USDA/RD; VA/VHA)*

As discussed in the introduction to this chapter, multiple strategies will be needed to flexibly and sustainably finance PRSS. No single approach will work in every state, locality, or service system. SAMHSA and CMS, with support from VA, HRSA, IHS, and AmeriCorps, should review current federal, state, and local financing mechanisms for PRSS, and develop recommendations for these services. Additionally, they should work with states, tribes, local governments, and peer organizations to highlight and promote the adoption of effective PRSS financing solutions. As part of this process, CMS should update the guidance provided under State Medicaid Director Letter number 07-011, which provided guidance to states interested in coverage of PRSS under Medicaid. Additionally, it should explore the feasibility of supporting innovation in the reimbursement and utilization of PRSS under Medicaid.

A clearer definition of PRSS under Medicaid, information on promising reimbursement models under the program, and updated guidance to states on the supervision and reimbursement of PRSS could facilitate more consistency in approaches and could help support the use of Medicaid to reimburse PRSS. Additionally, with support from ONDCP, HRSA, IHS, the Department of Agriculture (USDA)/ Office of Rural Development (RD), AmeriCorps, and SAMHSA, and CMS should identify potential mechanisms for financing for PRSS and for peer-led organizations.

***a)*** **Financing for PRSS and Peer-led Organizations** *(HHS/CMS, HRSA, IHS, SAMHSA; HUD/CPD, OCPD; ONDCP; USDA/RD; VA/VHA)*

CMS and SAMHSA, with support from IHS, HRSA, and other federal agencies, should work with states, Tribes, local governments, and peer organizations to identify, highlight, and promote the adoption of effective financing solutions. As part of this process, CMS, with support from these agencies, should develop and disseminate guidance to state Medicaid programs, including in relation to organizational homes for peer recovery support specialists, their supervision, various models for sustainably funding this service under state plans. In addition, in partnership with SAMHSA, CMS should offer technical assistance to states seeking to initiate, expand, or change mechanisms for covering PRSS under Medicaid. SAMHSA, with support from CMS, HRSA, IHS, and other agencies, should provide guidance to states on a broader range of financing mechanisms, including the Block Grant and state and local funding, as well as mechanisms for braiding these funding streams with Medicaid. With support from ONDCP, HRSA, IHS, and USDA/RD, AmeriCorps, SAMHSA and CMS should identify and provide recommendations on potential mechanisms for financing for PRSS, including through peer-led organizations.

b) **Financing for Recovery Housing.** *(HHS/ASPE, CMS, HRSA, IHS, SAMHSA; HUD/CPD, OCPD; ONDCP; USDA/RD; VA/VHA)*

Sustainable financing streams for recovery housing are also needed. Financing approaches will need to align with and complement self-pay funding models

under which residents seek and obtain employment and pay for their room and board, but may also need to accommodate models that serve individuals with greater levels of impairment who may require support for a longer period of time. Transitional payment approaches can cover the cost of recovery housing during an initial pre-employment period. Such approaches may need to have flexible provisions to account for limitations in employment opportunities in certain communities or the need for extended support among individuals with high levels of problem severity and complexity and low recovery capital. For more impaired individuals, the period of time during which such reimbursement is allowable may need to be extended.

The HUD Continuum of Care program represents another potential source of funding for recovery housing, provided regulatory and policy barriers to permanent housing associated with stays in recovery residences, which are typically classified as a form of transitional housing, can be resolved. Finally, the HUD Recovery Housing pilot program, authorized under the SUPPORT Act, helps those in recovery from SUD achieve stable housing through grants to states and the District of Columbia that provide assistance for individuals' recovery housing for up to two years.

HUD and HHS (both SAMHSA and CMS) should identify legal, regulatory, and policy barriers to increasing access to recovery housing and tenancy supports. They should consult with key stakeholders, including recovery housing associations, NASADAD, and the National Association of Medicaid Directors (NAMD).

### c) Financing of Recovery Support Services for Adolescents and Young Adults

Services for adolescents and young adults in or seeking recovery are especially limited and require development as well as sustainable financing mechanisms. These include recovery high schools, alternative peer groups, and collegiate recovery programs. SAMHSA, the Department of Education (ED), and the Administration for Children and Families (ACF) should jointly develop and implement a plan for seeding the development of these critical services, including through grant funding and technical assistance, and should work with school districts, colleges and universities, and other stakeholders to develop and implement plans for sustaining these critical RSS. In developing this plan, they should consult with key stakeholders, including the Association of Recovery in Higher Education, the Association of Recovery Schools, and the Association of Alternative Peer Groups.

Competitive grants may offer an effective mechanism for seeding and developing these entities with a goal of securing sustainable funding from school districts, higher education institutions, state and local governments. Additionally, it may be possible to identify ongoing funding streams within current ED programs.

# Criminal Justice and Public Safety

Arrest and incarceration of persons with substance use disorder (SUD) has had severe consequences for individuals, their families and communities, society, and taxpayers. Further, attaching criminal penalties to substance use alone has contributed to lost lives, hope and opportunity. Untreated substance use disorder is overrepresented in the prison population. It is estimated that 65 percent of persons incarcerated have an active SUD.[352] The impact begins at arrest and continues through incarceration, after release, and during reentry to communities. Arrest and incarceration for crimes related to substance use and possession disproportionately impact *Black, Indigenous and People of Color (BIPOC) and other historically marginalized* communities. In fact, Black persons are nearly five times more likely to be incarcerated for drug possession than White persons.[353]

The arrest and incarceration of people for possession of drugs for personal use – and the high number of people arrested and incarcerated for other reasons while also experiencing substance use disorders - has not only led to significant harms in BIPOC and other historically marginalized communities, but it increases risks of overdose. Upon release, incarcerated individuals are at a meaningfully elevated risk to die from an overdose than the general population.[354,355] It is clear that the criminal justice system, while improving public safety, must also play an important role in ensuring that people within its custody or supervision and upon reentry who use drugs do not overdose and instead have access to the continuum of services and support. Ensuring meaningful rehabilitation and successful reentry advances public health and public safety goals.

We need to ensure that those with SUD who are involved with the juvenile and criminal justice systems receive the services and support they need while in jail or prison, under community supervision, upon release, and during reentry. Entities along the justice continuum system must screen people for SUD, offer appropriate treatment, and provide effective reentry services pre- and post-release. We also must develop comprehensive, cross-system collaborations and services to divert people interacting with the criminal justice system due to drug use alone from that system without negatively impacting public safety and to link them to appropriate services.

We must invest in programs that provide evidence-based treatment and support at all points in the criminal justice system. We must build upon the growing support for this evidence-based approach among the criminal justice system and law enforcement stakeholders to rapidly scale up these efforts nationwide.[356]

## Principle 1: Improve access to MOUD for incarcerated and reentry populations

Medication for opioid use disorder (MOUD) programs in criminal justice settings, when administered properly by trained professionals, dramatically reduce mortality post-release and increase the likelihood that an individual will stay in treatment, rejoin their communities successfully, and reduce their risk of recidivism—all of which enhance individual and community public health and public safety outcomes.[357,358] Research has shown that for incarcerated individuals with OUD, treatment with MOUD corresponded to a reduction in the risk of death by 85-percent for drug overdoses in the month following their release.[359] We also

know that people with OUD are up to 50-percent less likely to die when they are treated long term with methadone or buprenorphine.[360] We must work to make low-threshold access to MOUD throughout the criminal justice system the norm. Evidence has shown that these medications when administered properly are safe, highly effective, and save lives.[361] Low-threshold programs prioritize providing MOUD quickly and with minimal barriers to eligibility, which expands access to more vulnerable populations and reduces overdose risk. Screening individuals at intake and ensuring individuals on MOUD are, at a minimum, maintained on their medication is essential. However, complex medical assessment should not hinder rapid initiation of treatment. All three Food and Drug Administration (FDA) approved medications (methadone, buprenorphine, and naltrexone) should be made available with medically appropriate dosing. [362] Although behavioral interventions may also be beneficial for people with OUD, providers should not withhold medications from people with OUD when behavioral interventions are not available or when individuals decline them, but will accept MOUD. Evidence has shown that MOUD when administered properly by trained professionals decreases the risk of opioid-related overdose and death, decreases illicit opioid use, and likewise improves health outcomes. They are also more effective in reducing illicit opioid use and retaining individuals in treatment than behavioral interventions and treatments alone.[363]

Although MOUD when administered properly by trained professionals has a strong evidence-base and saves lives, as of August 2021, only about 12 percent (602 out of 5,000) of correctional facilities offer any form of MOUD.[364] Few facilities maintain treatment for individuals receiving MOUD at arrest and even fewer initiate MOUD for untreated individuals.[365] Regulations surrounding the provision of methadone and buprenorphine are one reason for limited MOUD programs.[366] However, The Practice Guidelines for the Administration of Buprenorphine for Treating Opioid Use Disorder, were issued in April 2021 to assist in increasing access to buprenorphine[367] and proposed federal regulations that will permit opioid treatment programs (OTPs) to provide methadone through mobile components means will also assist expanding access in correctional facilities where there are barriers to establishing an OTP behind the walls.

The criminal justice system is a critical touchpoint for people with SUD today. However, we envision a future where these individuals are diverted from the criminal justice system when appropriate and without negatively impacting public safety and do not lose access to the continuum of care.

**A. Expand access to MOUD in state and local correctional facilities and community corrections.** *(Agencies Involved: DOJ/OJP, BOP, NIC; HHS/ASPE, NIH)*

As noted previously, very few jails and prisons continue treatment with methadone or buprenorphine for those receiving these medications prior to incarceration, and even fewer initiate OUD treatment with these medications. Jurisdictions wanting to continue or initiate OUD treatment with medication may need to develop approaches that are customized for their facility and population. Courts and community corrections agencies also play a large role in determining the type of treatment available to individuals with SUD in the criminal justice system.[368] When appropriate, individuals should be allowed to continue MOUD while on pretrial release, probation, or parole, and court-ordered treatment should not ban or discourage the use of MOUD—nor should it mandate or encourage use of one medication over another. Requiring persons to change medications or discontinue MOUD as a condition of criminal justice supervision is associated with poor criminal justice and health outcomes, and a lower likelihood of participating in

substance use treatment or MOUD in the future.[369,370,371] Worse, because physiological tolerance to opioids declines during abstinence, persons required to withdraw involuntarily from methadone or buprenorphine face a substantially increased risk of overdose and death if they use opioids even once.[372,373] Best practices have been published by leading organizations including the Substance Abuse and Mental Health Services Administration (SAMHSA)[374] and the National Association of Drug Court Professionals (NADCP).[375,376] NADCP suggests that medication decisions, including the decision to reduce or discontinue a medication, should be made by patients in consultation with a legally authorized and competently trained medical practitioner. As such, nonmedically-trained criminal justice professionals should consider medication decisions relating to participants' psychosocial needs made by duly trained and credentialed clinicians and supervision officers in conjunction with the individual.[377,378] Additionally, fewer than one in 21 youth 17-years-old and younger have access to MOUD.[379] Juvenile justice detention centers must also ensure access to MOUD and defer to trained medical professionals regarding medical decisions, such as the need for and mode of SUD treatment.

It has been reported that some judges direct participants to specific treatment providers and express a preference for a particular medication.[380] However, deference should be given to the treatment recommendations of medical professionals when appropriate. Communication and coordination among jails, prisons, courts, and community corrections regarding treatment plans can help ensure continued access to MOUD throughout transitions within the correctional system and upon release. As mentioned previously, the recently issued guidelines around buprenorphine prescribing and proposed regulations for mobile methadone will alleviate some barriers to providing MOUD in criminal justice settings. Still, working groups and discussions with corrections officials should convene to facilitate peer-learning, including lessons learned implementing and funding MOUD in various criminal justice settings.

In coordination with ongoing work of the NIDA's Justice Community Innovation Network and the National Institute of Corrections (NIC), ONDCP will survey state and local corrections systems to learn more about the MOUD landscape to better inform policy. ONDCP will also convene with BOP, NIC, and NIDA correctional leadership to develop and disseminate best practices for fully adopting MOUD in correctional settings.

Although roughly 2.3 million persons are incarcerated in prisons annually, roughly 8 to 10 million persons cycle through short-term incarceration in jails each year, many of whom are experiencing SUD and could benefit from access to MOUD administered properly by trained professionals.[381] ONDCP will leverage initiatives, such as OJP's Comprehensive Opioid, Stimulant, and Substance Abuse Program (COSSAP),[382] to expand the use of MOUD in jails. ONDCP also will work with OJP to prioritize MOUD in jails for grantee applications and awards.

**B. Expand funding for SUD treatment in the criminal justice system.** *(Agencies Involved: DOJ; HHS/ASPE, CMS, SAMHSA)*

Current federal Medicaid law generally prohibits federal Medicaid matching funds for otherwise reimbursable services for individuals when they are incarcerated, referred to as the Medicaid Inmate Exclusion Policy.[383] Section 5032 of the SUPPORT Act created demonstration opportunities for states to expand services to beneficiaries transitioning

from incarceration to the community, and states should work with CMS to incorporate SUD treatment best practices in their programs.

The Biden-Harris Administration is making significant investments in the SUD system with the potential to expand existing grant programs to provide services to incarcerated individuals, such as the Supplemental Substance Abuse Block Grant, State Opioid Response, and the Medication Assisted Treatment-Prescription Drug and Opioid Addiction grants.

Funding MOUD programs was a barrier found in a study of medical staff and wardens providing opioid agonist treatments in jails and prisons.[384] Many funding sources are not secure from year-to-year, leading to uncertainty about longer-term programming. ONDCP will explore sustainable opportunities to fund MOUD in jails, where the largest number of people with untreated SUD cycle in and out of the criminal justice system, and ensure its proper administration by trained professionals. Opioid litigation settlement proceeds will be among the potential funding sources ONDCP will recommend.

C. **Simplify the regulation of methadone and buprenorphine to create the necessary flexibility for jails and prisons to offer MOUD.** *(Agencies Involved: DOJ/DEA; HHS/SAMHSA)*

Regulatory changes are needed to offer these services in jails and prisons in a safe and legal way. SAMHSA should continue its efforts to adopt a more flexible "take home" medication rules for people in jail or prison when appropriate, and make the COVID-19 pandemic emergency regulations permanent, including allowing for remote prescribing. While HHS released updated buprenorphine prescribing guidelines expanding access to treatment,[385] it is important to recognize that many jail providers serve both facility- and community-based populations, leading to issues when prescribers have a patient limit. ONDCP should work to resolve this issue. ONDCP should also work with DEA to clarify the application of the "72-hour rule" to providers in the criminal justice system and explore the possibility of increasing the time length that allows trained practitioners to administer MOUD properly in the criminal justice setting when appropriate. The 72-hour rule, or three-day rule, allows practitioners to administer methadone (or other Schedule II medication approved for the treatment of OUD) for a 72-hour period while arranging referral to treatment through an OTP.[386]

## Principle 2: Advance racial equity in investigation, arrest, and sentencing for drug related offenses

As noted previously, BIPOC and other historically marginalized communities have experienced harmful disparate impacts throughout all aspects of the criminal justice system, leading to the disruption of families and communities. President Biden has emphasized the need to eliminate racial and other inequities in the criminal justice system while improving public safety and has stated that people should not be incarcerated for substance use alone but offered treatment instead.[387,388]

A. **Use data to identify racial inequities and to assist in driving policy changes.** *(Agencies Involved: DOJ/FBI, OJP)*