UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| MARK TASSINARI, RICHARD ESPINOSA, and JOSEPH ALMEIDA, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>THE SALVATION ARMY, A NEW YORK CORPORATION,<br><br>    Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil No. 21-10806-LTS |

MEMORANDUM AND ORDER ON DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT (DOC. NO. 297)

July 6, 2026

SOROKIN, J.

Mark Tassinari and Joseph Almeida represent a Rule 23(b)(2) class suing The Salvation Army, a New York corporation ("TSA")[1] for discriminating against individuals with opioid-use disorder.[2] They assert that TSA maintains a policy at its Adult Rehabilitation Centers that prevents such individuals from accessing medication for their disorder, in violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and the Fair Housing Act, 42 U.S.C. § 3604. TSA moved for summary judgment on two alternative grounds: first, that its Medication Policy is a matter of church doctrine protected by the First Amendment, and second, that it is entitled to

---

[1] Following Defendant's lead, the Court uses "TSA" to refer to Defendant and "The Salvation Army" to refer to "the international religious and charitable organization of which TSA is a part." Doc. No. 275 at 6 n.1.

[2] The Court previously ruled that a third plaintiff, Richard Espinoza, lacked standing to seek injunctive relief because his claim for injunctive relief was moot. Doc. No. 265 at 11–12.

judgment as a matter of law on Plaintiffs' statutory claims.  Doc. No. 297.[3]  For the reasons that

follow, TSA's motion for summary judgment is ALLOWED as to the Injunction Class.

I.    BACKGROUND

A.    Facts

The Court draws these facts from the two statements of material facts submitted by the

parties.  Doc. Nos. 281, 307.  It views the record in the light most favorable to Plaintiffs, as it

must on Defendant's motion for summary judgment.  See, e.g., LeBlanc v. Great Am. Ins. Co., 6

F.3d 836, 841 (1st Cir. 1993).  The following facts are undisputed, except as specifically noted.[4]

The Salvation Army is an "an international religious and charitable organization that is

part of the evangelical part of the universal Christian Church."  Doc. No. 281 ¶ 1.  The Salvation

Army provides a variety of charitable programs, including "food pantries, after-school programs,

veteran services, homeless shelters and rehabilitation centers."  Id. ¶ 4.  The Salvation Army

views the provision of these programs and services as the practice of its religion.[5]  Id.

---

[3] Citations to "Doc. No. __ " refer to documents appearing on the court's electronic docketing system ("ECF"); pincites are to the page numbers in the ECF header or to paragraph numbers where applicable.

[4] TSA did not specifically respond to Plaintiffs' additional facts, Doc. No. 281 ¶¶ 35–96; Doc. No. 307 ¶¶ 14–37, beyond objecting that these additional facts did not comply with the local rules, Doc. No. 288 at 2 n.1.  But nothing in Local Rule 56.1 or this Session's standing order on summary-judgment practice specifically precludes the assertion of additional material facts by the nonmoving party.  The Court credits Plaintiffs' undisputed factual assertions to the extent supported by the cited record evidence (without thereby adopting any legal conclusions contained within those "factual" assertions).  Plaintiffs' additional factual assertions do not determine the outcome here.

[5] As one former TSA official explained: "At the heart of The Salvation Army's compassionate ministry is the belief that in reaching out to the hungry, thirsty, lonely, naked, sick and imprisoned, we are actually reaching out to Christ himself. . . . The spiritual and social aspects of the Christian gospel combine to form an integrated, or total, ministry."  Doc. No. 99-2 ¶ 8.

TSA is a corporation that owns and operates The Salvation Army's programs in its "Eastern Territory."[6] Id. ¶¶ 2, 49. It operates twenty-nine Adult Rehabilitation Centers ("ARCs") in that territory. Id. ¶ 52. TSA refers to ARC participants as "beneficiaries." Id. ¶ 8. ARCs provide beneficiaries with housing and basic living necessities for six to twelve months, during which time beneficiaries live on site and participate in "work therapy" by working full time at the ARCs or processing donated goods for resale at Salvation Army thrift stores. Id. ¶¶ 56, 58–59. Almost all ARC beneficiaries are indigent, and about a third are required to participate in ARC programming as a condition of their probation or parole. Id. ¶¶ 54–55.

TSA views ARCs as "residential churches," and it considers the operation of ARCs to be one of the ways it practices its religion.[7] Id. ¶¶ 5, 10. TSA considers "the highest priority of the ARCs" to be "bring[ing] the beneficiaries into a personal relationship with God." Id. ¶ 9. ARCs "serve[] men and women with social, emotional and spiritual needs who have lost the ability to cope with their problems and provide for themselves." Doc. No. 141-8 at 23 (ARC Handbook), cited in Doc. No. 281 ¶ 56. Beneficiaries need not be Salvationists—the vast majority are not—and they may continue to practice their own religion if they do so on their own time. Doc. No. 281 ¶¶ 63, 65. But all beneficiaries are required to acknowledge that The Salvation Army is a church and must agree to participate in Salvationist religious activities as a condition of their ARC participation. Id. ¶ 11. Beneficiaries meet at least biweekly with their assigned spiritual counselor. Id. ¶ 12. They must also attend Sunday morning chapel services, a midweek service, daily devotions, and weekly Bible classes. Id. ¶ 13; see also Doc. No. 141-4 at 82–83.

---

[6] The Eastern Territory comprises Connecticut, Delaware, Maine, Massachusetts, New Hampshire, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, Vermont, Puerto Rico, the U.S. Virgin Islands, and certain counties in Kentucky. Doc. No. 38-1 ¶ 4.
[7] TSA also regards its Corps Community Centers as "churches." Doc. No. 281 ¶ 62.

Abstinence from alcohol and addictive substances is a core tenet of The Salvation Army's religious beliefs. Doc. No. 281 ¶ 16. TSA sincerely believes, as a matter of its religion, that long-term use of narcotics to treat addiction is not true rehabilitation, and that "abstinence and the power of God unto salvation is the only form of successful rehabilitation." Id. ¶¶ 17, 32.

TSA requires, as a condition of ARC participation, that beneficiaries abstain from alcohol and certain drugs. Id. ¶ 18. Beneficiaries must submit to urine drug testing when they apply for ARC admission and at regular intervals thereafter. Id. ¶ 77. Applicants with positive urine tests for a proscribed drug are generally required to "detox" before admission, although under some circumstances ARC policy permits such an applicant to be admitted if they have not used drugs for the prior forty-eight hours. Doc. No. 307 ¶ 9. ARCs are not licensed treatment facilities; they are overseen by religiously trained TSA personnel. Doc. No. 281 ¶¶ 14–15.

Most ARC beneficiaries have a substance-use disorder, and opioid-use disorder ("OUD") is prevalent among younger beneficiaries. Id. ¶ 57. OUD is a "chronic and complex brain disease marked by cognitive, behavioral, and physiological symptoms such as loss of control, cravings, and compulsive [opioid] use." Id. ¶ 36. Millions of people nationwide suffer from OUD. Id. ¶ 35. The disorder can lead to pain, suffering, worsening health, and death. Id. ¶ 38. In Massachusetts alone, there were 2,281 confirmed opioid-related overdose deaths in 2021. Doc. No. 143 ¶ 31 (Declaration of Dr. Claudia Rodriguez), cited in Doc. No. 281 ¶ 35.

The FDA has approved three medications for OUD ("MOUDs"): methadone, buprenorphine, and naltrexone. Doc. No. 281 ¶ 39. Methadone and buprenorphine are Schedule II and Schedule III drugs, respectively, under the Controlled Substances Act. Id. ¶¶ 23–24. Methadone and buprenorphine treat OUD by alleviating withdrawal symptoms, reducing cravings and the risk of overdose, and blocking the euphoric effects of opioids. Id. ¶ 42. These

two medications may cause a physical dependence in the user and can be abused—but, when used as prescribed, they do not cause "addiction" in the sense of "the compulsive seeking of the drug despite negative consequences." Doc. No. 143 ¶ 25, cited in Doc. No. 281 ¶ 45; see also Doc. No. 281 ¶¶ 28–29. By contrast, naltrexone is not a narcotic; it works by "blunt[ing] intoxicating effects of illicit opioids and reduc[ing] cravings," and its use requires abstinence from opioids, methadone, and buprenorphine for seven to fourteen days prior. Doc. No. 281 ¶¶ 26, 46–47. No single MOUD is effective for all individuals; treatment plans require individual medical decisions. Id. ¶ 48; see also Doc. No. 307 ¶¶ 13, 17. Use of MOUDs is the accepted standard of medical care for treating OUD, and ongoing MOUD treatment reduces the risk of relapse and overdose. Doc. No. 281 ¶¶ 40, 43.

TSA's Medication Policy limits ARC beneficiaries' use of certain medications in accordance with TSA's religious beliefs.[8] Id. ¶¶ 18–19; Doc. No. 307 ¶ 5. For hundreds of medications, the Medication Policy identifies the conditions for which each medication is typically used and categorizes each medication as "allowed," "caution," or "not typically allowed." See Doc. No. 141-16 (TSA ARC Medication Guide, revised September 8, 2022). Nearly one hundred medications are deemed "not typically allowed." Doc. No. 281 ¶ 19; Doc. No. 307 ¶ 3. Included among the "not typically allowed" medications are prescription drugs that are "known to be abusive and addictive." Doc. No. 281 ¶ 18; Doc. No. 307 ¶ 5. These categories are not absolute. The use of medications that are "not typically allowed" may be permitted on a case-by-case basis, and some drugs with the potential for abuse (such as

---

[8] Plaintiffs point out that the Medication Policy was informed by an older version of the Talbott Medical Guide, a secular resource. Doc. No. 307 ¶ 31. They do not dispute, however, that TSA's view of "abstinence" is its sincerely held religious belief. Doc. No. 281 ¶¶ 16–17.

gabapentin) or that are recognized as addictive (such as nicotine) are not banned.[9]  Doc. No. 281 ¶ 18 (Plaintiffs' response); id. ¶¶ 84–85; Doc. No. 307 ¶¶ 5–7, 10.  TSA generally prohibits ongoing use of narcotics, but some "short-term" and "temporary" use of prescription narcotics is permitted on a case-by-case basis.  Doc. No. 281 ¶¶ 30–31; see also id. (Plaintiffs' response) (noting that "short-term" and "temporary" are undefined durations); Doc. No. 307 ¶ 5.

Methadone and buprenorphine are among the medications "not typically allowed" at ARCs.  Doc. No. 281 ¶ 22.  Naltrexone use is permitted because the drug is not a narcotic and is not addictive.  Id. ¶ 26.  Individuals with OUD who use methadone and buprenorphine are not admitted to ARCs, and beneficiaries who test positive for either medication are subject to discharge.  Id. ¶¶ 71, 73, 75, 77.  People with OUD who use methadone or buprenorphine generally must "detox" before admission.  Id. ¶ 73; see also Doc. No. 307 ¶ 9.  However, on at least one occasion, TSA permitted a beneficiary to use methadone for pain management, Doc. No. 281 ¶ 78; Doc. No. 307 ¶ 6, and on at least one other occasion, an ARC allowed a beneficiary to use buprenorphine as MOUD "until TSA superiors learned and ended that practice," Doc. No. 307 ¶¶ 7, 26.

TSA operates other social-service programs, and in some of those programs, it permits— and even provides—buprenorphine and methadone to participants with OUD.  Doc. No. 281 ¶¶ 82–83; Doc. No. 307 ¶¶ 24, 35–37.  At TSA's Harbor Light Centers, for instance, TSA permits participants to use buprenorphine and methadone if those MOUDs are deemed medically appropriate for the participant and as consistent with state and federal guidelines.  Doc. No. 281 ¶ 83.  Harbor Light Centers include state-licensed halfway houses and certified "residential

---

[9] Nicotine is not listed in the Medication Policy, but the summary-judgment record shows that nicotine use by ARC beneficiaries is permitted.  Doc. No. 281 ¶ 84; Doc. No. 307 ¶ 29.

subacute detox" and "intensive outpatient treatment" facilities.  Doc. No. 308-1 at 7–10, 12, 19–20, 33–34 (Deposition of Rule 30(b)(6) Designee Arthur "Beau" Hill), cited in Doc. No. 307 ¶¶ 35–36.  These centers offer participants an array of services, including housing, counseling, employment, and educational services.  Id.  They also feature optional "spiritual-based programs" that are "available to every single person" in the Harbor Light Center.  Doc. No. 308-1 at 16–17, 34.  Unlike for ARC beneficiaries, participation in religious programming is not a requirement for Harbor Light participants.  Id. at 17, 34.

TSA has stipulated, for purposes of "conserving the [p]arties' resources and limiting the discovery burden," that it receives federal financial assistance, is principally engaged in the business of providing social services, and voluntarily and knowingly consented to the conditions of federal financial assistance.  Doc. No. 133.  ARCs do not directly receive federal funding, but they consistently operate at a deficit and are subsidized by TSA's other funds.  Doc. No. 281 ¶ 33.  Overall, TSA has approximately $1 billion in annual support and revenues.  Id. ¶ 49.

The named plaintiffs are individuals with OUD who use methadone and/or buprenorphine and were told they could not participate in an ARC because they used those medications.  Id. ¶ 94.  They were not offered accommodations.  Id.  TSA's denial of ARC housing and services caused serious harm to each named plaintiff.  Id. ¶ 95.  Each named plaintiff would be eligible for ARC admission but for their use of proscribed MOUD.  Id. ¶ 96.

### B.    Procedural Posture

The operative complaint is the second amended complaint, filed on August 22, 2022.  Doc. No. 83.  It alleges that TSA's Medication Policy violates Section 504 of the Rehabilitation

Act and the Fair Housing Act ("FHA").[10]  Id.  Plaintiffs moved for a preliminary injunction and

for provisional class certification, which the Court denied.  Doc. No. 218.  After discovery,

Plaintiffs moved to certify three classes.  Doc. No. 230.

The Court allowed the motion in part and certified three classes: (1) a Rule 23(b)(2)

injunctive-relief class asserting claims under both Section 504 and the FHA; (2) a Rule 23(b)(3)

damages class asserting claims under Section 504; and (3) a Rule 23(b)(3) damages class

asserting claims under the FHA.  Doc. No. 265 at 45–46.  The Injunction Class seeks an order

requiring TSA to, among other things, change "its policies to permit participants in ARC

programs . . . to participate in [medication-assisted treatment], if prescribed by a physician, and

to meet with and/or contact a physician concerning such prescription at any time during such

participation."  Doc. No. 83 at 48.  As certified, the Injunction Class is defined as follows:

> All individuals with opioid use disorder (OUD) who, in accordance with a
> healthcare provider's treatment plan, take any form of prescribed FDA approved
> methadone or buprenorphine medication for opioid use disorder, including
> Suboxone and Sublocade ("MOUD"), who are participating or seek to participate
> in any of Defendant The Salvation Army, a New York Corporation's Adult
> Rehabilitation Center (ARC) housing or services, and who are otherwise qualified
> for such housing or services.

Doc. No. 265 at 45.  Tassinari and Almeida are the class representatives.  Id. at 46.  The Court

also bifurcated the proceedings, staying litigation of the Damages Classes until after disposition

of the Injunction Class.  Id.; see also Doc. No. 272.

Now, TSA moves for summary judgment on the Injunction Class's claims.[11]  Doc. No.

297.  Initially, TSA argued that—even assuming its Medication Policy violates Section 504 or

---

[10] Although the second amended complaint includes a claim under the Americans with
Disabilities Act ("ADA"), the Court had previously ruled that TSA, as a religious organization,
qualified for the ADA's statutory exemption.  Doc. No. 72 at 21.
[11] TSA styles its motion as a motion for summary judgment as to all claims.  Doc. No. 297.  The
parties previously agreed that an order granting summary judgment for TSA would bind the
named plaintiffs and members of the Injunction Class but would not bind members of the

the FHA—it is entitled to judgment as a matter of law on its First Amendment defenses.  Doc.

Nos. 274, 275.  The parties fully briefed TSA's First Amendment defenses.  Doc. Nos. 275, 280,

288.  After considering the parties' briefing and holding a hearing, Doc. No. 293, and in light of

the prudential principle of constitutional avoidance, the Court directed the parties to file

supplemental briefing addressing the merits of Plaintiffs' statutory claims, Doc. No. 294 (citing

Ashwander v. TVA, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring)).  TSA filed a second

motion for summary judgment, arguing it is entitled to judgment as a matter of law on the merits

of Plaintiffs' statutory claims while also incorporating its prior constitutional arguments.  Doc.

No. 297.  The statutory issues are now fully briefed, Doc. Nos. 298, 306, 312, 315, and the Court

held another hearing on June 30, 2026, Doc. No. 320.  With the benefit of a fulsome exposition

of the statutory and constitutional issues in this case, the Court now resolves TSA's motion for

summary judgment.

## II.    LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  Once a party "has properly supported its motion for summary judgment, the

burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his

pleading, but must set forth specific facts showing there is a genuine issue for trial.'"  Barbour v.

Dynamics Rsch. Corp., 63 F.3d 32, 37 (1st Cir. 1995) (quoting Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 256 (1986)).  The Court is "obliged to []view the record in the light most favorable

to the nonmoving party"—here, Plaintiffs—"and to draw all reasonable inferences in the

---

Damages Classes absent notice and an opportunity to opt out, which they have not yet been
afforded.  Doc. No. 273.  The Court therefore construes the summary-judgment motion as
limited to the Injunction Class.

nonmoving party's favor." <u>LeBlanc</u>, 6 F.3d at 841.  Even so, the Court is to ignore "conclusory allegations, improbable inferences, and unsupported speculation." <u>Prescott v. Higgins</u>, 538 F.3d 32, 39 (1st Cir. 2008) (citation modified).  A court may enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

 III.   <u>DISCUSSION</u>

TSA advances several related affirmative defenses rooted in the First Amendment—most centrally, that its restriction on beneficiaries' use of narcotics to treat OUD is shielded from judicial scrutiny by the church-autonomy doctrine.  <u>See</u> Doc. No. 275.

The principle of constitutional avoidance directs courts to consider whether a case may be decided on statutory grounds before reaching constitutional questions.  <u>See</u> <u>Ashwander</u>, 297 U.S. at 347 (Brandeis, J., concurring); <u>Bond v. United States</u>, 572 U.S. 844, 855 (2014); <u>United States v. Vilches-Navarrete</u>, 523 F.3d 1, 9 n.6 (1st Cir. 2008).  This important rule is a prudential restraint on the exercise of judicial power.  <u>See, e.g.</u>, <u>Landor v. La. Dep't of Corr. & Pub. Safety</u>, No. 23-1197, 2026 WL 191277, at *4 n.1 (U.S. June 23, 2026).  For this reason, the Court ordered supplemental briefing regarding the merits of the statutory claims and defenses before resolving TSA's constitutional affirmative defenses.  Doc. No. 294.

In some circumstances, however, prudence and judicial restraint call for a different course.  <u>See, e.g.</u>, <u>Landor</u>, 2026 WL 191277, at *4 n.1; <u>Billard v. Charlotte Cath. High Sch.</u>, 101 F.4th 316, 327–29 (4th Cir. 2024).  Here, avoiding TSA's constitutional defenses would require adopting its statutory defenses, either under the Religious Freedom Restoration Act or as to the merits of Plaintiffs' Section 504 and FHA claims—a path that could sweep much wider than the narrow and straightforward constitutional issue does.  <u>Billard</u>, 101 F.4th at 327–28.  And,

importantly, reaching the statutory merits first would, in this case, undermine the protection the First Amendment provides matters of religious faith and doctrine.  See id. at 328–29 ("[W]hile avoiding the ministerial exception would do little to advance the purposes of the Ashwander doctrine, it would do much to undermine those of the ministerial exception itself.").  Here, "swerving around the [church-autonomy doctrine] would veer [the court] too close to the very interests that the First Amendment protects."  Id. (citation modified).

The Court's analysis therefore begins and ends with TSA's assertion of the church-autonomy doctrine as an affirmative defense.

A.    Church-Autonomy Doctrine

TSA's primary argument is that the church-autonomy doctrine shields its Medication Policy from government regulation and judicial scrutiny.  Doc. No. 275 at 11–17.  Specifically, TSA argues it is entitled to summary judgment because adjudication of this case involves matters of "faith and doctrine" that the First Amendment places beyond the ken of civil courts.  Id. at 16. The undisputed facts establish that ARCs are residential churches with an evangelical mission in which Salvationist doctrine—including the prohibition on use of narcotics as MOUDs— determines the message TSA preaches and the rules by which beneficiaries must abide.  The relief the Injunction Class Plaintiffs seek would require the Court to evaluate and potentially invalidate TSA's religious doctrine.  The First Amendment bars the Court's interference in the challenged portions of TSA's Medication Policy, and TSA is entitled to summary judgment.

The First Amendment's Religion Clauses provide: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."  U.S. Const. amend. I.  "The First Amendment protects the right of religious institutions 'to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'"  Our Lady of Guadalupe Sch. v. Morrissey-Berru, 591 U.S. 732, 736 (2020)

11

(quoting Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am., 344 U.S. 94, 116 (1952)).

Government intrusion into matters "of faith and doctrine" would both "obviously violate the free exercise of religion" and "constitute one of the central attributes of an establishment of religion." Id. at 746. This "general principle of church autonomy" includes (but is not limited to[12]) the independence of religious institutions from government interference in "internal management decisions that are essential to the institution's central mission." Id. at 746–47. In short, the government cannot tell a religious institution what it must believe or whom it may "choose [to] guide it on its way." Hosanna-Tabor Evangelical Lutheran Church v. EEOC, 565 U.S. 171, 196 (2012).

Of course, the First Amendment's protection of a zone of "church autonomy" is not boundless. The doctrine "does not mean that religious institutions enjoy a general immunity from secular laws." Our Lady of Guadalupe Sch., 591 U.S. at 746; cf. Belya v. Kapral, 45 F.4th 621, 630 (2d Cir. 2022) ("[S]imply having a religious association on one side of the 'v' does not automatically mean a district court must dismiss the case or limit discovery."). The Court need not endeavor to identify the precise outer limit of the church-autonomy doctrine, however, because wherever it is, TSA's ARC Medication Policy falls within it.[13]

---

[12] Plaintiffs argue that the church-autonomy doctrine has no bearing here because this case does not involve the "ministerial exception" recognized in cases like Our Lady of Guadalupe. Doc. No. 280 at 20–21. True enough, this is not a ministerial-exception case. But binding precedent makes clear that the ministerial exception is but one manifestation of the "general principle of church autonomy" in matters of "faith and doctrine and in closely linked matters of internal government." Our Lady of Guadalupe Sch., 591 U.S. at 747 (citing Watson v. Jones, 80 U.S. (13 Wall.) 679 (1872); Kedroff, 344 U.S. 94; Serbian E. Orthodox Diocese for U.S. & Can. v. Milivojevich, 426 U.S. 696 (1976)).

[13] At various points in its briefing and at oral argument, TSA seems to argue for an even-more-sweeping view of the church-autonomy doctrine—one that considers unconstitutional any government regulation that burdens, to any degree, a religious organization's exercise of its

The undisputed facts establish that TSA regards ARCs as residential churches whose highest priority is to "bring the beneficiaries into a personal relationship with God."  Doc. No. 281 ¶¶ 5, 9, 10.  The facts describe a lengthy evangelist program, running six to twelve months, aimed at rehabilitation through spiritual healing—essentially, a religious conversion program that requires beneficiaries to practice Salvationism.  See, e.g., id. ¶¶ 11–13, 58–59.  In both the daily and weekly religious activities and through the conditions under which beneficiaries agree to live, TSA imparts its Salvationist beliefs on the ARC beneficiaries.  While TSA in no way demands conversion as a condition of participation, it does require beneficiaries to live as Salvationists while residing in its residential churches.  Indeed, as counsel for TSA aptly put it at oral argument, the record shows that the service ARCs provide is "proselytization."

TSA's rehabilitation-through-conversion program requires beneficiaries to both engage in Salvationist practices—weekly chapel services and Bible studies, biweekly spiritual counseling, and daily devotions—and adhere to Salvationist rules—including the Medication Policy's

---

religious practice.  See, e.g., Doc. No. 275 at 16 (arguing that "[b]ecause the Religion Clauses preclude the government (including the courts) from opining on church doctrine, determining the parameters of what is doctrine, and interfering with the free exercise of that doctrine, it follows that Plaintiffs' discrimination claims under the Rehabilitation Act and the FHA are precluded on church autonomy grounds" (emphasis added)).  Such a broad understanding of the doctrine would swallow the whole of First Amendment law as it relates to religious organizations.  TSA cites no binding precedent embracing such a sweeping view.  Instead, the cases illustrate that the constitutionality of a rule or regulation that burdens religious exercise is readily capable of adjudication by civil courts.  See, e.g., Fulton v. City of Philadelphia, 593 U.S. 522, 532–33 (2021) ("[I]t is plain that the City's actions have burdened [Catholic Social Services'] religious exercise by putting it to the choice of curtailing its mission or approving relationships inconsistent with its beliefs. . . . [The court's] task is to decide whether the burden the City has placed on the religious exercise of CSS is constitutionally permissible."); see also Emp. Div., Dep't of Hum. Res. v. Smith, 494 U.S. 872 (1990).  As noted above, sincere religious beliefs do not grant an individual or entity "general immunity from secular laws."  Our Lady of Guadalupe Sch., 591 U.S. at 746.  Because the Court concludes that TSA's restriction on the use of narcotics as MOUD within its residential churches is a matter of doctrine that falls squarely within the well-established church-autonomy doctrine, it need not and does not go further to resolve this case.

prohibition on use of narcotic MOUDs. Id. ¶¶ 11–13, 16–18. TSA sincerely believes, as a core tenet of Salvationist doctrine, that "abstinence and the power of God unto salvation" is the "only form of successful rehabilitation," and that the long-term use of narcotics—including methadone and buprenorphine—to treat addiction is not true rehabilitation. Id. ¶¶ 16, 17, 32. TSA requires beneficiaries to abide by Salvationist understanding of "abstinence" and true rehabilitation while living in its residential church. Id. ¶ 18, 22, 32. TSA's rules for ARC beneficiaries' abstinence (including its ban on narcotic MOUDs) are also part of the way TSA communicates Salvationism's beliefs to beneficiaries. The method is the message.

Plaintiffs seek a declaration that TSA's enforcement of an aspect of its religious doctrine (that is, its "abstinence"-based prohibition on the use of narcotic MOUDs) within its residential churches is unlawful, as well as a Court order directing TSA to adopt and implement a policy, within these houses of worship, that is contrary to its religious beliefs. The Court can no sooner order TSA to abandon its Salvationist understanding of "abstinence" than it can order an Orthodox Jewish synagogue not to separate its congregants by sex. Cf., e.g., Solomon v. Congregation Tiffereth Israel of Revere, 183 N.E.2d 492, 492–93 (Mass. 1962) (affirming dismissal of suit brought by members of Orthodox Jewish synagogue challenging adoption of mixed-sex seating as an exclusively ecclesiastical matter). The First Amendment proscribes this governmental interference in matters of religious institutions' "faith and doctrine." Our Lady of Guadalupe Sch., 591 U.S. at 736 (quoting Kedroff, 344 U.S. at 116).

At the motion-to-dismiss stage, TSA argued that the Court lacked subject-matter jurisdiction over this dispute under the church-autonomy doctrine—an argument the Court rejected. Doc. No. 72 at 3–5. The Supreme Court has explained that the ministerial exception (one component of the church-autonomy doctrine) is not a jurisdictional bar to suit but an

14

affirmative defense to the merits. Hosanna-Tabor, 565 U.S. at 195 n.4. TSA did not show that the Court lacked power to hear this case as a jurisdictional matter. Doc. No. 72 at 3–5. And at the pleadings stage, it was at least plausible that evaluating Plaintiffs' disability discrimination claims would not require the Court to "weigh in on religious views" or "apply church doctrine." Id. at 4. The First Amendment analysis would take a different shape if, for example, Plaintiffs challenged a policy implemented at a religiously motivated social-services program operated by TSA. See, e.g., Fulton, 593 U.S. at 532–33 (evaluating "whether the burden the City has placed on the religious exercise of [Catholic Social Services] is constitutionally permissible").

But the summary-judgment record compels a different conclusion on the merits of TSA's affirmative defense. It is now undisputed that ARCs are TSA's residential churches, and that their mission is to bring beneficiaries into a closer relationship with God. TSA aims to achieve this mission by requiring ARC beneficiaries to live as Salvationists, even if they are not (or not yet) believers. It hopes that, through "abstinence and the power of God unto salvation," beneficiaries will successfully rehabilitate—and will live the good life, as Salvationists understand it. Doc. No. 281 ¶ 17. On this record, it is not a fair inference to characterize the ARCs as merely a housing program backed by a religious institution or even a treatment program staffed by people motivated by their religious beliefs. (The record shows that TSA runs such programs—but ARCs occupy a unique, evangelical and nonmedical position within TSA's programming.) On this record, Plaintiffs challenge the doctrinal substance of TSA's evangelical message of "abstinence" and the rules of conduct it enforces in its houses of worship. In this setting, the First Amendment shields TSA's religious doctrine from this governmental interference.

15

Plaintiffs assert that the Medication Policy reflects a flawed, outdated understanding of "addiction" and is internally inconsistent, permitting beneficiaries to use some substances with the potential for abuse or addiction while prohibiting prescribed MOUD.  Doc. No. 281 ¶¶ 45, 80, 84–85; see also Doc. No. 306 at 10–11, 16–17.  They note TSA permits or provides methadone and buprenorphine as MOUD in some of its other social-service programs, and they hold up that fact as evidence both that nonbelievers' use of those medications does not violate TSA's sincerely held religious beliefs and that TSA could, as a practical matter, permit beneficiaries to safely use these medications.  Doc. No. 281 ¶¶ 82–83, 86, 90–93; see also Doc. No. 306 at 18–19, 21–22.

On the facts of this case, these contentions miss the mark.  The Salvation Army—not the Court—determines Salvationist doctrine.  That TSA drew some aspects of its Medication Policy from a secular source does not render its policy nonreligious.  Indeed, from a lay perspective, any number of religious rules or doctrines can be viewed as arbitrary, inconsistent, or irrational—but these rules or doctrines are matters of faith, not susceptible to civil adjudication under our Constitution.  The Court may not and does not evaluate the correctness, internal consistency, or centrality of TSA's religious beliefs.  See Hernandez v. Comm'r of Internal Revenue, 490 U.S. 680, 699 (1989) ("It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds."); cf. Thomas v. Rev. Bd. of Ind. Emp. Sec. Div., 450 U.S. 707, 716 (1981) ("Courts are not arbiters of scriptural interpretation.").  The "abstinence" rule is part and parcel of TSA's evangelist efforts to bring ARC beneficiaries into a "personal relationship with God." Doc. No. 281 ¶ 9.  Judicial scrutiny of this church doctrine is precluded by the First Amendment.

16

Of course, many beneficiaries very well may participate in ARCs for food and shelter without interest in becoming Salvationists themselves.[14]  These individuals may view ARCs as Plaintiffs' counsel views them—as simply a housing or social-service program run by religiously motivated individuals.  But the undisputed facts in this litigation show that, in fact, ARCs are houses of worship where Salvationists both practice their religion and evangelize beneficiaries— and that the ban on use of narcotics as MOUDs is a matter of church doctrine.  That, elsewhere, TSA runs registered treatment programs that permit or even distribute narcotic MOUDs in no way undermines the religious beliefs at issue in this case.  Instead, it casts the ARCs in sharp relief: while TSA's religious beliefs motivate its treatment programs, its doctrine permeates its evangelical residential churches.  The First Amendment gives some protection to all these practices, but the church-autonomy doctrine shields the latter from government interference or entanglement.  In this case, that distinction is determinative.

Because Plaintiffs' claim for injunctive relief would require the Court to evaluate (and potentially invalidate) TSA's religious doctrine, the First Amendment forecloses Plaintiffs' claims, and summary judgment for TSA is required.

B.   Waiver

Plaintiffs argue that TSA waived its constitutional defenses to their Section 504 claims by accepting federal funds and through its stipulation in this case.[15]  Doc. No. 280 at 15–20.  This

---

[14] Plaintiffs note that about a third of ARC beneficiaries are required by courts to live in ARCs as a condition of their probation or parole.  Doc. No. 281 ¶ 55.  This case does not require the Court to determine the legality of judicial orders requiring persons to participate in a residential evangelizing program.  The Court assumes that, to the extent The Salvation Army describes ARCs to courts considering such orders, it does so consistent with the factual record in this case.

[15] TSA stipulated that TSA "receives federal financial assistance, including grant funding, loans, and other assistance from the federal government," is "principally engaged in the business of providing social services," and "voluntarily and knowingly consented to the conditions of federal financial assistance received, including by providing written assurances of compliance with

argument misconceives the nature of the church-autonomy doctrine and the First Amendment rights at issue.

As the Supreme Court has explained, the "Religion Clauses <u>bar</u> the government from interfering" with certain matters of religious faith and doctrine.  <u>Hosanna-Tabor</u>, 565 U.S. at 181, 185–89 (emphasis added).  In this way, the First Amendment not only protects the rights of individuals and organizations but structures the relations of church and state.  <u>See</u> <u>Billard</u>, 101 F.4th at 325–26.  The church-autonomy doctrine limits governmental authority, placing matters of "faith and doctrine" beyond the ken of civil courts.  <u>Id.</u>  Indeed, some courts have determined that, due to its structural nature, the ministerial exception—one instantiation of the church-autonomy doctrine—is categorically non-waivable.  <u>See, e.g.</u>, <u>Conlon v. InterVarsity Christian Fellowship</u>, 777 F.3d 829, 836 (6th Cir. 2015).

The Court need not conclude that a church-autonomy defense is non-waivable to conclude it was not waived here.  To the extent TSA may waive its church-autonomy defense (something the Court assumes without deciding), such a waiver must be knowing and voluntary. <u>See, e.g.</u>, <u>Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31</u>, 585 U.S. 878, 930 (2018) (holding that waiver of First Amendment rights "must be freely given and shown by clear and compelling evidence" and may not be presumed (citation modified)); <u>Johnson v. Zerbst</u>, 304 U.S. 458, 464 (1938) ("Courts indulge every reasonable presumption against waiver of fundamental constitutional rights . . . [and] a waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege." (citation modified)).  A generic agreement to abide by all terms of federal funding does not sufficiently put TSA on notice that, by accepting federal

---

Section 504 . . . to the extent required by the terms of the federal financial assistance and by law."  Doc. No. 133.

funds, it waived its fundamental constitutional right to determine matters of faith and doctrine free from governmental interference.  See Petruska v. Gannon Univ., 462 F.3d 294, 309 (3d Cir. 2006) (concluding university did not waive ministerial exception by "representing itself as an 'equal opportunity employer' or by accepting federal and state funds").

Of course, "Congress has broad power under the Spending Clause of the Constitution to set the terms on which it disburses federal funds."  Cummings v. Premier Rehab Keller, P.L.L.C., 596 U.S. 212, 216 (2022).  "[L]egislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the [recipients] agree to comply with federally imposed conditions."  Id. (alterations in original) (quoting Pennhurst St. Sch. & Hosp. v. Halderman, 451 U.S. 1, 17 (1981)).  The Rehabilitation Act, barring disability discrimination by funding recipients, is one such statute.  Id. at 217–18.

"Just as a valid contract requires offer and acceptance of its terms, the legitimacy of Congress' power to legislate under the spending power rests on whether the recipient voluntarily and knowingly accepts the terms of the 'contract.'"  Barnes v. Gorman, 536 U.S. 181, 186 (2002) (citation modified).  "Recipients cannot knowingly accept the deal with the Federal Government unless they would clearly understand the obligations that would come along with doing so."  Cummings, 596 U.S. at 219 (citation modified).  Courts therefore "construe the reach of Spending Clause conditions with an eye toward ensuring that the receiving entity of federal funds had notice that it will be liable."  Id. (citation modified); see also Landor, 2026 WL 191277, at *6 (emphasizing importance of consent by recipient to enforceability of conditions within Spending Clause legislation).

TSA has stipulated that it "voluntarily and knowingly consented to the conditions of federal financial assistance received, including by providing written assurances of compliance

19

with Section 504 . . . to the extent required by the terms of the federal financial assistance and by law." Doc. No. 133. And the record shows that, within TSA's social-service and treatment programs, like its Harbor Light Centers, TSA permits or provides MOUDs as required by government regulation. Doc. No. 281 ¶ 83.

But there is no indication—let alone clear and compelling evidence, see Janus, 585 U.S. at 930—that TSA knowingly agreed, as a condition of receiving federal funds, to waive First Amendment protection for its religious doctrine, its evangelical messaging, and the terms of its operation of its residential churches. On this record, TSA did not waive its church-autonomy doctrine defense, either when it received federal funds or in its stipulation in this litigation.

IV.    CONCLUSION

For the reasons stated above, TSA's motion for summary judgment (Doc. No. 297) is ALLOWED as to the Injunction Class. By July 20, 2026, the parties shall file a joint status report setting out their joint or separate positions as to how the Court should proceed with respect to the Damages Classes.

SO ORDERED.

 /s/ Leo T. Sorokin
United States District Judge

20